## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Civ. Case No. _____

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| INNOVATIVE PARTNERS, LP, also doing business as INNOVATIVE HEALTH PLAN or HEALTHCARE PLAN, a Texas limited partnership; | ) ) ) ) |
| | ) |
| AMERICAN COLLECTIVE, LP, also doing business as ACLP HEALTH PLAN, a Texas limited partnership; | ) ) ) |
| | ) |
| HEALTH PLAN ADMINISTRATORS, LLC, a Georgia limited liability company; | ) ) |
| | ) |
| PAPYRUS GREEN INVESTMENTS LLC, a Delaware limited liability company; | ) ) |
| | ) |
| AHMED IBRAHIM SHOKRY, individually, and as an owner, officer, director, member, manager, and/or partner of INNOVATIVE PARTNERS, LP; AMERICAN COLLECTIVE, LP; and PAPYRUS GREEN INVESTMENTS LLC; and | ) ) ) ) ) |
| | ) |
| AMANI IBRAHIM SHOKRY, individually, and as an owner, officer, director, member, manager, and/or partner of INNOVATIVE PARTNERS, LP, | ) ) ) |
| | ) |
| Defendants. | ) ) |

**FILED BY\_\_\_\_ABM\_\_\_\_D.C.**

**Apr 7, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

[FILED UNDER SEAL]

## COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

1

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, the Rule on Impersonation of Government and Businesses ("Impersonation Rule"), 16 C.F.R. Part 461, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801–6809, §§ 6821–6827. Defendants' violations stem from their unfair and deceptive marketing and sale of healthcare-related products. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction, monetary relief, and other relief, including an asset freeze, the appointment of a receiver, and immediate access to Defendants' business premises, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108, the Impersonation Rule, 16 C.F.R. Part 461, and Section 521 of the GLB Act, 15 U.S.C. § 6821.

## SUMMARY OF THE CASE

2. Defendants operate a nationwide telemarketing scheme to defraud both consumers seeking health insurance and consumers who already have health insurance coverage and are not looking to change policies. Defendants' telemarketers deceive consumers seeking health insurance by impersonating state and federal health insurance marketplaces, government agencies, and insurance carriers and then falsely marketing Defendants' healthcare-related products as offering comprehensive health insurance benefits. During sales calls, telemarketers pitch purported comprehensive health insurance by falsely promising consumers a Preferred Provider Organization ("PPO") policy with a $0 deductible that will cover doctor appointments, inpatient and emergency care, and prescription medications for nominal co-pays. In many

instances, scripts direct Defendants' telemarketers to describe the plans as "state issued" or "state private" plans, furthering the false impression that Defendants are affiliated with the government. Defendants' telemarketers employ even more brazen tactics when targeting already-insured consumers, including impersonating consumers' existing carriers and falsely claiming that the consumers' existing policies have been or will be canceled unless the consumers pay money immediately.

3. The products Defendants deceptively pitch to insurance-seeking consumers—or enroll already-insured consumers in without their knowledge—are not, in fact, PPO policies and do not provide comprehensive health insurance benefits. Defendants charge consumers monthly "premiums" like insurance companies charge for comprehensive health insurance plans, but Defendants' products are very different. Unlike insurance companies, Defendants do not cap consumers' out-of-pocket expenses or otherwise shield them from potentially catastrophic financial loss. Instead, Defendants' products purport to offer (1) unspecified discounts on medical care within certain provider networks; and (2) fixed, limited payouts for a narrow menu of healthcare issues and expenses, such as $150 towards the cost of an ambulance trip or $200 for an emergency room visit—services that can cost consumers thousands of dollars. Consumers must bear any remaining costs, and the risk of runaway medical bills, on their own. Moreover, in many instances, Defendants do not even provide the limited discounts or payouts their policy documents promise.

4. When consumers who have enrolled in Defendants' purported PPO policies attempt to use them at doctors' offices, pharmacies, or hospitals, they often discover that the products do not provide the comprehensive benefits they were promised. As a result, some consumers are forced to postpone or forgo care until they can get the coverage from an insurance

3

carrier that they thought they had paid for. Others have no choice but to proceed with the care they need, requiring them to take on substantial medical debt. Still others do not learn that they have no coverage until after the fact, when they receive medical bills for hundreds or thousands of dollars.

5.      When frustrated consumers attempt to cancel their purchases of Defendants' products, Defendants often ignore these requests. Because Defendants' plans auto-renew monthly, many consumers resort to canceling their payment cards to stop the recurring charges.

6.      Since 2023, Defendants have collected more than $91 million from their unlawful healthcare scheme, and their law violations continue.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

9.      The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108, as amended. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, as amended, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce. The FTC also enforces the Impersonation Rule, 16 C.F.R. Part 461, which prohibits the

4

impersonation of the government and businesses, and Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation" "to obtain or attempt to obtain" from a customer "customer information of a financial institution."

## DEFENDANTS

### Corporate Defendants

10.    Defendant **Innovative Partners, LP** ("Innovative Partners"), also doing business as Innovative Health Plan or Healthcare Plan, is a Texas limited partnership with its principal place of business at 1401 North University Drive, Suite 207, Coral Springs, Florida 33071. Innovative Partners transacts or has transacted business in this District and throughout the United States. Since at least April of 2023, acting alone or in concert with others, Innovative Partners has advertised, marketed, distributed, or sold healthcare-related products to consumers throughout the United States.

11.    Defendant **American Collective, LP** ("American Collective"), also doing business as ACLP Health Plan, is a Texas limited partnership with a Florida registered address at 7901 4th Street N, Suite 300, St. Petersburg, Florida 33702. American Collective transacts or has transacted business in this District and throughout the United States. Since at least 2025, acting alone or in concert with others, American Collective has advertised, marketed, distributed, or sold healthcare-related products to consumers throughout the United States.

12.    Defendant **Health Plan Administrators, LLC** ("Health Plan Administrators"), is a Georgia limited liability company with its principal place of business at 5379 Lyons Rd., #785, Coconut Creek, Florida 33073 and its corporate mailing address at 21264 Via Eden, Boca Raton, Florida 33433. Health Plan Administrators transacts or has transacted business in this District

and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Health Plan Administrators has advertised, marketed, distributed, or sold healthcare-related products to consumers throughout the United States.

13. Defendant **Papyrus Green Investments LLC** ("Papyrus Green Investments") is a Delaware limited liability company with its principal place of business at 21264 Via Eden, Boca Raton, Florida 33433. Papyrus Green Investments transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Papyrus Green Investments has advertised, marketed, distributed, or sold healthcare-related products to consumers throughout the United States.

### Individual Defendants

14. Defendant **Ahmed Ibrahim Shokry** ("Ahmed") is the controlling principal and 100% owner of Innovative Partners, the CEO and an owner of American Collective, and the manager and sole member of Papyrus Green Investments. At all times relevant to this Complaint, acting alone or in concert with others, Ahmed has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Corporate Defendant, including the acts and practices described in this Complaint. Payment processing records identify Ahmed as Innovative Partners' "Director," 100% owner, and "Responsible Individual," and he exercises significant control over the enterprise's operations. He is the company's chief architect and ultimate decisionmaker, with authority to recruit, hire, and fire executives, customer service and retention agents, and telemarketing companies. Ahmed has installed others—including his sister, Defendant Amani Ibrahim Shokry—to serve as corporate officers and oversee the operation's customer service call center, and those individuals answer to Ahmed. He knows that telemarketers systematically misrepresent Defendants' products to make sales—conduct he

furthers. For example, he has received repeated warnings about Innovative Partners' consistently high fraud-to-sales ratio from at least one of the company's merchant processors, and is the sole principal listed on documents the company has submitted in response to such warnings acknowledging that the high volume of dispute activity was due in part to consumers' "perception that the health plans had greater coverages than listed." Ahmed has routinely visited corporate headquarters to show the business to potential investors, to talk to team leaders and call center agents, and to look at financial records. He also manages Defendants' finances and is responsible for a substantial proportion of their spending. As one of four authorized users of Innovative Partners' corporate credit card, for example, Ahmed has made monthly six-figure purchases from lead generation companies as well as significant outlays for personal and travel expenses—spending that dwarfs that of the other cardholders. And he has funneled millions in corporate funds to his shell company, Papyrus Green Investments, which he uses as a personal slush fund. Ahmed resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.     Ahmed's sister, Defendant **Amani Ibrahim Shokry** ("Amani"), has served as the Chief Technology Officer of Innovative Partners. At all times relevant to this Complaint, acting alone or in concert with others, Amani has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Among other duties, Amani has overseen Innovative Partners' customer service call center in Coral Springs, Florida, where she has maintained an office and regular presence. Innovative Partners' customer service agents frequently field calls from angry consumers complaining that Innovative Partners' products were falsely marketed to them as comprehensive health insurance and requesting cancellation of their product subscriptions and refunds of their premiums. Amani has issued

7

directives regarding how agents should field such requests, including by instructing agents to say whatever they need to prevent consumers from canceling within the first 30 days. She is a signatory on a Health Plan Administrators account and Innovative Partners' many corporate bank accounts, and has regularly overseen large corporate expenditures, including payments to Innovative Partners' many telemarketing companies. She has also exercised control over those telemarketing companies, including by acting to terminate Innovative Partners' contracts with them when Defendants deem it advantageous to do so. Like Ahmed, Amani is an authorized user of Innovative Partners' corporate credit card, which she uses to fund a mixture of business and personal expenses. Amani resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMON ENTERPRISE**

16.     Defendants Innovative Partners, American Collective, Health Plan Administrators, and Papyrus Green Investments (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, and office locations, and that commingled funds. Health Plan Administrators and Papyrus Green Investments are shell companies that Ahmed and his associates use primarily to warehouse proceeds from the deceptive sale of Defendants' products, as well as to pay occasional business and personal expenses. Ahmed is the sole signatory on Papyrus Green Investments' bank account, while the Shokry siblings and their mother are signatories on Health Plan Administrators' bank account. Both companies claim the same single-family residence in Boca Raton—which the Shokrys' parents own and which has served as

Ahmed and Amani's principal residence at various points—as their corporate mailing address. Innovative Partners has claimed this same address as its mailing address, including on certified documents filed with the United States Department of Labor. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

17.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

18.     Since at least 2023, Defendants have deceptively telemarketed healthcare-related products to consumers nationwide by misrepresenting them as offering comprehensive health insurance benefits. Defendants often attract consumers by having their agents impersonate state health insurance marketplaces, government agencies, and insurance carriers. They target both consumers who are actively seeking health insurance coverage and consumers who are already insured and not looking to switch policies, using different deceptive sales scripts and strategies for each.

19.     Consumers seeking health insurance often reach Defendants through online lead generation websites that mimic federal or state insurance marketplaces but in fact connect consumers to telemarketers working for companies like Innovative Partners, which does not sell marketplace plans. Consumers who are already insured and are simply trying to find their current carrier's contact information also sometimes get routed to Defendants' telemarketers through

9

deceptive lead generation websites, which can show up as sponsored links in online searches for prominent health insurance companies. Some insured consumers also report receiving text messages or letters falsely stating that their existing insurance coverage has been or will shortly be canceled and providing a number to call to resolve the issue, which connects them to a telemarketer working for Defendants.

20.     At the core of Defendants' sales strategy, regardless of whom they target or what script their agents use, is a fundamental misrepresentation of what they sell. Comprehensive health insurance caps consumers' risk by shifting responsibility for significant future financial losses from the insured to the insurer: in exchange for monthly premiums, health insurance companies agree to assume responsibility for significant portions of the policyholder's potential medical expenses. Comprehensive plans sold through the federal or state marketplaces or directly by private insurers are required to have an out-of-pocket maximum that limits what enrollees might have to spend on healthcare, while Medicaid plans typically require enrollees to pay very little or nothing for covered services. For example, in 2025, marketplace plan enrollees with incomes between 100% and 250% of the poverty line had an out-of-pocket maximum of $3,050; any expenses beyond that were required to be borne entirely by the insurance company. Marketplace and similar plans also must cover ten categories of services defined by federal law as essential health benefits, starting as soon as the policy becomes effective and regardless of any pre-existing health conditions the consumer might have.

21.     Defendants' plans are not, and do not provide benefits commensurate with, comprehensive health insurance. (Indeed, in post-sale communications, Defendants themselves deny selling "insurance" of any kind, and have characterized their product as a "self-funded employee health benefit plan" that is "not designed to be a major medical policy/plan" or to

10

"replace a major medical policy.") Instead, Defendants and their agents typically enroll consumers in a hodgepodge of healthcare-related products. A standard Innovative Partners or American Collective plan purportedly includes discounts from healthcare providers on certain services, limited payouts for specified medical expenses, and various ancillary products. None of these products, singly or in combination with one another, provide benefits akin to comprehensive health insurance, as promised. None place an upper limit on a consumer's potential liability for medical expenses. Nearly all of the products' benefits are subject to strict caps, meaning consumers often pay far more in annual premiums than they could ever reasonably expect to receive in payouts from the plan.

22. Defendants report netting thousands of sales of their products per month, and they have deceived tens of thousands of consumers in total.

**Deceptive and Unfair Telemarketing Sales to Consumers Seeking Health Insurance**

*Insurance Lead Purchases*

23. Many consumers come across Defendants' scheme while researching health insurance options online. Consumers attempting to find healthcare.gov or the website for their state's insurance marketplace or Medicaid agency sometimes inadvertently wind up on advertising and marketing websites run by third-party lead generation companies. These websites often appear near the top of internet search results and have had government-related URLs. For example, Defendants have purchased leads generated from websites such as ObamaCarePlans.com, MassHealthPlans.com, AffordableCareCalifornia.org, ColoradoHealthinsurance.org, and NYStateHealthPlans.com. Such sites often feature logos of well-known insurance carriers like Blue Cross Blue Shield, Aetna, and Cigna. As depicted in Figure 1 below, these lead generation sites promise health insurance information or quotes to

11

consumers who enter their names and contact information, and also typically list a phone number for consumers to call directly. Some of these lead generation websites have borne striking resemblances to official state government websites. "MassHealthPlans.com," for example, is branded with a logo in the top left corner showing the state of Massachusetts overlaid—much like the logo for the Massachusetts Department of Public Health—with a shield and imagery of a snake wound around a rod.

\* \* \*

**Figure 1. MassHealthPlans.com Landing Page (December 8, 2023).**



24.     Consumers who input their personal information or call the numbers listed on these websites have reported that they do so because they believe they are engaging with a federal or state insurance marketplace. Instead, these consumers are connected to third-party lead generators, which—often after little or no interaction with consumers on the phone—transfer the consumers to telemarketing agents, including the telemarketers selling Defendants' products. This process of transferring live consumer calls (known as live transfer leads) to waiting telemarketers is so seamless that consumers typically do not realize that their calls have been

transferred to a different entity.

25.     Defendants have purchased the bulk of their live transfer leads from MediaAlpha, Inc. ("MediaAlpha"), a company that has operated lead generation websites promising health insurance quotes, including for marketplace plans. Between April 2023 and June 2025, Defendants spent at least $2.3 million dollars on live transfers from MediaAlpha alone. In August 2025, MediaAlpha paid $45 million to settle the FTC's allegations that it misled millions of consumers seeking to buy comprehensive health insurance by luring them in with misleading domain names and advertisements and then selling their information to telemarketers who typically did not offer the comprehensive health insurance that MediaAlpha advertised.

***Sales Pitches Falsely Representing Defendants' Products as Comprehensive Health Insurance***

26.     Consumers report, and scripts from a boiler-room used by Defendants' telemarketers confirm, that once telemarketers have a consumer on the line, they often introduce themselves as "licensed health agent[s]" or "licensed health insurance agent[s]." But historically, few of these telemarketers have actually been licensed to sell health insurance.

27.     When consumers ask whether they have connected to their state's health insurance marketplace or Medicaid agency, Defendants' telemarketers often falsely confirm that they have. One script even instructs telemarketers to tell consumers who are reluctant to provide payment information, "Keep in mind you called me today. We don't call anyone at the Marketplace. We are contracted with the Federal Government . . . ." Another script instructs telemarketers to answer "Yes this is Medicaid" if consumers ask. Yet another script directs Defendants' telemarketers to claim they are "the benefits coordinator for the marketplace" and are selling "state issued" or "state private" plans.

28.     At the outset of sales calls, Defendants' telemarketers ask consumers what type of plan they are seeking. When consumers respond that they are looking for comprehensive health

insurance or marketplace plans, telemarketers say they are searching for available options. One telemarketing script instructs agents to state that they "have access to all of the Top A rated insurance companies in the country" and will shop all available insurance plans on the consumer's behalf.

29.     Purportedly for the purpose of conducting this search of all available plans, the telemarketers collect consumers' information, including date of birth, preexisting health conditions, healthcare needs, household income, and insurance premiums paid for any prior coverage. After pretending to search for available plans, the telemarketers sometimes start by quoting the consumer purported deductibles and premium price ranges for various plans they do not actually offer. For example, one script instructs telemarketers to start by offering "Obamacare" plans, followed by "private market" plans from insurance carriers like Blue Cross Blue Shield and Humana, even though Defendants sell neither of these plan types. Finally, the telemarketers present Defendants' products as the "most affordable" option.

30.     Telemarketers portray Defendants' products as comparable to the comprehensive insurance plans offered through Affordable Care Act ("ACA") marketplaces (commonly known as "Obamacare") or directly through well-known private insurance companies. The only distinction that telemarketers emphasize when comparing the various plans is cost: the pitch makes it seem like Defendants' products offer similar coverage at a far lower price point, setting it up as the obvious choice. For example, one script instructs telemarketers to quote premium ranges of $550 to $600 per month for an ACA plan, $500 to $550 for a plan from "BlueCross Cigna Aetna etc" [*sic*], and $400 to $450 for a "state private" plan. Another instructs telemarketers to claim that the "state private" plans offer $0 deductibles, whereas "Obamacare" and "private market" plans have deductibles ranging from $1,500–$3,000 or $5,000+,

respectively. The script reflects such confidence that consumers will select Defendants' products over the supposedly comparable but more expensive "Obamacare" and "private market" plans that it instructs telemarketers—in bold-face, highlighted, all-caps text—to "**STOP TALKING AND WAIT... THEY WILL PICK LAST OPTION**".

31.     Throughout their sales pitches, the telemarketers repeatedly misrepresent that the healthcare-related products they sell have benefits akin to comprehensive health insurance. For example, telemarketers often state that Defendants' plans cover primary care and specialist visits, prescription medications, urgent care, and emergency room care, and that a consumer's out-of-pocket cost for these services will be $0, or a low or modest "copay."

32.     Some consumers report telemarketers telling them that their plans will provide "80/20" coverage, meaning that the consumer will only be responsible for twenty percent of a given medical expense. Several consumers report telemarketers making specific guarantees about the coverage, such as claiming that a specific name-brand prescription drug would be "100% covered," or that monthly doctor, chiropractor, and therapy appointments would be "all covered" after a $25 co-pay. One sales script instructs telemarketers to claim that "the only thing the plan doesn't cover" is substance abuse treatment and maternity care.

33.     Throughout their sales pitches, the telemarketers strategically deploy insurance terms of art like "coinsurance," "copay," "deductible," and "open enrollment" to reinforce the impression that the plans they are selling offer comprehensive health insurance benefits. The scripts instruct telemarketers to mention "PPO polic[ies]" and to plug the breadth of the plan's "PPO network," further reinforcing consumers' impression that the product on offer is comprehensive health insurance.

34.     Defendants' claims about their products are false. Defendants' products do not

16

provide comprehensive health insurance benefits akin to those available through ACA marketplaces or private insurance companies. They are not "state private" or "state issued"—no state plays any role in creating or administering them. They are not PPO policies. The extremely limited benefits of the products Defendants sell impose no upper limit on a consumer's potential liability for medical expenses and thus do not resemble comprehensive insurance coverage. Moreover, Defendants often do not provide even the limited benefits promised in the plan documents.

35.     Likewise, terms like "coinsurance," "copay," and "deductible" have little relevance to the products Defendants actually sell. These terms describe how healthcare costs are apportioned between consumers and their insurers, but Defendants are not insurers and assume none of consumers' costs beyond limited, capped rebates. Similarly, "open enrollment" is a designated annual period during which consumers can enroll in comprehensive health insurance coverage without a qualifying life event; Defendants' products are not comprehensive health insurance and can be purchased at any time.

36.     Unlike the comprehensive coverage they advertise, under Defendants' plans, consumers' potential liability for medical losses is limitless. At best, Defendants' products provide only (1) unspecified discounts on the sticker price of certain medical services; (2) limited payments for a narrow set of qualifying expenses incurred during a calendar year; and (3) a grab-bag of ancillary products, such as access to a telehealth platform, a prescription discount card, and supplemental policies that purportedly provide lump-sum payouts to enrollees who experience specific health events like limb loss or heart attacks. These products have no out-of-pocket maximum for consumers; instead, it is the plan's payouts that are capped. For example, under Innovative Partners' "Elite 6MD" plan, for which Innovative Partners has charged

17

consumers upwards of $300 per month, the maximum amount consumers can hope to recoup if they exhaust every illness-related benefit available under the plan is $850 per year. In other words, a consumer who Defendants charge $300 per month and remains enrolled for a whole year would pay Defendants $2750 more than they could ever recover in illness-related claims payments. Further, consumers whose illness-related care costs exceed $850, or whose costs do not map onto the specific allocations specified by the plan, must shoulder the resulting medical bills on their own.

37.     Beyond exposing consumers to potentially catastrophic financial risk, and contrary to Defendants' representations, Defendants' products "cover" (i.e., provide capped payouts for) only an extremely limited menu of services. Unlike marketplace and similar plans, Defendants' products categorically exclude certain insurance benefits deemed essential under federal law. For example, some of Defendants' products provide no payouts for any medical expenses related to pre-existing conditions if those expenses are incurred within the first year of enrollment, and provide no payouts for any illness-related expenses incurred within the first 30 days of the policy's effective date. One plan purports to cover unspecified amounts for an annual physical, related lab work, and 4 "injury or illness" office visits per year, but entirely excludes nearly all other medical treatment, such as any surgery and all care provided at a hospital. If a plan member fractured a bone and received thousands of dollars in related medical treatment, for example, all or nearly all of the bills likely would fall to the consumer.

38.     In making their deceptive sales pitches, Defendants conceal this material information about their products' many restrictions and limitations. Telemarketers do not disclose that Defendants' products provide, at best, nominal, capped payouts for qualifying medical services, or that they lack an out-of-pocket maximum that would impose a ceiling on the

amount enrollees might need to spend on healthcare costs. They also fail to disclose other prohibitions, such as that enrollees are categorically ineligible for payouts on illness-related medical services incurred within 30 days of enrollment, or within 12 months of enrollment for any medical services related to a pre-existing condition.

39.     When consumers request written plan information before enrollment, Defendants' telemarketers refuse to provide it. Telemarketer training materials include "rebuttals" to use in response to such requests, which instruct telemarketers to tell consumers that they "will get everything in writing once [they] get approved for the plan" and to deflect their concerns by reassuring them that Defendants' plans provide "coverage for all of [their] major/minor needs[.]"

40.     If consumers hesitate to purchase Defendants' products, ask for time to consider or shop around, or say they cannot afford the quoted premiums, Defendants' telemarketers assure consumers with various false or misleading representations about their qualifications, such as that they are "licensed health insurance agent[s]" or "the benefits coordinator for the marketplace." Defendants' telemarketers similarly and routinely indicate that they are an advocate for the consumer and have researched all available options, even going so far as to suggest that one benefit of "shopping with the marketplace" is that the agent has already vetted "all plans nationwide" and identified this one as the best option (Figure 2 below). Defendants also characterize other health insurance plans the consumer may be considering as "discount plan[s] with very limited coverage" (Figure 3 below) and suggest that consumers will be uninsured and therefore at risk of unaffordable emergency medical expenses if they do not promptly purchase Defendants' plan (Figure 4 below).

**Figure 2. "Rebuttal" script from telemarketing boiler room.**

a high

**"I'M JUST SHOPPING, I WANT TO KEEP LOOKING AROUND"**

"I completely understand that you want to shop around, but that's exactly what we are doing here together. As your licensed health insurance agent, I have access to all plans nationwide and specifically within your state. There is no plan I do not have access to, however there are many plans I have access to that you CANNOT find online. We looked at all the available plans and prices in your area together. If there was a better plan that was more beneficial for you then that's the plan we would be going over because it's in my best interest to put you in the right plan the first time. If I don't you'll be back at square one shopping around calling 5-10 brokers, hearing different things until you get even MORE frustrated! That's why shopping with the marketplace, we are not contracted with any specific carrier and you have equal access to all health plans. Again first all we're going to do is see if we can get you approved."

\* \* \*

20

**Figure 3. "Rebuttal" script from telemarketing boiler room.**



"I SAW A RATE ONLINE FOR CHEAPER"

"That's okay, so like I told you earlier I am a benefits coordinator for the marketplace. We have access to all the plans in the country and specifically within your state. There is no plan I do not have access to."

"What that plan sounds like is a discount plan with very limited coverage. Those rates are sometimes advertised to entice people, but the details of the plan are not advertised. That's what I have access to.

What insurance carrier was that through? What was the deductible? Did it have dental and vision?"

*Unsell the other plan by explaining benefits it doesn't have, having a high deductible, and explain how there are higher copays and higher coinsurance at hospital ...*

**Figure 4. "Rebuttal" script from telemarketing boiler room.**

"I'M ON A FIXED INCOME"

"I totally get that so I mean if a major medical emergency happens you wouldn't be able to afford that either so that's why we need medical insurance for when that happens, because in reality this is going to save you money especially when you're if God forbid you have to make a trip to the hospital."

41.    As soon as a telemarketer has persuaded a consumer to purchase Defendants' products by misrepresenting them as offering benefits commensurate with comprehensive health insurance, the telemarketer attempts to collect the consumer's credit, debit, or other payment information over the phone.

42.    In some instances, telemarketers notify consumers before collecting payment information that the consumer's first month's payment will be higher—sometimes by as much as $125—to cover a one-time enrollment fee. Some sales scripts instruct telemarketers to (falsely) call it a "state-mandated" fee. In other instances, the telemarketers do not mention the fee but charge consumers for it anyway, without their consent. One sales handbook even gives

21

telemarketers discretion to charge any amount above $100 for the fee. Defendants assure consumers who ask that they can cancel the plan at any time, and that consumers who cancel within the first 30 days will receive refunds.

43.     After collecting the consumer's payment information, the telemarketer sends the consumer a text or email link to a digital form that the consumer must fill out to complete the enrollment process. The telemarketer typically stays on the line and instructs the consumer how to fill out the form—a brief process that involves entering the consumer's date of birth, checking some boxes, and inputting an electronic signature. The form includes hyperlinks to Defendants' terms, but consumers consistently report that they do not see any substantive information or disclosures regarding Defendants' products during this process.

44.     As soon as consumers complete the digital paperwork, Defendants attempt to charge their payment cards while the telemarketer remains on the line with the consumer. In some instances, payments are processed immediately, and the telemarketers congratulate the consumers for having been approved. In other instances, however, the payments are not processed immediately because consumers' financial institutions flag the transactions as potentially fraudulent. The telemarketers are prepared for this possibility, and they often coach consumers to take steps to approve the payment despite the fraud warning. If efforts to override the potential fraud notification are unsuccessful, the telemarketers ask consumers for other payment methods until they find one that works.

45.     In various documents that consumers typically access only after they have enrolled, Defendants attempt to distance their products from comprehensive health insurance. For example, in fine-print plan summaries buried in an online web portal many consumers never discover, let alone review, Defendants have stated that Innovative Partners plans are "not

designed to be a major medical policy/plan nor [are they] designed to replace a major medical policy." In responding to complaints consumers filed with the Better Business Bureau, Defendants admit that Innovative Partners "provides supplemental health benefit plans, not comprehensive medical insurance. These plans offer specific network benefits and discounts but are not intended to cover all medical expenses like a major medical insurance plan."

46.     In these same responses, Defendants routinely disavow responsibility for misrepresentations made during sales calls, blaming the telemarketing companies contracted to sell the products and disingenuously claiming that Defendants are "not privy to the customer's conversation with the enrolling agency or the agent they spoke with at the time of enrollment." But as detailed below, Defendants are fully aware of—and in fact endorse—the marketing tactics their agents employ to deceive consumers.

47.     Consumers who manage to submit claims to Defendants consistently report that they never actually provide the promised discount pricing or capped payouts. In numerous instances, consumers who have attempted to use Defendants' products find that they have no coverage, their claims are never processed, or they are rejected with little or no explanation.

**Deceptive and Unfair Telemarketing Sales to Already-Insured Consumers**

48.     In addition to preying on consumers seeking health insurance, Defendants and their telemarketing agents have targeted consumers who are already insured and are not looking to change plans. They do this by impersonating consumers' insurance carriers or government-sponsored health insurance programs and then deceiving those consumers into unwittingly purchasing Defendants' products.

49.     Telemarketers reach this pool of insured consumers in multiple ways. Consumers searching online for their insurance carrier's contact information report clicking on prominently

displayed sponsored links that appear to be associated with their carrier but are in fact lead generation sites. Such consumers may call numbers listed on those sites or input their contact information thinking that they are contacting their insurer. Instead, the consumers are connected to lead generators who in turn funnel them to Defendants' telemarketers as live transfers.

50. One of the sales scripts obtained from a boiler-room used by Defendants' telemarketers reveals that in other instances, Defendants or their telemarketers send out what they call "text blasts" to a large group of insured consumers (Figure 5). The texts falsely state that consumers' existing insurance coverage has lapsed or may soon be canceled or disrupted. They provide a phone number to call to resolve the issue. Consumers who call this number reach Defendants' telemarketers. Consistent with this script, consumers have reported receiving text messages and letters flagging alleged problems with their existing coverage and directing them to call numbers that they later learned were associated with telemarketers, not their existing insurance carriers.

51. When telemarketers connect with an insured consumer, they typically ask the consumer to disclose various pieces of personal information, including their date of birth and current health insurance provider, sometimes claiming they need it for "HIPAA Verification." Armed with the consumer's personal information, the telemarketer pretends to pull up the consumer's insurance details and then claims that there is an issue with the policy, such as missing paperwork or recent changes in eligibility following the end of the COVID-19 pandemic.

* * *

**Figure 5. "Text Blast Flow" script from telemarketing boiler room.**



52. In some instances, telemarketers will tell consumers that they must make a payment to maintain or reinstate their existing coverage. Certain scripts even instruct telemarketers to threaten consumers with purported regulatory violations, forfeited coverage, and tax penalties if they do not comply immediately. In other instances, the telemarketer will report that the consumer is overpaying and collect the consumer's payment information by convincing them that they should apply for a plan with a lower rate. The training materials provided to Defendants' agents instruct them to "Go right in for the kill. Pitch hard, sell the benefits and unsell their current plan. . . . Tell them they are throwing money away."

53. Defendants' agents use this strategy to impersonate insurance carriers like Aetna and Blue Cross Blue Shield. They also use it to impersonate Medicaid and the state agencies that administer it, as shown by scripts instructing telemarketers to identify themselves to consumers as "State Health Enrollment" or to answer "Yes this is Medicaid" when consumers ask (Figure 6).

**Figure 6. "Medicaid" script from telemarketing boiler room.**



54. The telemarketers' impersonation of private insurance carriers and government-sponsored insurance programs, coupled with their myriad other false statements, leads many consumers to pay Defendants money to resolve purported problems with their existing coverage. Only later do they discover that they have been enrolled in one of Defendants' products and that their payments to Defendants have no effect on or relationship to their prior policy.

**Reliance on Third-Party Telemarketing "Downlines"**

55. Defendants have relied on a rotating cast of third-party telemarketing companies—referred to as "downlines"—to market their products. Defendants have typically recruited the downlines' principals (many of whom have been former employees of Ahmed's

prior business venture, a now-defunct telemarketing company that sold a similar set of healthcare-related products); lend them operating capital; provide them training, office space, online sales platform access, and customer service support; and closely control their sales conduct.

56.     The form contract that downlines are required to sign to do business with Innovative Partners mandates, among other things, that downlines' sales be approved by Innovative Partners, that all sales proceeds be transmitted to Innovative Partners, that all cancellation requests be routed through Innovative Partners, and that all training and marketing materials be submitted to and approved by Innovative Partners. The contract also vests Innovative Partners with unilateral authority to terminate its downlines' contracts, with or without cause.

57.     In public-facing responses to consumers' complaints to the Better Business Bureau, Innovative Partners often scapegoats its downlines, falsely claiming that any sales misrepresentations are attributable to "third-party marketing or lead generation companies" with which it has "no affiliation." In fact, Defendants actively cultivate and have wielded near-total control over the downlines, closely monitor and have full knowledge of their activities, and use them to further their unlawful sales practices.

**Tens of Thousands of Consumers Have Been Harmed by Defendants' Practices**

58.     Tens of thousands of consumers have purchased products from Defendants believing, based on the telemarketers' sales pitch, that they are either buying comprehensive health insurance coverage (or plans offering benefits commensurate with such coverage) or taking measures to preserve or reinstate their existing coverage.

59.     Many of those consumers have proceeded to make monthly payments to Defendants for their products. On average, consumers pay "premiums" of $330 per month, but some pay substantially more.

60.     Consumers who believe they have purchased comprehensive health insurance but do not frequently access healthcare services may go months or years without learning the truth about Defendants' products. But those consumers who do attempt to use their plans often discover that they are in fact uninsured, which can have disastrous medical and financial consequences. For example, one consumer who paid nearly $3,000 in premiums to Innovative Partners over the course of one year received a mere $750 in payouts while accruing more than $80,000 in medical debt for care that Defendants' downline telemarketer had falsely promised would be covered. Another consumer was forced to stop taking his prescription medications for a serious disease after discovering that the associated costs were hundreds of dollars higher than what the telemarketer had quoted during the sales call for those precise medications.

61.     Already-insured consumers who pay Defendants believing that doing so is required to continue or reinstate their existing insurance coverage receive nothing of value in return. They later discover that their payments to Defendants have no effect on their existing coverage and that they have been enrolled in a plan they did not know about or consent to.

62.     Consumers have complained directly to Defendants about their telemarketers' misrepresentations. In numerous instances, however, consumers who attempt to call the company's customer service number to complain have difficulty reaching anyone. Consumers report encountering multi-hour hold times and calls that inexplicably disconnect.

63.     Callers who do manage to connect to a customer service agent typically seek to cancel because they were led to believe the products offered comprehensive health insurance

benefits. Defendants often refuse to cancel consumers' plans or to issue refunds, even during the first 30 days. Other consumers attempt to cancel their plans by emailing Defendants only to be told that cancellation requests are only accepted via telephone—a restriction that telemarketers do not disclose at the time of sale. Consumers report being charged without their consent for Defendants' products, even after receiving reassurances from customer service agents that their plans had been canceled and that they would not be charged again. Some consumers whose cancellation requests Defendants ignored received refunds only after seeking assistance from the Better Business Bureau, which posts consumers' complaints publicly online. Many consumers have received only partial refunds.

64.     Because Defendants systematically disregard cancellation requests, many consumers resort to initiating chargebacks or canceling their payment cards to stop the recurring charges. From April 2023 through December 2023, Innovative Partner's refund rate hovered around 14 percent while its chargeback rate was over 4 percent. The refund rate climbed to an average of about 18 percent for January and February 2024. Due to its high chargeback rates, Innovative Partners has been flagged by both Visa and Mastercard's fraud monitoring programs, and at least two of its merchant processing accounts have been terminated in response to due diligence inquiries. Additionally, Discover rescinded Innovative Partners' access to its card network after concluding an investigation into its "questionable activity[.]"

65.     Hundreds of consumers have filed consumer complaints with the FTC and Better Business Bureau about Defendants. Consumers report that Defendants sold them healthcare-related products by falsely marketing them as offering comprehensive health insurance benefits, impersonated state marketplaces, insurance carriers, and Medicaid agencies, falsely stated that immediate payment was required to keep their health insurance plans active, ignored consumers'

29

cancellation requests, and improperly refused to issue refunds. In response to Better Business Bureau complaints, Defendants often submit form responses blaming "third-party marketing companies" for any misrepresentations made to consumers during sales calls and falsely stating that they have "no affiliation with these third-party companies and do[] not engage in such marketing activities."

66.     Consumers also complain to their financial institutions. In November 2023, when Innovative Partners had been in business for less than a year, Discover opened an investigation into the company, noting that "cardholders are stating they did not receive goods/services and the merchant is not a legitimate insurance company."

**Defendants' Efforts to Avoid Law Enforcement Scrutiny**

67.     Defendants' activities have attracted attention from state law enforcement, but this has not dissuaded their unlawful conduct. Instead, Defendants have at various points taken affirmative steps to resist and evade regulatory scrutiny.

68.     Defendants, apparently in an attempt to avoid state enforcement efforts, have held themselves out as sponsoring a self-funded "employee health benefit plan" for purposes of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Under ERISA, benefits provided in an employment context, including the provision of health benefits, are regulated by the U.S. Department of Labor, 29 U.S.C. § 1132(a)(2), (a)(5), or other federal authorities as appropriate, 29 U.S.C. § 1144(d). State regulation of ERISA plans is expressly preempted, 29 U.S.C. § 1144(a).

69.     ERISA applies only to "employee benefit plans." 29 U.S.C. §§ 1003, 1002(3). Defendants purport to create employment relationships with their enrollees for purpose of ERISA by affixing enrollees' electronic signatures to a document entitled "New Limited Partner

30

Joinder Agreement," pursuant to which enrollees ostensibly "agree to provide a minimum of five hundred (500) hours of work activity on the internet" (the details of which are not defined) in exchange for an "Active Limited Partnership Interest" in Innovative Partners or American Collective. Consumers sometimes find the Joinder Agreement in their online portals post-enrollment, but they consistently report that they have no recollection of seeing, signing, or discussing it at the time of sale. Consumers generally do not know Defendants purport to obligate them to perform "work activity on the internet."

70.     Defendants have used their self-proclaimed status as an ERISA plan sponsor to challenge the authority of state insurance agencies to regulate their conduct. For example, in July of 2024, as part of an inquiry into an individual agent's licensure application, the Florida Department of Financial Services' Division of Insurance Agent and Agency Services ("Florida DFS") performed a site inspection of two call center office suites from which several of Defendants' telemarketing downlines were selling Innovative Partners' products. During this inspection, state investigators observed and photographed various sales scripts and employee training materials, excerpts of which are included in this Complaint. The site inspection ended after individuals associated with the call center began hurriedly switching off and unplugging computers. Later that same day, one of the downline telemarketers sent a letter to Florida DFS asserting that the state lacked jurisdiction to regulate the sale of these products, referencing Innovative Partners' purported status as an ERISA plan sponsor. Innovative Partners made a similar assertion in December of 2024, in response to an inquiry from the Georgia Office of Insurance and Safety Fire Commissioner concerning a Georgia consumer's complaint about misrepresentations in the sale of Innovative Partners' products. After Innovative Partners invoked ERISA and asserted that its "plan is exempt from state regulation pursuant to 29 U.S.C.

31

§ 1144," the Commissioner's Office determined that it had no jurisdiction to pursue the consumer's complaint further. Since then, Innovative Partners has made further efforts to insulate itself from accusations that it sells insurance products subject to state regulation, including by noting in boilerplate responses to Better Business Bureau complaints that it "does not market or sell insurance."

71.     Beyond these attempts to evade state regulators, Defendants have taken steps to destroy evidence of wrongdoing. For example, in the weeks following Florida DFS's site inspection, supervisory employees at Innovative Partners' corporate office collected all training documents and notes from the customer service call center cubicles and proceeded to shred them, citing the possibility of an "audit."

72.     In June of 2025, the Insurance Commissioner of the State of California issued a cease-and-desist order against Innovative Partners and several associated entities and individuals, including Amani Shokry. The order states that Innovative Partners had engaged in a "scheme . . . to defraud victims into purchasing limited or non-existent health coverage by convincing them that they were purchasing comprehensive insurance plans," including specifically "Aetna or Blue Shield health insurance policies through Covered California" (California's ACA marketplace). In addition to ordering that Innovative Partners and its associates cease their unlawful activities in California, the Insurance Commissioner ordered Innovative Partners to show cause why it should not be fined $5,000 for each day that it operated in violation of California law.  And in November of 2025, the Michigan Department of Insurance and Financial Services issued a cease-and-desist order against Innovative Partners.

73.     Despite these developments, Defendants have persisted with their unlawful scheme. Consumer complaints submitted since the Florida DFS site inspection and the cease-

32

and-desist orders issued in at least two states show that Defendants' deceptive and unfair practices continue unabated.

74.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

75.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

76.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

77.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
### Misrepresentations Regarding Defendants' Products

78.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants represent, directly or indirectly, expressly or by implication, that:

   a.   Defendants' products are, or provide benefits commensurate with, PPO policies or other comprehensive health insurance plans;

   b.   Defendants are, or are affiliated with, government-sponsored health insurance programs, such as Medicaid or state or federal marketplaces;

   c.   Defendants are, or are affiliated with, insurance carriers; or

33

d. Consumers must pay Defendants to maintain or otherwise prevent disruption of their existing health insurance coverage.

79. In fact:

a. Defendants' products are not, and do not provide benefits commensurate with, PPO policies or other comprehensive health insurance plans;

b. Defendants are not, nor are they affiliated with, government-sponsored health insurance programs, such as Medicaid or state or federal marketplaces;

c. Defendants are not, nor are they affiliated with, insurance carriers; or

d. Consumers need not pay Defendants to maintain or otherwise prevent disruption of their existing health insurance coverage.

80. Therefore, Defendants' representations as described in Paragraph 78 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Unfairly Charging Consumers Without Consent

81. In numerous instances, Defendants charge consumers without their express informed consent.

82. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

83. Therefore, Defendants' acts or practices as described in Paragraph 81 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

84.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter. See 16 C.F.R. Part 310.

85.     Defendants and their network of telemarketing downlines are "seller[s]" or "telemarketer[s]" engaging in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

86.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2). Specifically, the TSR prohibits sellers and telemarketers from misrepresenting any material aspect of the performance, efficacy, nature or central characteristics of goods or services that are the subject of a sales offer. *Id.* § 310.3(a)(2)(iii). Likewise, the TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services, 16 C.F.R. § 310.3(a)(4), or from misrepresenting, directly or by implication, a seller's or telemarketer's affiliation with,

35

or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

87.     In addition, the TSR prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner, before a consumer consents to pay, all material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer. 16 C.F.R. § 310.3(a)(1)(ii).

88.     For products that include a negative option feature, the TSR further prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner and before a consumer consents to pay, all material terms and conditions of the negative option feature, including but not limited to the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s). 16 C.F.R. § 310.3(a)(1)(vii).

89.     Finally, the TSR prohibits sellers and telemarketers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the consumer. 16 C.F.R. § 310.4(a)(7).

90.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices." Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that in any action commenced under Section 19(a)(1), the court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to

consumers, including but not limited to recission or reformation of contracts, the refund of money or return of property."

## COUNT III
### Deceptive Telemarketing Calls in Violation of the TSR

91. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants misrepresent, directly or indirectly, expressly or by implication, that:

  a. Defendants' products are, or provide benefits commensurate with, PPO policies or other comprehensive health insurance plans;

  b. Defendants are, or are affiliated with, government-sponsored health insurance programs, such as Medicaid or state or federal marketplaces;

  c. Defendants are, or are affiliated with, insurance carriers; or

  d. Consumers must pay Defendants to maintain or otherwise prevent disruption of their existing health insurance coverage

92. Therefore, Defendants' acts or practices as described in Paragraph 91 are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), and (a)(4).

## COUNT IV
### Failure to Disclose Material Information in Telemarketing Calls in Violation of the TSR

93. In numerous instances, in connection with the advertising, marketing, promotion, or sale of healthcare-related products, before consumers consent to pay for the products, Defendants fail to disclose truthfully, in a clear and conspicuous manner, material restrictions, limitations, or conditions to purchase, receive, or use the products that are the subject of the sales offer, including that such products:

  a. Limit the monetary benefits provided for medical services;

37

b. Impose no limit on the amount consumers might have to spend on healthcare costs; and

c. Do not pay benefits for any illness-related expenses incurred during the first 30 days after the product's effective date, or within the first 12 months for medical expenses related to treatment of a pre-existing condition.

94. Therefore, Defendants' acts or practices as described in Paragraph 93 violate the TSR, 16 C.F.R. §§ 310.3(a)(1)(ii).

## COUNT V
### Failure to Disclose Material Terms and Conditions of Negative Option Feature in Telemarketing Calls in Violation of the TSR

95. In numerous instances, in connection with the advertising, marketing, promotion, or sale of healthcare-related products, before consumers consent to pay for the products, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, all material terms and conditions of Defendants' negative option feature, including the specific steps consumers must take to cancel the negative-option charges.

96. Therefore, Defendants' acts or practices as described in Paragraph 95 violate the TSR, 16 C.F.R. §§ 310.3(a)(1)(vii).

## COUNT VI
### Failure to Obtain Express, Informed Consent in Violation of the TSR

97. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants have charged consumers without their express informed consent, in violation of the TSR, 16 C.F.R. § 310.4(a)(7).

38

## THE TRADE REGULATION RULE ON
## IMPERSONATION OF GOVERNMENT AND BUSINESSES

98.      The Impersonation Rule, promulgated by the FTC under Section 18 of the FTC Act, 15 U.S.C. § 57a, became effective on April 1, 2024, and remains in full force and effect. The Impersonation Rule is codified at 16 C.F.R. Part 461.

99.      Section 461.2 of the Impersonation Rule prohibits: (a) "materially and falsely pos[ing] as, directly or by implication, a government entity or officer thereof, in or affecting commerce as *commerce* is defined in the Federal Trade Commission Act (15 U.S.C. 44);" and (b) "materially misrepresent[ing], directly or by implication, affiliation with, including endorsement or sponsorship by, a government entity or officer thereof, in or affecting commerce as *commerce* is defined in the Federal Trade Commission Act (15 U.S.C. 44)." 16 C.F.R. § 461.2. "Government" includes "federal, state, local, and tribal governments as well as agencies and departments thereof." 16 C.F.R. § 461.1.

100.      Section 461.3 of the Impersonation Rule prohibits: (a) "materially and falsely pos[ing] as, directly or by implication, a business or officer thereof, in or affecting commerce as commerce is defined in the Federal Trade Commission Act (15 U.S.C. 44);" and (b) "materially misrepresent[ing], directly or by implication, affiliation with, including endorsement or sponsorship by, a business or officer thereof, in or affecting commerce as commerce is defined in the Federal Trade Commission Act (15 U.S.C. 44)." 16 C.F.R. § 461.3. "Business" means "a corporation, partnership, association, or any other entity that provides goods or services, including not-for-profit entities." 16 C.F.R. § 461.1.

101.      The Impersonation Rule defines "materially" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." 16 C.F.R. § 461.1. "Officer" is defined as including "executives, officials, employees, and agents." *Id.*

39

102.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Impersonation Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices." Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that in any action commenced under Section 19(a)(1), the court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers, including but not limited to recission or reformation of contracts, the refund of money or return of property."

## COUNT VII
### False Claims of Government Affiliation, Endorsement, or Sponsorship

103.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants:

a.    Materially and falsely pose, directly or by implication, as a government entity, including government-sponsored health insurance programs like Medicaid or state or federal marketplaces; or

b.    Materially misrepresent, directly or by implication, affiliation with, including endorsement or sponsorship by, a government entity, including by representing that they are affiliated with government-sponsored health insurance programs, such as Medicaid or state or federal marketplaces.

104.    Therefore, Defendants' representations as set forth in Paragraph 103 violate Section 461.2(b) of the Impersonation Rule, 16 C.F.R. § 461.2.

40

## COUNT VIII
### Falsely Posing as a Business or Claiming Business Affiliation, Endorsement, or Sponsorship

105.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants:

    a.  Materially and falsely pose, directly or by implication, as a business, including insurance carriers; or

    b.  Materially misrepresent, directly or by implication, affiliation with, including endorsement or sponsorship by, a business, including insurance carriers.

106.    Therefore, Defendants' representations as set for the in Paragraph 105 violate Section 461.3 of the Impersonation Rule, 16 C.F.R. § 461.3.

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

107.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

108.    The GLB Act defines "customer" to mean "with respect to a financial institution any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." 15 U.S.C. § 6827(2). The GLB Act defines "financial institution" to include "any institution engaged in the

business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution." 15 U.S.C. § 6827(4)(A).

109.    Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

110.    Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

111.    Section 19 of the FTC Act, U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act. This relief may include, and is not limited to, rescission or reformation of contracts, and the refund of money or return of property.

## COUNT IX
### Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customer Information of a Financial Institution

112.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, Defendants make false, fictitious, or

42

fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution, such as credit or debit card numbers.

113. Defendants obtain or attempt to obtain the customer information of a financial institution by representing to customers of financial institutions, directly or indirectly, expressly or by implication, that:

a. Defendants' products are, or provide benefits commensurate with, PPO policies or other comprehensive health insurance plans;

b. Defendants are, or are affiliated with, government-sponsored health insurance programs, such as Medicaid or state or federal marketplaces;

c. Defendants are, or are affiliated with, insurance carriers; or

d. Consumers must pay Defendants to maintain or otherwise prevent disruption of their existing health insurance coverage.

114. Defendants' representations as described in Paragraph 113 are false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

115. Therefore, Defendant's acts or practices as described in Paragraphs 112 to 114 violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **CONSUMER INJURY**

116. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, TSR, Impersonation Rule, and GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, the Impersonation Rule, and the GLB Act.

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, and appointment of a receiver;

C.      Award monetary and other relief within the Court's power to grant, including the recission or reformation of contracts, the refund of money, or other relief necessary to redress injury to consumers; and

D.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: APRIL 7, 2026

MATTHEW G. SCHILTZ
Special Florida Bar No. A5502617
WILLIAM J. HODOR
Special Florida Bar No. A5501501

FEDERAL TRADE COMMISSION
230 S. Dearborn Street, Room 3030
Chicago, Illinois 60604

(312) 960-5619 [telephone, Schiltz]
(312) 960-5592 [telephone, Hodor]

mschiltz@ftc.gov [e-mail, Schiltz]
whodor@ftc.gov [e-mail, Hodor]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

44