## DECLARATION OF FRANCESCA D'ANGELO
## PURSUANT TO 28 U.S.C. § 1746

I, Francesca D'Angelo, hereby declare as follows:

1.	My name is Francesca D'Angelo, and I am a United States citizen who is over eighteen years of age. I reside in Buckingham, Pennsylvania. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to the facts stated herein.

2.	In January 2024, I was laid off from my job, which had been providing me with health insurance. As a result of losing my health insurance coverage, I signed up for an Independence Blue Cross "gold" health insurance plan through Pennie, the official Pennsylvania health insurance marketplace. The health insurance plan was expensive, however. I was paying over $500 per month for the plan. Although the plan did include prescription drug coverage, I take several prescription medications. One name brand prescription by itself was costing me about $1,200 per month out-of-pocket. As a result, I wanted to find more affordable health insurance that also included better prescription drug benefits.

3.	In or around July 2024, I was searching online for different health insurance plans. One of the websites I found advertised "Obamacare" health insurance plans, which I believe meant comprehensive health insurance plans similar to the kind of insurance I had previously and what I had purchased through the Pennsylvania marketplace. The website included a telephone number to call for more information. On or about Friday, July 26, 2024, I called the telephone number appearing on the website, and I was connected to a representative who said her name was "Monica St. James." I told Monica that I was looking for more affordable health insurance than what I had purchased through the Pennsylvania marketplace, and I explained to her that with my current insurance, I was still paying about $1,200 out-of-

pocket for a name brand prescription. Monica immediately said that she had a comprehensive Aetna insurance plan that would be ideal for me. Monica explained that with this Aetna plan, I would be "totally covered" at "almost 100%." Monica also told me that the plan included excellent prescription drug coverage. Throughout my conversation with Monica, she kept referring to herself and the company she represented as Aetna, so she led me to believe that I was dealing with Aetna directly.

4.      For the next few minutes, Monica and I discussed the Aetna insurance plan. Monica explained, for example, that emergency room visits were covered "at 90 percent," and that all of my doctors were "in network." Because I was concerned particularly about prescription drug costs, I asked Monica specifically if the brand name prescription drug that I was taking was covered under the plan. Monica assured me that the brand name prescription was "100% covered," which I understood to mean that I would have no out-of-pocket cost to fill the prescription. The fact that this prescription was "100% covered" was the primary reason I ultimately agreed to sign up for the Aetna plan that Monica was offering.

5.      Monica and I discussed the cost of the insurance plan. Monica explained that the cost of the insurance would be a little over $800 for one year of coverage that I would have to pay in two installments. Monica said that I would need to pay the first payment of about $412 immediately, followed by a second payment of $400 in August, at which point my coverage would be paid up for the year, and I would have no further payments due. Monica even broke it down and explained that I would be paying only about $68 each month for much better health insurance that included better prescription drug coverage. I considered the cost of the Aetna policy to be extremely reasonable considering that I was paying over $500 per month for my Pennsylvania marketplace plan.

6.     I was very excited about the policy Monica had explained to me, so I decided to purchase it. I knew the first payment of about $412 would be due immediately. While I normally use a Capital One credit card to make purchases, before I could provide the card information, Monica told me that she could not accept a Capital One credit card. As a result, I was required to use my debit card to pay the first installment. A charge of $412.84 was made to my debit card almost immediately.

7.     After signing up for what I thought was an Aetna health insurance plan with Monica and while I was still on the phone with her, I received several e-mails from "Innovative Partners," including an "Enrollment Authorization," sales receipt, "Partner Access," and "Partner Portal." Attached hereto as **D'Angelo Attachment (Att.) A** are true and correct printouts of some of the e-mails dated July 26, 2024, that I received, except that sensitive identifying information has been redacted. At the time, I was not aware of the name "Innovative Partners." Monica did not mention the name, and it did not grab my attention because I still believed that I was dealing with Aetna. Using the links and login information provided in the e-mails, Monica had me complete my plan enrollment and sign in to the "Partner Portal" website on my computer. She then had me change the login password, which I did. I did not spend much time on the website, but I recall that it was not easy to navigate. Monica also had me download an app to my phone, Cix Health, which she said would include my health plan ID cards that I could use at my pharmacy. I downloaded the app to my phone so that I could get the plan information needed to refill my prescriptions.

8.     That day or the next, I called Independence Blue Cross to cancel my existing health insurance plan. Because I had already paid coverage for the month of July, the policy would not expire until after the end of the month, July 31.

9.      Also around the same time, I called my pharmacy to provide them with the plan information needed to start taking advantage of my new prescription drug benefits.  Normally, I fill my prescriptions at an independent pharmacy near my home.  However, my pharmacist informed me that they did not accept the plan I was trying to use.  The pharmacist suggested that I try Walgreens to fill my prescriptions as they might accept the plan.  The pharmacist called in my prescriptions to a nearby Walgreens, but when I later called that Walgreens, they too informed me that they did not accept the health plan I was trying to use.  The Walgreens pharmacist suggested I try CVS.  I then called a nearby CVS and provided them with my health plan information.  To my surprise, CVS informed me that what I was trying to use was not an insurance plan with prescription drug coverage, but rather was a prescription drug discount card that provided only minimal discounts on prescription drugs and certainly not the "100% coverage" that Monica told me.  By this time, I was panicking.  Apparently, I did not have any prescription drug coverage, and I was becoming suspicious that I had been scammed.

10.     I called my bank to see what options I had regarding the $412.84 charge that was made to my debit card.  Because the debit card transaction had already been processed, my bank told me that I could dispute the transaction as fraudulent.  At the time, though, I was not entirely sure the insurance policy I thought I had purchased was fraudulent.  I wanted to do some more research.  As a result, I did not dispute the transaction at that time.

11.     Later that day or the next, I started to do some online research about Innovative Partners and the Aetna insurance policy I thought I had purchased.  I came across several Reddit posts online that discussed Innovative Partners being a scam.  Several of the posts told stories that sounded exactly like what I had experienced: on the phone, Innovative Partners claimed to be with a major health insurance company selling legitimate and reasonably priced

comprehensive health insurance, but those statements were all lies. What was being sold wasn't even comprehensive health insurance at all. At that point, I knew that I had been scammed.

12. After realizing that I had been scammed into purchasing a worthless health plan, I immediately wanted to cancel and get my money back. That following Monday, July 29, 2024, I sent an e-mail to Innovative Partners that read, "I was scammed into this false insurance. I want a refund NOW. NOW." A while later, Innovative Partners responded by e-mail telling me to call their "Member Services Department" to cancel or terminate the policy. Attached hereto as **D'Angelo Att. B** is a true and correct printout of my e-mail and Innovative Partner's response dated July 29, 2024, except that sensitive identifying information has been redacted.

13. I tried calling Innovative Partners' "Member Services Department" several times. Each time I called to try to cancel, however, the call was either never answered and kept ringing, or the company claimed to be closed. I was never able to reach anyone to cancel whatever product Monica actually sold me.

14. I was concerned that Innovative Partners had my debit card information and that they would try to take another payment out of my bank account. To prevent that from happening, I contacted my bank again, this time convinced that I had been the victim of a scam. Because I did not dispute the first transaction that Innovative Partners made as fraudulent, my bank informed me that the only thing that I could do to stop Innovative Partners from taking more money out of my account was to close the account. Based on my bank's advice, I did close the account, but at that time I was still out the $412.84 that Innovative Partners took from it on July 26, 2024.

15. Believing that I had been the victim of a scam, I filed a complaint against Innovative Partners with the Better Business Bureau (BBB) on August 1, 2024. Attached hereto

as **D'Angelo Att. C** is a true and correct copy of the complaint I submitted and subsequent responses from myself and Innovative Partners, except that certain identifying information has been redacted.  For my complaint, I wrote:

> I called this insurance company and they said they were under Obamacare affordable health act.  They charged me over $800 for health coverage and it was a complete scam.  Said I would be fully covered.  I cancelled my other insurance and then found out this was a scam.

16.     Over two weeks later, on August 19, 2024, Innovative Partners responded to my BBB complaint, claiming, in part, that "the Partner never spoke with Innovative Partners at the time of enrollment and we see no interaction with the Partner at the corporate office."  Innovative Partners also provided a copy of the same receipt I received showing that I had been charged $412.84.  Innovative Partners also said:

> In order to provide resolution to the Partner and initiate a refund if warranted we request that the Partner call into our customer service number to speak with an agent as soon as possible.  Innovative Partner *[sic]* cannot take any action on the account until we speak with the Partner.

In addition to showing that Innovative Partners charged $412.84 to my debit card ending 0310 on July 26, 2024, the receipt also shows different monthly charges for the following items: "Elite MD2," "Essential 25000," and "Guardian 5000."  I have no idea what those products or services are as Monica never explained any of them to me.  Throughout my entire conversation with Monica, she led me to believe that I was purchasing a health insurance plan though Aetna.  The receipt also incorrectly shows my address as 325 2nd Avenue, New York, New York 10003.  I have never been to that address, and I do not know why Innovative Partners has it listed there.

17.     The following day, I replied to Innovative Partners' BBB response by stating that I tried contacting customer service, which was non-existent.  "It just rings and rings," I wrote,

"They did not provide a [service] and lied about what they were. I didn't use their service once [because] it doesn't exist[.]"

18. Finally on August 29, 2024, Innovative Partners again responded to my BBB complaint. Although they again claimed to have "no record of any interaction with the Partner at or corporate office," they did state that the one charge of $412.84 had been refunded. I confirmed with my bank that I did receive a refund of $412.84. Innovative Partners apparently did try to take the second installment from my bank account. In responding to my complaint, Innovative Partners also wrote, "Our records show that subsequent billing attempts were declined by the Partner's bank, likely due to the account being closed. As a result, no charges were processed for the second month of the plan."

19. After realizing that I had been scammed, I was concerned that by the end of July 2024, I would not have any health insurance coverage. The Independence Blue Cross policy that I had canceled was set to expire at the end of the month. Right before the end of July, however, I called Pennie and spoke to a health insurance marketplace representative. I explained how I believed that I had been scammed by someone claiming to sell a comprehensive health insurance plan from Aetna at a much more affordable price, but what they really sold me was a worthless health plan. Thankfully, the Pennie representative was able to reinstate the health insurance coverage I had with Independence Blue Cross at the rate I was paying previously, and I did not have a lapse in coverage. The Pennie representative explained that they do not use last names when speaking with people, so the fact that the representative I spoke with claimed to be named "Monica St. James" was a red flag. Second, the Pennie representative said that they would never refer to the Affordable Care Act as "Obamacare." That, too, was a red flag that I had been scammed.

20.     My experience with Innovative Partners was stressful and upsetting. Monica outright lied to me, telling me that my plan was full coverage, comprehensive health insurance through Aetna—with better coverage than I had through my state marketplace plan—and assuring me that my brand name prescription medication would be "100% covered." I was shocked to later learn that this was not an Aetna insurance plan at all, and it did not cover my prescription or reduce the cost in any meaningful way. I would not have agreed to purchase the Innovative Partners plan had I known that I was not dealing with Aetna, it was not comprehensive insurance, and none of my prescriptions would be covered. I feel lucky that I figured out that Monica had lied to me in time to reinstate my Pennsylvania marketplace plan. Had I not been able to do so, I would have been without health insurance coverage and unable to afford my prescriptions.

21.     Despite reporting Innovative Partners to the BBB and getting my money returned, Innovative Partners still sends me e-mail. On January 21, 2025, Innovative Partners sent an e-mail encouraging me to "View [my] 2024 Health & Wellness Accomplishments." I have no use for Innovative Partners' junk e-mail.


I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on ___1/30___, 2025.

FRANCESCA D'ANGELO

Page **8** of **8**



**From: Innovative partners <admin_noreply@innovativepartnerslp.com>**
**Date: July 26, 2024 at 4:49:13 PM EDT**
**To:** ███████ **@gmail.com**
**Subject: Innovative Partners - Enrollment Authorization**

Hello FRANCESCA DANGELO,

With this email, you can complete the Innovative Partners enrollment application process. Your representative has already entered your information in the Innovative Partners Enrollment Portal. The final step is for you to review a summary of your program and authorize your enrollment application. To do so, click the link below and follow the instructions:

**CLICK HERE**

If you have any questions, please contact your representative. And thank you for your interest in our health plan. You're making a great choice!

Sincerely,
Innovative Partners



866-949-3581
partnerservices@innovativepartnerslp.com

1

D'Angelo Att. A
Page 1 of 6



**From:** Innovative Partners <partnerservices@innovativepartnerslp.com>
**Date:** July 26, 2024 at 4:52:28 PM EDT
**To:** ▮▮▮▮@gmail.com
**Cc:** membercc@innovativepartnerslp.com
**Subject:** Sales Receipt



866-949-3581
partnerservices@innovativepartnerslp.com

FRANCESCA DANGELO, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.

## SALES RECEIPT

| | |
|---|---|
| Date: | **07-26-2024** |
| Transaction No: | **9760610275** |
| Account No: | ▮xxxxxxxxxx0310 |

1

| | | |
|---|---|---|
| Payment Method: | **Credit Card** | |
| Coverage Through: | **08-26-2024** | |

Customer ID:  ███████@GMAIL.COM

Customer:  **FRANCESCA DANGELO**
325 2nd Ave, NEW YORK, NY, US, 10003
+1 ███████

Payment Towards:

| | |
|---|---|
| Enrollment Fee | **$0.00** |
| Monthly Payment for Elite MD 2 | **$192.90** |
| Monthly Payment for Essential 25000 | **$169.99** |
| Monthly Payment for Guardian 5000 | **$49.95** |
| Total Amount | **$412.84** |

Thank you for your order!

Need help? Contact your recruiter or our partner services team today!

2



**From:** Innovative Partners <partnerservices@innovativepartnerslp.com>
**Date:** July 26, 2024 at 4:52:42 PM EDT
**To:** ▮▮▮▮▮@gmail.com
**Subject: Innovative Partners - Partner Access**

Welcome FRANCESCA DANGELO
Limited Partner ID: G556857

Thank you for applying for health benefits coverage & becoming a plan participant through Innovative Partners! This is an automatically generated email. Please see the information below to get in contact with our Partner Services Team and/or your recruiter should you have any questions regarding the plan(s) you have agreed to enroll in today.

**Below is the provider search link for the First Health Network:**
https://providerlocator.firsthealth.com/home/index

Step 1: Click "Locate Provider".
Step 2: Next, "Select First Health network" and click "Start now".
Step 3: Select the provider type, ZIP or state and click on the "Search now" button.

**BE ON THE LOOKOUT**
You should receive your ID Cards in the mail within 10-14 business days.

You will also receive access details to the Partner Portal that is being setup for you. For questions, please call us or send us an email. Our third-party Partner Service team is available from 9:00 am - 6:00 pm Eastern Standard Time, Monday through Friday.

D'Angelo Att. A
Page 4 of 6

**IMPORTANT NOTICE**

All cancellations and refund request must be directed to the Partner Service team at the phone number/email below to ensure proper handling of your cancellation and/or refund.

 866-949-3581
partnerservices@innovativepartnerslp.com

2

**D'Angelo Att. A**
**Page 5 of 6**



From: Innovative partners <admin_noreply@innovativepartnerslp.com>
Date: July 26, 2024 at 4:52:42 PM EDT
To: ▆▆▆▆@gmail.com
Subject: Innovative Partners - Partner Portal

## Welcome FRANCESCA DANGELO

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ▆▆▆▆@GMAIL.COM
Temporary Password: ▆▆▆▆▆

Need help? Contact your recruiter or our partner services team today!

 **INNOVATIVE** PARTNERS    866-949-3581
partnerservices@innovativepartnerslp.com

1

D'Angelo Att. A
Page 6 of 6



**From:** Partner Services <partnerservices@innovativepartnerslp.com>
**Date:** July 29, 2024 at 11:53:39 AM EDT
**To:** Francesca D'Angelo <██████@gmail.com>
**Subject:** Re: Fraud and Scam

Please give our Member Services Department a call to finalize any cancellation and or termination of policy. Cancellations cannot be made through email.  **(866) 949-3581**

--
Best regards, Your healthcare team



**Innovative Partners**
   **(866) 949-3581**

On Mon, Jul 29, 2024 at 10:19 AM Francesca D'Angelo <██████@gmail.com> wrote:

I was scammed into this false insurance. I want a refund NOW. NOW.

Francesca D'Angelo

--
Best regards, Your healthcare team



**Innovative Partners**
   **(866) 949-3581**

D'Angelo Att. B
Page 1 of 1

# Innovative Partners, LP

**Case #:** 22076639

| | | | |
|---|---|---|---|
| **Consumer Info:** | D'Angelo, Francesca<br>██████████<br>Perkasie, PA ████<br>██████<br>████@gmail.com | **Business Info:** | Innovative Partners, LP<br>2234 N Federal Hwy PMB 2862<br>Boca Raton, FL 33431 |

**Date Filed:** 8/1/2024 10:35:34 AM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

I called this insurance company and they said they were under Obamacare affordable health act. They charged me over $800 for health coverage and it was a complete scam. Said I would be fully covered. I cancelled my other insurance and then found out this was a scam.

**Consumer's Desired Resolution:**

Billing Adjustment

## Complaint Timeline

| | |
|---|---|
| **08/01/2024** | Submitted: IABBB Complaint Form (API)<br>**Complaint Form** |
| **08/05/2024** | Assignment Changed: From: gwenj@bbbsefl.org<br>**gwenj@bbbsefl.org** |
| **08/05/2024** | Automated: Process complaint<br>**andrewr@bbbsefl.org** |
| **08/05/2024** | Pending initial Business response: Action Taken<br>**Threshold Application** |
| **08/19/2024** | Business Responded to Complaint: Action Taken: Extranet<br>**partnerservices@innovativepartnerslp.com** |
| **08/20/2024** | Pending consumer Response: Action taken<br>**andrewr@bbbsefl.org** |
| **08/20/2024** | More Information Submitted: by Consumer<br>████████**@gmail.com** |
| **08/20/2024** | Pending BBB review of rejection: Action taken<br>**andrewr@bbbsefl.org** |
| **08/20/2024** | Pending Business Response of Rejection: Action taken<br>**andrewr@bbbsefl.org** |
| **08/29/2024** | Business responded to rejection: Action Taken: Extranet<br>**partnerservices@innovativepartnerslp.com** |
| **08/30/2024** | Pending consumer response to rejection: Action taken<br>**andrewr@bbbsefl.org** |

D'Angelo Att. C
Page 1 of 4

**09/09/2024**        Answered: Action Taken
**Threshold Application**

# Complaint Messages

**08/19/2024 - Innovative Partners Compliance**
Respond to Complaint
Innovative Partners has investigated this complaint in detail. Upon investigation, the Partner never spoke with Innovative Partners at time of enrollment and we see no interaction with the Partner at the corporate office. The Partner states that there were over $800 in charges on the account however the Partner was only charged $412.84 as evidenced by the sales receipt provided to the BBB and the Partner. In order to provide resolution to the Partner and initiate a refund if warranted we request that the Partner call into our customer service number to speak with an agent as soon as possible. Innovative Partner cannot take any action on the account until we speak with the Partner.

**08/20/2024 - Francesca D'Angelo**
More Information

I have tried contacting customer service which is non existent.  It just rings and rings. This is a straight up scam.  Lost out on $412 that I  am in desperate need of. They did not provide a serve and lied about what they were. I didn't use their service once bc it doesn't exist and yet they made $412 off me and another $412 for the second month. Roughly speaking on the numbers. They are trying to give me the runaround saying to call their customer service when I did already to no avail. This is insane.

thank you.

**08/20/2024 - Francesca D'Angelo**
I do not accept the response made by the business to resolve this complaint

Complaint: 22076639

I am rejecting this response because:

I have tried contacting customer service which is non existent.  It just rings and rings. This is a straight up scam.  Lost out on $412 that I  am in desperate need of. They did not provide a serve and lied about what they were. I didn't use their service once bc it doesn't exist and yet they made $412 off me and another $412 for the second month. Roughly speaking on the numbers. They are trying to give me the runaround saying to call their customer service when I did already to no avail. This is insane.

thank you.

Sincerely,

Francesca D'angelo


**08/29/2024 - Innovative Partners Compliance**
Respond to Complaint

Innovative Partners has thoroughly investigated this complaint and found no record of any interaction with the Partner at our corporate office. Additionally, we can confirm that only one charge of $412.84 was made, which has since been refunded. Our records show that subsequent billing attempts were declined by the Partner's bank, likely due to the account being closed. As a result, no charges were processed for the second month of the plan. Given these circumstances, Innovative Partners is unable to assist the Partner further in this matter.



866-949-3581
partnerservices@innovativepartnerslp.com

FRANCESCA DANGELO, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.

## SALES RECEIPT

| | | |
|---|---|---|
| | | Customer ID: ▮▮▮@GMAIL.COM |
| Date: | 07-26-2024 | |
| | | Customer: FRANCESCA DANGELO |
| Transaction No: | 9760610275 | 325 2nd Ave, NEW YORK, NY, US, 10003 |
| Account No: | ▮xxxxxxxxxx0310 | +▮▮▮ |
| Payment Method: | Credit Card | |
| Coverage Through: | 08-26-2024 | |

Payment Towards:

| | |
|---|---|
| Enrollment Fee | $0.00 |
| Monthly Payment for Elite MD 2 | $192.90 |
| Monthly Payment for Essential 25000 | $169.99 |
| Monthly Payment for Guardian 5000 | $49.95 |
| Total Amount | $412.84 |

Thank you for your order!

Need help? Contact your recruiter or our partner services team today!

**D'Angelo Att. C**
**Page 4 of 4**

# PX 4

**DECLARATION OF LISA FRAZER**
**PURSUANT TO 28 U.S.C. § 1746**

I, Lisa Frazer, hereby declare as follows:

1.      My name is Lisa Frazer. I live in Plainfield, Indiana, and did so at the time of the events described in the following paragraphs. I am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      On or about December 14, 2025, as I was helping my adult son, Christian, look for health insurance, I believe I Googled "insurance for self-employed" and found a website entitled www.trusted.ramseysolutions.com. Believing this website was affiliated with Dave Ramsey, the American radio personality who offers financial advice, I trusted it and filled out an online form for a health insurance quote for my son. Once I submitted the online form, the site stated I had been connected with OnePro and a representative would contact me. Within a few minutes, I received a phone call from a Bargersville, Indiana, phone number 463-208-7475 and spoke with a female representative, whose name I don't recall.

3.      The female representative stated she was a licensed insurance agent calling regarding my request for an insurance quote. I reiterated this would be insurance for my adult son living in Florida but that I would be making the payments. The representative said this wouldn't be a problem and she would be able to help me.

4.      The agent took some personal information regarding my son, including his date of birth, Social Security number, and general health history, and then described the health insurance plan she found and recommended for my son as an Aetna policy through the First Health PPO Network. She described all the benefits, which included no deductible, low co-payments for services, prescription drug coverage, and a low monthly cost of $209.05. Believing this was an

1

affordable, full-coverage, health insurance option for my son, I agreed to enroll him. The representative told me there was an additional one-time enrollment fee of $50 to get the plan started, so I paid the $259.05 charge with my debit card. I did not sign any documents, either electronically or in hard copy, to enroll my son in this plan. A screenshot of my payment receipt is attached as **Frazer Attachment A**. I obtained a copy of this receipt from what I later learned was the American Collective portal.

5.     The representative gave me policy number U23953 and said my son's coverage would be effective in 30 days. She also gave me a telephone number (888-563-2321) for customer service. She then sent multiple emails to my son, including login credentials for a plan portal, which the representative said would contain all his plan documents and temporary insurance card. This entire phone conversation was very quick and took maybe 5-10 minutes.

6.     After the call, my son forwarded me the emails, which to my surprise, were all from a company called American Collective. None of the emails mentioned Aetna, which I would have expected. I then logged into the plan portal at https://member.adv.americancollectivelp.com, using the login information provided in the email, and noticed too that all the plan documents and temporary insurance card referenced only American Collective. I was concerned that the name "Aetna" appeared nowhere on the insurance card or plan documents because I had been told this was an Aetna plan and that's why I purchased it. I took a screenshot of the emails my son forwarded, as well as screenshots of the temporary insurance card and other plan information in the plan portal. I also downloaded PDFs of the plan documents found in the American Collective portal. Some of the screenshots and PDFs, with certain personally identifiable information redacted, are attached as **Frazer Attachments B-F**.

2

7.  Concerned that I had purchased something other than a true Aetna comprehensive health insurance plan, I searched for and began to read reviews for American Collective on various websites and found that many people were complaining that they too had been deceived by American Collective. These complaints included claims for services not being paid and customers being out lots of money, the insurance not being an actual Aetna policy and not being accepted by providers, and representations that American Collective was pooling the money paid for premiums and paying some but not all the health claims. This concerned me because it seemed like American Collective was attempting to appear legitimate but was actually operating more like a Ponzi scheme. I also researched www.trusted.ramseysolutions.com and learned that this website apparently is not affiliated with Dave Ramsey as I had been led to believe.

8.  After reading these reviews and looking at my son's documents, I realized I had been scammed, I wanted to cancel right away and get a refund. I called the customer service number (888-563-2321) that the sales representative had given me when I purchased the policy but was told my son would need to call. My son then attempted to call but was never able to speak with anyone. I then called back, disguising my voice as a male, and attempted to cancel. I, too, had difficulty getting through to a representative. Many times, the phone would ring and ring and other times, I was placed on hold and no one ever picked up. A few times, I was able to speak with different representatives but was told there was no way out of the plan and we couldn't cancel. I even remember being told we had to keep the policy for a year. One time, I called and when a representative answered, I told them they had scammed me and the representative hung up. I believe they eventually blocked my calls, because my calls no longer went through. I also attempted to call the phone number (463-208-7574) that the representative

3

had called me from but was told they could not help with the cancellation, and I would need to contact customer service.

9.     Being unable to cancel this insurance policy with American Collective, on or about December 15, 2025, I contacted my bank and filed a complaint to dispute the charges. My bank cancelled my debit card, issued me a new one, and provisionally credited my account while they investigated the $259.05 charge I had paid to American Collective.

10.     Also, on or about December 15, 2025, I submitted online complaints about my experience to the Better Business Bureau ("BBB") and the Federal Trade Commission's Consumer Sentinel Network ("FTC"). American Collective never responded to either complaint. True and correct copies of my BBB and FTC complaints, with certain personally identifiable information redacted, are attached as **Frazer Attachments G and H**.

11.     Sometime in mid-late January 2026, American Collective credited my bank account the full $259.05 I had paid. I received no communication from American Collective regarding this refund and only know because I saw the credit in my account. My bank then took back the provisional credit they had given me.

12.     FTC staff showed me **Attachment F**, which is a document I had sent to the FTC after downloading it from the American Collective portal. This document contains the *American Collective, LP New Limited Partner Joinder Agreement,* the *American Collective LP Terms of Use,* and the *Medical Plan Document and Summary Plan Description (SPD) For American Collective Unity Plans.* Page 5 of the *Joinder Agreement* as well as the last page of the document package, which is a full and complete understanding of the programs and an agreement to join American Collective, LP, are purportedly signed by my son, Christian Blake Bunker, as a New Active Limited Partner (NALP). My son was not on the call, did not agree to any of these conditions, nor

4

did he sign any of these documents. His signature on these documents is fraudulent, in my opinion. In fact, page 21 of the *Joinder Agreement* actually contains the signature of someone named "Alejandra Borucki" as the Limited Partner. I don't know anyone named Alejandra Borucki.

13. American Collective collected a total of $259.05 from me. In exchange, my son did not receive the comprehensive health and prescription insurance coverage or benefits promised during the December 14, 2025, sales call. The American Collective plan I paid for was not what the representative described on the phone, and I wouldn't have purchased it if the representative had truthfully explained what I was actually buying. Thankfully, my payment to American Collective was refunded by my bank, and ultimately refunded by American Collective, but the stress of this entire situation, including realizing that my son did not have health insurance was, upsetting. I spent a lot of time on the phone trying to cancel the purchase from American Collective. I also spent additional time hunting down and enrolling my son in true government-sponsored health insurance, which was stressful as well because I was afraid of being ripped off again.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2026.

Lisa Frazer

5

# FRAZER ATTACHMENT A

# PAYMENT RECEIPT

3:34

...ber.adv.americancollectivelp.com ⬆

← **My Transactions**

Transaction ID
11529603173

> Transaction Date           Total Amount
> December 30, 2025          $259.05

Payment Method
Credit Card

Transaction ID                    **APPROVED**
11475980019

> Transaction Date           Total Amount
> December 14, 2025          $259.05

Payment Method
Credit Card


**Dashboard**


Documents

  +  1  • • •

# FRAZER ATTACHMENT B

# SCREENSHOT OF EMAILS FORWARDED FROM SON



2:44

**Christian Bunker**                    12/15/25

Fwd: American Collective - Enrollment...

---------- Forwarded message ------...

**Christian Bunker**                    12/15/25

Fwd: American Collective Partner Portal

---------- Forwarded message ------...

**Christian Bunker**                    12/15/25

Fwd: American Collective - Partner Ac...

---------- Forwarded message ------...

**Christian Bunker**                    12/15/25

Fwd: American Collective - Payment R...

---------- Forwarded message ------...

# FRAZER ATTACHMENT C

# MEMBERSHIP CARD

2:28

.ıll 🤏 87

← **Membership Card**



**AMERICAN**
Collective LP

Partner Services: 866-270-1554

Name:
Member ID:
Group #: N/A
Dependent(s):

Partner Out of Pocket
PCP: $25
Specialist: $50
Urgent Care: $100
Preventive Care: $0

**revive**
the virtual care clinic

$0 co-Pay Telehealth
Search: member.myrevive.health/registration-search
Enrollment Code: AMERICANCLP
Login: member.myrevive.health
888-220-6650

DOWNLOAD

Dashboard

Documents

←        +        4        • • •

# FRAZER ATTACHMENT D

# PORTAL LOGIN CREDENTIALS



3:30

Welcome to American Collective! Your enrollment has been successfully completed. Now let's get started using your plan.

Get started by registering your partner portal – your personalized care journey begins here. Your partner portal is your central access point to manage your health plan —view digital ID cards, review your benefits, check co-pays and out-of-pocket maximums, search for providers, view claims, and more.

Your login credentials will be the email used upon enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.adv. americancollectivelp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ▮▮▮▮▮▮**@gmail.com**
Temporary Password: ▮▮▮▮▮▮▮

We recommend you bookmark the page below for

↩ Reply          ↪ Forward          ☺

3:30

Your login credentials will be the email used upon enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.adv.americancollectivelp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ███████@gmail.com
Temporary Password: ████████

We recommend you bookmark the page below for easy reference and quick access to your portal. However, should you have any questions contact our Partner Services Team at partnerservices@americancollectivelp.com.



(866) 270-1554
partnerservices@americancollectivelp.com

↩ Reply          ↪ Forward          ☺

# FRAZER ATTACHMENT E

# UNITY 2 SUMMARY

3:34

  

...ber.adv.americancollectivelp.com

← **Program Information**



**Summary**      **Eligible Services**      **Enrolle** >

# Unity 2

The First Health Network is one of the largest and most comprehensive independent participating provider (PPO) networks in the United States. Your plan includes participation in this network. When you go to a participating provider, First Health will reprice the charges from your doctor and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please contact 866.270.1554

View Brochure



Dashboard



Documents

            1         • • •

# FRAZER ATTACHMENT F

# AMERICAN COLLECTIVE DOCUMENTS

# AMERICAN COLLECTIVE, LP
# NEW LIMITED PARTNER JOINDER AGREEMENT

**THIS NEW LIMITED PARTNER JOINDER AGREEMENT** ("Agreement") is made and entered into effective for all purposes and in all respects on the date of execution indicated below by American Collective. LP, a Texas limited partnership ("American") and CHRISTIAN BUNKER as New Active Limited Partner ("NALP") (collectively , the "parties").

**WHEREAS,** American was formed subject to that certain Limited Partnership Agreement dated July 16, 2025. among Shermar Moore, as the General Partner. and the limited partner(s) named therein (the "Partnership Agreement") (capitalized terms used and not otherwise defined herein have the meanings given them in the Partnership Agreement); and

**WHEREAS,** American desires to gift an Active Limited Partnership Interest in American to NALP; and

**WHEREAS,** NALP desires to accept a gift of an Active Limited Partnership Interest and become an Active Limited Partner of American subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions contained herein, the parties agree as follows:

## ARTICLE 1
## PURPOSE

The purpose of this Agreement is to establish the terms and conditions upon which American gives and NALP receives an Active Limited Partnership Interest in American. and to confirm that NALP adopts and agrees to all of the terms on the Partnership Agreement which is attached hereto as Exhibit A.

## ARTICLE 2
## ACKNOWLEDGEMENT OF THE NATURE OF ACQUIRING AN ACTIVE LIMITED PARTNERSHIP INTEREST

The parties hereby acknowledge that no money has been exchanged for the issuance of the Active Limited Partnership Interest hereunder by American to NALP; however. NALP has agreed to provide a minimum of five hundred (500) hours of work activity on the internet. This acquisition of the Active Limited Partnership Interest is conditioned upon and subject to the terms of both this Agreement and NALP's compliance with the terms of the Partnership Agreement, as may be amended from time to time.

## ARTICLE 3
## ACTIVE LIMITED PARTNERSHIP INTEREST
Page 1 of 21

Subject to the terms and conditions of this Agreement and the Partnership Agreement, herein incorporated by reference and included as Exhibit A to this Agreement, American hereby gives to NALP an Active Limited Partnership Interest which is represented as a portion of a unit of American as described in Article XV of the Partnership Agreement. This Active Limited Partnership Interest entitles NALP to participate as a Limited Partner in American, with voting rights equal to NALP's Active Limited Partnership Interest in American.

## ARTICLE 4
## ADHERENCE TO PARTNERSHIP AGREEMENT

In accepting this Active Limited Partnership Interest, NALP hereby agrees (i) that NALP is a party to and bound by the Partnership Agreement, (ii) to take notice of, accept, and abide by the terms of the Partnership Agreement, and (iii) to execute and deliver such additional agreements, instruments, certificates, and documents as may be necessary, appropriate or convenient to reflect the foregoing matters and the election of American. NALP hereby acknowledges that they have had an opportunity to review all terms of the Partnership Agreement and to receive advice from their independent legal counsel. NALP accepts this gift of an Active Limited Partnership Interest freely and without reservation and fully supports the mission of American, its interest in adding new partners which may dilute NALP's own newly acquired interest/voting rights in American, and all provisions of the Partnership Agreement.

NALP specifically agrees to and understands the provisions of the Partnership Agreement related to NALP's status as a **Working Partner,** whereas NALP will assist in the collection, aggregation, and selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.

## ARTICLE 5
## NOT SECURITIES

NALP acknowledges that, due to the nature of the acquisition of an Active Limited Partnership Interest and the structure of American, NALP's Active Limited Partnership Interest is not a security and is not subject to federal or state securities laws. Furthermore, based on the terms of the Partnership Agreement, NALP acknowledges that no interest in American is a security interest and that all interests in American are not subject to federal or state securities laws.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE LAWS OF ANY STATE. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE

GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## ARTICLE 6
## EFFECTS

In accordance with the Partnership Agreement. American shall amend the roster of Active Limited Partners to include NALP. To the extent the General Partner of American determines that it is in the best interest of American to certify its Partnership Interests, American may provide NALP with a certificate reflecting NALP's Limited Partnership Interest in American.

## ARTICLE 7
## PLANS AND TERMINATION/WITHDRAWAL

NALP understands that Limited Partnership has created an employee health benefit plan (the "Plan") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") which is only available to employees and working owners such as Active Limited Partners. NALP also understands that Limited Partnership may provide other benefits in the future which will be available to Active Limited Partners as may be decided from time to time by the General Partner.

NALP understands that it is in no way obligated to enroll in any Partnership sponsored benefit plan and that if he/she chooses to enroll in any benefit plan, NALP is free to withdraw from said benefit plan in accordance with the terms of the Plan without losing his/her status as an Active Limited Partner. NALP also understands that that if he/she ceases acting as a Working Partner, NALP's benefit plan, if any, may automatically continue coverage pursuant to the Consolidated Omnibus Budget Reconciliation Plan of 1986, as amended ("COBRA") without an active election. as may be decided from time to time by, and in the discretion of, the General Partner. NALP is free to withdraw from said benefit plan at any time.

To the extent NALP enrolls in any the Plan, NALP agrees that a portion of the monthly payment made for benefits under the Plan shall include an administrative fee to cover administrative expenses of the Plan. The amount of the administrative fees shall be determined by the General Partner, in his discretion, and may change from time to time.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1  Duty as an Owner.**
NALP understands that he/she is a co-owner of American and thus owes a duty to his/her fellow Limited Partners, the General Partner, and the Partnership in general. NALP understands that in the process of recruiting new Limited Partners is always possible that a prospective Limited Partner may have been contacted by telephone, text message, email, or some other type of electronic means without having first received the consent of the individual contacted. NALP hereby specifically waives any and all claims that he/she may possibly have regarding a state or national Do Not Call List Registry, the Telephone Consumer Protection Act (47 USC § 227), any similar federal or state laws or regulations, and any other type of cause of action regarding how

NALP may have been recruited to become a Limited Partner and/or owner of American.

**8.2    Severability.**

Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable for any reason, the validity of the remaining provisions of this Agreement shall not be affected thereby and the unenforceable provision shall be deemed not to be a part of this Agreement.

**8.3    Entire Agreement; Waiver; Modification.**

This Agreement and the Partnership Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. No provision of this Agreement may be modified or waived except in writing signed by both parties.

**8.4    Anti-Waiver.**

The failure of any party to enforce any of its rights arising by reason of any breach of covenant or failure of condition on the part of the other party will not constitute a waiver of such breach. No custom or practice arising between the parties in the course of administering the Agreement will be construed to waive any party's right to: (i) insist upon the performance of the other party of any covenant or condition in the Agreement, or (ii) exercise any rights provided to it on the account of any breach of such covenant or failure of such condition.

**8.5    Captions.**

Captions in this Agreement are inserted for convenience only and do not define, describe or limit the scope or the intent of this Agreement or form a part thereof.

**8.6    Interpretation.**

The parties acknowledge that each of them and their respective counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the party responsible for drafting the agreement shall not be applied in the interpretation of this Agreement. In entering into this Agreement each of the parties represents that it has relied upon the advice of counsel of its own choosing and that it has read in full and understood the terms of this Agreement and voluntarily accepted the same.

**8.7    Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one document. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, .GIF, etc.) signature shall be deemed to be an original.

**8.8    Arbitration.**

Except as otherwise required by law, all disputes arising under or related to this Agreement (including, but not limited to, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel, or laches) shall be resolved by binding arbitration in Dallas County, Texas before JAMS, or its successor, pursuant to the FAA, by filing a written demand for arbitration with JAMS, with a copy to the other parties. The arbitration will be conducted in accordance with the provisions of JAMS' Comprehensive Arbitration Rules and Procedures (the "JAMS Rules") in effect at the time of filing of the demand for arbitration; provided, that the parties agree that (i) the arbitration shall be conducted by three (3) arbitrators (unless the parties agree to a smaller number) selected in accordance with the JAMS Rules, and (ii) each party shall bear its or his own costs and expenses in any such arbitration and one-half of the arbitrators' fees and expenses. By agreeing to arbitration, the parties hereto do not intend to deprive any court

20890817 1

of its jurisdiction to issue a pre- arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration.

**8.9     Governing Law; Venue.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. Although it is the intention of the parties that the arbitration provisions in Section 8.8 of this Agreement be fully enforced, to the extent any judicial action is required in aid of Section 8.8 of this Agreement or otherwise, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date written below.

**American Collective, LP**

*Sherman Moore*

Its: Manager
Shermar Moore

**NALP:**

X : *Christian Blake Bunker*

CHRISTIAN BUNKER

Date: 14 Dec 2025 21:12:00 GMT
Effective Date: 15 Dec 2025
IP Address: 69.230.93.166
Device Identity: Google Chrome

## EXHIBIT A

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

THE CONTENTS OF THIS AGREEMENT ARE CONFIDENTIAL. NEITHER PARTY WILL DISCLOSE, PERMIT THE DISCLOSURE OF, RELEASE, DISSEMINATE, OR TRANSFER, ANY INFORMATION OBTAINED HEREUNDER OR OTHERWISE RELATED TO THE AGREEMENT TO ANY OTHER PERSON OR ENTITY EXCEPT A PARTY'S IMMEDIATE STAFF, EMPLOYEES, CONSULTANTS, ACCOUNTANTS, ATTORNEYS, OR OTHER PROFESSIONAL RETAINED FOR THE PARTY'S DUE DILIGENCE REVIEW OF THE AGREEMENT AND EXCEPT, WITH PRIOR NOTICE TO COMPANY, PURSUANT TO LEGAL COMPULSION.

## LIMITED PARTNERSHIP AGREEMENT
## OF AMERICAN COLLECTIVE, LP

This Limited Partnership Agreement of American Collective, LP (the "Agreement") is made and entered into effective for all purposes and in all respects as of July 16, 2025 by Shemar Moore, as General Partner ("GP") and the Limited Partner who is a signatory hereto, as well as other Limited Partners which may be added from time to time pursuant to the provisions of the Texas Limited Partnership Act (Title 4, Chapter 153), this Agreement, and by subsequent agreements.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following terms and conditions.

## ARTICLE I.
## DEFINITIONS

**Section 1.01: Terms.**

When used in this Agreement, the following terms shall have the following meanings unless the context requires otherwise.

a.      "Agreement" means this Limited Partnership Agreement.

b.      "Certificate" means the Certificate of Limited Partnership described in Section 2.

c.      "Code" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent U.S. revenue laws.

d.  "General Partner" or "GP" means any person or entity from time to time admitted to the Partnership as an additional or substituted General Partner in accordance with this Agreement, and such persons' permitted successors and assigns.

e.  "Joinder Agreement" means an agreement in form and substance satisfactory to the General Partner, entered into between the Partnership and each new Limited Partner and providing for the joining of the Partnership and the possible return or revocation, as the case may be, of Limited Partnership Interests.

f.  "Active Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

g.  "Inactive Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and does not meet the definition of an "Active Limited Partner".

h.  "Limited Partners" means individuals that are either Active Limited Partners or Inactive Limited Partners, as defined herein.

i.  "Partners" means the General Partner(s) and all Limited Partners

j.  "Partnership" means American Collective, LP.

k.  "Partnership Interest" means each Partner's right to participate in the Partnership, either as a Limited Partner (a "Limited Partnership Interest") or as a General Partner (a "General Partnership Interest"), as the case may be.

l.  "Limited Partnership Act" means the Texas Business Organizations Code, including, but not limited to, Title 4, Chapter 153.

m.  "Successor General Partner" has the meaning specified in Section 10.01.

n.  "Tax Matters Partner" means the Partner so designated pursuant to Section 9.

o.  "Working Owner" means the General Partner or any Active Limited Partner.

**Section 1.02: Usage.**

All references to Article or Section numbers, unless otherwise indicated, refer to articles or sections of this Agreement. Headings are used for convenience only and do not form a part of this Agreement. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, and to the singular or plural, as the identity of the person, persons, entity, or entities to whom or which they refer may require.

## ARTICLE II.
## FORMATION OF LIMITED PARTNERSHIP

**Section 2.01: Formation.**

The Partners hereby form a limited partnership pursuant to the provisions of the Limited Partnership Act. The rights and liabilities of the Partners shall be as provided under the Limited Partnership Act, except as otherwise expressly provided in this Agreement. The General Partner shall execute and, as it deems appropriate, cause to be filed, recorded, and published a Certificate of Limited Partnership (the "Certificate") and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the Limited Partnership Act.

**Section 2.02: Name.**

The limited partnership formed hereby shall operate under the name of American Collective, LP ("Partnership").

**Section 2.03: Initial Registered Agent, Registered Address, and Principal Place of Business**

The initial registered agent shall be CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, and the initial principal place of business shall be 650 Poydras St., Suite 1400 PMB #6807, New Orleans, LA 70130. The business of the Partnership may also be conducted at such other or additional place or places as may be designated by the General Partner. The registered address and principal place of business may be changed from time to time at the discretion of the General Partner.

**Section 2.04: Term.**

The Partnership shall begin business on the date on which the Certificate of Limited Partnership is filed with the Secretary of State of the State of Texas and shall continue in perpetuity until terminated as provided herein.

## ARTICLE III.
## PURPOSES OF THE PARTNERSHIP

**Section 3.01**

The purposes of the Partnership shall be any legal purposes and shall include, but not be limited to, (i) promoting an understanding and awareness of data usage and security issues; (ii) assisting the Active Limited Partners to secure their personal data and information; (iii) assisting the Active Limited Partners in gathering and collection of data in general; (iv) the capture, segregation, aggregation, and sell to third-party marketing firms of both electronic and health data generated by Active Limited Partners and others; (v) assisting the Partners with marketing and monetizing the data and information collected by Active Limited Partners and others to third parties in a secure manner while removing any individual identifying information; (vi) providing the employees and the Active Limited Partners the opportunity to participate in Partnership- sponsored health insurance programs, the cost of which may be reduced by income generated from revenues from marketing Active Limited Partners' data and information; (vii) encouraging

scholarship and research in this field; (viii) promoting publications in this field; and (ix) fostering communications among teachers and scholars to enhance the public's understanding of data usage and security.

## Section 3.02

In order to promote the interest of the Partnership and to help recruit a significant number of Active Limited Partners which may be necessary to fulfill the needs of the Partnership and promote its ultimate success, the Partnership is authorized to provide and sponsor various health benefit plans to its common law employees and Active Limited Partners as the General Partner determines to be in the best interests of the Partnership. Only common law employees and Active Limited Partners shall be eligible to participate in said plans. Inactive Limited Partners shall not be allowed to participate.

## Section 3.03

In order to promote the purposes of the Partnership, each Active Limited Partner agrees and understands that he/she will function as a Working Owner by providing a minimum of 500 hours of work activity per year promoting the purposes of the Partnership.

## Section 3.04

The Partnership shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Agreement.

## Section 3.05

In carrying out the Partnership's purposes, the Partnership shall be empowered to (i) exercise all powers necessary to or reasonably connected with the Partnership's business that may be legally exercised by limited partnerships under the laws of the State of Texas and (ii) engage in all activities necessary, customary, convenient, or incidental to any of the foregoing.
The Partnership may engage or work with other entities from time to time as co-owners to promote and pursue the Partnership's purpose.

## Article IV.
## ACCOUNTING FOR THE PARTNERSHIP

### Section 4.01: Annual Statements.

The General Partner shall cause annual financial statements of the operations of the Partnership to be prepared and made available upon reasonable request to each Limited Partner. Such financial statements need not be audited unless the General Partner determines that audited financial statements are necessary, or unless audited financial statements are required by creditors of the Partnership.

### Section 4.02: Access to Accounting Records.

Any Limited Partner shall have reasonable access to the accounting records of the Partnership during regular business hours of the Partnership.

20890817 1

**Section 4.03: Income Tax Information.**

The General Partner shall make available to each Limited Partner information on the Partnership's taxable status and any business taxable income or loss and each item of income, gain, loss, deduction, or credit that is relevant to reporting Partnership income and how each Limited Partner is impacted by such income. This information shall be available to each Limited Partner within one hundred eighty (180) days after the close of the Partnership's taxable year, and, upon request to the General Partner, a copy of the Partnership's federal return of income for such year shall also be furnished.

**Section 4.04: Bank Accounts.**

The funds of the Partnership shall be deposited in such separate federally insured bank account or accounts as may be required, and the General Partner shall arrange for the appropriate conduct of such account or accounts.

**Section 4.05: Books of Account.**

There shall be kept at the principal office of the Partnership true and correct books of account in which shall be entered fully and accurately each and every transaction of the Partnership. The books shall be kept on the cash receipts and disbursements method for the Partnership's accounting year.

**Section 4.06 Accounting Year.**

The Partnership accounting year shall be the accounting year of the Partnership for both book and (as applicable) tax purposes, beginning January 1st and ending December 31st of each year.

**Article V.**
**ACQUISITION OF PARTNERSHIP INTEREST AND CAPITAL CONTRIBUTIONS**

**Section 5.01: Acquisition of Partnership Interest; Capital Contributions; Potential Future Revenue Potential.**

Each Inactive Limited Partner shall make a capital contribution in an amount determined by the General Partner in exchange for his/her interest in the Partnership. Active Limited Partners shall not make a capital contribution, other than his/her work effort as described herein, in exchange for his/her interest in the Partnership. The General Partner shall not have any personal liability for the repayment of any Limited Partner's capital contribution.

Notwithstanding the foregoing, it is intended that the Active Limited Partners will be given the opportunity to participate in one or more programs sponsored by the Partnership to market their personal data and information, for which the Partnership will receive compensation. Therefore, is hoped that the Partnership will receive income from such activities, which the Partnership intends to utilize to (i) pay its operational expenses, (ii) pay any outstanding debts, provide periodic dividends to the Active Limited Partners, (iv) reduce or eliminate the costs to the Partnership's employees of any sponsored health benefit plans, (v) reduce the costs to the Active Limited Partners of any sponsored health benefit plans, and/or (vi) for other purposes that benefit the Limited Partners. *All Limited Partners understand*

*that periodic dividends may be reported to the IRS.*

**Section 5.02: Loans.**

If the Partnership requires additional capital, the General Partner is authorized to cause the Partnership to borrow money upon such terms as the General Partner, in its sole discretion, shall determine and to mortgage, pledge, or hypothecate the assets of the Partnership in connection with such borrowing. In that event, the General Partner may, but shall not be required to, lend funds to the Partnership.

**Article VI.**
**PROFITS AND LOSSES**

**Section 6.01:  Determination.**

The net profits or net losses of the Partnership shall be determined in accordance with the method of accounting adopted by the Partnership.

**Section 6.02:  Allocation of Profits and Losses.**

The net profits of the Partnership shall be allocated eighty percent (80%) to the Limited Partners (in accordance with the formula set forth in Section 15.01) and twenty percent (20%) to the General Partner. Upon any dissolution or winding up of the Partnership, after payment of all debts and obligations, the net assets of the Partnership shall be allocated on the same basis as net profits of the Partnership are allocated as provided in this Section 6.02.

**Article VII.**
**PARTNERSHIP RECORDS**

**Section 7.01**

The General Partner shall cause the Partnership to maintain at its offices (i) a current list of the full name and last known business address of each Partner, (ii) a copy of the Certificate, (iii) copies of tax filings and financial statements for the previous four years, and copies of any then effective limited partnership agreements related to the Partnership.

**Article VIII.**
**PARTICIPATION IN ALLIANCES AND CONTRIBUTION OF PARTNER INFORMATION**

**Section 8.01:  Participation in Strategic Alliances.**

In connection with the purposes and activities described in Article III, and subject to the discretion of the General Partner, the Partnership may enter into one or more agreements, associations, or other arrangements with other organizations involved in the collection, maintenance, marketing, and use of data to help establish guidelines for certain business operations, share costs, and negotiate equitable revenue from said business operations. The  General Partner is authorized to negotiate, execute and deliver a charter and such other documents and instruments as it may deem (in its sole discretion) reasonable or appropriate to enter into and/or consummate such associations.

**Section 8.02:  Contribution of Partner Data.**

All Active Limited Partners acknowledge that, for so long as he/she remains an Active Limited Partner, each Active Limited Partner has the duty to contribute, and Partnership may collect, certain personal information and data generated from the use of the internet, mobile apps, "Smart" TVs, and other electronic devices, including without limitation information by which the Active Limited Partner may be personally identified, such as a postal address, e-mail address, telephone number, partnership benefits elections, internet usage information, mobile device app usage information, geo-location information or any other identifier by which such Active Limited Partner may be contacted ("Partner Data").

**Section 8.03:  Ownership and Use of Partner Data.**

All such Partner Data, in its aggregated form, shall be the property of the Partnership and may be used at the sole discretion of the General Partner in connection with or in support of the Partnership's business and administrative purposes. Partner Data may also be used by the Partnership to contact Active Limited Partners about goods and services that may be of interest to Active Limited Partners, provided that the Partnership provides a means by which Active Limited Partners may opt out of such use. The Partnership may disclose aggregated Partner Information and information that may, or may not, identify any individual, without restriction. The Partnership may disclose Partner Information that it collects from Active Limited Partners (or that an Active Limited Partner otherwise provides to the Partnership) to the Partnership's subsidiaries and affiliates, to contractors, service providers, and other third parties the Partnership uses to support its business, and to third parties to market their products or services to Active Limited Partners who have not opted out of such disclosures. The Partnership may also disclose Partner Information to comply with any court order, law, or legal process, including to respond to any government or regulatory request, and to enforce its rights under any applicable agreement or applicable law, including for billing and collection purposes.

**Section 8.04:  Data Security.**

The Partnership shall use commercially reasonable legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the Partner Data and to protect the Partner Data from unauthorized access, disclosure, duplication, use, modification, or loss. The Partnership shall attempt to obtain data protection insurance or similar insurance to the extent such insurance is available, and the premiums are commercially reasonable.

**Section 8.05:  Objection to Use by Active Limited Partner.**

All of the foregoing and other uses of Partner Data are at the discretion of the General Partner. In the event an Active Limited Partner objects to any use of such Active Limited Partner's Partner Data, such Active Limited Partner must notify the Partnership of its objection and opt out of such use. In that case, such Active Limited Partner shall be deemed to have exercised its right to return its Active Limited Partnership Interest to the Partnership. Upon return of its Active Limited Partner Interest, the General Partner will provide a withdrawing Active Limited Partner within formation and instruction necessary to terminate and/or remove any software provided by the Partnership which captures and transmits Partner Data. All Partner Data provided to the Partnership

prior to the withdrawal of an Active Limited Partner as well as all Partner Data transmitted to the Partnership after withdrawal and before termination and/or removal of any data capturing software shall remain the property of the Partnership to be used in accordance with the terms and conditions of this Agreement.

## Article IX.
## ADMINISTRATIVE PROVISIONS

### Section 9.01:  Management by the General Partner.

All of the business of the Partnership, including, but not limited to, decisions on all tax elections and the voting of any shares of stock owned by the Partnership, shall be under the exclusive management of the General Partner. The Limited Partner(s) shall not participate in the management or operation of the business of the Partnership.

### Section 9.02:  Tax Matters Partner.

The General Partner shall serve as the "Tax Matters Partner" for the Partnership. The Tax Matters Partner shall perform, and hereby agrees to perform, certain duties and obligations imposed upon a "Tax Matters Partner", as defined in § 6231(a)(7) of the Code, in connection with the audit or review of a Partnership federal return of income, as such duties and obligations are set forth in § 6221 of the Code and following sections. For all years for which the Bipartisan Budget Act of 2015 applies, the Tax Matters Partner shall also be the "Partnership Representative" of the Company under section 6223(a) of the Code (as enacted by the Bipartisan Budget Act of 2015). The Tax Matters Partner shall be reimbursed by the  Partnership for expenses incurred in the performance of such duties, including legal and accounting fees incurred in connection with such duties as Tax Matters Partner.

The General Partner shall have the right at any time to resign as Tax Matters Partner, by giving notice of such resignation in writing to all Partners. In the event it resigns, ceases to be a General Partner of the Partnership, or is unable or unwilling to serve as Tax Matters Partner for any reason, a new Tax Matters Partner will be appointed by a unanimous vote of the Partners.

### Section 9.03:  Time Devoted by the General Partner.

The parties understand that the General Partner has other business activities which over the year take a major part of the respective total time devoted to business matters. Accordingly, the General Partner is required to devote to the business of the Partnership only the time and attention as they, in their sole discretion, shall determine what is required to conduct the business of the Partnership.

### Section 9.04:  Limitation on Liability of General Partners, Indemnification.

To the fullest extent permitted by the Limited Partnership Act, the General Partner shall have no liability, responsibility, or accountability, in damages or otherwise, to any other Partner or the Partnership, and the Partnership agrees to indemnify, pay, protect, and hold harmless the General Partner (on the demand of and to the satisfaction of such General Partner) from and against, any and all liabilities, obligations, losses, damage, penalties, actions, judgments, suits, proceedings, costs, expenses, and disbursements, of any kind or nature whatsoever (including, without limitation, all costs and expenses of defense, appeal, and settlement of any and all suits,

actions, or proceedings. instituted against any such General Partner or the Partnership and all costs of investigation in connection therewith) ("Losses ") which may be imposed on, incurred by, or asserted against any such General Partner or the Partnership in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Partnership or on the part of any such General Partner as General Partner of the Partnership; provided that the General Partner shall be liable, responsible. and accountable, and the Partnership shall not be liable to the General Partner, for any portion of such Losses resulting from the General Partner's gross negligence or a willful breach of General Pa1iner's fiduciary duty to the Partnership or any Partner.

If any action, suit, or proceeding shall be pending or threatened against the Partnership or the General Partner relating to or arising out of, or alleged to relate to or arise out of. any such action or non-action, the General Partner shall have the right to employ, at the expense of the Partnership, separate counsel of the General Partner's choice in such action, suit or proceeding. The satisfaction of the obligations of the Partnership under this Section shall be from and limited to the assets of the Partnership and no Partner shall have any personal liability on account thereof. The General Partner shall have the right to bill the Partnership for. or otherwise request the Partnership to pay. at any time and from time to time after the General Partner has become obligated to make payment therefor, any and all amounts for which the General Partner believes, in good faith, that such General Partner is entitled to indemnification under this Section. The Partnership shall promptly pay any and all such bills and honor any and all such requests for payment when such bill or request is received by such General Partner. In the event that a final determination is made that the Partnership is not so obligated in respect of any amount paid by it to the General Partner. such General Partner shall promptly refund such amount to the Partnership.

The Partnership shall indemnify. to the extent of Partnership assets, the Limited Partners against any claims of liability asserted against the Limited Partners solely because they are Limited Partners of the Partnership.

**Section 9.05: Fees of General Partner.**

The Partnership shall pay reasonable fees to the General Partner for services rendered to the Partnership, as determined by the General Partner; provided, that such fees shall not exceed the fair market value of the applicable services, and any agreements providing for such fees shall be negotiated at arm's length.

**Section 9.06: Limited Liability of Limited Partners.**

A Limited Partner shall not be liable for the debts. liabilities. contracts, or any other obligations of the Partnership. Except as otherwise provided in this Agreement, a Limited Partner shall not take part in. or interfere in any manner with. the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.

**Section 9.07: Additional Authority of General Partner.**

The General Partner and Limited Partner(s), by signing and executing this Agreement, hereby authorize GP as General Partner, to take, permit, and/or omit any action or actions, and to do or have done any action or actions. which are, or may be. consistent with or authorized by the provisions of this Agreement, and irrevocably make, constitute and appoint GP as General Partner. as true and lawful

agent and attorney-in-fact with full power of substitution and with power and authority in each Limited Partner's name, place, and stead to make, sign, execute, acknowledge, swear to, deliver, perform, implement, file, and record any and all agreements, limited partnership agreements, deeds of trust, promissory notes, financing and continuation statements, certificates, options, leases and other conveyances and other documents or instruments, including, but not limited to, the amended certificate and every amended or restated certificate which GP as General Partner, considers to be required, necessary, desirable, or convenient (i) for, to, or in connection with the acquisition and ownership by the Partnership of interests in property, and (ii) for, to, or in the management of conduct of the business of the Partnership.

The power of attorney granted by each Limited Partner is a special power of attorney which (1) is irrevocable, (2) is coupled with an interest, (3) shall survive the death of the Limited Partner, (4) shall not be affected by the subsequent disability or incompetence of the Limited Partner, (5) shall survive the dissolution or termination of a Limited Partner which is a corporation, general or limited partnership, joint venture, trust, estate, or other entity or association, and (6) shall survive the sale, exchange, or other transfer by a Limited Partner of all or any portion of the Limited Partner's interest, where the assignee has been approved by GP as General Partner, for admission to the Partnership as a limited partner, and shall survive such admission and constitute a similar power of attorney from such assignee as a Limited Partner. If there is more than one Limited Partner, the power of attorney may be exercised by GP, as General Partner, for all the Limited Partners by a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all the Limited Partners together, or by listing all of the Limited Partners and executing any instrument with a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in- fact for all of the Limited Partners together.

Each Limited Partner expressly agrees to be bound by the representations made by GP as General Partner, acting pursuant to this Section 9.07, and hereby waives any and all defenses which shall be available to such Limited Partner to contest, negate, or disaffirm the actions of GP as General Partner pursuant to this Section 9.07.

Notwithstanding anything contained herein above or below to the contrary, any General Partner may act alone for and on behalf of the Partnership without the necessity of signatures, including but not limited to the exercise of the power of attorney granted to the General Partner under Section 9.07 of this Agreement.

**Section 9.08:  Voting Procedures.**

On all matters requiring a vote of the Partners under this Agreement, the General Partner shall provide written notice to all Partners of (i) the material substance of such vote, (ii) the General Partner's voting recommendation and reasons for such recommendation; (iii) the date by which votes must be received by the Partnership in order to be counted; and (iv) instructions on how each Partner shall cast their votes. Such notice may be delivered by email or other electronic means to all Limited Partners. Votes may be cast by Partners by email or other electronic means as specified in the notice. Where a vote is required of the Partners under this Agreement and does not require a unanimous vote, a simple majority of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Where a unanimous vote is required of the Partners under this Agreement, the unanimous consent of all Partnership Units casting votes on or before the voting deadline set forth

in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Any Partner who fails to cast a vote on or before the voting deadline set forth in the notice shall be deemed to have abstained from the vote and such Partner's Partnership Units shall not be included in the determination of a simple majority or unanimous vote.

## Article X.
## DEATH OR WITHDRAWAL OF A PARTNER

**Section 10.01: Resignation or Withdrawal of a General Partner.**

The Partnership shall not dissolve upon the following events: (a) incapacity of a General Partner, (b) filing, in any court pursuant to any federal or state statute, of a petition in bankruptcy or insolvency by, for a reorganization by, or for the appointment of a receiver of all or a portion of the petitioner's property by a General Partner, and/or (c) making an assignment for the benefit of creditors by a General Partner. Any General Partner may resign upon thirty (30) days' notice to all of the Partners.

In the event of a vacancy in the position of General Partner, a successor General Partner shall be appointed the General Partner. The General Partner will be authorized to appoint its successor any time prior to its departure as General Partner or within thirty (30) days of its vacating the position of General Partner. If the General Partner fails to appoint a successor, a successor General Partner will be appointed by a vote of the Limited Partners.

**Section 10.02: Death, Bankruptcy, or Incapacity of a Limited Partner.**

The death, bankruptcy, or incapacity of a Limited Partner shall not dissolve the Partnership.

**Section 10.03: Amended Certificate of Limited Partnership.**

Upon transfer or conversion of any General Partnership Interest, the Partnership shall file for record an amended Certificate and each Partner hereby agrees to execute such instrument, if requested.

**Section 10.04: Revocation of Limited Partnership Interest.**

Pursuant to a Limited Partner's Joinder Agreement, a Limited Partner's Partnership Interest may be revoked by the Partnership as noted in such Agreements as determined solely by the General Partner. Such action will immediately terminate any Partnership Interest in the Partnership held by such Limited Partner.

## Article XI.
## TRANSFER OF A PARTNERSHIP INTEREST

**Section 11.01: Prohibited Transfer of a Partnership Interest.**

Except as provided in this Article XI, no Partner may transfer or dispose of any Partnership Interest by sale, assignment, gift, or otherwise without the written consent of the General Partner. Any sale, assignment, gift, or transfer, or the purported sale, assignment, gift, or transfer, of any

Partnership Interest, except as specifically provided for and allowed in this Article XI, shall be null and void. This Article does not apply to revocations pursuant to Article X.

**Section 11.02: Transfer of a Partnership Interest by Sale.**

Transfers of a Partnership Interest by sale are not permitted except with the prior written consent of the General Partner.

**Section 11.03: Transfer of a Partnership Interest by Gift at the Death of a Partner.**

Any gift of a Partnership Interest or any transfer of Partnership Interest after the death of a Partner may be made only on the following conditions:

a. The estate of the deceased Partner or the Partner making a gift of a Partnership Interest (the "Donor") must grant a one (1) year period during which the General Partner may approve or deny the transfer of Partnership Interest; or

b. Any gift or transfer, or purported gift or transfer, of any Partnership Interest after the death of a Partner, except as otherwise provided in this Article XI, shall be null and void unless made strictly in accordance with the provisions of this Article XI.

**Section 11.04: Substituted Limited Partner.**

No transferee of the whole or any portion of a Limited Partner's interest in the Partnership who is not already a Partner in the Partnership shall have the right to become a substituted Limited Partner in place of the assignor unless:

a. the assignor shall designate such intention in the instrument of assignment;

b. the written consent of the General Partner to such substitution shall be obtained;

c. the instrument of assignment shall be in a form and substance satisfactory to the General Partner;

d. the assignor and assignee named therein shall execute and acknowledge such other instrument or instruments as the General Partner may deem necessary or desirable to effectuate such admission;

e. the assignee shall accept, adopt, and approve in writing all of the terms and conditions of this Agreement as the same may have been amended; and

f. such assignee shall pay or, at the election of the General Partner, obligate him or herself to pay all reasonable expenses connected with such admission, including but not limited to the cost of preparing, filing, and publishing any amendment of the Certificate to effectuate such admission.

**Section 11.05: Further Restrictions on Transfers**

In the case of the transfer of any Partnership Interest in any voluntary or involuntary manner whatsoever (other than as provided in Section 11.01, Section 11.02, and Section 11.03) under judicial order, legal process, execution, attachment, enforcement of a pledge, trust, or encumbrance or sale under any of them, the person to whom the Partnership Interest passes shall offer to give such Partnership Interest in the same manner as provided in Section 11.03 and shall be treated as a "deceased Partner." This section does not apply to revocations as noted in Article X.

No Partner shall make any transfer or assignment of all or any part of his or her interest in

this Partnership if said transfer or assignment would, when considered with all other transfers during the same applicable twelve (12) month period, cause a termination of this Partnership for federal or state income tax purposes, create noncompliance of the Partnership with the Limited Partnership Act.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

### Section 11.07: Security Interest.

No Partnership Interest herein shall be subjected to a security interest by any Partner without the written consent of the General Partner.

### Section 11.08: Transfer of a General Partner's Interest.

In the event that a General Partnership Interest is to be transferred pursuant to the provisions of this Article XI, then said General Partnership Interest shall be converted into a Limited Partnership Interest immediately prior to the closing of said transaction or the making of said transfer and the transferee or recipient shall receive only a Limited Partnership Interest. The Partnership shall file for record an amended Certificate as required by law, which shall specify the portion of the General Partnership Interest converted into a Limited Partnership Interest and the date the conversion occurred. Like other Partnership Interests, a General Partnership Interest may not be sold.

### Section 11.09: Transfer/Granting of Limited Partnership Interest by General Partner to New Limited Partners.

Notwithstanding anything contained herein above or below to the contrary, General Partner shall not be restricted in the granting of any Limited Partnership Interests to third parties desiring to join the Partnership so long as such new Limited Partners agree to the terms and conditions of this Agreement and a Joinder Agreement, and execute such other documents as deemed appropriate by the General Partner. The Partners anticipate a large volume of Limited Partners joining this Partnership and encourage the General Partner to give Limited Partnership Interests to any prospective Limited Partner in the best judgment of the General Partner subject to the terms of this section. Partners understand and agree that their interest's authority in Partnership may be diluted by the addition of new Limited Partners, but that they welcome new Limited Partners and desire for this Partnership to add as many Limited Partners as possible subject to the terms of this section.

### Article XII.
### DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

208908171

**Section 12.01:  Right to Dissolve the Partnership.**

No single Partner shall have the right to cause dissolution of the Partnership. However, one hundred percent (100%) of the Partnership Interests shall have the right to cause a dissolution. Notwithstanding anything to the contrary in this Section 12.01. the General Partner has the right to cause a dissolution of the Partnership if (i) the Partnership purposes are deemed illegal or (ii) if the General Partner determines that the Partnership has failed to become economically feasible or has become economically infeasible to operate as intended.

**Section 12.02:  Winding Up the Partnership.**

In the event of a dissolution. or the death, incapacity, withdrawal, or bankruptcy of the General Partner without determining a successor General Partner. or the mutual consent of all of the Partners, the Partnership shall immediately commence to wind up its affairs. The proceeds from liquidation of Partnership assets shall be applied in the following order.

    a.  Payment to creditors of the Partnership, other than Partners, in the order of priority provided by law;

    b.  Payment to Partners for loans, if any, made by them to the Partnership;

    c.  The balance, if any, shall be distributed among all the Partners as provided in Section 6.02 herein above.

**Section 12.03:  Waiver of Right to Decree of Dissolution.**

The parties hereby agree that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership. Accordingly, each party hereby waives and renounces any rights to a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership.

**Article XIII.**
**TITLE TO PARTNERSHIP  PROPERTY**

**Section 13.01**

Legal title to Partnership property shall be held in the name of the Partnership.  Subject to the provisions of Article IX. and the other provisions hereof, as well as their fiduciary obligations to the Limited Partners, the General Partner shall have the right, power, and authority (without regard to the term of the Partnership), acting for and on behalf of the Partnership, to enter into and execute any lease, contract. agreement, deed, mortgage, or other instrument or document required or otherwise appropriate to lease, sell, mortgage, convey, or refinance Partnership property (or any part thereof), to borrow money and execute promissory notes, to secure the same by mortgage (which term "mortgage" is hereby  defined for all purposes of this Agreement to include deeds of trust, financing statements. chattel mortgages, pledges, conditional sales contracts, and similar security agreements) upon Partnership property, to renew or extend any and all such loans or notes, and to convey Partnership property in fee simple by deed. mortgage. or otherwise. In no event shall any party dealing with such General Partner with respect to any Partnership property, or to whom Partnership property (or any part thereof) shall be conveyed. contracted to be sold, leased, mortgaged, or refinanced (which term "refinanced" is hereby defined for all purposes of this Agreement to include recast, modified, extended, or increased) by such General Partner, be obligated to see to the application of any purchase money. rent. or money borrowed or advanced

thereon, or be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such General Partner, and every contract, agreement, deed, mortgage, lease, promissory note, or other instrument or document executed by such General Partner, with respect to any Partnership property, shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (a) at the time or times of the execution and/or delivery thereof, the Partnership was in full force and effect, (b) such instrument or document was duly executed and authorized and is binding upon the Partnership and all of the Partners thereof, and (c) such General Partner executing and delivering the same were duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership. It is expressly understood and agreed that the manner of holding title to Partnership property (or any part thereof) and any Partnership assets are solely for the convenience of the Partnership. Accordingly, the spouse, heirs, executors or administrators, beneficiaries, successors, or assigns, of any Partner shall have no right, title or interest in or to any Partnership property or Partnership assets regardless of the manner in which title is held; rather, Partnership property and any Partnership assets shall be subject to the terms of this Agreement.

## Article XIV.
## AMENDMENTS

**Section 14.01**

The General Partner shall have the right to amend the Certificate of Limited Partnership or this Agreement without the consent of any Limited Partners for the following purposes: (i) to change the name or address of a Limited Partner; or (ii) to change the name of the registered office or registered agent of the Partnership; or (iii) in the opinion of the General Partner, there is an inconsistent, ambiguous, false or erroneous provision in this Agreement provided the amendment does not adversely affect the rights of the Partners under this Agreement; (iv) in the opinion of counsel for the Partnership, it is necessary or appropriate to satisfy a requirement of the Code with respect to partnerships, a requirement of Limited Partnership Act, or of any federal or state laws or regulations, provided such amendments do not adversely affect the interests of the Partners. Any amendment to the Certificate of Limited Partnership or this Agreement not otherwise expressly addressed in this Section 14.01 shall require the approval of the Partners pursuant to a vote conducted in accordance with Section 9.08.

## Article XV.
## OWNERSHIP UNITS

**Section 15.01**

Each Partnership Interest may be designated in units or fractional part thereof ("Partnership Units") with each unit representing a percentage interest in the voting rights of the Partnership. The General Partner is hereby granted twenty percent (20.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all General Partnership Interests. The Limited Partners, in the aggregate, are hereby granted eighty percent (80.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all Limited Partnership Interests. With respect to each Limited Partner, the Partnership Units shall equal a percentage equal that Limited Partner's pro rata share in relation to the total aggregate number of Limited Partners. But in no case, shall the total number of Limited Partner units exceed eighty percent (80.00%) of the total number of Partnership Units. Each Partnership Interest represents a Partner's entire interest in the Partnership, including such

Partner's right to vote on, consent to, or otherwise participate in any decision or action of or by the Partnership granted pursuant to this Agreement or, subject to applicable provisions of this Agreement, the Limited Partnership Act. Each Partnership Interest shall carry with it the right to vote (as specifically limited herein) as provided in this Agreement.

## Article XVI
## JURISDICTION AND VENUE

**Section 16.01.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. To the extent any judicial action is required in, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the undersigned Partners of American Collective, LP have sworn hereto and hereunto affixed their signatures as of the date and year first above written.

**GENERAL PARTNER**                     **American Collective, LP**

*Shermar Moore*                          *Shermar Moore*

Shermar Moore                            Its:    Manager
                                         Shermar Moore

**LIMITED PARTNER**

*Alejandra Borucki*

Alejandra Borucki, Limited Partner



YOU SHOULD CAREFULLY READ THE FOLLOWING TERMS BEFORE USING THE AMERICAN COLLECTIVE SERVICES. BY CREATING AN ACCOUNT AND USING THE SERVICES, YOU ARE CONSENTING TO BE BOUND BY AND ARE BECOMING A PARTY TO THIS AGREEMENT. IF YOU DO NOT AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, DO NOT LOG ON OR USE THE AMERICAN COLLECTIVE APPLICATION.

NOTICE REGARDING DISPUTE RESOLUTION: THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND A CLASS ACTION/REPRESENTATIVE-TYPE ACTION WAIVER WHICH STATES THAT WE AND YOU AGREE TO RESOLVE ANY DISPUTES IN BINDING ARBITRATION. ALL SUCH ARBITRATION CLAIMS MUST BE BROUGHT IN YOUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE OR MEMBER OR OTHERWISE ON BEHALF OF OTHERS IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE CAPACITY. ARBITRATION PRECLUDES YOU AND US FROM SUING IN COURT OR HAVING A JURY TRIAL.

WHILE YOU MUST AGREE TO THESE PROVISIONS, THERE IS AN OPTION, DESCRIBED BELOW, TO OPT OUT THE ARBITRATION PROVISIONS. THE OPTION TO OPT-OUT IS TIME-LIMITED TO THIRTY (30) DAYS AND REQUIRES YOUR IMMEDIATE ATTENTION. YOU CAN OPT-OUT OF THE ARBITRATION AGREEMENT BY CONTACTING INFO@AMERICANCOLLECTIVELP.COM WITHIN 30 DAYS OF ACCEPTING THESE TERMS.

By continuing to use the Services, You agree as follows:

- Any information that We collect through Your use of the Services is subject to the American Collective Privacy Policy, which is part of these Terms of Use;

- You are at least 18 years old or have been legally emancipated and are otherwise legally qualified to enter into and form contracts under applicable law;

- You understand and intend that this Agreement is a legally binding agreement and the equivalent of a signed, written contract;

- If You create a profile for a third party for whom you are not the parent or legal guardian, You represent and warrant that you have permission from such person to input and share their Personal Data within the App and with other third parties;

- You will use the Services in a manner consistent with applicable laws and regulations and these Terms of Use, as they may be amended by American Collective from time to time; and you shall not use the Services if it is illegal under the applicable law – it is your responsibility to ensure that the use of the services is lawful in the jurisdiction or country

where you are located.

IF YOU DO NOT AGREE WITH AND ACCEPT THESE TERMS, **IMMEDIATELY DELETE ALL FILES**, IF ANY, ASSOCIATED WITH THE ACCOMPANYING SERVICES AND MATERIALS FORM YOUR COMPUTER OR MOBILE DEVICE.

# TERMS OF USE

VERSION VALID AS OF July 15, 2025

Thank You for choosing American Collective .Please note, **these Terms of Use (the "Terms") constitute a binding agreement between You ("You" or "Your") and American Collective Partners, LP ("American Collective", "We", "Us", "Our")**. These Terms govern Your use of the American Collective website, located at https://americancollectivelp.com (the "Website"), and/or the American Collective application (the "Application" or "App") and the services available through the Website and App (collectively, the "Services"). By using or continuing to use the Services, You indicate that You have read, understand, and agree to these Terms and the American Collective Privacy Policy. All capitalized terms not defined in these Terms are defined in the Privacy Policy.

IF YOU DO NOT UNDERSTAND THIS AGREEMENT OR DO NOT AGREE TO BE BOUND BY THESE TERMS, YOU MAY NOT USE THE SERVICES.

## WHAT IS AMERICAN COLLECTIVE?

### Section 1

The American Collective Services allow You to track and manage Your and/or someone else's health by creating individual, personal health profiles where You can upload and store health data, forms, and prescriptions, coordinate with caregivers, family members, and treatment providers, and set reminders for appointments and medications. You may access and use the Services only in accordance with these Terms, and You agree to comply with all applicable laws, rules, and regulations, including any other policies incorporated into these Terms, such as the American Collective Privacy Policy.

**We are NOT a medical record**

We do not share the information you share with us with your healthcare provider and your healthcare provider does not share information with us. **The information you share with us should not be used to make medical decisions or shared with a healthcare provider for treatment purposes.**

**We do NOT provide medical advice**

American Collective is not authorized to provide medical advice requiring any type of professional medical licensure. American Collective provides the Services only to help You track and manage the information You share with us. THE SERVICES DO NOT CONTAIN OR CONSTITUTE, AND SHOULD NOT BE INTERPRETED AS, MEDICAL ADVICE OR OPINION. American Collective is not a medical professional service, and American Collective does not provide medical services or render medical advice. If You require medical advice or services, You should consult a medical professional.

AMERICAN COLLECTIVE IS NOT RESPONSIBLE NOR LIABLE FOR ANY ADVICE, COURSE OF TREATMENT, DIAGNOSIS OR ANY OTHER THIRD PARTY INFORMATION, SITE, SERVICE OR PRODUCTS THAT YOU OBTAIN THROUGH THE SERVICES. YOU ACKNOWLEDGE AND AGREE

THAT AMERICAN COLLECTIVE DOES NOT PROVIDE ANY MEDICAL DIAGNOSIS OR TREATMENT SERVICES OR ADVICE AND DOES NOT MAKE ANY REPRESENTATIONS, WARRANTIES, GUARANTEES OR ENDORSEMENTS REGARDING ANY MEDICAL INFORMATION THAT YOU MAY OBTAIN THROUGH THE SERVICES.

We may provide You with links to third parties that may provide You with medical advice (See Privacy Policy for details), but Your use of those third parties is not governed by these Terms or the American Collective Privacy Policy. Such links are provided for informational purposes and only and do not constitute an endorsement of the third parties we link to. American Collective does not evaluate or warrant the accuracy or quality of third-party services provided to You, and You are responsible for confirming the qualifications of any third-party service provider You use.

If at any time You are concerned about Your care or treatment, or You believe that You or someone else has a serious or life-threatening condition, **call 9-1-1 immediately** in areas where that service is available, or go to the nearest open clinic or emergency room.

**Plan Information:** We may provide you with summary information about the plans offered by your employer, and your enrollment status in these plans. The information displayed on the Services is summarized and is not intended to replace the policy documents issued by each health plan. If there is ever any discrepancy between the health plan or policy information displayed on the Services, the healthcare provider documents or records will govern.

**Health Related Information**: Any health-related information available on the Services describes general principles of health care that should not be construed as specific instructions for individual patients. It is not intended as a substitute for a consultation between patients and their health care provider, and should not be used to diagnose or treat a health problem without consulting a qualified health care provider. It is for reference only and should not be used to determine treatment for specific medical conditions.

**Provider Disclaimer:** As part of the Services, American Collective may provide you with third party information about healthcare providers' network participation with your health plan. You understand and agree that American Collective: (a) does not direct, have any control over, employ, or endorse any healthcare providers and has no control over the acts or omissions of any healthcare providers; (b) is not responsible or liable in any manner for the performance or conduct of any healthcare providers; (c) makes no representations, warranties or guarantees about the quality, suitability, safety or legality of the services provided by any healthcare provider, the qualifications, identity or background of any healthcare providers; (d) does not vet, screen or conduct any kind of identity or background checks of any healthcare providers; (e) is not responsible for payments charged by healthcare providers, and (f) makes no guarantee about the accuracy of this network information, the accuracy of claims processing by your health insurer, or the accuracy of billing by a healthcare providers. You should exercise caution and perform your own independent assessment and research of healthcare providers before receiving care from any healthcare providers. By using the Service, you acknowledge and agree that you are solely responsible for the communication you have with, and any care or services, you may receive from, any healthcare provider.

## WHO IS ELIGIBLE TO USE THE SERVICES?

### Section 2

By registering for an account and using the Services, **You represent and warrant**:

1. That You are at least 18 years old and are otherwise legally qualified to enter into and form contracts under applicable law;

2. Your registration data is true, accurate, current, and complete;

3. You will update Your registration data as needed to maintain its accuracy;

4. You are authorized to create an account (either for Yourself or another person);

5. **By using the Services, You represent and warrant that You have legal authority to share Your health data and other Personal Information (as that term is defined in the Privacy Policy) with American Collective. In addition, if You create a profile for a third party for whom you are not the parent or legal guardian, You represent and warrant that you have permission from such person to input and share their Personal Data within the App and with other third parties. Our use of the information You provide to American Collective via the Services is subject to the Privacy Policy in effect at the time we use it; and**

6. You are not located in a country that is subject to a U.S. Government embargo or that is designated by the U.S. Government as a "terrorist supporting' country, and You are not listed on any U.S. Government list of prohibited or restricted parties.

NOTE: THIS AGREEMENT IS VOID WHERE PROHIBITED BY LAW. DO NOT USE THE SERVICES WHERE PROHIBITED BY LAW. YOU UNDERSTAND THAT YOUR USE OF THE SERVICES MAY INVOLVE OR REQUIRE THE TRANSMISSION OF SIGNIFICANT AMOUNTS OF DATA. YOU ARE RESPONSIBLE FOR ALL DATA CHARGES THAT MAY BE CHARGED BY YOUR WIRELESS CARRIER OR INTERNET SERVICE PROVIDER OR THAT MAY OTHERWISE ARISE FROM YOUR USE OF THE SERVICES.

## HOW WILL AMERICAN COLLECTIVE TELL ME IF THEY CHANGE THESE TERMS?

### Section 3

American Collective reserves the right to change or modify these Terms at any time without prior notice to You. We will notify You of any change in these Terms, rates, or fees as required by law. We will also endeavor to provide advance notice of any material changes to these Terms by (1) posting a new version to the Services; and/or (2) posting a change notice on our Website and/or Application. What constitutes a "material change" will be determined at our sole discretion, in good faith and using common sense and reasonable judgment.

If You continue to use the Services after we have let You know that we have made changes, You agree to be bound by the modified Terms. If You do not accept the changes, You should immediately stop using the Services and delete all files associated with the Services on Your computer and/or mobile device.

## WHO OWNS THE AMERICAN COLLECTIVE SERVICES?

### Section 4

American Collective owns the Services and all materials You access through the App or Website. Subject to Your compliance with these Terms, American Collective grants You a non-exclusive, non-sublicensable, revocable, non-transferable license to use the Services through the Website or by downloading and installing the Application. THE SERVICES ARE FOR YOUR PERSONAL AND NON- COMMERCIAL USE ONLY. You may not use the Services for any other purpose than what is allowed under these Terms without American Collective's express written permission.

You may not use American Collective's name, trademarks, service marks, or logos, or those of third parties appearing on the Services in any advertising or publicity or to otherwise indicate American Collective's or such third party's sponsorship or affiliation with any product or service without express written permission from American Collective or such third party.

You own Your Personal Data and any other content You post on or through the Services. If you are entering someone else's information into the Services, you represent and warrant that you have permission to do so. For us to provide You with the Services, You grant to American Collective a perpetual, non-exclusive, fully paid and royalty-free, transferable, sublicensable, worldwide license to use Your content for the purpose of providing the Services, subject to the restrictions in the Privacy Policy. You also agree to allow American Collective to de-identify and anonymize Your content, including without limitation, Your personal health information in accordance with this Privacy Policy, and to use or disclose such de-identified information for any purpose.

## WHAT AM I NOT ALLOWED TO DO WITH THE SERVICES?

### Section 5

American Collective imposes certain restrictions on Your use of the Services. While using the Website, App, or Services, You shall not:

1. provide false, misleading or inaccurate information to American Collective or any other user;

2. impersonate, or otherwise misrepresent affiliation, connection, or association with, any person or entity;

3. use or attempt to use any engine, software, tool, agent, or other device or mechanism (including without limitation browsers, spiders, robots, avatars, or intelligent agents) to harvest or otherwise collect information from the Website for any use, including without limitation use on third-party websites;

4. access content or data not intended for You, or log onto a server or account that You are not authorized to access;

5. violate any applicable law or regulation;

6. attempt to probe, scan, or test the vulnerability of the Services, the Website, the App, or any associated system or network, or breach security or authentication measures without proper authorization;

7. interfere or attempt to interfere with the use of the Website, the App, or the Services by any other user, host, or network, including, without limitation by means of submitting a virus, overloading, "flooding," "spamming," "mail bombing," or "crashing";

8. forge any TCP/IP packet header or any part of the header information in any e-mail or in any uploading or posting to, or transmission, display, performance, or distribution by means of, the Services;

9. post or transmit any unsolicited advertising, promotional materials, "junk mail", "spam," "chain letters," "pyramid schemes" or any other form of solicitation;

10. avoid, bypass, remove, deactivate, impair, descramble or otherwise circumvent any technological measure implemented by American Collective, You, or any other third party (including another user) to protect the Services;

11. attempt to modify, reverse-engineer, decompile, disassemble or otherwise reduce or attempt to reduce to a human-perceivable form any of the source code used by American Collective in providing the Website or App. Any violation of this section may subject You to civil and/or criminal liability; or

12. encourage or enable any other individual to do any of the above.

American Collective is not obligated to monitor Your use of the Services, but We may do so to ensure Your compliance with these Terms, and to respond to law enforcement or other government agencies if and when we are required to. American Collective reserves the right

to suspend or terminate Your use of the Services without notice to You if You partake in any of the prohibited uses described above.

## WHO PROTECTS MY LOGIN INFORMATION?

### Section 6

You will choose a username and password when you register for the Application. You are responsible for maintaining the confidentiality of Your password. You may not use the account, username, or password of any other user at any time. You agree to notify American Collective immediately of any unauthorized use of Your account, username, and/or password.  AMERICAN COLLECTIVE WILL NOT BE LIABLE FOR ANY LOSS THAT YOU INCUR AS A RESULT OF SOMEONE ELSE USING YOUR PASSWORD, EITHER WITH OR WITHOUT YOUR KNOWLEDGE. You may be held liable for any losses incurred by American Collective, its affiliates, officers, directors, employees, consultants, agents, and/or its representatives due to someone else's use of Your account or password.

## HOW DOES AMERICAN COLLECTIVE PROTECT MY PRIVACY?

### Section 7

Please see our Privacy Policy for an explanation of the information that we collect from You and how we use Your information. By accessing or using the Website, App, or Services, or by downloading or uploading any content from or through the Services, You acknowledge and agree to the provisions of the Privacy Policy and affirm that the Privacy Policy is a part of these terms.

By using the Services and accepting these Terms, You acknowledge that American Collective may share Your Personal Data with other users (if you choose to allow this). We will seek Your consent before sharing your information with third parties according to the terms of the Privacy Policy.

We are not responsible for nor liable to You or any third party for a third party's treatment of Personal Data which was shared at your direction, including any collection, use, disclosure, storage, loss, theft, or misuse of Personal Data, whether or not such treatment violates applicable law.

## THE APP STORE AND GOOGLE PLAY

### Section 8

If You downloaded the App from the Apple App Store or Google Play (the "App Provider"), by agreeing to these Terms, You acknowledge that You understand and agree to the following:

1. This Agreement is only between You and American Collective, and not between You and the App Provider, and only American Collective is responsible for the Application;

2. The App Provider has no obligation to furnish any maintenance or support services with respect to the App;

3. In the event of any failure of the App to conform to any applicable warranty, (i) You may notify the App Provider and the App Provider will refund Your purchase price

for the App to You (if applicable); (ii) to the maximum extent permitted by applicable law, the App Provider will have no other warranty obligation with respect to the App; and (iii) any other claims, losses, liabilities, damages, costs, or expenses attributable to any failure to conform to any warranty will be Our responsibility;

4. The App Provider is not responsible for addressing any claims You have or any claims of any third party relating to the App or Your possession and use of the App, including without limitation: (i) product liability claims; (ii) any claim that the app fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation;

5. In the event of any third party claim that the App or Your possession and use of the App infringes that third party's intellectual property rights, the App Provider will not be responsible for the investigation, defense, settlement, or discharge of any such intellectual property infringement claim; and

6. The App Provider, and its subsidiaries, are third-party beneficiaries of these Terms as they relate to Your license to use the App. This means that, upon Your acceptance of these Terms, the App Provider will have the right (and will be deemed to have accepted the right) to enforce these Terms as related to Your license of the App against You.

**Apple users only**: If You downloaded the App from the App Store, the license granted to You in these Terms is non-transferable and is for use of the App on any Apple products that You own or control.

## WHAT IS AMERICAN COLLECTIVE'S COPYRIGHT POLICY?

### Section 9

By creating, posting, or sharing data, sound, and images on or through the Website or App ("Your User Content"), and subject to the Privacy Policy, You grant American Collective a perpetual, irrevocable, worldwide, non-exclusive, sub-licensable, royalty-free, fully paid up, transferable license to reproduce, distribute, publicly display, publicly perform, create derivative works of, and otherwise use and modify Your User Content for the purposes of providing and enhancing the Website, App, or other American Collective products and services. We may also create anonymized data and images from Your User Content, and such data and images will no longer be Your User Content. You waive any rights you may have regarding Your User Content being altered or manipulated in any way that may be objectionable to you. This license will terminate after you stop using the Website and App. American Collective reserves the right to refuse to accept, post, display, or transmit any of Your User Content in its sole discretion.

You represent and warrant that: (i) you own the content posted by you on or through the Website or App or otherwise have the right to grant the license set forth in these Terms, (ii) the posting and use of Your User Content on or through the Website or App does not violate the privacy rights, publicity rights, copyrights, contract rights, intellectual property rights, or any other rights of any person, and (iii) the posting of Your User Content on the Website or App does not result in a breach of contract between you and a third party. You agree to pay for all royalties, fees, and any other monies owed to any person by reason of

content you post on or through the Website or App. You also acknowledge and agree that Your User Content is non- confidential and non-proprietary.

American Collective may review and remove Your User Content at any time for any reason, including for activity which, in its sole judgment: violates these Terms; violates applicable laws, rules, or regulations; is abusive, disruptive, offensive or illegal; or violates the rights of, or harms or threatens the safety of, users of the Website or App.

## COMPUTER EQUIPMENT AND INTERNET ACCESS

### Section 10

You are responsible for obtaining, installing, maintaining, and operating all software, hardware, or other equipment (collectively, "Systems") necessary for You to access and use the Services. This includes, without limitation, obtaining internet services, and using up to date web- browsers and the best commercially available encryption, antivirus, anti-spyware, and internet security software. You are responsible for the data security of the Systems used to access the Services and for the transmission and receipt of information using such Systems. We are not responsible for any errors or problems that arise from the malfunction or failure of the Internet or Your Systems.

THERE ARE ALWAYS CERTAIN SECURITY AND ACCESS AVAILABILITY RISKS ASSOCIATED WITH USING OPEN NETWORKS SUCH AS THE INTERNET, AND YOU EXPRESSLY ASSUME SUCH RISKS.

## HOW DO I OPT-OUT OF RECEIVING EMAILS FROM AMERICAN COLLECTIVE?

### Section 11

In providing the Services, You may receive periodic email communications regarding the Services, new product offers and information regarding the Services, which are part of the Services and which You cannot opt out of receiving. You may also receive periodic promotions and other offers or materials American Collective believes might be of interest to You. You can opt-out of receiving these promotional messages at any time by following the unsubscribe instructions contained in each newsletter.

## LINKS TO OUTSIDE THIRD-PARTY WEBSITES & SERVICES

### Section 12

The Services may contain links to third-party websites or services that we do not own or control ("Third-Party Websites"). American Collective does not have control over, and we assume no responsibility for, the content and performance of Third-Party Websites. ACCORDINGLY, AMERICAN COLLECTIVE DOES NOT REPRESENT, WARRANT OR ENDORSE ANY THIRD-PARTY WEBSITE, OR THE ACCURACY, CURRENCY, CONTENT, FITNESS, LAWFULNESS, OR QUALITY OF THE INFORMATION, MATERIAL, GOODS, OR SERVICES AVAILABLE THROUGH THIRD-PARTY WEBSITES. AMERICAN COLLECTIVE WILL NOT, UNDER ANY CIRCUMSTANCES, BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES OR OTHER HARM, WHETHER TO YOU OR TO THIRD PARTIES, RESULTING FROM YOUR USE OF OR RELIANCE ON THIRD-PARTY WEBSITES.

YOU AGREE THAT, WHEN LINKING TO OR OTHERWISE ACCESSING OR USING A THIRD-PARTY WEBSITE, YOU ARE RESPONSIBLE FOR: (I) TAKING PRECAUTIONS AS NECESSARY TO PROTECT YOU AND YOUR COMPUTER SYSTEMS FROM VIRUSES, WORMS, TROJAN HORSES, MALICIOUS CODE, AND OTHER HARMFUL OR DESTRUCTIVE CONTENT; (II) ANY DOWNLOADING, USE OR PURCHASE OF MATERIAL THAT IS OBSCENE, INDECENT, OFFENSIVE, OR OTHERWISE OBJECTIONABLE OR UNLAWFUL, OR THAT CONTAINS TECHNICAL INACCURACIES, TYPOGRAPHICAL MISTAKES, AND OTHER ERRORS; (III) ANY DOWNLOADING, USE OR PURCHASE OF MATERIAL THAT VIOLATES THE PRIVACY OR PUBLICITY RIGHTS, OR INFRINGES THE INTELLECTUAL PROPERTY AND OTHER PROPRIETARY RIGHTS OF THIRD PARTIES, OR THAT IS SUBJECT TO ADDITIONAL TERMS AND CONDITIONS, STATED OR UNSTATED; (IV) ALL FINANCIAL CHARGES OR OTHER LIABILITIES TO THIRD PARTIES RESULTING FROM TRANSACTIONS OR OTHER ACTIVITIES; AND (V) READING AND UNDERSTANDING ANY TERMS OF USE OR PRIVACY POLICIES THAT APPLY TO THOSE THIRD-PARTY WEBSITES.

## YOUR REPRESENTATIONS AND WARRANTIES

### Section 13

You represent and warrant that Your use of the Services will be in accordance with these Terms and all applicable laws, regulations, rules, and American Collective policies and procedures. Specifically, **YOU REPRESENT AND WARRANT THAT YOU ARE LEGALLY AUTHORIZED TO SHARE PERSONAL DATA (WHETHER YOURS OR SOMEONE ELSE'S) WITH AMERICAN COLLECTIVE.**

## WARRANTY DISCLAIMERS & LIMITATION OF LIABILITY

### Section 14

**NO WARRANTIES**

THE WEBSITE, APP, AND SERVICES ARE PROVIDED "AS IS", WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED. AMERICAN COLLECTIVE EXPLICITLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT OR NON- INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF THE COURSE OF DEALING OR USAGE OF TRADE.  WE MAKE NO WARRANTY THAT THE SERVICES OR MATERIALS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. WE MAKE NO WARRANTY REGARDING THE QUALITY OF ANY SERVICES OR MATERIALS PURCHASED OR OBTAINED THROUGH THE SERVICES OR THE ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS, OR RELIABILITY OF ANY CONTENT OBTAINED THROUGH THE SERVICES.

**YOUR RESPONSIBILITY FOR OUR LOSS OR DAMAGE**

YOU AGREE THAT YOUR USE OF THE WEBSITE, APP, AND SERVICES IS AT YOUR SOLE RISK. YOU WILL NOT HOLD AMERICAN COLLECTIVE OR ITS THIRD-PARTY SERVICE PROVIDERS, LICENSORS, OR SUPPLIERS, AS APPLICABLE, RESPONSIBLE FOR ANY LOSS OR DAMAGE THAT RESULTS FROM YOUR ACCESS TO OR USE OF THE SERVICES, INCLUDING WITHOUT LIMITATION ANY LOSS OR DAMAGE TO ANY OF YOUR COMPUTERS OR DATA.

**YOUR RESPONSIBILITY TO BACKUP YOUR DATA**

THE WEBSITE, APP, AND SERVICES MAY CONTAIN BUGS, ERRORS, PROBLEMS, OR OTHER LIMITATIONS. YOU HEREBY ACKNOWLEDGE THAT A CATASTROPHIC SERVER FAILURE OR OTHER EVENT COULD RESULT IN THE LOSS OF ALL OF THE DATA RELATED TO YOUR ACCOUNT. YOU AGREE AND UNDERSTAND THAT IT IS YOUR RESPONSIBILITY TO BACKUP YOUR DATA TO YOUR PERSONAL COMPUTER OR EXTERNAL STORAGE DEVICE AND TO ENSURE SUCH BACKUPS ARE SECURE.

## NO LIABILITY FOR THIRD-PARTY DATA

NEITHER AMERICAN COLLECTIVE, NOR ANY OTHER PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE SERVICES OR MATERIALS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOSS OF DATA, OR LOSS OF GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES, OR FOR ANY DAMAGES FOR PERSONAL OR BODILY INJURY OR EMOTIONAL DISTRESS ARISING OUT OF OR IN CONNECTION WITH THE STORAGE AND/OR DISCLOSURE OF A THIRD PARTY'S PERSONAL DATA WITHOUT THAT PARTY'S CONSENT.

## LIMITATION OF LIABILITY

NEITHER AMERICAN COLLECTIVE, NOR ANY OTHER PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE SERVICES OR MATERIALS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOSS OF DATA OR LOSS OF GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES, OR FOR ANY DAMAGES FOR PERSONAL OR BODILY INJURY OR EMOTIONAL DISTRESS ARISING OUT OF OR IN CONNECTION WITH THE USE OF OR INABILITY TO USE THE SERVICES OR MATERIALS, OR FROM ANY COMMUNICATIONS, INTERACTIONS, OR MEETINGS WITH OTHER USERS OF THE SERVICES OR OTHER PERSONS WITH WHOM YOU COMMUNICATE OR INTERACT AS A RESULT OF YOUR USE OF THE SERVICES WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT AMERICAN COLLECTIVE HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE.

IF YOU ARE NOT SATISFIED WITH THE WEBSITE, APP, OR SERVICES, YOU SHOULD DISCONTINUE USING THEM – **THIS IS YOUR ONLY REMEDY**. BECAUSE SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SOME OF THESE LIMITATIONS MAY NOT APPLY TO YOU. IN SUCH STATES, AMERICAN COLLECTIVE'S LIABILITY IS LIMITED AND WARRANTIES ARE EXCLUDED TO THE GREATEST EXTENT PERMITTED BY LAW, BUT SHALL IN NO EVENT EXCEED $100.00. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THE SERVICES MUST COMMENCE WITHIN TWO (2) YEARS AFTER THE CONDUCT THAT CAUSED THE DISPUTE (AS DEFINED BELOW) OTHERWISE, SUCH CAUSE OF ACTION IS PERMANENTLY BARRED, WHICH MEANS THAT THE PARTIES WILL NOT HAVE THE RIGHT TO ASSERT THE CLAIM.

## INDEMNIFICATION

Section 15

You agree to indemnify, defend and hold harmless American Collective, its clients, its suppliers, and their respective affiliates, employees, officers, directors, agents, servants, and representatives of each from any liability, loss, claim, suit, damage, and expense (including reasonable attorneys' fees and expenses) arising out of or in any way connected with Your access to or use of the Website, App, or Services, Your violation of this Agreement, or any negligent or wrongful conduct by You or related to Your account by You or any other person accessing the Website, App or Services through Your account, regardless of whether You were aware of such use, including without limitation the storage and/or disclosure of any third party's Personal Data without that party's permission or consent.

## GOVERNING LAW

### Section 16

These Terms, and all claims or causes of action (whether sounding in contract, tort, any statutory cause of action, or any other legal theory) that may be based upon, arise out of, or relate to these Terms, the use of the Services, the rights and responsibilities of the parties, and all other disputes between the parties shall be governed by, and enforced in accordance with, the laws of Texas, without regard to or application of conflict of law. The United States District Court for the Northern District of Texas shall be the appropriate venue and have jurisdiction over any Dispute (as defined below). THE PARTIES HEREBY WAIVE ANY OBJECTION TO THE VENUE AND PERSONAL JURISDICTION OF SUCH COURTS.

## HOW AND WHEN CAN MY ACCOUNT BE TERMINATED?

### Section 17

If You breach any of these Terms, we may suspend or disable Your account or terminate Your access to the Website, App, or Services without prior notice to You.  There may be other instances where We may need to terminate Your access to the Website, App, or Services that are not related to any of Your actions or inactions.  We reserve the right to terminate Your access to and use of the Website, App, or Services and materials at any time, with or without cause.

If You wish to terminate Your account, please contact American Collective at info@americancollectivepartnerslp.com to immediately discontinue Your use of the Services, and delete all files associated with the Services from Your computer or mobile device.

## HOW DO I PROVIDE FEEDBACK AND WHO OWNS IT?

### Section 18

We welcome and encourage You to provide us with feedback, comments, and suggestions for improvements to the Website, App, or Services ("Feedback").  You may submit Feedback by emailing us at info@americancollectivelp.com  If You submit any Feedback to us, we will own all intellectual property rights in such Feedback and may use such Feedback for any lawful purpose.

## NOTICES

Section 19

All notices required or permitted to be given under these Terms must be in writing. American Collective shall give any notice by email sent to the most recent email address, if any, that You have provided to Us. You agree that any notice received from American Collective electronically satisfies any legal requirement that such notice be in writing. YOU ALONE ARE RESPONSIBLE FOR ENSURING THAT YOUR EMAIL ADDRESS ON FILE WITH AMERICAN COLLECTIVE IS ACCURATE AND CURRENT, AND NOTICE TO YOU SHALL BE DEEMED EFFECTIVE UPON THE SENDING BY AMERICAN COLLECTIVE OF AN EMAIL TO THE ADDRESS WE HAVE ON FILE.

You shall give any notice to American Collective by means of: (1) U.S. mail, postage prepaid, to American Collective Partners, LP 650 Poydras Street, Suite 1400, New Orleans, LA 70130; or (2) email to info@americancollectivepartnerslp.com  Notice to American Collective shall be effective upon receipt of notice by American Collective.

## GENERAL CONTRACT LANGUAGE

### Section 20

If any provision of these Terms is determined to be invalid, illegal, or unenforceable, the remaining provisions of these Terms remain in full force, provided that the essential terms and conditions remain valid, binding, and enforceable and the economic and legal substance of the transactions contemplated by these Terms are materially preserved.

The United States export control laws regulate the export and re-export of technology originating in the United States. This includes the electronic transmission of information and software to foreign countries and to certain foreign nationals. You agree to abide by these laws and their regulations.

Nothing in these Terms creates an agency, partnership, or joint venture. Failure to enforce any provision will not constitute a waiver of that provision.

## DISPUTE RESOLUTION

### Section 22

**READ THIS SECTION CAREFULLY. IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING WAIVING YOUR RIGHT TO FILE A LAWSUIT IN COURT OR TO PURSUE CLAIMS IN A CLASS, GROUP OR REPRESENTATIVE CAPACITY OR AS A PRIVATE ATTORNEY GENERAL OR AS A THIRD PARTY.**

**YOU MAY OPT OUT OF THESE ARBITRATION AND CLASS ACTION/REPRESENTATIVE PROVISIONS BY FOLLOWING THE INSTRUCTIONS BELOW. IF YOU DO NOT OPT-OUT, THESE TERMS WILL APPLY RETROACTIVELY TO ALL CLAIMS YOU MAY POSSESS.**

**22.1.   CLASS ACTION WAIVER AND REPRESENTATIVE-TYPE ACTION WAIVER.** TO THE FULLEST EXTENT ALLOWED BY LAW, NEITHER YOU NOR AMERICAN COLLECTIVE SHALL BE ENTITLED TO PARTICIPATE IN ANY PAST, PENDING, OR FUTURE CLASS OR OTHER REPRESENTATIVE-TYPE ACTIONS, TO CONSOLIDATE, TO JOIN OR COORDINATE DISPUTES BY OR AGAINST OTHER INDIVIDUALS OR ENTITIES, OR TO PARTICIPATE IN OR LITIGATE

ANY DISPUTE IN A REPRESENTATIVE CAPACITY, INCLUDING AS A REPRESENTATIVE MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY, OR OTHERWISE SEEK TO RECOVER FOR LOSSES INCURRED BY A THIRD PARTY IN ANY ACTION PURSUANT TO ANY STATUTE THAT ALLOWS RECOVERY ON BEHALF OF, FOR THE BENEFIT OF OTHER INDIVIDUALS. YOU AND AMERICAN COLLECTIVE ARE EACH EXPRESSLY AND UNCONDITIONALLY WAIVING SUCH RESPECTIVE RIGHTS, INCLUDING THE RIGHTS TO A TRIAL BY JURY.

**22.2. AGREEMENT TO ARBITRATE.** To the fullest extent allowed by law, you and American Collective agree to submit all Disputes between us to individual, binding arbitration pursuant to the provisions in this Section 22. A "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between you and American Collective that in any way relates to or arises from any aspect of our relationship, including, without limitation, your use of the Services, all marketing related to the Services, our products, any licensed content, and all matters relating to or arising from these Terms (including Privacy Policy and all other terms incorporated into these Terms) or any other agreement between you and American Collective, including any disputes over the validity, enforceability, or interpretation of this agreement to arbitrate. Any Disputes shall be subject to these BINDING ARBITRATION AND CLASS ACTION AND REPRESENTATIVE-TYPE WAIVER provisions regardless of whether the Dispute is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, and negligence), or any other legal or equitable theory. This includes claims or requests for relief that accrued before you agreed to these Terms. You and We understand that there is no judge or jury in arbitration and that court review of an arbitration award is limited. The parties waive their rights to a jury trial and to have any Dispute resolved in court. To the extent applicable law does not allow the waiver of certain claims, but permits those claims to be arbitrated, then such claims shall be resolved in arbitration. To the extent allowed by law, the arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity, including injunctive relief. (4) This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA"), including its procedural provisions, in all respects. State arbitration laws do not govern in any respect.

**Delegation; Interpretation.** The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all Disputes, including, but not limited to, any claim that all or any part of these Terms are void or voidable. This arbitration agreement is intended to be broadly interpreted and will survive termination of these Terms.

**Severability.** If any provision of this arbitration agreement is found unenforceable, that provision will be severed, and the rest of the arbitration agreement will remain in full force and effect. If a court decides that applicable law precludes enforcement of this arbitration agreement as to any particular claim, then that claim must be severed from the arbitration, while the remaining claims will still be resolved through binding arbitration.

**Notice of Dispute.** Most user concerns can be resolved quickly and to Your satisfaction by emailing American Collective Partner Services at

info@americancollectivepartnerslp.com. If we cannot resolve your complaint, prior to initiating arbitration, you must first send a written Notice of Dispute by email at: info@americancollectivelp.com. The Notice of Dispute must include the following at a minimum: (a) your full legal name, email address, your unique partner or member ID; (b) a detailed description of your claim or Dispute with American Collective, including dates, and (c) the specific damages or other remedy or remedies that you are seeking. If we have a dispute with you, We must first send a written Notice of Dispute detailing the Dispute and sending it to you by mail, email to the address you provided to Us during the registration or ordering products. If the claim detailed in either parties' Notice of Dispute is not resolved within thirty (30) days of sending the Notice of Dispute that conforms to these requirements, then you or Us may commence arbitration according to the requirements in these Terms (the "Initial Dispute Resolution Period").

If a Dispute cannot be resolved through negotiations during the Initial Dispute Resolution Period, then either party may initiate binding arbitration as the sole means to formally resolve the Dispute, unless an exception or exclusion applies as stated below.

The arbitration will be administered by a single arbitrator by JAMS in accordance with the JAMS Streamlined Arbitration Rules and Procedures (the "JAMS Rules") effective as of the date of the Notice of Dispute, the current version of which are available at the JAMS website, http://www.jamsadr.com/rules-streamlined-arbitration, as modified by this Agreement. If, for any reason, JAMS is unable to provide the arbitration, then except as otherwise stated below, you or we may file the Dispute with any national arbitration company that handles consumer arbitrations following procedures that are substantially similar to the JAMS Rules.

Unless contrary to the JAMS Rules, Arbitration hearings may be conducted by videoconference unless the arbitrator believes an in-person hearing is necessary. In such instances, the location of an arbitration hearing will be decided pursuant to the JAMS Rules. You and American Collective agree to submit to the personal jurisdiction of any federal or state court of the state of Texas in order to compel arbitration, to stay proceedings pending arbitration, or to confirm, modify, vacate, or enter judgment on the award entered by the arbitrator. In an arbitration, the arbitrator shall allow dispositive motions.

The arbitrator will make a decision in writing but need not provide a statement of reasons unless requested by a party. The arbitrator must follow applicable law. The decision of the arbitrator shall be final and binding on you and American Collective. To the greatest and broadest extent allowed by law, the arbitrator shall determine the scope, validity, interpretation and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration. The arbitration shall be governed by the FAA.

Notwithstanding anything to the contrary herein, if the arbitrator may not legally adjudicate or award a particular legal or equitable claim or remedy, such claim or remedy shall be stayed until all other claims and remedies are final and the arbitration completed, after which the federal or state court may adjudicate the remaining claim or remedy. In doing so, the federal or state court is bound under the principles of claim or issue preclusion by the decision of the arbitrator.

**22.3.   Exception – Litigation of Intellectual Property Claims and Small Claims Court Claims.** Notwithstanding the parties' agreement to resolve all disputes through arbitration, either party may bring an action in state or federal court that only asserts claims for patent infringement or invalidity, copyright or trademark infringement, Computer Fraud and Abuse, and/or trade secret misappropriation, but not, for clarity, claims related to the license granted to you for the Services under these Terms. Such claims are subject to the jurisdiction and applicable law provisions in Section 16. Either party may also seek relief in a small claims court for any individual disputes or claims within the scope of that court's jurisdiction. If an arbitration is filed, before the arbitrator is formally appointed, either party can send written notice to the opposing party and the arbitration provider that it wants the case decided by a small claims court, after which the arbitration provider shall close the case.

**22.4.   Exception – Mass Arbitration.** For mass arbitrations (which are defined as 25 or more similar demands for arbitration filed against the same party or related parties by individual claimants represented by either the same law firm or law firms acting in coordination), the JAMS Mass Arbitration Procedures and Guidelines ("JAMS Mass Arbitration Rules") shall apply. In such proceedings, the parties agree that, notwithstanding any other provisions of these Terms, the Process Administrator (as described in the JAMS Mass Arbitration Rules) and the arbitrators shall have the authority to implement the procedures set forth in the JAMS Mass Arbitration Rules, including the authority to batch together individual arbitration demands into a single coordinated proceeding. All provisions of this Section 22 that are not in conflict with the JAMS Mass Arbitration Rules shall continue to apply.  If the Mass Arbitration is found to be invalid for any reason, the parties agree that the Arbitration Agreement contained in Section 22.2 severed, and the parties may resolve their Dispute in a court of competent jurisdiction.

**22.5.   Right to Opt Out.** You have the right to opt-out and not be bound by the arbitration agreement in Section 22.2 C by sending Us a written notice via info@americancollectivelp.com. You must sign and date the notice, and include in it your name, address, and order number (if applicable), and a clear statement that you are opting out of these arbitration agreement provisions. The notice must be sent within 30 days of the date on which you first access or use the Services and agree to these Terms; otherwise you shall be bound in accordance with Section 22.2. If you opt out of these arbitration provisions, American Collective also will not be bound by them.

## CALIFORNIA CONSUMER NOTICE

### Section 23

The Services are provided by American Collective located at 650 Poydras Street, Suite 1400, New Orleans, LA 70130

If you have a question or complaint regarding the Services, please write to Us to the foregoing address email address:  650 Poydras Street, Suite 1400, New Orleans, LA 70130.

If you are a California resident, you may have these Terms mailed to you electronically by sending a letter to the foregoing address with your electronic mail address: info@americancollectivelp.com

California residents may reach the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by post at 1625 North Market Blvd., Sacramento, CA 95834 or by telephone at (916) 445-1254 or (800) 952-5210 or Hearing Impaired at TDD (800) 326-2297 or TDD (916) 322-1700.

## MOBILE TERMS OF SERVICE

### Section 24

Our mobile message service (the "Service") is operated by American Collective, LP. Your use of the Service constitutes your agreement to these terms and conditions ("Mobile Terms"). We may modify or cancel the Service or any of its features without notice. To the extent permitted by applicable law, we may also modify these Mobile Terms at any time and your continued use of the Service following the effective date of any such changes shall constitute your acceptance of such changes.

By consenting to Our SMS/text messaging service, you agree to receive recurring SMS/text messages from and on behalf of American Collective through your wireless provider to the mobile number you provided, even if your mobile number is registered on any state or federal Do Not Call list. Text messages may be sent using an automatic telephone dialing system or other technology. Service-related messages may include updates, alerts, and information (e.g., order updates, account alerts, etc.). Promotional messages may include promotions, specials, and other marketing offers (e.g., cart reminders).

You understand that you do not have to sign up for this program in order to make any purchases, and your consent is not a condition of any purchase with American Collective. Your participation in this program is completely voluntary.

We do not charge for the Service, but you are responsible for all charges and fees associated with text messaging imposed by your wireless provider. Message frequency varies. Message and data rates may apply. Check your mobile plan and contact your wireless provider for details. You are solely responsible for all charges related to SMS/text messages, including charges from your wireless provider.

You may opt-out of the Service at any time. Text the single keyword command STOP to (866) 270-1554 or click the unsubscribe link (where available) in any text message to cancel. You will receive a one-time opt-out confirmation text message. No further messages will be sent to your mobile device, unless initiated by you. If you have subscribed to other American Collective mobile message programs and wish to cancel, except where applicable law requires otherwise, you will need to opt out separately from those programs by following the instructions provided in their respective mobile terms.

For Service support or assistance, text HELP to (866) 270-1554 or email info@americancollectivelp.com.

We may change any short code or telephone number we use to operate the Service at any time and will notify you of these changes. You acknowledge that any messages, including any STOP or HELP requests, you send to a short code or telephone number we have changed may not be received and we will not be responsible for honoring requests made in such messages.

The wireless carriers supported by the Service are not liable for delayed or undelivered messages. You agree to provide us with a valid mobile number. If you get a new mobile number, you will need to sign up for the program with your new number.

To the extent permitted by applicable law, you agree that we will not be liable for failed, delayed, or misdirected delivery of any information sent through the Service, any errors in such information, and/or any action you may or may not take in reliance on the information or Service.

## HOW DO I CONTACT AMERICAN COLLECTIVE?

### Section 25

American Collective is headquartered in New Orleans, Louisiana in the United States of America.

Specific questions and comments should be directed to the appropriate department via email to info@americancollectivepartnerslp.com. While we make every effort to respond to emails within 1 week of receiving them, we cannot guarantee a response to every electronic communication.

You may also contact us via postal mail at:

**American Collective Partners, LP**

650 Poydras Street, Suite 1400, New Orleans, LA 70130



# Medical Plan Document and
# Summary Plan Description (SPD)
# For American Collective Unity Plans

### August 1, 2025

**For the Schedule of Benefits, See Page 8**
For assistance in a non-English language, please call 888-701-2975.
Para obtener asistencia en Español, por favor llame al número arriba.

1



# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................ 4

GENERAL PLAN INFORMATION ....................................................................................................... 5

DEFINITIONS ................................................................................................................................... 6

SCHEDULE OF BENEFITS ................................................................................................................ 8

   MEDICAL BENEFITS.................................................................................................................... 9
   PREVENTION AND WELLNESS BENEFITS ................................................................................. 10
   PREVENTIVE MEDICATIONS ..................................................................................................... 14
   AVAILABLE PHARMACY BENEFIT ............................................................................................. 14
   YOUR PHARMACY PLAN.......................................................................................................... 15

COVERED EXPENSES .................................................................................................................... 16

GENERAL EXCLUSIONS AND LIMITATIONS ................................................................................. 18

PARTICIPATION ............................................................................................................................ 26

   WHO IS ELIGIBLE TO BE A PARTICIPANT? ............................................................................... 26
   WHO ARE ELIGIBLE DEPENDENTS?......................................................................................... 26
   HOW TO ENROLL .................................................................................................................... 26
   WHEN PARTICIPATION BEGINS ............................................................................................... 27
   NEW HIRES............................................................................................................................. 27
   MID-YEAR COVERAGE CHANGES ............................................................................................ 27
   OTHER INFORMATION REGARDING COVERAGE ........................................................................ 27
   WHEN YOUR PARTICIPATION ENDS ........................................................................................ 28
   WHEN YOUR DEPENDENT'S PARTICIPATION ENDS.................................................................. 28
   CHOICES AVAILABLE WHEN PARTICIPATION ENDS .................................................................. 28

HEALTH CARE COVERAGE........................................................................................................... 29

   MEDICAL COVERAGE .............................................................................................................. 29
   YOUR COVERAGE ................................................................................................................... 29
   MEDICAL COVERAGE OPTIONS................................................................................................ 29
   COVERED AND NON-COVERED MEDICAL SERVICES ................................................................ 29

CONTINUATION COVERAGE UNDER COBRA ............................................................................. 30

   WHAT IS COBRA COVERAGE? .............................................................................................. 30
   WHO IS ENTITLED TO ELECT COBRA? .................................................................................. 31
   WHEN IS COBRA COVERAGE AVAILABLE? ............................................................................ 31
   YOU MUST GIVE NOTICE OF SOME QUALIFYING EVENTS......................................................... 31
   NOTICE TO QUALIFIED BENEFICIARY ...................................................................................... 32
   ELECTING COBRA ................................................................................................................. 32
   HOW LONG DOES COBRA COVERAGE LAST?........................................................................ 33
   SECOND QUALIFYING EVENT EXTENSION................................................................................ 34
   PAYMENT FOR CONTINUATION COVERAGE.............................................................................. 34
   ALTERNATE RECIPIENTS UNDER QMCSOS.............................................................................. 35
   OTHER OPTIONS BESIDES COBRA ......................................................................................... 35
   IF YOU HAVE QUESTIONS........................................................................................................ 35
   KEEP YOUR PLAN INFORMED OF ADDRESS CHANGES ............................................................. 35
   CONTACT INFORMATION ......................................................................................................... 35
   COBRA NOTICE PROCEDURES............................................................................................... 35
   COBRA ADMINISTRATION ...................................................................................................... 37
   CORRECTION OF MISTAKES..................................................................................................... 37



**ADMINISTRATION, APPEALS, SUBROGATION, AND RIGHT OF RECOVERY** ................................................................ 38

ADMINISTRATION ............................................................................................................................... 38
CHANGING OR ENDING THE PLAN ........................................................................................................ 38
CLAIMS PROCEDURE .......................................................................................................................... 39
AUTHORIZED REPRESENTATIVE ........................................................................................................... 39
HOW TO FILE A CLAIM ...................................................................................................................... 39
CLAIM DETERMINATION TIME LIMITS ................................................................................................... 40
CALCULATING TIME PERIODS ............................................................................................................... 41
MANNER AND CONTENT OF NOTICE OF BENEFIT DETERMINATION .............................................................. 41
APPEALS PROCEDURE ......................................................................................................................... 42
VOLUNTARY EXTERNAL REVIEW PROGRAM FOR GROUP HEALTH CLAIMS ..................................................... 43
NOTICE OF BENEFIT DETERMINATION ON APPEAL .................................................................................... 46
DISCRETIONARY AUTHORITY ............................................................................................................... 46
EXTERNAL REVIEW OR LEGAL ACTION .................................................................................................. 47
USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION ................................................................... 47
DEFINITIONS RELATED TO THE USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION .......................... 47
DISCLOSURE OF PHI TO THE EMPLOYER ................................................................................................ 49
EMPLOYER CONDITIONS WITH REGARD TO PHI ...................................................................................... 49
SECURITY WITH REGARD TO PHI ......................................................................................................... 50
NONCOMPLIANCE ISSUES .................................................................................................................... 50
SUBROGATION AND RIGHT OF RECOVERY .............................................................................................. 50

**MISCELLANEOUS AND STATEMENT OF ERISA RIGHTS** .................................................................... 52

MISCELLANEOUS LIMITATIONS ON RIGHTS ............................................................................................. 52
QUALIFIED MEDICAL CHILD SUPPORT ORDERS (QMCSO) ......................................................................... 52
FAMILY AND MEDICAL LEAVE ............................................................................................................. 52
MILITARY SERVICE ............................................................................................................................ 53
DESIGNATION OF PRIMARY CARE PROVIDERS AND/OR OB/GYN ................................................................ 53
UTILIZATION TEST ............................................................................................................................. 53
SERVICE OF PROCESS ......................................................................................................................... 53
PLAN SPONSOR'S EMPLOYER IDENTIFICATION NUMBER; PLAN NUMBER ..................................................... 53
TYPE OF PLAN .................................................................................................................................. 53
PLAN ADMINISTRATOR AND ADMINISTRATION OF PLAN ........................................................................... 53
INDEMNIFICATION ............................................................................................................................. 53
CIRCUMSTANCES WHICH MAY AFFECT BENEFITS ..................................................................................... 54
SOURCE OF PLAN CONTRIBUTIONS ....................................................................................................... 54
FUNDING MEDIUM FOR PROVIDING BENEFITS ........................................................................................ 54
NONTRANSFERABILITY ........................................................................................................................ 54
EMPLOYMENT ................................................................................................................................... 54
INCOMPETENCE OF PARTICIPANTS AND BENEFICIARIES .............................................................................. 54
WAIVER .......................................................................................................................................... 55
ERRORS AND MISTAKES ..................................................................................................................... 55
DISCRETION/NONDISCRIMINATION ....................................................................................................... 55
RIGHT TO REQUIRE INFORMATION AND RELIANCE THEREON ...................................................................... 55
CONCLUSIVENESS OF RECORDS ............................................................................................................ 55
END OF PLAN YEAR ........................................................................................................................... 55
GOVERNING LAW .............................................................................................................................. 55
STATEMENT OF ERISA RIGHTS ............................................................................................................ 55

**NO SURPRISES ACT** ...................................................................................................................... 57



# <u>INTRODUCTION</u>

Welcome to the American Collective LP Welfare Benefits Plan.  This Plan Document applies to the Unity Plan(s).  This document explains the operation of your health plan. Please call 866-270-1554 if you have any questions.

**Introduction**
The Plan Sponsor has established the Plan to help offset the financial impact of an Injury or Sickness.

The Plan Document describes the terms for payment of covered medical and prescription charges.

**Applicable Law**
This Plan is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). To the extent not preempted by Federal law, the Plan shall be governed by the law of the State where the Plan Sponsor maintains its principal place of business.

**Discretionary Authority**
The Plan Administrator has the exclusive right to interpret the Plan and to decide all matters arising under the Plan, including the right to make determinations of fact, and construe and interpret possible ambiguities, inconsistencies, or omissions in the Plan and the SPD. The Plan Administrator also has full discretionary authority to interpret the Plan and to determine all questions relating to the Plan as they relate to eligibility to participate in the Plan or the level of stipend offered under the Plan. The Plan Administrator may delegate one or more of its responsibilities to one or more individuals, committees, or third parties.

**Fiduciary**
The Plan Administrator is the named fiduciary of the Plan.

**Legal Entity; Service of Process**
The Plan is a legal entity. Legal process may be served on the Plan Administrator. You must exhaust your appeal rights (other than external review) before bringing legal action.

**Plan Contributions and Funding**
The Plan is self-funded by the general assets of the Plan Sponsor and participants. The Plan Sponsor determines the level of required participant contributions.



# GENERAL PLAN INFORMATION

| | |
|---|---|
| **Plan Name** | American Collective LP Welfare Benefits Plan |
| **Plan Number** | 501 |
| **Plan Sponsor** | American Collective LP<br>650 Poydras Street, Suite 1400, PMB #6807<br>New Orleans, LA 70130 |
| **Plan Sponsor FIEN** | 39-2150479 |
| **Plan Administrator** | American Collective LP<br>650 Poydras Street, Suite 1400, PMB #6807<br>New Orleans, LA 70130<br>(866) 270-1554 |
| **Type of Plan** | Welfare Benefits Plan |
| **Funding Method of Plan** | Self-Funded |
| **Original Plan Effective Date** | August 1, 2025 |
| **Plan Year** | January 1 through December 31 |
| **Program or Policy Name** | Unity Plan |
| **Waiting Period** | 30 days |
| **Agent for Service of Process** | CT Corporation System<br>1999 Bryan St., Suite 900<br>Dallas, TX 75201 |
| **Partner Services** | PartnerServices@AmericanCollectiveLP.com |
| **Claims** | ATTN: American Collective LP Medical Claim<br>Premiere Administrative Solutions<br>PO Box 21751<br>Eagan, MN 55121<br>Payor ID #: 29084<br>(866) 270-1554 |



# DEFINITIONS

**Ancillary Services**
Items and services provided by an out-of-network provider at a health care facility, as that term is defined in the No Surprises Act, that is in-network and for which balance billing is prohibited under the No Surprises Act.

**Appeals Authority**
The Plan Administrator, Third-Party Administrator or other persons or entities, as described in the Plan, that have the authority to grant or deny an appeal of a claim arising under the Plan.

**Child(ren)**
"Child" or "Children" has the meaning as defined in the "Who Are Eligible Dependents?" subsection.

**COBRA Administrator**
The entity designated by the Plan Administrator to fulfill the COBRA administrative functions of the Plan.

**Code**
The Internal Revenue Code of 1986, as amended from time to time.

**Coinsurance**
Percentage of covered expenses that you pay after meeting the applicable Deductible.

**Copay**
A flat fee that is paid to the provider of the medical service each time a service is provided.

**Covered Expenses, Covered Services**
Those services or supplies eligible for payment under the coverage you have selected.  Please note, however, that even if a service is covered, it may not be covered at 100% (see Coinsurance and Maximum Allowance), or it may not be paid for if you have not yet met your Deductible.

**Deductible**
The amount you are required to pay each year before any payments are made by the medical coverage options for covered services, except for specified services to which the Deductible requirement does not apply.

**Eligible Dependents**
Individuals eligible for dependent coverage under the Plan.  "Eligible Dependents" has the meaning as defined in the "Who Are Eligible Dependents?" subsection.

**Employee**
For purposes of this Plan, "Employee" means an individual who is a partner in the limited partnership.

**ERISA**
The Employee Retirement Income Security Act of 1974, as amended from time to time.

**Experimental/Investigative**
Experimental/Investigative is determined at the sole discretion of the Third-Party Administrator.  For a detailed definition, see the "General Exclusions and Limitations" section.



**Maximum Allowable Charge**
The amount that an in-network provider has agreed to accept as payment for a particular service. Also called a negotiated or contracted fee. The amount that is applied to your in-network Deductible and Out-of-Pocket Maximum is based on the Allowance.

**Plan**
The American Collective LP Welfare Benefits Plan.

**Plan Document**
This American Collective LP Welfare Benefits Plan document, together with all Appendices.

**Plan Sponsor**
The sponsor of the Plan as described in the Introduction section of this Plan document, or any successor entity with respect to this Plan.

**Plan Year**
The 12-month period for which current benefits, limits, Deductibles, and maximums apply. For the Plan, the Plan Year is the calendar year (January 1 - December 31). The initial Plan Year is a short Plan Year, running from August 1, 2025- December 31, 2025.

**Preventive Care**
To the extent not otherwise specified by an Insurer-provided documents or under applicable law or regulations, any medical, vision or dental service that is designed to avoid illness or promote wellness.

**Qualified Medical Child Support Order (QMCSO)**
Any court order or an equivalent administrative order which:
- Provides for child support with respect to a participant's Child or directs the participant to provide coverage under a health benefits plan under a state domestic relations law and conforms to the applicable requirement under ERISA regarding qualified medical child support order; or
- Enforces a law relating to medical child support described in Social Security Act, Section 1908, with respect to a group health plan law and conforms to the applicable requirement under ERISA regarding qualified medical child support order.

**Spouse**
"Spouse" has the meaning as defined in the "Who Are Eligible Dependents?" subsection.

**Third-Party Administrator (or Plan Administrator)**
The Third-Party Administrator as set forth in the section "General Plan Information."



# SCHEDULE OF BENEFITS

**You, as the Plan Participant, are responsible for ensuring that any medical service you are planning or is being planned on your behalf is covered by this Plan. You should read this Plan Document, paying particular attention to this Schedule of Benefits and the list of Exclusions from the Plan. If, after reading this Plan Document you or a provider has questions about whether a medical service is covered and how it is covered, you should Call 866-949-3581 with your questions.**

Reimbursement from the Plan may be reduced or denied due to the provisions in the Plan, such as coordination of benefits, subrogation, or medical necessity.

**Maximum Allowable Charge Limitation**
The Plan pays benefits based on the Maximum Allowable Charge, as defined in the "Definitions" section of this Plan Document, rather than billed charges. If a Provider charges more than the Maximum Allowable Charge (as determined by the Plan), the Plan Participant may be responsible for the amount in excess of the Maximum Allowable Charge, unless prohibited by applicable law.

The Plan has a fiduciary obligation to its participants to preserve Plan assets against charges that exceed the Maximum Allowable Charge. This excess amount is considered outside the scope of the Plan: it is not counted toward satisfaction of the Deductible, and it is not paid by the Plan even after satisfaction of the Deductible.

The Maximum Allowable Charge will not include charges for any items billed separately by the provider that are not customarily included in a global billing procedure code in accordance with the American Medical Association's CPT® (Current Procedural Terminology) and/or the Healthcare Common Procedure Coding System (HCPCS) codes used by CMS.

**Advocacy**
It is the Plan's position that a Provider should not balance bill a Plan Participant for amounts in excess of the Maximum Allowable Charge. It is the Plan's position that these Excess Charges are clearly excessive and exorbitant.

**Physician Network**
Your physician network name, **First Health**, phone number and website are displayed on the front of your ID card. American Collective has entered into an agreement with the displayed physician network. In-network physicians have agreed to charge reduced fees to Plan Participants.

The Plan may pay for services from physicians who are not contracted by the displayed network at the in-network benefit level if the Plan Participant has no in-network physician in the necessary specialty who is accepting patients within a 20-mile radius of their home, or

You have a free choice of any physician (i.e. in-network or out-of-network) and you, together with your physician, are ultimately responsible for determining the appropriate course of medical treatment, regardless of whether the Plan will pay for all or a portion of the cost of such care.

If a physician is removed from the Plan's network, the Plan will notify Plan Participants who are receiving care from the physician that the physician is no longer in the Plan's network and that the Participant has the right to elect to continue receiving transitional care from the physician subject to the Maximum Allowable Charge Limitation.

**Information and Records**
Premier Administrative Solutions ("PAS") may require additional information to make a benefit determination on behalf of the Plan. The Plan Participant or Provider must send this information in the timeframe requested. Failure to send may result in denial of payment.

8



**Claims Review**
PAS may use its discretionary authority to utilize an independent bill review and/or claim audit program.

PAS has the discretionary authority to reduce any charge to a Usual and Customary or Reasonable amount. The Usual and Customary amount will be determined based on the amount allowed by Medicare on the same date of service and in the same geographic area where the service was provided.

For professional services, the Usual and Customary amount will be determined at 140% of the amount allowed by Medicare.

Other services covered by the Plan will be determined at 150% of the amount allowed by Medicare.

## Medical Benefits

Unity Plans only provide coverage for Office and Urgent Care visits with Medical Providers for Sickness, Accident, and Preventive Care.  All benefits are outlined below and are detailed in the Plan Benefits and Exclusions sections which follow. **If a benefit is not included in the following Schedule of Benefits or in the Plan Benefits section, you should consider the benefit not covered.**

Sickness, Accident and Preventive Care services must be provided outside of a hospital.  You may use Medical Providers contracted by the PPO network listed on the front of your ID card to avoid any balance billing by a provider.  If you do not utilize a Medical Provider contracted with the PPO, we will utilize the Maximum Allowable Charge Limitation, and you may be subject to balance billing by the provider.

**Note:** This plan does not cover any services provided by a hospital (inpatient, outpatient, or rehabilitation), any diagnostic testing outside of those described in the preventive care benefits, surgery, anesthesia, emergency room, rehabilitation, medical equipment and supplies, or ambulance.

## Benefits for Treatment of Sickness and Accidents During Office Visits and Urgent Care Visits

| Covered Benefit | Unity 1 Plan | Unity 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| Deductible | There are No Deductibles | | | |
| Coinsurance/Out-of-Pocket Limit | There is no Coinsurance or Out-of-Pocket | | | |
| OFFICE VISITS FOR SICKNESS OR ACCIDENT | | | | |
| Maximum Visits Per Year | 1 Visit | 2 Visits | 4 Visits | 6 Visits |
| Visit Limit Applies | Combined total of PCP, Specialist and Urgent Care | | | |
| Primary Care Physician (PCP) | $25 Copayment, then 100% of Allowed | | | |
| Providers Considered PCP | Internal Medicine, Pediatrician, Family Practice, General Practice, and Geriatrician (All Other Provider Types are considered to be Specialists) | | | |
| Specialist | $50 Copayment, then 100% of Allowed | | | |
| Urgent Care Center | $100 Copayment, then 100% of Allowed | | | |

**Note**: Office visit charges, Diagnostic Labs and Radiology Completed in the Office; Specialist testing such as Cardiac Testing, Pulmonary Testing (Including Sleep Studies), Neurologic Testing, and Gastroenterology Testing are not covered.


**AMERICAN**
Collective LP

## Prevention and Wellness Benefits

| Covered Benefit | Unity 1 Plan | Unity 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| PREVENTION/WELLNESS CARE FOR ADULTS | | | | |
| This does not apply to your annual sickness or accident office visit limit. | | | | |
| Adult Benefit Apply For | Applicable to members between the ages of 18 and 64 | | | |
| Benefit for Prevention/Wellness | 100% of Maximum Allowable Benefits (No Deductible, Coinsurance or Copayments) | | | |
| Preventive Exam/Physical | Up to One Exam Every 12 Months | | | |
| Abdominal Aortic Aneurysm Screening | Up to One Exam Per Lifetime for Members who have smoked | | | |
| Alcohol Misuse: Unhealthy Alcohol Use Screening and Counseling | Up to One Alcohol and Drug Screening Per Year | | | |
| Anxiety Disorders in Adults | Up to One Anxiety Screening Per Year | | | |
| Aspirin: Preventive Medication | Low Dose Aspirin is covered for adults ages 50-59 with a high cardiovascular risk | | | |
| Blood Pressure Screening | For members up to Age 40, a least one Blood Pressure Screening every 2 years; For members Age 40 and above, one Blood Pressure Screening Per Year | | | |
| Cholesterol Screening | For Members with Heart Disease, Diabetes or a Family History of High Cholesterol, one Cholesterol Screening Per Year | | | |
| Colorectal Cancer Screening | For Members Ages 45-64, Up to One Colorectal Cancer Screening Every 10 Years; Up to One Fecal screening Test (Cologuard Every 2 Years) | | | |
| Depression Screening | Up to One Depression Screening Per Year | | | |
| Diabetes Screening | Up to One Diabetes Screening Per Year for those Ages 40-65 overweight or obese, or have other risk factors | | | |
| Healthy Diet and Physical Activity Counseling | Up to One Diet and Physical Activity Counseling Per Year for those at higher risk for chronic diseases | | | |
| Hepatitis B Virus Infection Screening | Up to One Hepatitis B Screening Per year for members at high risk (Not vaccinated as an infant or from a Country with a high prevalence of Hepatitis B) | | | |
| Hepatitis C Virus (HCV) Infection Screening | Up to One Hepatitis C Screening Per Year | | | |
| HIV Preexposure Prophylaxis for the Prevention of HIV Infection | These are Covered; Please see the subsection "Preventive Medications" for more information. | | | |
| HIV Screening and Counseling | Up to One HIV Screening Per Year for Members Over Age 15 or with Higher Risk | | | |
| Latent Tuberculosis Infection Screening in Adults | Up to One Tuberculosis Screening Per Year for Members at High Risk | | | |



**AMERICAN**
Collective LP

| Covered Benefit | Unity 1 Plan | Unity 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| PREVENTION/WELLNESS CARE FOR ADULTS, Continued | | | | |
| This does not apply to your annual sickness or accident office visit limit. | | | | |
| Lung Cancer Screening | Up to One Lung Cancer Screening Per Year for Members Over Age 50 or those who have quit smoking in last 15 years | | | |
| Sexually Transmitted Infections Counseling | Up to One Counseling Session Per Year for Adults at Higher Risk | | | |
| Syphilis Screening | Up to One Syphilis Screening Per Year for Members at High Risk | | | |
| Tobacco Use Counseling and Interventions | Up to One Tobacco Counseling Per Year for Tobacco Users | | | |
| PREVENTION/WELLNESS CARE FOR WOMEN | | | | |
| This does not apply to your annual sickness or accident office visit limit. | | | | |
| Well Women Exams | Up to one Well Women exam per Year | | | |
| Bone Density Screening | Up to One Bone Density Screening Per year for Women 64 and Under who have gone through menopause | | | |
| Breast Cancer Genetic Test (BRCA) | One-time Test for Women at Higher Risk (Risk must be established via screening) | | | |
| Breast Cancer Screening Via Mammogram | Mammogram screening every year for Women ages 40 and Older | | | |
| Breast Cancer Chemoprevention Counseling | Up to One Counseling Session Per year for Women at High Risk | | | |
| Cervical Cancer Screening | One Test Per year for Women Ages 21 to 65 | | | |
| Chlamydia Infection Screening | One Test Per Year for Women at Higher Risk | | | |
| Diabetes Screening | For Women with a history of gestational diabetes who aren't currently pregnant or haven't been diagnosed with Type 2 diabetes previously | | | |
| Domestic and Interpersonal Violence Screening and Counseling | Up to One Screening and Counseling Session Per year | | | |
| Gonorrhea Screening | One Test Per Year for Women at Higher Risk | | | |
| Urinary Incontinence Screening | One Screening Per year | | | |
| PREVENTION/WELLNESS FOR PREGNANT WOMEN (OR THOSE WHO MAY BECOME PREGNANT) | | | | |
| This does not apply to your annual sickness or accident office visit limit. | | | | |
| Breastfeeding Support and Counseling | Programs provided by Trained Professionals for Pregnant and Nursing Women | | | |
| Breastfeeding Supplies | Rental or Purchase of a Breast Pump | | | |
| Birth Control | Up to One Patient Education and Counseling Session for Birth Control | | | |
| Gestational Diabetes Screening | Up to One Screening for Women 24 weeks' pregnant or those at risk of developing gestational diabetes | | | |
| Maternal Depression Screening | Available at Each Well Baby Visit | | | |

11



| Covered Benefit | Unity 1 Plan | Unity 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| Preeclampsia Prevention and Screening | Available for Women with High Blood Pressure or other risk factors | | | |
| Rh Incompatibility Screening | Up to One Screening for pregnant women, with follow-up testing for Women at High Risk | | | |
| **PREVENTION/WELLNESS FOR CHILDREN (APPLIES TO MEMBERS UNDER AGE 18)** | | | | |
| **This does not apply to your annual sickness or accident office visit limit.** | | | | |
| Well Child Visits | Up to One Exam within each of the following timeframes/ages (Please refer to Immunization Schedule Below) | | | |
| | Birth to 3-5 Days | | | |
| | 1 Month | Up to 1 Visit | | |
| | 2 Months | Up to 1 Visit | | |
| | 4 Months | Up to 1 Visit | | |
| | 6 Months | Up to 1 Visit | | |
| | 9 Months | Up to 1 Visit | | |
| | 12 Months | Up to 1 Visit | | |
| | 15 Months | Up to 1 Visit | | |
| | 18 Months | Up to 1 Visit | | |
| | 2 Years | Up to 1 Visit | | |
| | 30 Months | Up to 1 Visit | | |
| | 3 Years | Up to 1 Visit | | |
| | 4 Years | Up to 1 Visit | | |
| | 5+ Years | Up to 1 Visit | | |



| Covered Benefit | Unity 1 Plan | Unity 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| **PREVENTION/WELLNESS CARE FOR CHILDREN, Continued** | | | | |
| **This does not apply to your annual sickness or accident office visit limit.** | | | | |
| Alcohol, Tobacco and Drug Use Assessment for Adolescents | Up to One Assessment Per year for Children between 10 and 19 years old | | | |
| Autism Screening | One Screening at 18 Months and Another at 24 Months | | | |
| Behavioral Assessment | Up to One Assessment Per year for Children between 10 and 19 years old | | | |
| Bilirubin Concentration Screening | As needed for Newborns | | | |
| Blood Screening for Newborns | As needed for Newborns | | | |
| Depression Screening for Adolescents | Up to One Screening Per Year for Children Age 12 and Over | | | |
| Developmental Screening | Up to One Screening for Children Age 3 and Under | | | |
| Dyslipidemia Screening | Up to One Screening for Children between 9 and 11 years and between 17 and 21 years who are at risk for Lipid Disorders | | | |
| Gonorrhea Preventive Medication | Up to one administration of the medication for the eyes of all newborns | | | |
| Hearing Screenings | Up to One Screening for a Newborn and regular screenings is recommended by a medical provider | | | |
| Hematocrit or Hemoglobin Screening | Up to One Screening Per Child | | | |
| Hemoglobinopathies and/or Sickle Cell Screening for Newborns | Up to One Screening Per Newborn | | | |
| Hypothyroidism Screening | Up to One Screening Per Newborn | | | |
| Lead Screening | Screening based on Exposure to Lead | | | |
| Obesity Screening and Counseling | Up to One Screening and Counseling Session Per Year | | | |
| Oral Health Risk Assessment | Up to One Screening and Counseling Session Per Year for Children Ages 6 Months to 6 Years | | | |
| Phenylketonuria (PKU) Screening | Up to One Screening for Newborns | | | |
| STI Prevention Counseling | Up to One Counseling Session for Adolescents at Higher Risk | | | |
| Vision Screening | Up to One Screening Per Year | | | |
| **IMMUNIZATIONS** | | | | |
| Frequency of Immunization | Varies based on Age with Standards detailed in https://www.cdc.gov/vaccines/hcp/imz-schedules | | | |
| Chickenpox (Varicella) | Covered based on CDC Recommended Schedule | | | |
| Diphtheria, Tetanus and Pertussis (DTaP) | Covered based on CDC Recommended Schedule | | | |
| Haemophilus Influenzae Type B | Covered based on CDC Recommended Schedule | | | |
| Hepatitis A | Covered based on CDC Recommended Schedule | | | |
| Hepatitis B Virus Infection Screening | Covered based on CDC Recommended Schedule | | | |
| Human Papillomavirus (HPV) | Covered based on CDC Recommended Schedule | | | |
| Inactive Poliovirus | Covered based on CDC Recommended Schedule | | | |
| Influenza (Flu Shot) | Covered based on CDC Recommended Schedule | | | |
| Measles | Covered based on CDC Recommended Schedule | | | |
| Meningococcal | Covered based on CDC Recommended Schedule | | | |

13


**AMERICAN**
Collective LP

| Covered Benefit | Unity 1 Plan | Unit 2 Plan | Unity 4 Plan | Unity 6 Plan |
|---|---|---|---|---|
| IMMUNIZATIONS, Continued | | | | |
| Mumps | Covered based on CDC Recommended Schedule | | | |
| Pneumococcal | Covered based on CDC Recommended Schedule | | | |
| Rotavirus | Covered based on CDC Recommended Schedule | | | |
| Rubella | Covered based on CDC Recommended Schedule | | | |

**NOTE:** You may be able to obtain your immunization(s) in your local pharmacy. In such cases the Pharmacy may charge you at the time the immunization is administered. If this occurs you must complete the Immunization Transmittal found in your web portal and mail it to Premiere Administrative Solutions at the address shown in the table above. Your submission must include an itemized statement from the Pharmacy and a receipt indicating your payment.

## Preventive Medications

In accordance with the Patient Protection and Affordable Care Act (PPACA) certain preventive medicines are covered at 100 percent with no member out of pocket cost. All medicines, including over-the-counter items, require a prescription from the doctor and must be provided by a participating retail, or through the home delivery pharmacy.

Below is information about the medicines available. A summary of the categories includes:

- Low-dose aspirin to prevent cardiovascular disease for men age 45-79 and to prevent cardiovascular disease and preeclampsia for women age 13-79.
- Generic bowel prep medicines required for the preparation of a preventive colonoscopy screening.
- Generic breast cancer prevention medicines for women age 35 and older.
- Fluoride supplements for children ages 6 months through 5 years old.
- Folic acid supplements for women.
- Statins for primary prevention of cardiovascular diseases in adults: low to moderate intensity statins are recommended for adults who are between the ages of 40-75, have no history of cardiovascular disease (CVD), have one or more risk factors for CVD and have a calculated 10-year CVD event risk of 10% or greater. Lovastatin and pravastatin are covered.
- Smoking cessation: Generic, brand-name with no generic equivalent (single source) and over the counter smoking cessation medicines. The day supply limit applied to these FDA-approved tobacco cessation medicines is 180 days per member per 365 days. Brand smoking cessation medicines that do have a generic equivalent (multi-source) are covered with copayment/cost sharing, or according to your benefit design.
- Routine immunizations for children, adolescents and adults as recommended from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (covered under medical benefit)
- Iron supplementation for children ages 6 months to 1 year old who are at increased risk for iron deficiency anemia.
- Contraceptives: Generic contraceptives are covered with no cost share. Brand contraceptive products that do have a generic equivalent (multi-source) and brand name contraceptives with no generic equivalent (single source) are covered with copayment/cost sharing.
- Pre-Exposure Prophylaxis (PrEP) for the prevention of HIV infection.

## Available Pharmacy Benefit

| Medications Available at No Cost | |
|---|---|
| No Cost Drugs | Only Drugs included on Revive's Preferred Drug List are available at no cost. There are over 70 Preferred Drugs available at the retail Pharmacy and over 1,100 Preferred Drugs available through Mail Order. The list of Preferred Drugs is found using the QR code reflected below: |
| Retail Pharmacy | You may obtain up to a 30-Day supply of medications on Revive's Preferred Drug List for the treatment of acute conditions, like antibiotics and steroids. These are available at any Retail Pharmacy contracted with Revive. Contracted Pharmacies can be identified on the Revive Web Portal or by calling (888) 220-6650. |

14



**AMERICAN**
Collective LP

| Mail Order Pharmacy | You may obtain up to a 90-Day supply of medications on Revive's Preferred Drug List for ongoing use or for the treatment of chronic conditions by using Revive's Mail Order Pharmacy. Instructions for getting set up with Revive are shown below. Please note: Up to 4 deliveries of Mail Order Drugs are available at no cost. If you request more than 3 refills per year, shipping cost will be charged to you for the extra deliveries. |
|---|---|
| **Medications Available at Discounted Cost** | |
| Drugs which are not included on Revive's Preferred Drug List may be subject to a 20-50% discount by showing your ID Card at a contracted Pharmacy. | |

## Your Pharmacy Plan

### About Revive

The Revive Prescription Benefit Program provides members with free access to over 1,100 commonly prescribed maintenance medications delivered directly to their homes. It also includes more than 70 urgent care medications available for pickup at over 70,000 pharmacies- all at no cost with membership.

### Available Drugs

Scan the QR Code to view the list of drugs available with Revive



### How to get Set Up with Revive

Revive provides access to healthcare benefits through its member portal or the Revive app, so you can access care whenever it's convenient for you. Complete your enrollment today and gain instant access to on-demand, personalized care.

#### Sign-up Instructions:
1. Scan the QR Code or go to member.myrevive.health/selfsignup



2. You will be taken to a web page where you will be prompted to enter a code.  Enter **tczK7bzr3s**
3. Next, enter your First and Last Name, Email Address, then click **Submit**
4. You will receive an email to login and complete the registration process to access the program
5. When asked, create a unique password and click **Submit**
6. You will now be sent to your personal portal to access the care services that have been selected for you.

### Access your Revive Personal Health Care Portal

Go to https://member.myrevive.health

### Revive Customer Support

Should you have any trouble with registration, accessing your benefits, or scheduling an appointment, reach out to the revive customer care team at:
- Phone: (888) 220-6650
- Email: customercare@revive.health

15



# <u>COVERED EXPENSES</u>

Members are covered or not covered for the following health care facilities, providers, and services, as specifically described below.

For services that are deemed covered and received from a Practitioner or Medical Professional CONTRACTED by the PPO reflected on the front of the ID card, charges for those services will be covered, subject to medical necessity and program limitations. For services that are deemed covered and received from a Practitioner or Medical Professional NOT CONTRACTED by the PPO reflected on the front of the ID card, charges for those services will be covered, subject to the Maximum Benefit Limit, medical necessity and program limitations.

**Annual Preventive Exams**
Annual Preventive Exams, Screening, Counseling, Testing and Immunizations are covered by the Unity Plan(s), subject to the frequency and other limitations outlined in the Schedule of Benefits.

**Audiological Procedures**
Hearing treatment, if provided in an Office Visit or Urgent Care Center, is covered subject to the benefits and limitations applicable to Office Visits and Urgent Care visit for Sickness or Accident.  Other treatment, such as surgery is NOT covered in your Unity Plan.

**Cologuard**
Cologuard fecal testing is covered for Ages 45 to 64 every two years, at 100%.

**Colonoscopy**
Diagnostic colonoscopies are covered for Ages 45 to 64 every 10 years.

**Diagnostic Imaging**
All Diagnostic Imaging with the exception of Preventive Mammography and Bone Density Testing described in the Schedule of Benefits is NOT covered under your Unity Plan.  This includes X-Rays, MRI, MRA, Ultrasound, CT Scans, and PET Scans.

**Mammograms**
Mammograms are covered as part of your Unity Plan Preventive Services, at a frequency identified in the Schedule of Benefits.

**Mental Health**
Mental health and substance abuse counseling is NOT covered except to the extent required as a preventive service.

**Physician Services**
Physician services include the diagnosis, treatment, management or prevention of an Illness or Injury. Office visits for Primary Care, Urgent Care, and Specialty Care are eligible for sharing subject to a Copayment and 100% coverage for treatment of sickness and accident.  There is a limit based on the Unity Plan in which you enrolled, of the number of office visits for sickness and accident which are covered each year you are enrolled.  Each year, at the anniversary of your enrollment, your office benefit maximum benefit will reset. For Preventive/Wellness Services provided by a Physician, coverage will be at 100% for the specific services outlined in the Schedule of Benefits.

**Vaccines Administered by Pharmacists**
Vaccination services administered by pharmacists are covered, subject to the list of covered Immunizations and frequency identified in the Schedule of Benefits. If you receive vaccines from a Pharmacist, you may be required to pay for the vaccine when it is administered by the Pharmacist.  In such cases, you must file a Transmittal for Reimbursement available on your Member Portal with a copy of the Pharmacist's printout of services rendered and your receipt.



**Well Baby Visits**
Well baby visits, including immunizations, are eligible for sharing within the first year of birth.

**Well Child Exam**
Well Child Exams, Screening, Counseling, and Immunizations are covered by your Unity Plan subject to the list of specific services and limitations listed in the Schedule of Benefits.



# GENERAL EXCLUSIONS AND LIMITATIONS

It is very important to review the Schedule of Benefits and the Description of Covered Services in the previous Section.  This Section details General Exclusions and Limitations applicable to the Plan.

1. **Abortion**
   Services, supplies, care or treatment in connection with an abortion.

2. **ADD/ADHD/SPD and Similar Chemical Imbalances**
   Treatment of purported chemical imbalances not demonstrable by lab tests, such as for Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, Sensory Processing Disorder, and similar disorders. Please note:  Office visits where medication reviews are completed ARE COVERED, up to the maximum number of office visits in the Unity plan.

3. **Alcohol/Drug-Related Problems**
   Services, supplies, care or treatment for an injury and/or disease and/or bodily malfunction which occurred as a result of that Partner's abuse and/or use of alcohol or drugs/pharmaceuticals, including Drug and/or Alcohol Rehabilitation Treatment are not covered.

4. **Allergy Testing**
   Allergy testing, including skin tests, blood tests, and provocation tests, is not covered.

5. **Alternative Medicine and Non-Conventional Treatments**
   An "alternative medical treatment" or "non-conventional treatment" is a treatment proposed by a member for a condition lawfully diagnosed by a licensed medical professional, but which treatment was not prescribed by the member's provider. Expenses of Alternative Treatment are not covered.

6. **Ambulance**
   Ambulance transportation, including Emergency and/or Non-Emergency land or air ambulance transportation, is not covered.

7. **Ambulatory Surgery**
   Ambulatory surgery, also referred to as "day surgery" or "outpatient surgery," is not covered.

8. **Anesthesia**
   Anesthesia, inclusive of that related to surgery and spinal injections, is not covered.

9. **Anti-Aging or Aging "Reversal"**
   Treatments and devices for the normal changes or declines in bodily functions that typically occur with age (e.g., sexual aids, eyeglasses, hearing aids, dentures, etc.) are not covered.

10. **Armed Conflict**
    Injuries or illness resulting from a member's participation as a combatant in an armed conflict, but not including actions taken purely in self-defense or in defense of an immediate family member, are not covered.

11. **Audiological Therapy**
    Hearing Therapy by a licensed audiologist is not covered.

12. **Breast Implants**
    The placement, replacement or removal of breast enhancement devices and complications related to breast implants are not covered.



13. **Cardiac Therapy**
Cardiac Therapy, in accord with a Physician's order to improve body function, is not covered.

14. **Charges before or after Active Membership**
Medical care, treatment, or supplies for which a charge was incurred before a person was enrolled, or after membership ceased or became inactive, is not covered.

15. **Chemotherapy and Radiation Therapy**
Chemotherapy and Radiation Therapy are not covered.

16. **Chiropractic Therapy**
Treatment of skeletal or musculoskeletal disease or injury by a person holding a Doctor of Chiropractic degree (abbreviated as "D.C.") is not covered.

17. **Circumcision**
Circumcision is not covered.

18. **Civil Disobedience/Protests/Riots**
Injuries or illness resulting from or occurring during participation in an act of civil disobedience, demonstrating, protesting or rioting is not covered.

19. **Complications of Non-Eligible Treatments**
Care, services, or treatment required as a result of complications from a treatment not eligible for sharing is not covered.

20. **Cosmetic Procedures**
Cosmetic care or treatment is not covered, including but not limited to:
   - Pharmacological regimens,
   - Nutritional procedures or treatments,
   - Cosmetic surgery,
   - Plastic surgery,
   - Salabrasion,
   - Chemosurgery, and
   - Other such skin abrasion procedures associated with the removal or revision of scars, tattoos or actinic changes.

21. **CT Scan**
CT Scans are not covered.

22. **Custodial Care**
Services or supplies provided mainly as a rest cure, maintenance, custodial care, or other care that does not treat an Illness or Injury, are not covered.

23. **Dental Care**
Dental prostheses and care or treatment of the person's teeth above or below the gums is not covered.

24. **Durable Medical Equipment**
The purchase, rental or replacement of durable or reusable equipment or devices is not covered, including, but not limited to:
   - Orthotics,
   - Hearing aids,

19



- Tubing,
- Masks, and
- Their associated expenses.

### 25. Emergency Room

Emergency Room services are not covered.  This is regardless of the medical necessity of the ER visit and/or whether the enrolled member is admitted to the facility.  When the ER facility is not covered, neither are the services of any medical professional who treated the patient while they were in the ER.

### 26. Excess Charges

The part of an expense for care and treatment of an injury or illness that is in excess of the Maximum Allowable Charge is not covered.

### 27. Exercise Programs

Exercise programs for treatment of any condition, except for Physician- supervised cardiac rehabilitation and/or physical therapy are not covered.

### 28. Experimental, Investigational, Unproven or Unapproved Services

Care and treatment that is either Experimental, Investigational, or Unproven, or that has not been approved by the American Medical Association, FDA, or other industry recognized authoritative bodies, or that is illegal by U.S. law, is not covered.

### 29. Euthanasia/Assisted Suicide

Expenses for intentionally terminating or assisting with the termination of a human life are not covered.

### 30. Eye Care

Eye exercise therapy, radial keratotomy or other eye surgery to correct near-sightedness, routine eye examinations, including refractions, lenses for the eyes, and exams for their fitting, are not covered.

### 31. Failure to Follow Medical Advice

Expenses for care and treatment of an injury or illness, the need for which was the result of a failure to follow medical advice or an unreasonable delay in following medical advice, are not covered.

### 32. Genetic Testing

Genetic Testing including the process of analyzing cells or tissue to look for changes in genes, chromosomes, or proteins that may be a sign of a disease or condition, such as cancer, is not covered. This includes:
- Pre-symptomatic and predictive testing,
- Carrier testing,
- Pharmacogenetics,
- Prenatal testing,
- Newborn screening, and
- Preimplantation testing.

The only exception to this exclusion is BRCA testing for women where there is a confirmed high risk of breast cancer.

### 33. Goods and Services Purchased from Relatives

Purchases of Services from a relative are not covered.

### 34. Hair Loss

Care and treatment for hair loss, hair transplants or any drug that promises hair growth, whether or not it is prescribed by a Physician, is not covered.



**35. Hearing Aids and Exams**
Charges for services or supplies in connection with routine hearing exams, hearing aids, or exams for their fitting, are not covered.

**36. Hazardous Hobbies**
Care and treatment of an injury or illness that results from engaging in a hazardous hobby is not covered. A hobby is hazardous if it is an activity which is characterized by a constant or recurring threat of danger or risk of bodily harm. Examples of hazardous hobbies include, but are not limited to:
- Rock/cliff climbing,
- Spelunking,
- Scuba diving,
- Skydiving,
- Bungee jumping,
- Hang gliding,
- Kite surfing,
- Paragliding,
- Base jumping, and
- All other extreme sports.

**37. Hemophilia**
No form of Hemophilia is covered.

**38. Home Health Care**
Skilled care services at home are not covered.

**39. Homeopathic**
Homeopathic treatments and prescriptions are not covered.

**40. Hospice Care**
Hospice Care services are not covered.

**41. Hospital Charges**
Medical Services provided by a Hospital on Inpatient or Outpatient basis are not covered.

**42. Hyperbaric Oxygen Therapy**
Hyperbaric Oxygen Therapy is not covered.

**43. Illegal Acts**
Charges for services received as a result of the following are not covered:
- Injury or illness caused by engaging in an illegal act or occupation,
- By committing or attempting to commit any crime, criminal act, assault, or other felonious behavior, including but not limited to:
  - Illegal drug activity,
  - Crimes against persons,
  - Crimes against property,
  - DUI, and
  - Gun offenses.

**44. Impotence**
Surgical and non-surgical services for the treatment of impotence are not covered.



45. **Infertility**
Diagnostics, testing, surgical repair, non-surgical repair, surgical impregnation, in vitro fertilization, or other procedures and Prescription Drugs for the treatment of infertility, are not covered.

46. **Infusion Therapy**
Infusion therapy, at home, in a Physician's Office, or Facility (Hospital, Rehabilitation Hospital, Skilled Nursing Facility or any other facility), is not covered.

47. **In-Office Surgery and Therapeutic Injections**
Surgery which can be performed in the office of a Medical Professional is not covered.  Therapeutic injections completed in a Medical Professional's office are not covered.

48. **Interest/Late Charges/Penalties**
Costs incurred for interest charges, late charges, or penalties from any Provider are not covered. Interest or finance charges from a credit card or lending institution that a Member borrows from to pay medical bills are also not covered.

49. **Long-Term Care**
Nursing home and other long-term care is not covered.

50. **Mental Health Services**
Charges for psychiatric or psychological counseling, mental disability, learning disability, bereavement counseling, biofeedback therapy, and psychological testing are not covered.

51. **MRIs**
MRIs are considered a Diagnostic Radiology service and are not covered.

52. **Naturopathic Care**
Naturopathic adjustments, manipulations, and other treatments are not covered.

53. **Negligent Acts**
Expenses resulting from an Illness or Injury as to which the Partner or covered family member has acted with negligence or with reckless disregard to safety, as evidenced by medical records, are not covered.

54. **Non-Medical Expenses**
Expenses not directly related to provided medical services are not covered (e.g., phone chargers, cots and/or meals for visitors, etc.).

55. **No Obligation to Pay**
Charges incurred for which the patient has no legal obligation to pay are not covered.

56. **Not a Medically Necessary Service**
Care and treatment that does not meet the criteria of a Medically Necessary Service or is not specified as a Medically Necessary Service; care, treatment, services, or supplies not recommended and approved by a Physician; or treatment, services, or supplies received when the Sharing Member is not under the regular care of a Physician are not covered. American Collective reserves the right to review billing submitted by providers for payment, and upon review by a qualified medical professional, decline to share expenses deemed to be Not a Medically Necessary Service.

57. **Nutritional Supplements**
Nutritional products, supplements, consultations, education, and educational materials are not covered.

22



58. **Nutritionist**
Services of nutritionists and dietary consultants are not covered.

59. **Occupational Therapy**
Occupational therapy is not covered.

60. **Optometric Vision Therapy**
Optometric vision therapy is not covered.

61. **Organ/Tissue Donation**
Expenses related to organ or tissue donation are not covered.

62. **Organ Transplant**
Expenses incurred in connection with any organ or tissue transplant are not covered.

63. **Outpatient Prescribed or Non-Prescribed Medical Supplies**
Outpatient prescribed or non- prescribed medical supplies are not covered. This is including, but not limited to:
   - Over-the-counter drugs and treatments,
   - Elastic stockings,
   - Tubings,
   - Masks,
   - Ostomy supplies,
   - Insulin infusion pumps,
   - Ace bandages,
   - Gauze,
   - Syringes,
   - Diabetic test strips, and
   - Similar supplies.

64. **Personal Comfort Items**
Personal comfort items or other equipment are not covered, such as, but not limited to:
   - Air conditioners,
   - Air-purification units,
   - Humidifiers,
   - Electric heating units,
   - Orthopedic mattresses,
   - Blood pressure instruments,
   - Scales,
   - Elastic bandages or stockings,
   - Non-prescription drugs and medicines and first-aid supplies, and
   - Non-hospital adjustable beds.

65. **Physical Therapy**
Physical therapy is not covered.

66. **Pre-Employment and Pre-School/Athletic Physicals**
Pre-Employment, Pre-School/Athletic Physicals are not covered if outside a normal schedule of wellness and preventive care provided by the patient's regular physician.

67. **Professional Racing or Competitive Events**
Charges for treatment of injuries or illness while racing or competing as an amateur or professional are not covered. "Professional" means that such activity is one's primary vocation and means of financial support.

23