| Date ▾ | Description ↕ | Category | | Amount ↕ | |
|---|---|---|---|---:|---|
| Jul 18, 2024 | INNOVATIVE HEALTH PLANS | Bills & utilities | ∨ | −$339.86 | › |
| | INNOVATIVE HEALTH PLANS | Bills & utilities | ∨ | −$339.86 | › |
| Jul 15, 2024 | INNOVATIVE HEALTH PLANS | Bills & utilities | ∨ | $339.86 | › |
| Jun 24, 2024 | INNOVATIVE HEALTH PLANS | Bills & utilities | ∨ | $339.86 | › |

# Gillam
# Attachment N

Fwd: Innovative Partners - Cancellation Confirmation

From: Jack Woodley ███████████████████████

To: hailey.gillam@███████

Date: Thursday, July 18, 2024 at 12:16 AM CDT

---------- Forwarded message ---------
From: **Innovative Partners** <partnerservices@innovativepartnerslp.com>
Date: Wed, 17 Jul 2024 at 22:40
Subject: Innovative Partners - Cancellation Confirmation
To: <jack.woodley ███████████ >
Cc: <membercc@innovativepartnerslp.com>

Dear JACK WOODLEY,

We've received your request to cancel your health plan activated on 03-14-2024. We're currently processing your cancellation. Your health plan will be terminated as of 07-13-2024.

If you have any questions regarding your cancellation or if you received this email by mistake, please contact Partner Services at 866-949-3581.

Best regards,
Innovative Partners

 **INNOVATIVE** PARTNERS

866-949-3581
partnerservices@innovativepartnerslp.com

# Gillam
# Attachment O

# MARPAI

Member:      JACK WOODLEY
Member ID:   G775910
Group ID:    MP200

## Claims Summary

Questions about this claim?
Call:   866-949-3581
Email:  claims@innovativepartnerslp.com

**Download EOB**

**Share EOB**

Claim Number: ▮▮▮▮▮▮▮▮

| | | | |
|---|---|---|---|
| Member: | JACK WOODLEY | Total Billed Charges: ⓘ | 931.35 |
| Service Date(s): | 07/03/2024 | Total Plan Allowed: ⓘ | 931.35 |
| Claim Status: | Completed | Total Not Covered: ⓘ | 931.35 |
| Claim Finalized Date: ⓘ | 09/16/2024 | Total Deductible: ⓘ | 0.00 |
| Plan: | IP Elite MD 6 | Total Co-Pays: ⓘ | 0.00 |
| Claim Type: | Medical | Total Coinsurance: ⓘ | 0.00 |
| Provider: | Laboratory Corporation America Holdings | Total Gross Paid: ⓘ | 0.00 |
| Rendering Provider: | | Total Other Insurance/Adjustments: ⓘ | 0.00 |
| | | Total Amount Paid: ⓘ | 0.00 |
| | | Total Member May Have to Pay: ⓘ | 931.35 |

# MARPAI

| Member: | JACK WOODLEY |
|---|---|
| Member ID: | G775910 |
| Group ID: | MP200 |

## Claims Summary

Questions about this claim?
Call:    866-949-3581
Email:   claims@innovativepartnerslp.com

**Download EOB**

**Share EOB**

Claim Number: ███████████

| Member: | JACK WOODLEY | Total Billed Charges: ⓘ | 931.35 |
|---|---|---|---|
| Service Date(s): | 07/03/2024 | Total Plan Allowed: ⓘ | 931.35 |
| Claim Status: | Completed | Total Not Covered: ⓘ | 931.35 |
| Claim Finalized Date: ⓘ | 09/16/2024 | Total Deductible: ⓘ | 0.00 |
| Plan: | IP Elite MD 6 | Total Co-Pays: ⓘ | 0.00 |
| Claim Type: | Medical | Total Coinsurance: ⓘ | 0.00 |
| Provider: | Laboratory Corporation America Holdings | Total Gross Paid: ⓘ | 0.00 |
| Rendering Provider: | | Total Other Insurance/Adjustments: ⓘ | 0.00 |
| | | Total Amount Paid: ⓘ | 0.00 |
| | | Total Member May Have to Pay: ⓘ | 931.35 |

# MARPAI

Member: **JACK WOODLEY**
Member ID: **G775910**
Group ID: **MP200**

## Claims Summary

Questions about this claim?
Call:   866-949-3581
Email:   claims@innovativepartnerslp.com

**Download EOB**

**Share EOB**

---

Claim Number: ▮▮▮▮▮▮▮

| | | | |
|---|---|---|---|
| Member: | JACK WOODLEY | Total Billed Charges: | 224.00 |
| Service Date(s): | 07/16/2024 | Total Plan Allowed: | 224.00 |
| Claim Status: | Completed | Total Not Covered: | 224.00 |
| Claim Finalized Date: | 09/16/2024 | Total Deductible: | 0.00 |
| Plan: | IP Elite MD 6 | Total Co-Pays: | 0.00 |
| Claim Type: | Medical | Total Coinsurance: | 0.00 |
| Provider: | ▮▮▮▮▮▮▮ | Total Gross Paid: | 0.00 |
| Rendering Provider: | ▮▮▮▮▮ | Total Other Insurance/Adjustments: | 0.00 |
| | | Total Amount Paid: | 0.00 |
| | | Total Member May Have to Pay: | 224.00 |

# PX 6

**DECLARATION OF DAVID HICKS**
**PURSUANT TO 28 U.S.C. § 1746**

I, David Hicks hereby declare as follows:

1.      My name is David Hicks. I live in Warrensburg, Missouri and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      In January 2024, I started a new job and enrolled in health insurance coverage through this employer. I am a Type 1 diabetic and have other health conditions that require ongoing care, and I was finding that under my employer's health insurance plan, my out-of-pocket costs for diabetes medications and supplies were really high. Around August 2024, I searched online for health insurance to see if there were other plans that might lower those out-of-pocket costs. I submitted my information to a website promising health insurance quotes, and shortly afterwards, I started receiving nonstop calls from agents offering to sell me health insurance plans.

3.      On August 17, 2024, I picked up one of these calls from an agent named Kelly. I told her that I was a Type 1 diabetic with several other health conditions. I said I had health insurance through my employer, and I wanted to see if there were other plans with better coverage. My main concern was lower out-of-pocket costs for my diabetes medications and supplies, especially Dexcom glucose monitoring. I knew many health insurance policies did not cover it, and without insurance, it could cost hundreds of dollars per month.

4.      Kelly said she found a PPO plan for me with better coverage than my employer health plan. I asked her about out-of-pocket costs for my prescriptions and doctor's visits, and I took notes as Kelly explained the plan details. **Hicks Attachment A** is a true and correct image of those notes. Kelly said that under the PPO she found, my monthly out-of-pocket costs would

be $30 for Humalog insulin, $25 for syringes, $80 for semaglutide, and $25 for Dexcom. I did not ask about my other prescriptions, including an anti-depressant, cholesterol medication, blood pressure medication, and medication to manage appetite. I asked Kelly about the coverage for my monthly doctor's appointments, monthly chiropractor appointments, and my therapist appointments, which are every other week. Kelly confirmed that these visits were all covered, and my copay for each would be $25. She also mentioned the plan deductible was either $0 or a very low amount, but I don't remember the exact value.

5. Kelly said the cost for the plan she was offering was $428.79 per month to cover my son and me, and for the first month, there was an added $125 state mandated fee, making the first month's charge $553.79. Although $428.79 was more than the monthly premium for my employer's health insurance plan, my total health-related spend per month would be lower under Kelly's plan because the out-of-pockets costs for my diabetes medications and supplies, as quoted by Kelly, were so much lower. I asked Kelly if I needed to keep my employer plan if I enrolled in the plan she was offering. She said that because her plan had better coverage, I did not need to keep the employer plan and should cancel it.

6. Kelly said that the PPO she was offering was a special plan issued by the state in limited quantities, and if I did not enroll in that moment, it would not be available to me later. I did not want to lose the opportunity to enroll, and I agreed to buy Kelly's plan.

7. To enroll me, Kelly collected my information, including payment information, over the phone. To complete enrollment, she emailed me a digital form to fill out while she remained on the phone. There was no information about the plan on this form, and Kelly said I would receive plan information in the mail after I enrolled.

8.      After I filled out the form, Kelly confirmed I was enrolled, and my plan would be effective September 1, 2024. She gave me a confirmation number, member ID number, and two customer service phone numbers to call with plan questions: 888-376-0675 and 888-376-0445. I wrote these numbers down on the same page of notes with the plan details Kelly had outlined, **Hicks Attachment A**.

9.      After I purchased the plan from Kelly, I canceled my employer-sponsored insurance.

10.      A week or two later, I received my health plan ID card in the mail. The company name on the card was Innovative Partners. There was no plan information attached to the card, and I never received any other plan documents in the mail.

11.      A few weeks after I purchased the plan from Kelly, I went to refill my prescriptions at my pharmacy. I provided the Innovative Partners health plan ID card, but the pharmacy could not find my plan information in their system. The pharmacy called the phone number on the card but was placed on a long hold and did not get through to an agent. The pharmacy tried again, and I also tried calling on my cell phone while I was there. We did not connect with an agent. The pharmacy said they would keep trying, and I went home without my medications.

12.      Later, the pharmacy called me to let me know they finally did get through to Innovative Partners and learned that my plan was not health insurance—it was a discount plan. Now, to refill my prescriptions, the out-of-pocket costs for a month were double or more what Kelly had quoted. For example, it was $60 for Humalog insulin, which Kelly had quoted at $30; $62 for syringes, which Kelly had quoted at $25; $400 for Dexcom, which Kelly had quoted at $25; and $200 for semaglutide, which Kelly had quoted at $80.

13.     Kelly had put me in a terrible position. I need my medications to live, and I could not afford them without insurance. I had canceled my employer-sponsored insurance to enroll in the Innovative Partners plan because Kelly said it was health insurance with better coverage. I was shocked to later learn from my pharmacist that it was not health insurance at all. I never would have purchased the Innovative Partners plan if Kelly had told me it was a discount plan. The discount plan was worthless to me, and I did not want it.

14.     In September I called Innovative Partners to cancel. After waiting on hold for around an hour to an hour and a half, I told the agent that I wanted to cancel and receive a refund because my plan was not health insurance. The agent on the line insisted that my plan was health insurance. After that call, I called my pharmacy back and told them that Innovative Partners had confirmed my plan was insurance. I requested the pharmacy process my prescriptions again using the Innovative Partners plan. The pharmacy said they could not process it and that my plan was not insurance.

15.     I called Innovative Partners again to cancel my plan, and I was on hold for another hour or hour and a half until I connected to an agent. I insisted I wanted to cancel, and the agent said that my request would be processed in a few days. A few days later, I still had not received a refund. I called Innovative Partners again, and after another long hold, the agent said my cancellation and refund was still being processed. I called Innovative Partners repeatedly to request cancellation and my refund, and I do not remember how many times.

16.     Finally, on September 14, 2024, I still had not received a refund from Innovative Partners, and I filed a Better Business Bureau complaint about my experience with the company. **Hicks Attachment B** is a true and correct copy of this complaint. Sometime after I filed that

complaint, Innovative Partners did refund me the $553.79 I had paid for the first month of the plan.

17.     Although I did get a refund from Innovative Partners, I'm still dealing with the serious consequences of switching from my employer-sponsored health insurance plan to the worthless discount plan that Kelly sold to me as "health insurance." Ultimately, Kelly's lies resulted in my being uninsured for several months. The cost of my care without insurance is very high. My diabetes medications and supplies alone would have cost me over $700 monthly, and when I initially learned this, I was devastated. I could not afford that and decided to stop taking diabetes medications altogether. That worried my doctor, who worked with me to find discounts and samples to help lower the cost to around $500 per month. Without insurance, it also costs me $85 for each of my monthly doctor's appointments. I have had to take on more hours at my job to pay for all of this. As a consequence, I am stretched very thin and have less time for my son, my dogs, exercise, sleep, and keeping up with household tasks. Even after taking on extra hours, I still can't afford all of the care I need. Although I should see the chiropractor once a month and my therapist twice a month, I now go to the chiropractor sparingly because of the cost. I had stopped seeing my therapist altogether for the same reason, but I have resumed appointments because the therapist is not charging me. I have stopped taking my other medications, including those for managing my cholesterol, blood pressure, and depression, because I can't afford them. Now, my blood pressure is higher, and my doctor is concerned about it. I've also noticed a difference in my mood.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  12/31 , 2024.

David E. Hicks

David Hicks

# Hicks
# Attachment A

per month - PHCS

Lantus - $40

Humalog - $30                        Dr. co-pay - $25

syringes - $25                       counselor - $25

dexcom - $25

semaglutide - $80

plan - $371.28        w/ Jacob - $428.75

state fee $125        PPO Network        Agent - Kelly

payment - 1st

$553.79 / $428.75

customer service - 888-376-0675        *call Delta Dental
                        -0445              for dental

member ID - 6484528        enter -120

confirmation # - TO 4635        cap - 50

effective 9/1/2024

# Hicks
# Attachment B

# Innovative Partners, LP

**Case #:** 22291151

| | | | |
|---|---|---|---|
| **Consumer Info:** | Hicks, David<br>███████████<br>Warrensburg, MO ████<br>█████████<br>████████@yahoo.com | **Business Info:** | Innovative Partners, LP<br>2234 N Federal Hwy PMB 2862<br>Boca Raton, FL 33431<br>2393839145 |

**Date Filed:** 9/16/2024 10:44:12 AM

**Nature of the Complaint:** Repair Issues

**Consumer's Original Complaint:**

I am a Type I diabetic and had health insurance through my employer. The health insurance I had through my employer did not cover my diabetic medications at an affordable rate. I began looking elsewhere for health insurance to try and find a way to be able to afford my medications. I had an agent (Kelly) contact me and sold me the Health Insurance policy through Innovative Partners. Kelly gave me the prices that my medications would cost me and informed me that I could cancel the current insurance I had. I cancelled the insurance through my employer so that I would not be paying for 2 insurance policies. The I find out that the insurance policy that was sold to me was not an insurance policy after but was a savings program that was now costing me $429.78 per month and that the prices that I had been told that my prescriptions would be was no where close to what I had been quoted. Now I am without health insurance for the rest of the year and I am in a bit of a bad situation being without insurance. I do not want this to happen to anyone else and want people to be aware of this company and their lies.

**Consumer's Desired Resolution:**

Modification/discontinuance of an advertised claim; Contact by the business; I want people to be aware of what these people are doing so that they cannot screw anyone else over the way they are trying to do me

# Complaint Timeline

**09/16/2024**  Submitted: IABBB Complaint Form (API)
**Complaint Form**

**09/16/2024**  Processed by blue: Automation
**IABBB Complaint Form**

**09/16/2024**  Pending initial Business response: Action Taken
**Threshold Application**

# PX 7

## <u>DECLARATION OF KIMBERLY HOOD</u>
### PURSUANT TO 28 U.S.C. § 1746

I, Kimberly Hood, hereby declare as follows:

1.      My name is Kimberly Hood. I live in Bardstown, Kentucky. I am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      In November of 2023, I was searching for health coverage after a period of being uninsured. I had recently dealt with a severe bout of pneumonia and had been paying out of pocket for care, so I felt a sense of urgency about getting myself covered. I searched online and found a website for Kentucky State Health Insurance, which is my state's marketplace. All of the plans listed there were really expensive, so I started calling various phone numbers I found online for the Kentucky marketplace, hoping to ask someone about whether I might qualify for a cheaper plan. On November 7, 2023, I called a number that I thought was associated with the Kentucky marketplace. I think the number may have been 877-682-0520, though I am not confident about that. I ended up being connected with someone who introduced himself as Ricky.

3.      I told Ricky that I had searched the Kentucky marketplace website, but that the cheapest plans I could find there were $500 to $600. Ricky told me that they had other plans that were more affordable, and that he could log into the marketplace and pull them up. From the start, I believed—and Ricky confirmed and reinforced—that I was speaking to someone who worked for the Commonwealth of Kentucky.

4.      After asking me about my household income, Ricky reassured me that I qualified for state assistance that would reduce the cost of my insurance premiums. I was so relieved. He asked me some additional questions and then told me that there were multiple options available.

He first described a plan that would cover an unlimited number of doctor's visits, but that cost roughly $800 per month. He then described a less comprehensive plan that cost approximately $600 per month. Finally, he offered a plan that I could actually afford. Under this plan, which he described as a "nationwide PPO" that would cost around $243 per month, I would be able to go to any in-network provider without having to get preauthorization first. There would be no deductible (which Ricky emphasized as an especially great feature), and no co-pays for preventive care. For all other care, I would pay $25 co-pays for doctor's visits and $50 co-pays for visits to specialists, immediate care, and the emergency room. I remember these specific details because I jotted some of them down during the call. **Hood Attachment A** is a true and correct copy of my notes.

5.      The plan Ricky described sounded good, so I asked some clarifying questions to make sure I understood the details. I believe that I asked about lab work and x-rays, and Ricky said that they were covered and that I would only ever need to pay the $25 or $50 co-pay for the associated provider visit. I also asked about hospital admissions, and Ricky said that if I had to be admitted to the hospital (beyond a simple visit to the ER), the insurance would cover 80% of the cost and I would be responsible for the remaining 20%. I found his explanation kind of confusing, but the plan seemed to cover what I needed and was much more affordable than the ones I had seen on the Kentucky marketplace website.

6.      I asked Ricky about the process for canceling the plan, and whether I would be locked in for a full year if I enrolled. Ricky said that the plan ran month to month, and that I could call and cancel any time without penalty.

7.      I told Ricky that I was interested in enrolling in the $243-per-month plan, but that I wanted to shop around a little more before committing. Ricky said that the open-enrollment

deadline was about to expire and that tomorrow would be too late. This confused me because I thought that open enrollment lasted until January, but Ricky insisted that today was my last chance and that it was lucky I had called when I had. I did not want to miss the open-enrollment window, so I agreed to enroll.

8.      Ricky processed my enrollment while we were on the phone. I do not remember specific details of the enrollment process, but I feel confident that I never reviewed any explanatory documents or signed anything. I do remember Ricky telling me that there was an additional cost I would need to pay to enroll, making the charge for the first month $368.20 instead of the $243 standard rate. I told him that this was fine for the first month and read him my debit card number over the phone. Ricky charged my card while we were still on the phone, and the funds were withdrawn from my bank account.

9.      Ricky confirmed that my enrollment had processed and that my coverage would become effective the following day. He told me that I would receive a "welcome package" in the mail in a few weeks' time. I thanked him for all his help and ended the call.

10.      After the call, I noticed that I had received two emails from a company called "Innovative Partners." I do not recall Ricky specifically mentioning the name Innovative Partners to me, but I figured that it must be the name of the broker selling the marketplace plan I had bought and did not think too much of it. I hand-wrote the name "Innovative Partners" and the customer service number listed in these emails (866-949-3581) on a separate post-it note, a true and correct copy of which is visible in **Hood Attachment A**.

11.      The first email, which came from partnerservices@innovativepartnerslp.com and had the subject line "Sales Receipt," confirmed that I had been charged a total of $368.20. **Hood Attachment B** is a true and correct copy of that email with my personal information redacted.

The email broke the $368.20 total down into three separate line items: $125 for an "enrollment fee"; $193.25 for "Elite 4"; and $49.95 for something called "Guardian 5000." I understood what "enrollment fee" meant, but I did not know what "Elite 4" or "Guardian 5000" stood for, or why they were listed as separate line items on the receipt. I made a mental note to follow up about this.

12. The second email, which came from admin_noreply@innovativepartnerslp.com and had the subject line "Innovative Partners – Partner Portal," included a link to and log-in credentials for a "Partner Portal" where I could access "programs, temporary ID cards, resources, monthly payment details, and more." **Hood Attachment C** is a true and correct copy of that email with my personal information redacted.

13. I immediately logged into the Partner Portal to check it out. It seemed oddly generic. I did find a link to my temporary health insurance ID card, a copy of which I downloaded to my phone. **Hood Attachment D** is a true and correct copy of that temporary ID card.

14. I looked for information about my plan's prescription coverage (which I did not recall Ricky having discussed during our call), but I could not find anything on the portal related to prescription benefits. I did fine a 14-page brochure called "Health Benefit Plan," which I briefly skimmed. **Hood Attachment E** is a true and correct copy of that brochure. On the fifth page, I found what appeared to be a summary of something called the "Elite 4" plan, which matched what had been listed on my sales receipt. But this summary only further confused me. It contained a chart with four rows: "Primary Care," "Specialist," "Urgent Care Visits," and "Emergency Room." Next to these rows was a column labeled "Days per plan year," with the number "4" listed for each category of care except for Emergency Room, which listed the

number "1." The column after that was titled "Maximum amount per plan year," under which a monetary amount of $150 was listed for each of the four categories of care. I had no idea what "days per plan year" or "maximum amount per plan year" meant in the context of the insurance plan I had purchased, but it was enough to make me concerned.

15.     The next day, November 8, 2024, I called Innovative Partners back to ask about the confusing chart from the brochure I had downloaded, as well as to inquire about prescription coverage. After a few minutes on hold, I got through to a customer service representative. In response to my questions about the plan summary chart and my concern that it seemed to say I was only covered for four doctor's visits per year, she told me that the plan brochure was "just written weird" and that I was free to go to the doctor as many times as I wanted. I also asked if the plan I had purchased included prescription coverage, and the representative told me that it did. She said she would email me a prescription card and we ended the call.

16.     I then received an email from partnerservices@innovativepartnerslp.com with the subject line "PRESCRIPTION CARD," which included an embedded image of a prescription benefit card. Shortly after receiving it, I replied to the email asking if someone could "send me something outlining what the plan coverage is," as I still had not been able to find any kind of comprehensible plan summary documents in the Partner Portal. No one ever responded to that email. **Hood Attachment F** is a true and correct copy of the email exchange, except that the image of the prescription card I received—which was visible to me at the time I originally received the email—no longer loads and has instead been replaced with the text <image.png>. My personal information has been redacted from **Hood Attachment F**.

17.     Shortly after receiving the prescription card via email, I attempted to use it at the local Walgreens where I fill a monthly prescription. After examining the card, the pharmacist

told me that it was "useless" and that I would be better off paying in cash and using GoodRx, a service that offers coupons to help defray prescription drug costs. I needed my prescription, so I ended up following the pharmacist's advice and paying cash. Even though I got a substantial discount through GoodRx, I still had to pay approximately $100 out of pocket for that prescription. When combined with my other regular prescriptions (none of which were covered by my Innovative Partners card), my total monthly costs totaled about $350. This was by no means affordable for me, especially on top of the monthly cost of my Innovative Partners plan. Still, I figured I could budget for regular prescription costs. The most important consideration for me—and the reason I did not seek to cancel my Innovative Partners plan at that point—was that I believed I now had comprehensive health insurance and would be able to seek medical care without incurring huge medical bills.

18.     At some point in the month following my enrollment, I again reviewed the plan brochure I had found in the Partner Portal in search of information about the mysterious "Guardian 5000" charge that had appeared on the sales receipt I had received on November 7, 2023. Based on that plan brochure, I was able to piece together that Guardian 5000 was a policy through which I would get a lump-sum cash payment if I experienced a catastrophic health event, like loss of a limb. It seemed similar to life insurance and had nothing to do with accessing health care. I am certain that Ricky and I never spoke about any such policy during our phone call on November 7 because it is not something I would have agreed to purchase.

19.     When I realized all of this, I called Innovative Partners back. When I got through to a representative, I explained that I did not need this "Guardian 5000" coverage and asked for a refund of the $49.95 I had been charged on November 7. The representative I spoke to said that they could not refund me the money, but that they would remove the policy to ensure I would not

be charged for it in the future. I asked the representative to at least send me a confirmation email confirming that the Guardian 5000 policy had been removed, and she replied that they "don't do that." I was initially concerned about their refusal to provide me with any documentation, but on December 7, 2023, Innovative Partners charged me $193.25 instead of $243.20. Relieved, I chalked the $49.95 charge up to an administrative mistake and let the issue of a refund drop.

20.    I was anxious to schedule a doctor's appointment, but I wanted to wait until I received the "welcome package" from Innovative Partners before doing so in case there were important plan details I should know about before scheduling. Weeks passed and no welcome package arrived. At some point in late November or early December, I called Innovative Partners again to ask about where it was. When I managed to get through to a representative, I was told that the package must have gotten lost and that I should refer to the Partner Portal for a copy of my temporary insurance card. I told them that the information on the Partner Portal was confusing and unclear regarding the scope of my benefits, and that my medical provider would expect to see an actual insurance card rather than a screenshot of a temporary ID card. The representative said they would send me another welcome package, but still more time passed and it never arrived.

21.    Finally, I went ahead and scheduled a doctor's appointment at a primary care practice in my area, figuring I would show the temporary ID card as instructed by the Innovative Partners representative. (I never ended up receiving any "welcome package," in the mail or otherwise, though I did ultimately receive an envelope with a physical copy of my insurance card in October 2024.)

22.    On December 13, 2023, I went to a new patient visit at a local health clinic to establish care with a primary care provider. When I checked in at the front desk, I showed the

receptionist the screenshot of my temporary health insurance ID card. The receptionist entered the information into her computer. She told me that I owed a co-pay of $25, which matched the "Primary Physician" co-pay listed on my temporary card. I paid it. I was able to see the primary care provider without incident; no one raised any concerns about my insurance policy not being valid.

23.     The following month, I got really sick and could not stop vomiting. I went to an immediate care clinic near me hoping they might be able to help. I showed the receptionist there the screenshot of the temporary ID from the Partner Portal. She took down my policy information and entered it into her computer, like she was checking to make sure that it was active. Once again, no one gave me any indication that something was wrong with my coverage. I was treated and allowed to leave after paying the $50 co-pay, which matched the "Specialist Co-Pay" listed on my temporary ID card.

24.     Months passed, and I continued paying Innovative Partners my $193.25 premium on the 7th of each month. Everything seemed fine, although my prescription costs continued to run me hundreds of dollars each month.

25.     In or around May of 2024, I got sick again with the same vomiting symptoms I had experienced earlier. I went back to the same immediate care clinic I had visited in January. This time, the receptionist already had the insurance information from my temporary ID card stored in her computer. She charged me the $50 co-pay again, and I was able to receive care, just like I had before.

26.     I felt better for a few months, but things worsened again in August of 2024 when I came down with bronchitis. On or about August 23, 2024, I went back to the immediate care clinic, which charged me the $50 co-pay and wrote me a new prescription. (During the months I

was sick in 2024, my prescription costs sometimes topped $600 per month.) Once again, no one at the clinic mentioned there being a problem with my insurance.

27. My symptoms did not improve, so on August 27, 2024, I went to the primary care provider I had established care with back in December. The receptionist looked me up in her computer and asked me if I still had First Health Network/Innovative Partners insurance. I told her I did. Once again, I was able to receive care without incident.

28. The provider wanted to run some additional tests, so on September 5, 2024 I went back to that same clinic for lab work.

29. On September 11, 2024, I went back to my provider again for another office visit, as my symptoms were not improving.

30. I went back yet again the following week, on September 18, 2024. At this visit, my provider diagnosed me with pneumonia and recommended that I get a CT scan. She put in an order and advised me to schedule the scan as soon as possible.

31. I would have done so, but I had noticed something strange in my provider's MyChart portal. All of the claims associated with my prior visits were still listed as "Pending Insurance"—even the one from nearly a year before in December of 2023. Next to each pending claim was a dollar amount ranging from $282 to $461, which freaked me out. I did not want to schedule a CT scan until I was certain that my insurance was going to cover the bill. I decided to call Innovative Partners to see what the hold-up was.

32. On September 23, 2024, I called 866-949-3581, the Innovative Partners Customer Service number listed on the back of my temporary ID card. This time—and almost every time I called Innovative Partners in the weeks that followed—I waited on hold for upwards of 15 minutes before finally being connected with a customer service representative. I remember that

Page 9 of 20

there was a lot of background noise on the call, as if the representative were in a busy room, which struck me as odd. I explained that I was following up on the status of the insurance claims submitted by my primary care provider, all of which were still showing up as "Pending Insurance" in MyChart. The Innovative Partners representative said she would look me up in their system and put me on hold for several more minutes. When she came back, she claimed that they had not received anything from my provider's office. I read her the specific appointment information from my MyChart portal, but the representative reiterated that Innovative Partners had received nothing. She told me to tell my provider to submit the claims to P.O. Box 21112, Eagan, MN 55121 (the address listed on the back of my temporary insurance card) and that they would process the claims when they were received. I told her that I would do so and we ended the call. What with all the holds, this call ended up lasting more than twenty minutes.

33.     That same day, I sent my provider's office a message via my MyChart portal. I told them that I had called my insurance company to see why all of my claims were still listed as pending insurance, and that Innovative Partners claimed to have no record of my provider submitting anything. On September 25, 2024, a customer service representative from my provider's office responded: "We have sent the claims to your medical insurance. We have been trying to reach out to them but have not been able to get in touch with them. I have sent this for further review with our insurance department." Concerned, I responded right away asking: "Will [I] owe all of that? I was ordered to go to a specialist because [I']m real sick. [I']m just worried after seeing nothing paid." I sent them the 866-949-3581 number and told them that I had been able to get ahold of Innovative Partners by calling it. **Hood Attachment G** is a true and correct copy of my correspondence with my provider's office via my MyChart portal.

34.     I then called Innovative Partners back using the same number and was connected with a different representative. I explained that my provider's office had assured me that my claims had been submitted. Once again, the representative insisted that Innovative Partners had not received any claims on my behalf. I asked how long it typically takes for claims to show up in their system and she said it could take between 10 and 12 weeks to process. I told her that my oldest claim was from December of 2023, and it was now September of 2024. She reiterated that they could not process claims that they had not received. Frustrated, I ended the call.

35.     On September 26, 2024, I received another message from my provider's office via my MyChart portal. The message said: "Ms. Hood, I had sent this for a further review with our insurance department. They have resubmitted claims to the insurance company for them to process. That is also the phone number we used to try and contact them. At this time these are currently pending with insurance at this time as we would need an EOB showing what is patient responsibility." [*sic*]. Feeling reassured that the resubmission of the claims would resolve the issues, I messaged my provider's office the following: "Okay thank you. I was worried it may have been a scam since it never paid any of them. I haven't had insurance for a few years so we paid oop [out of pocket] for it and [I']m not sure how it works. Thank you for your help. I was sure worried when I s[aw] it." A true and correct copy of this exchange is also included on **Hood Attachment G**.

36.     Although I remained seriously ill, I was too nervous to return to my primary care provider at that point because of all the billing issues. As far as I knew, there had been no similar problems when I had gone to the immediate care clinic, so on September 27, 2024 I returned there seeking treatment for my ongoing pneumonia symptoms. The clinic took an x-ray of my

lungs, gave me some shots, and put me on a 10-day course of antibiotics. At last, my symptoms started improving.

37.     On October 15, 2024, I called Innovative Partners again to check whether they had received the re-submitted claims from my primary care provider. Once again, the representative I spoke to told me that they had received nothing from my provider's office. She also said that Innovative Partners would only pay claims dating back six to nine months. It had already been more than nine months since my initial appointment on December 13, 2023.

38.     On October 18, 2024, I sent my provider's office the following message via my MyChart portal: "I called again today and they have received ZERO claims from you guys. I pay for health insurance out of pocket. I am so worried about this. You had 6 months to file she said. Nothing has been filed since my 1st visit December 2023. I need someone [to] fix this so [I] can go to the dr. I can't afford to possibly come back with thousands of dollars['] worth of unpro[ce]ssed claims over my head. What is the problem? Please for the love of god, call them and figure it out…. [I] shouldn't be crying." Later that day, I got a message back from my provider's office saying: "Ms. Hood, I show we followed up with insurance since this has not been processed. We have resubmitted claims to the mailing address again." A true and correct copy of this exchange is included on **Hood Attachment G**.

39.     On October 25, 2024, I received an out-of-the-blue text message from the immediate care clinic that said: "The balance for Kimberly's visit on Sep 27, 2024 for $384.00 is now ready for payment. Visit https://birdeye.cx.c94v4s to pay or call us at 844-784-8245, or we will charge the card on file if available." **Hood Attachment H** contains a true and correct copy of this text message.

40.     I immediately called the clinic to ask what this was about. I spoke to a receptionist who told me that they had already attempted to charge my debit card but that the card had been declined for insufficient funds. I asked why they were not charging it to my insurance. The receptionist said that Innovative Partners had refused to any pay my claims. According to whatever documentation the receptionist was able to see on her end, Innovative Partners had rejected the claims for my January and May appointments for reasons that were not specified, and they had rejected the claim from my September 27, 2024 appointment based on me supposedly having "other insurance." I was so confused.

41.     I got off the phone with the clinic and called Innovative Partners. I spoke to a representative who denied that Innovative Partners had rejected any claims. When I told her that my clinic was saying one of my claims had been rejected due to me having "other insurance," she acted like she had no idea what I was talking about. She repeated the same line I had heard before—that Innovative Partners had never received any claims from the immediate care clinic. She advised me to have the clinic resubmit the claims. I took brief handwritten notes of these conversations in a notebook. **Hood Attachment I** is a true and correct photo of those notes, pictured with the back of my physical insurance card (which I had finally received in the mail by that point).

42.     I called the immediate care clinic back again and reported what the Innovative Partners representative had said. The receptionist said that she would need a reference number from Innovative Partners in order to re-submit. So I called Innovative Partners back again to ask for this reference number. But the Innovative Partners representative I spoke to said that she had no idea what I was talking about and that they "don't do" reference numbers. She also said that my plan only covered a maximum of four appointments per year, so my benefits were exhausted

in any event. This directly contradicted what the prior Innovative Partners representative had told me about being able to go to the doctor as many times as I wanted, and also suggested that Innovative Partners had "covered" my first four appointments when it had not. By this point, it was clear that Innovative Partners was giving me the run-around.

43.    I called the immediate care clinic back for a third time and reported what the Innovative Partners representative had told me. The receptionist said that I was "getting inaccurate information" from Innovative Partners and that there was nothing else they could do. I was furious. As soon as I got off the phone, I called my bank and canceled my debit card. I figured there was no point in continuing to call Innovative Partners because it was clear that this was all a scam.

44.    I have been unable to make the $384 payment that the immediate care clinic says I owe for the September 27, 2024 appointment. (The clinic sent me an additional text about that payment on November 24, 2024, at which point I texted them "Stop" to unsubscribe from their text message collection efforts. A true and correct copy of this exchange is included on **Hood Attachment H**.) I am terrified that they are going to come after me for the balances from my appointments in January and May 2024, which I would be similarly unable to pay.

45.    In the weeks following my cancellation of my debit card, the claims that were previously listed as "Pending Insurance" in my primary care provider's MyChart portal were updated to say: "Insurance Covered: $0." According to MyChart, I owed $442 for the appointment on December 13, 2023; $461 for the appointment on August 27, 2024; $282 for the appointment on September 5, 2024; $461 for the appointment on September 11, 2024; and $336 for the appointment on September 18, 2024. **Hood Attachment J** contains true and correct screenshots of these balances from my MyChart portal that I took in or around December of

2024, and in which personal information has been redacted. Altogether, these bills totaled $1,982. There is no way that my family will be able to cover this amount. I expect that this will destroy my credit, which I have spent years trying to build.

46.     My family's financial situation was made even worse by the fact that I paid Innovative Partners almost $2500 between November 2023 and October 2024. **Hood Attachment K** contains four true and accurate screenshots reflecting each debit Innovative Partners has drawn on my account. This was a huge expense for my family, which I only undertook because, based on Ricky's description of the plan benefits, I believed I was purchasing comprehensive health insurance.

47.     To add insult to injury, after I canceled my debit card, Innovative Partners started inundating me with emails, texts, and calls trying to get me to update my payment information. When they unsuccessfully attempted to charge my canceled debit card on November 7, 2024, I received an email informing me that my payment method had been declined and that health services would be suspended until I provided new payment information. I ignored this email.

48.     On November 8, 2024, I received a text message from (888) 452-7291 that said: "Hi, we have noticed a decline in your monthly premium payment for your health coverage, resulting in your policy being placed on hold. To reactivate your health policy, please call us at 855-432-1273 or 561-849-4761. Best regards, Members Services." **Hood Attachment L** is a true and accurate screenshot of the text thread containing this message. I did not respond to it.

49.     On November 12, 2024, I received another text message—this time from (944) 827-6830—saying the following: "IP Healthcare: URGENT – KIMBERLY , today is the last day to update your health plan for account # G514179 To ensure continued coverage/benefits please contact our Partner Services team TODAY at (561) 849-4761. Reply STOP to end alerts." [*sic*

throughout]. This time, I responded to this text by saying: "Pay the claims you should. Then we can proceed." I received no response. **Hood Attachment M** is a true and accurate screenshot of the text thread containing these messages.

50.     On November 13, 2024, I received a text from the original (888) 452-7291 number that simply repeated its initial message about my "policy being placed on hold" due to a "decline" in my "monthly premium payment." I responded by saying "Pay my claims." A true and accurate screenshot of this exchange is contained within **Hood Attachment L**.

51.     Innovative Partners never responded to my demands that they pay my claims. Instead, they continued spamming me with boilerplate texts from the (888) 452-7291 and (944) 827-6830 numbers. I received messages on November 14, November 19, November 22 (three times), and November 27. Eventually, I sent the word "Stop" to both numbers so that they would be blocked from sending me further texts. True and accurate screenshots of these text threads are included as **Hood Attachment L** and **Hood Attachment M**.

52.     Even after I blocked the text messages, Innovative Partners continued harassing me. On or about November 20, 2024, they again attempted to debit $193.25 from my canceled card, but the card was again declined. I received another email from partnerservices@innovativepartnerslp.com with the subject line "Innovative Partners – PAYMENT DECLINED – Action Required" stating that Innovative Partners would be "unable to process [my] payment and provide health services to [me]" until I updated my payment method. **Hood Attachment N** is a true and correct copy of this email, with my personal information redacted.

53.     On December 12, 2024, Innovative Partners attempted to charge my canceled card again, and I received yet another "PAYMENT DECLINED" email.

54.     On December 13, 2024, I received a call from (833) 969-4116, which turned out to be an Innovative Partners representative. The representative said that my card appeared to be expired and asked me for updated payment information. I told her that my card had *not* expired and that I had in fact deactivated it because Innovative Partners was scamming me and not paying any of my claims. When I asked her to explain why Innovative Partners had rejected my claims, she said that she just works in the billing department and does not know anything about claims. I snapped back at her, demanding to know whether Innovative Partners was going to let my medical bills go to collections and ruin my credit, and she hung up on me.

55.     That same day, I submitted a complaint to the FTC. **Hood Attachment O** is a true and correct copy of that complaint with my personal information redacted. I also submitted complaints with the Kentucky Department of Insurance and the Better Business Bureau.

56.     In trying to piece together what had happened to me, I spent some time poking around the Innovative Partners Partner Portal to see if it might reveal clues. In doing so, I found two additional plan documents that I had not seen before.

57.     The first document was entitled "Innovative Partners, LP Health Benefit Plan Wrap Document." A true and correct copy of it is included as **Hood Attachment P**. At 38 pages of single-spaced type, this document was extremely dense and difficult to understand, but I now understand that it describes Innovative Partners' products as "limited medical benefit" plans rather than as health insurance.  I would never have purchased an Innovative Partners plan if I had known it was anything short of comprehensive insurance coverage.

58.     The second document, labeled "Innovative Partners, LP New Limited Partner Joinder Agreement," was even more confusing. It contained what looks like a handwritten signature of my name on page 21, but I have no memory of reviewing or signing this document.

On the first page, it stated that I had agreed to "provide a minimum of five hundred (500) hours of work activity on the internet" in exchange for "an Active Limited Partnership Interest" in Innovative Partners, LP. No one from Innovative Partners had ever mentioned a "work activity" requirement to me, and I never would have agreed to such a thing. I still have no idea what this document means. **Hood Attachment Q** is a true and correct copy of this document.

59. On January 9, 2025, I received an out-of-the-blue email from partnerservices@innovativepartnerslp.com with the subject line "Innovative Partners – Cancellation Confirmation." The email said: "We've received your request to cancel your health plan activated on 11-08-2023. We're currently processing your cancellation. Your health plan will be terminated as of 11-07-2024." **Hood Attachment R** is a true and correct copy of that email with my personal information redacted. I am not sure what prompted them to send it, but I hope it means they will stop contacting me.

60. In early February 2025, just when I thought my saga with Innovative Partners was over, I received a document labeled "Explanation of Benefits" in the mail from an entity called "Marpai Health" in Eagan, Minnesota. I had never heard of Marpai Health before, but I knew it must be related to Innovative Partners because the document said "Group Name: Innovative Partners, LP" in the upper righthand corner. **Hood Attachment S** is a true and correct copy of that document with my personal information redacted.

61. The document stated that it was providing "information about how a claim from a health provider (such as a doctor or hospital) was paid on [my] behalf." It listed the charge associated with my September 5, 2024 visit to my provider's office for lab work, claiming (inaccurately) that the total amount I had been billed for that visit was $256. (In fact, I had been billed $282.) The document said that this $256 amount was subject to a $143.18 "reduction"

reflecting "the negotiated and or reduced amounts with health care providers due to networks, direct contracts, qualified payment amount or other types of negotiations." It listed the remaining balance—$112.82—as the "Total Patient Responsibility" that was not covered by my plan. On a separate line labeled "What Your Plan Paid," the document listed $0. I could not tell from this document whether Innovative Partners/Marpai Health had simply negotiated some kind of reduced price with my provider or actually made a payment on my behalf, since the document seemed to say both things.

62. The back side of the document was even more confusing. It contained a breakdown of the costs associated with the specific medical services I had received on September 5, 2024, as well as a breakdown of the "Plan Allowed/Qualified Payment Amount" that my plan had supposedly covered. But nothing about the chart made any sense. The cost breakdown was inaccurate, and "$112.82" was listed as both the "Plan Allowed" amount and the "Not Covered" amount. Furthermore, a code listed on the final column of the chart suggested that my "[a]nnual benefit had been exhausted," even though this was the first benefit-related correspondence I had ever received related to my Innovative Partners plan.

63. I logged into my provider's MyChart portal to see if any of these changes were reflected there and discovered that the "outstanding balance" for my September 5, 2024 visit had, in fact, been updated. The portal now said that "Insurance Covered" $143.18 of my $282 total balance. A total of $26 was still listed as "Pending Insurance," leaving a balance of $112.82 for me to pay. **Hood Attachment T** is a true and correct screenshot of this information from my MyChart portal, which I took on or around February 3, 2025, and in which personal information is redacted. The balances from my other appointments remain unchanged and still say "Insurance

Page 19 of 20

Covered: $0." This belated $143.18 discount barely makes a dent in the thousands of dollars of medical debt that I accumulated while enrolled with Innovative Partners.

64.     This has been a horrific ordeal for me. I am out thousands of dollars, and my bank has rejected my attempt to dispute the charges. I am potentially facing thousands more dollars in medical debt, which will ruin my credit and bankrupt my family. I am also forgoing needed medical care, including the CT scan my provider recommended as well as a mammogram for a lump in my breast, because I remain uninsured and cannot possibly afford to pay for it out of pocket. I feel hopeless about the whole situation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___Feb 7th___, 2025.

_Kimberly Hood_____
Kimberly Hood

# Hood
# Attachment A



# Hood
# Attachment B

**From:** Innovative Partners <partnerservices@innovativepartnerslp.com>
**Sent:** Tuesday, November 7, 2023 2:40 PM
**To:** ███████@hotmail.com ███████@hotmail.com>
**Cc:** IPA1405@carynhealth.com <IPA1405@carynhealth.com>; membercc@innovativepartnerslp.com <membercc@innovativepartnerslp.com>
**Subject:** Sales Receipt

**Innovative Partners**

866-949-3581
partnerservices@innovativepartnerslp.com

KIMBERLY HOOD, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.

## SALES RECEIPT

| | | | |
|---|---|---|---|
| Date: | **11-07-2023** | Customer ID: | ████████@hotmail.com |
| Transaction No: | **8893958225** | Customer: | **KIMBERLY HOOD** |
| Account No: | ██ **xxxxxxx1549** | | **BARDSTOWN, KY, US,** |
| Payment Method: | **Credit Card** | | |
| Coverage Through: | **12-07-2023** | | |

Payment Towards:

| | |
|---|---|
| **Enrollment Fee** | **$125.00** |
| **Monthly Payment for Elite 4** | **$193.25** |
| **Monthly Payment for Guardian 5000** | **$49.95** |

Total Amount   **$368.20**

Thank you for your order!

Need help? Contact your recruiter or our partner services team today!

Total Amount   **$368.20**

# Hood
# Attachment C

**From:** Innovative partners <admin_noreply@innovativepartnerslp.com>
**Sent:** Tuesday, November 7, 2023 2:40:47 PM
**To:** ▮▮▮▮▮@hotmail.com ▮▮▮▮▮@hotmail.com>
**Subject:** Innovative Partners - Partner Portal

## Welcome KIMBERLY HOOD

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ▮▮▮▮▮**@hotmail.com**
Temporary Password: ▮▮▮▮▮

Need help? Contact your recruiter or our partner services team today!

866-949-3581
partnerservices@innovativepartnerslp.com

# Hood
# Attachment D



## Eligibility

**Providers:** To confirm eligibility, verify benefits, or check the status of a claim:
Electronic Eligibility through Availity - Payer ID: 35245
Marpai Portal: www.myMarpai.com
Innovative Partners Customer Service: 866-949-3581
Limited Benefit Plan

**Partners:** To confirm eligibility, verify benefits, or check the status of a claim,
please call Innovative Partners at 866-949-3581
To find a First Health provider, please call
800-226-5116 or visit www.firsthealthlbp.com

## Claims Submission

Please submit Medical Electronic Claims Directly to Marpai Payer ID# 35245

Or mail claims to:
Marpai Health

P.O. Box 21112
Eagan, MN 55121

1/2

# Hood
# Attachment E



INNOVATIVE
PARTNERS

# HEALTH BENEFIT PLAN

# TABLE OF CONTENTS

First Health Plan Overview ............................................. 3

Elite 2 ...................................................................... 4

Elite 4 ...................................................................... 5

Elite 6 ....................................................................... 6

Ancillary Benefits

    Guardian ............................................................ 7

    Essential ............................................................ 8

    Teladoc ............................................................. 9

    Dental ............................................................. 11

Additional Benefits

    Single Care ......................................................12

    Progressive Nutracare .......................................... 13

# FIRST HEALTH PLAN ▶ OVERVIEW

As a participant of this plan, you and any beneficiaries you have added to your plan will have access to the following benefits:

## First Health Network:

The First Health Network is one of the largest and most comprehensive independent participating provider (PPO) network in the United States. Your plan includes participation in this network. When you go to a participating provider, First Health will reprice the charges from your doctor and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please contact 888.677.6074





3

# ELITE 2 OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 2 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| | Primary Care | 2 | $150 | $25 |
| Outpatient Services | Specialist | 2 | $150 | $50 |
| | Urgent Care Visits | 2 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

4

# ELITE 4    OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 4 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Outpatient Services | Primary Care | 4 | $150 | $25 |
| | Specialist | 4 | $150 | $50 |
| | Urgent Care Visits | 4 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

5

# ELITE 6

# OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 6 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| | Primary Care | 6 | $150 | $25 |
| Outpatient Services | Specialist | 6 | $150 | $50 |
| | Urgent Care Visits | 6 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# GUARDIAN

## ANCILLARY BENEFITS

$5,000 | $10,000 | $15,000 | $20,000 | $25,000 | $35,000 | $50,000

Elite participants may enroll in our Guardian plan to add coverage for accidental death and dismemberment.

These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| COVERED PERSONS | Percentage of Principal Sum |
| --- | --- |
| Primary Insured | 100% |
| Spouse | 50% |
| Dependent Children | 25% |

| COVERED LOSSES | |
| --- | --- |
| Life | 100% |
| Both Hands, feet, or sight of both eyes | 100% |
| One hand and one foot | 100% |
| One hand or one foot and sight of one eye | 100% |
| Both speech and hearing | 100% |
| One hand or one foot or sight of one eye | 50% |
| Speech or hearing in both ears | 50% |

7

# ESSENTIAL ANCILLARY BENEFITS

## $5,000 | $10,000 | $15,000 | $20,000 | $25,000

Elite participants may enroll in our Essential plan to help with their critical illness needs.

These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| ELIGIBLE ADULT CRITICAL ILLNESS | Percent of Allowed Amount |
| --- | --- |
| Invasive Cancer | **100%**<br>If the Diagnosis is more than 90 days after both the Plan and Policy Effective Date |
| Invasive Cancer | **10%**<br>If the Diagnosis is during the first 90 days after the Plan or Policy Effective Date |
| Cancer in Situ | 25% |
| Heart Attack | 100% |
| Stroke | 100% |
| Major Organ Transplant<br>(Only one Major Organ per Lifetime) | 100% |
| Coronary Artery Bypass Surgery | 25% |
| Angioplasty | 25% |
| Aortic Surgery | 25% |
| Heart Valve Replacement/Repair Surgery | 25% |
| Coma<br>(Lasting more than 15 consecutive days) | 100% |
| Paralysis | 100% |
| End-Stage Renal Failure | 100% |

8

# TELADOC

Teladoc Health is one of the largest telemedicine companies in the United States. Your plan allows you to have a consultation with a physician, or other healthcare providers, licensed in your individual state. You will be able to talk to a doctor virtually anytime, anywhere by either telephone or video. You can contact your doctor through your landline telephone, your cellular telephone, the Teladoc app, or through the website. After your consultation, your doctor will diagnose your symptoms and send a prescription if necessary. All of this is provided for you with a $0 Co-Pay! Yes, you will not be charged for your medical consultation!

## Get Started In Minutes!

To get started, download the app or get started online. You can also call 1-800-Teladoc. Then fill out a brief medical history like you would at a doctor's office

## Teladoc Advantages

Get connected with the right medical care. Don't wait weeks for an appointment. Our doctors, therapists, and specialists can help you with:

- The flu
- Infections
- Anxiety
- Stress
- Skin conditions
- Advice on serious medical conditions.

No matter what you're facing, we're available from wherever you are by phone, video or app.



# TELADOC

## Get Peace of Mind

Whether it's a perscription sent to the pharmacy of your choice, the guidance to move forward, or a review of your condition from a medical expert, Teladoc is ready to help.

## Get Started Now

https://member.teladoc.com/registrations/get_started

## Download The App

https://apps.apple.com/US/app/id656872607?mt=8








10

# DENTAL

## Copay

Participating members are eligible for dental coverage with copay.

Please contact: 888.677.6074 to confirm participating providers and copays.

## Covered Services and Procedures:

- Diagnostic Services
- Preventive Services
- Restorative Services
- Endodontic Services
- Periodontic Services
- Prosthodontic Services
- Prosthodontic Services (removable)
- Implant Services
- Prosthodontic Services
- Oral Surgery Services
- Orthodontic Services
- Adjunctive Services

Procedures and services not included will be discounted 20% of Dentist's normal fee at time of service



11

# SINGLE CARE



## Save up to 80% on your prescriptions with SingleCare!

Just show one of these cards to the pharmacist next time you fill a prescription.

## Your Free Card Is Ready To Download

This SingleCare pharmacy savings card entitles you to up 80% off 10,000+ prescription medications.

The card is pre-activated and ready for immediate use at any participating pharmacy nationwide.

SingleCare cards work whether you have health insurance or not, and our prices often beat insurance cost-share. A typical person that regularly fills prescriptions saves an average of $37 a script and hundreds of dollars per year.

Using SingleCare is easy: just show our card to the pharmacist when you fill your next prescription.

Savings are automatically applied at checkout.

Keep one card for yourself and share the QR code with a friend or family member so they can get their digital card!

SingleCare is not insurance. There are no claim forms, deductibles, limitations, or maximums.

SingleCare can be used by anyone. No one is excluded from this program for any reason.



12

# PROGRESSIVE NUTRACARE

Progressive Nutracare specializes in professional grade Nutraceuticals offering a wide arrangement of science backed formulas to support your healthy lifestyle. From Fish Oils and Probiotics, to Thyroid and Adrenal Support, our team of medical experts weigh in on each formula to ensure we exceed industry quality standards.

MEMBERSSAVE15 – this can be included at checkout and you will receive 15% off of your entire Purchase.

## Benefits:

Supplements and Vitamins
- Amino Acids
- Antioxidants
- Fish Oils and Omegas
- Homeopathics
- Probiotics and Enzymes
- Protein

Health Concerns Supported:

- Adrenal
- Cardiovascular
- Gut Health
- Joint and Inflammation
- Immune Health
- Weight Loss Support
- Men's Health
- Women's Health
- Yeast and Fungal



13



# Hood
# Attachment F

**From:** Kimberly H████████ @hotmail.com>
**Sent:** Wednesday, November 8, 2023 4:36:40 PM
**To:** Partner Services <partnerservices@innovativepartnerslp.com>
**Subject:** Re: PRESCRIPTION CARD

Thank you. Can you send me something outlining what the plan coverage is. I appreciate it.
Thank you Kim

> On Nov 8, 2023, at 4:14 PM, Partner Services
> <partnerservices@innovativepartnerslp.com> wrote:
>
>
>
> --
> <image.png>

Best regards, Your healthcare team

**Innovative Partners**
(866) 949-3581

# Hood
# Attachment G







# Hood
# Attachment H



# Hood
# Attachment I



Fast Pace   Jan.

may 2024 - Not Paid

Sept 27 2024 - Rejected for
10/25/24    Other Insurance ???
I called told me thats not true
to have them resubmit.

10/25/24 Fast Pace tried to deduct
$384.00 from my acct.

**Eligibility**

**Claims Submission**
Please submit Medical Electronic Claims
Directly to Marpai Payer ID# 35245

Or mail claims to
Marpai Health
P.O. Box 21112
Eagan, MN 55121

For identification purposes only. Not a guarantee of coverage or payment

# Hood
# Attachment J









# Hood
# Attachment K





# Hood
# Attachment L




# Hood
# Attachment M



# Hood
# Attachment N

**From:** Innovative Partners <partnerservices@innovativepartnerslp.com>
**Sent:** Wednesday, November 20, 2024 1:16:31 PM
**To:** ▓▓▓▓▓@hotmail.com ▓▓▓▓▓@hotmail.com>
**Cc:** membercc@innovativepartnerslp.com <membercc@innovativepartnerslp.com>
**Subject:** Innovative Partners - PAYMENT DECLINED — Action Required

Dear KIMBERLY HOOD,

We regret that your payment method for Innovative Partners has been declined. We do not want you to miss out on the benefits of your health plan, but we are unable to process your payment and provide health services to you until you correct your bank information or provide a new payment method.

The details are:
Payment Amount: $193.25
Payment Method: Credit Card
Last 4 Digits of Payment Method: ▓▓ xxxxxxxx1549

Health services will be suspended until payment is resolved, so we urge you to please provide another payment method as soon as possible by calling Partner Services at 866-949-3581 between 10am to 6pm. They will help you verify your existing bank information or process a new payment method.

If you feel this was in error or have questions about this transaction, please contact our Partner Services team. You may also want to contact your bank or credit card company.

Best regards,
Innovative Partners



Innovative Partners

866-949-3581
partnerservices@innovativepartnerslp.com

# Hood
# Attachment O

## Record # 1 / 181282329 / Consumer Sentinel Network Complaint

| Reference Number: | 181282329 | Originator Reference Number: | |
|---|---|---|---|
| Language: | English | Contact Type: | Complaint |
| Source: | Consumer | DNC?: | No |
| Comments: | 18669493581 Innovative Partners health insurance Paid $368 down $193 month health coverage. No PPO said it would cover doctor visits, immediate care center, hospitals, labs ect. Paid 0 claims. This policy never paid even 1 claim. I paid for a year on time. I was told the effective date was 11823. Nortons primary care submitted the claims for 4 office visits and they were ignored. No response starting from December 13th 2023 until September. I called innovative partners and they said they never received any requests for payment. Nortons assured me they were sent but they sent again. 2 months later they still were ignored so i called again and I was told the same thing. Not received. The doctor sent them but they are ignoring them. I went to the immediate care center for 3 visits that was not paid either. I used my debit card for the copay and since insurance didn't approve and pay they tried to charge my debit bank card $380 . I didn't have that much but they tried to drain my account because of this insurance. I had to cancel my debit card. Immediate care says I owe 3 visits because insurance ignored 2 claims $380 each x3! Innovative partners did respond to 1 immediate care claim by denial. They said because i had other insurance. Ridiculous reason since I do not and paid these people for coverage. They claimed i would be covered, took my money and paid zero. Sad to take from the most vulnerable. My husband paid for this policy because i have no insurance for years and its awful. Im so depressed and now my credit ive fought to keep good is going to be destroyed. Thousands in bills are coming due that shouldn't be my responsibility. Someone should stop this. Awful. Other-Other Update | | |
| Additional Comments: | | | |
| Complaint disposition provided?: | | | |
| Complaint Disposition: | | | |
| Data Reference: | | Load Date: | 12/13/2024 2:01:52 PM |
| Created By: | FTCCIS-FTCUSER | Created Date: | 12/13/2024 2:01:52 PM |
| Updated By: | rpalma | Updated Date: | 12/13/2024 3:49:40 PM |
| Complaint Source: | FTC Mobile Complaints | Product Service Description: | Insurance (excl. Medical) |
| Amount Requested: | | Amount Paid: | $2,685.00 |
| Payment Method: | Debit Card | Agency Contact: | Mobile |
| Complaint Date: | 12/13/2024 | Transaction Date: | |
| Initial Contact: | Phone Call: 18669493581 | Initial Response: | |
| Statute/Rule: | FTC Act Sec 5 (BCP) Rule\Other | Law Violation: | Deception/Misrepresentation Other (Note the Violation in the Comment Field) |

1/10/25, 4:06 PM                                   Printer Friendly Record Details

| Topic: | | Dispute with Credit Bureau?: | |
|---|---|---|---|
| Dispute with Credit Bureau - Responded?: | | Dispute with Credit Bureau - Resolved to Satisfaction?: | |
| Member of armed forces or dependent?: | No | Cross Border Complaint?: | No |

| Consumer Information | | | |
|---|---|---|---|
| Consumer Small Business or Organization: | | | |
| First Name: | Kimberly | Last Name: | hood |
| Address 1: | ███████████ | Address 2: | |
| City: | Bardstown | State: | Kentucky |
| Zip: | ███████████ | Country: | UNITED STATES |
| County: | Nelson | Federal Judicial District: | Kentucky - Western |
| Home Number: | | Cell Number: | ███████████ |
| Work Number: | | Ext: | |
| Fax Number: | | Email: | ███████████ |
| Age Range: | ███████████ | Military Service Branch: | |
| Soldier Status: | | Soldier Station: | |

| Subject | | | |
|---|---|---|---|
| Subject: | Innovative Partners | Normalized Name: | Innovative Partners |
| Address 1: | Marpai Health po box 21112 | Address 2: | |
| City: | Eagan (Cleansed: Saint Paul) | State/Prov: | Minnesota |
| ZIP: | 55121 | Country: | UNITED STATES |
| County: | Dakota | Federal Judicial District: | Minnesota |
| Email: | | URL: | |
| Phone Number: | 866-9493581 | Ext: | |
| Subject ID Type: | | Subject ID Issuer State: | |
| Subject ID Issuer Country: | | | |
| Representative: | innovative partners | Title: | |

# Hood
# Attachment P

# Innovative Partners, LP Health Benefit Plan Wrap Document

In order to better serve its employees and Active Limited Partners (collectively "Plan Participants"), Innovative Partners, LP has chosen to offer various different levels of participation in the Health Benefit Plan ("Plan") to our plan participants. These different levels of participation may often be referred to as a "Program" or a "Policy". In order to best address the individual needs of our Plan Participants, our Plan offers eight (1) different levels of limited medical benefit participation. Our most basic and affordable participation levels are the *Elite* Programs/Policies, which are offered at three (3) different levels.  We also offer seven (7) different *Optimum* Programs/Policies which are available at benefit levels one (1) through seven (7).

Any of our Elite or Optimum Programs/Policies can be supplemented by our *Guardian* Accidental Death and Dismemberment ("AD&D") Program/Policy, our *Essential* Critical Illness ("CI") Program/Policy, and/or our *Dental* Program/Policy. The AD&D and the CI Programs/Policies can only be purchased in conjunction with either an Elite or Optimum Program/Policy. Realizing that some of our employees and or Active Limited Partners may have other forms of health insurance that meet their needs and may not want to participate in one of the limited medical benefit Programs/Policies, our employees and active Limited partners may enroll in the Dental Program as a standalone Program/Policy without participating in any of the limited medical benefit Programs/Policies.

Regardless of your level of participation, all of these Programs/Policies collectively constitute the self-funded Innovative Partners, LP Health Benefit Plan. You have been given a Summary Plan Description ("SPD") for each particular Program/Policy that you enrolled in. This WRAP Plan Document merely supplements the SPD(s) that you were given. It in no way reduces or limits any rights that are contained in any SPD.

The rights discussed in this Document apply equally to all of the health benefit plan Programs/Policies that are sponsored by Innovative Partners, LP.

## I.    DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. All of the definitions in the SPD that you received are hereby incorporated by reference into this Document. You should read and understand these definitions as well as the definitions in the SPD.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**COBRA** means the Consolidated Omnibus Budget Reconciliation Act, as amended.

**Company** means the Plan Sponsor.

**Co-pay** means the charge stated as a set dollar amount, that the Plan Participant is required to pay for certain covered health services. If the Plan has co-pay benefits, please note that the Plan Participant is responsible for paying the lesser of the applicable Co-pay or the covered amount.

**FMLA** means the Family and Medical Leave Act of 1993, as amended.

**GINA** means the Genetic Information Nondiscrimination Act, as amended.

**HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as amended.

**PHI** means Protected Health Information.

**Plan Termination** means the date the Plan Participant is terminated from the Plan.

**Plan Year** means the 12-month period beginning January 1 and ending December 31.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

## II.   GENETIC INFORMATION NONDISCRIMINATION ACT "GINA"

GINA prohibits group health plans, issuers of individual health care policies, and Employers from discriminating based on genetic information. The term "Genetic Information" means, with respect to any individual, information about:

1.   Such individual's genetic tests;
2.   The genetic tests of family members of such individual; and
3.   The manifestation of a Disease or disorder in family members of such individual.

The term "Genetic Information" includes participating in clinical research involving genetic services. Genetic tests would include analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detect genotypes, mutations, or chromosomal changes. Genetic information is a form of Protected Health Information (PHI) as defined by and in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and is subject to applicable Privacy and Security Standards.

Family members as it relates to GINA include Dependents, plus all relatives to the fourth degree, without regard to whether they are related by blood, marriage, or adoption. Underwriting as it relates to GINA includes any rules for determining eligibility, computing premiums, or contributions. Offering reduced premiums or other rewards for providing genetic information would be impermissible underwriting.

GINA will not prohibit a healthcare provider who is treating an individual from requesting that the patient undergo genetic testing. The rules permit the Plan to obtain genetic test results and use them to make claims payment determinations when it is necessary to do so to determine

whether the treatment provided to the patient was medically advisable and/or necessary.

The Plan may request, but not require, genetic testing in certain very limited circumstances involving research, so long as the results are not used for underwriting, and then only with written notice to the individual that participation is voluntary and will not affect eligibility for benefits, premiums, or contributions. In addition, the Plan will notify and describe its activity to the Health and Human Services secretary of its activities falling within this exception.

While the Plan may collect genetic information after initial enrollment, it may not do so in connection with any annual renewal process where the collection of information affects subsequent enrollment. The Plan will not adjust premiums or increase group contributions based on genetic information, request or require genetic testing or collect genetic information either prior to or in connection with enrollment or for underwriting purposes.

## III.    CLAIMS PAYMENT

The procedures outlined below must be followed by Participants to obtain payment of health benefits under this Plan.

All claims and questions regarding health claims should be directed to the Third-Party Administrator. The Plan Administrator shall be ultimately and finally responsible for adjudicating such claims and for providing a full and fair review of the decision on such claims in accordance with the following provisions and with ERISA.  Benefits under the Plan will be paid only if the Plan Administrator decides at its discretion that the Participant is entitled to them.  The responsibility to process claims in accordance with the Plan Document may be delegated to the Third-Party Administrator; provided, however, that the Third-Party Administrator is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion.

Each Participant claiming benefits under the Plan shall be responsible for supplying, at such times and in such manner as the Plan Administrator in its sole discretion may require, written proof that the expenses were incurred or that the benefit is covered under the Plan.  If the Plan Administrator in its sole discretion shall determine that the Participant has not Incurred a Covered Expense or that the benefit is not covered under the Plan, or if the Participant shall fail to furnish such proof as is requested, no benefits shall be payable under the Plan.

A call from a Provider who wants to know if an individual is covered under the Plan, or if a certain procedure is covered by the Plan, prior to providing treatment is not a "claim," since an actual claim for benefits is not being filed with the Plan.  These are simply requests for information, and any response is not a guarantee of benefits, since payment of benefits is subject to all Plan provisions, limitations, and exclusions.  Once treatment is rendered, a Clean Claim must be filed with the Plan (which will be a "Post service Claim").  At that time, a determination will be made as to what benefits are payable under the Plan.

A Participant has the right to request a review of an Adverse Benefit Determination. If the claim is denied at the end of the appeal process, as described below, the Plan's final decision is

known as a Final Adverse Benefit Determination. If the Participant receives notice of a Final Adverse Benefit Determination, or if the Plan does not follow the claims procedures properly, the Participant then has the right to request an independent external review. The external review procedures are described below.

The claims procedures are intended to provide a full and fair review. This means, among other things, that claims and appeals will be decided in a manner designed to ensure the independence and impartiality of the persons involved in making these decisions.

Benefits will be payable to the Participant, or to a Provider that has accepted an Assignment of Benefits as consideration in full for services rendered.

According to Federal regulations that apply to the Plan, there are four types of claims: Pre-service (Urgent and Non-urgent), Concurrent Care, and Post service. However, as noted below, because of this Plan's design, there are no Pre-service Urgent Care Claims which may be filed with the Plan.

**A.     When Claims Must Be Filed:**

Claims must be filed with the Third-Party Administrator within 180 days of the date charges for the service were Incurred. Benefits are based upon the Plan's provisions at the time the charges were incurred. Claims filed later than that date shall be denied.

Upon receipt of the required information, the claim will be deemed to be filed with the Plan. The Third-Party Administrator will determine if enough information has been submitted to enable proper consideration of the claim. If not, more information may be requested as provided herein. This additional information must be received by the Third-Party Administrator within 45 days from receipt by the Participant of the request for additional information. Failure to do so may result in claims being declined or reduced.

**B.     Timing of Claim Decisions:**

The Plan Administrator shall notify the Participant, in accordance with the provisions set forth below, of any Adverse Benefit Determination (and, in the case of pre-service claims and concurrent claims, of decisions that a claim is payable in full) within the following timeframes:

1.     If the Participant has provided all of the information needed to process the claim, in a reasonable period of time, but not later than thirty (30) days after receipt of the claim, unless an extension has been requested, then prior to the end of the 15-day extension period.

2.     If the Participant has not provided all of the information needed to process the claim and additional information is requested during the initial processing period, then the Participant will be notified of a determination of benefits prior to the end of the extension period unless additional information is requested during the extension period, then the Participant will be notified of the determination by a date agreed to

by the Plan Administrator and the Participant. This period may be extended by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Participant, prior to the expiration of the initial 30-day processing period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

3.      The period of time within which a benefit determination is required to be made shall begin at the time a claim is deemed to be filed in accordance with the procedures of the Plan.

**C.      Notification of an Adverse Benefit Determination:**

The Plan Administrator shall provide a Participant with a notice, either in writing or electronically (or, in the case of pre-service urgent care claims, by telephone, facsimile, or similar method, with written or electronic notice following within 3 days), containing the following information:

1.      Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2.      A reference to the specific portion(s) of the Plan Document upon which a denial is based;

3.      Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim;

4.      A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5.      A description of the Plan's review procedures and the time limits applicable to the procedures, including a statement of the Participant's right to bring a civil action under Section 502(a) of ERISA following an Adverse Benefit Determination on final review;

6.      A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

7.      The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

8.      Any rule, guideline, protocol, or similar criterion that was relied upon in making the determination (or a statement that it was relied upon and that a copy will be provided to the Participant, free of charge, upon request);

9.      In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances or a statement that such explanation will be provided to the Participant, free of charge, upon request; and

10.      In a claim involving urgent care, a description of the Plan's expedited review process.

## IV.   APPEALS PROCEDURE

### A.   Full and Fair Review of All Claims:

In cases where a claim for benefits is denied, in whole or in part, and the Participant believes the claim has been denied wrongly, the Participant may appeal the denial and review pertinent documents. The claims procedures of this Plan provide a Participant with a reasonable opportunity for a full and fair review of a claim and Adverse Benefit Determination. More specifically, the Plan provides:

1.      Participants at least 180 days following receipt of notification of an initial Adverse Benefit Determination within which to appeal the determination;

2.      Participants have the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

3.      Participants have the opportunity to review the Claim file and to present evidence and testimony as part of the internal claims and appeals process;

4.      For a review that does not afford deference to the previous Adverse Benefit Determination and that is conducted by an appropriately named fiduciary of the Plan, who shall be neither the individual who made the Adverse Benefit Determination that is the subject of the appeal nor the subordinate of such individual;

5.      For a review that takes into account all comments, documents, records, and other information submitted by the Participant relating to the claim, without regard to whether such information was submitted or considered in the prior benefit determination;

6.      That, in deciding an appeal of any Adverse Benefit Determination that is based in

whole or in part upon a medical judgment, the Plan fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual;

7.      For the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with a claim, even if the Plan did not rely upon their advice;

8.      That a Participant will be provided, free of charge: (a) reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim in possession of the Plan Administrator or Third Party Administrator; (b) information regarding any voluntary appeals procedures offered by the Plan; (c) information regarding the Participant's right to an external review process; (d) any internal rule, guideline, protocol or other similar criterion relied upon, considered or generated in making the adverse determination; and (e) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances; and

9.      That a Participant will be provided, free of charge, and sufficiently in advance of the date that the notice of Final Internal Adverse Benefit Determination is required, with new or additional evidence considered, relied upon, or generated by the Plan in connection with the Claim, as well as any new or additional rationale for denial at the internal appeals stage, and a reasonable opportunity for the Participant to respond to such new evidence or rationale.

**B.      Requirements for Appeal:**

The Participant must file the appeal in writing (although oral appeals are permitted for pre-service urgent care claims) within 180 days following receipt of the notice of an Adverse Benefit Determination. For pre-service urgent care claims, if the Participant chooses to orally appeal, the Participant may telephone the number shown below. To file an appeal in writing, the Participant's appeal must be addressed as follows and mailed or emailed as follows:

Innovative Partners, LP
2234 North Federal Hwy., #2862
Boca Raton, FL 33431
PartnerServices@InnovativePartnersLP.com

It shall be the responsibility of the Participant to submit proof that the claim for benefits is covered and payable under the provisions of the Plan.  Any appeal must include:

1.      The name of the Participant;

2.      The Participant's social security number;

3.   The group name or identification number;

4.   All facts and theories supporting the claim for benefits. Failure to include any theories or facts in the appeal will result in their being deemed waived. In other words, the Participant will lose the right to raise factual arguments and theories which support this claim if the Participant fails to include them in the appeal;

5.   A statement in clear and concise terms of the reason or reasons for disagreement with the handling of the claim; *and*

6.   Any material or information that the Participant has which indicates that the Participant is entitled to benefits under the Plan.

If the Participant provides all of the required information, it may be that the expenses will be eligible for payment under the Plan.

**C.   Timing of Notification of Benefit Determination on Review:**

The Plan Administrator shall notify the Participant of the Plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the appeal.

**D.   Calculating Time Periods:**

The period of time within which the Plan's determination is required to be made shall begin at the time an appeal is filed in accordance with the procedures of this Plan, without regard to whether all information necessary to make the determination accompanies the filing.

**E.   Manner and Content of Notification of Adverse Benefit Determination on Review:**

The Plan Administrator shall provide a Participant with notification, with respect to pre-service urgent care claims, by telephone, facsimile, or similar method, and with respect to all other types of claims, in writing or electronically, of a Plan's Adverse Benefit Determination on review, setting forth:

1.   Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2.   A reference to the specific portion(s) of the plan provisions upon which a denial is based;

3.   Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim, and a discussion of the decision;

Page **8** of **38**

4.    A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5.    A description of available internal appeals and external review processes, including information regarding how to initiate an appeal;

6.    A description of the Plan's review procedures and the time limits applicable to the procedures. This description will include information on how to initiate the appeal and a statement of the Participant's right to bring a civil action under section 502(a) of ERISA following an Adverse Benefit Determination on final review;

7.    A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

8.    The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

9.    Any rule, guideline, protocol, or similar criterion that was relied upon, considered, or generated in making the determination will be provided free of charge. If this is not practical, a statement will be included that such a rule, guideline, protocol, or similar criterion was relied upon in making the determination and a copy will be provided to the Participant, free of charge, upon request;

10.   In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances, will be provided. If this is not practical, a statement will be included that such explanation will be provided to the Participant, free of charge, upon request; *and*

11.   The following statement: "You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

**E.    Furnishing Documents in the Event of an Adverse Determination:**

In the case of an Adverse Benefit Determination on review, the Plan Administrator shall provide such access to, and copies of, documents, records, and other information described in the section relating to "Manner and Content of Notification of Adverse Benefit Determination on Review" as appropriate.

**F.    Decision on Review:**

Page **9** of **38**