UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Civ. Case No. _____

FEDERAL TRADE COMMISSION,       )
                                )
              Plaintiff,         )
                                )
         v.                     )
                                )
INNOVATIVE PARTNERS, LP, also doing  )     [**FILED UNDER SEAL**]
business as INNOVATIVE HEALTH PLAN or  )
HEALTHCARE PLAN, a Texas limited  )
partnership, *et al.*,          )
                                )
              Defendants.        )
                                )

**EXHIBITS SUPPORTING PLAINTIFF'S *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE,
APPOINTMENT OF A RECEIVER, OTHER RELIEF, AND ORDER TO
SHOW CAUSE WHY A PRELIMINARY INUNCTION SHOULD NOT ISSUE**

**VOLUME II OF V**

Dated: _APRIL 7_____, 2026            Presented by:

Matthew G. Schiltz (Special Bar No. A5502617)
William J. Hodor (Special Bar No. A5501501)
Federal Trade Commission, Midwest Region
230 South Dearborn Street, Room 3030
Chicago, Illinois 60604
(312) 960-5619 [telephone, Schiltz]
(312) 960-5592 [telephone, Hodor]
mschiltz@ftc.gov [e-mail, Schiltz]
whodor@ftc.gov [e-mail, Hodor]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## VOLUME I

### CONSUMER DECLARATIONS

Declaration of Deann Armes ..................................................................................PX 1

Declaration of Karl P. Clark..................................................................................PX 2

Declaration of Francesca D'Angelo .......................................................................PX 3

Declaration of Lisa Frazer ....................................................................................PX 4

Declaration of Hailey Gillam................................................................................PX 5

Declaration of David Hicks ..................................................................................PX 6

Declaration of Kimberly Hood .............................................................................PX 7

Declaration of Autumn Leddon ............................................................................PX 8

Declaration of Holly Lewis ..................................................................................PX 9

Declaration of Gary Litman..................................................................................PX 10

Declaration of Griffin Malnar...............................................................................PX 11

## VOLUME II

### CONSUMER DECLARATIONS

Declaration of Trevon McKenzie ...........................................................................PX 12

Declaration of Debbie Marcela Meschwitz Cronenbold .........................................PX 13

Declaration of William Muñoz, Jr. ........................................................................PX 14

Declaration of Nicole Shevchenko ........................................................................PX 15

Declaration of Diane Smith ..................................................................................PX 16

Declaration of Krista Taylor .................................................................................PX 17

Declaration of Robert Tracy .................................................................................PX 18

Declaration of Megen Walker................................................................................PX 19

i

## LAW ENFORCEMENT DECLARATIONS

Declaration of Christopher McGuire ..................................................................................PX 20
Regional Administrator, Bureau of Investigation, Division of Insurance
Agent and Agency Services, Florida Department of Financial Services

Declaration of Monica Fernandes........................................................................................PX 21
Investigator, Bureau of Investigation, Division of Insurance Agent and
Agency Services, Florida Department of Financial Services

## FORMER EMPLOYEE DECLARATION

Declaration of Crystal Rogers ...........................................................................................PX 22
Former Employee, Customer Service Representative, Innovative Partners, LP

## VOLUME III

## EXPERT DECLARATION

Declaration of Helen G. Levy, Ph.D. .................................................................................PX 23
Research Professor, University of Michigan, Institute for Social Research

## VOLUME IV

## INVESTIGATOR DECLARATION

Declaration of Christine Carson ........................................................................................PX 24
Investigator, Federal Trade Commission

## VOLUME V

## INVESTIGATOR DECLARATION

Declaration of Christine Carson, *continued*.......................................................................PX 24
Investigator, Federal Trade Commission

# PX 12

## DECLARATION OF TREVON MCKENZIE
### PURSUANT TO 28 U.S.C. § 1746

I, Trevon McKenzie hereby declare as follows:

1.    My name is Trevon McKenzie. I live in Harrah, Oklahoma and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.    Through my employer, I am enrolled in a group health insurance plan with Blue Cross Blue Shield of Michigan. In November 2024, I needed to contact my insurance company because there was an issue with coverage for my diabetes medication. On November 21, 2024, I googled Blue Cross Blue Shield of Michigan, and one of the top search results had a phone number, 877-717-0447, which I then called.

3.    I connected to an agent and told him that I was calling because Blue Cross Blue Shield had improperly declined coverage for my diabetes medication. The agent asked me for personal information he said he needed to pull up my account in his system.

4.    I don't remember all of the specific information the agent requested, but I do remember him asking for my payment information. I was surprised by this question, and I told him that my premiums are automatically withdrawn from my paycheck. I also told him that this is information the insurance company should already have and should not need to request it from me. The agent was insistent and pressured me for payment information, which he said was necessary to verify my account. This raised alarm bells for me, so I asked the agent to confirm which company he worked for. He told me he was with Blue Cross Blue Shield of Michigan.

5.    The agent told me that according to his records, my health insurance coverage was not active. He said to renew my plan, I would need to pay a $362.85 premium that the state government would hold during a 90-day probationary period while it verified my information.

Page 1 of 4

The agent reassured me that the money would never be withdrawn from my account—it would just a be hold on my account while the state completed its verification. He warned that if I didn't provide payment information for this, then I would have to wait until the end of the 90-day probationary period to fill my diabetes prescription.

6.     I needed my diabetes medication soon, so I gave the agent my debit card information. He warned me that I may receive an alert from my bank asking me to verify I knew the identity of the company that was collecting this information.

7.     As he predicted, I did get a call from the bank's fraud department while I was still on the phone with the agent, so I merged the two calls. Once the agent and my bank's fraud department were both on the line, the agent immediately began trying to convince the fraud department that the transaction was legitimate. The agent was talking very fast, and I could not follow exactly what he was saying. My bank's fraud department stated that it could only speak with the account holder and then asked me for confirmation that I was familiar with the company that was involved in this transaction. I confirmed because I thought I was speaking with Blue Cross Blue Shield of Michigan. The bank's fraud department ended its call, and my call with the agent also ended shortly thereafter.

8.     Throughout my conversation with this agent, I asked him several times whether he was with Blue Cross Blue Shield of Michigan, and each time, he confirmed that he was.

9.     At one point during our conversation, the call disconnected, and the agent had called me back from 561-486-7608, which is a different number from the one I had called from my online search results.

10.     As soon as I got off the phone with the agent, I checked my bank account online. I saw that contrary to what he told me on the phone, my account had been charged the full $362.85

from a company I had never heard of called Innovative Health, not Blue Cross Blue Shield of Michigan. **McKenzie Attachment A** is a true and correct image of my bank account transaction history showing this charge, which was later reversed by my bank.

11. When I saw the charge, I immediately called my bank's fraud department to report the charge as fraudulent. The department said they would block all future charges. The bank also canceled the debit card associated with that account and eventually reversed the $362.85 charge.

12. I had received several emails that day from a company called Innovative Partners. One of the emails, from partnerservices@innovativepartnerslp.com with the subject "Payment Receipt," stated that my debit card had been charged $362.85. **McKenzie Attachment B** is a true and correct copy of this email.

13. That day, I also called the number for Blue Cross Blue Shield of Michigan that was on my insurance card and described what had happened. The agent responded that my experience earlier that day had not been with Blue Cross Blue Shield of Michigan. The agent also recommended that I report my experience to the Federal Trade Commission.

14. After my call with my insurance company, I called the Federal Trade Commission to report my experience with Innovative Partners, and **McKenzie Attachment C** is a true and correct transcript of that call.

15. Although my bank did refund the money that Innovative Partners stole from me, this experience was very frustrating and upsetting. It is infuriating that the scammer at Innovative Partners repeatedly lied to me, telling me that he was with Blue Cross Blue Shield of Michigan. I had to expend extra time and energy reversing the Innovative Partners charge and confirming my

actual insurance coverage when I was already focused on making sure I had coverage for my critical diabetes medicine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  /2 – /9 – , 2024.

*Trevon S. McKenzie*

Trevon McKenzie

# McKenzie Attachment A

**12:29**

< **INNOVATIVE HEALTH P XX9436 F...**

Amount
# -$362.85

Description
**INNOVATIVE HEALTH P 720-5189436 FL -
432720804379**

Posting Date
**11/22/2024**

Transaction ID
**292789757**

Transaction Categories
**Healthcare & Pharmacy**

**Need Help?**

**Dispute**                                    >
I want to report an error or fraudulent activity

# McKenzie Attachment B

From: **Innovative Partners** <partnerservices@innovativepartnerslp.com>
Date: Thu, Nov 21, 2024 at 2:19 PM
Subject: Payment Receipt
To: <▮▮▮▮@gmail.com>
CC: <membercc@innovativepartnerslp.com>



Billing Department
1401 N University Dr Suite 207
Coral Springs, FL 33071

Partner's Name: TREVON MCKINZIE
▮▮▮▮ HARRAH, OK, US, ▮▮▮▮
+▮▮▮▮

## Payment Receipt

| Date: | 11/21/2024 |
|---|---|
| Total Amount: | $362.85 |
| Transaction ID: | 10150285174 |
| Payment Method: | Visa ▮ xxxxxxxxx3878 |

Partner ID: G153100
Coverage Period: 11/22/2024 - 12/21/2024

| Plan Information & Breakdown | Total Billed Amount |
|---|---|
| Enrollment Fee | $100.00 |
| Elite MD 2 | $212.90 |
| Guardian 5000 | $49.95 |
| | $362.85 |

If you have inquiries regarding your coverage or benefits, we encourage you to reach out to our dedicated Partner Services Team. They are readily available to provide guidance and support, ensuring that you have a clear understanding of your benefits and coverage options. Our team is committed to assisting you every step of the way, addressing any questions or concerns you may have to ensure you make informed decisions about your healthcare needs. Please don't hesitate to contact us at (866)949-3581, we are here to help!



## Next Premium Payment

| Due Date: | 12/22/2024 |
|---|---|
| Amount Due: | $262.85 |
| Coverage Period: | 12/22/2024 - 01/21/2025 |
| Payment Method: | Visa ▮xxxxxxxxx3878 |

## Payment Reminders and Options

Ensuring your timely payment is crucial to maintaining uninterrupted coverage with Innovative Partners. It is essential to pay the full amount on or before the due date indicated at the top of your bill. Failure to do so, including late payments or partial payments, may result in the loss of your coverage. If the full amount is not received by the end of your grace period, your coverage may be canceled due to nonpayment.

## New Payment Option: ACH Payments

We are pleased to announce that we now accept ACH (Automated Clearing House) payments, which are widely recognized as the safest method for paying bills. ACH payments offer security and convenience, ensuring your payments are processed efficiently and securely.

## Important Information Regarding Past Due Amounts:

If you apply for a new policy with us, any past due amounts owed within the last 12 months may need to be settled before your new coverage can commence.

## Payment Options:

- **Autopay:** We are pleased to inform you that we accept ACH, as well as Visa, Mastercard, and American Express for premium payments. Should you choose to use any of these methods, you can rest assured that your transaction will be processed securely and efficiently.
- **Phone:** Contact our dedicated team members at (866) 949-3581 for assistance with payments or to set up other payment arrangements.

Your prompt attention to these payment guidelines helps us continue to provide you with comprehensive coverage and support. Should you have any questions or require further assistance, please do not hesitate to reach out. We are committed to ensuring a seamless payment experience for you.

# McKenzie Attachment C

CID: ████████ ; Timestamp: 11-21-2024 15:57:19
Thank you for calling the Federal Trade Commission Identity Theft Clearinghouse.
My name is Tamara.
Have you already filed a report with us?
No, I haven't.
Okay.
Yes, I just need a brief description on what happened. I haven't. Okay.
Yes, I just need a brief description on what happened.
Okay.
I was having some issues with a medication being filled,
and my benefits is through Blue Cross Blue Shield of Michigan.
So I Googled Blue Cross Blue Shields
of Michigan
and it popped up
and gave me a number
when I called the number
and I was trying
to find that part out.
Well, they claimed to have put a manager on the phone,
and he took down my bank information, and he said the state pays for it,
but in order for me to get
Because of the pre-enrollment
Verified I'd have to have
The bank information where your
Check's been pulled from
And he pulled He said it wouldn't pull this money out, but it did.
And so in the meantime, I found my Blue Cross Blue Shield card
and called the number on there.
And they said it wasn't them and they wouldn't do that.
So she asked me to get me to the guy.
Yes, and I'll be assisting you with filing a fraud report and also giving you information on how to
protect yourself. May I have your first and last name? Trevon.
You said Trevon, T-R-E-V-O-N?
Yes.
McKenzie, M-C-K-E-N-Z-I-E?
Correct.
By any chance, do you still have that telephone number for the imposters claiming to be Blue Cross
Blue Shield of Michigan?
Yes.
I will give you the number I called first, and it had hung up.
And I'm going to give you the number he called me back from.
Okay. Yes, sir.
The original number I called was
877-717-0447.
I just want to make sure I got it correct. Did you say 877-7170447?
Yes, ma'am.
Okay. Yes, I'm ready for the number.
Okay. The other number, he called me for me. He called me 561-486-7608. 6 7 6 0 8
How much did they take out?
Let me go back in here
and I can tell you that too.
I have my
bank app.
And on the email he sent, it says
innovative partners.
Oh, they sent an email
too. Let me get that. Hold on.
He said
innovation
I-N-N-O-V-A-T-I-O-N?
I-N-N-O-V-A-T-I-V-E, Innovative.
Oh, Innovative. It even has an address for the billing department.
What's the email address?
Where is it coming from?

Innovative partners at?
That I don't see.
Let me see.
We can't straight to the inbox.
It does have a billing department address.
It's got a regular address, a Florida address.
Okay, let me see.
$360, how much?
$362.85.
Okay.
And it's asking for the transaction date. When was that?
That was today. Just a while ago.
What was the payment method? Was it a debit card?
Yes.
So I did put in the innovative partners, and I put in that they are located in Florida.
Did you have any other contact information on that? I put in that they're located in Florida.
Did you have any other contact information on them, like a telephone number?
If not, it's okay.
The address we've got on here is 1401 North University Drive. It says Suite 207 in Carroll Springs,
Florida. 07 and
Carol Springs, Florida
and that's
33071
Thank you
Can you spell the city for me just so that's accurate?
Okay. C-O-R-A-L and then Springs, S-P-R-I-N-G-S
Okay.
I just didn't hear you.
Alright, thank you.
Okay, and did they ask for any personal information like your Social Security number?
Didn't ask for the Social Security.
They did get my birthday and home address, and of course he had my phone.
Well, in any event, just in case, if they did have your Social Security number,
we would refer you over to the Credit Bureau's Experian Equifax
TransUnion. They offer protection mechanisms and monitoring services. We recommend the
Fraud Alert, which is free, and it will protect your personal information so no 1 will be able to
open up new accounts and get things using your information. So I can provide the telephone number if
you need it.
I'm actually driving, so I couldn't even write it down.
Oh, okay. If you can remember the website annualcreditreport.com, you can request for the fraud alert
there, and they'll communicate to the other 3 credit bureaus for you.
May we have a primary telephone number for you?
It's ███████ .
██████ . And did you want to list your email address on file? It's ██████ at gmail.com.
Okay. ██████ at gmail.com.
The next question, for demographic purposes, may we have your age range?
The ranges are in 10s?
███████ . Perfect.
And the last thing needed is a mailing address?
██████████
██████████
And that's in
Harrah, Oklahoma H-A-R-R-A-H-████ .
Okay, I got it.
Is that a residence or should I put an apartment number?
No, that's a residence.
Okay.
So I just completed your report and you will receive an email with your reference number.
I just have to state it for the recorded line.
I know you're driving, and I want you to be safe.
So your reference number is 1-80-415-687. And that will be in your email as well.
Did you have any other questions?
That'll be air.
Okay.

Well, thank you again for calling the Federal Trade Commission.
Have a good day.
You too. Thank you.
Bye-bye.

# PX 13

## DECLARATION OF DEBBIE MARCELA MESCHWITZ CRONENBOLD
## PURSUANT TO 28 U.S.C. § 1746

I, Debbie Marcela Meschwitz Cronenbold hereby declare as follows:

1.      My name is Debbie Marcela Meschwitz Cronenbold. I live in Brighton, Massachusetts and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      I moved to the United States in 2023, and in March 2024, I was uninsured and looking to enroll in health insurance.  I was working a temporary job at that time, and it did not provide health insurance. I was worried about a potential tax penalty if I did not have health insurance. Sometime in March 2024, I googled "insurance mass health." I landed at what appeared to be a site for MassHealth, where I believed I could enroll in a state-sponsored health insurance plan. I'm fairly certain the URL was masshealthplans.com. The site solicited my personal information, including my phone number and zip code, and answers to a questionnaire about my health insurance needs. I submitted the information, completed the questionnaire, and shortly afterwards, I started receiving lots of phone calls about enrolling in health insurance.

3.      During one of these calls, which I received on March 28, 2024, I purchased a healthcare plan that I believed to be a MassHealth plan. The agent I spoke to when enrolling told me told it would cover all of my medical expenses, and I would not have any out-of-pocket costs. The agent also said the plan only required payment for three months, and after that, I would be covered for the rest of the year for free. After I enrolled in the plan, I did not see any confirmation or plan documents in my email inbox. To ask about this, that same day, I decided to call back at the same number from which the agent had just called me.

Page **1** of **8**

4.      When the call connected, I was speaking to a different agent. I told him that I had just purchased a MassHealth plan and was looking for documents related to this plan, because I had not received them yet. This new agent, who said his name was David, identified himself as a licensed health insurance agent but did not give the name of the company or agency he was working for. I told him that the plan I had just purchased had full coverage for all medical expenses and only required 3 months of payments, after which the coverage would continue for the rest of the year for free. He told me that he had found my enrollment information, and it was a plan through another company. David said I had not purchased the type of plan I was describing. He told me he could enroll me in the correct full-coverage healthcare plan, and after enrolling in this plan, I would need to call the other company to cancel the first enrollment.

5.      I decided to follow David's advice and proceed with enrolling in a plan with him. At that time, I did not know much about the health insurance plan I needed, because I was still relatively new to the country. I did know, however, that health insurance coverage is essential in this country, and I was eager for coverage. Also, I trusted David's recommendations about enrolling in a health insurance plan because I believed he was with MassHealth.

6.      To enroll me in a plan, David asked for my personal information, including health conditions and social security number.  He told me that the plan he found for me would only require me to pay around $250 per month for three months, and then I would be insured for the rest of the year. David also said that with this plan I would have no out-of-pocket costs for any medical expenses, which was what I was looking for.

7.      At some point during our calls, David learned that I am a native Spanish speaker, and David speaks Spanish fluently. We switched to speaking in Spanish, and I asked David to explain the plan benefits again in Spanish so I could be very certain that I fully understood what I

was buying. David stated in Spanish that under the health insurance plan he had found for me, I would only have to pay for three months but would receive coverage for the full year, and there would be no out-of-pocket costs for any medical expenses.

8.      I decided to purchase the plan David recommended, which I believed to be a MassHealth plan. David told me that my charge for the first month would be around $340, because it included an enrollment fee, and the payment in the other months would be lower. He explained that the fee was non-refundable but was required in order to process my enrollment paperwork. David then collected my debit card information and sent me a text with a link to complete the enrollment on my device while he stayed on the phone line. **Meschwitz Cronenbold Attachment A** is a true and correct image of that text, which was from 956-625-4397. When I clicked the text link, and it opened a webpage that asked me to enter my date of birth "to verify [my] identity" before accessing the application. **Meschwitz Cronenbold Attachment B** is a true and correct screenshot of that page. I submitted this information, and then there was another page with checkboxes requesting confirmation that I wanted to enroll in the plan. I do not recall seeing any details about the plan features on this page. David instructed me to check the boxes to complete enrollment. I followed these instructions, and afterwards, David told me that I was enrolled. Before ending the call, David said that if I have any questions about my plan, I should call 888-201-1810, which was an exclusive "members only" line; he warned me that no one will pick up the phone if I called the customer service number on my plan documents. David also told me that he is my personal insurance agent, and gave me his direct number: 628-900-8986.

Page **3** of **8**

9. David gave me the phone number to call to cancel that health insurance plan I had previously enrolled in, and after my call with him, I did so. I do not remember the name of the company or the number that I called, but I do remember the cancellation was quick and easy.

10. A few minutes after my call with David ended, I received several emails related to my new plan from addresses with the domain "innovativepartnerslp.com." One was an email with subject "Sales Receipt" and a large Innovative Partners logo at the top, and it stated that my card had been charged a $50 enrollment fee, $216.87 "[m]onthly payment for Elite MD 6," and $69.95 "[m]onthly payment for Guardian 15000," for a total of $339.82. **Meschwitz Cronenbold Attachment C** is a true and correct pdf copy of this email. Another email, with the subject "Innovative Partners – Partner Portal," included login information and a link to a portal that would provide "immediate access" to my "temporary ID card[], resources, [and] monthly payment details." **Meschwitz Cronenbold Attachment D** is a true and correct image of this message.

11. That day, I signed into the "Partner Portal," from the link in **Meschwitz Cronenbold Attachment D**, and I downloaded several documents that I found in the portal. I have attached those documents, which are labeled as follows: **Meschwitz Cronenbold Attachment E** is a true and correct pdf of my temporary ID card; **Meschwitz Cronenbold Attachment F** is a true and correct pdf of the document with file name "SPD-Elite-6MD"; **Meschwitz Cronenbold Attachment G** is a true and correct pdf of the document with file name "Elite-MD-Plan-Brochure"; **Meschwitz Cronenbold Attachment H** is a true and correct pdf of the document with file name "SPD-Guardian"; **Meschwitz Cronenbold Attachment I** is a true and correct pdf of the document titled "New Limited Partner Joinder Agreement"; and

**Meschwitz Cronenbold Attachment J** is a true and correct pdf of a document with "terms and conditions" for "using the [I]nnovative services."

12. When I opened and read these documents, I discovered that the benefits listed were significantly different from those that David had described to me over the phone. My understanding of the plan described in the documents is that it would only provide limited benefits, such as a total of $150 towards one emergency room visit per year, and I would have to pay the rest of the costs. The plan that David told me I was purchasing offered complete coverage and no out-of-pocket expenses. I would not have purchased this product had David been honest with me and had I known it only offered limited benefits and not full coverage. I decided to call the company and cancel immediately.

13. Less than one hour after I had purchased the plan from David on March 28, 2024, I called the "members only" customer service number he had provided, 888-201-1810, to cancel my plan. I connected with an agent who told me that my cancellation would be processed with a full refund within five days. I also sent an email Innovative Partners at partnerservices@innovativepartnerslp.com to ensure there was a written record of my cancellation request.

14. I waited five to ten days, and when I checked my bank statement, I saw that the charge still had not been reversed. I also had not received a response to my cancellation email. To check on the status of my cancellation and refund request, I called the "members only" customer service number, 888-201-1810, again. I connected to the same agent as I did during my previous call to this number, and he confirmed that my cancellation request had been received and was being processed. The agent said it would take five more days to process and for the refund to appear in my bank statement.

15.     Around two weeks after I had purchased (and attempted to cancel) the Innovative Partners plan, I received some documents related to the plan in the mail. These included a letter from Innovative Partners stating that if I canceled within "30 calendar days," I would "receive a refund of [my] first month's premium." **Meschwitz Cronenbold Attachment K** is a true and correct image of this letter.

16.     When I received these documents in the mail, I still had not received a refund or reply to my cancellation email, so I called the "members only" customer service number, 888-201-1810, again. I connected to the same agent as during my previous calls to this line, and the agent told me that under the terms of my contract, I could not cancel my plan until I had been enrolled a minimum of three months.  I told the agent that the physical documents I had received in the mail stated that I could cancel within 30 days for a full refund, but the agent still refused.

17.     Throughout April 2024, I called the "members only" customer service number, 888-201-1810, many times—at least 15 to 20 times if I had to guess—to ask why my cancellation and refund request had not been completed. Over the course of the month, the agent for the "members only" service number kept changing his response to the cancellation request. During the calls earlier in the month, he had stated that my refund would be processed within five days; during the later calls, he told me that I was not eligible for a refund and under the terms of the contract, I needed to be enrolled for a minimum of three or six months. When I disputed this, citing for example the language from the Innovative Partners letter, **Meschwitz Cronenbold Attachment K**, the agent tried to convince me that I was confused or did not understand the terms of the contract properly. This was very frustrating. I felt like the agent was lying to me to hang onto my personal information and continue collecting money from me.

18.     Sometime in April 2024, I also tried calling David back on his direct line, 628-900-8986, for help with my cancellation request and refund. When I reached David, he told me he was not aware of my cancellation request. After that call, I attempted to call David again, but he never picked up any of my subsequent calls.

19.     Despite my repeated requests, I did not receive a refund or a response to my cancellation email in April 2024. What I did receive was a security alert from my bank asking if I had authorized a $289.82 charge, dated April 28, 2024, from "Innovative Health Plan." **Meschwitz Cronenbold Attachment L** is a true and correct image of this alert. In response, I notified the bank that I did not authorize the charge. I could not believe the company was attempting to charge me again, after so many cancellation requests over the course of the past month! After I notified my bank that the Innovative Health Plan charge was unauthorized, the bank canceled my debit card and issued me a new one, thankfully preventing any additional charges from Innovative Partners. The initial charge, however, had not been reversed or refunded.

20.     On April 29, 2024, I reported my experience to the Federal Trade Commission. On April 30, 2024, I filed a complaint with the Better Business Bureau (BBB). **Meschwitz Cronenbold Attachment M** is a true and correct copy of my BBB complaint. After I complained to the BBB, on May 9, 2024, I received two emails from partnerservices@innovativepartnerslp.com; one message stated Innovative Partners was "processing [my] cancellation" and the other stated that the initial $339.82 charge would be refunded that day. I did receive the refund.

21.     My experience searching for health insurance and being tricked into purchasing the Innovative Partners product has been very upsetting and stressful. I feel upset that David and

Innovative Partners lied to me to take my money. When I asked David to confirm he was with MassHealth, he told me he was and that he was selling me a plan with full coverage and no out-of-pocket costs. What he actually sold me, according to the documents, is a plan with very limited benefits, putting me at risk of potentially large medical bills that I cannot afford. Innovative Partners—especially the agent on the "members only" customer service line—continued to lie to me about my refund and the terms for cancellation, including by pressuring me to stay enrolled for at least six months. Innovative Partners ignored my repeated cancellation and refund requests until I contacted the BBB. It was very frustrating that I had to spend so much time fighting to get my money back. I feel anxious that this company has collected sensitive personal information about me, including information about my health conditions and my social security number. I would not have provided any of this information had I known that this was not a real health insurance company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 22_, 2024.

_____
Debbie Marcela Meschwitz Cronenbold

# Meschwitz Cronenbold

# Attachment A



Thursday, Mar 28 • 12:30 PM

Texting with (956) 625-4397 (SMS/MMS)



To complete the enrollment app,click this link :https:// enroll.innovativepartnerslp.com /autologin?u=

@g mail.com&p=

↻
Tap to load preview

# Meschwitz Cronenbold
# Attachment B



# Meschwitz Cronenbold
# Attachment C

From: Innovative Partners <partnerservices@innovativepartnerslp.com>
Date: Thu, Mar 28, 2024, 12:35 PM
Subject: Sales Receipt
To: <███████████████████@gmail.com>
Cc: <IPA0213@carynhealth.com>, <membercc@innovativepartnerslp.com>



866-949-3581
partnerservices@innovativepartnerslp.com

DEBBIE MESCHWITZ CRONENBOLD, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.



| | |
|---|---|
| Customer ID: | ███████████████████@gmail.com |
| Customer: | DEBBIE MESCHWITZ CRONENBOLD |
| | BRIGHTON, MA, US, ████ |
| | +█████████ |
| Payment Method: | Credit Card |
| Coverage Through: | 04-28-2024 |

**Payment Towards:**

| | |
|---|---|
| Enrollment Fee | $50.00 |
| Monthly Payment for Elite MD 6 | $219.87 |
| Monthly Payment for Guardian 15000 | $69.95 |
| Total Amount | $339.82 |

**Thank you for your order!**

Need help? Contact your recruiter or our partner services team today!

# Meschwitz Cronenbold
# Attachment D

From: **Innovative partners** <admin_noreply@innovativepartnerslp.com>
Date: Thu, Mar 28, 2024, 12:35 PM
Subject: Innovative Partners - Partner Portal
To: <███████████████████@gmail.com>

## Welcome DEBBIE MESCHWITZ CRONENBOLD

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ████████████████**@gmail.com**
Temporary Password: ████████████

Need help? Contact your recruiter or our partner services team today!

 **INNOVATIVE** PARTNERS

866-949-3581
partnerservices@innovativepartnerslp.com

# Meschwitz Cronenbold

# Attachment E



**INNOVATIVE** PARTNERS

**Innovative Partners, LP**                    Partner Services: 866-949-3581

Name: DEBBIE MEMBERZ   **Member Out of Pocket**

Member ID: G589083   **PCP: $25**
                       **Specialist: $50**
Group #: MP200   **Urgent Care: $50**
                       **ER: $50**
**Elite MD 6**

Provider Network


**First Health**
Network
**Limited Benefit Plan**

---

Eligibility

**Providers:** To confirm eligibility, verify benefits,
or check the status of a claim:
Electronic Eligibility through Availity – Payer ID: 35245
Marpai Portal: www.myMarpai.com
Innovative Partners Customer Service: 866-949-3581
Limited Benefit Plan

**Partners:** To confirm eligibility, verify benefits,
or check the status of a claim,
please call Innovative Partners at 866-949-3581
To find a First Health provider, please call
800-226-5116 or visit www.firsthealthlbp.com

Claims Submission

Please submit Medical Electronic Claims
Directly to Marpai Payer ID# 35245

Or mail claims to:
Marpai Health

P.O. Box 21112
Eagan, MN 55121

# Meschwitz Cronenbold

# Attachment F

# INNOVATIVE PARTNERS, LP
# HEALTH BENEFIT PLAN
### Summary Plan Description for the Benefits of the
### Elite 6MD Policy

Congratulations, you have just enrolled in Innovative Partners, LP's *Elite 6MD* Health Benefit Plan. This is a limited medical health benefit plan sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA"). This plan is designed to meet the needs of our employees and Active Limited Partners (including their families) who have been either unable to find a suitable major medical policy/plan, or who wish to supplement their existing major medical policy/plan. Please keep in mind that this Plan is not designed to be a major medical policy/plan nor is it designed to replace a major medical policy. This Plan has certain limitations and exclusions contained herein. Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **1-866-949-3581** or email us at: **PartnerServices@InnovativePartnersLP.com**. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1:        GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time. |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | April 1, 2023 |
| 1.9. | Plan Year: | January 1 through December 31 |

RV110723

| 1.10. | Open Enrollment Period: | Within 30 days of becoming an Employee or an Active Limited Partner |
| 1.11 | Program or Policy Name: | Elite 6MD |
| 1.12. | Waiting Period: | No claim will be paid for medical services that are incurred within the first 30 days of the effective date of coverage |
| 1.13. | Agent for Service of Process: | CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201 |
| 1.14. | Partner Services: | PartnerServices@InnovativePartnersLP.com |
| 1.15. | Claims: | First Health, PO Box 3040, Farmington Hills, MI  48333 Payor ID: 42049 |

## SECTION 2:      NETWORK BENEFITS AND DISCOUNT PROGRAMS

We want to keep all of our partners as healthy and safe as possible; therefore, as a participant in this plan you (and any beneficiaries that you have added to your plan) will have access to the following benefits:

### 2.1    First Health Network (*an Aetna and CVS Health Company*):

The First Health Network is one of the largest and most comprehensive independent participating provider (PPO) networks in the United States. This network is owned and sponsored by two names in healthcare that you can trust – **Aetna and CVS**! Your plan includes participation in this network. When you go to a participating provider, First Health will reprice the charges from your doctor, and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please go to **FirstHealthLBP.com**.

### 2.2    Prescription Discount Benefits:

All of the participants in your plan get to enjoy the countless discount pharmaceutical benefits of SingleCare. To download the app, simply go to: SingleCare.com and *use the code on your card*.

## SECTION 3:          SCHEDULE OF HOSPITAL AND MEDICAL BENEFITS

RV110723

**3.1      General Medical Benefits:**

This Plan provides medical benefits in Section 3.1 that are designed to assist with the expenses that you, or a covered person, may incur as a result of an unforeseen illness, sickness, or injury to the body. Whereas the benefits in Section 3.2 can only be for expenses resulting from an Accident, benefits in Section 3.1 can be used for either Accident or non-Accident expenses.

1.      ***Emergency Room and Urgent Care Visits: $150/ one visit per year/ $50 co-pay.***
We will pay you $150 each time you, or a covered person, visit a hospital emergency room or urgent care medical professional, and you make a $50 co-pay to the medical facility. This benefit can only be used a maximum of one time per year per covered person.

2.      **Physician Visit Benefit:**

a.      ***Specialist Physician Visits:   $150 / per visit per year / $50 co-pay.***
We will pay you $150 when you, or a covered person, visit a physician who is a Specialist, and you make a $50 co-pay to the Specialist.

b.      ***Physicians:   $150   /   per   visit   per   year   /   $25   co-pay.***
We will pay you $150 when you, or a covered person, visit a physician or urgent care medical professional, and you make a $25 co-pay to the physician.

c.      You, or a covered person, are allocated a total of six (6) of the Specialist *or* physician visits described in the preceding two paragraphs. You, or a covered person, are free to use all six (6) of the allocated visits for either a Specialist or a physician, or you can mix or match the various benefits as long as you, or a covered person, do not exceed a combined number of six (6) visits for all Specialist and physician visits.

**3.2      Medical Benefits Resulting from an Accident Only:**

This Plan also provides additional medical benefits in this Section 3.2 that are designed to assist with the expenses that you, or a covered person, may incur as a result of an Accident as defined herein. *These benefits are not for unforeseen illness or sickness, they are only for an Accident as defined.*

1.      ***Hospital Room and General Nursing Care up to the Semiprivate Room Rate: up to $2,500.***
If you, or a covered person, are confined to a hospital room as a result of an Accident, we will pay up to $2500 for the cost of the room, general boarding costs, and general nursing care up to a maximum of $2500.

2.      ***Physician's Fees for Surgery: up to $2500.***

RV110723

We will pay a physician's fee for a surgical procedure required by an Accident to you, or a covered person, up to a maximum of $2500. The surgery must be performed in a hospital, or other state-licensed surgical center.

3. ***Anesthesia Services: up to $2500.***
We will pay for any anesthesia services that are medically necessary as a result of an Accident to you, or a covered person, up to a maximum of $2500.

4. ***Nonsurgical Physician Care, inpatient or outpatient: $75.***
We will pay you $75 for any nonsurgical physician services that you incur as a result of an Accident to you, or a covered person, regardless if the services are inpatient or outpatient.

5. ***Hospital Emergency Room Care: up to $500.***
We will pay $500 in the event you, or a covered person, are required to receive emergency room care at a hospital as a result of an Accident.

6. ***X-rays, Ultrasounds, and other Medical Imaging: up to $250.***
We will pay $250 for x-rays, ultrasounds, and other medical imaging performed, as described herein, that are medically necessary as a result of an Accident to you, or a covered person.

7. ***Ambulance Service: up to $250.***
We will pay $250 if your injuries, or those of a covered person, as a result of an Accident that requires you, or a covered person, to be transported by an ambulance.

8. ***Prescription Drugs: up to $500.***
We will reimburse up to the amount of $500 for any prescription drug cost that you, or a covered person, incur provided that the prescription drugs are directly related to and medically necessary as a direct result of an Accident.

9. ***Dental Surgery for Injury to Sound Natural Teeth: up to $500.***
We will reimburse you, or a covered person, up to the amount of $500 for any dental surgery medically necessary and entirely required as a direct result of an Accident.

10. ***Physical Therapy: First Visit $60, Subsequent Visits, $30.***
In the event the injuries that you, or a covered person, incur as a direct result of an Accident, require you, or a covered person, to receive physical therapy services, we will reimburse $60 for the first physical therapy visit and reimburse $30 for each subsequent visit up to a maximum number of four (4) visits after the initial first visit.

**3.3    Waiting Period:**

All sickness and indemnity benefits provided for in this Plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days

RV110723

thereafter. The waiting period limitation does not apply to benefits regarding an Accident or loss of life.

***PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.***

## SECTION 4:      DEFINITIONS

The following definitions shall be controlling when used in connection with this plan. You should read and understand these definitions.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**Active Limited Partner(s)** means the limited partner made a signatory to either the Limited Partnership Agreement of the Plan Sponsor, or a Joinder Agreement to such Limited Partnership Agreement hereto, as well as other limited partners which may be added from time to time pursuant to the Limited Partnership Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

**Ambulatory Surgical Center** (ASC) means a distinct entity that operates exclusively for the purpose of furnishing outpatient surgical services.  The Ambulatory Surgical Center must be certified by the Center for Medicare and Medicaid Services (CMS).  An ASC is either an independent facility or operated by a Hospital.  A Hospital-operated facility must be a separately identifiable entity, physically and administratively, and be financially independent and distinct from other operations of the Hospital.

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the participant. This term does not include fostering a child. A child must be below the age of 26.

**Covered Accident** means an Accident that occurs on a day that coverage is in force for a Covered Person, results in a loss or injury covered by the Plan and is not excluded by name or specific description in this Plan.

**Covered Person** means the plan participant. If you purchased insurance coverage that includes your spouse and/or child/children, these individuals are also included.

RV110723

**Covered Sickness** means a sickness that occurs on a day that coverage is in force, results in a loss covered by this plan, and is not excluded by name or specific description in this plan.

**Diagnosis** means the definitive establishment of the Critical Illness Condition through the use of clinical and/or laboratory findings. The Diagnosis must be made by a Physician who is a board-certified specialist where required under this coverage.

**Diagnostic Center or Facility** means a licensed and accredited entity that:

- Operates for the primary purpose of conducting medical diagnostic tests on patients,
- Does not assume ongoing responsibility for patient care, and
- Provides its services for use by other medical personnel.
- A Diagnostic Center or Facility may be either independent or operated by another medical entity.

**Dentist, Doctor, or Physician** means a legally qualified practitioner of the healing arts acting within the scope of his or her license and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**Emergency Room** means a portion of a Hospital where emergency diagnosis and treatment of a Sickness or Accident is provided.

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Experimental/Investigational** means a drug, device, medical care, or medical treatment will be considered experimental/investigational if:

- The drug or device cannot be lawfully marketed without the approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;
- The informed consent document utilized with the drug, device, medical care, or treatment states or indicates that the drug, device, medical, or medical treatment is part of a clinical trial, experimental phase, or investigational phase or if such a consent document is required by law;
- The drug, device, medical care, or medical treatment or the patient informed consent document utilized with the drug, device, medical care, or medical treatment was reviewed and approved by the treating facility's Institutional Review Board or other body serving a similar function, or if federal or state law requires such review and approval; or
- Reliable evidence shows that the drug, device, medical care, or medical treatment is the subject of ongoing Phase I or Phase II clinical trials, is the research, experimental study, or

RV110723

investigational arm of ongoing Phase III clinical trials, or is otherwise under study to determine the maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis.

**Health Benefit Plan** means this ERISA governed self-funded Plan sponsored by Innovative Partners, LP.

**Hospital** means a short-term, acute general hospital that is:

- Primarily engaged in providing, by or under the continuous supervision of physicians, to inpatients diagnostic and therapeutic services for diagnosis, treatment, and care of injured or sick persons;
- Has organized departments of medicine and major surgery;
- Has a requirement that every patient must be under the care of a physician or dentist;
- Provides 24-hour nursing care by or under the supervision of RNs;
- Has in effect a hospital review plan applicable to all patients which meet at least the standards set forth in Section 1861(k) of the United States Public Law 89-97 (42 USCA 1395x[k]);
- Duly licensed by the agency responsible for licensing such hospitals; and
- Not, other than incidentally, a place of rest, a place primarily for the treatment of tuberculosis, a place for the aged, a place for drug addicts or alcoholics, a place primarily for the treatment of mental disorders or chemical dependency, or a place for convalescent, custodial, educational or rehabilitory care.

**Limited Medical Benefit** means a plan, program, or policy that had limited or defined benefits. It is not a comprehensive major medical plan, nor is it intended to replace a major medical plan. The plan is intended to provide you, and your covered dependents, with basic insurance coverage that is capped at specific amounts for specific services. This plan is also exempt from, and thus is not compliant with, ACA.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Medically Necessary** means a service or supply that is necessary and appropriate for the diagnosis or treatment of an injury or Sickness based on generally accepted current medical practice.  A service or supply will not be considered Medically Necessary if:

- it is provided only as a convenience to the Covered Person or provider;
- it is not an appropriate treatment for the Covered Person's diagnosis or symptoms;
- it exceeds in scope, duration, or intensity that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment; or
- it is an experimental/investigational treatment.

The fact that a Physician may prescribe, authorize, or direct a service does not, of itself, make it Medically Necessary or covered by the Plan.

**Participant or Plan Participant** means the individual to whom this plan is issued.

RV110723

**Plan** means the Health Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Health Benefit Plan, and such meanings as further defined by the ERISA.

**Pre-existing Condition** means a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received from a physician within a 12-month period preceding the effective date of coverage of the Covered Person.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Reliable Evidence** means only: published reports and articles in an authoritative medical and scientific literature; written protocol or protocols by the treating facility studying substantially the same drug, device, or medical care or treatment; or the written informed consent used by the treating facility or other facility studying substantially the same drug, device, medical care or treatment.  Benefits will be considered in accordance with the drug or device at the time it is given or when medical care is received.

**Sickness** means an illness, infection, disease, or any other abnormal physical condition not caused by an Accident.

**Specialist** means *a* physician who focuses on a specific area of medicine and also *has advanced medical training in the specific area of medical specialty*. A specialist must be board-certified if certification is available for such specialty.

**Spouse** means any individual to whom you are legally married.

**Year, Coverage Year, or Plan Year** means the 12-month period beginning on the effective date of this plan and ending on the anniversary of the effective date of this plan. Subsequent years will run from anniversary date to anniversary date.

## SECTION 5:    DESCRIPTION OF PLAN BENEFITS

**Physicians and Urgent Care Visit Benefit:**

We will pay the Physicians and Urgent Care Visit Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for a doctor's office visit. This benefit also includes an office visit or diagnostic x-ray and/or laboratory testing for routine or preventative screenings, including a baseline mammogram, screening mammograms, cervical cytologic screenings, colorectal cancer screenings, prostate cancer screenings, and health screenings for children, per the standards and schedules of the American Academy of Pediatrics. Services must be rendered by a licensed Physician acting within the scope of his/her license.

RV110723

**Emergency Room Benefit:**

We will pay the Emergency Room Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for and requires medical care from an emergency room due to injuries received in a Covered Accident or due to a Covered Sickness. The visit must occur on a day that the coverage is in force.

For a visit due to injuries received in a Covered Accident, the visit must occur within 72 hours after the date of the Covered Accident. Services must be rendered by a Physician.

## SECTION 6:      LIMITATIONS AND EXCLUSIONS

We will not pay benefits for:

- Pre-existing Conditions during the 12 months following the effective date under this Plan.
- Treatment, services, or supplies which:
  - Are not Medically Necessary;
  - Are not prescribed by a doctor as necessary to treat the Sickness or Injury;
  - Are experimental/investigational in nature, except as required by law;
  - Are received without charge or legal obligation to pay; or
  - Are provided by an immediate family member.
- Dental care or treatment, except for:
  - Dental care or treatment due to accidental injury to sound natural teeth within 12 months of a Covered Accident and
  - Dental care or treatment necessary due to congenital disease or anomaly.
- Elective procedures and cosmetic surgery.  Cosmetic surgery shall not include:
  - Reconstructive surgery when such service is incidental to or follows, surgery resulting from trauma, infection, or other disease and
  - Reconstructive surgery because of a congenital disease or anomaly of a covered Dependent Child which has resulted in a functional defect.
- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.
- Spinal manipulation or adjustment, including massage therapy.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related Injury or Sickness, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Pregnancy.
- Charges for custodial maintenance or care.
- Treatment of mental illnesses, emotional disorders, and substance abuse.
- Services rendered to a transplant donor of any organ or bodily element or the acquisition cost of any organ or bodily element.

RV110723

- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.
- Eyeglasses, contact lenses, hearing aids, eye examinations, and hearing tests.

## SECTION 7:    CLAIMS PROCEDURE

Claims shall be submitted to:

> First Health
> PO Box 3040
> Farmington Hills, MI  48333
> Payor ID: 42049

*Please include the plan number as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all medical records regarding your claim.*

RV110723

# Meschwitz Cronenbold

# Attachment G



# INNOVATIVE
## PARTNERS

# HEALTH BENEFIT PLAN

# TABLE OF CONTENTS

First Health Plan Overview ............................................... 3

Elite 2MD ........................................................ 4

Elite 4MD ........................................................ 5

Elite 6MD ........................................................ 6

Ancillary Benefits

    Guardian ....................................................... 7

    Essential ...................................................... 8

    Teladoc ...................................................... 9

    Dental ....................................................... 11

Additional Benefits

    Accidental Medical....................................................12

    Single Care ................................................13

    Progressive Nutracare ...........................................14

# FIRST HEALTH PLAN OVERVIEW

As a participant of this plan, you and any beneficiaries you have added to your plan will have access to the following benefits:

## First Health Network:

The First Health Network is one of the largest and most comprehensive independent participating provider (PPO) network in the United States. Your plan includes participation in this network. When you go to a participating provider, First Health will reprice the charges from your doctor and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please contact **866.949.3581**





 OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 2 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| | Primary Care | 2 | $150 | $25 |
| Outpatient Services | Specialist | 2 | $150 | $50 |
| | Urgent Care Visits | 2 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category;(2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

### Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# ELITE 4MD OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 4 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Outpatient Services | Primary Care | 4 | $150 | $25 |
| | Specialist | 4 | $150 | $50 |
| | Urgent Care Visits | 4 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category;(2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

**Waiting Period**

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# ELITE 6MD OVERVIEW

## Primary Care, Physician, Specialist, or Urgent Care Visits

Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| ELITE 6 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Outpatient Services | Primary Care | 6 | $150 | $25 |
| | Specialist | 6 | $150 | $50 |
| | Urgent Care Visits | 6 | $150 | $50 |
| | Emergency Room | 1 | $150 | $50 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category;(2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

**Waiting Period**

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# GUARDIAN

## ANCILLARY BENEFITS

$5,000 | $10,000 | $15,000 | $20,000 | $25,000 | $35,000 | $50,000

Elite participants may enroll in our Guardian plan to add coverage for accidental death and dismemberment.

These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| COVERED PERSONS | Percentage of Principal Sum |
|---|---|
| Primary Insured | 100% |
| Spouse | 50% |
| Dependent Children | 25% |

**COVERED LOSSES**

| | |
|---|---|
| Life | 100% |
| Both Hands, feet, or sight of both eyes | 100% |
| One hand and one foot | 100% |
| One hand or one foot and sight of one eye | 100% |
| Both speech and hearing | 100% |
| One hand or one foot or sight of one eye | 50% |
| Speech or hearing in both ears | 50% |

7

# ESSENTIAL

## ANCILLARY BENEFITS

$5,000 | $10,000 | $15,000 | $20,000 | $25,000

Elite participants may enroll in our Essential plan to help with their critical illness needs.

These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| ELIGIBLE ADULT CRITICAL ILLNESS | Percent of Allowed Amount |
|---|---|
| Invasive Cancer | 100%<br>If the Diagnosis is more than 90 days after both the Plan and Policy Effective Date |
| Invasive Cancer | 10%<br>If the Diagnosis is during the first 90 days after the Plan or Policy Effective Date |
| Cancer in Situ | 25% |
| Heart Attack | 100% |
| Stroke | 100% |
| Major Organ Transplant<br>(Only one Major Organ per Lifetime) | 100% |
| Coronary Artery Bypass Surgery | 25% |
| Angioplasty | 25% |
| Aortic Surgery | 25% |
| Heart Valve Replacement/Repair Surgery | 25% |
| Coma<br>(Lasting more than 15 consecutive days) | 100% |
| Paralysis | 100% |
| End-Stage Renal Failure | 100% |

8

# ACCIDENTAL MEDICAL

## ADDITIONAL BENEFITS

Elite participants have access to an additional accidental benefit. This benefit is designed to assist with expenses that you, or a covered person may incur as a result of an accident

| ELIGIBLE ACCIDENTAL MEDICAL | Allowed Amount |
|---|---|
| Nonsurgicl Physician Care, inpatient or outpatient | $75 |
| X-rays, Ultrasounds, and other Medical Imaging | $2500 |
| Anesthesia | $2500 |
| Hospital room & General Nursing Care | $2500 |
| Hospital Emergency Room Care | $500 |
| Physician's Fees for Surgery | $2500 |
| Ambulance Service | $250 |
| Prescription Drugs | $500 |
| Dental Surgery for Injury to Sound Natural Teeth | $500 |
| Physical Therapy | First Visit $60, Subsequent Visits, $30 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category;(2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

**Waiting Period**

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

9

# TELADOC

Teladoc Health is one of the largest telemedicine companies in the United States. Your plan allows you to have a consultation with a physician, or other healthcare providers, licensed in your individual state. You will be able to talk to a doctor virtually anytime, anywhere by either telephone or video. You can contact your doctor through your landline telephone, your cellular telephone, the Teladoc app, or through the website. After your consultation, your doctor will diagnose your symptoms and send a prescription if necessary. All of this is provided for you with a $0 Co-Pay! Yes, you will not be charged for your medical consultation!

## Get Started In Minutes!

To get started, download the app or get started online. You can also call 1-800-Teladoc. Then fill out a brief medical history like you would at a doctor's office

## Teladoc Advantages

Get connected with the right medical care. Don't wait weeks for an appointment. Our doctors, therapists, and specialists can help you with:

- The flu
- Infections
- Anxiety
- Stress
- Skin conditions
- Advice on serious medical conditions.

No matter what you're facing, we're available from wherever you are by phone, video or app.



# TELADOC

## Get Peace of Mind

Whether it's a perscription sent to the pharmacy of your choice, the guidance to move forward, or a review of your condition from a medical expert, Teladoc is ready to help.

## Get Started Now

https://member.teladoc.com/registrations/get_started

## Download The App

https://apps.apple.com/US/app/id656872607?mt=8








11

# DENTAL

## Copay

Participating members are eligible for dental coverage with copay.

Please contact: • • • •• • • •• • • ••to•confirm participating providers and copays.

## Covered Services and Procedures:

- Diagnostic Services
- Preventive Services
- Restorative Services
- Endodontic Services
- Periodontic Services
- Prosthodontic Services
- Prosthodontic Services (removable)
- Implant Services
- Prosthodontic Services
- Oral Surgery Services
- Orthodontic Services
- Adjunctive Services

Procedures and services not included will be discounted 20% of Dentist's normal fee at time of service



12

# SINGLE CARE



## Save up to 80% on your prescriptions with SingleCare!

Just show one of these cards to the pharmacist next time you fill a prescription.

## Your Free Card Is Ready To Download

This SingleCare pharmacy savings card entitles you to up 80% off 10,000+ prescription medications.

The card is pre-activated and ready for immediate use at any participating pharmacy nationwide.

SingleCare cards work whether you have health insurance or not, and our prices often beat insurance cost-share. A typical person that regularly fills prescriptions saves an average of $37 a script and hundreds of dollars per year.

Using SingleCare is easy: just show our card to the pharmacist when you fill your next prescription.

Savings are automatically applied at checkout.

Keep one card for yourself and share the QR code with a friend or family member so they can get their digital card!

SingleCare is not insurance. There are no claim forms, deductibles, limitations, or maximums.

SingleCare can be used by anyone. No one is excluded from this program for any reason.



# PROGRESSIVE NUTRACARE

Progressive Nutracare specializes in professional grade Nutraceuticals offering a wide arrangement of science backed formulas to support your healthy lifestyle. From Fish Oils and Probiotics, to Thyroid and Adrenal Support, our team of medical experts weigh in on each formula to ensure we exceed industry quality standards.

MEMBERSSAVE15 – this can be included at checkout and you will receive 15% off of your entire Purchase.

## Benefits:

Supplements and Vitamins

- Amino Acids
- Antioxidants
- Fish Oils and Omegas
- Homeopathics
- Probiotics and Enzymes
- Protein

Health Concerns Supported:

- Adrenal
- Cardiovascular
- Gut Health
- Joint and Inflammation
- Immune Health
- Weight Loss Support
- Men's Health
- Women's Health
- Yeast and Fungal





# Meschwitz Cronenbold

# Attachment H

# INNOVATIVE PARTNERS, LP
# HEALTH BENEFIT PLAN
## GUARDIAN ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT

Congratulations, you have just enrolled in Innovative Partners, LP's Guardian Accidental Death and Dismemberment Health Benefit Plan. This Guardian Accidental Death and Dismemberment Policy is intended solely to be a supplement to your other Innovative Partners, LP's Health Benefit Plan coverage. This supplemental policy is sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA").

Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **1-888-677-6074** or email us at: **PartnerServices@InnovativePartnersLP.com**. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1:   GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time. |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | |
| 1.9. | Plan Year: | January 1 through December 31 |
| 1.10. | Open Enrollment Period: | Within 30 days of becoming an Employee or an Active Limited Partner |

Page **1** of **5**

1.11    Program or Policy Name:    Guardian Accidental Death and Dismemberment

1.12.   Waiting Period:    No claim will be paid for medical services that are incurred within the first 30 days of the effective date of coverage

1.13.   Agent for Service of Process: CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201

1.14.   Partner Services:    PartnerServices@InnovativePartnersLP.com

1.15.   Claims:    Group Resources, Inc.
Po Box 100043
Duluth, GA 30096
(Specify: **Innovative Partners Accidental Death and Dismemberment Claim**)

## SECTION 2:    SCHEDULE OF BENEFIT COVERAGES

When you enrolled, you purchased coverage at a selected Principal Sum amount. Please notice that your actual coverage in the event of an Accidental Death and Dismemberment is based upon the Principal Sum amount that you purchased. If the Principal Sum amount listed below is not correct, please contact Partner Services immediately.

**Principal Sum**                              $ _____

| **Covered Persons** | **Percentage of Principal Sum** |
|---|---|
| Primary Insured | 100% of Principal Sum |
| Spouse | 50% of Principal Sum |
| Dependent Children | 25% of Principal Sum |

| **Covered Losses** | **Benefit Amount** |
|---|---|
| Life | 100% of the Principal Sum |
| Both Hands or both Feet or sight of both Eyes | 100% of the Principal Sum |
| One Hand and one Foot | 100% of the Principal Sum |
| One Hand or one Foot, and sight of one Eye | 100% of the Principal Sum |
| Both Speech and Hearing | 100% of the Principal Sum |
| One Hand or one Foot or sight of one Eye | 50% of the Principal Sum |
| Speech, or Hearing in Both Ears | 50% of the Principal Sum |

Thumb and Index Finger on the Same Hand            25% of the Principal Sum

## SECTION 3:        DEFINITIONS

The following definitions shall be controlling when used in connection with this benefit. You should read and understand these definitions.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the benefit plan participant. This term does not include fostering a child. A child must be below the age of 26.

**Covered Accident** means an Accident that occurs on a day that coverage is in force for a Covered Person, results in a loss or injury covered by this benefit, and is not excluded by name or specific description in this benefit.

**Covered Person** means the plan participant or limited partner. If you purchased coverage that includes your spouse and/or child/children, these individuals are also included.

**Doctor or Physician** means a legally qualified practitioner of the healing arts acting within the scope of his or her license and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Health Benefit Plan** means this ERISA governed self-funded Plan sponsored by Innovative Partners, LP.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Loss of Hand or Foot** means the complete and permanent severance through or above the wrist or ankle joint.

**Loss of Hearing** means the total and permanent loss of hearing in both ears.  Such loss correctable by surgery or implants is not considered total and permanent.

**Loss of Sight** means the total and permanent loss of entire sight. Such loss correctable by surgery or lenses is not considered total and permanent.

**Loss of Speech** means the total and permanent loss of speech.

**Loss of Thumb and Index Finger of the same Hand** means the complete and permanent severance through or above the joints where the thumb and index finger are joined to the hand.

**Participant or Plan Participant** means the individual to whom this Plan or any Policy there under is issued.

**Plan** means the Health Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Health Benefit Plan, and such meanings as further defined by the ERISA.

**Principal Sum or Principal Sum Amount** means the amount of coverage that you purchased. Your benefit amount that would be paid for a covered claim is based upon a percentage of the Principal Sum.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Reliable Evidence** means only: published reports and articles in an authoritative medical and scientific literature; written protocol or protocols by the treating facility studying substantially the same drug, device, or medical care or treatment; or the written informed consent used by the treating facility or other facility studying substantially the same drug, device, medical care or treatment. Benefits will be considered in accordance with the drug or device at the time it is given or when medical care is received.

**Spouse** means any individual to whom you are legally married.

**Year, Coverage Year, or Benefit Plan Year** means the 12-month period beginning on the effective date of this benefit plan and ending on the anniversary of the effective date of this benefit plan. Subsequent years will run from anniversary date to anniversary date.

## SECTION 4:    DESCRIPTION OF POLICY BENEFITS

*All benefits are payable at most once daily per benefit category*

If a Covered Person's Accidental Bodily Injury results in a loss, within 180 days after the accident causing the loss, we will pay the Accidental Death and Dismemberment Benefit, shown in the above Schedule of Benefits.

Page **4** of **5**

If the Covered Person suffers more than one loss from any one accident, we will pay only one amount, the largest.

*Please note that a Spouse receives 50% of the above-referenced benefit, and a Child receives 25% of the above-referenced benefit.*

## SECTION 5:     LIMITATIONS AND EXCLUSIONS

- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related Injury or Sickness, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.

## SECTION 6:     CLAIMS PROCEDURE

Claims should be submitted to:

**Group Resources, Inc.**
**PO Box 100043**
**Duluth, GA 30096**
**(Specify: Innovative Partners Accidental Death and Dismemberment Claim)**


*Please include the plan number, your plan participant number, as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all medical records regarding your claim.*

# Meschwitz Cronenbold

# Attachment I

# INNOVATIVE PARTNERS, LP
# NEW LIMITED PARTNER JOINDER AGREEMENT

**THIS NEW LIMITED PARTNER JOINDER AGREEMENT** ("Agreement") is made and entered into effective for all purposes and in all respects on the date of execution indicated below by Innovative Partners, LP, a Texas limited partnership ("Innovative") and DEBBIE MESCHWITZ-CRONENBOLD ive Limited Partner ("NALP") (collectively, the "parties").

**WHEREAS,** Innovative was formed subject to that certain Limited Partnership Agreement dated December 1, 2022, among Jimmie Sutton, as the General Partner, and the limited partner(s) named therein (the "Partnership Agreement") (capitalized terms used and not otherwise defined herein have the meanings given them in the Partnership Agreement);

**WHEREAS,** Innovative desires to gift an Active Limited Partnership Interest in Innovative to NALP; and

**WHEREAS,** NALP desires to accept a gift of an Active Limited Partnership Interest and become an Active Limited Partner of Innovative subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions contained herein, the parties agree as follows:

## ARTICLE 1
## PURPOSE

The purpose of this Agreement is to establish the terms and conditions upon which Innovative gives and NALP receives an Active Limited Partnership Interest in Innovative, and to confirm that NALP adopts and agrees to all of the terms on the Partnership Agreement which is attached hereto as Exhibit A.

## ARTICLE 2
## ACKNOWLEDGEMENT OF THE NATURE OF ACQUIRING AN ACTIVE LIMITED PARTNERSHIP INTEREST

The parties hereby acknowledge that no money has been exchanged for the issuance of the Active Limited Partnership Interest hereunder by Innovative to NALP; however, NALP has agreed to provide a minimum of five hundred (500) hours of work activity on the internet. This acquisition of the Active Limited Partnership Interest is conditioned upon and subject to the terms of both this Agreement and NALP's compliance with the terms of the Partnership Agreement, as may be amended from time to time.

## ARTICLE 3
## ACTIVE LIMITED PARTNERSHIP INTEREST

Subject to the terms and conditions of this Agreement and the Partnership Agreement, herein incorporated by reference and included as Exhibit A to this Agreement, Innovative hereby gives to NALP an Active Limited Partnership Interest which is represented as a portion of a unit of Innovative as described in Article XV of the Partnership Agreement. This Active Limited Partnership Interest entitles NALP to participate as a Limited Partner in Innovative, with voting rights equal to NALP's Active Limited Partnership Interest in Innovative.

## ARTICLE 4
## ADHERENCE TO PARTNERSHIP AGREEMENT

In accepting this Active Limited Partnership Interest, NALP hereby agrees (i) that NALP is a party to and bound by the Partnership Agreement, (ii) to take notice of, accept, and abide by the terms of the Partnership Agreement, and (iii) to execute and deliver such additional agreements, instruments, certificates, and documents as may be necessary, appropriate or convenient to reflect the foregoing matters and the election of Innovative. NALP hereby acknowledges that they have had an opportunity to review all terms of the Partnership Agreement and to receive advice from their independent legal counsel. NALP accepts this gift of an Active Limited Partnership Interest freely and without reservation and fully supports the mission of Innovative, its interest in adding new partners which may dilute NALP's own newly acquired interest/voting rights in Innovative, and all provisions of the Partnership Agreement.

NALP specifically agrees to and understands the provisions of the Partnership Agreement related to NALP's status as a **Working Partner**, whereas NALP will assist in the collection, aggregation, and selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.

## ARTICLE 5
## NOT SECURITIES

NALP acknowledges that, due to the nature of the acquisition of an Active Limited Partnership Interest and the structure of Innovative, NALP's Active Limited Partnership Interest is not a security and is not subject to federal or state securities laws. Furthermore, based on the terms of the Partnership Agreement, NALP acknowledges that no interest in Innovative is a security interest and that all interests in Innovative are not subject to federal or state securities laws.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE LAWS OF ANY STATE. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE

**GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

## ARTICLE 6
## EFFECTS

In accordance with the Partnership Agreement, Innovative shall amend the roster of Active Limited Partners to include NALP. To the extent the General Partner of Innovative determines that it is in the best interest of Innovative to certify its Partnership Interests, Innovative may provide NALP with a certificate reflecting NALP's Limited Partnership Interest in Innovative.

## ARTICLE 7
## EMPLOYEE BENEFIT PLANS

NALP understands that Limited Partnership has created an employee health benefit plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") which is only available to employees and working owners such as Active Limited Partners. NALP also understands that Limited Partnership may provide other benefits in the future which will be available to Active Limited Partners as may be decided from time to time by the General Partner. NALP also understands that it is in no way obligated to enroll in any Partnership sponsored benefit plan and that if he/she chooses to enroll in any benefit plan, NALP is free to withdraw from said benefit plan at any time without losing his/her status as an Active Limited Partner.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1:   Duty as an Owner.**
NALP understands that he/she is a co-owner of Innovative and thus owes a duty to his/her fellow Limited Partners, the General Partner, and the Partnership in general. NALP understands that in the process of recruiting new Limited Partners is always possible that a prospective Limited Partner may have been contacted by telephone, text message, email, or some other type of electronic means without having first received the consent of the individual contacted. NALP hereby specifically waives any and all claims that he/she may possibly have regarding a state or national Do Not Call List Registry, the Telephone Consumer Protection Act (47 USC § 227), any similar federal or state laws or regulations, and any other type of cause of action regarding how NALP may have been recruited to become a Limited Partner and/or owner of Innovative.

**8.2   Severability.**
Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable for any reason, the validity of the remaining provisions of this Agreement shall not be affected thereby and the unenforceable provision shall be deemed not to be a part of this Agreement.

**8.3:   Entire Agreement; Waiver; Modification.**
This Agreement and the Partnership Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the

subject matter hereof. No provision of this Agreement may be modified or waived except in writing signed by both parties.

**8.4:   Anti-Waiver.**

The failure of any party to enforce any of its rights arising by reason of any breach of covenant or failure of condition on the part of the other party will not constitute a waiver of such breach. No custom or practice arising between the parties in the course of administering the Agreement will be construed to waive any party's right to: (i) insist upon the performance of the other party of any covenant or condition in the Agreement, or (ii) exercise any rights provided to it on the account of any breach of such covenant or failure of such condition.

**8.5:   Captions.**

Captions in this Agreement are inserted for convenience only and do not define, describe or limit the scope or the intent of this Agreement or form a part thereof.

**8.6:   Interpretation.**

The parties acknowledge that each of them and their respective counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the party responsible for drafting the agreement shall not be applied in the interpretation of this Agreement. In entering into this Agreement each of the parties represents that it has relied upon the advice of counsel of its own choosing and that it has read in full and understood the terms of this Agreement and voluntarily accepted the same.

**8.7:   Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one document. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, .GIF, etc.) signature shall be deemed to be an original.

**8.8:   Arbitration.**

Except as otherwise required by law, all disputes arising under or related to this Agreement (including, but not limited to, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel, or laches) shall be resolved by binding arbitration in Dallas County, Texas before JAMS, or its successor, pursuant to the United States Arbitration Act, 9 U.S.C. § 1, by filing a written demand for arbitration with JAMS, with a copy to the other parties. The arbitration will be conducted in accordance with the provisions of JAMS' Comprehensive Arbitration Rules and Procedures (the "JAMS Rules") in effect at the time of filing of the demand for arbitration; provided, that the parties agree that (i) the arbitration shall be conducted by three (3) arbitrators (unless the parties agree to a smaller number) selected in accordance with the JAMS Rules, and (ii) each party shall bear its or his own costs and expenses in any such arbitration and one-half of the arbitrators' fees and expenses. By agreeing to arbitration, the parties hereto do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration.

**8.9:   Governing Law; Venue.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. Although it is the intention of the parties that the arbitration provisions in Section 8.8 of this Agreement be fully enforced, to the extent any judicial action is required in aid of Section 8.8 of this Agreement or otherwise, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such

courts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date written below.

**Innovative Partners, LP**
Its: Manager
*Jimmie Sutton*
Jimmie Sutton
Date: 28 Mar 2024 16:03:00 GMT

**NALP:**
X : *Debbie Marcela Meschwitz Cronenbold*

DEBBIE MESCHWITZ-CRONENBOLD

Date: 28 Mar 2024 16:03:00 GMT
Effective Date:  29 Mar 2024
IP Address  ███████
Device Identity: Google Chrome

EXHIBIT A

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

THE CONTENTS OF THIS AGREEMENT ARE CONFIDENTIAL. NEITHER PARTY WILL DISCLOSE, PERMIT THE DISCLOSURE OF, RELEASE, DISSEMINATE, OR TRANSFER, ANY INFORMATION OBTAINED HEREUNDER OR OTHERWISE RELATED TO THE AGREEMENT TO ANY OTHER PERSON OR ENTITY EXCEPT A PARTY'S IMMEDIATE STAFF, EMPLOYEES, CONSULTANTS, ACCOUNTANTS, ATTORNEYS, OR OTHER PROFESSIONAL RETAINED FOR THE PARTY'S DUE DILIGENCE REVIEW OF THE AGREEMENT AND EXCEPT, WITH PRIOR NOTICE TO COMPANY, PURSUANT TO LEGAL COMPULSION.

## LIMITED PARTNERSHIP AGREEMENT OF
## INNOVATIVE PARTNERS, LP

This Limited Partnership Agreement of Innovative Partners, LP (the "Agreement") is made and entered into effective for all purposes and in all respects as of December 1, 2022 by Jimmie Sutton, as General Partner ("GP") and the Limited Partner who is a signatory hereto, as well as other Limited Partners which may be added from time to time pursuant to the provisions of the Texas Limited Partnership Act (Title 4, Chapter 153), this Agreement, and by subsequent agreements.

Now, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following terms and conditions.

## ARTICLE I.
## DEFINITIONS

**Section 1.01:         Terms.**
When used in this Agreement, the following terms shall have the following meanings unless the context requires otherwise.

   a. "Agreement" means this Limited Partnership Agreement.

   b. "Certificate" means the Certificate of Limited Partnership described in Section 2.

   c. "Code" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent U.S. revenue laws.

d. "General Partner" or "GP" means any person or entity from time to time admitted to the Partnership as an additional or substituted General Partner in accordance with this Agreement, and such persons' permitted successors and assigns.

e. "Joinder Agreement" means an agreement in form and substance satisfactory to the General Partner, entered into between the Partnership and each new Limited Partner and providing for the joining of the Partnership and the possible return or revocation, as the case may be, of Limited Partnership Interests.

f. "Active Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

g. "Inactive Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and does not meet the definition of an "Active Limited Partner".

h. "Limited Partners" means individuals that are either Active Limited Partners or Inactive Limited Partners, as defined herein.

i. "Partners" means the General Partner(s) and all Limited Partners.

j. "Partnership" means Innovative Partners, LP.

k. "Partnership Interest" means each Partner's right to participate in the Partnership, either as a Limited Partner (a "Limited Partnership Interest") or as a General Partner (a "General Partnership Interest"), as the case may be.

l. "Limited Partnership Act" means the Texas Business Organizations Code, including, but not limited to, Title 4, Chapter 153.

m. "Successor General Partner" has the meaning specified in Section 10.01.

n. "Tax Matters Partner" means the Partner so designated pursuant to Section 9.

o. "Working Owner" means the General Partner or any Active Limited Partner.

**Section 1.02:     Usage.**

All references to Article or Section numbers, unless otherwise indicated, refer to articles or sections of this Agreement. Headings are used for convenience only and do not form a part of this Agreement. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, and to the singular or plural, as the identity of the person, persons, entity, or entities to whom or which they refer may require.

## ARTICLE II.
## FORMATION OF LIMITED PARTNERSHIP

**Section 2.01:     Formation.**

The Partners hereby form a limited partnership pursuant to the provisions of the Limited

Partnership Act. The rights and liabilities of the Partners shall be as provided under the Limited Partnership Act, except as otherwise expressly provided in this Agreement. The General Partner shall execute and, as it deems appropriate, cause to be filed, recorded, and published a Certificate of Limited Partnership (the "Certificate") and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the Limited Partnership Act.

**Section 2.02:** **Name.**

The limited partnership formed hereby shall operate under the name of Innovative Partners, LP ("Partnership").

**Section 2.03:** **Initial Registered Agent, Registered Address, and Principal Place of Business**

The initial registered agent shall be Patrick Dooley. The initial registered address shall be c/o CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, and the initial principal place of business shall be 130 W. Ovation Drive, Pot St. Joe, FL 32456. The business of the Partnership may also be conducted at such other or additional place or places as may be designated by the General Partner. The registered address and principal place of business may be changed from time to time at the discretion of the General Partner.

**Section 2.04:** **Term.**

The Partnership shall begin business on the date on which the Certificate of Limited Partnership is filed with the Secretary of State of the State of Texas and shall continue in perpetuity until terminated as provided herein.

## ARTICLE III.
## PURPOSES OF THE PARTNERSHIP

**Section 3.01**

The purposes of the Partnership shall be any legal purposes and shall include, but not be limited to, (i) promoting an understanding and awareness of data usage and security issues; (ii) assisting the Active Limited Partners to secure their personal data and information; (iii) assisting the Active Limited Partners in gathering and collection of data in general; (iv) the capture, segregation,  aggregation, and sell to third-party marketing firms of both electronic and health data generated by Active Limited Partners and others; (v) assisting the Partners with marketing and monetizing the data and information collected by Active Limited Partners and others to third parties in a secure manner while removing any individual identifying information; (vi) providing the employees and the Active Limited Partners the opportunity to participate in Partnership-sponsored health insurance programs, the cost of which may be reduced by income generated from revenues from marketing Active Limited Partners' data and information; (vii) encouraging scholarship and research in this field; (viii) promoting publications in this field; and (ix) fostering communications among teachers and scholars to enhance the public's understanding of data usage and security.

**Section 3.02**

In order to promote the interest of the Partnership and to help recruit a significant number of Active Limited Partners which may be necessary to fulfill the needs of the Partnership and promote its ultimate success, the Partnership is authorized to provide and sponsor various health benefit plans to its common law employees and Active Limited Partners as the General Partner determines to be in the best interests of the Partnership. Only common law employees and Active

Limited Partners shall be eligible to participate in said plans. Inactive Limited Partners shall not be allowed to participate.

**Section 3.03**

In order to promote the purposes of the Partnership, each Active Limited Partner agrees and understands that he/she will function as a Working Owner by providing a minimum of 500 hours of work activity per year promoting the purposes of the Partnership.

**Section 3.04**

The Partnership shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Agreement.

**Section 3.05**

In carrying out the Partnership's purposes, the Partnership shall be empowered to (i) exercise all powers necessary to or reasonably connected with the Partnership's business that may be legally exercised by limited partnerships under the laws of the State of Texas and (ii) engage in all activities necessary, customary, convenient, or incidental to any of the foregoing. The Partnership may engage or work with other entities from time to time as co-owners to promote and pursue the Partnership's purpose.

**Article IV.**
**ACCOUNTING FOR THE PARTNERSHIP**

**Section 4.01:        Annual Statements.**

The General Partner shall cause annual financial statements of the operations of the Partnership to be prepared and made available upon reasonable request to each Limited Partner. Such financial statements need not be audited unless the General Partner determines that audited financial statements are necessary, or unless audited financial statements are required by creditors of the Partnership.

**Section 4.02:        Access to Accounting Records**.

Any Limited Partner shall have reasonable access to the accounting records of the Partnership during regular business hours of the Partnership.

**Section 4.03:        Income Tax Information**.

The General Partner shall make available to each Limited Partner information on the Partnership's taxable status and any business taxable income or loss and each item of income, gain, loss, deduction, or credit that is relevant to reporting Partnership income and how each Limited Partner is impacted by such income. This information shall be available to each Limited Partner within one hundred eighty (180) days after the close of the Partnership's taxable year, and, upon request to the General Partner, a copy of the Partnership's federal return of income for such year shall also be furnished.

**Section 4.04:        Bank Accounts**.

The funds of the Partnership shall be deposited in such separate federally insured bank account or accounts as may be required, and the General Partner shall arrange for the appropriate conduct of such account or accounts.

**Section 4.05:        Books of Account**.

There shall be kept at the principal office of the Partnership true and correct books of account in which shall be entered fully and accurately each and every transaction of the Partnership. The books shall be kept on the cash receipts and disbursements method for the

Partnership's accounting year.

**Section 4.06          Accounting Year.**

The Partnership accounting year shall be the accounting year of the Partnership for both book and (as applicable) tax purposes, beginning January 1st and ending December 31st of each year.

**Article V.**
**ACQUISITION OF PARTNERSHIP INTEREST AND CAPITAL CONTRIBUTIONS**

**Section 5.01:          Acquisition of Partnership Interest; Capital Contributions; Potential Future Revenue Potential.**

Each Inactive Limited Partner shall make a capital contribution in an amount determined by the General Partner in exchange for his/her interest in the Partnership. Active Limited Partners shall not make a capital contribution, other than his/her work effort as described herein, in exchange for his/her interest in the Partnership. The General Partner shall not have any personal liability for the repayment of any Limited Partner's capital contribution.

Notwithstanding the foregoing, it is intended that the Active Limited Partners will be given the opportunity to participate in one or more programs sponsored by the Partnership to market their personal data and information, for which the Partnership will receive compensation. Therefore, is hoped that the Partnership will receive income from such activities, which the Partnership intends to utilize to (i) pay its operational expenses, (ii) pay any outstanding debts, (iii) provide periodic dividends to the Active Limited Partners, (iv) reduce or eliminate the costs to the Partnership's employees of any sponsored health benefit plans, (v) reduce the costs to the Active Limited Partners of any sponsored health benefit plans,  and/or (vi) for other purposes that benefit the Limited Partners. *All Limited Partners understand that periodic dividends may be reported to the IRS.*

**Section 5.02:          Loans.**

If the Partnership requires additional capital, the General Partner is authorized to cause the Partnership to borrow money upon such terms as the General Partner, in its sole discretion, shall determine and to mortgage, pledge, or hypothecate the assets of the Partnership in connection with such borrowing. In that event, the General Partner may, but shall not be required to, lend funds to the Partnership.

**Article VI.**
**PROFITS AND LOSSES**

**Section 6.01:          Determination.**

The net profits or net losses of the Partnership shall be determined in accordance with the method of accounting adopted by the Partnership.

**Section 6.02:          Allocation of Profits and Losses.**

The net profits of the Partnership shall be allocated eighty percent (80%) to the Limited Partners (in accordance with the formula set forth in Section 15.01) and twenty percent (20%) to the General Partner.  Upon any dissolution or winding up of the Partnership, after payment of all debts and obligations, the net assets of the Partnership shall be allocated on the same basis

as netprofits of the Partnership are allocated as provided in this Section 6.02.

## Article VII.
## PARTNERSHIP RECORDS

**Section 7.01**

    The General Partner shall cause the Partnership to maintain at its offices (i) a current listof the full name and last known business address of each Partner, (ii) a copy of the Certificate, (iii) copies of tax filings and financial statements for the previous four years, and (iv) copies of any then effective limited partnership agreements related to the Partnership.

## Article VIII.
## PARTICIPATION IN ALLIANCES AND CONTRIBUTION OF PARTNER INFORMATION

**Section 8.01:**      **Participation in Strategic Alliances.**

    In connection with the purposes and activities described in Article III, and subject to the discretion of the General Partner, the Partnership may enter into one or more agreements, associations, or other arrangements with other organizations involved in the collection, maintenance, marketing, and use of data to help establish guidelines for certain business operations, share costs, and negotiate equitable revenue from said business operations. The General Partner is authorizedto negotiate, execute and deliver a charter and such other documents and instruments as it may deem (in its sole discretion) reasonable or appropriate to enter into and/or consummate such associations.

**Section 8.02:**      **Contribution of Partner Data.**

    All Active Limited Partners acknowledge that, for so long as he/she remains an Active Limited Partner, each Active Limited Partner has the duty to contribute, and Partnership may collect, certain personal information and data generated from the use of the internet, mobile apps, "Smart" TVs, and other electronic devices, including without limitation information by which the Active Limited Partner may be personally identified, such as a postal address, e-mail address, telephone number, partnership benefits elections, internet usage information, mobile device app usage information, geo-location information or any other identifier by which such Active Limited Partner may becontacted ("Partner Data").

**Section 8.03:**      **Ownership and Use of Partner Data.**

    All such Partner Data, in its aggregated form, shall be the property of the Partnership and may be used at the sole discretion of the General Partner in connection with or in support of the Partnership's business and administrative purposes. Partner Data may also be used by the Partnership to contact Active Limited Partners about goods and services that may be of interest to Active Limited Partners, provided that the Partnership provides a means by which Active Limited Partners may opt out of such use. The Partnership may disclose aggregated Partner Information and information that may, or may not, identify any individual, without restriction. The Partnership may disclose Partner Information that it collects from Active Limited Partners (or that an Active Limited Partner otherwise provides to the Partnership) to the Partnership's subsidiaries and affiliates, to contractors, service providers, and other third parties the Partnership uses to support its business, and to third parties to market their products

or services to Active Limited Partners who have not opted out of such disclosures. The Partnership may also disclose Partner Information to comply with any court order, law, or legal process, including to respond to any government or regulatory request, and to enforce its rights under any applicable agreement or applicable law, including for billing and collection purposes.

**Section 8.04:        Data Security.**

The Partnership shall use commercially reasonable legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the Partner Data and to protect the Partner Data from unauthorized access, disclosure, duplication, use, modification, or loss. The Partnership shall attempt to obtain data protection insurance or similar insurance to the extent such insurance is available and the premiums are commercially reasonable.

**Section 8.05:        Objection to Use by Active Limited Partner.**

All of the foregoing and other uses of Partner Data are at the discretion of the General Partner. In the event an Active Limited Partner objects to any use of such Active Limited Partner's Partner Data, such Active Limited Partner must notify the Partnership of its objection and opt out of such use. In that case, such Active Limited Partner shall be deemed to have exercised its right to return its Active Limited Partnership Interest to the Partnership. Upon return of its Active Limited Partner Interest, the General Partner will provide a withdrawing Active Limited Partner with information and instruction necessary to terminate and/or remove any software provided by the Partnership which captures and transmits Partner Data. All Partner Data provided to the Partnership prior to the withdrawal of an Active Limited Partner as well as all Partner Data transmitted to the Partnership after withdrawal and before termination and/or removal of any data capturing software shall remain the property of the Partnership to be used in accordance with the terms and conditions of this Agreement.

## Article IX.

### ADMINISTRATIVE PROVISIONS

**Section 9.01:        Management by the General Partner.**

All of the business of the Partnership, including, but not limited to, decisions on all tax elections and the voting of any shares of stock owned by the Partnership, shall be under the exclusive management of the General Partner. The Limited Partner(s) shall not participate in the management or operation of the business of the Partnership.

**Section 9.02:        Tax Matters Partner.**

The General Partner shall serve as the "Tax Matters Partner" for the Partnership. The Tax Matters Partner shall perform, and hereby agrees to perform, certain duties and obligations imposed upon a "Tax Matters Partner", as defined in § 6231(a)(7) of the Code, in connection with the audit or review of a Partnership federal return of income, as such duties and obligations are set forth in § 6221 of the Code and following sections. For all years for which the Bipartisan Budget Act of 2015 applies, the Tax Matters Partner shall also be the "Partnership Representative" of the Company under section 6223(a) of the Code (as enacted by the Bipartisan Budget Act of 2015). The Tax Matters Partner shall be reimbursed by the

Partnership for expenses incurred in the performance of such duties, including legal and accounting fees incurred in connection with such duties as Tax Matters Partner.

The General Partner shall have the right at any time to resign as Tax Matters Partner, by giving notice of such resignation in writing to all Partners. In the event it resigns, ceases to be a General Partner of the Partnership, or is unable or unwilling to serve as Tax Matters Partner for any reason, a new Tax Matters Partner will be appointed by a unanimous vote of the Partners.

**Section 9.03:** **Time Devoted by the General Partner.**

The parties understand that the General Partner has other business activities which over the year take a major part of the respective total time devoted to business matters. Accordingly, the General Partner is required to devote to the business of the Partnership only the time and attention as they, in their sole discretion, shall determine what is required to conduct the business of the Partnership.

**Section 9.04:** **Limitation on Liability of General Partners, Indemnification.**

To the fullest extent permitted by the Limited Partnership Act, the General Partner shall have no liability, responsibility, or accountability, in damages or otherwise, to any other Partner or the Partnership, and the Partnership agrees to indemnify, pay, protect, and hold harmless the General Partner (on the demand of and to the satisfaction of such General Partner) from and against, any and all liabilities, obligations, losses, damage, penalties, actions, judgments, suits, proceedings, costs, expenses, and disbursements, of any kind or nature whatsoever (including, without limitation, all costs and expenses of defense, appeal, and settlement of any and all suits, actions, or proceedings, instituted against any such General Partner or the Partnership and all costs of investigation in connection therewith) ("Losses ") which may be imposed on, incurred by, or asserted against any such General Partner or the Partnership in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Partnership or on the part of any such General Partner as General Partner of the Partnership; provided that the General Partner shall be liable, responsible, and accountable, and the Partnership shall not be liable to the General Partner, for any portion of such Losses resulting from the General Partner's gross negligence or a willful breach of General Paliner's fiduciary duty to the Partnership or any Partner.

If any action, suit, or proceeding shall be pending or threatened against the Partnership or the General Partner relating to or arising out of, or alleged to relate to or arise out of, any such action or non-action, the General Partner shall have the right to employ, at the expense of the Partnership, separate counsel of the General Partner's choice in such action, suit or proceeding. The satisfaction of the obligations of the Partnership under this Section shall be from and limited to the assets of the Partnership and no Partner shall have any personal liability on account thereof. The General Partner shall have the right to bill the Partnership for, or otherwise request the Partnership to pay, at any time and from time to time after the General Partner has become obligated to make payment therefor, any and all amounts for which the General Partner believes, in good faith, that such General Partner is entitled to indemnification under this Section. The Partnership shall promptly pay any and all such bills and honor any and all such requests for payment when such bill or request is received by such General Partner. In the event that a final determination is made that the Partnership is not so obligated in respect of any amount paid by it to the General Partner, such General Partner shall promptly refund such amount to the Partnership.

The Partnership shall indemnify, to the extent of Partnership assets, the Limited

Partners against any claims of liability asserted against the Limited Partners solely because they are Limited Partners of the Partnership.

**Section 9.05:        Fees of General Partner.**

The Partnership shall pay reasonable fees to the General Partner for services rendered to the Partnership, as determined by the General Partner; provided, that such fees shall not exceed the fair market value of the applicable services, and any agreements providing for such fees shall be negotiated at arm's length.

**Section 9.06:        Limited Liability of Limited Partners.**

A Limited Partner shall not be liable for the debts, liabilities, contracts, or any other obligations of the Partnership. Except as otherwise provided in this Agreement, a Limited Partner shall not take part in, or interfere in any manner with, the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.

**Section 9.07:        Additional Authority of General Partner.**

The General Partner and Limited Partner(s), by signing and executing this Agreement, hereby authorize GP as General Partner, to take, permit, and/or omit any action or actions, and to do or have done any action or actions, which are, or may be, consistent with or authorized by the provisions of this Agreement, and irrevocably make, constitute and appoint GP as General Partner, as true and lawful agent and attorney-in-fact with full power of substitution and with power and authority in each Limited Partner's name, place, and stead to make, sign, execute, acknowledge, swear to, deliver, perform, implement, file, and record any and all agreements, limited partnership agreements, deeds of trust, promissory notes, financing and continuation statements, certificates, options, leases and other conveyances and other documents or instruments, including, but not limited to, the amended certificate and every amended or restated certificate which GP as General Partner, considers to be required, necessary, desirable, or convenient (i) for, to, or in connection with the acquisition and ownership by the Partnership of interests in property, and (ii) for, to, or in the management of conduct of the business of the Partnership.

The power of attorney granted by each Limited Partner is a special power of attorney which (1) is irrevocable, (2) is coupled with an interest, (3) shall survive the death of the Limited Partner, (4) shall not be affected by the subsequent disability or incompetence of the Limited Partner, (5) shall survive the dissolution or termination of a Limited Partner which is a corporation, general or limited partnership, joint venture, trust, estate, or other entity or association, and (6) shall survive the sale, exchange, or other transfer by a Limited Partner of all or any portion of the Limited Partner's interest, where the assignee has been approved by GP as General Partner, for admission to the Partnership as a limited partner, and shall survive such admission and constitute a similar power of attorney from such assignee as a Limited Partner. If there is more than one Limited Partner, the power of attorney may be exercised by GP, as General Partner, for all the Limited Partners by a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all the Limited Partners together, or by listing all of the Limited Partners and executing any instrument with a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all of the Limited Partners together.

Each Limited Partner expressly agrees to be bound by the representations made by GP as General Partner, acting pursuant to this Section 9.07, and hereby waives any and all defenses which shall be available to such Limited Partner to contest, negate, or disaffirm the actions of

Page **14** of **21**

GP as General Partner pursuant to this Section 9.07.

Notwithstanding anything contained herein above or below to the contrary, any General Partner may act alone for and on behalf of the Partnership without the necessity of signatures, including but not limited to the exercise of the power of attorney granted to the General Partner under Section 9.07 of this Agreement.

**Section 9.08:        Voting Procedures.**

On all matters requiring a vote of the Partners under this Agreement, the General Partner shall provide written notice to all Partners of (i) the material substance of such vote, (ii) the General Partner's voting recommendation and reasons for such recommendation; (iii) the date by which votes must be received by the Partnership in order to be counted; and (iv) instructions on how each Partner shall cast their votes. Such notice may be delivered by email or other electronic means to all Limited Partners. Votes may be cast by Partners by email or other electronic means as specified in the notice. Where a vote is required of the Partners under this Agreement and does not require a unanimous vote, a simple majority of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Where a unanimous vote is required of the Partners under this Agreement, the unanimous consent of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Any Partner who fails to cast a vote on or before the voting deadline set forth in the notice shall be deemed to have abstained from the vote and such Partner's Partnership Units shall not be included in the determination of a simple majority or unanimous vote.

## Article X.

## DEATH OR WITHDRAWAL OF A PARTNER

**Section 10.01:        Resignation or Withdrawal of a General Partner.**

The Partnership shall not dissolve upon the following events: (a) incapacity of a General Partner, (b) filing, in any court pursuant to any federal or state statute, of a petition in bankruptcy or insolvency by, for a reorganization by, or for the appointment of a receiver of all or a portion of the petitioner's property by a General Partner, and/or (c) making an assignment for the benefit of creditors by a General Partner. Any General Partner may resign upon thirty (30) days' notice to all of the Partners.

In the event of a vacancy in the position of General Partner, a successor General Partner shall be appointed the General Partner. The General Partner will be authorized to appoint its successor any time prior to its departure as General Partner or within thirty (30) days of its vacating the position of General Partner. If the General Partner fails to appoint a successor, a successor General Partner will be appointed by a vote of the Limited Partners.

**Section 10.02:        Death, Bankruptcy, or Incapacity of a Limited Partner.**

The death, bankruptcy, or incapacity of a Limited Partner shall not dissolve the Partnership.

**Section 10.03:        Amended Certificate of Limited Partnership.**

Upon transfer or conversion of any General Partnership Interest, the Partnership shall file for record an amended Certificate and each Partner hereby agrees to execute such instrument, if requested.

**Section 10.04:     Revocation of Limited Partnership Interest.**

Pursuant to a Limited Partner's Joinder Agreement, a Limited Partner's Partnership Interest may be revoked by the Partnership as noted in such Agreements as determined solely by the General Partner. Such action will immediately terminate any Partnership Interest in the Partnership held by such Limited Partner.

## Article XI.

## TRANSFER OF A PARTNERSHIP INTEREST

**Section 11.01:     Prohibited Transfer of a Partnership Interest.**

Except as provided in this Article XI, no Partner may transfer or dispose of any Partnership Interest by sale, assignment, gift, or otherwise without the written consent of the General Partner. Any sale, assignment, gift, or transfer, or the purported sale, assignment, gift, or transfer, of any Partnership Interest, except as specifically provided for and allowed in this Article XI, shall be null and void. This Article does not apply to revocations pursuant to Article X.

**Section 11.02:     Transfer of a Partnership Interest by Sale.**

Transfers of a Partnership Interest by sale are not permitted except with the prior written consent of the General Partner.

**Section 11.03:     Transfer of a Partnership Interest by Gift at the Death of a Partner.**

Any gift of a Partnership Interest or any transfer of Partnership Interest after the death of a Partner may be made only on the following conditions:

a.  The estate of the deceased Partner or the Partner making a gift of a Partnership Interest (the "Donor") must grant a one (1) year period during which the General Partner may approve or deny the transfer of Partnership Interest; or

b.  Any gift or transfer, or purported gift or transfer, of any Partnership Interest after the death of a Partner, except as otherwise provided in this Article XI, shall be null and void unless made strictly in accordance with the provisions of this Article XI.

**Section 11.04:     Substituted Limited Partner.**

No transferee of the whole or any portion of a Limited Partner's interest in the Partnership who is not already a Partner in the Partnership shall have the right to become a substituted Limited Partner in place of the assignor unless:

a.  the assignor shall designate such intention in the instrument of assignment;

b.   the written consent of the General Partner to such substitution shall be obtained;

c.   the instrument of assignment shall be in a form and substance satisfactory to the General Partner;

d.   the assignor and assignee named therein shall execute and acknowledge such other instrument or instruments as the General Partner may deem necessary or desirable to effectuate such admission;

e.   the assignee shall accept, adopt, and approve in writing all of the terms and conditions of this Agreement as the same may have been amended; and

f.   such assignee shall pay or, at the election of the General Partner, obligate him or herself to pay all reasonable expenses connected with such admission, including but not limited to the cost of preparing, filing, and publishing any amendment of the Certificate to effectuate such admission.

**Section 11.05:      Further Restrictions on Transfers**

In the case of the transfer of any Partnership Interest in any voluntary or involuntary manner whatsoever (other than as provided in Section 11.01, Section 11.02, and Section 11.03) under judicial order, legal process, execution, attachment, enforcement of a pledge, trust, or encumbrance or sale under any of them, the person to whom the Partnership Interest passes shall offer to give such Partnership Interest in the same manner as provided in Section 11.03 and shall be treated as a "deceased Partner." This section does not apply to revocations as noted in Article X.

No Partner shall make any transfer or assignment of all or any part of his or her interest in this Partnership if said transfer or assignment would, when considered with all other transfers during the same applicable twelve (12) month period, cause a termination of this Partnership for federal or state income tax purposes, create noncompliance of the Partnership with the Limited Partnership Act.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**Section 11.07:      Security Interest.**

No Partnership Interest herein shall be subjected to a security interest by any Partner without the written consent of the General Partner.

**Section 11.08:      Transfer of a General Partner's Interest.**

In the event that a General Partnership Interest is to be transferred pursuant to the provisions of this Article XI, then said General Partnership Interest shall be converted into a

Limited Partnership Interest immediately prior to the closing of said transaction or the making of said transfer and the transferee or recipient shall receive only a Limited Partnership Interest. The Partnership shall file for record an amended Certificate as required by law, which shall specify the portion of the General Partnership Interest converted into a Limited Partnership Interest and the date the conversion occurred. Like other Partnership Interests, a General Partnership Interest may not be sold.

**Section 11.09:      Transfer/Granting of Limited Partnership Interest by General Partner to New Limited Partners.**

Notwithstanding anything contained herein above or below to the contrary, General Partner shall not be restricted in the granting of any Limited Partnership Interests to third parties desiring to join the Partnership so long as such new Limited Partners agree to the terms and conditions of this Agreement and a Joinder Agreement, and execute such other documents as deemed appropriate by the General Partner. The Partners anticipate a large volume of Limited Partners joining this Partnership and encourage the General Partner to give Limited Partnership Interests to any prospective Limited Partner in the best judgment of the General Partner subject to the terms of this section. Partners understand and agree that their interest's authority in Partnership may be diluted by the addition of new Limited Partners, but that they welcome new Limited Partners and desire for this Partnership to add as many Limited Partners as possible subject to the terms of this section.

## Article XII.

### DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

**Section 12.01:      Right to Dissolve the Partnership.**

No single Partner shall have the right to cause dissolution of the Partnership. However, one hundred percent (100%) of the Partnership Interests shall have the right to cause a dissolution. Notwithstanding anything to the contrary in this Section 12.01, the General Partner has the right to cause a dissolution of the Partnership if (i) the Partnership purposes are deemed illegal or (ii) if the General Partner determines that the Partnership has failed to become economically feasible or has become economically infeasible to operate as intended.

**Section 12.02:      Winding Up the Partnership.**

In the event of a dissolution, or the death, incapacity, withdrawal, or bankruptcy of the General Partner without determining a successor General Partner, or the mutual consent of all of the Partners, the Partnership shall immediately commence to wind up its affairs. The proceeds from liquidation of Partnership assets shall be applied in the following order.

   a. Payment to creditors of the Partnership, other than Partners, in the order of priority provided by law;

   b. Payment to Partners for loans, if any, made by them to the Partnership;

   c. The balance, if any, shall be distributed among all the Partners as provided in Section 6.02 herein above.

**Section 12.03:**          **Waiver of Right to Decree of Dissolution.**

The parties hereby agree that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership. Accordingly, each party hereby waives and renounces any rights to a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership.

## Article XIII.

### TITLE TO PARTNERSHIP PROPERTY

**Section 13.01**

Legal title to Partnership property shall be held in the name of the Partnership.   Subject to the provisions of Article IX, and the other provisions hereof, as well as their fiduciary obligations to the Limited Partners, the General Partner shall have the right, power, and authority (without regard to the term of the Partnership), acting for and on behalf of the Partnership, to enter into and execute any lease, contract, agreement, deed, mortgage, or other instrument or document required or otherwise appropriate to lease,sell, mortgage, convey, or refinance Partnership property (or any part thereof), to borrow money and execute promissory notes, to secure the same by mortgage (which term "mortgage" is hereby defined forall purposes of this Agreement to include deeds of trust, financing statements, chattel mortgages, pledges, conditional sales contracts, and similar security agreements) upon Partnership property, to renew or extend any and all such loans or notes, and to convey Partnership property in fee simple by deed, mortgage, or otherwise. In no event shall any party dealing with such General Partner with respect to any Partnership property, or to whom Partnership property (or any part thereof) shall be conveyed, contracted to be sold, leased, mortgaged, or refinanced (which term "refinanced" is hereby defined for all purposes of this Agreement to include recast, modified, extended, or increased) by such General Partner, be obligated to see to the application of any purchase money, rent, or money borrowed or advanced thereon, or be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire intothe necessity or expediency of any act or action of such General Partner, and every contract, agreement,deed, mortgage, lease, promissory note, or other instrument or document executed by such General Partner, with respect to any Partnership property, shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (a) at the time or times of the execution and/or delivery thereof, the Partnership was in full force and effect, (b) such instrument or document was duly executed and authorized and is binding upon the Partnership and all of the Partners thereof, and (c) such General Partner executing and delivering the same were duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership. It is expressly understood and agreed that the manner of holding title to Partnership property (or any part thereof) and any Partnership assets are solely for the convenience of the Partnership. Accordingly, the spouse, heirs, executors or administrators, beneficiaries, successors, or assigns, of any Partner shall have no right, title or interest inor to any Partnership property or Partnership assets regardless of the manner in which title is held; rather,Partnership property and any Partnership assets shall be subject to the terms of this Agreement.

## Article XIV.

## AMENDMENTS

**Section 14.01**

The General Partner shall have the right to amend the Certificate of Limited Partnership or this Agreement without the consent of any Limited Partners for the following purposes: (i) to change the name or address of a Limited Partner; or (ii) to change the name of the registered office or registered agent of the Partnership; or (iii) in the opinion of the General Partner, there is an inconsistent, ambiguous, false or erroneous provision in this Agreement provided the amendment does not adversely affect the rights of the Partners under this Agreement; (iv) in the opinion of counsel for the Partnership, it is necessary or appropriate to satisfy a requirement of the Code with respect to partnerships, a requirement of Limited Partnership Act, or of any federal or state laws or regulations, provided such amendments do not adversely affect the interests of the Partners. Any amendment to the Certificate of Limited Partnership or this Agreement not otherwise expressly addressed in this Section 14.01 shall require the approval of the Partners pursuant to a vote conducted in accordance with Section 9.08.

## Article XV.

## OWNERSHIP UNITS

**Section 15.01**

Each Partnership Interest may be designated in units or fractional part thereof ("Partnership Units") with each unit representing a percentage interest in the voting rights of the Partnership. The General Partner is hereby granted twenty percent (20.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all General Partnership Interests. The Limited Partners, in the aggregate, are hereby granted eighty percent (80.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all Limited Partnership Interests. With respect to each Limited Partner, the Partnership Units shall equal a percentage equal that Limited Partner's pro rata share in relation to the total aggregate number of Limited Partners. But in no case, shall the total number of Limited Partner units exceed eighty percent (80.00%) of the total number of Partnership Units. Each Partnership Interest represents a Partner's entire interest in the Partnership, including such Partner's right to vote on, consent to, or otherwise participate in any decision or action of or by the Partnership granted pursuant to this Agreement or, subject to applicable provisions of this Agreement, the Limited Partnership Act. Each Partnership Interest shall carry with it the right to vote (as specifically limited herein) as provided in this Agreement.

## Article XVI

## JURISDICTION AND VENUE

**Section 16.01.**

This Agreement is governed by and is to be construed in accordance with the laws

of the State of Texas, irrespective of its choice-of-law rules. To the extent any judicial action is required in, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the undersigned Partners Innovative Partners, LP have sworn hereto and hereunto affixed their signatures as of the date and year first above written.

**GENERAL PARTNER**                          **Innovative Partners, LP**
                                             Its: Manager
*Jimmie Sutton*                              *Jimmie Sutton*
Jimmie Sutton                                Jimmie Sutton

**LIMITED PARTNER**:
*Tiffany Bredeson*
Tiffany Bredeson, Limited Partner

# Meschwitz Cronenbold

# Attachment J



**YOU SHOULD CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS BEFORE USING THE INNOVATIVE SERVICES. BY CREATING AN ACCOUNT AND USING THE SERVICES, YOU ARE CONSENTING TO BE BOUND BY AND ARE BECOMING A PARTY TO THIS AGREEMENT. IF YOU DO NOT AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, DO NOT LOG ON OR USE THE INNOVATIVE APPLICATION.**

By continuing to use the Services, You agree as follows:

- Any information that We collect through Your use of the Services is subject to the Innovative Privacy Policy, which is part of these Terms of Use;

- You are at least 18 years old or have been legally emancipated;

- You understand and intend that this Agreement is a legally binding agreement and the equivalent of a signed, written contract;

- If You create a profile for a third party for whom you are not the parent or legal guardian, You represent and warrant that you have permission from such person to input and share their Personal Data within the App and with other third parties.

- You will use the Services in a manner consistent with applicable laws and regulations and these Terms of Use, as they may be amended by Innovative from time to time; and

- You understand, accept, and have received these Terms, and acknowledge and demonstrate that You can access these Terms at will HERE.

IF YOU DO NOT AGREE WITH AND ACCEPT THESE TERMS, **DO NOT LOG INTO THE APP AND IMMEDIATELY DELETE ALL FILES**, IF ANY, ASSOCIATED WITH THE ACCOMPANYING SERVICES AND MATERIALS FORM YOUR COMPUTER OR MOBILE DEVICE.

ARBITRATION NOTICE: EXCEPT IF YOU OPT-OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN THE ARBITRATION SECTION BELOW, YOU AGREE THAT DISPUTES BETWEEN YOU AND INNOVATIVE WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION. BY CONTINUING TO USE THE APPLICATION, AND UNLESS YOU OPT-OUT, YOU WAIVE YOUR RIGHT TO PARTICIPATE

IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. YOU CAN OPT-OUT OF THE ARBITRATION AGREEMENT BY CONTACTING SUPPORT@INNOVATIVEPARTNERSLP.COM WITHIN 30 DAYS OF ACCEPTING THESE TERMS.

# TERMS OF USE
VERSION VALID AS OF March 1, 2023

Thank You for choosing Innovative to help You manage You and/or someone else's health! Please note, **these Terms of Use (the "Terms") constitute a binding agreement between You ("You" or "Your") and Innovative Partners, LP ("Innovative", "We", "Us", "Our")**. These Terms govern Your use of the Innovative website, located at https://www.innovativepartnerslp.com (the "Website"), and/or the Innovative application (the "Application" or "App") and the services available through the Website and App (collectively, the "Services"). By using or continuing to use the Services, You indicate that You have read, understand, and agree to these Terms and the Innovative Privacy Policy. All capitalized terms not defined in these Terms are defined in the Privacy Policy.

IF YOU DO NOT UNDERSTAND THIS AGREEMENT OR DO NOT AGREE TO BE BOUND BY THESE TERMS, YOU MAY NOT USE THE SERVICES.

# WHAT IS INNOVATIVE?
Section 1

The Innovative Services allow You to track and manage Your and/or someone else's health by creating individual, personal health profiles where You can upload and store health data, forms, and prescriptions, coordinate with caregivers, family members, and treatment providers, and set reminders for appointments and medications. You may access and use the Services only in accordance with these Terms, and You agree to comply with all applicable laws, rules, and regulations, including any other policies incorporated into these Terms, such as the Innovative Privacy Policy.

### We are NOT a medical record
We do not share the information you share with us with your healthcare provider and your healthcare provider does not share information with us. **The information you share with us should not be used to make medical decisions or shared with a healthcare provider for treatment purposes.**

### We do NOT provide medical advice
Innovative provides the Services only to help You track and manage the information You share with us. THE SERVICES DO NOT CONTAIN OR CONSTITUTE, AND SHOULD NOT BE INTERPRETED AS, MEDICAL ADVICE OR OPINION. Innovative is not a medical professional service, and Innovative does not provide medical services or render medical advice. If You require medical advice or services, You should consult a medical professional.

We may provide You with links to third parties that may provide You with medical advice (See Privacy Policy for details), but Your use of those third parties is not governed by these Terms or the Innovative Privacy Policy. Such links are provided for informational purposes and only and do not constitute an endorsement of the third parties we link to. Innovative does not evaluate

or warrant the accuracy or quality of third-party services provided to You, and You are responsible for confirming the qualifications of any third-party service provider You use.

If at any time You are concerned about Your care or treatment, or You believe that You or someone else has a serious or life-threatening condition, **call 9-1-1 immediately** in areas where that service is available, or go to the nearest open clinic or emergency room.

## WHO IS ELIGIBLE TO USE THE SERVICES?
### Section 2

By registering for an account and using the Services, **You represent and warrant**:

1. That You are at least 18 years old and are otherwise legally qualified to enter into and form contracts under applicable law;

2. Your registration data is true, accurate, current, and complete;

3. You will update Your registration data as needed to maintain its accuracy;

4. You are authorized to create an account (either for Yourself or another person);

5. **By using the Services, You represent and warrant that You have legal authority to share Your health data and other Personal Information (as that term is defined in the Privacy Policy) with Innovative. In addition, if You create a profile for a third party for whom you are not the parent or legal guardian, You represent and warrant that you have permission from such person to input and share their Personal Data within the App and with other third parties.  Our use of the information You provide to Innovative via the Services is subject to the Privacy Policy in effect at the time we use it**; and

6. You are not located in a country that is subject to a U.S. Government embargo or that is designated by the U.S. Government as a "terrorist supporting' country, and You are not listed on any U.S. Government list of prohibited or restricted parties.

NOTE: THIS AGREEMENT IS VOID WHERE PROHIBITED BY LAW. DO NOT USE THE SERVICES WHERE PROHIBITED BY LAW. YOU UNDERSTAND THAT YOUR USE OF THE SERVICES MAY INVOLVE OR REQUIRE THE TRANSMISSION OF SIGNIFICANT AMOUNTS OF DATA. YOU ARE RESPONSIBLE FOR ALL DATA CHARGES THAT MAY BE CHARGED BY YOUR WIRELESS CARRIER OR INTERNET SERVICE PROVIDER OR THAT MAY OTHERWISE ARISE FROM YOUR USE OF THE SERVICES.

## HOW WILL INNOVATIVE TELL ME IF THEY CHANGE THESE TERMS?
### Section 3

With the exception of the Arbitration Agreement included at the end of these Terms, Innovative reserves the right to change or modify these Terms at any time without prior notice to You. If we materially change or modify these Terms, we will let You know by (1) posting a new version to the Services; and/or (2) posting a change notice on our Website and/or Application.

If You continue to use the Services after we have let You know that we have made changes, You agree to be bound by the modified Terms. If You do not accept the changes, You should immediately stop using the Services and delete all files associated with the Services on Your computer and/or mobile device.

## WHO OWNS THE INNOVATIVE SERVICES?
### Section 4

Innovative owns the Services and all materials You access through the App or Website. Subject to Your compliance with these Terms, Innovative grants You a non-exclusive, non-sublicensable, revocable, non-transferable license to use the Services through the Website or by downloading and installing the Application. THE SERVICES ARE FOR YOUR PERSONAL AND NON-COMMERCIAL USE ONLY. You may not use the Services for any other purpose than what is allowed under these Terms without Innovative's express written permission.

You may not use Innovative's name, trademarks, service marks, or logos, or those of third parties appearing on the Services in any advertising or publicity or to otherwise indicate Innovative's or such third party's sponsorship or affiliation with any product or service without express written permission from Innovative or such third party.

You own Your Personal Data and any other content You post on or through the Services. If you are entering someone else's information into the Services, you represent and warrant that you have permission to do so. For us to provide You with the Services, You grant to Innovative a perpetual, non-exclusive, fully paid and royalty-free, transferable, sublicensable, worldwide license to use Your content for the purpose of providing the Services, subject to the restrictions in the Privacy Policy. You also agree to allow Innovative to de-identify and anonymize Your content, including without limitation, Your personal health information in accordance with this Privacy Policy, and to use or disclose such de-identified information for any purpose.

## WHAT AM I NOT ALLOWED TO DO WITH THE SERVICES?
### Section 5

Innovative imposes certain restrictions on Your use of the Services. While using the Website, App, or Services, You shall not:

1. provide false, misleading or inaccurate information to Innovative or any other user;

2. impersonate, or otherwise misrepresent affiliation, connection, or association with, any person or entity;

3. use or attempt to use any engine, software, tool, agent, or other device or mechanism (including without limitation browsers, spiders, robots, avatars, or intelligent agents) to harvest or otherwise collect information from the Website for any use, including without limitation use on third-party websites;

4. access content or data not intended for You, or log onto a server or account that You are not authorized to access;

5. violate any applicable law or regulation;

6. attempt to probe, scan, or test the vulnerability of the Services, the Website, the App, or any associated system or network, or breach security or authentication measures without proper authorization;

7. interfere or attempt to interfere with the use of the Website, the App, or the Services by any other user, host, or network, including, without limitation by means of submitting a virus, overloading, "flooding," "spamming," "mail bombing," or "crashing";

8. forge any TCP/IP packet header or any part of the header information in any e-mail or in any uploading or posting to, or transmission, display, performance, or distribution by means of, the Services;

9. post or transmit any unsolicited advertising, promotional materials, "junk mail", "spam," "chain letters," "pyramid schemes" or any other form of solicitation;

10. avoid, bypass, remove, deactivate, impair, descramble or otherwise circumvent any technological measure implemented by Innovative, You, or any other third party (including another user) to protect the Services;

11. attempt to modify, reverse-engineer, decompile, disassemble or otherwise reduce or attempt to reduce to a human-perceivable form any of the source code used by Innovative in providing the Website or App. Any violation of this section may subject You to civil and/or criminal liability; or

12. encourage or enable any other individual to do any of the above.

Innovative is not obligated to monitor Your use of the Services, but We may do so to ensure Your compliance with these Terms, and to respond to law enforcement or other government agencies if and when we are required to. Innovative reserves the right to suspend or terminate

Your use of the Services without notice to You if You partake in any of the prohibited uses described above.

## WHO PROTECTS MY LOGIN INFORMATION?
### Section 6

You will choose a username and password when you register for the Application. You are responsible for maintaining the confidentiality of Your password. You may not use the account, username, or password of any other user at any time. You agree to notify Innovative immediately of any unauthorized use of Your account, username, and/or password. INNOVATIVE WILL NOT BE LIABLE FOR ANY LOSS THAT YOU INCUR AS A RESULT OF SOMEONE ELSE USING YOUR PASSWORD, EITHER WITH OR WITHOUT YOUR KNOWLEDGE. You may be held liable for any losses incurred by Innovative, its affiliates, officers, directors, employees, consultants, agents, and/or its representatives due to someone else's use of Your account or password, regardless of whether You were aware of such use.

## HOW DOES INNOVATIVE PROTECT MY PRIVACY?
### Section 7

Innovative respects the information You provide to us. Please see our Privacy Policy for an explanation of the information that we collect from You and how we use Your information that is NOT subject to the Health Insurance Portability and Accountability Act ("HIPAA"), which is the primary federal law governing the privacy of health information. By accessing or using the Website, App, or Services, or by downloading or uploading any content from or through the Services, You acknowledge and agree to the provisions of the Privacy Policy and affirm that the Privacy Policy is a part of these terms.

By using the Services and accepting these Terms, You acknowledge that Innovative may share Your Personal Data with other users (if you choose to allow this). We will seek Your consent before sharing your information with third parties according to the terms of the Privacy Policy.

We are not responsible for nor liable to You or any third party for a third party's treatment of Personal Data, including any collection, use, disclosure, storage, loss, theft, or misuse of Personal Data, whether or not such treatment violates applicable law.

## THE APP STORE AND GOOGLE PLAY
### Section 8

If You downloaded the App from the Apple App Store or Google Play (the "App Provider"), by agreeing to these Terms, You acknowledge that You understand and agree to the following:

1.  This Agreement is only between You and Innovative, and not between You and the App Provider, and only Innovative is responsible for the Application;

2.  The App Provider has no obligation to furnish any maintenance or support services with respect to the App;

3.  In the event of any failure of the App to conform to any applicable warranty, (i) You may notify the App Provider and the App Provider will refund Your purchase price for the App to You (if applicable); (ii) to the maximum extent permitted by applicable law, the App Provider will have no other warranty obligation with respect to the App; and (iii) any other claims, losses, liabilities, damages, costs, or expenses attributable to any failure to conform to any warranty will be Our responsibility;

4.  The App Provider is not responsible for addressing any claims You have or any claims of any third party relating to the App or Your possession and use of the App, including without limitation: (i) product liability claims; (ii) any claim that the app fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation;

5.  In the event of any third party claim that the App or Your possession and use of the App infringes that third party's intellectual property rights, the App Provider will not be responsible for the investigation, defense, settlement, or discharge of any such intellectual property infringement claim; and

6.  The App Provider, and its subsidiaries, are third-party beneficiaries of these Terms as they relate to Your license to use the App. This means that, upon Your acceptance of these Terms, the App Provider will have the right (and will be deemed to have accepted the right) to enforce these Terms as related to Your license of the App against You.

**Apple users only**: If You downloaded the App from the App Store, the license granted to You in these Terms is non-transferable and is for use of the App on any Apple products that You own or control.

## WHAT IS INNOVATIVE'S COPYRIGHT POLICY?
### Section 9

By creating, posting, or sharing data, sound, and images on or through the Website or App ("Your User Content"), and subject to the Privacy Policy, You grant Innovative a perpetual, irrevocable, worldwide, non-exclusive, sub-licensable, royalty-free, fully paid up, transferable license to reproduce, distribute, publicly display, publicly perform, create derivative works of, and otherwise use and modify Your User Content for the purposes of providing and enhancing the Website, App, or other Innovative products and services. We may also create anonymized data and images from Your User Content, and such data and images will no longer be Your User