

# Tracy
# Attachment J

# INNOVATIVE PARTNERS, LP
# NEW LIMITED PARTNER JOINDER AGREEMENT

**THIS NEW LIMITED PARTNER JOINDER AGREEMENT** ("Agreement") is made and entered into effective for all purposes and in all respects on the date of execution indicated below by Innovative Partners, LP, a Texas limited partnership ("Innovative") and ROBERT TRACY New Active Limited Partner ("NALP") (collectively, the "parties").

**WHEREAS,** Innovative was formed subject to that certain Limited Partnership Agreement dated December 1, 2022, among Jimmie Sutton, as the General Partner, and the limited partner(s) named therein (the "Partnership Agreement") (capitalized terms used and not otherwise defined herein have the meanings given them in the Partnership Agreement);

**WHEREAS,** Innovative desires to gift an Active Limited Partnership Interest in Innovative to NALP; and

**WHEREAS,** NALP desires to accept a gift of an Active Limited Partnership Interest and become an Active Limited Partner of Innovative subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions contained herein, the parties agree as follows:

## ARTICLE 1
## PURPOSE

The purpose of this Agreement is to establish the terms and conditions upon which Innovative gives and NALP receives an Active Limited Partnership Interest in Innovative, and to confirm that NALP adopts and agrees to all of the terms on the Partnership Agreement which is attached hereto as Exhibit A.

## ARTICLE 2
## ACKNOWLEDGEMENT OF THE NATURE OF ACQUIRING AN ACTIVE
## LIMITED PARTNERSHIP INTEREST

The parties hereby acknowledge that no money has been exchanged for the issuance of the Active Limited Partnership Interest hereunder by Innovative to NALP; however, NALP has agreed to provide a minimum of five hundred (500) hours of work activity on the internet. This acquisition of the Active Limited Partnership Interest is conditioned upon and subject to the terms of both this Agreement and NALP's compliance with the terms of the Partnership Agreement, as may be amended from time to time.

## ARTICLE 3
## ACTIVE LIMITED PARTNERSHIP INTEREST

Subject to the terms and conditions of this Agreement and the Partnership Agreement, herein incorporated by reference and included as Exhibit A to this Agreement, Innovative hereby gives to NALP an Active Limited Partnership Interest which is represented as a portion of a unit of Innovative as described in Article XV of the Partnership Agreement. This Active Limited Partnership Interest entitles NALP to participate as a Limited Partner in Innovative, with voting rights equal to NALP's Active Limited Partnership Interest in Innovative.

## ARTICLE 4
## ADHERENCE TO PARTNERSHIP AGREEMENT

In accepting this Active Limited Partnership Interest, NALP hereby agrees (i) that NALP is a party to and bound by the Partnership Agreement, (ii) to take notice of, accept, and abide by the terms of the Partnership Agreement, and (iii) to execute and deliver such additional agreements, instruments, certificates, and documents as may be necessary, appropriate or convenient to reflect the foregoing matters and the election of Innovative. NALP hereby acknowledges that they have had an opportunity to review all terms of the Partnership Agreement and to receive advice from their independent legal counsel. NALP accepts this gift of an Active Limited Partnership Interest freely and without reservation and fully supports the mission of Innovative, its interest in adding new partners which may dilute NALP's own newly acquired interest/voting rights in Innovative, and all provisions of the Partnership Agreement.

NALP specifically agrees to and understands the provisions of the Partnership Agreement related to NALP's status as a **Working Partner**, whereas NALP will assist in the collection, aggregation, and selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.

## ARTICLE 5
## NOT SECURITIES

NALP acknowledges that, due to the nature of the acquisition of an Active Limited Partnership Interest and the structure of Innovative, NALP's Active Limited Partnership Interest is not a security and is not subject to federal or state securities laws. Furthermore, based on the terms of the Partnership Agreement, NALP acknowledges that no interest in Innovative is a security interest and that all interests in Innovative are not subject to federal or state securities laws.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE LAWS OF ANY STATE. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE

GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## ARTICLE 6
## EFFECTS

In accordance with the Partnership Agreement, Innovative shall amend the roster of Active Limited Partners to include NALP. To the extent the General Partner of Innovative determines that it is in the best interest of Innovative to certify its Partnership Interests, Innovative may provide NALP with a certificate reflecting NALP's Limited Partnership Interest in Innovative.

## ARTICLE 7
## EMPLOYEE BENEFIT PLANS

NALP understands that Limited Partnership has created an employee health benefit plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") which is only available to employees and working owners such as Active Limited Partners. NALP also understands that Limited Partnership may provide other benefits in the future which will be available to Active Limited Partners as may be decided from time to time by the General Partner. NALP also understands that it is in no way obligated to enroll in any Partnership sponsored benefit plan and that if he/she chooses to enroll in any benefit plan, NALP is free to withdraw from said benefit plan at any time without losing his/her status as an Active Limited Partner.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1:    Duty as an Owner.**
NALP understands that he/she is a co-owner of Innovative and thus owes a duty to his/her fellow Limited Partners, the General Partner, and the Partnership in general. NALP understands that in the process of recruiting new Limited Partners is always possible that a prospective Limited Partner may have been contacted by telephone, text message, email, or some other type of electronic means without having first received the consent of the individual contacted. NALP hereby specifically waives any and all claims that he/she may possibly have regarding a state or national Do Not Call List Registry, the Telephone Consumer Protection Act (47 USC § 227), any similar federal or state laws or regulations, and any other type of cause of action regarding how NALP may have been recruited to become a Limited Partner and/or owner of Innovative.

**8.2    Severability.**
Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable for any reason, the validity of the remaining provisions of this Agreement shall not be affected thereby and the unenforceable provision shall be deemed not to be a part of this Agreement.

**8.3:    Entire Agreement; Waiver; Modification.**
This Agreement and the Partnership Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the

subject matter hereof. No provision of this Agreement may be modified or waived except in writing signed by both parties.

**8.4:     Anti-Waiver.**

The failure of any party to enforce any of its rights arising by reason of any breach of covenant or failure of condition on the part of the other party will not constitute a waiver of such breach. No custom or practice arising between the parties in the course of administering the Agreement will be construed to waive any party's right to: (i) insist upon the performance of the other party of any covenant or condition in the Agreement, or (ii) exercise any rights provided to it on the account of any breach of such covenant or failure of such condition.

**8.5:     Captions.**

Captions in this Agreement are inserted for convenience only and do not define, describe or limit the scope or the intent of this Agreement or form a part thereof.

**8.6:     Interpretation.**

The parties acknowledge that each of them and their respective counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the party responsible for drafting the agreement shall not be applied in the interpretation of this Agreement. In entering into this Agreement each of the parties represents that it has relied upon the advice of counsel of its own choosing and that it has read in full and understood the terms of this Agreement and voluntarily accepted the same.

**8.7:     Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one document. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, .GIF, etc.) signature shall be deemed to be an original.

**8.8:     Arbitration.**

Except as otherwise required by law, all disputes arising under or related to this Agreement (including, but not limited to, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel, or laches) shall be resolved by binding arbitration in Dallas County, Texas before JAMS, or its successor, pursuant to the United States Arbitration Act, 9 U.S.C. § 1, by filing a written demand for arbitration with JAMS, with a copy to the other parties. The arbitration will be conducted in accordance with the provisions of JAMS' Comprehensive Arbitration Rules and Procedures (the "JAMS Rules") in effect at the time of filing of the demand for arbitration; provided, that the parties agree that (i) the arbitration shall be conducted by three (3) arbitrators (unless the parties agree to a smaller number) selected in accordance with the JAMS Rules, and (ii) each party shall bear its or his own costs and expenses in any such arbitration and one-half of the arbitrators' fees and expenses. By agreeing to arbitration, the parties hereto do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration.

**8.9:     Governing Law; Venue.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. Although it is the intention of the parties that the arbitration provisions in Section 8.8 of this Agreement be fully enforced, to the extent any judicial action is required in aid of Section 8.8 of this Agreement or otherwise, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such

courts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date written below.

**Innovative Partners, LP**
Its: Manager
*Jimmie Sutton*
Jimmie Sutton
Date: 29 Apr 2024 15:04:00 GMT

**NALP:**
X : *Robert k tracy*

ROBERT TRACY

Date: 29 Apr 2024 15:04:00 GMT
Effective Date:  01 May 2024
IP Address  ███████████
Device Identity: Google Chrome

EXHIBIT A

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

THE CONTENTS OF THIS AGREEMENT ARE CONFIDENTIAL. NEITHER PARTY WILL DISCLOSE, PERMIT THE DISCLOSURE OF, RELEASE, DISSEMINATE, OR TRANSFER, ANY INFORMATION OBTAINED HEREUNDER OR OTHERWISE RELATED TO THE AGREEMENT TO ANY OTHER PERSON OR ENTITY EXCEPT A PARTY'S IMMEDIATE STAFF, EMPLOYEES, CONSULTANTS, ACCOUNTANTS, ATTORNEYS, OR OTHER PROFESSIONAL RETAINED FOR THE PARTY'S DUE DILIGENCE REVIEW OF THE AGREEMENT AND EXCEPT, WITH PRIOR NOTICE TO COMPANY, PURSUANT TO LEGAL COMPULSION.

<div align="center">

**LIMITED PARTNERSHIP AGREEMENT OF
INNOVATIVE PARTNERS, LP**

</div>

This Limited Partnership Agreement of Innovative Partners, LP (the "Agreement") is made and entered into effective for all purposes and in all respects as of December 1, 2022 by Jimmie Sutton, as General Partner ("GP") and the Limited Partner who is a signatory hereto, as well as other Limited Partners which may be added from time to time pursuant to the provisions of the Texas Limited Partnership Act (Title 4, Chapter 153), this Agreement, and by subsequent agreements.

Now, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following terms and conditions.

<div align="center">

**ARTICLE I.
DEFINITIONS**

</div>

**Section 1.01:          Terms.**
When used in this Agreement, the following terms shall have the following meanings unless the context requires otherwise.

    a.  "Agreement" means this Limited Partnership Agreement.

    b.  "Certificate" means the Certificate of Limited Partnership described in Section 2.

    c.  "Code" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent U.S. revenue laws.

d. "General Partner" or "GP" means any person or entity from time to time admitted to the Partnership as an additional or substituted General Partner in accordance with this Agreement, and such persons' permitted successors and assigns.

e. "Joinder Agreement" means an agreement in form and substance satisfactory to the General Partner, entered into between the Partnership and each new Limited Partner and providing for the joining of the Partnership and the possible return or revocation, as the case may be, of Limited Partnership Interests.

f. "Active Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

g. "Inactive Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and does not meet the definition of an "Active Limited Partner".

h. "Limited Partners" means individuals that are either Active Limited Partners or Inactive Limited Partners, as defined herein.

i. "Partners" means the General Partner(s) and all Limited Partners.

j. "Partnership" means Innovative Partners, LP.

k. "Partnership Interest" means each Partner's right to participate in the Partnership, either as a Limited Partner (a "Limited Partnership Interest") or as a General Partner (a "General Partnership Interest"), as the case may be.

l. "Limited Partnership Act" means the Texas Business Organizations Code, including, but not limited to, Title 4, Chapter 153.

m. "Successor General Partner" has the meaning specified in Section 10.01.

n. "Tax Matters Partner" means the Partner so designated pursuant to Section 9.

o. "Working Owner" means the General Partner or any Active Limited Partner.

**Section 1.02:**          **Usage.**

All references to Article or Section numbers, unless otherwise indicated, refer to articles or sections of this Agreement. Headings are used for convenience only and do not form a part of this Agreement. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, and to the singular or plural, as the identity of the person, persons, entity, or entities to whom or which they refer may require.

## ARTICLE II.
## FORMATION OF LIMITED PARTNERSHIP

**Section 2.01:**          **Formation.**

The Partners hereby form a limited partnership pursuant to the provisions of the Limited

Partnership Act. The rights and liabilities of the Partners shall be as provided under the Limited Partnership Act, except as otherwise expressly provided in this Agreement. The General Partner shall execute and, as it deems appropriate, cause to be filed, recorded, and published a Certificate of Limited Partnership (the "Certificate") and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the Limited Partnership Act.

**Section 2.02:          Name.**

The limited partnership formed hereby shall operate under the name of Innovative Partners, LP ("Partnership").

**Section 2.03:          Initial Registered Agent, Registered Address, and Principal Place of Business**

The initial registered agent shall be Patrick Dooley. The initial registered address shall be c/o CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, and the initial principal place of business shall be 130 W. Ovation Drive, Pot St. Joe, FL 32456. The business of the Partnership may also be conducted at such other or additional place or places as may be designated by the General Partner. The registered address and principal place of business may be changed from time to time at the discretion of the General Partner.

**Section 2.04:          Term.**

The Partnership shall begin business on the date on which the Certificate of Limited Partnership is filed with the Secretary of State of the State of Texas and shall continue in perpetuity until terminated as provided herein.

**ARTICLE III.**
**PURPOSES OF THE PARTNERSHIP**

**Section 3.01**

The purposes of the Partnership shall be any legal purposes and shall include, but not be limited to, (i) promoting an understanding and awareness of data usage and security issues; (ii) assisting the Active Limited Partners to secure their personal data and information; (iii) assisting the Active Limited Partners in gathering and collection of data in general; (iv) the capture, segregation, aggregation, and sell to third-party marketing firms of both electronic and health data generated by Active Limited Partners and others; (v) assisting the Partners with marketing and monetizing the data and information collected by Active Limited Partners and others to third parties in a secure manner while removing any individual identifying information; (vi) providing the employees and the Active Limited Partners the opportunity to participate in Partnership-sponsored health insurance programs, the cost of which may be reduced by income generated from revenues from marketing Active Limited Partners' data and information; (vii) encouraging scholarship and research in this field; (viii) promoting publications in this field; and (ix) fostering communications among teachers and scholars to enhance the public's understanding of data usage and security.

**Section 3.02**

In order to promote the interest of the Partnership and to help recruit a significant number of Active Limited Partners which may be necessary to fulfill the needs of the Partnership and promote its ultimate success, the Partnership is authorized to provide and sponsor various health benefit plans to its common law employees and Active Limited Partners as the General Partner determines to be in the best interests of the Partnership. Only common law employees and Active

Limited Partners shall be eligible to participate in said plans. Inactive Limited Partners shall not be allowed to participate.

**Section 3.03**

In order to promote the purposes of the Partnership, each Active Limited Partner agrees and understands that he/she will function as a Working Owner by providing a minimum of 500 hours of work activity per year promoting the purposes of the Partnership.

**Section 3.04**

The Partnership shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Agreement.

**Section 3.05**

In carrying out the Partnership's purposes, the Partnership shall be empowered to (i) exercise all powers necessary to or reasonably connected with the Partnership's business that may be legally exercised by limited partnerships under the laws of the State of Texas and (ii) engage in all activities necessary, customary, convenient, or incidental to any of the foregoing. The Partnership may engage or work with other entities from time to time as co-owners to promote and pursue the Partnership's purpose.

## Article IV.
## ACCOUNTING FOR THE PARTNERSHIP

**Section 4.01:** **Annual Statements.**

The General Partner shall cause annual financial statements of the operations of the Partnership to be prepared and made available upon reasonable request to each Limited Partner. Such financial statements need not be audited unless the General Partner determines that audited financial statements are necessary, or unless audited financial statements are required by creditors of the Partnership.

**Section 4.02:** **Access to Accounting Records.**

Any Limited Partner shall have reasonable access to the accounting records of the Partnership during regular business hours of the Partnership.

**Section 4.03:** **Income Tax Information.**

The General Partner shall make available to each Limited Partner information on the Partnership's taxable status and any business taxable income or loss and each item of income, gain, loss, deduction, or credit that is relevant to reporting Partnership income and how each Limited Partner is impacted by such income. This information shall be available to each Limited Partner within one hundred eighty (180) days after the close of the Partnership's taxable year, and, upon request to the General Partner, a copy of the Partnership's federal return of income for such year shall also be furnished.

**Section 4.04:** **Bank Accounts.**

The funds of the Partnership shall be deposited in such separate federally insured bank account or accounts as may be required, and the General Partner shall arrange for the appropriate conduct of such account or accounts.

**Section 4.05:** **Books of Account.**

There shall be kept at the principal office of the Partnership true and correct books of account in which shall be entered fully and accurately each and every transaction of the Partnership. The books shall be kept on the cash receipts and disbursements method for the

Partnership's accounting year.

**Section 4.06          Accounting Year.**

The Partnership accounting year shall be the accounting year of the Partnership for both book and (as applicable) tax purposes, beginning January 1st and ending December 31st of each year.

## Article V.
## ACQUISITION OF PARTNERSHIP INTEREST AND CAPITAL CONTRIBUTIONS

**Section 5.01:          Acquisition of Partnership Interest; Capital Contributions; Potential Future Revenue Potential.**

Each Inactive Limited Partner shall make a capital contribution in an amount determined by the General Partner in exchange for his/her interest in the Partnership. Active Limited Partners shall not make a capital contribution, other than his/her work effort as described herein, in exchange for his/her interest in the Partnership. The General Partner shall not have any personal liability for the repayment of any Limited Partner's capital contribution.

Notwithstanding the foregoing, it is intended that the Active Limited Partners will be given the opportunity to participate in one or more programs sponsored by the Partnership to market their personal data and information, for which the Partnership will receive compensation. Therefore, is hoped that the Partnership will receive income from such activities, which the Partnership intends to utilize to (i) pay its operational expenses, (ii) pay any outstanding debts, (iii) provide periodic dividends to the Active Limited Partners, (iv) reduce or eliminate the costs to the Partnership's employees of any sponsored health benefit plans, (v) reduce the costs to the Active Limited Partners of any sponsored health benefit plans,  and/or (vi) for other purposes that benefit the Limited Partners. *All Limited Partners understand that periodic dividends may be reported to the IRS.*

**Section 5.02:          Loans.**

If the Partnership requires additional capital, the General Partner is authorized to cause the Partnership to borrow money upon such terms as the General Partner, in its sole discretion, shall determine and to mortgage, pledge, or hypothecate the assets of the Partnership in connection with suchborrowing. In that event, the General Partner may, but shall not be required to, lend funds to the Partnership.

## Article VI.
## PROFITS AND LOSSES

**Section 6.01:          Determination.**

The net profits or net losses of the Partnership shall be determined in accordance with the method of accounting adopted by the Partnership.

**Section 6.02:          Allocation of Profits and Losses.**

The net profits of the Partnership shall be allocated eighty percent (80%) to the Limited Partners (in accordance with the formula set forth in Section 15.01) and twenty percent (20%) to the General Partner.  Upon any dissolution or winding up of the Partnership, after payment of all debts and obligations, the net assets of the Partnership shall be allocated on the same basis

as netprofits of the Partnership are allocated as provided in this Section 6.02.

## Article VII.
## PARTNERSHIP RECORDS

**Section 7.01**

The General Partner shall cause the Partnership to maintain at its offices (i) a current listof the full name and last known business address of each Partner, (ii) a copy of the Certificate, (iii) copies of tax filings and financial statements for the previous four years, and (iv) copies of any then effective limited partnership agreements related to the Partnership.

## Article VIII.
## PARTICIPATION IN ALLIANCES AND CONTRIBUTION
## OF PARTNER INFORMATION

**Section 8.01:**          **Participation in Strategic Alliances.**

In connection with the purposes and activities described in Article III, and subject to the discretion of the General Partner, the Partnership may enter into one or more agreements, associations, or other arrangements with other organizations involved in the collection, maintenance, marketing, and use of data to help establish guidelines for certain business operations, share costs, and negotiate equitable revenue from said business operations. The General Partner is authorizedto negotiate, execute and deliver a charter and such other documents and instruments as it may deem (in its sole discretion) reasonable or appropriate to enter into and/or consummate such associations.

**Section 8.02:**          **Contribution of Partner Data.**

All Active Limited Partners acknowledge that, for so long as he/she remains an Active Limited Partner, each Active Limited Partner has the duty to contribute, and Partnership may collect, certain personal information and data generated from the use of the internet, mobile apps, "Smart" TVs, and other electronic devices, including without limitation information by which the Active Limited Partner may be personally identified, such as a postal address, e-mail address, telephone number, partnership benefits elections, internet usage information, mobile device app usage information, geo-location information or any other identifier by which such Active Limited Partner may becontacted ("Partner Data").

**Section 8.03:**          **Ownership and Use of Partner Data.**

All such Partner Data, in its aggregated form, shall be the property of the Partnership and may be used at the sole discretion of the General Partner in connection with or in support of the Partnership's business and administrative purposes. Partner Data may also be used by the Partnership to contact Active Limited Partners about goods and services that may be of interest to Active Limited Partners, provided that the Partnership provides a means by which Active Limited Partners may opt out of such use. The Partnership may disclose aggregated Partner Information and information that may, or may not, identify any individual, without restriction. The Partnership may disclose Partner Information that it collects from Active Limited Partners (or that an Active Limited Partner otherwise provides to the Partnership) to the Partnership's subsidiaries and affiliates. to contractors, service providers, and other third parties the Partnership uses to support its business, and to third parties to market their products

or services to Active Limited Partners who have not opted out of such disclosures. The Partnership may also disclose Partner Information to comply with any court order, law, or legal process, including to respond to any government or regulatory request, and to enforce its rights under any applicable agreement or applicable law, including for billing and collection purposes.

**Section 8.04:        Data Security.**

The Partnership shall use commercially reasonable legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the Partner Data and to protect the Partner Data from unauthorized access, disclosure, duplication, use, modification, or loss. The Partnership shall attempt to obtain data protection insurance or similar insurance to the extent such insurance is available and the premiums are commercially reasonable.

**Section 8.05:        Objection to Use by Active Limited Partner.**

All of the foregoing and other uses of Partner Data are at the discretion of the General Partner. In the event an Active Limited Partner objects to any use of such Active Limited Partner's Partner Data, such Active Limited Partner must notify the Partnership of its objection and opt out of such use. In that case, such Active Limited Partner shall be deemed to have exercised its right to return its Active Limited Partnership Interest to the Partnership. Upon return of its Active Limited Partner Interest, the General Partner will provide a withdrawing Active Limited Partner with information and instruction necessary to terminate and/or remove any software provided by the Partnership which captures and transmits Partner Data. All Partner Data provided to the Partnership prior to the withdrawal of an Active Limited Partner as well as all Partner Data transmitted to the Partnership after withdrawal and before termination and/or removal of any data capturing software shall remain the property of the Partnership to be used in accordance with the terms and conditions of this Agreement.

## Article IX.

## ADMINISTRATIVE PROVISIONS

**Section 9.01:        Management by the General Partner.**

All of the business of the Partnership, including, but not limited to, decisions on all tax elections and the voting of any shares of stock owned by the Partnership, shall be under the exclusive management of the General Partner. The Limited Partner(s) shall not participate in the management or operation of the business of the Partnership.

**Section 9.02:        Tax Matters Partner.**

The General Partner shall serve as the "Tax Matters Partner" for the Partnership. The Tax Matters Partner shall perform, and hereby agrees to perform, certain duties and obligations imposed upon a "Tax Matters Partner", as defined in § 6231(a)(7) of the Code, in connection with the audit or review of a Partnership federal return of income, as such duties and obligations are set forth in § 6221 of the Code and following sections. For all years for which the Bipartisan Budget Act of 2015 applies, the Tax Matters Partner shall also be the "Partnership Representative" of the Company under section 6223(a) of the Code (as enacted by the Bipartisan Budget Act of 2015). The Tax Matters Partner shall be reimbursed by the

Partnership for expenses incurred in the performance of such duties, including legal and accounting fees incurred in connection with such duties as Tax Matters Partner.

The General Partner shall have the right at any time to resign as Tax Matters Partner, by giving notice of such resignation in writing to all Partners. In the event it resigns, ceases to be a General Partner of the Partnership, or is unable or unwilling to serve as Tax Matters Partner for any reason, a new Tax Matters Partner will be appointed by a unanimous vote of the Partners.

**Section 9.03:**      **Time Devoted by the General Partner.**

The parties understand that the General Partner has other business activities which over the year take a major part of the respective total time devoted to business matters. Accordingly, the General Partner is required to devote to the business of the Partnership only the time and attention as they, in their sole discretion, shall determine what is required to conduct the business of the Partnership.

**Section 9.04:**      **Limitation on Liability of General Partners, Indemnification.**

To the fullest extent permitted by the Limited Partnership Act, the General Partner shall have no liability, responsibility, or accountability, in damages or otherwise, to any other Partner or the Partnership, and the Partnership agrees to indemnify, pay, protect, and hold harmless the General Partner (on the demand of and to the satisfaction of such General Partner) from and against, any and all liabilities, obligations, losses, damage, penalties, actions, judgments, suits, proceedings, costs, expenses, and disbursements, of any kind or nature whatsoever (including, without limitation, all costs and expenses of defense, appeal, and settlement of any and all suits, actions, or proceedings, instituted against any such General Partner or the Partnership and all costs of investigation in connection therewith) ("Losses ") which may be imposed on, incurred by, or asserted against any such General Partner or the Partnership in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Partnership or on the part of any such General Partner as General Partner of the Partnership; provided that the General Partner shall be liable, responsible, and accountable, and the Partnership shall not be liable to the General Partner, for any portion of such Losses resulting from the General Partner's gross negligence or a willful breach of General Paliner's fiduciary duty to the Partnership or any Partner.

If any action, suit, or proceeding shall be pending or threatened against the Partnership or the General Partner relating to or arising out of, or alleged to relate to or arise out of, any such action or non-action, the General Partner shall have the right to employ, at the expense of the Partnership, separate counsel of the General Partner's choice in such action, suit or proceeding. The satisfaction of the obligations of the Partnership under this Section shall be from and limited to the assets of the Partnership and no Partner shall have any personal liability on account thereof. The General Partner shall have the right to bill the Partnership for, or otherwise request the Partnership to pay, at any time and from time to time after the General Partner has become obligated to make payment therefor, any and all amounts for which the General Partner believes, in good faith, that such General Partner is entitled to indemnification under this Section. The Partnership shall promptly pay any and all such bills and honor any and all such requests for payment when such bill or request is received by such General Partner. In the event that a final determination is made that the Partnership is not so obligated in respect of any amount paid by it to the General Partner, such General Partner shall promptly refund such amount to the Partnership.

The Partnership shall indemnify, to the extent of Partnership assets, the Limited

Partners against any claims of liability asserted against the Limited Partners solely because they are Limited Partners of the Partnership.

**Section 9.05:          Fees of General Partner.**

The Partnership shall pay reasonable fees to the General Partner for services rendered to the Partnership, as determined by the General Partner; provided, that such fees shall not exceed the fair market value of the applicable services, and any agreements providing for such fees shall be negotiated at arm's length.

**Section 9.06:          Limited Liability of Limited Partners.**

A Limited Partner shall not be liable for the debts, liabilities, contracts, or any other obligations of the Partnership. Except as otherwise provided in this Agreement, a Limited Partner shall not take part in, or interfere in any manner with, the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.

**Section 9.07:          Additional Authority of General Partner.**

The General Partner and Limited Partner(s), by signing and executing this Agreement, hereby authorize GP as General Partner, to take, permit, and/or omit any action or actions, and to do or have done any action or actions, which are, or may be, consistent with or authorized by the provisions of this Agreement, and irrevocably make, constitute and appoint GP as General Partner, as true and lawful agent and attorney-in-fact with full power of substitution and with power and authority in each Limited Partner's name, place, and stead to make, sign, execute, acknowledge, swear to, deliver, perform, implement, file, and record any and all agreements, limited partnership agreements, deeds of trust, promissory notes, financing and continuation statements, certificates, options, leases and other conveyances and other documents or instruments, including, but not limited to, the amended certificate and every amended or restated certificate which GP as General Partner, considers to be required, necessary, desirable, or convenient (i) for, to, or in connection with the acquisition and ownership by the Partnership of interests in property, and (ii) for, to, or in the management of conduct of the business of the Partnership.

The power of attorney granted by each Limited Partner is a special power of attorney which (1) is irrevocable, (2) is coupled with an interest, (3) shall survive the death of the Limited Partner, (4) shall not be affected by the subsequent disability or incompetence of the Limited Partner, (5) shall survive the dissolution or termination of a Limited Partner which is a corporation, general or limited partnership, joint venture, trust, estate, or other entity or association, and (6) shall survive the sale, exchange, or other transfer by a Limited Partner of all or any portion of the Limited Partner's interest, where the assignee has been approved by GP as General Partner, for admission to the Partnership as a limited partner, and shall survive such admission and constitute a similar power of attorney from such assignee as a Limited Partner. If there is more than one Limited Partner, the power of attorney may be exercised by GP, as General Partner, for all the Limited Partners by a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all the Limited Partners together, or by listing all of the Limited Partners and executing any instrument with a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all of the Limited Partners together.

Each Limited Partner expressly agrees to be bound by the representations made by GP as General Partner, acting pursuant to this Section 9.07, and hereby waives any and all defenses which shall be available to such Limited Partner to contest, negate, or disaffirm the actions of

GP as General Partner pursuant to this Section 9.07.

Notwithstanding anything contained herein above or below to the contrary, any General Partner may act alone for and on behalf of the Partnership without the necessity of signatures, including but not limited to the exercise of the power of attorney granted to the General Partner under Section 9.07 of this Agreement.

**Section 9.08:       Voting Procedures.**

On all matters requiring a vote of the Partners under this Agreement, the General Partner shall provide written notice to all Partners of (i) the material substance of such vote, (ii) the General Partner's voting recommendation and reasons for such recommendation; (iii) the date by which votes must be received by the Partnership in order to be counted; and (iv) instructions on how each Partner shall cast their votes. Such notice may be delivered by email or other electronic means to all Limited Partners. Votes may be cast by Partners by email or other electronic means as specified in the notice. Where a vote is required of the Partners under this Agreement and does not require a unanimous vote, a simple majority of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Where a unanimous vote is required of the Partners under this Agreement, the unanimous consent of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Any Partner who fails to cast a vote on or before the voting deadline set forth in the notice shall be deemed to have abstained from the vote and such Partner's Partnership Units shall not be included in the determination of a simple majority or unanimous vote.

## Article X.

## DEATH OR WITHDRAWAL OF A PARTNER

**Section 10.01:       Resignation or Withdrawal of a General Partner.**
The Partnership shall not dissolve upon the following events: (a) incapacity of a General Partner, (b) filing, in any court pursuant to any federal or state statute, of a petition in bankruptcy or insolvency by, for a reorganization by, or for the appointment of a receiver of all or a portion of the petitioner's property by a General Partner, and/or (c) making an assignment for the benefit of creditors by a General Partner. Any General Partner may resign upon thirty (30) days' notice to all of the Partners.

In the event of a vacancy in the position of General Partner, a successor General Partner shall be appointed the General Partner. The General Partner will be authorized to appoint its successor any time prior to its departure as General Partner or within thirty (30) days of its vacating the position of General Partner. If the General Partner fails to appoint a successor, a successor General Partner will be appointed by a vote of the Limited Partners.

**Section 10.02:       Death, Bankruptcy, or Incapacity of a Limited Partner.**

The death, bankruptcy, or incapacity of a Limited Partner shall not dissolve the Partnership.

**Section 10.03:       Amended Certificate of Limited Partnership.**

Upon transfer or conversion of any General Partnership Interest, the Partnership shall file for record an amended Certificate and each Partner hereby agrees to execute such instrument, if requested.

**Section 10.04:     Revocation of Limited Partnership Interest.**

Pursuant to a Limited Partner's Joinder Agreement, a Limited Partner's Partnership Interest may be revoked by the Partnership as noted in such Agreements as determined solely by the General Partner. Such action will immediately terminate any Partnership Interest in the Partnership held by such Limited Partner.

## Article XI.

## TRANSFER OF A PARTNERSHIP INTEREST

**Section 11.01:     Prohibited Transfer of a Partnership Interest.**

Except as provided in this Article XI, no Partner may transfer or dispose of any Partnership Interest by sale, assignment, gift, or otherwise without the written consent of the General Partner. Any sale, assignment, gift, or transfer, or the purported sale, assignment, gift, or transfer, of any Partnership Interest, except as specifically provided for and allowed in this Article XI, shall be null and void. This Article does not apply to revocations pursuant to Article X.

**Section 11.02:     Transfer of a Partnership Interest by Sale.**

Transfers of a Partnership Interest by sale are not permitted except with the prior written consent of the General Partner.

**Section 11.03:     Transfer of a Partnership Interest by Gift at the Death of a Partner.**

Any gift of a Partnership Interest or any transfer of Partnership Interest after the death of a Partner may be made only on the following conditions:

a. The estate of the deceased Partner or the Partner making a gift of a Partnership Interest (the "Donor") must grant a one (1) year period during which the General Partner may approve or deny the transfer of Partnership Interest; or

b. Any gift or transfer, or purported gift or transfer, of any Partnership Interest after the death of a Partner, except as otherwise provided in this Article XI, shall be null and void unless made strictly in accordance with the provisions of this Article XI.

**Section 11.04:     Substituted Limited Partner.**

No transferee of the whole or any portion of a Limited Partner's interest in the Partnership who is not already a Partner in the Partnership shall have the right to become a substituted Limited Partner in place of the assignor unless:

a. the assignor shall designate such intention in the instrument of assignment;

b.  the written consent of the General Partner to such substitution shall be obtained;

c.  the instrument of assignment shall be in a form and substance satisfactory to the General Partner;

d.  the assignor and assignee named therein shall execute and acknowledge such other instrument or instruments as the General Partner may deem necessary or desirable to effectuate such admission;

e.  the assignee shall accept, adopt, and approve in writing all of the terms and conditions of this Agreement as the same may have been amended; and

f.  such assignee shall pay or, at the election of the General Partner, obligate him or herself to pay all reasonable expenses connected with such admission, including but not limited to the cost of preparing, filing, and publishing any amendment of the Certificate to effectuate such admission.

**Section 11.05:**       **Further Restrictions on Transfers**

In the case of the transfer of any Partnership Interest in any voluntary or involuntary manner whatsoever (other than as provided in Section 11.01, Section 11.02, and Section 11.03) under judicial order, legal process, execution, attachment, enforcement of a pledge, trust, or encumbrance or sale under any of them, the person to whom the Partnership Interest passes shall offer to give such Partnership Interest in the same manner as provided in Section 11.03 and shall be treated as a "deceased Partner." This section does not apply to revocations as noted in Article X.

No Partner shall make any transfer or assignment of all or any part of his or her interest in this Partnership if said transfer or assignment would, when considered with all other transfers during the same applicable twelve (12) month period, cause a termination of this Partnership for federal or state income tax purposes, create noncompliance of the Partnership with the Limited Partnership Act.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**Section 11.07:**       **Security Interest.**

No Partnership Interest herein shall be subjected to a security interest by any Partner without the written consent of the General Partner.

**Section 11.08:**       **Transfer of a General Partner's Interest.**

In the event that a General Partnership Interest is to be transferred pursuant to the provisions of this Article XI, then said General Partnership Interest shall be converted into a

Limited Partnership Interest immediately prior to the closing of said transaction or the making of said transfer and the transferee or recipient shall receive only a Limited Partnership Interest. The Partnership shall file for record an amended Certificate as required by law, which shall specify the portion of the General Partnership Interest converted into a Limited Partnership Interest and the date the conversion occurred. Like other Partnership Interests, a General Partnership Interest may not be sold.

**Section 11.09:**      **Transfer/Granting of Limited Partnership Interest by General Partner to New Limited Partners.**

Notwithstanding anything contained herein above or below to the contrary, General Partner shall not be restricted in the granting of any Limited Partnership Interests to third parties desiring to join the Partnership so long as such new Limited Partners agree to the terms and conditions of this Agreement and a Joinder Agreement, and execute such other documents as deemed appropriate by the General Partner. The Partners anticipate a large volume of Limited Partners joining this Partnership and encourage the General Partner to give Limited Partnership Interests to any prospective Limited Partner in the best judgment of the General Partner subject to the terms of this section. Partners understand and agree that their interest's authority in Partnership may be diluted by the addition of new Limited Partners, but that they welcome new Limited Partners and desire for this Partnership to add as many Limited Partners as possible subject to the terms of this section.

## Article XII.

## DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

**Section 12.01:**      **Right to Dissolve the Partnership.**

No single Partner shall have the right to cause dissolution of the Partnership. However, one hundred percent (100%) of the Partnership Interests shall have the right to cause a dissolution. Notwithstanding anything to the contrary in this Section 12.01, the General Partner has the right to cause a dissolution of the Partnership if (i) the Partnership purposes are deemed illegal or (ii) if the General Partner determines that the Partnership has failed to become economically feasible or has become economically infeasible to operate as intended.

**Section 12.02:**      **Winding Up the Partnership.**

In the event of a dissolution, or the death, incapacity, withdrawal, or bankruptcy of the General Partner without determining a successor General Partner, or the mutual consent of all of the Partners, the Partnership shall immediately commence to wind up its affairs. The proceeds from liquidation of Partnership assets shall be applied in the following order.

a.  Payment to creditors of the Partnership, other than Partners, in the order of priority provided by law;

b.  Payment to Partners for loans, if any, made by them to the Partnership;

c.  The balance, if any, shall be distributed among all the Partners as provided in Section 6.02 herein above.

**Section 12.03:**          **Waiver of Right to Decree of Dissolution.**

The parties hereby agree that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership. Accordingly, each party hereby waives and renounces any rights to a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership.

## Article XIII.

## TITLE TO PARTNERSHIP PROPERTY

### Section 13.01

Legal title to Partnership property shall be held in the name of the Partnership.  Subject to the provisions of Article IX, and the other provisions hereof, as well as their fiduciary obligations to the Limited Partners, the General Partner shall have the right, power, and authority (without regard to the term of the Partnership), acting for and on behalf of the Partnership, to enter into and execute any lease, contract, agreement, deed, mortgage, or other instrument or document required or otherwise appropriate to lease, sell, mortgage, convey, or refinance Partnership property (or any part thereof), to borrow money and execute promissory notes, to secure the same by mortgage (which term "mortgage" is hereby defined for all purposes of this Agreement to include deeds of trust, financing statements, chattel mortgages, pledges, conditional sales contracts, and similar security agreements) upon Partnership property, to renew or extend any and all such loans or notes, and to convey Partnership property in fee simple by deed, mortgage, or otherwise. In no event shall any party dealing with such General Partner with respect to any Partnership property, or to whom Partnership property (or any part thereof) shall be conveyed, contracted to be sold, leased, mortgaged, or refinanced (which term "refinanced" is hereby defined for all purposes of this Agreement to include recast, modified, extended, or increased) by such General Partner, be obligated to see to the application of any purchase money, rent, or money borrowed or advanced thereon, or be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such General Partner, and every contract, agreement, deed, mortgage, lease, promissory note, or other instrument or document executed by such General Partner, with respect to any Partnership property, shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (a) at the time or times of the execution and/or delivery thereof, the Partnership was in full force and effect, (b) such instrument or document was duly executed and authorized and is binding upon the Partnership and all of the Partners thereof, and (c) such General Partner executing and delivering the same were duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership. It is expressly understood and agreed that the manner of holding title to Partnership property (or any part thereof) and any Partnership assets are solely for the convenience of the Partnership. Accordingly, the spouse, heirs, executors or administrators, beneficiaries, successors, or assigns, of any Partner shall have no right, title or interest in or to any Partnership property or Partnership assets regardless of the manner in which title is held; rather, Partnership property and any Partnership assets shall be subject to the terms of this Agreement.

## Article XIV.

## AMENDMENTS

**Section 14.01**

The General Partner shall have the right to amend the Certificate of Limited Partnership or this Agreement without the consent of any Limited Partners for the following purposes: (i) to change the name or address of a Limited Partner; or (ii) to change the name of the registered office or registered agent of the Partnership; or (iii) in the opinion of the General Partner, there is an inconsistent, ambiguous, false or erroneous provision in this Agreement provided the amendment does not adversely affect the rights of the Partners under this Agreement; (iv) in the opinion of counsel for the Partnership, it is necessary or appropriate to satisfy a requirement of the Code with respect to partnerships, a requirement of Limited Partnership Act, or of any federal or state laws or regulations, provided such amendments do not adversely affect the interests of the Partners. Any amendment to the Certificate of Limited Partnership or this Agreement not otherwise expressly addressed in this Section 14.01 shall require the approval of the Partners pursuant to a vote conducted in accordance with Section 9.08.

## Article XV.

## OWNERSHIP UNITS

**Section 15.01**

Each Partnership Interest may be designated in units or fractional part thereof ("Partnership Units") with each unit representing a percentage interest in the voting rights of the Partnership. The General Partner is hereby granted twenty percent (20.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all General Partnership Interests. The Limited Partners, in the aggregate, are hereby granted eighty percent (80.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all Limited Partnership Interests. With respect to each Limited Partner, the Partnership Units shall equal a percentage equal that Limited Partner's pro rata share in relation to the total aggregate number of Limited Partners. But in no case, shall the total number of Limited Partner units exceed eighty percent (80.00%) of the total number of Partnership Units. Each Partnership Interest represents a Partner's entire interest in the Partnership, including such Partner's right to vote on, consent to, or otherwise participate in any decision or action of or by the Partnership granted pursuant to this Agreement or, subject to applicable provisions of this Agreement, the Limited Partnership Act. Each Partnership Interest shall carry with it the right to vote (as specifically limited herein) as provided in this Agreement.

## Article XVI

## JURISDICTION AND VENUE

**Section 16.01.**

This Agreement is governed by and is to be construed in accordance with the laws

of the State of Texas, irrespective of its choice-of-law rules. To the extent any judicial action is required in, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

   IN WITNESS WHEREOF, the undersigned Partners Innovative Partners, LP have sworn hereto and hereunto affixed their signatures as of the date and year first above written.

**GENERAL PARTNER**

*Jimmie Sutton*
Jimmie Sutton

**Innovative Partners, LP**
Its: Manager
*Jimmie Sutton*
Jimmie Sutton

**LIMITED PARTNER**:
*Tiffany Bredeson*
Tiffany Bredeson, Limited Partner

# Tracy
# Attachment K

# Innovative Partners, LP Health Benefit Plan Wrap Document

In order to better serve its employees and Active Limited Partners (collectively "Plan Participants"), Innovative Partners, LP has chosen to offer various different levels of participation in the Health Benefit Plan ("Plan") to our plan participants. These different levels of participation may often be referred to as a "Program" or a "Policy". In order to best address the individual needs of our Plan Participants, our Plan offers eight (1) different levels of limited medical benefit participation. Our most basic and affordable participation levels are the *Elite* Programs/Policies, which are offered at three (3) different levels.   We also offer seven (7) different *Optimum* Programs/Policies which are available at benefit levels one (1) through seven (7).

Any of our Elite or Optimum Programs/Policies can be supplemented by our *Guardian* Accidental Death and Dismemberment ("AD&D") Program/Policy, our *Essential* Critical Illness ("CI") Program/Policy, and/or our *Dental* Program/Policy. The AD&D and the CI Programs/Policies can only be purchased in conjunction with either an Elite or Optimum Program/Policy. Realizing that some of our employees and or Active Limited Partners may have other forms of health insurance that meet their needs and may not want to participate in one of the limited medical benefit Programs/Policies, our employees and active Limited partners may enroll in the Dental Program as a standalone Program/Policy without participating in any of the limited medical benefit Programs/Policies.

Regardless of your level of participation, all of these Programs/Policies collectively constitute the self-funded Innovative Partners, LP Health Benefit Plan. You have been given a Summary Plan Description ("SPD") for each particular Program/Policy that you enrolled in. This WRAP Plan Document merely supplements the SPD(s) that you were given. It in no way reduces or limits any rights that are contained in any SPD.

The rights discussed in this Document apply equally to all of the health benefit plan Programs/Policies that are sponsored by Innovative Partners, LP.

## I.     DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. All of the definitions in the SPD that you received are hereby incorporated by reference into this Document. You should read and understand these definitions as well as the definitions in the SPD.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**COBRA** means the Consolidated Omnibus Budget Reconciliation Act, as amended.

**Company** means the Plan Sponsor.

**Co-pay** means the charge stated as a set dollar amount, that the Plan Participant is required to pay for certain covered health services. If the Plan has co-pay benefits, please note that the Plan Participant is responsible for paying the lesser of the applicable Co-pay or the covered amount.

**FMLA** means the Family and Medical Leave Act of 1993, as amended.

**GINA** means the Genetic Information Nondiscrimination Act, as amended.

**HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as amended.

**PHI** means Protected Health Information.

**Plan Termination** means the date the Plan Participant is terminated from the Plan.

**Plan Year** means the 12-month period beginning January 1 and ending December 31.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

## II.    GENETIC INFORMATION NONDISCRIMINATION ACT "GINA"

GINA prohibits group health plans, issuers of individual health care policies, and Employers from discriminating based on genetic information. The term "Genetic Information" means, with respect to any individual, information about:

1.    Such individual's genetic tests;
2.    The genetic tests of family members of such individual; and
3.    The manifestation of a Disease or disorder in family members of such individual.

The term "Genetic Information" includes participating in clinical research involving genetic services. Genetic tests would include analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detect genotypes, mutations, or chromosomal changes. Genetic information is a form of Protected Health Information (PHI) as defined by and in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and is subject to applicable Privacy and Security Standards.

Family members as it relates to GINA include Dependents, plus all relatives to the fourth degree, without regard to whether they are related by blood, marriage, or adoption. Underwriting as it relates to GINA includes any rules for determining eligibility, computing premiums, or contributions. Offering reduced premiums or other rewards for providing genetic information would be impermissible underwriting.

GINA will not prohibit a healthcare provider who is treating an individual from requesting that the patient undergo genetic testing. The rules permit the Plan to obtain genetic test results and use them to make claims payment determinations when it is necessary to do so to determine

whether the treatment provided to the patient was medically advisable and/or necessary.

The Plan may request, but not require, genetic testing in certain very limited circumstances involving research, so long as the results are not used for underwriting, and then only with written notice to the individual that participation is voluntary and will not affect eligibility for benefits, premiums, or contributions. In addition, the Plan will notify and describe its activity to the Health and Human Services secretary of its activities falling within this exception.

While the Plan may collect genetic information after initial enrollment, it may not do so in connection with any annual renewal process where the collection of information affects subsequent enrollment. The Plan will not adjust premiums or increase group contributions based on genetic information, request or require genetic testing or collect genetic information either prior to or in connection with enrollment or for underwriting purposes.

## III.   CLAIMS PAYMENT

The procedures outlined below must be followed by Participants to obtain payment of health benefits under this Plan.

All claims and questions regarding health claims should be directed to the Third-Party Administrator. The Plan Administrator shall be ultimately and finally responsible for adjudicating such claims and for providing a full and fair review of the decision on such claims in accordance with the following provisions and with ERISA. Benefits under the Plan will be paid only if the Plan Administrator decides at its discretion that the Participant is entitled to them. The responsibility to process claims in accordance with the Plan Document may be delegated to the Third-Party Administrator; provided, however, that the Third-Party Administrator is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion.

Each Participant claiming benefits under the Plan shall be responsible for supplying, at such times and in such manner as the Plan Administrator in its sole discretion may require, written proof that the expenses were incurred or that the benefit is covered under the Plan. If the Plan Administrator in its sole discretion shall determine that the Participant has not Incurred a Covered Expense or that the benefit is not covered under the Plan, or if the Participant shall fail to furnish such proof as is requested, no benefits shall be payable under the Plan.

A call from a Provider who wants to know if an individual is covered under the Plan, or if a certain procedure is covered by the Plan, prior to providing treatment is not a "claim," since an actual claim for benefits is not being filed with the Plan. These are simply requests for information, and any response is not a guarantee of benefits, since payment of benefits is subject to all Plan provisions, limitations, and exclusions. Once treatment is rendered, a Clean Claim must be filed with the Plan (which will be a "Post service Claim"). At that time, a determination will be made as to what benefits are payable under the Plan.

A Participant has the right to request a review of an Adverse Benefit Determination. If the claim is denied at the end of the appeal process, as described below, the Plan's final decision is

Page **3** of **38**

known as a Final Adverse Benefit Determination. If the Participant receives notice of a Final Adverse Benefit Determination, or if the Plan does not follow the claims procedures properly, the Participant then has the right to request an independent external review. The external review procedures are described below.

The claims procedures are intended to provide a full and fair review. This means, among other things, that claims and appeals will be decided in a manner designed to ensure the independence and impartiality of the persons involved in making these decisions.

Benefits will be payable to the Participant, or to a Provider that has accepted an Assignment of Benefits as consideration in full for services rendered.

According to Federal regulations that apply to the Plan, there are four types of claims: Pre-service (Urgent and Non-urgent), Concurrent Care, and Post service. However, as noted below, because of this Plan's design, there are no Pre-service Urgent Care Claims which may be filed with the Plan.

**A.     When Claims Must Be Filed:**

Claims must be filed with the Third-Party Administrator within 180 days of the date charges for the service were Incurred. Benefits are based upon the Plan's provisions at the time the charges were incurred. Claims filed later than that date shall be denied.

Upon receipt of the required information, the claim will be deemed to be filed with the Plan. The Third-Party Administrator will determine if enough information has been submitted to enable proper consideration of the claim. If not, more information may be requested as provided herein. This additional information must be received by the Third-Party Administrator within 45 days from receipt by the Participant of the request for additional information. Failure to do so may result in claims being declined or reduced.

**B.     Timing of Claim Decisions:**

The Plan Administrator shall notify the Participant, in accordance with the provisions set forth below, of any Adverse Benefit Determination (and, in the case of pre-service claims and concurrent claims, of decisions that a claim is payable in full) within the following timeframes:

1.      If the Participant has provided all of the information needed to process the claim, in a reasonable period of time, but not later than thirty (30) days after receipt of the claim, unless an extension has been requested, then prior to the end of the 15-day extension period.

2.      If the Participant has not provided all of the information needed to process the claim and additional information is requested during the initial processing period, then the Participant will be notified of a determination of benefits prior to the end of the extension period unless additional information is requested during the extension period, then the Participant will be notified of the determination by a date agreed to

Page **4** of **38**

by the Plan Administrator and the Participant. This period may be extended by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Participant, prior to the expiration of the initial 30-day processing period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

3. The period of time within which a benefit determination is required to be made shall begin at the time a claim is deemed to be filed in accordance with the procedures of the Plan.

**C.    Notification of an Adverse Benefit Determination:**

The Plan Administrator shall provide a Participant with a notice, either in writing or electronically (or, in the case of pre-service urgent care claims, by telephone, facsimile, or similar method, with written or electronic notice following within 3 days), containing the following information:

1. Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2. A reference to the specific portion(s) of the Plan Document upon which a denial is based;

3. Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim;

4. A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5. A description of the Plan's review procedures and the time limits applicable to the procedures, including a statement of the Participant's right to bring a civil action under Section 502(a) of ERISA following an Adverse Benefit Determination on final review;

6. A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

7. The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

8.   Any rule, guideline, protocol, or similar criterion that was relied upon in making the determination (or a statement that it was relied upon and that a copy will be provided to the Participant, free of charge, upon request);

9.   In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances or a statement that such explanation will be provided to the Participant, free of charge, upon request; and

10.   In a claim involving urgent care, a description of the Plan's expedited review process.

## IV.   APPEALS PROCEDURE

### A.   Full and Fair Review of All Claims:

In cases where a claim for benefits is denied, in whole or in part, and the Participant believes the claim has been denied wrongly, the Participant may appeal the denial and review pertinent documents. The claims procedures of this Plan provide a Participant with a reasonable opportunity for a full and fair review of a claim and Adverse Benefit Determination. More specifically, the Plan provides:

1.   Participants at least 180 days following receipt of notification of an initial Adverse Benefit Determination within which to appeal the determination;

2.   Participants have the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

3.   Participants have the opportunity to review the Claim file and to present evidence and testimony as part of the internal claims and appeals process;

4.   For a review that does not afford deference to the previous Adverse Benefit Determination and that is conducted by an appropriately named fiduciary of the Plan, who shall be neither the individual who made the Adverse Benefit Determination that is the subject of the appeal nor the subordinate of such individual;

5.   For a review that takes into account all comments, documents, records, and other information submitted by the Participant relating to the claim, without regard to whether such information was submitted or considered in the prior benefit determination;

6.   That, in deciding an appeal of any Adverse Benefit Determination that is based in

whole or in part upon a medical judgment, the Plan fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual;

7. For the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with a claim, even if the Plan did not rely upon their advice;

8. That a Participant will be provided, free of charge: (a) reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim in possession of the Plan Administrator or Third Party Administrator; (b) information regarding any voluntary appeals procedures offered by the Plan; (c) information regarding the Participant's right to an external review process; (d) any internal rule, guideline, protocol or other similar criterion relied upon, considered or generated in making the adverse determination; and (e) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances; and

9. That a Participant will be provided, free of charge, and sufficiently in advance of the date that the notice of Final Internal Adverse Benefit Determination is required, with new or additional evidence considered, relied upon, or generated by the Plan in connection with the Claim, as well as any new or additional rationale for denial at the internal appeals stage, and a reasonable opportunity for the Participant to respond to such new evidence or rationale.

**B.      Requirements for Appeal:**

The Participant must file the appeal in writing (although oral appeals are permitted for pre-service urgent care claims) within 180 days following receipt of the notice of an Adverse Benefit Determination. For pre-service urgent care claims, if the Participant chooses to orally appeal, the Participant may telephone the number shown below. To file an appeal in writing, the Participant's appeal must be addressed as follows and mailed or emailed as follows:

<div align="center">

Innovative Partners, LP
2234 North Federal Hwy., #2862
Boca Raton, FL 33431
PartnerServices@InnovativePartnersLP.com

</div>

It shall be the responsibility of the Participant to submit proof that the claim for benefits is covered and payable under the provisions of the Plan.  Any appeal must include:

1. The name of the Participant;

2. The Participant's social security number;

<div align="center">

Page **7** of **38**

</div>

3.     The group name or identification number;

4.     All facts and theories supporting the claim for benefits. Failure to include any theories or facts in the appeal will result in their being deemed waived. In other words, the Participant will lose the right to raise factual arguments and theories which support this claim if the Participant fails to include them in the appeal;

5.     A statement in clear and concise terms of the reason or reasons for disagreement with the handling of the claim; *and*

6.     Any material or information that the Participant has which indicates that the Participant is entitled to benefits under the Plan.

If the Participant provides all of the required information, it may be that the expenses will be eligible for payment under the Plan.

**C.    Timing of Notification of Benefit Determination on Review:**

The Plan Administrator shall notify the Participant of the Plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the appeal.

**D.    Calculating Time Periods:**

The period of time within which the Plan's determination is required to be made shall begin at the time an appeal is filed in accordance with the procedures of this Plan, without regard to whether all information necessary to make the determination accompanies the filing.

**E.    Manner and Content of Notification of Adverse Benefit Determination on Review:**

The Plan Administrator shall provide a Participant with notification, with respect to pre-service urgent care claims, by telephone, facsimile, or similar method, and with respect to all other types of claims, in writing or electronically, of a Plan's Adverse Benefit Determination on review, setting forth:

1.     Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2.     A reference to the specific portion(s) of the plan provisions upon which a denial is based;

3.     Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim, and a discussion of the decision;

4.     A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5.     A description of available internal appeals and external review processes, including information regarding how to initiate an appeal;

6.     A description of the Plan's review procedures and the time limits applicable to the procedures. This description will include information on how to initiate the appeal and a statement of the Participant's right to bring a civil action under section 502(a) of ERISA following an Adverse Benefit Determination on final review;

7.     A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

8.     The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

9.     Any rule, guideline, protocol, or similar criterion that was relied upon, considered, or generated in making the determination will be provided free of charge. If this is not practical, a statement will be included that such a rule, guideline, protocol, or similar criterion was relied upon in making the determination and a copy will be provided to the Participant, free of charge, upon request;

10.    In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances, will be provided. If this is not practical, a statement will be included that such explanation will be provided to the Participant, free of charge, upon request; *and*

11.    The following statement: "You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

**E.     Furnishing Documents in the Event of an Adverse Determination:**

In the case of an Adverse Benefit Determination on review, the Plan Administrator shall provide such access to, and copies of, documents, records, and other information described in the section relating to "Manner and Content of Notification of Adverse Benefit Determination on Review" as appropriate.

**F.     Decision on Review:**

If, for any reason, the Participant does not receive a written response to the appeal within the appropriate time period set forth above, the Participant may assume that the appeal has been denied. The decision by the Plan Administrator or other appropriate named fiduciary of the Plan on review will be final, binding and conclusive and will be afforded the maximum deference permitted by law. All claim review procedures provided for in the Plan must be exhausted before any legal action is brought.

**G.      External Review Process:**

The Federal External Review Process does not apply to a denial, reduction, termination, or failure to provide payment for a benefit based on a determination that a participant or beneficiary fails to meet the requirements for eligibility under the terms of a group health plan.

The Federal External Review Process applies only to:

1.      An Adverse Benefit Determination (including a Final Internal Adverse Benefit Determination) by a plan or issuer that involves medical judgment (including, but not limited to, those based on the plan's or issuer's requirements for Medical Necessity, appropriateness, health care setting, level of care, or effectiveness of a covered benefit; or its determination that a treatment is Experimental or Investigational), as determined by the external reviewer; *and*

2.      A rescission of coverage (whether or not the rescission has any effect on any particular benefit at that time).

**H.      Request for External Review:**

The Plan will allow a Claimant to file a request for an external review with the Plan if the request is filed within 4 months after the date of receipt of a notice of an Adverse Benefit Determination or Final Internal Adverse Benefit Determination. If there is no corresponding date four months after the date of receipt of such a notice, then the request must be filed by the first day of the fifth month following the receipt of the notice. For example, if the date of receipt of the notice is October 30, because there is no February 30, the request must be filed by March 1. If the last filing date would fall on a Saturday, Sunday, or Federal holiday, the last filing date is extended to the next day that is not a Saturday, Sunday, or Federal holiday.

1.      *Preliminary Review.* Within 5 business days following the date of receipt of the external review request, the Plan will complete a preliminary review of the request to determine whether:

- The Claimant is or was covered under the Plan at the time the health care item or service was requested or, in the case of a retrospective review, was covered under the Plan at the time the health care item or service was provided;

- The Adverse Benefit Determination or the Final Adverse Benefit Determination does not relate to the Claimant's failure to meet the

requirements for eligibility under the terms of the Plan (e.g., worker classification or similar determination);

- The Claimant has exhausted the Plan's internal appeal process unless the Claimant is not required to exhaust the internal appeals process under the interim final regulations; and

- The Claimant has provided all the information and forms required to process an external review. Within 1 business day after completion of the preliminary review, the Plan will issue a notification in writing to the Claimant. If the request is complete but not eligible for external review, such notification will include the reasons for its ineligibility and contact information for the Employee Benefits Security Administration (toll-free number 866-444-EBSA (3272)). If the request is not complete, such notification will describe the information or materials needed to make the request complete and the Plan will allow a Claimant to perfect the request for external review with the four-month filing period or within the 48-hour period following the receipt of the notification, whichever is later.

2.  *Referral to Independent Review Organization.* The Plan will assign an Independent. Review Organization (IRO) that is accredited by URAC or by a similar nationally-recognized accrediting organization to conduct the external review. Moreover, the Plan will take action against bias and ensure independence. Accordingly, the Plan will contract with (or direct the Claims Processor to contract with, on its behalf) at least 3 IROs for assignments under the Plan and rotate claims assignments among them (or incorporate other independent unbiased methods for selection of IROs, such as random selection). In addition, the IRO may not be eligible for any financial incentives based on the likelihood that the IRO will support the denial of benefits

3.  *Reversal of Plan's Decision.* Upon receipt of a notice of a final external review decision reversing the Adverse Benefit Determination or Final Internal Adverse Benefit Determination, the Plan will provide coverage or payment for the claim without delay, regardless of whether the plan intends to seek judicial review of the external review decision and unless or until there is a judicial decision otherwise.

**I.      Appointment of Authorized Representative:**

A Participant is permitted to appoint an authorized representative to act on his or her behalf with respect to a benefit claim or appeal of a denial. An Assignment of Benefits by a Participant to a Provider will not constitute the appointment of that Provider as an authorized representative. To appoint such a representative, the Participant must complete a form obtained from the Plan Administrator or the Third-Party Administrator. However, in connection with a claim involving Urgent Care, the Plan will permit a healthcare professional with knowledge of the Participant's medical condition to act as the Participant's authorized representative without the completion of this form. In the event a Participant designates an authorized representative, all future

communications from the Plan will be with the representative, rather than the Participant, unless the Participant directs the Plan Administrator, in writing, to the contrary.

**J.      Physical Examinations:**

The Plan reserves the right to have a Physician of its own choosing examine any Participant whose condition, Sickness or Injury is the basis of a claim. All such examinations shall be at the expense of the Plan. This right may be exercised when and as often as the Plan may reasonably require during the pendency of a claim. The Participant must comply with this requirement as a necessary condition to coverage.

**K.      Autopsy:**

The Plan reserves the right to have an autopsy performed upon any deceased Participant whose condition, Sickness, or Injury is the basis of a claim. This right may be exercised only where not prohibited by law.

**L.      Payment of Benefits:**

All benefits under this Plan are payable, in U.S. Dollars, to the covered Employee whose Sickness or Injury is the basis of a claim. In the event of the death or incapacity of a covered Employee and in the absence of written evidence to this Plan of the qualification of a guardian for his or her estate, this Plan may, in its sole discretion, make any and all such payments to the individual or Institution which, in the opinion of this Plan, is or was providing the care and support of such Employee.

**M.      Assignments:**

Benefits for medical expenses covered under this Plan may be assigned by a Participant to the Provider as consideration in full for services rendered; however, if those benefits are paid directly to the Employee, the Plan shall be deemed to have fulfilled its obligations with respect to such benefits. The Plan will not be responsible for determining whether any such assignment is valid. Payment of benefits that have been assigned will be made directly to the assignee unless a written request not to honor the assignment, signed by the covered Employee and the assignee, has been received before the proof of loss is submitted.

No Participant shall at any time, either during the time in which he or she is a Participant in the Plan, or following his or her termination as a Participant, in any manner, have any right to assign his or her right to sue to recover benefits under the Plan, to enforce rights due under the Plan or to any other causes of action which he or she may have against the Plan or its fiduciaries.

A Provider which accepts an Assignment of Benefits, in accordance with this Plan as consideration in full for services rendered, is bound by the rules and provisions set forth within the terms of this document.

Benefits due to any Network Provider will be considered "assigned" to such Provider and

Page **12** of **38**

will be paid directly to such Provider, whether or not a written Assignment of Benefits was executed. Notwithstanding any assignment or non-Assignment of Benefits to the contrary, upon payment of the benefits due under the Plan, the Plan is deemed to have fulfilled its obligations with respect to such benefits, whether or not payment is made in accordance with any assignment or request.

**O.     Recovery of Payments:**

Occasionally, benefits are paid more than once, are paid based upon improper billing or a misstatement in a proof of loss or enrollment information, are not paid according to the Plan's terms, conditions, limitations or exclusions, or should otherwise not have been paid by the Plan. As such this Plan may pay benefits that are later found to be greater than the Maximum Allowable Charge. In this case, this Plan may recover the amount of the overpayment from the source to which it was paid, primary payers, or from the party on whose behalf the charge(s) were paid. As such, whenever the Plan pays benefits exceeding the amount of benefits payable under the terms of the Plan, the Plan Administrator has the right to recover any such erroneous payment directly from the person or entity who received such payment and/or from other payers and/or the Participant.

A Participant, Provider, another benefit plan, insurer, or any other person or entity who receives a payment exceeding the amount of benefits payable under the terms of the Plan or on whose behalf such payment was made, shall return or refund the amount of such erroneous payment to the Plan within 30 days of discovery or demand. The Plan Administrator shall have no obligation to secure payment for the expense for which the erroneous payment was made or to which it was applied.

The person or entity receiving an erroneous payment may not apply such payment to another expense. The Plan Administrator shall have the sole discretion to choose who will repay the Plan for an erroneous payment and whether such payment shall be reimbursed in a lump sum. When a Participant or other entity does not comply with the provisions of this section, the Plan Administrator shall have the authority, in its sole discretion, to deny payment of any claims for benefits by the Participant and to deny or reduce future benefits payable (including payment of future benefits for other injuries or Illnesses) under the Plan by the amount due as reimbursement to the Plan. The Plan Administrator may also, in its sole discretion, deny or reduce future benefits (including future benefits for other injuries or Illnesses) under any other group benefits plan maintained by the Plan Sponsor. The reductions will equal the amount of the required reimbursement.

Providers and any other person or entity accepting payment from the Plan or to whom a right to benefits has been assigned, in consideration of services rendered, payments and/or rights, agrees to be bound by the terms of this Plan and agree to submit claims for reimbursement in strict accordance with their State's health care practice acts, ICD-9 or CPT standards, Medicare guidelines, HCPCS standards, or other standards approved by the Plan Administrator or insurer. Any payments made on claims for reimbursement not in accordance with the above provisions shall be repaid to the Plan within thirty (30) days of discovery or demand or incur prejudgment interest of 1.5% per month. If the Plan must bring an action against a Participant, Provider or other

person or entity to enforce the provisions of this section, then that Participant, Provider or other person or entity agrees to pay the Plan's attorneys' fees and costs, regardless of the action's outcome.

Further, Participants, beneficiaries, estate, heirs, guardian, personal representative, or assigns (Participants) shall assign or be deemed to have assigned to the Plan their right to recover said payments made by the Plan, from any other party and/or recovery for which the Participant(s) are entitled, for or in relation to facility-acquired condition(s), Provider error(s), or damages arising from another party's act or omission for which the Plan has not already been refunded.

The Plan reserves the right to deduct from any benefits properly payable under this Plan the amount of any payment which has been made:

1.   In error;

2.   Pursuant to a misstatement contained in a proof of loss or a fraudulent act;

3.   Pursuant to a misstatement made to obtain coverage under this Plan within two years after the date such coverage commences;

4.   With respect to an ineligible person;

5.   In anticipation of obtaining a recovery if a Participant fails to comply with the Plan's Third-Party Recovery, Subrogation and Reimbursement provisions; or

6.   Pursuant to a claim for which benefits are recoverable under any policy or act of law providing for coverage for occupational Injury or Disease to the extent that such benefits are recovered. This provision shall not be deemed to require the Plan to pay benefits under this Plan in any such instance.

The deduction may be made against any claim for benefits under this Plan by a Participant if such payment is made with respect to the Participant.

If the Plan seeks to recoup funds from a Provider, due to a claim being made in error, a claim being fraudulent on the part of the Provider, and/or the claim that is the result of the Provider's misstatement, said Provider shall, as part of its assignment to benefits from the Plan, abstain from billing the Participant for any outstanding amount(s).

## V.   TERMINATION OF COVERAGE

### A.   Termination of Plan Participation:

A Plan Participant's coverage will terminate with the Plan for any one of the reasons outlined in this section. This termination language will apply to each class of eligible Employee. Coverage

ends on the last day of the month following one of the events listed, unless otherwise specified below:

1.  *Termination of the Plan Participant as either an Employee or an Active Limited Partner.* The Plan Participant will be terminated from the Plan on the last day of the month in which the Plan Participant is either no longer either an Employee or an Active Limited Partner.

2.  *Voluntary Termination of Coverage.* Coverage will end the last day of the month for a Plan Participant who voluntarily ends coverage.

3.  *Death.* Coverage will end on the last day of the month in which the death of the Plan Participant occurred.

4.  *Contributions.* If the covered Plan Participant fails to remit required contributions, then coverage will terminate at the end of the period for which a contribution was last made.

5.  *Leave.* At the end of a company-approved Leave of Absence or the end of an approved period of disability.

6.  *COBRA.* The day the COBRA Plan Participant is no longer eligible for COBRA or after electing COBRA, the day the Plan Participant becomes eligible for Medicare or another insurance plan (unless defined otherwise by federal regulations).

7.  *Military Duty.* The date the Plan Participant becomes a full-time Participant of the Armed Forces of any United States on a full-time active-duty basis, or a government unit covered by or Uniformed Services Employment and Re-employment Rights Act of 1993 (USERRA). Reserve duty, drills, and summer camp shall be excluded from the definition of active duty unless such duty lasts over 30 days as defined by the act. Once eligibility in the Plan ends, the Participant if applicable may have continuation rights with the Plan under COBRA as defined by USERRA.

**B.      Rescission of Coverage:**

Coverage under this Plan may be rescinded under certain circumstances. A determination by the Plan that rescission is warranted will be considered an Adverse Benefit Determination for purposes of review and appeal. A Participant whose coverage is being rescinded will be provided a thirty (30) day notice period as described under Health Care Reform and regulatory guidance. Such notice shall be considered an Adverse Benefit Determination. At the conclusion of the thirty (30) day notice period, coverage shall be terminated retroactively to the date identified in the notification. Claims Incurred after the retroactive date of termination shall not be further processed and/or paid under the Plan. Claims Incurred after the retroactive date of termination that were paid under the Plan will be treated as erroneously paid claims under this Plan.

## VI.    CONTINUATION OF COVERAGE

### A.    Employer Continuation Coverage:

Continued coverage *may* be available for eligible Participants as provided by the Employer. Please contact the Plan Sponsor for further details regarding any continuation of coverage provisions that may apply. *

*\*Note: For any Employer sponsored continuation of coverage that exists, coverage will be considered to run concurrently with COBRA continuation coverage.*

### B.    Continuation During Family and Medical Leave Act (FMLA) Leave:

Regardless of the established leave policies mentioned above, the Plan shall at all times comply with FMLA. During any leave taken under FMLA, the Employee will maintain coverage under this Plan on the same conditions as coverage would have been provided if the covered Employee had been continuously employed during the entire leave period.

### C.    Family and Medical Leave Act of 1993 (FMLA):

This applies to Employers with fifty (50) or more Employees for at least twenty (20) workweeks in the current or preceding Calendar Year. The following are some definitions identified by the FMLA:

### D.    Covered Service Member:

Shall Mean current service members and covered veterans who are undergoing medical treatment, recuperation, or therapy due to a serious Injury or Illness, rather than just current service members. A covered veteran is an individual who was discharged or released under conditions other than dishonorable at any time during the five (5) year period prior to when the eligible Employee takes FMLA Leave to care for the covered veteran.

### E.    Eligible Employee:

Shall mean an individual who has been employed by the Plan Sponsor for at least twelve (12) months, has performed at least 1,250 hours of service during the previous twelve (12) month period, and has worked at a location where at least 50 Employees are employed by the Employer within seventy-five (75) miles.

### F.    Family Member:

Shall mean the (a) Employee's biological, step, or foster parent or (b) a natural, adopted, foster, or stepchild, or a legal ward under eighteen (18) years of age, or eighteen (18) years and older and incapable of self-care because of a mental or physical disability or (c) Spouse.
**Serious Illness or Injury (of a service member or covered veteran):** This shall mean an Illness

or Injury Incurred in the line of duty that may render the service member medically unfit to perform his or her military duties. A serious Injury or Illness for a current service member includes an Injury or Illness that existed before the beginning of the service member's active duty and was aggravated by service in the line of duty on active duty in the armed forces. A serious Injury or Illness for a covered veteran means an Injury or Illness that was incurred or aggravated by the service member in the line of duty on active duty in the armed forces and manifested itself before or after the service member became a veteran.

These definitions are listed as a guide and the actual wording of the FMLA, as amended, shall supersede these definitions.

**G.      Basic Leave Entitlement:**

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible Employees for the following reasons:

1.      For incapacity due to Pregnancy, prenatal medical care, or childbirth;

2.      To care for the Employee's child after birth or placement for adoption or foster care;

3.      To care for the Employee's Spouse, son, daughter, or parent, who has a serious health condition; or

4.      For a serious health condition that makes the employee unable to perform the Employee's job.

**H.      Military Family Leave Entitlements:**

Eligible employees whose spouse, son, daughter, or parent is on covered active duty or call to covered active duty status may use their twelve (12) week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to twenty-six (26) weeks of leave to care for a covered service member during a single twelve (12) month period. A covered service member is:

1.      A current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious Injury or Illness (**Note: The FMLA definitions of "serious Injury or Illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."**); or

2.      A veteran who was discharged or released under conditions other than dishonorable

at any time during the five-year period prior to the first date the eligible Employee takes FMLA Leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious Injury or Illness.

*Note: The FMLA definitions of "serious Injury or Illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition.")*

## I.      Benefits and Protections:

During FMLA Leave, the Employer must maintain the Employee's health coverage under any "group health plan" on the same terms as if the Employee had continued to work. Upon return from FMLA Leave, most Employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA Leave cannot result in the loss of any employment benefit that accrued prior to the start of an Employee's leave.

## J.      Eligibility Requirements:

Employees are eligible if they have worked for a covered Employer for at least twelve (12) months, have 1,250 hours of service in the previous twelve (12) months, and if at least fifty (50) Employees are employed by the Employer within seventy-five (75) miles.

## K.      Definition of Serious Health Condition:

A serious health condition is an Illness, Injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility or continuing treatment by a health care provider for a condition that either prevents the Employee from performing the functions of the Employee's job or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three (3) consecutive calendar days combined with at least two (2) visits to a health care provider or one (1) visit and a regimen of continuing treatment, or incapacity due to Pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

## L.      Use of Leave:

An Employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when Medically Necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the Employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

**M.     Substitution of Paid Leave for Unpaid Leave:**

Employees may choose, or Employers may require the use of accrued paid leave while taking FMLA Leave. In order to use paid leave for FMLA Leave, Employees must comply with the Employer's normal paid leave policies.

**N.     Employee Responsibilities:**

Employees must provide thirty (30) days advance notice of the need to take FMLA Leave when the need is foreseeable. When a thirty (30) day notice is not possible, the Employee must provide notice as soon as practicable and generally must comply with an Employer's normal call-in procedures.

Employees must provide sufficient information for the Employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the Employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care Provider, or circumstances supporting the need for military family leave. Employees also must inform the Employer if the requested leave is for a reason for which FMLA Leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**O.     Employer Responsibilities:**

Covered Employers must inform Employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the Employees' rights and responsibilities. If they are not eligible, the Employer must provide a reason for the ineligibility.

Covered Employers must inform Employees if leave will be designated as FMLA-protected and the amount of leave counted against the Employee's leave entitlement. If the Employer determines that the leave is not FMLA- protected, the Employer must notify the Employee.

**P.     Unlawful Acts by Employers:**

FMLA makes it unlawful for any Employer to:

1.      Interfere with, restrain, or deny the exercise of any right provided under FMLA; or

2.      Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Q.     Enforcement:**

An Employee may file a complaint with the U.S. Department of Labor or may bring a

Page **19** of **38**

private lawsuit against an Employer. FMLA does not affect any Federal or State law prohibiting discrimination or supersede any State or local law that provides greater family or medical leave rights. FMLA section 109 (29 U.S.C. § 2619) requires FMLA-covered Employers to post the text of this notice. Regulation 29 C.F.R. § 825.300(a) may require additional disclosures.

**R.      For Additional Information:**

1-866-4US-WAGE (1-866-487-9243) or TTY: 1-877-889-5627; www.WageHour.dol.gov

**S.      Continuation During USERRA:**

Participants who are absent from employment because they are in the Uniformed Services may elect to continue their coverage under this Plan for up to twenty-four (24) months. To continue coverage, Participants must comply with the terms of the Plan, including election during the Plan's annual enrollment period, and pay their contributions, if any. In addition, USERRA also requires that, regardless of whether a Participant elected to continue his or her coverage under the Plan, his or her coverage be reinstated immediately upon his or her return to employment, so long as he or she meets certain requirements contained in USERRA. Participants should contact their participating Employer for information concerning their eligibility for USERRA and any requirements of the Plan.

**T.      Continuation During COBRA – Introduction:**

The right to this form of continued coverage was created by a federal law, under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"). COBRA Continuation Coverage can become available to Participants when they otherwise would lose their group health coverage. The entire cost (plus a reasonable administration fee) must be paid by the plan member. Coverage will end in certain instances, including if the Participant fails to make timely payment of contributions or premiums. Participants should check with their Employer to see if COBRA applies to them.

**U.      COBRA Continuation Coverage:**

Is a continuation of Plan coverage when coverage otherwise would end because of a life event known as a "Qualifying Event." Life insurance, accidental death and dismemberment benefits and weekly income or long-term disability benefits (if a part of the Employer's plan) are not considered for continuation under COBRA.

**Qualifying Events:** Specific Qualifying Events are listed below. After a Qualifying Event, COBRA Continuation Coverage must be offered to a "Qualified Participant." The Employee could become a Qualified Participant if coverage under the Plan is lost because of the Qualifying Event.

A covered Employee (meaning an Employee covered under the Plan) will become a Qualified Participant if he or she loses his or her coverage under the Plan because either one of the following Qualifying Events happens:

1.      The hours of employment are reduced; or

2. The employment ends for any reason other than gross misconduct.

**V.      Employer Notice of Qualifying Events:**

When the Qualifying Event is the end of employment (for reasons other than gross misconduct), reduction of hours of employment, or the covered Employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), the Employer must notify the COBRA Administrator of the Qualifying Event.

**W.      Employee Notice of Qualifying Events:**

Each covered Employee is responsible for providing the COBRA Administrator / Plan Administrator with the following notices, in writing, either by U.S. First Class Mail or hand delivery:

1. Notice of the occurrence of a second Qualifying Event after a Qualified Participant has become entitled to COBRA Continuation Coverage with a maximum duration of eighteen (18) or twenty-nine (29) months;

2. Notice that a Qualified Participant entitled to receive COBRA Continuation Coverage with a maximum duration of eighteen (18) months has been determined by the Social Security Administration ("SSA") to be disabled at any time during the first sixty (60) days of COBRA Continuation Coverage; and

3. Notice that a Qualified Participant, with respect to whom a notice described above has been provided, has subsequently been determined by the SSA to no longer be disabled.

A form of notice is available, free of charge, from the COBRA Administrator / Plan Administrator and must be used when providing the notice.

**X.      Deadline for Providing the Notice for Qualifying Events:**

As described above, the notice must be furnished by the date that is sixty (60) days after the latest of:

1. The date on which the relevant Qualifying Event occurs;

2. The date on which the Qualified Participant loses (or would lose) coverage under the Plan as a result of the Qualifying Event; or

3. The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

For the disability determination described above, the notice must be furnished by the date that is sixty (60) days after the latest of:

1. The date of the disability determination by the SSA;

2. The date on which a Qualifying Event occurs;

3. The date on which the Qualified Participant loses (or would lose) coverage under the Plan as a result of the Qualifying Event; or

4. The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

In any event, this notice must be furnished before the end of the first eighteen (18) months of COBRA Continuation Coverage.

For a change in disability status described above, the notice must be furnished by the date that is thirty (30) days after the later of:

1. The date of the final determination by the SSA that the Qualified Participant is no longer disabled; or

2. The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

The notice must be postmarked (if mailed) or received by the COBRA Administrator (if hand delivered), by the deadline set forth above. If the notice is late, the opportunity to elect or extend COBRA Continuation Coverage is lost, and if the person is electing COBRA Continuation Coverage, his or her coverage under the Plan will terminate on the last date for which he or she is eligible under the terms of the Plan, or if the person is extending COBRA Continuation Coverage, such Coverage will end on the last day of the initial eighteen (18) month COBRA coverage period.

**Y.     Who Can Provide the Notice:**

Any individual who is the covered Employee (or former Employee), or any representative acting on behalf of the covered Employee (or former Employee), may provide the notice.

**Z.     Required Contents of the Notice:**

The notice must contain the following information:

1. Name and address of the covered Employee or former Employee;

2. Identification of the initial Qualifying Event and its date of occurrence, if the person is already receiving COBRA Continuation Coverage and wishes to extend the maximum coverage period;

3. A description of the Qualifying Event (for example, divorce, entitlement to Medicare by the covered Employee or former Employee, disability of a Qualified Participant or loss of disability status);

4. In the case of a Qualifying Event that is Medicare entitlement of the covered Employee or former Employee, date of entitlement;

5. In the case of a Qualifying Event that is disability of a Qualified Participant, name and address of the disabled Qualified Participant, the date the disability began, the date of the SSA's determination, and a copy of the SSA's determination;

6. In the case of a Qualifying Event that is loss of disability status, name and address of the Qualified Participant who is no longer disabled, the date the disability ended and the date of the SSA's determination; and

7. A certification that the information is true and correct, a signature and date.

If a copy of the SSA's determination cannot be provided by the deadline for providing the notice, complete and provide the notice, as instructed, by the deadline and submit the copy of the SSA's determination within thirty (30) days after the deadline. The notice will be timely if done so. However, no COBRA Continuation Coverage, or extension of such Coverage, will be available until the copy of the SSA's determination is provided.

If the notice does not contain all of the required information, the COBRA Administrator may request additional information. If the individual fails to provide such information within the time period specified by the COBRA Administrator in the request, the COBRA Administrator may reject the notice if it does not contain enough information for the COBRA Administrator to identify the plan, the covered Employee (or former Employee), the Qualifying Event or disability, and the date on which the Qualifying Event, if any, occurred.

**AA. Electing COBRA Continuation Coverage:** Complete instructions on how to elect COBRA Continuation Coverage will be provided by the COBRA Administrator within fourteen (14) days of receiving the notice of the Qualifying Event. The individual then has sixty (60) days in which to elect COBRA Continuation Coverage. The sixty (60) day period is measured from the later of the date coverage terminates and the date of the notice containing the instructions. If COBRA Continuation Coverage is not elected in that sixty (60) day period, then the right to elect it ceases.

Each Qualified Participant will have an independent right to elect COBRA Continuation Coverage. Covered Employees may elect COBRA Continuation Coverage on behalf of their Spouses.

Page **23** of **38**

In the event that the COBRA Administrator determines that the individual is not entitled to COBRA Continuation Coverage, the COBRA Administrator will provide the individual with an explanation as to why he or she is not entitled to COBRA Continuation Coverage.

**BB.    Duration of COBRA Continuation Coverage:**

COBRA Continuation Coverage will be available up to the maximum time period shown below. Generally, multiple Qualifying Events which may be combined under COBRA will not continue coverage for more than thirty-six (36) months beyond the date of the original Qualifying Event. When the Qualifying Event is "entitlement to Medicare," the 36-month continuation period is measured from the date of the original Qualifying Event. For all other Qualifying Events, the continuation period is measured from the date of the Qualifying Event, not the date of loss of coverage. When the Qualifying Event is the covered Employee's (or former Employee's) becoming entitled to Medicare benefits (under Part A, Part B, or both), COBRA Continuation Coverage lasts for up to a total of thirty-six (36) months.

When the Qualifying Event is the end of employment or reduction of the covered Employee's hours of employment, and the covered Employee became entitled to Medicare benefits less than eighteen (18) months before the Qualifying Event, COBRA Continuation Coverage for Qualified Participants other than the covered Employee lasts until thirty-six (36) months after the date of Medicare entitlement. For example, if a covered Employee becomes entitled to Medicare eight (8) months before the date on which his or her employment terminates.

Otherwise, when the Qualifying Event is the end of employment (for reasons other than gross misconduct) or reduction of the covered Employee's hours of employment, COBRA Continuation Coverage generally lasts for only up to a total of eighteen (18) months. There are two ways in which this eighteen (18) month period of COBRA Continuation Coverage can be extended.

**CC.    Disability Extension of COBRA Continuation Coverage:**

If an Employee is determined by the SSA to be disabled and the Employee notifies the COBRA Administrator as set forth above, the Employee may be entitled to receive up to an additional eleven (11) months of COBRA Continuation Coverage, for a total maximum of twenty-nine (29) months. The disability would have to have started at some time before the sixtieth (60th) day of COBRA Continuation Coverage and must last at least until the end of the eighteen (18) month period of COBRA Continuation Coverage. An extra fee will be charged for this extended COBRA Continuation Coverage.

**DD.    Second Qualifying Event Extension of COBRA Continuation Coverage:**

If an Employee experiences another Qualifying Event while receiving eighteen (18) months of COBRA Continuation Coverage, the Spouse can get up to eighteen (18) additional months of COBRA Continuation Coverage, for a maximum of thirty-six (36) months, if notice of the second Qualifying Event properly is given to the Plan as set forth above. This extension may be available to the Spouse receiving COBRA Continuation Coverage if the covered Employee or

former Employee dies, becomes entitled to Medicare benefits (under Part A, Part B, or both), or gets divorced or legally separated, but only if the event would have caused the Spouse to lose coverage under the Plan had the first Qualifying Event not occurred.

**EE.** **Shorter Duration of COBRA Continuation Coverage:**

COBRA Continuation Coverage also may end before the end of the maximum period on the earliest of the following dates:

1.    The date the Employer ceases to provide a group health plan to any Employee;

2.    The date on which coverage ceases by reason of the Qualified Participant's failure to make timely payment of any required contributions or premium;

3.    The date that the Qualified Participant first becomes, after the date of the election, covered under any other group health plan (as an Employee or otherwise), or entitled to either Medicare Part A or Part B (whichever comes first) (except as stated under COBRA's special bankruptcy rules). However, a Qualified Participant who becomes covered under a group health plan which has a pre-existing condition limit must be allowed to continue COBRA Continuation Coverage for the length of a Pre-Existing condition or to the COBRA maximum time period, if less (note: there are limitations on plans imposing a pre-existing condition exclusion and such exclusions will become prohibited beginning in 2014 under the Affordable Care Act); or

4.    The first day of the month that begins more than thirty (30) days after the date of the SSA's determination that the Qualified Participant is no longer disabled, but in no event before the end of the maximum coverage period that applied without taking into consideration the disability extension.

**FF.** **Contribution and/or Premium Requirements:**

Once COBRA Continuation Coverage is elected, the individual must pay for the cost of the initial period of coverage within forty-five (45) days. Payments then are due on the first day of each month to continue coverage for that month. If a payment is not received within thirty (30) days of the due date, COBRA Continuation Coverage will be canceled and will not be reinstated.

**GG.** **Current Addresses:**

In order to protect the rights of the Employee, the Employee should keep the Employer informed of any changes in their address.

**HH.** **Marketplace:**

HHS regulations provide special enrollment periods for plans in the Marketplace to

individuals eligible for COBRA when: 1) such individuals initially are eligible for COBRA due to a loss of other minimum essential coverage; and 2) when such individuals' COBRA coverage is exhausted. In addition, COBRA beneficiaries can choose plans in the Marketplace during the annual open enrollment period and if they are determined eligible for any other special enrollment periods outside of the open enrollment period.

## VII.    MISCELLANEOUS PROVISIONS

### A.    Applicable Law:

This is a self-funded benefit plan coming within the purview of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is funded with Employee and/or Employer contributions. As such, when applicable, Federal law and jurisdiction preempt State law and jurisdiction.

### B.    Claims Audit:

In addition to the Plan's Medical Record Review process, the Plan Administrator may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim. While every claim may not be subject to a bill review or audit, the Plan Administrator has the sole discretionary authority for the selection of claims subject to review or audit.

The analysis will be employed to identify charges billed in error and/or charges that are not Usual and Customary and/or Medically Necessary and Reasonable, if any, and may include a patient medical billing records review and/or audit of the patient's medical charts and records.

Upon completion of an analysis, a report will be submitted to the Plan Administrator or its agent to identify the charges deemed in excess of the Usual and Customary and Reasonable amounts or other applicable provisions, as outlined in this Plan Document. Despite the existence of any agreement to the contrary, the Plan Administrator has the discretionary authority to reduce any charge to a Usual, Customary, and Reasonable charge, in accordance with the terms of this Plan Document.

### C.    Clerical Error/Delay:

Clerical errors made on the records of the Plan and delays in making entries on such records shall not invalidate coverage nor cause coverage to be in force or to continue in force. Rather, the Effective Dates of coverage shall be determined solely in accordance with the provisions of this Plan regardless of whether any contributions with respect to Participants have been made or have failed to be made because of such errors or delays. Upon discovery of any such error or delay, an equitable adjustment of any such contributions will be made.

### D.    Conformity With Applicable Laws:

This Plan shall be deemed to automatically be amended to conform as required by any

applicable law, regulation or the order or judgment of a court of competent jurisdiction governing provisions of this Plan, including, but not limited to, stated maximums, exclusions or limitations. In the event that any law, regulation or the order or judgment of a court of competent jurisdiction causes the Plan Administrator to pay claims which are otherwise limited or excluded under this Plan, such payments will be considered as being in accordance with the terms of this Plan Document. It is intended that the Plan will conform to the requirements of ERISA, as it applies to Employee welfare plans, as well as any other applicable law.

**E.      Fraud:**

The following actions by any Participant, or a Participant's knowledge of such actions being taken by another, constitute fraud and will result in immediate termination of all coverage under this Plan for the Employee:

1.      Attempting to submit a claim for benefits (which includes attempting to fill a prescription) for a person who is not a Participant of the Plan;

2.      Attempting to file a claim for a Participant for services that were not rendered or Drugs or other items which were not provided;

3.      Providing false or misleading information in connection with enrollment in the Plan; or

4.      Providing any false or misleading information to the Plan.

**F.      Headings:**

The headings used in this Plan Document are used for convenience of reference only. Participants are advised not to rely on any provision because of the heading.

**G.      No Waiver or Estoppel:**

No term, condition or provision of this Plan shall be deemed to have been waived, and there shall be no estoppel against the enforcement of any provision of this Plan, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than the one specifically waived.

**H.      Plan Contributions:**

The Plan Administrator shall, from time to time, evaluate the funding method of the Plan and determine the amount to be contributed by the Participating Employer and the amount to be contributed (if any) by each Participant.

The Plan Sponsor shall fund the Plan in a manner consistent with the provisions of the

Internal Revenue Code, ERISA, and such other laws and regulations as shall be applicable to the end that the Plan shall be funded on a lawful and sound basis; but, to the extent permitted by governing law, the Plan Administrator shall be free to determine the manner and means of funding the Plan.

Notwithstanding any other provision of the Plan, the Plan Administrator's obligation to pay claims otherwise allowable under the terms of the Plan shall be limited to its obligation to make contributions to the Plan as set forth in the preceding paragraph. Payment of said claims in accordance with these procedures shall discharge completely the Company's obligation with respect to such payments.

In the event that the Company terminates the Plan, then as of the effective date of termination, the Employer and eligible Employees shall have no further obligation to make additional contributions to the Plan and the Plan shall have no obligation to pay claims Incurred after the termination date of the Plan.

**I.      Right to Receive and Release Information:**

For the purpose of determining the applicability of and implementing the terms of these benefits, the Plan Administrator may, without the consent of or notice to any person, release or obtain any information necessary to determine the acceptability of any applicant or Participant for benefits from this Plan. In so acting, the Plan Administrator shall be free from any liability that may arise with regard to such action. Any Participant claiming benefits under this Plan shall furnish to the Plan Administrator such information as may be necessary to implement this provision.

**J.      Written Notice:**

Any written notice required under this Plan which, as of the Effective Date, is in conflict with the law of any governmental body or agency which has jurisdiction over this Plan shall be interpreted to conform to the minimum requirements of such law.

**K.      Right of Recovery:**

In accordance with the Recovery of Payments provision, whenever payments have been made by this Plan in a total amount, at any time, in excess of the Maximum Amount of benefits payable under this Plan, the Plan shall have the right to recover such payments, to the extent of such excess, from any one or more of the following as this Plan shall determine: any person to or with respect to whom such payments were made, or such person's legal representative, any insurance companies, or any other individuals or organizations which the Plan determines are responsible for payment of such amount, and any future benefits payable to the Participant. See the Recovery of Payments provision for full details.

**L.      Statements:**

All statements made by the Company or by a Participant will, in the absence of fraud, be considered representations and not warranties, and no statements made for the purpose of obtaining

benefits under this document will be used in any contest to avoid or reduce the benefits provided by the document unless contained in a written application for benefits and a copy of the instrument containing such representation is or has been furnished to the Participant.

Any Participant who knowingly and with intent to defraud the Plan, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent act. The Participant may be subject to prosecution by the United States Department of Labor. Fraudulently claiming benefits may be punishable by a substantial fine, imprisonment, or both.

**M.      Protection Against Creditors:**

No benefit payment under this Plan shall be subject in any way to alienation, sale, transfer, pledge, attachment, garnishment, execution, or encumbrance of any kind, and any attempt to accomplish the same shall be void. If the Plan Administrator shall find that such an attempt has been made with respect to any payment due or to become due to any Participant, the Plan Administrator in its sole discretion may terminate the interest of such Participant or former Participant in such payment. And in such case, the Plan Administrator shall apply the amount of such payment to or for the benefit of such Participant or former Participant, spouse, parent, adult child, guardian of a minor child, brother or sister, or other relatives of a dependent of such Participant or former Participant, as the Plan Administrator may determine, and any such application shall be a complete discharge of all liability with respect to such benefit payment. However, at the discretion of the Plan Administrator, benefit payments may be assigned to health care Providers.

**N.      Unclaimed Self-Insured Plan Funds:**

In the event a benefits check issued by the Third-Party Administrator for this self-insured Plan is not cashed within one year of the date of issue, the check will be voided and the funds will be returned to this Plan and applied to the payment of current benefits and administrative fees under this Plan. In the event a Participant subsequently requests payment with respect to the voided check, the Third-Party Administrator for the self-insured Plan shall make such payment under the terms and provisions of the Plan as in effect when the claim was originally processed. Unclaimed self-insured Plan funds may be applied only to the payment of benefits (including administrative fees) under the Plan pursuant to ERISA.

**VIII.   HIPAA PRIVACY**

The Plan provides each member with a separate Notice of Privacy Practices. This Notice describes how the Plan uses and discloses your personal health information. It also describes certain rights you have regarding this information. Additional copies of our Notice of Privacy Practices are available by calling the Plan Sponsor at the phone number included in Article II -Introduction and Purpose; General Plan Information.

**A.      Breach:**

Means an unauthorized acquisition, access, use or disclosure of Protected Health Information ("PHI") or Electronic Protected Health Information ("ePHI") that violates the HIPAA Privacy Rule and that compromises the security or privacy of the information.

**B.     Protected Health Information ("PHI"):**

Means individually identifiable health information, as defined by HIPAA, that is created or received by us and that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or for which there is a reasonable basis to believe the information can be used to identify the individual. PHI includes information of persons living or deceased.

**C.     Commitment to Protecting Health Information:** The Plan will comply with the Standards for Privacy of Individually Identifiable Health Information (i.e., the "Privacy Rule") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Such standards control the dissemination of "protected health information" ("PHI") of Participants. Privacy Standards will be implemented and enforced in the offices of the Employer and Plan Sponsor and any other entity that may assist in the operation of the Plan.

The Plan is required by law to take reasonable steps to ensure the privacy of the Participant's PHI, and inform him/her about:

1.      The Plan's disclosures and uses of PHI;

2.      The Participant's privacy rights with respect to his/her PHI;

3.      The Plan's duties with respect to his/her PHI;

4.      The Participant's right to file a complaint with the Plan and with the Secretary of HHS; and

5.      The person or office to contact for further information about the Plan's privacy practices.

Within this provision capitalized terms may be used, but not otherwise defined. These terms shall have the same meaning as those terms set forth in 45 CFR Sections 160.103 and 164.501. Any HIPAA regulation modifications altering a defined HIPAA term or regulatory citation shall be deemed incorporated into this provision.

**D.     How Health Information May be Used and Disclosed:**

In general, the Privacy Rules permit the Plan to use and disclose, the minimum necessary amount, an individual's PHI, without obtaining authorization, only if the use or disclosure is:

1. To carry out Payment of benefits;

2. For Health Care Operations;

3. For Treatment purposes; or

4. If the use or disclosure falls within one of the limited circumstances described in the rules (e.g., the disclosure is required by law or for public health activities).

**E.    Disclosure of PHI to the Plan Sponsor for Plan Administration Purposes:**
In order that the Plan Sponsor may receive and use PHI for plan administration purposes, the Plan Sponsor agrees to:

1. Not use or further disclose PHI other than as permitted or required by the Plan documents or as required by law (as defined in the Privacy Standards);

2. Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan, agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such PHI;

3. Establish safeguards for information, including security systems for data processing and storage;

4. Maintain the confidentiality of all PHI, unless an individual gives specific consent or authorization to disclose such data or unless the data is used for health care payment or Plan operations;

5. Receive PHI, in the absence of an individual's express authorization, only to carry out Plan administration functions;

6. Not use or disclose genetic information for underwriting purposes;

7. Not use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or Employee benefit plan of the Plan Sponsor, except pursuant to an authorization which meets the requirements of the Privacy Standards;

8. Report to the Plan any PHI use or disclosure that is inconsistent with the uses or disclosures provided for of which the Plan Sponsor becomes aware;

9. Make available PHI in accordance with section 164.524 of the Privacy Standards (45 CFR 164.524);

10. Make available PHI for amendment and incorporate any amendments to PHI in accordance with section164.526 of the Privacy Standards (45 CFR 164.526);

Page **31** of **38**

11.   Make available the information required to provide an accounting of disclosures in accordance with section164.528 of the Privacy Standards (45 CFR 164.528);

12.   Make its internal practices, books and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of the U.S. Department of Health and Human Services ("HHS"), or any other officer or Employee of HHS to whom the authority involved has been delegated, for purposes of determining compliance by the Plan with part 164, subpart E, of the Privacy Standards (45 CFR 164.500 et seq);

13.   Report to the Plan any inconsistent uses or disclosures of PHI of which the Plan Sponsor becomes aware;

14.   Train Employees in privacy protection requirements and appoint a privacy compliance coordinator responsible for such protections;

15.   If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible; and

16.   Ensure that adequate separation between the Plan and the Plan Sponsor, as required in section 164.504(f)(2)(iii) of the Privacy Standards (45 CFR 164.504(f)(2)(iii)), is established that only the privacy officer, other Employees, or other persons under control of the Plan Sponsor, shall be given access to the PHI to be disclosed

The Plan may disclose PHI to a government authority when required or authorized by law, or with the Participant's agreement, if the Plan reasonably believes he/she to be a victim of abuse, neglect, or domestic violence. In such case, the Plan will promptly inform the Participant that such a disclosure has been or will be made unless the Plan believes that informing him/her would place him/her at risk of serious harm (but only to someone in a position to help prevent the threat). Disclosure generally may be made to a minor's parents or other representatives although there may be circumstances under Federal or State law when the parents or other representatives may not be given access to the minor's PHI. Some examples of disclosure include, but are not limited to, the following:

1.   Health Oversight Activities. The Plan may disclose PHI to a health oversight agency for oversight activities authorized by law. This includes civil, administrative or criminal investigations; inspections; claim audits; licensure or disciplinary actions; and other activities necessary for appropriate oversight of a health care system, government health care program, and compliance with certain laws;

2.   Lawsuits and Disputes. The Plan may disclose PHI when required for judicial or

administrative proceedings. For example, the Participant's PHI may be disclosed in response to a subpoena, discovery requests, or other required legal processes when the Plan is given satisfactory assurances that the requesting party has made a good faith attempt to advise the Participant of the request or to obtain an order protecting such information, and done in accordance with specified procedural safeguards;

3.  <u>Law Enforcement</u>. The Plan may disclose PHI to a law enforcement official when required for law enforcement purposes concerning identifying or locating a suspect, fugitive, material witness or missing person. Under certain circumstances, the Plan may disclose the Participant's PHI in response to a law enforcement official's request if he/she is, or are suspected to be, a victim of a crime and if it believes in good faith that the PHI constitutes evidence of criminal conduct that occurred on the Sponsor's or Plan's premises;

4.  <u>Decedents</u>. The Plan may disclose PHI to family members or others involved in decedent's care or payment for care, a coroner, funeral director or medical examiner for the purpose of identifying a deceased person, determining a cause of death or as necessary to carry out their duties as authorized by law. The decedent's health information ceases to be protected after the individual is deceased for 50 years;

5.  <u>Research</u>. The Plan may use or disclose PHI for research, subject to certain limited conditions;

6.  <u>To Avert a Serious Threat to Health or Safety</u>. The Plan may disclose PHI in accordance with applicable law and standards of ethical conduct, if the Plan, in good faith, believes the use or disclosure is necessary to prevent or lessen a threat to health or safety of a person or to the public;

7.  <u>Worker's Compensation</u>. The Plan may disclose PHI when authorized by and to the extent necessary to comply with workers' compensation or other similar programs established by law; and

8.  <u>Military and National Security</u>. The Plan may disclose PHI to military authorities of armed forces personnel under certain circumstances. As authorized by law, the Plan may disclose PHI required for intelligence, counter-intelligence, and other national security activities to authorized Federal officials.

**F.  Participant's Rights:**

The Participant has the following rights regarding PHI about him/her:

1.  <u>Request Restrictions</u>. The Participant has the right to request additional restrictions on the use or disclosure of PHI for treatment, payment, or health care operations. The Participant may request that the Plan restrict disclosures to family members, relatives, friends or other persons identified by him/her who are involved in his/her care or payment for his/her care.  The Plan is not required to agree to these

requested restrictions;

2.   <u>Right to Receive Confidential Communication</u>. The Participant has the right to request that he/she receive communications regarding PHI in a certain manner or at a certain location. The request must be made in writing and how the Participant would like to be contacted. The Plan will accommodate all reasonable requests;

3.   <u>Right to Receive Notice of Privacy Practices</u>. The Participant is entitled to receive a paper copy of the plan's Notice of Privacy Practices at any time. To obtain a paper copy, contact the Privacy Compliance Coordinator;

4.   <u>Accounting of Disclosures</u>. The Participant has the right to request an accounting of disclosures the Plan has made of his/her PHI. The request must be made in writing and does not apply to disclosures for treatment, payment, health care operations, and certain other purposes. The Participant is entitled to such an accounting for the 6 years prior to his/her request. Except as provided below, for each disclosure, the accounting will include: (a) the date of the disclosure, (b) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (c) a description of the PHI disclosed, (d) a statement of the purpose of the disclosure that reasonably informs the Participant of the basis of the disclosure, and certain other information. If the Participant wishes to make a request, please contact the Privacy Compliance Coordinator;

5.   <u>Access</u>. The Participant has the right to request the opportunity to look at or get copies of PHI maintained by the Plan about him/her in certain records maintained by the Plan. If the Participant requests copies, he/she may be charged a fee to cover the costs of copying, mailing, and other supplies. To inspect or copy PHI, or to have a copy of your PHI transmitted directly to another designated person, contact the Privacy Compliance Coordinator. A request to transmit PHI directly to another designated person must be in writing, signed by the Participant and the recipient must be clearly identified. The Plan must respond to the Participant's request within 30 days (in some cases, the Plan can request a 30-day extension). In very limited circumstances, the Plan may deny the Participant's request. If the Plan denies the request, the Participant may be entitled to a review of that denial;

6.   <u>Amendment</u>. The Participant has the right to request that the Plan change or amend his/her PHI. The Plan reserves the right to require this request be in writing. Submit the request to the Privacy Compliance Coordinator. The Plan may deny the Participant's request in certain cases, including if it is not in writing or if he/she does not provide a reason for the request; and

7.   <u>Fundraising Contacts</u>. The Participant has the right to opt out of fundraising contacts.

**G.   Questions or Complaints:**

If the Participant wants more information about the Plan's privacy practices, has questions or concerns, or believes that the Plan may have violated his/her privacy rights, please contact the Plan using the following information. The Participant may submit a written complaint to the U.S. Department of Health and Human Services or with the Plan. The Plan will provide the Participant with the address to file his/her complaint with the U.S. Department of Health and Human Services upon request.

The Plan will not retaliate against the Participant for filing a complaint with the Plan or the U.S. Department of Health and Human Services. For Privacy Compliance Coordinator Contact Information, please contact the Plan Sponsor at the number indicated in Article II Purpose of Plan; General Information.

## IX.    HIPAA SECURITY PROGRAM

The Plan Sponsor has standards for the security of individually identifiable health information (the "Security Rule") that impose rules for maintaining the integrity, confidentiality, and availability of protected health information that it creates, receives, maintains, or maintains electronically that is kept in electronic format (ePHI) as required under the Health Insurance Portability and Accountability Act (HIPAA).

**A.      Electronic Protected Health Information (ePHI):** As defined in Section 160.103 of the Security Standards (45 C.F.R. 160.103), means individually identifiable health information transmitted or maintained in any electronic media.

**B.      Security Incidents:** As defined within Section 164.304 of the Security Standards (45 C.F.R. 164.304), means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operation in an information system.

**C.      Plan Sponsor Obligations:** To enable the Plan Sponsor to receive and use Electronic PHI for Plan Administration Functions (as defined in 45 CFR §164.504(a)), the Plan Sponsor agrees to:

1.      Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of the Plan;

2.      Ensure that adequate separation between the Plan and the Plan Sponsor, as required in 45 CFR § 164.504(f)(2)(iii), is supported by reasonable and appropriate Security Measures;

3.      Ensure that any agent, including a subcontractor, to whom the Plan Sponsor provides Electronic PHI created, received, maintained, or transmitted on behalf of

the Plan, agrees to implement reasonable and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of the Electronic PHI and report to the Plan any security incident of which it becomes aware; and

4.      Report to the Plan any security incident of which it becomes aware.

**D.      Notification Requirements in the Event of a Breach of Unsecured PHI:**

The required breach notifications are triggered upon the discovery of a breach of unsecured PHI. A breach is discovered as of the first day the breach is known, or reasonably should have been known.

When a breach of unsecured PHI is discovered, the Plan will:

1.      Notify the Participant whose PHI has been, or is reasonably believed to have been, assessed, acquired, used, or disclosed as a result of the breach, in writing, without unreasonable delay, and in no case later than sixty (60) calendar days after discovery of the breach. Breach Notification will be provided to the individual by:

   a.      Written notice by first-class mail to Participant at last known address or, if specified by Participant, e-mail;
   b.      If Plan has insufficient or out-of-date contact information for the Participant, the Participant must be notified by a "substitute form;
   c.      If an urgent notice is required, Plan may contact the Participant by telephone.

2.      The Breach Notification will have the following content:

   a.      Brief description of what happened, including the date of the breach, and the date discovered;
   b.      Types of unsecured PHI involved (e.g., name, Social Security number, date of birth, home address, account number);
   c.      Steps the Participant should take to protect from potential harm; and
   d.      What the Plan is doing to investigate the breach, mitigate losses and protect against further breaches.

3.      Notify the media if the breach affected more than 500 residents of a State or jurisdiction. Notice must be provided to prominent media outlets serving the State or jurisdiction without unreasonable delay and in no case later than 60 calendar days after the date the breach was discovered;

4.      Notify the HHS Secretary if the breach involves 500 or more individuals, contemporaneously with the notice to the affected individual and in the manner specified by HHS. If the breach involves less than 500 individuals, an internal log or other documentation of such breaches must be maintained and annually submitted to HHS within 60 days after the end of each calendar year; and

Page **36** of **38**

5.  When a Business Associate, which provides services for the Plan and comes in contact with PHI in connection with those services discovers a breach has occurred, that Business Associate will notify the Plan without unreasonable delay and in no case later than 60 calendar days after discovery of a breach so that the affected Participants may be notified. To the extent possible, the Business Associate should identify each individual whose unsecured PHI has been, or is reasonably believed to have been, breached.

## X.    OVERVIEW OF ERISA PARTICIPANT'S RIGHTS

As a Participant in the Plan, you are entitled to certain rights and protections under ERISA. ERISA provides that all Participants are entitled to:

### A.    Receive Information About Your Plan and Benefits:

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls (if any), all documents governing the Plan, including insurance contracts, collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

### B.    Continue Group Health Plan Coverage:

Continue health care coverage for yourself if there is a loss of coverage under the Plan as a result of a Qualifying Event. You may have to pay for such coverage. Review this Plan Document and the documents governing the Plan on the rules governing your COBRA Continuation Coverage rights.

### C.    Prudent Actions by Plan Fiduciaries:

In addition to creating rights for Participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Participants and beneficiaries. No one, including your Employer, your union (if any), or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

Page **37** of **38**

**D.     Enforce Your Rights:**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a State or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who would pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**E.     Assistance with Your Questions:**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest Office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C., 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

Dated and authorized to be effective this 1st day of April 2023.

**Innovative Partners, LP** (*Plan Sponsor and Plan Administrator*)

By: *Jimmie Sutton*
Jimmie Sutton, General Partner

# Tracy
# Attachment L

## MY TRANSACTIONS



| | Transaction ID | Transaction Date | Payment Method | Total Amount | Status |
|---|---|---|---|---|---|
| ⌄ | 9465408528 | April 29, 2024 | Credit Card | $421.28 | APPROVED |

| Essential Amount | Guardian Amount | Dental Amount | Program Amount | Enrollment Fee |
|---|---|---|---|---|
| $169.99 | $0 | $0 | $251.29 | $0 |

Rows per page: 10 ⌄    1–1 of 1

# Tracy
# Attachment M



Case 0:26-cv-60976-AHS   Document 1-11   Entered on FLSD Docket 04/07/2026   Page 67 of 100

# Tracy
# Attachment N

TO:     Jimmie Sutton
        Innovative Partners, LP
        2234 North Federal Hwy. #2862
        Boca Raton, FL 33431

From:   Member ID: G938002
        Group #: MP200
        Robert Tracy
        ██████████████
        Broomfield, CO ████

Date:   May 7, 2024

Subject: Notice of cancellation, demand refund and rejection of New Limited Partner Joinder Agreement

Mr. Sutton,

This communication serves as notice of cancellation of the health insurance sold to me on April 29, 2024 under Member ID: G938002 Group #: MP200.  I also reject the terms of the NEW LIMITED PARTNER JOINDER AGREEMENT as I was not properly and fully informed the purchase of health insurance required me to join this partnership, provide 500 hours of work activity on the internet and grant the partnership permission to sell my data to 3rd parties.

On April 29, 2024, I received an unsolicited phone call from a person who represented themselves as "Haley" at 646 362-3938 who claimed she could assist me in securing health insurance.  Haley claimed she could secure me health insurance with coverage similar to my former policy and at a cheaper rate than COBRA.  She presented me a plan on the phone with a premium that I agreed to.  Haley claimed I would be sent an email with a sign-in to access the formal documents on the Innovative Partners portal once the policy had been approved by United Healthcare.  Haley said she could be reached at 954 824-5569 if I had any follow-up questions.

When the formal documents were finally available on the Innovative Partners portal, I was shocked to learn the terms of this health insurance policy ***materially deviate from the terms your agent had represented in our phone call on April 29, 2024.***

1.  Haley told me the insurance policy was through United Healthcare.  The policy documents sent to me and on the portal don't show United Healthcare, but a company I never heard of before.
2.  Haley told me there was no maximum $ limit on coverage.  The policy documents sent me and on the portal show maximum $ limits per event of only a few hundred or a couple thousand dollars.
3.  Haley led me to believe the policy complied with the Patient Protection and Affordable Care Act, yet the documents on the portal specifically claim the policy is exempt from the Patient Protection and Affordable Care Act.
4.  I was horrified to learn my signature had been affixed to the New Limited Partner Joinder Agreement.  I thought I was purchasing health insurance through United Healthcare plan, Haley never said anything about becoming a New Active Limited Partner and agreeing to "*provide a minimum of five hundred (500) hours of work activity on the internet.* I never was made aware my purchase of health insurance would permit "*selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.*

I never was informed of these terms and never agreed to these terms and deny my signature was properly affixed to this contract.  This is not what I agreed to in my April 29 phone call with Haley.  ***I do not grant you permission to sell my information to 3rd parties and demand you do not sell my data to any 3rd parties.***
Haley has not responded to my repeated calls nor my texts to 954 824-5569.
I demand you cancel the policy, Member ID: G938002 Group #: MP200; refund the full $421.28 charge made on April 29, 2024 and cease any further attempts to charge the credit card provided.  Innovative Partners has no permission to sell my data to 3rd parties and it has no permission to charge the credit card number I gave Haley.

I don't know if this is merely an administrative error or an intentional misrepresentation with the intent to defraud people looking for health insurance.  The appropriate law enforcement and regulatory authorities will make that determination.

Robert K. Tracy, CPA

# Tracy
# Attachment O

From: **Innovative Partners** <partnerservices@innovativepartnerslp.com>
Date: Tue, May 7, 2024 at 11:20 AM
Subject: Innovative Partners - Cancellation Confirmation
To: ▓▓▓▓▓▓▓@gmail.com>
Cc: <IPA02433@carynhealth.com>, <membercc@innovativepartnerslp.com>

Dear ROBERT TRACY,

We've received your request to cancel your health plan activated on 05-01-2024. We're currently processing your cancellation. Your health plan will be terminated as of 05-01-2024.

If you have any questions regarding your cancellation or if you received this email by mistake, please contact Partner Services at 866-949-3581.

Best regards,
Innovative Partners

 INNOVATIVE PARTNERS

866-949-3581
partnerservices@innovativepartnerslp.com

# PX 19

## DECLARATION OF MEGEN WALKER
### PURSUANT TO 28 U.S.C. § 1746

I, Megen Walker, hereby declare as follows:

1.      My name is Megen Walker. I live in Mount Hermon, California and did so at the time of the events described in the following paragraphs. I am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      On or about July 11, 2024, I was looking to purchase a California state marketplace plan, Covered California, for my teenage daughter, me, and possibly my husband. Our health insurance under my husband's union work had lapsed in May when he was laid off, and COBRA was too costly. My daughter had general care and specialist medical appointments scheduled in the next few days, and therefore I was seeking health insurance coverage that would be effective prior to those appointments. I searched online for Covered California insurance. I found what appeared to be a Covered California website, and it provided the phone number 888-679-1963.

3.      I then called 888-679-1963 and connected to an agent. The agent said his name was Alex Thompson and that he was a licensed insurance agent. I asked Alex if this was Covered California, and he confirmed that it was. Alex asked what type of insurance we needed, if there were any preexisting health conditions, or any medications we were taking. I told him I was looking for not only medical but also dental and prescription coverage for my daughter and me and possibly my husband too, depending on cost. I told Alex my daughter had specialist appointments scheduled and my husband is on blood thinner. Alex told me not to worry, that he would line up the best insurance for us.

4.      Alex asked for our personal information, including full names, dates of birth, and social security numbers, and said that he had found a good fit for all of us – an Aetna policy for

$366.92 per month. I asked if there were any other options and he said no as this was computer-generated based on our needs. Alex then outlined the plan benefits. Specifically, Alex stated that with this plan, my out-of-pocket costs would be a $25 copay for doctor's visits, a $50 copay for urgent care, emergency room, or specialist visits, and a $50 copay for dental visits. Alex stated there were no deductibles for medical or dental and coverage was 100% covered after paying the copay. I asked about prescription coverage and he said 100% and didn't mention any copays. I mentioned our medications and asked specifically if they were covered and Alex said yes at 100% coverage. I said my daughter had an appointment at Sutter Health on July 15 and they were scheduling her an appointment with a specialist at the Stanford Clinic. Alex asked for the doctor's name and when I provided it, he told me they accept this insurance and it will be 100% covered after a $50 copay. Alex told me the medical coverage would be effective July 12 and the dental coverage 30 days later. He mentioned the plan also included vision coverage but we didn't discuss the details. The cost was $366.92 per month, and for the first month only, I would have the added charge of a $50 enrollment fee.

5.      I asked Alex why this plan is so cheap for all the benefits it has and Alex said it's so affordable because a substantial amount of the plan cost is paid by the state of California since it's state subsidized insurance. I confirmed with Alex that this was full medical, dental and prescription coverage for my daughter, husband, and me. Alex confirmed that it was and that it also included vision although we didn't discuss those benefits. I was more concerned with medical coverage for my daughter so I didn't ask for specifics of the vision coverage and felt it was a bonus in the plan Alex offered. Alex told me all the plan details would be included in the plan documents available to me in the membership portal.

6.     This plan, as described, sounded exactly like what I was looking for so I agreed to purchase it. I was so happy to have the coverage my daughter needed and thanked Alex for making the process so simple. Alex then asked for my credit card information which I provided to him over the phone. Alex then sent me a text message with a link to "complete the enrollment," and I simultaneously received an email from admin_noreply@innovativepartnerslp.com with the subject "Innovative Partners – Enrollment Authorization" with a link to "complete the Innovative Partners enrollment." True and correct copies of the text message and email I received are attached as **Walker Attachments A and B**, respectively.

7.     Alex then asked me to click the link and sign the papers to authorize this insurance while he waited on the phone. I clicked the link in the text message and noticed the paperwork was blank except for a signature box. Alex apologized and said the plan documents must not have been uploaded yet but should be in my portal within 24-48 hours. He instructed me to just sign in the signature box. Because I believed what Alex had told me about the plan benefits and believed I was talking with Covered California, I signed in the box. Alex then told me I was enrolled, my insurance card would be emailed and mailed to me, my plan documents would be available in the portal, and stated the coverage would begin on July 12. During this process, I confirmed with Alex at least three more times, that this is full medical, dental and prescription coverage for my daughter, husband, and me. Each time Alex confirmed that it was. I then asked Alex for a phone number I could call if I had any problems and Alex provided the number I had called (888-678-1963) and told me I could reach him directly at that number. Alex then ended the call by telling me it was, "great working with you."

8.     Shortly after the call, I received a sales receipt by email from Innovative Partners (partnerservices@innovativepartnerlslp.com) stating my enrollment has been successfully

completed and that another email would follow with details on how to access the online portal and my plan documents. My Visa credit card was charged a total of $416.92 ($50 enrollment fee, $276.97 monthly premium for Elite MD 2, and $89.95 monthly premium for Guardian 25000). A true and correct copy of the email receipt is attached as **Walker Attachment C**.

9. I then received a couple of emails from Innovative Partners. One message was from partnerservices@innovativepartnerslp.com with the subject "Innovative Partners – Partner Access," and it contained a "provider search link for the First Health Network" and instructions on how to locate plan-covered providers. It also stated that all cancellations and refund requests should be directed to "the Partner Service team" at partnerservices@innovativepartnerslp.com and 866-949-3581. A true and correct copy of this email is attached as **Walker Attachment D**. The other email was from admin_noreply@innovativepartnerslp.com with the subject "Innovative Partners – Partner Portal." This message contained login credentials for the "Partner Portal" where I could access to my temporary ID card. A true and correct copy of this email is attached as **Walker Attachment E**.

10. Later that afternoon, I logged into the "Partner Portal," using the login information and URL (https://member.innovativepartnerslp.com) provided in the "Innovative Partners – Partner Portal" email, **Walker Attachment E,** to access my temporary insurance card. A true and correct copy of the insurance card is attached as **Walker Attachment F**. When I first looked at the card, I was surprised that the name "Aetna" appeared nowhere on this card since I had been told this was an Aetna plan. Instead, the name "First Health Network Limited Benefit Plan" appeared under "Provider Network" in the bottom left corner on the card front. The name "Innovative Partners" was displayed in the top center along with a "Partner Services" phone number, 866-949-3581. The plan name, "Elite MD 2" was also listed on the front of the card

along with my Member ID, Group #, and my "Member Out of Pocket" costs, including PCP: $25, Specialist: $50, Urgent Care: $50, and ER: $50. The back of the card gave instructions for Providers and Partners on how to confirm eligibility, verify benefits, or check status of a claim along with websites and phone numbers for these services. The back bottom provided instructions on how to submit claims and directed they be submitted to "Marpai Health". I received a physical copy of the insurance card in the mail a week or so later. It appeared to be the same as the temporary card I accessed in the Partner Portal.

11.     On or about July 15, 2024, when we arrived for my daughter's appointment at the local doctor's office (PAMF Sutter Health) and I presented my insurance card, the representative said this looks kind of weird and that normally if you don't have insurance, you will have to pay in advance. The representative further stated that since you do have your insurance card, there will be no payment due today. We later received a $422 bill from Sutter Health.

12.     Also, while at PAMF Sutter Health, I was trying to get my daughter a referral to a specialist at the Stanford Clinic. As I had only received the plan membership card but had yet to receive the plan documents, I placed a 3-way call with the PAMF billing representative to the "Covered California" phone number 888-679-1963 I had initially called and we spoke with a female representative, whose name I don't recall. This representative assured me and PAMF that my daughter's medical appointments would be covered at 100%. In fact, she said if the bill is $350, $350 will be paid and made no mention of a copay. We were on the phone for over 15 minutes and the PAMF representative couldn't find the insurance to verify coverage in the clinic's system but the insurance representative kept assuring us that it would be covered, so the PAMF representative said okay, "forced" it through, and said we'll sort it out. I asked her if she saw the insurance in her system and she said she didn't but was going to take it to her supervisor.

Page 5 of 10

13. On or about July 15, 2024, I also tried to use the plan at CVS pharmacy for my husband's blood thinner medication. I presented my insurance card to the CVS representative who said that it is not medical insurance. CVS said there should be a number on the card that they need to process prescription coverage and because there isn't one on the card, they know that it's fake insurance. My husband was down to his last two pills of this lifesaving medication so we had to bite the bullet and pay approximately $1500 out of pocket. There is no generic available and no discounts available for a 30-day supply.

14. Realizing that I had been scammed and purchased fake insurance, I wanted to cancel this policy right away. From July 15 – August 8, 2024, I called Innovative Partners numerous times at 888-679-1963, the enrollment number I initially called and customer service number Alex provided; and at 866-949-3581, the "Partner Services" phone number listed on my insurance card and emails I received from Innovative Partners, attempting to cancel this policy. When I called these phone numbers, if the phone was answered, I was placed on hold for several minutes and no one ever picked-up. Other times, the phone just rang and no one answered. True and correct copies of screenshots of calls I placed are attached as **Walker Attachment G**.

15. On or about August 8, 2024, after much internet searching trying to find actual Covered California insurance, I contacted my local Covered California representative for Santa Cruz county, at a number I don't recall, to make a complaint about Innovative Partners. The representative I spoke with said they are aware of Innovative Partners and recommended I call Marpai Health at 866-805-2541. I called Marpai and the representative I spoke with, whose name I don't recall, told me they handle services for Innovative Partners. She said Marpai processes denial of claims and that with the policies Innovative Partners sells almost everything is denied. The Marpai representative further stated the policy I purchased has limited coverage and pays

only $150 maximum per year for one primary care appointment, no specialists, and everything else gets denied. I told Marpai that's not what I was told when they sold me the policy and I wanted to cancel but couldn't get in touch with anyone. Marpai told me she was very sorry, wished they had told me the truth, and told me I would need to contact Innovative Partners directly to cancel as she wasn't able to do that for me. A screenshot of the call I placed to Marpai Health is attached as **Walker Attachment H**.

16. Because Innovative Partners had been ignoring my repeated calls attempting to cancel the plan, I decided to try to stop the charges through my bank. On or about August 8, 2024, I contacted Bay Federal Credit Union ("BFCU") to file a complaint against Innovative Partners and to flag the charge as fraudulent. BFCU initially reversed the charges, put a block or freeze on my credit card, issued me a new credit card, said they would investigate further, and told me they would send a detailed letter to me seeking additional information. BFCU also suggested I contact Visa to dispute the charge – which I did. Unfortunately, on or about August 15, 2024, somehow the block or freeze placed by BFCU was lifted and Innovative Partners was able to successfully process an additional charge of $366.92 for this fraudulent insurance. Visa has since credited me both charges ($416.92 and $366.92) paid to Innovative Partners while they investigate.

17. In August and September 2024, starting around the time I had reported the Innovative Partners charges as fraud to BFCU and Visa, Innovative Partners began to contact me regularly by text, email, and phone with messages stating that my payment for Innovative Partners had been declined and my health services will be suspended until payment is resolved. The emails were from partnerservices@innovativepartnerslp.com and the subject was "Innovative Partners – PAYMENT DECLINED – Action Required." After receiving the August

11, 2024 email, I replied to partnerservices@innovativepartnerslp.com conveying my frustration that I have tried to call since July 15 and no one ever answers, that I was informed by Covered California that this company is fraudulent insurance, and I thought I had insurance for my daughter's medical appointments. I requested a refund. Innovative Partners did not respond. After receiving the September 11, 2024 email, I responded again stating this insurance isn't what I signed up for and requesting that they credit my account immediately. Innovative Partners did not respond to this email either. True and correct copies of the emails and my responses are attached as **Walker Attachment I**.

18.     On or about September 3, 2024, I called the phone number 888-679-1963 again and was finally able to speak with a representative named Miki at extension 6601 who said the company name is Health Enrollment Department and they work for about 30 different companies, including Innovative Partners. I attempted to cancel my policy and Miki told me that after 30 days Innovative Partners will not authorize or issue any refunds for any reason. I explained to Miki that I had been trying to cancel my policy since July 15, had called several times, and no one ever answered the phone. Miki said she couldn't refund anything.

19.     On or about September 3, 2024, I submitted online complaints about my experience to the Better Business Bureau ("BBB") and the Federal Trade Commission's Consumer Sentinel Network ("FTC"). On or about September 26, 2024, Innovative Partners responded to my BBB complaint, stating in part, that "Innovative Partners does not represent or sell Covered California plans," that I didn't communicate with Innovative Partners "during the enrollment process," and suggesting I must have called a third-party company not affiliated with them. The response also stated all the plan benefits were provided to me before and after enrollment, which was not my experience. The plan benefits explained to me over the phone

turned out to be completely false, and when I checked the portal after enrollment, I did not find any plan documents there. In response to my BBB complaint, Innovative Partners did agree to refund me and stated they would review their customer service process to address the cancellation issues. I rejected their response because their statements were untrue based on my experience. Innovative Partners never responded to my complaint with the FTC. True and correct copies of my BBB complaint and Innovative Partners' response are attached as **Walker Attachments J** and **K**, respectively. A true and correct copy of my FTC complaint is attached as **Walker Attachment L**.

20.     On or about September 11, 2024, I received an email from partnerservices@innovativepartnerslp.com with the subject "Innovative Partners – Cancellation Confirmation"; it stated Innovative Partners had received my request to cancel my health plan activated on July 12, 2024, they were processing my cancellation, and my health plan would be terminated as of September 11, 2024. A true and correct copy of this email is attached as **Walker Attachment M**.

21.     On or about October 9, 2024, my bank credit card was credited $366.92 by Innovative Partners. However, they never refunded the $416.92 I was initially charged on July 11.

22.     In July and August 2024, Innovative Partners collected a total of $783.84 in payments from me. In exchange, my family did not receive the health, prescription or dental insurance coverage or benefits promised during the July 11, 2024 sales call. Instead, we accrued more than $420 in medical bills and were forced to pay approximately $1500 for my husband's lifesaving, prescription blood thinner that we desperately needed. Those payments far exceeded the modest $0, $25 or $50 copays that the sales agent Alex said I would owe. Thankfully, my payments to Innovative Partners were refunded by Visa, but I am still dealing with significant

medical bills. Additionally, the stress of this entire situation, including realizing my family wasn't medically insured and needing medications and care is terrifying. I had many sleepless nights and felt like I was suffering from PTSD. I spent several hours on the telephone and internet trying to cancel this fraudulent insurance and hunting down and enrolling in true Covered California insurance, which caused me more stress because I was fearful of being ripped off again. This experience was especially upsetting and extremely stressful because Innovative Partners and its sales agents preyed on me and my family at a time when we were especially vulnerable: in desperate need of medical and prescription insurance coverage.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2024.

Megen Walker

# WALKER
# ATTACHMENT A



**Walker Attachment A, Page 1 of 1**

# WALKER
# ATTACHMENT B

 Gmail                                              **Megen Walker** ████████ @gmail.com>

## Innovative Partners - Enrollment Authorization

**Innovative partners** <admin_noreply@innovativepartnerslp.com>          Thu, Jul 11, 2024 at 12:10 PM
To: ██████ @gmail.com

Hello MEGAN WALKER,

With this email, you can complete the Innovative Partners enrollment application process. Your representative has already entered your information in the Innovative Partners Enrollment Portal. The final step is for you to review a summary of your program and authorize your enrollment application. To do so, click the link below and follow the instructions:

**CLICK HERE**

If you have any questions, please contact your representative. And thank you for your interest in our health plan. You're making a great choice!

Sincerely,
Innovative Partners

 Innovative Partners

866-949-3581
partnerservices@
innovativepartnerslp.com

**Walker Attachment B, Page 1 of 1**

# WALKER
# ATTACHMENT C

 Gmail                                          **Megen Walker** ██████ @gmail.com>

---

## Sales Receipt
1 message

**Innovative Partners** <partnerservices@innovativepartnerslp.com>            Thu, Jul 11, 2024 at 12:19 PM
To: ██████ @gmail.com
Cc: membercc@innovativepartnerslp.com



866-949-3581
partnerservices@innovativepartnerslp.com

MEGAN WALKER, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.

### SALES RECEIPT

| | |
|---|---|
| Date: | **07-11-2024** |
| Transaction No: | **9711699463** |
| Account No: | ██**xxxxxxxxxx2030** |
| Payment Method: | **Credit Card** |
| Coverage Through: | **08-11-2024** |

Customer ID:        ██████ **@gmail.com**

Customer:        **MEGAN WALKER**
                 ██████ MOUNT HERMON, CA,
         US, ██████
         +██████

**Walker Attachment C, Page 1 of 2**

Gmail - Sales Receipt

Payment Towards:

| | |
|---|---|
| **Enrollment Fee** | **$50.00** |
| **Monthly Payment for Elite MD 2** | **$276.97** |
| **Monthly Payment for Guardian 25000** | **$89.95** |
| **Total Amount** | **$416.92** |

## Thank you for your order!

Need help? Contact your recruiter or our partner services team today!

**Walker Attachment C, Page 2 of 2**

# WALKER
# ATTACHMENT D



**Megen Walker** ▮▮▮▮▮▮@gmail.com>

---

## Innovative Partners - Partner Access
1 message

**Innovative Partners** <partnerservices@innovativepartnerslp.com>                    Thu, Jul 11, 2024 at 12:19 PM
To: ▮▮▮▮▮@gmail.com

---

Welcome MEGAN WALKER
Limited Partner ID: G991339

Thank you for applying for health benefits coverage & becoming a plan participant through Innovative Partners! This is an automatically generated email. Please see the information below to get in contact with our Partner Services Team and/or your recruiter should you have any questions regarding the plan(s) you have agreed to enroll in today.

**Below is the provider search link for the First Health Network:**
https://providerlocator.firsthealth.com/home/index

Step 1: Click "Locate Provider".
Step 2: Next, "Select First Health network" and click "Start now".
Step 3: Select the provider type, ZIP or state and click on the "Search now" button.

**BE ON THE LOOKOUT**
You should receive your ID Cards in the mail within 10-14 business days.

You will also receive access details to the Partner Portal that is being setup for you. For questions, please call us or send us an email. Our third-party Partner Service team is available from 9:00 am - 6:00 pm Eastern Standard Time, Monday through Friday.

**IMPORTANT NOTICE**
All cancellations and refund request must be directed to the Partner Service team at the phone number/email below to ensure proper handling of your cancellation and/or refund.

 **INNOVATIVE** PARTNERS

866-949-3581
partnerservices@
innovativepartnerslp.com

**Walker Attachment D, Page 1 of 1**

# WALKER
# ATTACHMENT E



**Megen Walker** ██████ @gmail.com>

---

## Innovative Partners - Partner Portal

1 message

---

**Innovative partners** <admin_noreply@innovativepartnerslp.com>
To: ████ @gmail.com

Thu, Jul 11, 2024 at 12:19 PM

---

Welcome MEGAN WALKER

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ████ **@gmail.com**
Temporary Password: ███████

Need help? Contact your recruiter or our partner services team today!



866-949-3581
partnerservices@
innovativepartnerslp.com

---

**Walker Attachment E, Page 1 of 1**

# WALKER
# ATTACHMENT F



## Innovative Partners, LP

Partner Services: 866-949-3581

**Name:** MEGAN
          WALKER
**Member ID:** G991339
**Group #:** MP200
Elite MD 2

## Member Out of Pocket

**PCP:** $25
**Specialist:** $50
**Urgent Care:** $50
**ER:** $50

## Provider Network



First Health
Network
**Limited Benefit Plan**

---

### Eligibility

**Providers:** To confirm eligibility, verify benefits,
or check the status of a claim:
Electronic Eligibility through Availity - Payer ID: 35245
Marpai Portal: www.myMarpai.com
Innovative Partners Customer Service: 866-949-3581
Limited Benefit Plan

**Partners:** To confirm eligibility, verify benefits,
or check the status of a claim,
please call Innovative Partners at 866-949-3581
To find a First Health provider, please call
800-226-5116 or visit www.firsthealthlbp.com

### Claims Submission

Please submit Medical Electronic Claims
Directly to Marpai Payer ID# 35245

Or mail claims to:
Marpai Health
P.O. Box 21112
Eagan, MN 55121

For identification purposes only. Not a guarantee of coverage or payment.
Benefit Plans are not sold or insured by First Health or its associates.

**Walker Attachment F, Page 1 of 1**

# WALKER
# ATTACHMENT G





**Walker Attachment G, Page 2 of 5**



**Walker Attachment G, Page 3 of 5**



**Walker Attachment G, Page 4 of 5**



**Walker Attachment G, Page 5 of 5**