# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Civ. Case No. _____

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INNOVATIVE PARTNERS, LP, also doing | ) | **[FILED UNDER SEAL]** |
| business as INNOVATIVE HEALTH PLAN or | ) | |
| HEALTHCARE PLAN, a Texas limited | ) | |
| partnership, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## EXHIBITS SUPPORTING PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A RECEIVER, OTHER RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INUNCTION SHOULD NOT ISSUE

### VOLUME III OF V

Dated: __APRIL 7__, 2026          Presented by:

Matthew G. Schiltz (Special Bar No. A5502617)
William J. Hodor (Special Bar No. A5501501)
Federal Trade Commission, Midwest Region
230 South Dearborn Street, Room 3030
Chicago, Illinois 60604
(312) 960-5619 [telephone, Schiltz]
(312) 960-5592 [telephone, Hodor]
mschiltz@ftc.gov [e-mail, Schiltz]
whodor@ftc.gov [e-mail, Hodor]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## VOLUME I

## CONSUMER DECLARATIONS

Declaration of Deann Armes ..................................................................................................PX 1

Declaration of Karl P. Clark..................................................................................................PX 2

Declaration of Francesca D'Angelo .......................................................................................PX 3

Declaration of Lisa Frazer ....................................................................................................PX 4

Declaration of Hailey Gillam................................................................................................PX 5

Declaration of David Hicks ..................................................................................................PX 6

Declaration of Kimberly Hood .............................................................................................PX 7

Declaration of Autumn Leddon ............................................................................................PX 8

Declaration of Holly Lewis ..................................................................................................PX 9

Declaration of Gary Litman..................................................................................................PX 10

Declaration of Griffin Malnar...............................................................................................PX 11

## VOLUME II

## CONSUMER DECLARATIONS

Declaration of Trevon McKenzie ...........................................................................................PX 12

Declaration of Debbie Marcela Meschwitz Cronenbold .........................................................PX 13

Declaration of William Muñoz, Jr. .........................................................................................PX 14

Declaration of Nicole Shevchenko .........................................................................................PX 15

Declaration of Diane Smith ...................................................................................................PX 16

Declaration of Krista Taylor ..................................................................................................PX 17

Declaration of Robert Tracy ..................................................................................................PX 18

Declaration of Megen Walker.................................................................................................PX 19

**LAW ENFORCEMENT DECLARATIONS**

Declaration of Christopher McGuire ....................................................................PX 20
Regional Administrator, Bureau of Investigation, Division of Insurance
Agent and Agency Services, Florida Department of Financial Services

Declaration of Monica Fernandes.........................................................................PX 21
Investigator, Bureau of Investigation, Division of Insurance Agent and
Agency Services, Florida Department of Financial Services

**FORMER EMPLOYEE DECLARATION**

Declaration of Crystal Rogers ..............................................................................PX 22
Former Employee, Customer Service Representative, Innovative Partners, LP

## VOLUME III

### EXPERT DECLARATION

Declaration of Helen G. Levy, Ph.D.....................................................................PX 23
Research Professor, University of Michigan, Institute for Social Research

## VOLUME IV

### INVESTIGATOR DECLARATION

Declaration of Christine Carson ...........................................................................PX 24
Investigator, Federal Trade Commission

## VOLUME V

### INVESTIGATOR DECLARATION

Declaration of Christine Carson, *continued*.........................................................PX 24
Investigator, Federal Trade Commission

ii

# PX 23

**DECLARATION OF HELEN G. LEVY, Ph.D.**
**PURSUANT TO 28 U.S.C. § 1746**

I, Helen G. Levy, Ph.D., hereby declare as follows:

## I.   Background and Qualifications

1.   This report was written at the request of the Federal Trade Commission ("FTC") in connection with the case *FTC v. Innovative Partners, LP, et al.*

2.   My name is Helen G. Levy, and I am a United States citizen. I received my Ph.D. in Economics from Princeton University in 1998. From 1998 to 2000, I completed postdoctoral training in health policy as a Robert Wood Johnson Scholar in Health Policy Research at the University of California at Berkeley. I began an appointment as Assistant Professor at the University of Chicago's Irving B. Harris School of Public Policy Studies in 2000. In 2004, I moved to the University of Michigan as Research Assistant Professor at the Institute for Social Research, where I am now Research Professor, with additional appointments at the University of Michigan's Gerald R. Ford School of Public Policy and School of Public Health. I am also a Research Associate of the National Bureau of Economic Research and an elected member of the National Academy of Social Insurance. My curriculum vitae is attached as **Appendix A**.

3.   My research focuses on health insurance, with a particular emphasis on understanding the causes and consequences of not having health insurance and on public policies to expand coverage. My most highly cited publications are about how health insurance affects health and access to care; how health literacy affects access to care; and racial and ethnic disparities in health insurance coverage. Other relevant publications have analyzed consumers' out-of-pocket medical spending and insurance coverage (Gruber and Levy 2009; Barcellos, Jacobson and Levy 2023) and the definition of Essential Health Benefits under the Affordable Care Act (Bagley and Levy 2014). In total, my scholarly publications have been cited more than 6,000 times.

4.   In 2010–2011, I served as a Senior Economist at the White House Council of Economic Advisers, participating in the implementation of the Affordable Care Act ("ACA"). Between 2014 and 2024, I was part of a research team evaluating Michigan's Medicaid expansion under the ACA, focusing on how expansion affected health insurance coverage and hospital uncompensated care.

5.   I have taught multiple undergraduate and graduate courses in health economics and microeconomics that cover fundamental concepts about insurance as a mechanism for reducing financial risks associated with bad health events. The most recent of these was in Winter 2024 when I taught "Economic Analysis in the Practice of Public Policy" (Public Policy 558) at the University of Michigan.

1

6. Based on my education, training, and professional experience as summarized above, and as described my curriculum vitae, I consider myself to be an expert in the fields of health economics and health insurance.

7. I am being compensated by the FTC in this action at a rate of $150 per hour.

## II.   Materials and Methods Used to Prepare this Report

8. The FTC asked that I evaluate the health plans sold by Innovative Partners, LP ("Innovative Partners") and by American Collective, LP ("American Collective"), and respond to their questions about these plans and about health insurance more generally. In particular, they asked that I compare these plans' benefits with the benefits that would be provided by comprehensive private health insurance plans like those sold through ACA Marketplaces ("Marketplaces"). The Marketplaces are government-sponsored platforms where consumers can purchase individual health insurance that meets state and federal standards, and will qualify low-income consumers for federal subsidies.

9. I reviewed the following materials provided by FTC:

Expert Exhibit 1: Images of a telemarketing script for the sale of Innovative Partners plans, captured during a site inspection by Florida Department of Financial Services on July 17, 2024, at 2841 West Cypress Creek Road, Suite A, Fort Lauderdale, Florida, 33309.

Expert Exhibit 2: Images of a telemarketing script for the sale of Innovative Partners plans, captured during a site inspection by Florida Department of Financial Services on July 17, 2024, at 2841 West Cypress Creek Road, Suite B, Fort Lauderdale, Florida, 33309.

Expert Exhibit 3: Declaration, including attachments, of consumer Robert Tracy, who purchased an Innovative Partners plan in April 2024.

Expert Exhibit 4: Declaration, including attachments, of consumer Diane Smith, who purchased an Innovative Partners plan in June 2024.

Expert Exhibit 5: Declaration, including attachments, of consumer Hailey Gillam, who purchased an Innovative Partners plan in March 2024.

Expert Exhibit 6: Declaration, including attachments, of consumer Debbie Meschwitz Cronenbold, who purchased an Innovative Partners plan in March 2024.

Expert Exhibit 7: Documents and images related to American Collective plans, provided by FTC in 2026. The documents in this exhibit are the Medical Plan Document and Summary Plan Description for American Collective Unity Plans (a

2

single document); a Summary of Benefits and Coverage for the American Collective Unity 4 plan; a color brochure describing "plan coverages and benefits" for the American Collective Unity 4 plan; a Summary Plan Description for the American Collective Safeguard+ Accidental Death and Dismemberment Benefit; and a color brochure describing the American Collective "Safeguard+ AD&D Benefit," and the transcript of an undercover call on January 21, 2026 between an investigator purporting to be a consumer looking for insurance and a sales representative for American Collective, LP.  The images include the front and back of a membership card for the American Collective Unity 4 plan (Member card_front.png; Member card_back.png); and images that appear to be screenshots of an enrollee-facing website showing who is enrolled (Program Info_Enrolled Members.png), a short summary of the Unity 4 plan's provider network (Program Info_Summary.png), what services are covered by Unity 4 (Program Info_Eligible Services.png), additional coverage (in this case, Safeguard+) for the enrollee (Program Info_Add-ons.png), and the charges to the enrollee's credit card (My Transactions.png).

10.     The Summary Plan Descriptions for three of Innovative Partners' plans, which were included as attachments to certain of the above-listed exhibits, were of particular interest to me because they contain detailed descriptions of the benefits provided by the plans, including covered services, payment amounts, exclusions, and other limitations. The Summary Plan Description for the Optimum 1MD plan is Attachment F to Expert Exhibit 3; the Summary Plan Description for the Optimum 3MD plan is Attachment F to Expert Exhibit 4; and the Summary Plan Description for the Elite 6MD plan is both Attachment B to Expert Exhibit 5 and Attachment F to Expert Exhibit 6.

11.     I also relied on the Summary Plan Description for the Innovative Partners Essential Critical Illness Benefit, which is Attachment H to Expert Exhibit 3; the document describing the Guardian Accidental Death and Dismemberment Benefit, which is Attachment H to Expert Exhibit 6 as well as Attachment C to Expert Exhibit 5; and the Summary Plan Description for the Benefits of the Dental 1K plan, which is Attachment G to Expert Exhibit 4.

12.     I also relied on color brochures summarizing benefits of the suite of Optimum 1MD through Optimum 7MD plans (Attachment G to Expert Exhibit 3) and the suite of Elite 2MD, Elite 4MD, and Elite 6MD plans (Attachment G to Expert Exhibit 6). These brochures outline how the plans for which I did not have detailed Summary Plan Descriptions relate to those for which I did have Summary Plan Descriptions.

3

13. I consulted the websites of both First Health Group Corporation[1] and MultiPlan, Inc. (re-branded in early 2025 as Claritev, Inc.),[2] the entities identified in the Innovative Partners Summary Plan Documents as operating the provider networks available to plan participants, to get a general sense of what they do and what the networks are. I consulted the website for Aetna Dental Administrators; this entity is mentioned in Section 3.2 of the Summary Plan Description for the Innovative Partners Dental 1K plan (Attachment G to Expert Exhibit 4), with the specific website www.aetna.com/Dentaladministrators listed on the member ID card included as Attachment I to Expert Exhibit 4. I also visited the websites for Teladoc Health, Inc.,[3] SingleCare,[4] and Progressive Nutracare,[5] which are identified in the Summary Plan Descriptions and/or the brochures as entities providing additional plan benefits.

14. These materials—the Summary Plan Descriptions, the accompanying brochures, and the public websites referenced above—are the basis for my understanding of the benefits provided by Innovative Partners and American Collective health plans.

15. I consulted external sources, cited in the body of the report, for specific facts and figures to place the benefits of Innovative Partners and American Collective plans in context. For example, I consulted publications from the Commerce Department on types of health spending in the United States, which showed that less than 6 percent of such spending is due to accidents, in order to provide insight into how useful the Innovative Partners plans' accident-only benefits might be for a typical enrollee. I consulted published statistics from the Agency for Healthcare Research and Quality on the average cost of a hospital stay in the US in 2016, and I adjusted this number by the Consumer Price Index to current (2024) dollars to illustrate how large this cost is relative to the benefits provided by Innovative Partners plans. I also consulted a publication from the nonprofit health policy organization KFF reporting that one-quarter of non-elderly adults in the US have a health condition that would count as a "pre-existing condition" to provide some idea of how many enrollees might be affected by excluding such conditions from coverage, as Innovative Partners plans do.

16. **Assumptions needed to resolve discrepancies in Innovative Partners plan documents.** There are multiple discrepancies between the benefits listed in the Summary Plan Descriptions and the color brochures for the Innovative Partners

---

[1] I visited www.firsthealth.com, which redirects to https://providerlocator.firsthealth.com/Home/Index, and www.FirstHealthLPB.com.

[2] I visited www.multiplan.com, which redirects to www.claritev.com.

[3] https://www.teladochealth.com/

[4] https://www.singlecare.com/

[5] https://www.progressivenutracare.com/

4

plans. In these cases, the Summary Plan Description states a maximum *per-use* benefit that the brochure describes as the maximum *annual* benefit for a particular service. For example, the Summary Plan Description for the Optimum 3MD plan (Expert Exhibit 4, Attachment F: p. 3) states, "You will be reimbursed up to $200 for each day that you, or a covered person, are confined in a hospital for up to a total of ten (10) confinement days per year[.]" This would imply a maximum benefit of $2,000 per year. In contrast, the color brochure for the Optimum plans (Expert Exhibit 3, Attachment G: p. 6) lists $200 as the "Maximum amount per plan year" payable under the Optimum 3MD plan (emphasis added). Another example is outpatient doctors' visits benefits under the Optimum 1MD plan or the Elite 6MD plan. The Summary Plan Descriptions for these plans suggest that either four (Optimum 1MD) or six (Elite 6MD) visits are covered per plan year with a maximum payment of $150 per visit (Expert Exhibit 3, Attachment F, p. 3; Expert Exhibit 5, Attachment B, p. 3), while the color brochures corresponding to each of these plans indicate the "[m]aximum amount per plan year" for all such visits is $150 (Expert Exhibit 3, Attachment G, p. 4; Expert Exhibit 6, Attachment G, p. 6). Similar discrepancies exist for all benefits that may be used more than once: in each case, the Summary Plan Description indicates a maximum payment amount payable on a per-visit basis up to a designated cap, whereas the color brochure suggests that this payment amount is the most a consumer will be able to recoup for that category of service for the entire year. Where these discrepancies occur, I assumed that the Summary Plan Description, which specifies a higher maximum benefit than the color brochure, is correct.

17. **Assumption needed to resolve ambiguity in Innovative Partners plan documents.** All three Innovative Partners Summary Plan Descriptions contain identical ambiguous language about the maximum number of physical therapy visits allowed under the accident benefit: "…we will reimburse $60 for the first physical therapy visit and reimburse $30 for each subsequent visit up to a maximum number of four (4) visits after the initial first visit." It is unclear whether "after the initial first visit" modifies "each subsequent visit," in which case the maximum allowed visits would be four, or "four (4) visits," in which case the maximum allowed visits would be five. I have chosen the latter interpretation: one visit at $60, followed by four at $30, for a total benefit of five visits and $180 = $60 + 4 x $30.

18. **Discrepancy in American Collective plan documents.** The American Collective plan documents contain conflicting information about whether or not the plan imposes a cap on enrollees' out-of-pocket spending on covered services. The Summary of Benefits and Coverage lists out-of-pocket limits of $9,200/individual and $18,400/family (Expert Exhibit 7, Summary of Benefits and Coverage: p. 1). These amounts are the same as the required limits for Marketplace plans in 2025.[6] The Medical Plan Document and Summary Plan Description for the Unity plans,

---

[6] Source: CMS guidance, Nov. 15, 2023, at https://www.cms.gov/files/document/2025-papi-parameters-guidance-2023-11-15.pdf

in contrast, states "There is no Coinsurance or Out-of-Pocket" and makes no further mention of limiting enrollees' out-of-pocket spending (Expert Exhibit 7, Medical Plan Document and Summary Plan Description: p. 9).

19.   In all cases where my analysis required assumptions to resolve discrepancies or ambiguities in the plan materials, I have given the plan the benefit of the doubt by assuming the correct reading is the one that reflects *greater* plan benefits.

20.   **Detailed assumptions underlying the illustrative health spending scenarios.** The FTC requested that I develop hypothetical scenarios to compare a consumer's out-of-pocket healthcare spending under Innovative Partners plans with a comprehensive private health insurance plan available through a government-sponsored Marketplace or directly from an insurance company. These hypothetical scenarios required a number of choices and assumptions.

   i.   **Choice of health events for hypothetical scenarios.** I chose two health conditions requiring hospitalization for these hypothetical scenarios: appendicitis and septicemia. I chose appendicitis because it is a familiar condition that presents as an emergency. I have used appendicitis as an example in my teaching to explain to students why even a healthy person might need insurance. I chose septicemia because it is one of the most common reasons for hospitalization based on published government data, cited below. A third hypothetical scenario is an enrollee who experiences both appendicitis and septicemia in a single plan year. The point of these different scenarios is not the clinical details of treatment, but rather the total cost and how it is split between the enrollee and the plan. I obtained measures of total cost for these conditions from publicly available data, cited below. For appendicitis, I consulted a price transparency website that relies on millions of private health care claims, which shows an average cost of approximately $12,000. For septicemia, I consulted published government data, which shows an average cost of approximately $24,000 (after inflating to real 2024 dollars using the Consumer Price Index). Both sources are cited below. I assumed that total cost under the third scenario would simply be the sum of the first two scenarios, or $36,000.

   ii.   **Choice of Innovative Partners plans for hypothetical scenarios.** For the Innovative Partners plans, I chose to model hypothetical spending under the Optimum 3MD plan, which has the most benefits of the three plans for which I had a Summary Plan Description and is the only one of the three that provides any hospital benefits in case of illness. (The Optimum 1MD and Elite 6MD plans provide hospital benefits only for care arising out of accidents, which are a far less common source of health care spending as compared to illness.) I did not include any American Collective plan in the hypothetical scenarios because none of them covers any hospital services.

6

iii. **Assumptions about financial terms of typical Marketplace coverage.** For the financial terms of a typical Marketplace plan,[7] I relied on published data from KFF, cited below, summarizing the average out-of-pocket limits in plans for Marketplace enrollees at different income levels. These data show that a typical Marketplace enrollee, meaning one at the median income level, would have a plan with an out-of-pocket maximum of $7,000. Because the three hypothetical scenarios all involved total health spending in excess of $7,000, it was not necessary to specify other details of the hypothetical Marketplace plan, such as the deductible or copayments; in all three scenarios, the enrollee would reach the out-of-pocket maximum. This is by design: the scenarios are intended to illustrate what happens when an enrollee experiences a costly health event that exposes them to serious financial risk.

iv. **Assumptions and choices consistently erred on the side of generosity to Innovative Partners plans.** As explained above, where there was ambiguity or discrepancy in Innovative Partners plan documents, I made assumptions that give the plan the benefit of the doubt. Similarly, the assumptions underlying the hypothetical scenarios were chosen carefully so that the comparison between the Innovative Partners plan and comprehensive Marketplace coverage would not slight the benefits of the Innovative Partners plan. These assumptions include:

- Choosing to model the plan that has the most benefits from among the three Innovative Partners plans for which I had a Summary Plan Description, Optimum 3MD: That plan was the only one that provided any coverage for hospital care for illness. Had I chosen one of the other two Innovative Partners plans for which I had Summary Plan Descriptions (Optimum 1MD or Elite 6MD), the hypothetical enrollee would have been exposed to almost the entire cost of the health event due to these plans' lack of any illness-related hospital benefits.

- Assuming for the sake of the hypothetical scenario that the services needed by the enrollee would closely align with the very specific schedule of benefits offered by the Optimum 3MD plan. For example, in Scenario 3, I assumed that the patient would use 5 ICU days and 8 hospital days because the maximum benefits under the plan would be 5 ICU days and 10 hospital days. In total, Scenario 3 exhausts 87% of the total benefits that an enrollee could get from the Optimum 3MD plan.

---

[7] Comprehensive private health insurance plans sold outside the Marketplace are subject to the same rules as Marketplace plans. Therefore, a "typical Marketplace plan" is also typical of a comprehensive private insurance plan purchased directly from an insurer. I will use the phrase "typical Marketplace plan" in what follows to mean "typical comprehensive private health insurance plan available through a government-sponsored Marketplace or directly from an insurance company."

7

- Ignoring the fact that a typical Marketplace plan would very likely start limiting enrollee cost-sharing well below the plan's $7,000 out-of-pocket maximum: a typical plan would have a deductible of about $3,000, meaning that the plan would begin to assume responsibility for the majority of spending once the enrollee's out-of-pocket spending reached $3,000. For example, with a $3,000 deductible and 25% coinsurance, an enrollee with the $12,000 appendicitis bill in Scenario 1 would only have to pay $5,250 out-of-pocket ($3,000 + 0.25*[$12,000 - $3,000]), while the Marketplace plan would pay the remaining $6,750 of the enrollee's hospital bill. It would not affect the bottom line in Scenarios 2 or 3 because the enrollee would hit the out-of-pocket maximum even with very generous Marketplace coverage. I decided that the complexity of this calculation distracted from the larger point of the hypothetical scenarios, which is that as spending increases, a Marketplace plan would protect enrollees from high spending, while the Innovative Partners plan would not.

- Assuming that the hypothetical scenarios represent the enrollee's only spending during the plan year: In the case of the Innovative Partners plan, any covered spending earlier in the plan year would reduce what the plan would later pay for the hypothetical hospitalization. For the Marketplace plan, it would have the opposite effect, reducing what the beneficiary would have to pay for the hypothetical hospitalization because they would already be on the way to reaching their out-of-pocket maximum. Again, I decided that this complexity would only distract from the point of the scenarios (while making the Innovative Partners plan look worse), so I omitted it.

- Finally, I note that the choice to compare Innovative Partners plans to typical Marketplace coverage rather than Medicaid or typical employer coverage also errs on the side of generosity to Innovative Partners plans. Medicaid programs are required to cover a broad range of services[8] with at most nominal enrollee cost-sharing,[9] so that Medicaid provides outstanding protection against financial risk for enrollees. Employer plans, too, tend to have more financial protection than Marketplace coverage; most employer plans impose an out-of-pocket maximum on employee spending that is $6,000 or less,[10] substantially

---

[8] Mandatory Medicaid benefits include, but are not limited to, inpatient and outpatient hospital services, physician services, and laboratory and X-ray services. Source: https://www.medicaid.gov/medicaid/benefits/mandatory-optional-medicaid-benefits

[9] https://www.medicaid.gov/medicaid/cost-sharing/cost-sharing-out-pocket-costs

[10] KFF, "Employer Health Benefits: Annual Survey 2024," p. 12. Available at https://www.kff.org/health-costs/2024-employer-health-benefits-survey/

8

lower than the $7,000 cap that I assume for typical Marketplace coverage in the hypothetical scenario below. Thus, if I had been asked to compare the benefits of Innovative Partners plans to these other types of coverage, rather than to Marketplace and off-Marketplace comprehensive private coverage, the Innovative Partners plans would look even worse in comparison.

## III. Evaluation of Innovative Partners and American Collective Plans

21. The substance of my report is structured around the following questions:

A. What is comprehensive health insurance?

B. What are the benefits of Innovative Partners health plans, including the Elite and Optimum programs or policies?

C. What are the benefits of American Collective's Unity plans?

D. What are the benefits of the supplemental plans, including accidental death and dismemberment benefits ("Guardian" from Innovative Partners; "Safeguard+" from American Collective) and critical illness policy ("Essential" from Innovative Partners)?

E. How do the benefits of Innovative Partners health plans, individually or in combination with its supplemental plans, compare to the benefits of comprehensive private health insurance plans available through government-sponsored Marketplaces or directly from private insurers?

F. What do the terms "deductible," "copay," and "out-of-pocket maximum," mean in the context of health insurance? What relevance do these terms have to the health plans and supplemental plans offered by Innovative Partners?

G. What is a "PPO" health insurance plan, and how do the benefits of Innovative Partners health plans compare to benefits of a PPO plan?

H. For illustrative health scenarios, compare a consumer's estimated out-of-pocket healthcare spending under Innovative Partners plans, individually or in combination with each other, to out-of-pocket spending under a comprehensive private health insurance plan available through a government-sponsored Marketplace or directly from an insurance company.

I. Are Innovative Partners health plans, accidental death and dismemberment plans, and critical illness plans, whether individually or in combination with each other, equivalent to comprehensive health insurance?

9

J.     Are American Collective health plans and accidental death and dismemberment plan, whether individually or in combination with each other, equivalent to comprehensive health insurance?

## A. What is comprehensive health insurance?

22.     Comprehensive health insurance is a type of insurance that protects enrollees against the risk of high out-of-pocket health care spending. Its defining feature, which makes it health insurance rather than another product, is that it shifts the risk of catastrophic medical expenses from the enrollee to the insurer. Enrollees pay premiums upfront which reflect the expected costs for an average consumer during a year; the plan then pays most of enrollees' actual costs for health care during the year, limiting how much enrollees must pay out-of-pocket. Many plans contract with networks of health care providers who provide care for the plan's enrollees at negotiated rates.

23.     Comprehensive health insurance coverage typically covers most health care enrollees might need, such as hospital care, physicians' services, and emergency room care.[11] The cost of this care is split between the enrollee and the plan, with the plan taking on more responsibility for costs as the enrollee's health care expenses add up.

24.     For example, a typical policy might start the plan year with the enrollee paying all of their own medical bills. Once the enrollee's total spending reaches a threshold known as the *deductible*, the plan begins paying most of the enrollee's subsequent costs. At this stage, enrollees may contribute either a small, fixed amount known as a *copayment* (e.g., $25 for an office visit) or a percentage of their costs known as *coinsurance* (e.g., 25% of the bill), and the plan pays the remainder of the bill. Some plans have no deductible, meaning that insurers cover most of the cost of care from the very beginning. Regardless of whether the plan has a deductible, out-of-pocket spending—including any amounts paid before the deductible is met and also any copayments or coinsurance—will continue to add up for enrollees who keep using health care until the enrollee reaches their *out-of-pocket maximum*. The out-of-pocket maximum is the point at which the plan starts to pay all the bills and the enrollee no longer faces additional out-of-pocket costs, regardless of the total cost of their health care. The benefits are structured this way so that enrollees bear routine, low-level expenses but are protected from the catastrophic costs of care for expensive events.

---

[11] Health insurance – unlike, for example, car insurance or homeowners' insurance – often covers not only the cost of unexpected events but also routine services like check-ups or basic preventive care. The Affordable Care Act requires private health insurance to cover certain preventive services with no out-of-pocket cost to the enrollee. Source: KFF, "Preventive Services Covered by Private Health Plans under the Affordable Care Act", updated Feb. 28, 2024. https://www.kff.org/womens-health-policy/preventive-services-covered-by-private-health-plans/

10

25.     Comprehensive health insurance plans may be more or less generous depending on the scope of covered services and the exact amounts chosen for the deductible, copayments/coinsurance, and out-of-pocket maximum. For example, a "gold-plated plan" might cover all services without cost-sharing, while a "skimpy plan" might exclude dental and vision care and have a high deductible ($5,000) and out-of-pocket maximum ($8,000). But even this skimpy plan would protect the enrollee against the risk of catastrophically high medical spending. From an economic perspective, protection from the risk of high health care expenses is the defining feature of comprehensive health insurance.[12] Policies that provide this protection are often referred to as comprehensive major medical coverage (henceforth "comprehensive coverage" or "comprehensive health insurance coverage").

**B.   What are the benefits of Innovative Partners health plans, including the Elite and Optimum programs or policies?**

26.     To address this question, I reviewed the three Summary Plan Descriptions available to me, which were for the Optimum 1MD,[13] Optimum 3MD,[14] and Elite 6MD[15] plans. These documents provide detailed information on the benefits of each of these plans. In addition, I reviewed the two Innovative Partners color brochures which summarize the benefits for the suite of seven Optimum plans (Optimum 1MD through Optimum 7MD)[16] and the suite of three Elite plans (Elite 2MD, Elite 4MD, and Elite 6MD).[17] These color brochures are less detailed than the Summary Plan Descriptions; nonetheless, they describe the features of the plans in each suite and confirm that the basic structure of benefits is similar for all of these plans, with different tiers of benefits reflected in the numbers (e.g. Optimum 7MD or Elite 6MD would pay out more benefits than their lower-numbered counterparts).

27.     The documents that I reviewed make it clear that the Optimum and Elite plans all have the same basic structure of paying fixed benefits to enrollees, that none of

---

[12] The Congressional Budget Office, for example, defines private health insurance coverage as a policy that, at a minimum, covers high-cost medical events and various services, including those provided by physicians and hospitals. Source: Congressional Budget Office, "Health Insurance Coverage for People Under Age 65: Definitions and Estimates for 2015 to 2018," April 2019; https://www.cbo.gov/publication/55094

[13] Expert Exhibit 3, Attachment F: Summary Plan Description for the Benefits of the Optimum 1MD policy

[14] Expert Exhibit 4, Attachment F: Summary Plan Description for the Benefits of the Optimum 3MD policy

[15] Expert Exhibit 5, Attachment B: Summary Plan Description for the Benefits of the Elite 6MD policy

[16] Expert Exhibit 3, Attachment G: Innovative Partners Health Benefit Plan (describes Optimum plans)

[17] Expert Exhibit 6, Attachment G: Innovative Partners Health Benefit Plan (describes Elite plans)

11

the plans has an out-of-pocket maximum for enrollee costs, and that all plans significantly limit what services qualify for benefits. As a result, none of the plans is comprehensive health insurance.

28.     The main benefits of the Innovative Partners plans are that they (1) give enrollees <u>access to a provider network</u> from which they can buy care at negotiated prices, and (2) provide for <u>fixed-dollar payments to enrollees</u> who consume a narrowly defined assortment of covered medical services. Plans that provide fixed-dollar payments like this are sometimes called "fixed indemnity" plans. A key characteristic of these plans—meaning both fixed indemnity plans in general and the Innovative Partners plans in particular—is that they do not protect enrollees from the risk of high out-of-pocket spending, as would be the case with comprehensive health insurance coverage. It is the plan's payments that are capped, not the enrollees' out-of-pocket spending. In addition, even the fixed-dollar payments promised by the Innovative Partners plans are subject to numerous limitations and exclusions, described at more length below.

29.     To expand on the dual benefits of these plans:

<u>Access to a provider network</u> means that enrollees who visit in-network health care providers will be billed for services at a rate that has been negotiated between the network and the providers, and which reflects a discount off the providers' list price for services. The three Summary Plan Descriptions to which I had access indicate that Innovative Partners plans provide access to one of two networks— either the network managed by First Health (Elite MD plans) or by MultiPlan (Optimum MD plans).[18] Based on publicly available information on the First Health website[19] and the Claritev (formerly MultiPlan) website,[20] these are networks of providers who bill at negotiated rates. I have no information on how much of a discount the negotiated rates under First Health or MultiPlan represent compared to the list price that would be charged to consumers without these benefits.[21]

---

[18] MultiPlan recently re-branded as Claritev; *see* "MultiPlan shifts direction, changes name to Claritev," by Hayley DeSilva, *Modern Healthcare*, Feb. 18, 2025, at <u>https://www.modernhealthcare.com/digital-health/multiplan-rebranding-claritev-lawsuits</u>. As of March 9, 2025, an attempt to visit the MultiPlan website (<u>www.multiplan.com</u>) re-directed to www.claritev.com. This webpage informs the visitor about the re-branding ("MultiPlan is now Claritev") and includes a link to the MultiPlan provider search tool, which still uses MultiPlan's logo and URL (providersearch.multiplan.com).

[19] Source: "Who is First Health and what is our role?" https://providerlocator.firsthealth.com/Home/Index

[20] Source: https://www.claritev.com/services/network-based/

[21] In the private insurance market as a whole, in-network rates are, on average, approximately 40% of what a consumer without any insurance might be billed. Source: Figure 18 in "In-Network and Out-of-Network Utilization and Pricing: A Study of Private Healthcare Claims," *Fair Health White Paper*, February 2024, https://www.fairhealth.org/publications/whitepapers

12

Access to a provider network by itself is like a shopper's club card or Groupon that provides discounts on purchases from specific retailers. While it may reduce average spending, it does not protect enrollees from the risk of high spending, and therefore does not constitute insurance.

In addition, access to a provider network does not mean that the plan will necessarily pay any fraction of the negotiated rate to the provider on behalf of the enrollee. Indeed, the Summary Plan Descriptions from Innovative Partners make clear that the plan will not pay any medical bills on behalf of the enrollee. Instead, the plan provides for fixed-dollar payments to enrollees who use particular medical services. The amount of the payments, and which services qualify for payments, vary depending on the plan. In all cases, however, it is the *plan's* payments that are capped; there is no cap on what enrollees might have to spend.

30.     The exact amounts to be paid when medical care is needed for illness for the Optimum 3MD plan, which has the most benefits of the three plans for which I had Summary Plan Descriptions, are displayed in **Table 1**. **Table 2** reflects the amounts authorized under the Optimum 1MD plan, which has less benefits. **Table 3** reflects the Elite 6MD plan, which has the least benefits. All three plans draw a distinction between services to treat illness and those needed due to accident, which would be very unusual in the context of comprehensive health insurance.[22] The accident benefit, which is the same for all three plans, is summarized in **Table 4**.

31.     Notable aspects of the three plans' fixed-indemnity benefits schedules include:

- The Optimum 3MD plan, which has the most benefits of the three plans, pays out at most $4,400 for hospital care due to illness. In order to get the maximum inpatient benefit, a hospitalized enrollee would have to consume all the inpatient care specified in the Summary Plan Description: ten days in the hospital, five days in the ICU, and inpatient surgery with general anesthesia. This enrollee would also have to pay the hospital $200 in copayments: $100 for the hospital admission and $100 for the ICU admission. Thus, the maximum **net** inpatient benefit to the enrollee would be $4,200 ($4,400 from the plan to the enrollee minus $200 from the enrollee to the hospital).

- An enrollee who fully exhausted all illness benefits (both hospital and outpatient) afforded under the Optimum 3MD plan, which would require them to consume all the types of care specified in Table 1, would receive a total payment of $7,800 from the plan. Subtracting the

---

[22] Data from the US Commerce Department indicate that less than 6% of all health spending in the US is due to injuries. Source: Dunn A, Whitmire B, Batch A, Fernando L, Rittmueller L. "High spending growth rates for key diseases in 2000–14 were driven by technology and demographic factors." *Health Affairs*. 2018 Jun 1;37(6):915-24, and https://apps.bea.gov/data/special-topics/health-care/viz/diseases/

required copayments, which total $575, yields a total net payment of $7,225.

- The two plans with less benefits, Optimum 1MD and Elite 6MD, provide no benefits at all for hospital care due to illness.

- An enrollee who fully exhausted all illness benefits under the Optimum 1MD plan, which would require them to consume all the types of care specified in **Table 2**, would receive a total net payment of $2,025.

- An enrollee who fully exhausted all illness benefits under the Elite 6MD plan, which would require them to consume all the types of care specified in **Table 3**, would receive a total net payment of $850.

- In all three plans, maximum payments in case of accident are higher than for illness but are nonetheless capped at fairly low levels relative to the costs enrollees might incur. An enrollee who fully exhausted all accident benefits would receive a total net payment of $9,755. See **Table 4**.[23]

32. All of these plans share two serious limitations: they do not cap enrollees' out-of-pocket spending, and they significantly limit what services qualify for benefits. To say more about each of these points:

    i. First, the plans <u>do not cap enrollees' out-of-pocket health care spending</u>. Unlike comprehensive health insurance, which assumes an increasing

---

[23] It is unclear from the plan documents how the plans' accident-specific benefits might be coordinated with those for illness or accident. For example, under the Optimum 3MD plan, do the limits on the number of times particular benefits can be used apply to accident benefits as well? For example, if an enrollee has used the ambulance benefit of $200 twice – the maximum number of uses allowed, as specified in Section 3.2, "General Medical Benefits" – for sickness events and then requires a third ambulance trip due to an accident, is the enrollee still eligible to receive the accident-specific ambulance benefit of $250 for the third trip? If not, the accident benefit is considerably less generous than it appears in the Summary Plan Description. It is also unclear whether an enrollee can invoke both the accident benefit and the general benefit for an accident event, assuming the cap on the general benefit has not been reached. For example, could an enrollee who required an ambulance ride as a result of an accident and had not yet had any ambulance rides in the plan year receive both the accident-specific ambulance benefit of $250 and the general ambulance benefit of $200, or would they be limited to only one of these? The average charge for an ambulance ride in the US is more than $1,000 (FAIR Health, "Ground Ambulance Services in the United States: A Study of Private Healthcare Claims," February 2022; https://s3.amazonaws.com/media2.fairhealth.org/whitepaper/asset/Ground%20Ambulance%20Services%20in%20the%20United%20States%20-%20A%20FAIR%20Health%20White%20Paper.pdf). These questions are unanswerable because of the lack of information in the plan document about coordination of the two sets of benefits. Regardless of any coordination, the most important point about the distinction the plan draws between illnesses and accidents is that the more generous benefits are reserved for accidents, which are statistically a much smaller source of spending risk, as noted in footnote 22 above.

share of enrollee expenses as medical costs increase and ultimately caps enrollee out-of-pocket costs, these plans cap the plan's payments. They have no out-of-pocket maximum for enrollees.

ii. Second, the plans significantly limit what services qualify for benefits. Illness benefits are provided only for the categories of services outlined in Tables 1, 2, and 3. As already noted, the Optimum 1MD and Elite 6MD plans offer no benefits at all for hospitalization due to illness. Eight to 10 percent of US adults ages 18 to 64 will have a hospital stay in a year, with an average total cost of more than $15,000.[24] Even the benefits summarized in the tables come with significant limitations and exclusions. There is a thirty-day waiting period for coverage of anything related to illness, so an enrollee who had appendicitis within thirty days of enrolling would have no coverage for this condition. There is a one-year waiting period for coverage of any pre-existing conditions. Pre-existing conditions affect more than a quarter of non-elderly adults in the US.[25] There is no coverage for pregnancy; or for the treatment of mental illness, attempted suicide, substance abuse, or self-inflicted injuries. The plans also have a list of specifically excluded activities, including, but not limited to, participating in sports at the professional, semi-professional, or intercollegiate level; interscholastic tackle football; mountaineering; snowmobiling; and scuba diving. All of these limitations further distinguish the Innovative Partners health plans from comprehensive health insurance coverage, which generally covers most medically necessary care regardless of why it is needed.

33. For both of these reasons—the absence of a cap on enrollees' out-of-pocket costs and the significant limitations on what services qualify for benefits—these plans cannot be considered comprehensive health insurance coverage.

## C. What are the benefits of American Collective's Unity plans?

34. To address this question, I reviewed the Medical Plan Document and Summary Plan Description for the Unity 1, Unity 2, Unity 4, and Unity 6 plans (included in Expert Exhibit 7), which provides detailed information on the benefits of these plans. In addition, I reviewed the Summary of Benefits and Coverage and color

---

[24] Freeman WJ, Weiss AJ, Heslin KC. "Overview of U.S. Hospital Stays in 2016: Variation by Geographic Region." HCUP Statistical Brief #246. December 2018. Agency for Healthcare Research and Quality, Rockville, MD. https://hcup-us.ahrq.gov/reports/statbriefs/sb246-Geographic-Variation-Hospital-Stays.pdf. I have adjusted the average costs for 2016 reported in this publication by the Consumer Price Index for All Urban Consumers (BLS CPI-U) to current (2024) dollars.

[25] Pollitz K. "Pre-existing Conditions: What Are They and How Many People Have Them?" KFF Policy Watch. October 2020. https://www.kff.org/policy-watch/pre-existing-conditions-what-are-they-and-how-many-people-have-them/

brochure for the Unity 4 plan (both included in Expert Exhibit 7). I did not have Summaries of Benefits and Coverage or color brochures for the other Unity plans; however, it is clear from the Medical Plan Document and Summary Plan Description that the basic structure of benefits is similar for all of these plans, with different tiers of benefits reflected in the numbers (Unity 1 covers one office visit, Unity 2 covers two office visits, and so on.)

35. Like the Innovative Partners Elite plans, the American Collective Unity plans give enrollees access to the First Health provider network.

36. The American Collective Unity plans cover a list of "Prevention and Wellness Benefits" with no cost-sharing from enrollees (Expert Exhibit 7, Medical Plan Document and Summary Plan Description: pp. 10-14). This list appears to be very similar to the list of adult preventive services given a grade of A or B by the US Preventive Services Task Force,[26] which the ACA requires all health insurance plans – including those provided by self-insured employers – to cover without cost-sharing.

37. Beyond these preventive services, however, the scope of services for sickness or accidents covered by the Unity plans is extremely limited. In particular, the Unity plans cover only a set number of office visits for sickness or accident: one, two, four, or six visits depending on the plan level (for example, Unity 4 covers four office visits). These visits may be with primary care physicians, specialists, or urgent care centers, with different copayments depending on the type of provider ($25 for primary care, $50 for specialist, $100 for urgent care).

38. The value of this extremely limited benefit to enrollees is further diminished by the fact that many services that might be needed in the course of a covered office visit are explicitly excluded from coverage. Excluded services include "Office visit charges, Diagnostic Labs and Radiology Completed in the Office; Specialist testing such as Cardiac Testing, Pulmonary Testing (Including Sleep Studies), Neurologic Testing, and Gastroenterology Testing" (Expert Exhibit 7, Medical Plan Document and Summary Plan Description: p. 9). Also explicitly excluded is any type of surgery, which is defined so broadly as to include "suturing a wound" (Expert Exhibit 7, Medical Plan Document and Summary Plan Description for American Collective Unity Plans: p. 25) meaning that getting stitches would not be covered.

39. There is no coverage for emergency room care in any of the Unity plans.

40. There is no coverage for hospital care in any of the Unity plans.

---

[26] https://www.uspreventiveservicestaskforce.org/uspstf/recommendation-topics/uspstf-a-and-b-recommendations

41. The Unity plan documents are inconsistent about whether or not the plan has an out-of-pocket limit on enrollee spending; as noted above, the Medical Plan Document and Summary Plan Description does not mention any such limit, while the Summary of Benefits and Coverage for the Unity 4 plan lists a limit of $9,200 individual/$18,400 family. This is largely irrelevant, however, because any out-of-pocket limit would apply only to spending on *covered services*, and the extremely limited nature of services covered by these plans renders these limits – if they are in fact a feature of these plans – effectively useless. The Summary of Benefits and Coverage for the Unity 4 plan (included in Expert Exhibit 7) illustrates this uselessness clearly with the example "Peg is Having a Baby" on p. 5, in which the enrollee must pay $12,425 of the $12,700 total cost of her care, despite the fact that $12,425 clearly exceeds the individual out-of-pocket limit of $9,200 stated on p. 1 of that document.

42. The particular set of benefits provided by the Unity plans – full coverage for a list of federally-endorsed preventive services, partial coverage for a few office visits, and no coverage for anything else – complies with the aforementioned ACA preventive services requirement and also likely meets the ACA's definition of "Minimum Essential Coverage." This because the ACA's definition of Minimum Essential Coverage is almost tautological: any health insurance plan offered by an employer is considered to be Minimum Essential Coverage, as long as it is not a specifically excepted type of plan such as accident-only coverage or coverage for on-site medical clinics. Offering Minimum Essential Coverage shields the employer from broad financial penalties specified under Section 4980H(a) of the ACA, which are designed to penalize large employers who do not offer coverage at all.

43. The Unity plans would not, however, meet the higher ACA threshold of providing Minimum Value, which requires that plans provide "substantial coverage of both inpatient hospital services and physician services,"[27] which these plans do not do. Large employers who do not offer affordable health insurance providing Minimum Value may be subject to financial penalties under Section 4980H(b) of the ACA.

44. Because of the extremely limited benefits provided by the Unity plans, none of them can be considered comprehensive health insurance coverage. The fact that they cover preventive care does not affect this conclusion.

45. These deficiencies in the coverage provided by the American Collective Unity plans mean that they could not be offered for sale in the Marketplace, nor would they qualify for subsidies under the ACA.

---

[27] "Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016," 80 Federal Register 39, Feb 27, 2015: p. 10828

17

46. The benefits provided by the Unity plans are so severely limited that in the remainder of this report I largely focus on the Innovative Partners plans, some of which provide at least limited coverage for hospital services.

**D. What are the benefits of Innovative Partners supplemental plans, including accidental death and dismemberment policy ("Guardian") and critical illness policy ("Essential"), and the American Collective accidental death and dismemberment benefit ("Safeguard+")?**

47. These supplemental plans provide lump-sum payments in the event of specified accidents and illnesses.

    i. The Innovative Partners Guardian Accidental Death and Dismemberment Benefit[28] provides a lump-sum payment if an accident causes death or dismemberment, such as the loss of a hand, foot, vision, or hearing. The amount of the payout depends on the specific event and the "principal sum." The policy documents available to me do not define the principal sum, nor is it possible to tell from the documents what the amount is. The field in the policy documents labeled "Principal Sum" is left blank. Nonetheless, the plan documents make it clear that this benefit is similar to a very simple life insurance policy: a lump-sum benefit paid out in the event of the enrollee's death, or, in this case, dismemberment.

    ii. The American Collective Safeguard+ Accidental Death and Dismemberment Benefit[29] is the same as the Innovative Partners Guardian Accidental Death and Dismemberment Benefit.

    iii. The Innovative Partners Essential Critical Illness Benefit[30] provides a lump-sum payment if an enrollee experiences a serious illness, such as cancer, heart attack, or stroke. Again, the amount of the payout depends on the specific illness, as well as the "principal sum." The Summary Plan Description available to me does not define the principal sum, nor is it possible to tell from the documents what the amount is. The field labeled "Principal Sum" is once again left blank. Nonetheless, the plan documents make it clear that this benefit, too, is similar to a very simple life insurance policy: a lump-sum benefit paid out in the event of a covered illness, regardless of how high the enrollee's medical costs for the illness may be.

**E. How do the benefits of Innovative Partners health plans, individually or in combination with its supplemental plans, compare to the benefits of comprehensive**

---

[28] Expert Exhibit 6, Attachment H: Guardian Accidental Death and Dismemberment Benefit

[29] Summary Plan Description for American Collective LP's Safeguard+ Accidental Death and Dismemberment Benefit

[30] Expert Exhibit 3, Attachment H: Summary Plan Description of the Essential Critical Illness Benefit

**private health insurance plans available through government-sponsored Marketplaces or directly from private insurers?**

48.     The benefits of Innovative Partners health plans, individually or in combination with their supplemental Essential and Guardian plans, do not amount to comprehensive health insurance coverage that protects enrollees against the risk of high out-of-pocket health care spending.[31]

49.     Marketplace plans, as well as comprehensive plans sold directly by private insurers, provide comprehensive insurance coverage that protects enrollees against the risk of high out-of-pocket spending. I will henceforth refer to these two types of plans as "Marketplace and similar plans." Marketplace and similar plans are subject to regulations that ensure that they provide comprehensive coverage. Specifically, they must meet very specific requirements for <u>what health care services are covered</u> and <u>how much enrollees pay out-of-pocket for health care</u>.

      i.     In terms of <u>what services are covered</u>, Marketplace and similar plans must cover ten categories of services defined by the ACA as Essential Health Benefits.[32] These are:

         1. Ambulatory patient services;
         2. Emergency services;
         3. Hospitalization;
         4. Maternity and newborn care;
         5. Mental health and substance use disorder services, including behavioral health treatment;
         6. Prescription drugs;
         7. Rehabilitative and habilitative services and devices;
         8. Laboratory services;
         9. Preventive and wellness services and chronic disease management; and
         10. Pediatric services, including oral and vision care.

      ii.     In terms of <u>how much enrollees pay out-of-pocket for care</u>, while Marketplace and similar plans have some flexibility to require enrollee cost-sharing (deductibles, co-payments, and/or coinsurance), all such plans are required to set out-of-pocket maximums at or below levels specified each year by the Center for Medicare and Medicaid Services (CMS), with lower limits on out-of-pocket spending for lower-income enrollees. A typical Marketplace enrollee in 2025 might have a $7,000 annual out-of-pocket maximum, while a lower-income enrollee might have a much

---

[31] The American Collective Unity plans also cannot be considered comprehensive health insurance coverage, as described above.

[32] Patient Protection and Affordable Care Act, Subtitle D, Part 1, Sec. 1302

19

lower annual out-of-pocket maximum of $3,050.[33] The purpose of this requirement is to ensure that all enrollees are protected against the risk of catastrophic medical expenses.

50. Innovative Partners plans, in contrast, do not cover all Essential Health Benefits, nor do they limit enrollee out-of-pocket costs as required by the ACA. In terms of covered services, two of the three Summary Plan Descriptions I reviewed (Optimum 1MD and Elite 6MD) have no coverage for hospitalization due to illness. None of the Innovative Partners LP plans covers maternity and newborn care, substance use disorders, or vision care. They impose a one-year waiting period on coverage of pre-existing conditions and provide less benefits for treatment of illness than accidents, neither of which would not be allowed for Marketplace and similar plans. In terms of limiting enrollee cost-sharing, Innovative Partners plans do not cap enrollees' out-of-pocket health care spending, as described in response to Question B above.

51. These deficiencies in Innovative Partners plans—their failure to cover all Essential Health Benefits and their lack of an out-of-pocket maximum—mean that they could not be offered for sale in the Marketplace, nor would they qualify for subsidies under the ACA.

**F. What do the terms "deductible," "copay," and "out-of-pocket maximum" mean in the context of health insurance? What relevance do these terms have to the health plans and supplemental plans offered by Innovative Partners?**

52. These are health insurance terms of art that describe how costs are split between the insurance plan and the enrollee, as described in response to Question A above. These terms have no relevance to the plans offered by Innovative Partners because of the fixed indemnity nature of the benefits provided by those plans. In particular: the term **deductible** has no relevance to the plans offered by Innovative Partners because there is no point at which these plans assume responsibility for most of consumers' costs. The term **copay** has no relevance to the plans offered by Innovative Partners, although it is used in the plan documents. The use of this term in the plan documents is not apt, however, because a $25 "copay" for a physician visit coupled with a fixed $150 payment to the consumer is mathematically equivalent to a fixed $125 payment to the consumer. A true copay would imply that the plan is paying the rest of the bill, which is not the case for the Innovative Partners plans. The term **out-of-pocket maximum** has no relevance to the Innovative Partners plans because they have no out-of-pocket maximums.

---

[33] The highest allowable out-of-pocket maximums for individual Marketplace enrollees depend on income relative to the Federal Poverty Level ("poverty") and change from year to year. In 2025, the caps were as follows: out-of-pocket maximum no greater than $3,050 if income is 100 to 250% of poverty; $7,350 if income is 200 to 250% of poverty; and $9,200 if income is above 250% of poverty. Source: CMS guidance, Nov. 15, 2023, https://www.cms.gov/files/document/2025-papi-parameters-guidance-2023-11-15.pdf

**G. What is a "PPO" health insurance plan, and how do the benefits of Innovative Partners health plans compare to benefits of a PPO plan?**

53.     The acronym PPO stands for Preferred Provider Organization. In the 1980s, this term meant what today we would call a provider network. Today, the term PPO is shorthand for a comprehensive health insurance plan that gives enrollees access to a broad network of health care providers, in contrast to an HMO (Health Maintenance Organization), which is typically a plan with a narrower provider network. Innovative Partners plans may give enrollees access to a provider network, but they do not offer the comprehensive financial protection that a PPO would be expected to provide: most importantly, an out-of-pocket maximum.

**H. For illustrative health scenarios, compare a consumer's estimated out-of-pocket healthcare spending under Innovative Partner plans, individually or in combination with each other, to out-of-pocket spending under a comprehensive private health insurance plan available through a government-sponsored Marketplace or directly from an insurance company.**

54.     To illustrate how the Innovative Partners plans[34] compare to comprehensive health insurance coverage in terms of a consumer's out-of-pocket healthcare costs, I consider three scenarios: first, that the individual is hospitalized for an **appendectomy**, with a hospital bill for $12,000.[35] Second, that they are hospitalized for **septicemia**, the most common non-childbirth-related reason for hospital stays in the US, with a hospital bill for $24,000.[36] Third, that they experience hospitalizations for **both appendectomy and septicemia** within a single year, with total hospital bills of $36,000.

55.     **Table 5** below summarizes these illustrative scenarios, comparing costs under the Innovative Partners Optimum 3MD plan with a typical ACA Marketplace plan. In each scenario, I compare how much the consumer would have to pay with typical

---

[34] I do not include any of the American Collective Unity plans in this comparison because their benefits, as already noted, do not include any coverage for hospital care. They would therefore cover almost nothing in any case requiring hospitalization, as illustrated in the Unity plans' Summary of Benefits and Coverage (see paragraphs 38 to 41 above).

[35] The Fair Health Consumer (www.fairhealthconsumer.org) healthcare expense estimator reports that average in-network charges for appendectomy and related imaging, lab work, anesthesia, and facility fees, are $11,790 in Chicago, Illinois.

[36] McDermott KW and Roemer M. "Most Frequent Principal Diagnoses for Inpatient Stays in U.S. Hospitals, 2018." HCUP Statistical Brief #277. July 2021. Agency for Healthcare Research and Quality, Rockville, MD. https://hcup-us.ahrq.gov/reports/statbriefs/sb277-Top-Reasons-Hospital-Stays-2018.jsp. I have adjusted the average costs for 2018 reported in this publication by the Consumer Price Index for All Urban Consumers (BLS CPI-U) to current (2024) dollars.

21

Marketplace coverage that has an annual out-of-pocket maximum of $7,000[37] versus how much they would have to pay with the Innovative Partners Optimum 3MD plan, which has the most benefits of the three plans for which I had a Summary Plan Description, and is the only one of the three that provides any coverage for hospitalization due to illness. My calculations assume that the hospitalization does not occur within the first 30 days of coverage under the Innovative Partners plan, or within the first year of enrollment if the hospitalization stems from a pre-existing condition during the individual's first year of enrollment; if it did, the individual would not qualify for any benefits.

56. **Scenario 1: Appendectomy ($12,000 hospital bill).** For purposes of calculating the benefits paid under the Optimum 3MD plan in this scenario, I assume that the individual visits the ER but does not require an ambulance; uses at least $400 of imaging; is admitted to the hospital, where they have surgery with general anesthesia; is discharged after two days; and has one follow-up visit with a physician. With the Optimum 3MD plan, this individual would have to pay the $12,000 bill. They would then receive a total payment of $2,200 from the plan, composed of the following benefits:

- $200 for an ER visit
- $400 for imaging
- $400 for hospital admission
- $400 for hospital confinement (2 days x $200/day)
- $400 for inpatient surgery
- $200 for inpatient general anesthesia
- $200 for a follow-up visit with a doctor

The enrollee's net out-of-pocket expense would be the amount of the hospital bill ($12,000) minus the payment from the plan ($2,200), or <u>$9,800</u>.

With typical Marketplace coverage, this individual would have to pay <u>$7,000</u> (the annual out-of-pocket maximum), and the insurance plan would pay the remaining $5,000.

57. **Scenario 2: Septicemia ($24,000 hospital bill).** For purposes of calculating the benefits paid under the Optimum 3MD plan in this scenario, I assume that the individual arrives at the ER via ambulance; uses at least $200 of lab tests; is admitted to the hospital, and then the ICU, spending a total of 13 days as an

---

[37] For purposes of this declaration, "typical Marketplace coverage" assumes a consumer at the median income level for Marketplace enrollees (250% of poverty, or $37,650, for an individual in 2024). *See* CMS, "Effectuated Enrollment: Early 2024 Snapshot and Full Year 2023 Average," at https://www.cms.gov/files/document/early-2024-and-full-year-2023-effectuated-enrollment-report.pdf). The average enrollee at this income level had an out-of-pocket maximum of $7,107 in 2024, which I have rounded to $7,000 in these calculations for simplicity. Source: KFF, "Cost-Sharing for Plans Offered in the Federal Marketplace for 2024," at https://files.kff.org/attachment/Cost-Sharing-for-Plans-Offered-in-the-Federal-Marketplace-2024.pptx

inpatient (8 hospital days and 5 ICU days); and requires five follow-up physician visits. With the Innovative Partners Optimum 3MD plan, this individual would have to pay the $24,000 bill. They would then receive a payment of $5,000 from the plan, composed of the following benefits:

- $200 for an ambulance trip
- $200 for an ER visit
- $200 for lab tests
- $400 for hospital admission
- $1,600 for hospital confinement (8 days x $200/day)
- $400 for ICU admission
- $1,000 for ICU confinement (5 days x $200/day)
- $1,000 for doctors' visits (5 visits x $200/visit)

The enrollee's net out-of-pocket expense would be the amount of the hospital bill ($24,000) minus the payment from the plan ($5,000), or $19,000.

With typical Marketplace coverage, this individual would have to pay $7,000 (the annual out-of-pocket maximum), and the insurance plan would pay the remaining $17,000.

58. **Scenario 3: Appendectomy and septicemia ($36,000 total in hospital bills).** For purposes of calculating the benefits paid under the Optimum 3MD plan in this scenario, I assume that the individual uses all of the services described in Scenarios 1 and 2. This comes close to exhausting all of the benefits available from this plan; the only benefits unused are outpatient surgery and outpatient anesthesia, the wellness visit, and one ambulance trip. The individual has more than exhausted the hospital admission benefit, which is capped at one use, and so the individual receives this benefit only once despite being admitted to the hospital twice.

In this scenario, with the Innovative Partners Optimum 3MD plan, this enrollee's net out-of-pocket expense would be the amount of the hospital bill ($36,000) minus the payment from the plan ($6,800), or $29,200.

With typical Marketplace coverage, this individual would have to pay $7,000 (the out-of-pocket maximum), and the insurance plan would pay the remaining $29,000.

59. For even more costly illness-related events than the ones described here, Marketplace coverage would cover all of the additional cost of care above the $7,000 annual out-of-pocket maximum. A consumer with an Innovative Partners Optimum 3MD plan, in contrast, would receive a payment of no more than $7,800 (the maximum possible from exhausting all benefits for illness detailed in Table 1) and would have to pay out-of-pocket any additional costs for a more costly event. That is, with Marketplace coverage, the enrollee would pay at most $7,000

23

while the plan pays the rest; with the Optimum 3MD plan, the plan would pay at most $7,800 while the enrollee pays the rest.

60.     The scenarios would be the same whether or not the enrollee also had the Innovative Partners Guardian Death and Dismemberment Benefit and/or the Essential Critical Illness Benefit because none of the scenarios involves death, dismemberment, or any of the critical illnesses subject to the Essential Critical Illness Benefit (cancer, heart attack, end-stage renal failure, major organ transplant, and stroke). Moreover, even in the case of an event covered by the Guardian or Essential benefits (e.g. cancer), the payments made by the plan are capped at specific values regardless of how high the consumer's medical bills are, so that consumers are not protected from the risk of truly catastrophic expenses.

**I.   Are Innovative Partners health plans, accidental death and dismemberment plans, and critical illness plans, whether individually or in combination with each other, equivalent to comprehensive health insurance?**

61.     No. These plans place no out-of-pocket maximum on enrollee health care costs and significantly limit what services qualify for benefits. They do not protect consumers from the risk of high out-of-pocket health care spending, which is the defining feature of comprehensive health insurance. Innovative Partners health plans, accidental death and dismemberment plans, and critical illness plans, whether individually or in combination with each other, are not equivalent to comprehensive health insurance.

**J.   Are American Collective health plans and accidental death and dismemberment plan, whether individually or in combination with each other, equivalent to comprehensive health insurance?**

62.     No. These plans have no coverage for hospital or emergency room care and significantly limit what services qualify for benefits. It is unclear whether the plans have an out-of-pocket maximum on enrollee health care costs; but even if they do, any such maximum would apply only to covered services, and would therefore not protect consumers from the risk of high out-of-pocket health care spending, which is the defining feature of comprehensive health insurance. American Collective health plans and accidental death and dismemberment plan, whether individually or in combination with each other, are not equivalent to comprehensive health insurance.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on March 25, 2026.

*Helen Levy*

_____

HELEN G. LEVY, Ph.D.

24

| Services | (A) Benefit per use | (B) Copay per use | (C) Maximum number of uses per year | (D) Maximum Annual Benefit = A*C | (E) Maximum Annual Benefit Net of Copayments = (A – B)*C |
|---|---|---|---|---|---|
| **Table 1**: Summary of Plan Benefits for Illness Innovative Partners **Optimum 3MD** Policy | | | | | |
| **Hospital services:** | | | | | |
| Hospital admission | $400 | $100 | 1 | $400 | $300 |
| Hospital confinement | $200 | $0 | 10 days | $2,000 | $2,000 |
| ICU admission | $400 | $100 | 1 | $400 | $300 |
| ICU confinement | $200 | $0 | 5 days | $1,000 | $1,000 |
| Inpatient surgery | $400 | $0 | 1 | $400 | $400 |
| Inpatient general anesthesia | $200 | $0 | 1 | $200 | $200 |
| **Outpatient surgery/anesthesia:** | | | | | |
| Outpatient surgery | $200 | $100 | 1 | $200 | $100 |
| Outpatient general anesthesia | $100 | $25 | 1 | $100 | $75 |
| **Emergency room visits** | $200 | $25 | 2 | $400 | $350 |
| **Physician/urgent care visits** | $200 | $25 | 6 | $1,200 | $1,050 |
| **Wellness visit** | $500 | $0 | 1 | $500 | $500 |
| **Ambulance trips** | $200 | $0 | 2 | $400 | $400 |
| **Lab test** | $200 | $25 | 1 | $200 | $175 |
| **Imaging** | $400 | $25 | 1 | $400 | $375 |
| **Prescription drugs** | No coverage | | | | |
| **Dental surgery** | No coverage | | | | |
| **Physical therapy** | No coverage | | | | |
| *Maximum total annual benefit:* | | | | *$7,800* | *$7,225* |
| See notes to Table 1 on next page. | | | | | |

25

| Notes to Table 1, Summary of Plan Benefits for Illness<br>Innovative Partners **Optimum 3MD** Policy |
|---|
| Additional benefits:<br>• Benefits for <u>accidents only</u> as described in Table 4<br>• Access to MultiPlan network<br>• Plan brochure advertises optional dental coverage[38]<br>• Plan description encourages enrollees to download and use the SingleCare app. Based on a visit to www.singlecare.com, this is a prescription drug discount card that is available to anyone.<br>• Plan description promises free access to TelaDoc, a tele-health provider. The description indicates that the plan will provide one (1) tele-health consultation with a $0 co-pay, but the value of this benefit and the extent of the coverage is otherwise unclear.<br>• The plan brochure includes a 15% discount code for the purchase of Nutraceuticals from "Progressive Nutracare." The value of this benefit is unclear. |
| Limitations and exclusions include:<br>• Thirty day waiting period for any coverage related to illness<br>• Twelve month waiting period for coverage of pre-existing conditions<br>• No coverage for pregnancy, mental illness, attempted suicide, substance abuse, or self-inflicted injuries<br>• Specifically excluded activities: participating in sports at the professional, semi-professional, or intercollegiate level; interscholastic tackle football; mountaineering; snowmobiling; or scuba diving |

---

[38] This may refer to the Dental 1K plan, which was the only dental plan for which I had a Summary Plan Description (Smith Attachment G: Summary Plan Description for the Benefits of the Dental 1K plan). Under the Dental 1K plan, the plan pays a fraction of the costs of dental services classified as preventive, basic, or major, provided by in-network and out-of-network providers. The plan's share ranges from 100% (for in-network preventive procedures such as a routine dental exam/cleaning) to 25% (for out-of-network major procedures such as a crown). The Dental 1K plan has a $50 annual deductible and a $3,000 cap per person per year on the benefits the plan will pay.

| Services | (A) Benefit per use | (B) Copay per use | (C) Maximum number of uses per year | (D) Maximum Annual Benefit = A*C | (E) Maximum Annual Benefit Net of Copayments = (A – B)*C |
|---|---|---|---|---|---|
| **Table 2**: Summary of Plan Benefits for Illness Innovative Partners **Optimum 1MD** Policy | | | | | |
| **Hospital services** | No coverage | | | $0 | $0 |
| **Outpatient surgery/anesthesia** | No coverage | | | $0 | $0 |
| **Emergency room visits** | $150 | $25 | 1 | $150 | $125 |
| **Physician/urgent care visits** | $150 | $25 | 4 | $600 | $500 |
| **Wellness visit** | $1,000 | $0 | 1 | $1,000 | $1,000 |
| **Ambulance trips** | $150 | $0 | 1 | $150 | $150 |
| **Lab test** | $150 | $25 | 1 | $150 | $125 |
| **Imaging** | $150 | $25 | 1 | $150 | $125 |
| **Prescription drugs** | No coverage | | | $0 | $0 |
| **Dental surgery** | No coverage | | | $0 | $0 |
| **Physical therapy** | No coverage | | | $0 | $0 |
| *Maximum total annual benefit:* | | | | *$2,200* | *$2,025* |

Additional benefits:
- Benefits for <u>accidents only</u> as described in Table 4
- Access to MultiPlan network
- Plan brochure advertises optional dental coverage. See footnote 32 above.
- Plan description encourages enrollees to download and use the SingleCare app. Based on a visit to www.singlecare.com, this is a prescription drug discount card that is available to anyone.
- Plan description promises free access to TelaDoc, a tele-health provider. The description indicates that the plan will provide one (1) tele-health consultation with a $0 co-pay, but the value of this benefit and the extent of the coverage is otherwise unclear.
- The plan brochure includes a 15% discount code for the purchase of Nutraceuticals from "Progressive Nutracare." The value of this benefit is unclear.

Notes to Table 2 continue on next page

27

| Continuation of Notes to Table 2, Summary of Plan Benefits for Illness<br>Innovative Partners **Optimum 1MD** Policy |
| --- |
| Limitations and exclusions include:<br>• Thirty day waiting period for any coverage related to illness<br>• Twelve month waiting period for coverage of pre-existing conditions<br>• No coverage for pregnancy, mental illness, attempted suicide, substance abuse, or self-inflicted injuries<br>• Specifically excluded activities: participating in sports at the professional, semi-professional, or intercollegiate level; interscholastic tackle football; mountaineering; snowmobiling; or scuba diving |

| Services | (A) Benefit per use | (B) Copay per use | (C) Maximum number of uses per year | (D) Maximum Annual Benefit = A*C | (E) Maximum Annual Benefit Net of Copayments = (A − B)*C |
|---|---|---|---|---|---|
| **Table 3**: Summary of Plan Benefits for Illness Innovative Partners **Elite 6MD** Policy | | | | | |
| **Hospital services** | No coverage | | | $0 | $0 |
| **Outpatient surgery/anesthesia** | No coverage | | | $0 | $0 |
| **Emergency room visits** | $150 | $50 | 1 | $150 | $100 |
| **Physician visits** | | | | | |
| Primary care | $150 | $25 | 6 total | $900 | $750[39] |
| Specialist/urgent care | $150 | $50 | | | |
| **Wellness visits** | No coverage | | | $0 | $0 |
| **Ambulance trips** | No coverage | | | $0 | $0 |
| **Lab tests** | No coverage | | | $0 | $0 |
| **Imaging** | No coverage | | | $0 | $0 |
| **Prescription drugs** | No coverage | | | $0 | $0 |
| **Dental surgery** | No coverage | | | $0 | $0 |
| **Physical therapy** | No coverage | | | $0 | $0 |
| ***Maximum total annual benefit:*** | | | | ***$1,050*** | ***$850*** |

Additional benefits:
- Benefits for <u>accidents only</u> as described in Table 4
- Access to MultiPlan network
- Plan brochure advertises optional dental coverage. See footnote 32 above.
- Plan description encourages enrollees to download and use the SingleCare app. Based on a visit to www.singlecare.com, this is a prescription drug discount card that is available to anyone.

Notes to Table 3 continue on next page

---

[39] This assumes all 6 visits are primary care, with copays of $25 each. If they were specialist/urgent care visits, with copays of $50 each, the maximum annual net benefit for physician visits would be only ($900 − 6*$50) = $600.

<div style="border:1px solid black; padding:10px;">

**Continuation of Notes to Table 3, Summary of Plan Benefits for Illness**
**Innovative Partners Elite 6MD Policy**

---

Additional benefits (continued from previous page):

- Plan brochure promises free access to TelaDoc, a tele-health provider. The description indicates that the plan will provide one (1) tele-health consultation with a $0 co-pay, but the value of this benefit and the extent of the coverage is otherwise unclear.
- The plan brochure includes a 15% discount code for the purchase of Nutraceuticals from "Progressive Nutracare." The value of this benefit is unclear.

Limitations and exclusions include:

- Thirty day waiting period for any coverage related to illness
- Twelve month waiting period for coverage of pre-existing conditions
- No coverage for pregnancy, mental illness, attempted suicide, substance abuse, or self-inflicted injuries
- Specifically excluded activities: participating in sports at the professional, semi-professional, or intercollegiate level; interscholastic tackle football; mountaineering; snowmobiling; or scuba diving

</div>

| Table 4: Summary of Maximum Benefits for **Accidents** Innovative Partners Optimum 3MD, Optimum 1MD, and Elite 6MD Policies[40] | |
|---|---|
| **Services** | **Maximum Annual Benefit** |
| Hospital room/nursing care | $2,500 |
| Physician's fees for surgery | $2,500 |
| Anesthesia services | $2,500 |
| Non-surgical physician care (inpatient or outpatient) | $75 |
| Hospital emergency room care | $500 |
| X-rays, ultrasounds, other medical imaging | $250 |
| Ambulance service | $250 |
| Prescription drugs | $500 |
| Dental surgery | $500 |
| Physical therapy: $60 first visit, $30 per additional visit; maximum of 5 visits | $180 |
| *Maximum total annual benefit:* | *$9,755* |
| Limitations and exclusions include: <br>• Twelve month waiting period for coverage of pre-existing conditions <br>• No coverage for pregnancy, mental illness, attempted suicide, substance abuse, or self-inflicted injuries <br>• Specifically excluded activities: participating in sports at the professional, semi-professional, or intercollegiate level; interscholastic tackle football; mountaineering; snowmobiling; or scuba diving | |

---

[40] As discussed in footnote 23, it is unclear whether or how accident benefits in this table are coordinated with the general benefits for accident or illness described in Tables 1, 2, and 3.

**Table 5**: Illustrative Health Spending Scenarios for Enrollee Out-of-Pocket Cost with Innovative Partners Optimum 3MD Policy vs. Comprehensive Coverage

| | Optimum 3MD | Comprehensive health insurance with $7,000 out-of-pocket maximum |
|---|---|---|
| **Scenario 1: Total cost = $12,000 (appendicitis)** | | |
| (1) Total hospital bill | $12,000 | $12,000 |
| (2) Plan pays enrollee | $2,200 | $0 |
| (3) Plan pays hospital | $0 | $5,000 |
| (4) Enrollee pays hospital | $12,000 | $7,000 |
| **(5) Enrollee net out-of-pocket cost: Row (4) – Row (2)** | **$9,800** | **$7,000** |
| **Scenario 2: Total cost = $24,000 (septicemia)** | | |
| (6) Total hospital bill | $24,000 | $24,000 |
| (7) Plan pays enrollee | $5,000 | $0 |
| (8) Plan pays hospital | $0 | $17,000 |
| (9) Enrollee pays hospital | $24,000 | $7,000 |
| **(10) Enrollee net out-of-pocket cost: Row (9) – Row (7)** | **$19,000** | **$7,000** |
| **Scenario 3: Total cost = $36,000 (appendicitis AND septicemia)** | | |
| (11) Total hospital bill | $36,000 | $36,000 |
| (12) Plan pays enrollee | $6,800 | $0 |
| (13) Plan pays hospital | $0 | $29,000 |
| (14) Enrollee pays hospital | $36,000 | $7,000 |
| **(15) Enrollee net out-of-pocket cost: Row (14) – Row (12)** | **$29,200** | **$7,000** |

# APPENDIX A

March 2026

# HELEN G. LEVY

Institute for Social Research
University of Michigan
426 Thompson St.                                    Phone: (734) 936 – 4506
Ann Arbor, MI 48104                                  hlevy@umich.edu

## EDUCATION

1998    Ph.D., Economics, Princeton University
1991    B.A. *cum laude*, Mathematics and History, Yale University

## EMPLOYMENT

**University of Michigan at Ann Arbor, 2004 to present**
Research Professor, Survey Research Center, Institute for Social Research, 2016 – present
   *Additional current appointments as Research Professor at the University of Michigan:*
   Department of Health Management and Policy, School of Public Health (2016 – present)
   Gerald R. Ford School of Public Policy (2016 – present)
   Mary H. Weiser Food Allergy Center, Michigan Medicine (2023 – present)

*Past appointments at the University of Michigan:*
Associate Director, Survey Research Center, Institute for Social Research, 2019 – 2023
Research Associate Professor, 2011 – 2016
Research Assistant Professor, 2004 – 2011

Visiting Scholar, National Poverty Center, 2004

**Russell Sage Foundation, New York NY**
Visiting Scholar, Academic year 2016 –2017

**White House Council of Economic Advisers, Executive Office of the President, Washington DC**
Senior Economist, Academic year 2010 – 2011

**University of Chicago**
Assistant Professor, Harris Graduate School of Public Policy Studies, 2000 – 2004

**University of California at Berkeley**
Robert Wood Johnson Foundation Scholar in Health Policy Research, 1998 – 2000

**The Robert Wood Johnson Foundation, Princeton NJ**
Research Intern (part-time), 1995 – 1998

34

**White House Task Force on Health Care Reform, Washington DC**
Policy Assistant, January – May 1993

**Agency for Health Care Policy and Research, U.S. Department of Health and Human Services, Rockville MD**
Research Assistant, 1991 – 1993

## PUBLICATIONS

1. Becker NV, **Levy H**, Hirth RA, Clark SJ, Tipirneni R, Ayanian JZ. Financial outcomes among Medicaid enrollees. *JAMA Network Open.* In press.
2. Dalziel, K., Chua, K.P., Hua, X., Huang, L., Ryan, A., Freed, G.L., **Levy, H.** and Ayanian, J.Z., 2026. Association of Medicaid expansion with children's insurance coverage and healthcare utilization. *Health Affairs Scholar*, 4(1).
3. Lei L, Maust DT, Ankuda C, Hoffman G, Kim HM, Strominger J, **Levy H**. 2025. "Older Adults Living with Dementia Enrolled in Similar Medicare Advantage Plans Compared to Those without Dementia." *Alzheimer's & Dementia: Behavior & Socioeconomics of Aging* 1:e70016
4. Buchmueller, Thomas C., and **Helen Levy**. 2025. "The Impact of Health Insurance on Mortality." *Annual Review of Public Health* 46:541-550.
5. Tipirneni, Renuka, Eric T. Roberts, **Helen G. Levy**, Andrei R. Stefanescu, Kenneth M. Langa, Kara Zivin, Donovan T. Maust, and John Z. Ayanian. "Health Care Utilization and Costs for Older Adults Aging into Medicare After the Affordable Care Act." *JAMA Health Forum*, 6(1):e245025-e245025
6. Peirce, Alexandra, Ying-Jen Lin, Angela Fagerlin, Michele Heisler, **Helen Levy**, and Jeffrey Kullgren. 2024. "Evaluating a novel online behavioural intervention to encourage cost-conscious strategies among US adults with chronic conditions who are enrolled in a high-deductible health plan: a proof-of-concept pilot study." *BMJ Open* 14(5): e076852.
7. Lei L, **Levy H**, Ankuda C, Hoffman G, Kim HM, Strominger J, Maust DT. 2024. "Partner Plan Choices and Medicare Advantage Enrollment Decisions Among Older Adults." *JAMA*, 2024.
8. Hirth, Richard A., Zachary M. Levinson, Neha Buch Blattner, Vanessa K. Dalton, Angela S. Kelley, Michael Lanham, Marsha Manning, Edward C. Norton, **Helen G. Levy**, and James M. Dupree. 2023. "Developing an Adjunct Services Approach to Identify the Use of Procedures Not Covered by Health Insurance: The Case of In Vitro Fertilization." *Medical Care* 61(4): 222-225.
9. Barcellos, Silvia, Mireille Jacobson, and **Helen G. Levy**. 2023. "The Impact of Eligibility for Medicaid versus Subsidized Private Health Insurance on Medical Spending, Self-Reported Health, and Public Program Participation." *American Journal of Health Economics* 9(2): 262-295.
    Hu, Tiffany Yung-Shin, Iman Ali, Michele Heisler, **Helen Levy**, Angela Fagerlin, and Jeffrey T. Kullgren. 2023. "Helping Patients with Chronic Conditions Overcome Challenges of High-Deductible Health Plans: Mixed Methods Study." *JMIR Formative Research* 7(1): e37596

10. **Levy, Helen**. "The Long-Run Prevalence of Food Insufficiency among Older Americans." 2022. *Applied Economic Perspectives and Policy* 2022: 1-16. *Awarded 2023 Outstanding Article Award from Applied Economic Perspectives and Policy*

11. Tipirneni R, **Levy HG**, Langa KM, McCammon RJ, Zivin K, Luster J, Karmakar M, Ayanian JZ. 2021. "Changes in Health Care Access and Utilization for Low-SES Adults Age 51-64 after Medicaid Expansion." *The Journals of Gerontology: Series B* 76(6):1218-1230

12. Buchmueller, Thomas C., **Helen Levy**, and Robert G. Valletta. 2021. "Medicaid Expansion and the Unemployed." *Journal of Labor Economics* 39 (S2): S575-S617.

13. Kullgren, Jeffrey T., Elizabeth Q. Cliff, Christopher Krenz, Brady T. West, **Helen Levy**, Mark Fendrick, and Angela Fagerlin. 2020. "Use of Health Savings Accounts Among US Adults Enrolled in High-Deductible Health Plans." *JAMA Network Open* 3(7): e2011014-e2011014. DOI:10.1001/jamanetworkopen.2020.11014

14. Buchmueller, Thomas C., Betsy Q. Cliff, and **Helen Levy**. 2020. "The Benefits of Medicaid Expansion." *JAMA Health Forum* 1(7):e200879-e200879.

15. **Levy, Helen**, Andrew Ying, and Nicholas Bagley. 2020. "What's Left of the Affordable Care Act? A Progress Report." *RSF: The Russell Sage Foundation Journal of the Social Sciences* 6(2): 42–66. DOI: 10.7758/RSF.2020.6.2.02

16. Glied, Sherry, and **Helen Levy**. 2020. "The Potential Effects of Coronavirus on National Health Expenditures," *JAMA*, published online April 28, 2020. doi:10.1001/jama.2020.6644

17. Buchmueller, Thomas C. and **Helen G. Levy**. 2020. "The ACA's Impact on Racial and Ethnic Disparities in Health Insurance Coverage and Access to Care." *Health Affairs* 39(3): 395 - 402

18. Rhodes, Jordan H., Thomas C. Buchmueller, **Helen G. Levy** and Sayeh S. Nikpay. 2020. "Heterogeneous Effects of the ACA Medicaid Expansion on Hospital Financial Outcomes." *Contemporary Economic Policy* 38(1):81-93. doi: 10.1111/coep.12428.

19. **Levy, Helen**, John Z. Ayanian, Thomas C. Buchmueller, Donald R. Grimes, and Gabriel M. Ehrlich. 2020. "Macroeconomic Feedback Effects of Medicaid Expansion: Evidence from Michigan." *Journal of Health Politics, Policy, and Law* 45(1): 5 – 48. *Awarded 2020 George I. Treyz Gold Award for Excellence in Economic and Demographic Analysis from REMI Inc.*

20. Dupree JM, Levinson Z, Kelley AS, Manning M, Dalton VK, **Levy H**, Hirth RA. 2019. "Provision of Insurance Coverage for IVF by a Large Employer and Changes in IVF Rates among Health Plan Enrollees." *JAMA* 322(19):1920-1921. doi: 10.1001/jama.2019.16055

21. Kelley, Alan Taylor, Renuka Tipirneni, and **Helen Levy**. 2019. "Changes in Veterans' Coverage and Access to Care Following the Affordable Care Act, 2011-2017." *American Journal of Public Health* 109 (9): 1233-1235.

22. Kullgren, Jeffrey T., Betsy Q. Cliff, Chris D. Krenz, **Helen Levy**, Brady West, A. Mark Fendrick, Jonathan So, and Angela Fagerlin. 2019. "A Survey of Americans with High-Deductible Health Plans Identifies Opportunities to Enhance Consumer Behaviors." *Health Affairs* 38(3): 416-424.

36

23. Hirth, Richard A., Yubraj Acharya, **Helen G. Levy**, and Kenneth M. Langa. 2019. "Does Home Equity Affect Decisions on Long-Term Care Insurance Purchases? Evidence from the United States." *Research on Aging* 41(6): 602-628. doi: 10.1177/0164027519830078

24. Cliff, Betsy Q., Christopher Krenz, Brady T. West, **Helen Levy**, A. Mark Fendrick, Tyler NA Winkelman, Jonathan So, Angela Fagerlin, and Jeffrey T. Kullgren. 2019. "Attitudes about Consumer Strategies among Americans in High-deductible Health Plans." *Medical Care* 57 (3): 187-193.

25. **Levy, Helen**, Thomas Buchmueller, and Sayeh Nikpay. 2019. "The Impact of Medicaid Expansion on Household Consumption." *Eastern Economic Journal* 45(1): 34-57.

26. Vincent Fusaro, H. Luke Shaefer, and **Helen Levy**. 2018. "Racial and Ethnic Disparities in the Lifetime Prevalence of Homelessness in the United States." *Demography* 55(6): 2119-2128.

27. Michael M. McKee, HwaJung Choi, Shelby Wilson, Melissa J. DeJonckheere, Philip Zazove, and **Helen Levy**. 2018. "Determinants of Hearing Aid Use among Older Americans with Hearing Loss." *The Gerontologist*. DOI: 10.1093/geront/gny051

28. **Helen Levy**, Edward C. Norton, and Jeffrey Smith. 2018. "Tobacco Regulation and Cost-Benefit Analysis: How Should We Value Foregone Consumer Surplus?" *American Journal of Health Economics* 4(1): 1 - 25.

29. Kullgren, Jeffrey T., Elizabeth Q. Cliff, Christopher Krenz, Brady T. West, **Helen Levy**, A. Mark Fendrick, and Angela Fagerlin. 2018. "Consumer Behaviors Among Individuals Enrolled in High-Deductible Health Plans in the United States." *JAMA Internal Medicine* 178(3): 424-426. DOI: 10.1001/jamainternmed.2017.6622

30. Matthew A. Davis, Kai Zheng, Yang Liu, and **Helen Levy**. 2017. "Public Response to Obamacare on Twitter." *Journal of Medical Internet Research* 19(5):e167. DOI:10.2196/jmir.6946

31. Sayeh Nikpay, Seth Freedman, **Helen Levy**, and Thomas Buchmueller. 2017. "Impact of the ACA Medicaid Expansion on Emergency Department Visits: Evidence from State-Level Emergency Department Databases." *Annals of Emergency Medicine* 70:215-225.

32. Thomas Buchmueller and **Helen Levy**. 2017. "Health Reform in the Age of Trump," in *Economics and Policy in the Age of Trump*, ed. Chad Bown, CEPR, pp. 15 - 25.

33. Swenson, Carolyn Weaver, Neil S. Kamdar, **Helen Levy**, Darrell A. Campbell Jr, and Daniel M. Morgan. 2017. "Insurance Type and Major Complications after Hysterectomy." *Female Pelvic Medicine & Reconstructive Surgery* 23 (1): 39-43.

34. John Z. Ayanian, Gabriel M. Ehrlich, Donald R. Grimes, and **Helen Levy**. 2017. "Economic Effects of Medicaid Expansion in Michigan." *New England Journal of Medicine* 376: 407-410.

35. **Levy, Helen**, Thomas C. Buchmueller, and Sayeh Nikpay. 2016. "Health Reform and Retirement." *The Journals of Gerontology: Series B* 73(4): 713-722.

36. Amanda Sonnega, Kristen Robinson, and **Helen Levy**. 2016. "Home and Community-Based Service and Other Senior Service Use: Prevalence and Characteristics in a National Sample." Available online, *Home Health Care Services Quarterly.*

37. Sayeh Nikpay, Thomas Buchmueller, **Helen Levy**, and Simone Singh. 2016. "The Relationship between Uncompensated Care and Hospital Financial Position: Implications of the ACA Medicaid Expansion for Hospital Operating Margins." *Journal of Health Care Finance* 2016: 43(2).

38. Elham Mahmoudi, Wassim Tarraf, Brianna L. Maroukis, and **Helen G. Levy**. 2016. "Does Medicare Managed Care Reduce Racial/Ethnic Disparities in Diabetes Preventive Care and Healthcare Expenditures?" *American Journal of Managed Care* 22(10): e360-e367.

39. Richard Hirth, Sebastian Calónico, Theresa Gibson, **Helen Levy**, Jeffrey Smith, and Anup Das. 2016. "Long-Term Health Spending Persistence among the Privately Insured in the US." *Fiscal Studies* 37(3-4):749-783.

40. Thomas C. Buchmueller, Zachary M. Levinson, **Helen G. Levy**, and Barbara L. Wolfe. 2016. "The Effect of the Affordable Care Act on Racial and Ethnic Disparities in Health Insurance Coverage." *American Journal of Public Health* 106:1416–1421.

41. **Helen Levy** and Alexander T. Janke. 2016. "Health Literacy and Access to Care." *Journal of Health Communication* 21 (Supp. 1), pp.43-50.

42. Sayeh Nikpay, Tom Buchmueller, and **Helen Levy**. 2016. "ACA Medicaid Expansion Reduced Uninsured Hospital Stays in 2014." *Health Affairs* 35(1):106-110.

43. **Helen Levy**. 2015. "Income, Poverty, and Material Hardship among Older Americans." *RSF: The Russell Sage Foundation Journal of the Social Sciences* 1(1):55-77.

44. **Helen Levy**. 2015. "Assessing the Need for a New Household Panel Study: Health Insurance and Health Care." *Journal of Economic and Social Measurement* 40(1-4):341-356.

45. Sayeh Nikpay, Tom Buchmueller, and **Helen Levy**. 2015. "Early Medicaid Expansion in Connecticut Stemmed the Growth in Hospital Uncompensated Care." *Health Affairs* 34(7):1170-1179.

46. Lindsey Leininger, and **Helen Levy**. 2015. "Child Health and Access to Medical Care." *The Future of Children* 25(1):65 - 90.

47. Richard A. Hirth, Teresa B. Gibson, **Helen G. Levy**, Jeffrey A. Smith, Sebastian Calónico, and Anup Das. 2015. "New Evidence on the Persistence of Health Spending." *Medical Care Research and Review* 72(3): 277-297.

48. Katherine Baicker and **Helen Levy**. 2015. "Cost Sharing as a Tool to Drive Higher-Value Care," (Viewpoint), *JAMA Internal Medicine*.

49. Katherine Baicker and **Helen Levy**. 2015. "How Narrow a Network Is Too Narrow?" (Viewpoint), *JAMA Internal Medicine*.

50. **Helen Levy**, Alexander T. Janke, and Kenneth M. Langa. 2014. "Health Literacy and the Digital Divide Among Older Americans," *Journal of General Internal Medicine* 30(3): 284-289

51. Elham Mahmoudi and **Helen G. Levy**. 2014. "How Did Medicare Part D Affect Racial and Ethnic Disparities in Drug Coverage?" *Journals of Gerontology Series B: Psychological Sciences and Social Sciences* 71(3): 581-589.

52. Nicholas Bagley and **Helen Levy**. 2014. "Essential Health Benefits and the Affordable Care Act: Law and Process," *Journal of Health Politics, Policy, and Law* 29(2):441 – 465. Reprinted in: The Future of Healthcare Reform in the United States, Anup Malani and Michael H. Schill (eds.), University of Chicago Press, 2015.

53. **Helen Levy**, Peter A. Ubel, Amanda J. Dillard, David R. Weir, and Angela Fagerlin. 2013. "Health Numeracy: The Importance of Domain in Assessing Numeracy," *Medical Decision Making* 34(1):  107 - 115.

54. Thomas Buchmueller, Colleen Carey, and **Helen G. Levy**. 2013. "Will Employers Drop Health Insurance Coverage because of the Affordable Care Act?" *Health Affairs* 32(9): 1522-1530.

55. Katherine Baicker and **Helen Levy**. 2013. "Coordination versus Competition in Health Care Reform," *New England Journal of Medicine* 369:789-791.

56. **Helen Levy**. 2012/203. "Health Reform: Learning from Massachusetts," *Inquiry*, 49(4) Winter: 300-302.

57. Katherine Baicker and **Helen Levy**. 2012. "The Insurance Value of Medicare," *New England Journal of Medicine* 367:1773-1775.

58. Marianne Udow-Phillips, Joshua Fangmeier, Thomas Buchmueller, and **Helen Levy**. 2012. "The ACA's Medicaid Expansion: Michigan Impact," Center for Healthcare Research & Transformation Issue Brief. Ann Arbor, MI.

59. Jill R. Horwitz and **Helen Levy**. 2012. "Obamacare will help drive down health care costs," posted on CNN Opinion June 28, 2012.

60. Jill R. Horwitz, **Helen Levy**, and Kathryn Gilbert. 2012. "Health Care Economics 101 and the Supreme Court," posted on *Health Affairs* blog May 23, 2012.

61. **Helen Levy**. 2010. Review of *Who Has the Cure? Hamilton Project Ideas on Health Care*, Jason Furman (editor). *Journal of Economic Literature* 48: 464 – 466.

62. Lindsey Leininger, **Helen Levy**, and Diane Schanzenbach. 2010. "Consequences of SCHIP Expansions for Household Well-Being." *Forum for Health Economics & Policy* 13(1): (Frontiers in Health Policy Research), Article 3.

63. **Helen Levy** and David R. Weir. 2010. "Take-Up of Medicare Part D: Evidence from the Health and Retirement Study." *Journal of Gerontology: Social Sciences* 65B(4): 492 – 501.

64. Jonathan Gruber and **Helen Levy**. 2009. "The Evolution of Medical Spending Risk." *Journal of Economic Perspectives* 23(4): 25–48.

65. Karin V. Rhodes, Teri L. Veith, Hallie Kushner, **Helen Levy**, and Brent R. Asplin. 2009. "Referral Without Access: For Psychiatric Services, Wait for The Beep." *Annals of Emergency Medicine* 54(2): 272-278.

66. Catherine McLaughlin, **Helen Levy**, and Brian Quinn. 2009. "Aspects of Health Reform: Contributions from the Economic Research Initiative on the Uninsured," *Inquiry* 46(2): 182 – 186.

67. **Helen Levy** and Italo Gutierrez. 2009. "Documentation and Benchmarking of Health Insurance Measures in the Health and Retirement Study." Available online at: http://hrsonline.isr.umich.edu/sitedocs/userg/HRS_HealthInsuranceMeasures.pdf

68. **Helen Levy** and Thomas DeLeire. 2008/2009 "What Do People Buy When They Don't Buy Health Insurance and What Does that Say about Why They Are Uninsured?" *Inquiry* Winter 45(4): 365–379.

69. Katherine Baicker and **Helen Levy**. 2008. "Employer Health Insurance Mandates and the Risk of Unemployment." *Risk Management and Insurance Review* 11(1): 109-132.

70. **Helen Levy** and David Meltzer. 2008. "The Impact of Health Insurance on Health." *Annual Review of Public Health* 2008 29: 399-409.

71. **Helen Levy**. 2007. "Health Insurance and the Transition to Adulthood," in *The Price of Independence: The Economics of Early Adulthood*, Sheldon Danziger and Cecilia Rouse (eds.); Russell Sage Foundation, 2007: 84 – 106.

72. **Helen Levy**. 2007. "Health Insurance Coverage of the Baby Boomers Approaching Retirement," in *Redefining Retirement: How Will Boomers Fare?* Olivia Mitchell, Brigitte Madrian, and Beth Soldo (eds.); Oxford University Press, 2007: 159 – 175.

73. **Helen Levy**. 2007. "Health Insurance Data in the Panel Study of Income Dynamics," Technical Report, available online at http://psidonline.isr.umich.edu/Guide/Quality/Health-Insurance-Data.pdf.

74. **Helen Levy**. 2007. Review of *Medicine and the Market: Equity v. Choice*, by Daniel Callahan and Angela Wasunna. *Journal of Economic Literature* 45(3): 760 – 761.

75. **Helen Levy**. 2006. "How Is Health Insurance Affected by the Economy? Public and Private Coverage among Low-Skilled Adults in the 1990s." Chapter 14 in *Working and Poor: How Economic and Policy Changes Are Affecting Low-Wage Workers*, Rebecca M. Blank, Sheldon H. Danziger, and Robert F. Schoeni (eds). Russell Sage Foundation. 396 – 425.

76. Thomas DeLeire, Judith Levine and **Helen Levy**. 2006. "Is Welfare Reform Responsible for Low-Skilled Women's Declining Health Insurance Coverage in the 1990s?" *Journal of Human Resources* 41(3):467-94.

77. **Helen Levy** and David Meltzer. 2006. "The Effect of Health Insurance on Health: How Good Is Our Evidence?" *Global Forum Update on Research for Health*, 2006, volume 3, pp. 137-141.

78. Brent R. Asplin, Karin V. Rhodes, **Helen Levy**, Nicole Lurie, A. Lauren Crain, Bradley P. Carlin and Arthur L. Kellermann. 2005. "Insurance Status and Access to Urgent Ambulatory Care Follow-up Appointments." *JAMA* 294:1248-1254.

79. Thomas DeLeire and **Helen Levy**. 2004. "Worker Sorting and the Risk of Death on the Job." *Journal of Labor Economics* 22(4):925 – 953.

80. **Helen Levy** and David Meltzer. 2004. "What Do We Really Know about Whether Health Insurance Affects Health?" in *Health Policy and the Uninsured: Setting the Agenda*, Catherine McLaughlin (ed.), Urban Institute Press, Washington DC.

81. **Helen Levy** and Roger Feldman. 2001. "Does the Incidence of Group Health Insurance Fall on Individual Workers?" *International Journal of Health Care Finance and Economics*, 1, 227 – 247.

82. Henry Farber and **Helen Levy**. 2000. "Recent Trends in Employer-Sponsored Health Insurance: Are Bad Jobs Getting Worse?" *Journal of Health Economics* 19(1): 93 – 119.

83. William N. Evans, **Helen Levy** and Kosali I. Simon. 2000. "Research Data in Health Economics," *Journal of Economic Perspectives* 14(4): 203-216.

84. Alan B. Krueger and **Helen Levy**. 1996. "Accounting for the Slowdown in Employer Health Care Costs," *Proceedings of the National Tax Association*, Eighty-Ninth Annual Conference 61-75.

85. M.E. Johantgen, R.M. Coffey, R. Harris, **H. Levy** and J.J. Clinton. 1995. "Hospital Characteristics Associated with Breast-Conserving Surgery." *American Journal of Public Health* October 85:1432-1434.

## GOVERNMENT REPORTS

1. University of Michigan Institute for Healthcare Policy & Innovation (multiple authors). 2024. Healthy Michigan Plan Section 1115 Demonstration Summative Evaluation Report. [Under review at Centers for Medicare & Medicaid Services]

2. University of Michigan Institute for Healthcare Policy & Innovation (multiple authors). 2022. Healthy Michigan Plan Section 1115 Demonstration Interim Evaluation Report. Available from: https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/mi-healthy-michigan-appvd-interim-eval-rpt-11302022.pdf
3. Thomas Buchmueller, Aaron Kaye, and Helen Levy. 2022. "The Healthy Michigan Plan: 2021 Report on Uncompensated Care." Submitted to the Michigan Department of Health and Human Services. (Similar reports were submitted annually in 2014 – 2021.)
4. Helen Levy and Thomas Buchmeuller. 2019. "Healthy Michigan Plan Evaluation Domain II – Reduction in the Number of Uninsured." Submitted to the Michigan Department of Health and Human Services.
5. Thomas Buchmeuller, Helen Levy, Sayeh Nikpay, and Jordan Rhodes. 2019. "Healthy Michigan Plan Evaluation Domain I – Hospital Uncompensated Care." Submitted to the Michigan Department of Health and Human Services.
6. Helen Levy. 2012. "The Economic Impact of Michigan's Dr. Ron Davis Smoke-Free Air Law: A Report to the Michigan Department of Community Health."
7. John Moeller and Helen Levy. 1996. "Dental Services: A Comparison of Use, Expenditures, and Sources of Payment, 1977 and 1987." National Medical Expenditure Survey Research Findings 26, Agency for Health Care Policy and Research (AHCPR Pub. No. 96-0005).
8. John Moeller and Helen Levy. 1995. "Prescribed Medicines in Ambulatory Care Settings: A Comparison of Use, Expenditures, and Sources of Payment, 1977 and 1987." National Medical Expenditure Survey Research Findings 24, Agency for Health Care Policy and Research (AHCPR Pub. No. 95-0062).
9. Joel Cohen, Llewellyn Cornelius, Beth Hahn and Helen Levy. 1994. "Use of Services and Expenditures for the Noninstitutionalized Population under Medicaid." National Medical Expenditure Survey Research Findings 20, Agency for Health Care Policy and Research (AHCPR Pub. No. 94-0051).

## SELECTED WORKING PAPERS

John Bound, Helen Levy, and Lauren Nicholas. "Social Security Benefit Claiming and Medicare Utilization." Michigan Retirement Research Center Working Paper 2013-297, October 2013.

Helen Levy and Kristin Seefeldt. "Saving among Low-Income Women: Motivation and Obstacles." Michigan Retirement Research Center Working Paper 2008-199, September 2008.

Helen Levy and Kristin Seefeldt. "How Do Lower-Income Families Think about Retirement?" Michigan Retirement Research Center Working Paper 2008-195, September 2008.

Thomas DeLeire and Helen Levy. "How Well Can We Measure the Well-Being of the Poor Using Food Expenditure?" National Poverty Center Working Paper 06-29, August 2006.

Miles Kimball, Helen Levy, Fumio Ohtake, and Yoshiro Tsutsui. "Unhappiness after Hurricane Katrina." National Bureau of Economic Research Working Paper 12062, January 2006.

Helen Levy. "Health Insurance and the Wage Gap." National Bureau of Economic Research Working Paper 11975, January 2006.

Thomas DeLeire and Helen Levy. "The Material Well-Being of Single Mother Households in the 1980s and 1990s: What Can We Learn from Food Spending?" National Poverty Center Working Paper 05-01, January 2005.

Helen Levy. "Private Employer-Sponsored Disability Insurance: Where are the Gaps in Coverage?" National Bureau of Economic Research Working Paper 10382, March 2004.

Helen Levy. "The Economic Consequences of Being Uninsured," Economic Research Initiative on the Uninsured Working Paper 12, October 2002.

Helen Levy. "Who Pays for Health Insurance? Employee Contributions to Health Insurance Premiums," Princeton University Industrial Relations Section Working Paper 398, March 1998.

## OTHER PROFESSIONAL ACTIVITIES

- Health and Retirement Study: Co-Investigator (2011 – 2017; 2024 - present); Associate Director (2018 – 2023)
- *Journal of Health Politics, Policy, and Law*: Associate Editor (2016 – present)
- American Economic Association Committee on Economic Statistics: Member (2022 – present)
- National Academy of Social Insurance: Member (elected 2016)
- National Bureau of Economic Research: Research Associate (2009 – present); Faculty Research Fellow (1999 – 2009)
- Population Studies Center, University of Michigan: Affiliate (2005 – present)
- Panel to Evaluate and Improve the Supplemental Poverty Measure, Council on National Statistics/National Academies of Sciences, Engineering, and Medicine: Member (2021 – 2023)
- National Center for Health Statistics, Board of Scientific Counselors: Member (2019 – 2022)
- FAIR Health, Academic Advisory Board: Member (2019 – 2022)
- *RSF: The Russell Sage Foundation Journal of the Social Sciences*: Editorial Board Member (2018 – 2021)
- Federal Economic Statistics Advisory Committee: Member (2014 – 2019)
- University of Michigan Institute for Healthcare Policy and Innovation: Leadership Team Member (2013 – 2019)

## TEACHING EXPERIENCE

*Economic Analysis in the Practice of Public Policy* (Public Policy 558), University of Michigan
Winter 2024

*Economics of Health Care* (Economics 438), University of Michigan
Winter 2014

*Health Economics and Public Policy* (Public Policy 644), University of Michigan
Winter 2008, Fall 2012

*Introduction to Health Economics* (Economics 395), University of Michigan
Fall 2005, Winter 2007

*Applied Econometrics II* (Public Policy 421), University of Chicago
Spring 2003

*Introduction to Microeconomics and Public Policy* (Public Policy 323), University of Chicago
Fall 2000, 2001, 2002, 2003

*Health Economics* (Public Policy 383), University of Chicago

42

Spring 2000

## HONORS AND AWARDS

University of Chicago, Harris Graduate School of Public Policy Studies, Levin Faculty Fellowship, 2002 – 2003

University of Chicago, Harris Graduate School of Public Policy Studies, co-recipient of Public Policy Students' Association Prize for Best Teaching in a Core Course, 2001

Upjohn Institute, Dissertation Prize Finalist, 1999

Princeton University, Woodrow Wilson Fellowship, 1996 - 1998

Yale College, Saybrook College Fellows' Prize, June 1991

## GRANTS (CURRENT; AS PRINCIPAL INVESTIGATOR OR CO-INVESTIGATOR)

| | |
|---|---|
| 2024 – 2029 | National Institute on Aging. "Health and Retirement Study, Years 35 – 40" Co-investigator, with David Weir and Ken Langa (MPIs) et al. |

## GRANTS (PAST)

| | |
|---|---|
| 2020 - 2025 | Center for Medicare and Medicaid Services. "Healthy Michigan Plan Evaluation" Co-investigator, with John Ayanian (PI) et al. |
| 2018 – 2023 | National Institute on Aging. "Health and Retirement Study, Years 29 – 34" Associate Director, with David Weir (PI) et al.; $110M |
| 2022 – 2023 | Michigan Retirement and Disability Research Center. "Estimating Racial Disparities in Economic Outcomes," PI; $50K |
| 2019 – 2022 | U.S. Department of Agriculture/Univ. of Kentucky Center for Poverty Research. "Understanding Food Related Hardship Among Older Americans," PI; $224K |
| 2019 – 2022 | Agency for Healthcare Research and Quality. "Medicaid versus Private Coverage for Low-Income Families: What are the Tradeoffs between Cost-Sharing and Access to Care?" with Mireille Jacobson (PI) and Silvia Barcellos; $265K |
| 2019 – 2020 | Michigan Retirement Research Center. "The Risk of High Out-of-Pocket Health Spending Risk among Older Americans," PI; $50K |
| 2018 – 2020 | Russell Sage Foundation. "Medicaid Expansion as Unemployment Safety Net," PI, with Tom Buchmueller; $35K |
| 2014 – 2019 | Center for Medicare and Medicaid Services. "Healthy Michigan Plan Evaluation." Co-investigator, with John Ayanian (PI) et al.; $8M |
| 2017 – 2018 | Social Security Administration/Michigan Retirement Research Center. "Is Health Reform Affecting Retirement Yet?" Principal Investigator, with Tom Buchmueller and Sayeh Nikpay; $50K |

| | |
|---|---|
| 2017 – 2018 | Michigan Department of Health and Human Services. "Impact of the Healthy Michigan Plan on Uncompensated Care." Co-Investigator, with Tom Buchmueller (PI) and Sayeh Nikpay; $135K |
| 2012 – 2017 | National Institute on Aging. "Health and Retirement Study, Years 23-28" Co-Investigator, with David Weir (PI) et al.; $115M |
| 2016 – 2017 | Michigan Department of Health and Human Services. "Impact of the Healthy Michigan Plan on Uncompensated Care and Insurance Premium Rates" Co-Investigator, with Kyle Grazier (PI), Tom Buchmueller, and Sayeh Nikpay; $260K |
| 2016 | Commonwealth Fund. "Macroeconomic Impact of Medicaid Expansion in Michigan" Co-Investigator, with John Ayanian (PI); $50K |
| 2015 – 2016 | Michigan Department of Health and Human Services. "Impact of the Healthy Michigan Plan on Uncompensated Care and Insurance Premium Rates" Co-Investigator, with Kyle Grazier (PI), Tom Buchmueller, and Sayeh Nikpay; $260K |
| 2015 – 2016 | Social Security Administration/Michigan Retirement Research Center. "Health Reform and Health Insurance Coverage among Early Retirees" Principal Investigator, with Tom Buchmueller and Sayeh Nikpay; $75K |
| 2011 – 2016 | National Institute on Aging. "Health Literacy and Health Disparities among the Elderly" (K01) Principal Investigator, $540K |
| 2014 – 2015 | Russell Sage Foundation. "How Will the Affordable Care Act Affect Health Disparities?" (co-investigator, with Tom Buchmueller (PI) and Barbara Wolfe; $24,950) |
| 2014 – 2015 | Michigan Center on the Demography of Aging. "Cognitive ability and awareness of hypertension in older Americans," (with Ken Langa; $14,000) |
| 2014 – 2015 | Social Security Administration/Michigan Retirement Research Center. "The Effect of Health Reform on Retirement," (with Tom Buchmueller and Sayeh Nikpay; $75,000) |
| 2013 – 2015 | National Institute on Drug Abuse/Centers for Disease Control. "Improving Cost-Benefit Analysis of Tobacco Regulation," (co-investigator, with Edward Norton (PI) and Jeffrey Smith; R03; $154,958 |
| 2012 – 2013 | Social Security Administration/Michigan Retirement Research Center. "The Health and Medical Care Use of Social Security Disability Insurance Recipients," (co-investigator; with John Bound and Lauren Nicholas (PI); $50,000) |
| 2009 – 2010 | Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services. "New Evidence on the Persistence of High Health Spending" (co-investigator; PI: Richard Hirth; R01; $147,230) |
| 2009 – 2010 | Michigan Center on the Demography of Aging. "Cognition, Medicare Spending, and Mortality among the Elderly" ($19,957) |
| 2009 – 2010 | Michigan Population Studies Center, Mueller Fund. "Medicare Part D and Crowd-Out of Employer-Provided Drug Coverage," March 2009 – February 2010 (with Omar Alshanqeety; $6,000) |

44

| | |
|---|---|
| 2008 – 2009 | Social Security Administration/Michigan Retirement Research Center. "Economic Hardship among the Elderly: How Important is Failure to Take Up Public Programs?" October 2008 – September 2009 ($50,000) |
| 2008 – 2009 | Robert Wood Johnson Foundation, Changes in Health Care Financing and Organization. "Consequences of SCHIP for Household Well-Being," October 2008 – September 2009 (with Diane Whitmore Schanzenbach and Lindsey Leininger; $124,694) |
| 2008 – 2010 | National Institute on Aging. "What Triggers Loss of Health Insurance among the Near-Elderly?" July 2008 – July 2010 (R03; $124,640) |
| 2008 | Social Security Administration/Michigan Retirement Research Center. "Obstacles to Saving among Economically Vulnerable Women," May 2008 – September 2008 (with Kristin Seefeldt; $50,000) |
| 2008 | U.S. Department of Agriculture, Research Innovation and Development Grants in Economics (RIDGE) Program. "Food Stamp Use among the Elderly: Evidence from Panel Data," January 2008 – December 2008 ($40,000) |
| 2007 – 2008 | Social Security Administration/Michigan Retirement Research Center. "How Do Low-Income Families Think about Retirement?" October 2007 – September 2008 (with Kristin Seefeldt; $25,000) |
| 2006 – 2007 | Social Security Administration/Michigan Retirement Research Center. "Extra Help: Take-up of the Social Security Administration's Low-Income Subsidy Program for Part D of Medicare in 2006," January 2007 – September 2007 (with David Weir; $100,000) |
| 2007 | U.S. Department of Agriculture, Economic Research Service. "The Changing Safety Net: Low Income Families' Survival Strategies for Managing Layoffs, Lack of Health Insurance, and Other Shocks to Economic Well-Being," January 2007 – December 2007 (co-investigator; PI: Kristin Seefeldt; $102,814) |
| 2007 | Annie E. Casey Foundation. "The Changing Safety Net," September 2006 – August 2007 (co-investigator; PI: Kristin Seefeldt; $49,922) |
| 2006 - 2007 | University of Michigan Center for Local, State and Urban Policy. "The New Working Poverty: Low Income Families' Survival Strategies for Managing Layoffs, Lack of Health Insurance, and Other Shocks to Economic Well-Being," September 2006 – August 2007 (co-investigator; PI: Kristin Seefeldt; $27,915) |
| 2003 - 2004 | University of Chicago Center for Human Potential and Public Policy, Innovative Research Program Award, "Equal Pay for Equal Math? Mathematics and the Gender Wage Gap," September 2003 – August 2004 (with Thomas DeLeire; $28,076) |
| 2003 - 2004 | U.S. Department of Agriculture/Joint Center for Poverty Research, "Welfare Reform and Nutritional Well Being," July 2003 – December 2004 (with Thomas DeLeire; $40,000) |
| 2003 | Economic Research Initiative on the Uninsured/Robert Wood Johnson Foundation, "Welfare Reform and the Uninsured," January 2003 – December 2003 (with Thomas DeLeire and Judith Levine; $99,928) |

| | |
|---|---|
| 2002 | California Health Care Foundation, "What Do People Buy When They Don't Buy Insurance?" January 2002 – August 2002 ($51,818) |
| 2001 | University of Chicago Population Research Center, supplemental grant to provide computer support for "Where Are the Gaps in Disability Insurance Coverage?" January 2001 – December 2001 ($4,000) |
| 2001 | Economic Research Initiative on the Uninsured/Robert Wood Johnson Foundation, "The Economic Consequences of Being Uninsured." January 2001 – December 2001 ($39,710) |
| 2001 | Department of Labor, Pension and Welfare Benefits Administration, "Where Are the Gaps in Disability Insurance Coverage?" January 2001 – December 2001 ($10,570) |
| 2000 - 2001 | Department of Labor, "Does the Incidence of Group Health Insurance Fall on Individual Workers?" September 2000 – June 2001 (subcontractor; PI: Roger Feldman; $75,000) |
| 1999 - 2000 | Citigroup Behavior Sciences Council Exploratory Grant, August 1999 – July 2000 ($9,000) |
| 1997 | American Compensation Association Emerging Scholar Grant, 1997 ($5,000) |

## MISCELLANEOUS

- Testimony before the Ways & Means Committee, US House of Representatives, January 28, 2014: "The definition of full-time work and labor market consequences of the Affordable Care Act."

- Referee for the *American Economic Review, American Economic Journal – Applied, American Economic Journal – Economic Policy, American Economic Journal –Policy, American Journal of Health Economics, American Journal of Managed Care, Demography, Economic Inquiry, Economic Journal, Health Affairs, Health Economics, Health Services Research, The Industrial and Labor Relations Review, Industrial Relations, Inquiry, International Journal of Health Care Finance and Economics, Journal of Aging and Social Policy, JAMA, JAMA – Health Forum, Journal of Health and Aging, Journal of Health Economics, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of Labor Economics, Journal of Medical Internet Research, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Public Economics, Lancet, National Tax Journal, New England Journal of Medicine, Pediatrics, Population Studies, Review of Economics and Statistics, Review of Economics of the Household* and *Social Security Bulletin*

46

# EXPERT EXHIBIT 1

## Innovative Partners Optimum Script:

Hello, this is _____, your Licensed Health Agent. How can I **help** you today?

Are You Currently insured with one of our plans now, or are you uninsured?

**IF UNINSURED:**

- When was the last time you had health insurance?
- Was that through your work or on your own?
- What happened to that plan? (was it canceled, did you not make the monthly premium the reasoning)

**IF INSURED:**

- Who do you currently have your insurance with?
- Is that through your company or on your own?
- What is the premium you are responsible for on a monthly basis?

Your Zipcode will bring up **ALL** the plans in your Region, So what is your Zipcode?

Are you looking for an Individual or Family plan?

The First thing the Underwriters look at for all US Citizens is the Date of Birth. So what is your date of birth? *(Get-Date of birth for Family members or spouse if needed)*

What is your estimated Gross household income for the current year (2023)?

When the Underwriters pull up your Medical records, are there any conditions or prescriptions that will appear on your records?

So you never had any Critical illnesses like Cancer, HIV, or Strokes?

OKAY GREAT! So you are BLESSED with Good Health!

Some plans can be customized based on needs. Are there any specific benefits you are looking for **TODAY** with this plan?

This bracket is income-dependent, but this is a good rubric to go by for any income. Start high and go low. Tell them you are taking Maternity and Substance abuse off to justify the rate drop. Or as long as they come up healthy.

| Example Chart | State Private brackets | Obamacare brackets |
|---|---|---|
| Individual | $400-$550 monthly | $611-$733 monthly |
| 2 people on the plan | $550-$600 monthly | $848-$923 monthly |
| Family | $750-$800 monthly | $1038-$1224 monthly |

Now that I'm placing all of your data in the system, a Chart pops up. The chart gives us an accurate reflection of what the plans cost within your bracket. And your bracket is telling me that plans range from _____ to _____ a month. So since you fall within that bracket, is that affordable for you on a ~~monthly basis?~~ Today.

**IF THE RESPONSE IS NO**

Okay, let me ask you, you don't need Drug and Alcohol coverage for rehabs or Maternity coverage for newborn babies on your plan, right? (WHEN THEY SAY NO) Okay, I can take off those extra benefits of the plan. I have a more affordable bracket that ranges from_____ to _____. Is that more affordable for you?

**Once you have agreed on a price --->**

Ok **Great!** Just to give you some Background information on me and what I do here, I am a Benefits coordinator, which means I have access to all of the Top A rated insurance companies in the country, so it's my job to shop **ALL** of the available insurance plans with you to help you find the **MOST** coverage at the **BEST RATE**. So what I'm going to do now is place you on a brief hold while I pinpoint which plan comes back the most cost-effective, and when I get back on the line, we'll go over all your best options together. **OK?**

**OKAY GREAT!** So just hang on tight for about 30 seconds to a minute, and I'll be right back on the line, **OKAY?**

**HOLD FOR 30 seconds to a MINUTE**

**COME BACK FROM HOLD**

*Start the end of page*

Can you hear me? (CUSTOMER: Yes)

So After Shopping in your county, I noticed that our Government's Obamacare Marketplace plans returned higher. When I pulled up BLUECROSS, UNITED, HUMANA, CIGNA, and AETNA, their premiums ranged from <u>Higher Cost - Higher Cost.</u>

But when I pulled up our State Issued plans for healthy Citizens like yourself, their bracket ranged from <u>Low-Cost-Low Cost,</u> but the plan that came up as the most cost-effective is underwritten through Innovative Partners, which gives you access to (Plan Network) **The Multiplan PPO network.**

**The Multiplan PPO network** is the largest network in the country. This means The Multiplan PPO will allow you to pick and choose all your Doctors, Hospitals, and Specialists, giving you the Flexibility of Choice.

Also, some plans are statewide but this plan is nationwide! So if you have to travel or see relatives, you will be covered in all 50 states!

You'll also get a prescription card with the plan, and all your prescriptions are sent to a Prescription assistance division program where your Generic medications come back between $4 and $15, and your Brand name drugs will come back at $30 or higher. (Tier or drug dependent)

Instead of getting stuck with a High deductible because you're healthy, it allowed me to remove the deductible from the plan. So there is NO DEDUCTIBLE TO SATISFY. What you'll receive is called 1st dollar coverage at any Hospital of your Choice. That's why a low deductible or NO DEDUCTIBLE is way better than a higher one.

All your Primary Doctor Visits will have a $25 Copay

Specialist Visits $50 Copay, and Urgent Care is also a $50 Copay.

Also, for all of your Preventative and Wellness Screenings i.e., your Annual Checkups, Physicals, Pap Smears, or Mammograms, they will be covered at 100% at no cost to you.

*(If you're adding a Dental policy, explain the benefits, Read off of the Benefits portal)*

Now the only thing the plan doesn't cover is Maternity for newborn babies and Substance abuse for Drugs and alcohol, and YOU DON" T NEED THAT, RIGHT????

Because if we left that on the plan, the plan was coming back at <u>Higher Cost</u>. But since we took the Maternity and Substance abuse off the plan it allowed us to drop the plan to <u>Plan Cost</u>

<u>(Pause let them realize that)</u>

So you like being at <u>Plan Cost</u> better than being stuck at the <u>Higher Cost</u> a month, **RIGHT?**

OK, great! So the next step is that we'll fax everything over to the Underwriters. Everything is processed electronically, and then once you are approved for the plan, you will receive an email confirmation first with temporary insurance cards until you get the hard copy policy in the mail in about 7-14 days.

Also, during the enrollment, your state regulates an additional $125 for the first month. So only for the First month, your plan will be Plan Cost + $125 but all future months will be the Plan Cost going forward. What that does is it puts your approval through within 24 hours so your policy goes into effect immediately, then it locks in the rate at the Plan Cost going forward so your plan will never increase, and also your plan stays month to month with NO contract so you can keep the plan as long or as little as you would like!

**Now I'll walk you through the Medical History questions shortly, but since you're the Primary on the plan, as long as we can get you approved. How do you want your name to appear on the Hard Medical Cards?**

And what's the Mailing address? I can have your insurance cards sent to you, assuming you do get accepted.

Now before I Start the Medical History questions, I want you to write my number down in case you have any questions after we get you underwritten, so it is **(877)393-0934** . I'm going to ask you a few Medical questions at this time. Please Let me know if any of these apply to your current Medical History.

## MEDICAL QUESTIONS:

1. To the Best of your knowledge and belief, within the last five years, has any applicant been diagnosed or treated with any of the following symptoms or conditions:
   - Cancer
   - Tumor
   - Stroke
   - Had a heart attack
   - Had heart surgery
   - COPD or Emphysema

2. To the Best of your knowledge and belief, within the last five years, has any applicant been diagnosed or treated with any of the following symptoms or conditions:

- Crohn's disease
- Liver Disorder
- Kidney disorder or End-stage renal disease

3. Lastly, to the best of your knowledge and belief, within the last five years, has any applicant been diagnosed or treated by a physician or medical practitioner for Acquired immune deficiency syndrome (AIDS) or tested positive for Human Immunodeficiency Virus (HIV)?

4. Now, we're going to attach those medical questions to the application.

But for the First month with the plan, would you like to use a **VISA** or **MASTERCARD?**

**FOR DEBIT OR CREDIT:**

Okay, is that going to be a VISA, MASTERCARD, AMEX, or DISCOVER?

OKAY, All Visas begin with the # 4 all Mastercards begin with the # 5. I'm ready for the card number whenever you are....

# ONCE YOU RECEIVE CREDIT CARD #

# SEND TEXT MESSAGE LINK TO FINISH APPROVAL PROCESS

The text will say "To Complete the Enrollment App, click the link._____"

It will bring you to a secure page to verify your **Date of Birth**, enter the two digit month, two digit day, and four digit year. Once you submit that it will bring you to a page with enrollment details. Verify your information is spelled correctly at the top, then scroll down you will see the breakdown of your policy. Scroll down again and you will see three boxes to the left hand side for you to check.

Make sure you check all the boxes.

What you see there is the breakdown of your core policy, broken down similar to how a restaurant bill would be itemized.

Then you can e-sign your name in the space and click the navy blue button below that says "SUBMIT".

Once you see the Credit Card has processed :

Tell Customer: Congratulations! So we are getting the green light over here! You have been approved! Clap your hands with them! Cheer them on! WOOHOO!

# EXPERT EXHIBIT 2

# NEW HIRE TRAINING GUIDE

## WELCOME TO THE TEAM!!!

### PLEASE DO NOT WRITE IN THESE BOOKLETS!

AT THE END OF DAY...
BOOKLETS ARE COLLECTED
PLEASE RETURN YOUR BOOKLET TO YOUR
TRAINER/MANAGER

*"The only thing standing between you and your goal is the bullsh\*t story you keep telling yourself as to why you can't achieve it."*

*-Wolf of Wall Street*

# Health Insurance Terminology

*Insurance*

*Coinsurance:*
A type of insurance in which the insured pays a share of the payment made against a claim.
→ 80/20 coinsurance in which the insurance covers 80% and th member is responsible for the remaining 20%

*Copay:* a flat fee that you pay on the spot each time you go to your doctor o fill a prescription.

*Deductible:* the financial amount the insured is responsible for before benefits will be paid.

*Premium:* the financial amount the insured is responsible for on a monthly basis.

*Max Out-of-Pocket/Stop Loss Feature:* limits the amount out-of-pocket expense the insured will pay, after that benefits are paid at 100% by the insurer.

*Network:* The facilities, providers and suppliers your health insurer or plan has contracted with to provide health care services. *Depending on how many plans are offered in your area, you may find plans of all or any of these types at each meta level - Bronze, Silver, Gold, and Platinum.*

## HIPAA: Verify information

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that requires the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge.

*Open Enrollment:* (OE) is an annual period of time, anywhere from a few weeks to 3 months, when individuals and families have the chance to change health insurance plans, enroll in coverage for the first time, or apply for subsidies to help pay for health insurance for the coming year. Which ONE applies to you depends on what kind of health coverage you qualify to receive. Generally speaking, there are three types of open enrollment:

• *Employer Coverage* -
Set by your employer, based on whether you qualify for employer-sponsored health insurance and other benefits

• *ACA/Individual Coverage* -
The annual period to see if you qualify for subsidies to help pay for your health insurance and/or get insurance for the coming year if you don't qualify for the other two kinds of coverage listed here, or military (Tricare) coverage.

• *Medicare Advantage/Supplement Coverage* -
Additional coverage for those who qualify basically anyone 65 years and older, or those with permanent disabilities.

Open enrollment will start November 1, 2024. In most states, it's slated to end December 15, 2023, although the Biden administration has proposed an extension through January 15, 2025 and some states will have later deadlines.



*Medical Underwriting:* Medical underwriting is the process of evaluating application for health insurance coverage by examining the applicant's medic history. The price of coverage is determined by the risk factors of the applicant. Depending on the insurance company's policies and federal and state regulation medical underwriting for high-risk candidates may lead to the exclusion of covera for certain conditions, denial of coverage altogether, or coverage offered only a very high price.

*Special Enrollment Period: (SEP)*
A time outside the yearly Open Enrollment Period when you can sign up for heal insurance. You qualify for a Special Enrollment Period if you've had certain li events, including losing health coverage, moving, getting married, having a baby, adopting a child.
Depending on your Special Enrollment Period type, you may have 30 days befor or 60 days following the event to enroll in a plan. If you miss your Speci Enrollment Period window, you may have to wait until the next Open Enrollmer Period to apply.You can enroll in Medicaid or the Children's Health Insuranc Program (CHIP) any time of year, whether you qualify for a Special Enrollmer Period or not.

*Health Maintenance Organization (HMO):* A type of health insurance plan tha usually limits coverage to care from doctors who work for or contract with th HMO. It generally won't cover out-of-network care except in an emergency. A HMO may require you to live or work in its - OF I work service area to be eligibl for coverage. HMOs often provide integrated care and focus on prevention an wellness. Most Obamacare and group plans are HMO's.

*Preferred Provider Organization (PPO):* A type of health plan where you pay less i you use providers in the plan's network. You can use doctors, hospitals, anc providers outside of the network without a referral for an additional cost. It allow you to pick and choose your doctors.

*Medical Underwriting:* Medical underwriting is the process of evaluating application for health insurance coverage by examining the applicant's medical history. The price of coverage is determined by the risk factors of the applicant. Depending on the insurance company's policies and federal and state regulation, medical underwriting for high-risk candidates may lead to the exclusion of coverage for certain conditions, denial of coverage altogether, or coverage offered only at very high price.

*Special Enrollment Period: (SEP)*

A time outside the yearly Open Enrollment Period when you can sign up for health insurance. You qualify for a Special Enrollment Period if you've had certain life events, including losing health coverage, moving, getting married, having a baby, or adopting a child.

Depending on your Special Enrollment Period type, you may have 30 days before or 60 days following the event to enroll in a plan. If you miss your Special Enrollment Period window, you may have to wait until the next Open Enrollment Period to apply.You can enroll in Medicaid or the Children's Health Insurance Program (CHIP) any time of year, whether you qualify for a Special Enrollment Period or not.

*Health Maintenance Organization (HMO):* A type of health insurance plan that usually limits coverage to care from doctors who work for or contract with the HMO. It generally won't cover out-of-network care except in an emergency. An HMO may require you to live or work in its - OF I work service area to be eligible for coverage. HMOs often provide integrated care and focus on prevention and wellness. Most Obamacare and group plans are HMO's.

*Preferred Provider Organization (PPO):* A type of health plan where you pay less if you use providers in the plan's network. You can use doctors, hospitals, and providers outside of the network without a referral for an additional cost. It allows you to pick and choose your doctors.

*Exclusive Provider Organization (EPO):* A managed care plan where services are covered only if you use doctors, specialists, or hospitals in the plan's network. You do not need a referral if you want to see a specialist with EPO insurance. An EPO is a hybrid between an HMO and PPO plan.

*Major Medical:* Major medical health insurance is a type of health insurance that covers the expenses associated with serious illness or hospitalization. It pays for all or a percentage of covered expenses after you meet certain deductibles, copays or out-of-pocket costs.

MEDICAID: *[ medic-AID]*

Medicaid provides health coverage to millions of Americans, including:

- Eligible Low-Income Adults,
- Children,
- Pregnant Women,
- Elderly Adults and
- People with Disabilities.

Medicaid is administered by states, according to federal requirements.
The program is funded jointly by individual states and the federal government.
Medicaid income limits depend on the State.



Medicare vs. Medicaid

| | MEDICARE | MEDICAID |
|---|---|---|
| ELIGIBILITY | People over 65, People with certain disabilities | Low-income individuals and families |
| COVERAGE | Hospital (part A), doctor services (part B), prescriptions (part D) | Hospital and doctor services, prescriptions, home health care |
| COST | Low monthly premiums, deductibles, some out-of-pocket costs | None based on eligibility. |
| ENROLLMENT | Oct. 15- Dec. 7 or 3 months following 65 birthday | Anytime based on eligibility |

INSURANCE  Lic. 0121751

7

MEDICARE: [medi-CARE]

Medicare is Federal Health Insurance for anyone age 65 and older, and some people under 65 with certain disabilities or conditions.

To Qualify for Medicare:

→    Be age 65 or older;  Be a U.S. resident; AND.

→    Be either a U.S. citizen, OR.

→    Be an Alien who has been lawfully admitted for permanent residence and has been residing in the United States for 5 continuous years prior to the month of filing application for Medicare.

Part A:  Provides inpatient hospitalization, post hospital skilled facility care, and home care coverage.

Part B: Provides medical coverage for physician visits, diagnostic tests, physical therapy and medical supplies.

Part C: Provides Medicare A & B supplemental coverage through "Medicare Advantage". Provided by private insurance carriers. Options include HMO, PPO, POS, and specialty plans.

Part D:  Provides prescription drug coverage.

Medicare Supplemental Insurance (MEDIGAP): Extra insurance you can buy from a private company that helps pay your share of costs in Original Medicare. Policies are standardized, and in most states named by letters, like Plan G or Plan K. The benefits in each lettered plan are the same, no matter which insurance company sells it.



8

# How To Handle A Generic Call

[Manners Matter] ☺

"Good Morning/ Afternoon"

"Hello my name is _____ your Licensed Insurance Agent."

"Who do I have the pleasure of speaking with?"

"How can I help you?"

"May I please have your Member ID to better assist you?"

*Search using phone numbers or names if they don't have a member ID.*

"Thank you, one moment while I pull up your account....."

"Ok, great. Now for HIPAA verification, may I please have you verify you DOB (date of birth) and the full address on file?"

"Thank you for verifying that information, I'm happy to help you with that!"

"Please give me a moment while I look into this for you."

*If a member refuses to verify information:*

"We are HIPPA compliant so we do have to verify your information."

## 5Ps of Telephone Etiquette

Follow these 5 Ps while on the phone;

**Polite**
Use a soft tone

**Prepared**
Have all the relevant details (names, numbers, dates, etc.)

**to the Point**
Don't beat around the bush

**Perceptive**
Don't waste people's time by talking on irrelevant topics

**cooPerative**
Provide the information needed, if you can't help, find someone who can, or tell the caller you will call back with the information.

# General Probing Questions

- Is your coverage through the state?
- Individual or a Family plan?
- Who is your current provider?
- When was the last time you submitted a payment and the amount?
- Do you currently have any medical needs that need immediate care?
- How often do you go to the doctor?
- Do you have any upcoming scheduled appointments?
- Any specific medications that you are currently taking?
- How soon do you need to refill your prescriptions?
- Are you open to using a broader network of healthcare providers?

## Types of Probing Questions



**Rapport Building**

- I see you live in [location]. Have you ever been to [local landmark]? I came across it in an article and it stuck with me for some reason.
- Did you read that [relevant article in prospect's industry]? What did you think of that?
- Have you traveled recently for work or leisure?

**Problem-Solving**

- How much is this problem costing the company? In time? In dollars?
- How would you describe the problem you're trying to solve? Why haven't you solved it yet?
- What worries you most about the current problem?

**Budget**

- Do you have a budget range in mind?
- What will happen if your available budget doesn't cover the cost of your must-haves?
- Are there opportunities for additional funding?

**Solution-Oriented**

- What does the ideal solution look like to you?
- Beyond product features, what are the brand qualities you need from a provider?
- What are your must-haves and nice-to-haves in a solution?

**Buying Process**

- Can you tell me more about your decision-making process? Who is involved? Is there a timeline?
- What additional information do you need to feel ready to make a purchase?
- Have you ruled out other providers for this solution? Why?

**Deep Probing**

- Can you tell me more about that?
- How do you feel about that?
- Can you be more specific?

11

# The Sales Script

"Hi, This is _____ your licensed health insurance agent. How can I help yo today?"

"Are you looking for an individual or family plan?"

"When was the last time that you had a health insurance policy?"

"Who was your previous health insurance carrier?"

"Was that through your employer's benefit or on your own?"

"OK, Great and when are you looking to have your policy effective?"

"And what was the monthly premium that you were responsible for with that plan

"Okay, and have you ever been diagnosed with any critical illness in the last 5 yea such as (cancer, HIV, strokes, heart attacks)?"

"Do you have any pre-existing conditions such as (diabetes, heart disease, asthm cancer, high blood pressure),or any condition that requires ongoing medic treatment?"

"And if you had to estimate your gross household income for the year what woul that be?"

"Are there any specific benefits that you are looking for with the plan TODAY? ( anything you needed covered in particular?"

"Do you mind spelling your first and last name for me please?"
"What is your date of birth?"
"Zip code?"
"Email Address?"

"Okay let me place you on a brief hold while I put your information into the syste and pull up the options available in your state."
**(Place on hold and build policy)**

"Thank you for holding. So I did go ahead and pull up the options available in your state. What I'm going to do is start with the most comprehensive and work our way down the list of options. Feel free to write any of this down if you like."

"First, We have the government Obamacare marketplace plans. *Currently, those premiums are charting back at the highest rates.* Those are ranging anywhere between $_____ and $_____ per month and the deductibles are anywhere between $1500 to $3000 (per person)."

"Next, You have your consumer private market options. This would be your Bluecross Blueshield, United, Humana, Cigna, And Aetna options. Those policy premiums are ranging anywhere between $_____ and $_____ per month. The deductibles are a little higher and start at around $5000 a person."

"However, your most affordable option would be through the state private issued plans and with your state deductions applied you do qualify for a zero dollar deductible and those policy premiums are looking to be anywhere between $_____ to $_____."

"So, of the options that I just listed for you, which of them sounds best? And then we can get into the details of the plan....."

**(STOP TALKING AND WAIT... THEY WILL PICK LAST OPTION)**

"Okay, perfect. The network that the policy utilizes is through Multiplan PPO. Are you familiar with what a PPO policy is? What having a PPO network means is that you're part of an Open Access agreement and can go to any doctor, hospital, or specialist of your choice so you're not restricted to a limited access network. The plan is also nationwide. So, you can also utilize your coverage benefits in all 50 states so If you are ever traveling or visiting relatives you will be covered."

"Now, in terms of your prescriptions, your generic medications are going to be anywhere between $0 to $15 and your brand name medications are anywhere between $0 to $30."

"Like I said, it is a *$0 deductible plan* ; Do you know how a Deductible works?, what that means is that you don't have any out-of-pocket annual amount to satisfy before your coverage benefits kick in."

13

"Your coverage benefits kick in immediately."

"For your *Primary Care Doctor's Visits* and any *Specialist Visits* the copays are o $25. Also, just a $25 copay to be seen in an *Urgent Care or ER Visit*."

"For both Primary Care Doctors and Specialist Visits, the copays are only $25. If seen by Urgent Care or ER, there will also only be a $25 copay."

*check in*
"Does that work for you?"

"Now, in terms of your wellness and preventative screenings such as (an checkups, physicals, pap smears, mammograms, any cancer screening bloodwork) those are all covered at 100%, making it a $0 coinsurance."

**Get information for Hard Copy Medical cards**
(confirm spelling of first & last name, address, phone number, and email)





*Enrollment Fee:*

"Now, for the first month of the policy there is a one-time stāte mand enrollment fee of $125 that is applied to the first month only. So for the first mo it's going to be your premium total of $_____ plus the $125 state fee and all fut months it's just going to be the $_____ moving forward."
"You're not bound by a 6 month or year long contract, it also guarantees that for lifetime of the plan, however long you decide to keep it,, your premium rate $_____ can never increase."

"Now, before we move forward with your payment method and text message verification, I do have to put a couple of medical history questions on file for you for underwriting purposes. So, just let me know once you are ready to begin the medical history questions and then we can start."

*Medical Questions:*

1.  "To the best of your knowledge and belief, within the last five years has any applicant been diagnosed with any of the following symptoms or conditions
    - Cancer
    - Tumor
    - Stroke
    - Heart Attack
    - Heart Surgery
    - COPD emphysema"

2.  "To the best of your knowledge and belief within the last five years has any applicant been diagnosed or treated for any of the following symptoms or conditions:
    - Crohn's disease
    - Liver Disorder
    - Kidney disorder or end stage renal disease"

3.  "Lastly, To the best of your knowledge and belief within the last five years has any applicant been diagnosed or treated for AIDS or tested positive for HIV?"



**When addressing medical questions, it's vital to approach with Empathy and Respect for the applicant's comfort level. Create a supportive environment where they feel safe to share by using open-ended questions and actively listening to their concerns.*

15

## COLLECTING CARD INFORMATION

"OK, I'm getting ready to send over the application. In order for you to receive it, need to confirm that you have a Smartphone to send the link over to. Do you have access to an Android or an Iphone?"

"Okay great! and then for the payment method that you wanted to attach to your plan for Financial Responsibility was that going to be with a *VISA, MASTERCARD, DISCOVER, OR AMERICAN EXPRESS.*"

"*Whenever you are ready to begin provide me with the full card number in 4 digit increments for clarity*"

"*Expiration date?*"
"*CVV?*"

"Thank you, and please <u>verify the name as it appears on the card.</u>"

"Is there a middle initial?"

"Verify the correct billing address associated with this card."





## Choose Your Platform:

### INNOVATIVE OR STRATEGIC

## INNOVATIVE:

"You will receive a *Text Message Confirmation* from our system to verify your approval and finalize your Enrollment."

"The text will say 'To complete your enrollment [members name], please click the link below."

(Email will say the same thing)

*Once the link open in their browser the must complete

1. Client types in the Date of Birth for the Primary Applicant to *Verify Identity* before accessing the application, then click "Done" to continue.
2. The next page will load an *Itemized Breakdown* of billing, have them scroll down and click "I Accept".
3. The next page has *3 boxes of Acknowledgements* to check off on, once all 3 boxes have a check, have them click next.
4. Next is the *Authorization for Enrollment,*
   a. First, have them look for the text box that says "Authorize this application by typing in your full name"
   b. After typing their name, underneath their name is a box for an E-Signature.
   c. Have them check that the "Use Stylized Script" is selected.
   d. Finally, guide them to click on "Submit Application"
5. A window will pop up for the applicant to *Verify their Primary Address.*
   a. IF, Billing Address is Different than their primary address, they must check off the box at the lower left of the window that says
      i. "Billing address is different from mailing address."
   b. Once addresses are entered, click "Submit"
6. While the app is being processed, a pop up will instruct the applicant "Do not close the browser window until you see a success message." this may take a few moments.
7. The pop-up will close on its own and depending on the status of the payment, it will bring them to either;
   a. Successful Transaction, will let the member know their application has been submitted and that they'll receive an email with further info.
   b. Unsuccessful Transaction; There will be some kind of error
      i. Insuffficient Funds 1
      ii. General Error
      iii. Pick Up Card SF 2
      iv. Blocked First User
      v. CVV mismatch
      vi. Do Not Honor

17

## Choose Your Platform:

### INNOVATIVE OR STRATEGIC

### STRATEGIC:

"You will receive a *Text Message Confirmation* from our system to verify your approval and finalize your Enrollment."

The text will say "[Applicant Name], to complete your plan enrollment, please click here" with a link provided to click into the application.
(The Email will let them know they are One Step Closer, it will have the same wording with the link provided)

1. Client types in the Date of Birth for the Primary Applicant to Verify Identity before accessing the application, then click "Submit" to continue.
2. The next page will show them their Enrollment Application Summary.
   a. Have them scroll down, down, down to where there are boxes to check off
   b. It is required that ALL boxes with selected plans are checked off before continuing; including the two Acknowledgements at the bottom.
3. Below the acknowledgements, there is an E-Signature box that they must sign or initial before clicking "Enroll".
4. While the app is being processed, a pop-up will instruct the applicant "Do not close the browser window until you see a success message." this may take a few moments.
5. The pop-up will close on its own and depending on the status of the payment, it will bring them to either;
   a. Successful Transaction, will let the member know their application has been submitted and that they'll receive an email with further info.
   b. Unsuccessful Transaction; There will be some kind of error:
      i. Insufficient Funds 1
      ii. General Error
      iii. Pick Up Card SF 2
      iv. Blocked First User
      v. CVV mismatch
      vi. Do Not Honor



## Your payment was successful

Thank you for your payment. We will be in contact with more details shortly

## BUTTON UP:

"What you will receive within the next 24 hours is 3 emails from Member Services. Make sure to check your spam and junk folder just in case. One is your welcome email, the other will have your temporary password for your benefits portal account. The username is your member ID number which is (1-***-***-****) ...

That is an important number, that is how we will recognize you, that's like your medical social security number. If anyone calls you trying to solicit you, trying to change or update your coverage and they DO NOT know your member ID number, then they are not with us, they are not CMS.GOV appointed and approved, you can just hang up, and that's for your protection."

"Since you officially have health coverage, I can give you access to get placed on the National Do Not Call List. Just call 1-888-382-1222. So you won't have to worry about brokers and solicitors calling you."

"Also, here is our direct line to Customer Service. Because you are a member and have a policy number you don't have to call the main insurance line that you called today. You do not need to call the number you see on your medical cards, that's for doctors to call for claims purposes, you do not need to call the number in the welcome emails either, that is a global service number where you will speak to someone in the Philippines. If you want to speak to an American agent, you call the customer service number I gave you, which is our direct Customer Service line which is _____."

"You can ask for me, again my name is_____. If I am on a call, one of the customer service professionals will be more than capable to help you 10am-6pm EST."



19

# TEXT BLAST FLOW

"Hello My name is _____ your Licensed Health Insurance Agent."
"How can I help you today?"

"The reason you would receive a text message would be because you need to update your healthcare coverage for this year."

"Verify who your current healthcare provider so i can further assist you
What is your member identification number?"

"Let me put your information in the database and pull up your policy."
"For HIPAA Verification, please verify your
(First & Last Name) (DOB) (Email) & (Address)"

*Place on brief hold to review.*

"It's showing you did not complete your income verification & medical background check. This has a $125 state mandated enrollment fee, and initiates your income verification for eligibility for any subsidies.
The deadline for this was April 1st so you are required to satisfy the full consumer market value of the premium until your income has been verified.(60-90 days) "

### ***FLIPS***

** *The ones that say they're on autopay*, reassure them that there is no longer a card on file for autopay.

** *The ones that pay nothing*, let them know that they did not complete medical underwriting and that there is also a state enrollment fee to continue with the policy.PAST DUE IN INSTALLMENTSFor example: If they currently pay 20 monthly, offer a one time yearly fee of $1,004. Break that down monthly to show them what they can save by purchasing the policy for the year. (INSTALLMENT UP TO 6 Months!!)

20

- Definition: A reply intended to show fault in an opponent's argument.

- If nothing else, the writer must anticipate potential objections from his/her readers and plan his/her argument accordingly.

# Rebuttals

## "CAN YOU SEND ME SOMETHING IN WRITING?"

"Of course! You will get everything in writing once you get approved for the plan. First what we need to do is submit an application to see if we even can get you approved for the plan. IF you are approved for the plan, you will receive an email confirmation with benefit details and your temporary insurance cards that you can print out and use until you get the hard copy policy in the mail. And you also have a 10-Day look period to overlook all the coverage to make sure you're still satisfied with the plan. If for any reason you aren't 100% satisfied with the coverage, just call me back, we can switch to something else cause we have all the insurance plans in your state and it doesn't matter to me which one you go with as long as you're happy with the plan!"

"This is a customized plan which includes coverage for all of your major/minor needs, but we did take maternity/substance abuse coverage off of the plan to make it more manageable cost/wise and there is no reason to pay for benefits that you would not be utilizing. Customizable plans do not have a set brochure, as it is generated at the time of enrollment. You will receive everything in writing later today via email, and at that time you will see the entire benefit outline. If at any point you want to make any changes on the coverage you can give us a call and we will make those necessary changes."

21

## "I DON'T FEEL COMFORTABLE GIVING YOU MY PAYMENT INFO OVER THE PHONE?"

"Having financial responsibility is required by all insurance compani because the insurance company isn't going to go through the means of underwrit you unless you have the means to pay for it. Same case with car insurance, insurance, etc. Keep in mind, your payment method is only being attached to yo application. You are NOT being charged right now. Now, if you are accepted, yo will receive email confirmation with the outline of coverage as well as yo temporary insurance cards."

"Keep in mind you called me today. We don't call anyone at the Marketpla We are contracted with the Federal Government, and all of our calls are record for quality assurance. I work in the most highly regulated industry in the count Health Insurance. I'm licensed in over 40 states around the country, so I'm not goi to risk my insurance licenses, and how I provide for my family over (the month premium).
Back to script."

## "DO I HAVE TO GIVE MY PAYMENT INFO TO YOU NOW?"

"Yes, having financial responsibility is required by all insurance compani because the insurance companies will not go through the means of underwriti you unless you have the means to pay for it."

"Keep in mind, your payment method is only being attached to yo application so we can try and get you approved. You are NOT being charged ri now. If you get accepted you will receive an email confirmation with the ent outline of coverage and your temporary insurance cards! By any means, if you do like anything about the plan you have a 10-day free look period to see if you're s satisfied with the coverage, but I know you're going to love the plan!"

(Back to script)



## "I NEED TO TALK TO MY SPOUSE"

"As you should speak with your spouse."

Or

"I understand, my spouse and I are exactly the same way."

"But all we are doing is seeing if we can get you approved for the plan with the medical underwriters today. This is all hypothetical as of now, I would hate for you to speak with your spouse, get him/her excited about the plan benefits/cost when you have not been approved yet, it would be wasteful. Once you get approved for the plan you will get an email confirmation with the entire outline of coverage as well as your temporary medical cards so you and your spouse can overlook all the coverage together black and white, clear as crystal. By any means when you both take a look at the policy and have any questions about the plan or don't like anything about it you can always give me a call and we can switch you into something else."

"Is your spouse available to get on the line with us now? That way we can go over the benefits with them; in case they have questions."

"Also, remember you also have your 10 - Day free look period to overlook all the coverage to make sure you're still satisfied with the plan and by any means you aren't you can get a full refund. But, I know you will love the plan because I shopped all the plans with you! This is the best plan at the best price for you and your family."



23

## "I NEED TO THINK ABOUT THIS"

"I completely understand that you need to think about everything, that's what we are doing here together, we looked at all the available plans and prices in your area together. If there was a better plan that was more beneficial for you then that's the plan we would be going over because it's definitely in my best interest to put you in the right plan the first time. If I don't do it right the first time it's a losing situation for both of us."

When people say they need to think about it, it could mean one of two things:

1. They are not interested in the plan we are going over or "CUSTOMER NAME"

2. They are interested but they are just unsure.

*Which of the Two is it?*

*Once they answer with option #2...*

"Since you're interested and Unsure. Are you unsure about the coverage or is it unaffordable?"

*(Once you get the truth out of them you have to work with them to get the sale done whether it be post date or lowering the cost of the plan.)*



24

## "I SPOKE TO ANOTHER AGENT AND HE/SHE GAVE ME A CHEAPER PRICE":

"That's okay, so like I told you earlier I am a benefits coordinator for the marketplace. We have access to all the plans in the country and specifically within your state. There is no plan I do not have access to."

"What that plan sounds like is a discount plan with very limited coverage. What insurance carrier was that through? What was the deductible? Did it have dental and vision? (Unsell the other plan by explaining the benefits it doesn't have, having a high deductible, and explain how there are higher copays and higher deductibles)."

## "I'M JUST SHOPPING, I WANT TO KEEP LOOKING AROUND"

"I completely understand that you want to shop around, but that's exactly what we are doing here together. As your licensed health insurance agent, I have access to all plans nationwide and specifically within your state. There is no plan I do not have access to, however there are many plans I have access to that you CANNOT find online. We looked at all the available plans and prices in your area together. If there was a better plan that was more beneficial for you then that's the plan we would be going over because it's in my best interest to put you in the right plan the first time. If I don't you'll be back at square one shopping around calling 5-10 brokers, hearing different things until you get even MORE frustrated! That's why shopping with the marketplace, we are not contracted with any specific carrier and you have equal access to all health plans. Again first all we're going to do is see if we can get you approved."

## "I DON'T HAVE THE MONEY"

1. "Okay do you have any savings account or any account you can transfer funds from?"
2. "Is there a CC that you can pay with today to secure the plan, that way you can pay that off later on when you get paid?"
3. "Do you have any family members or friends that can help you until you get the money?"
4. "Okay, when do you get paid next? We can set what's called a post date, which means the payment will ONLY be taken out on the date that we select. When do you get paid next?"

25

## "I SAW A RATE ONLINE FOR CHEAPER"

"That's okay, so like I told you earlier I am a benefits coordinator for the marketplace. We have access to all the plans in the country and specifically within your state. There is no plan I do not have access to."

"What that plan sounds like is a discount plan with very limited coverage. Those rates are sometimes advertised to entice people, but the details of the plan are not advertised. That's what I have access to.
What insurance carrier was that through? What was the deductible? Did it have dental and vision?"

*Unsell the other plan by explaining benefits it doesn't have, having a high deductible, and explain how there are higher copays and higher coinsurance at hospital…*

"Sure no worries. However, as your licensed health agent I am obligated to tell you these are live rates for the day. The premium costs do go up daily due to supply and demand. It's based on how many people are enrolling within your state and within your county. The rates increase similar to how flight prices do."

"As the seats fill up the rates go up. As the policy fills up, the rates increase. There also will likely be a deductible of $4,000 or more at a later date. If you like the plan, it's wise to get it approved promptly. By doing so, you secure the current rate and it protects you from any future increases. It's essentially about ensuring you're getting the best value for your commitment.

## "I'M NOT SUPPOSED TO PAY ANYTHING"

"I understand that you haven't paid in the past but under the new administration, you are required to submit an income verification and medical background check with a licensed agent through the state in order to maintain eligibility. Based on your updated application and the income provided you are required to satisfy the full consumer market value of the plan to initiate your health coverage, this is due to the recent changes to the federal poverty level requirements post pandemic effective as of April 1, 2023."



26

## "I DONT HAVE THE MONEY TO PAY FOR THIS"

"I totally understand that, and don't want to put you in a financial bind, that's why I'm here to help you to avoid those expensive medical bills that God forbid happens. Let me have your zip code so I can pull up the fixed income plans in your area. This is for the what ifs, so let's see where we can help you out with getting you the coverage you need........So I do see that based on your income you do qualify for a state private issued plan with $0 deductible these are plans offered to low income families to ensure health coverage."

## "I'M ON A FIXED INCOME"

"I totally get that so I mean if a major medical emergency happens you wouldn't be able to afford that either so that's why we need medical insurance for when that happens, because in reality this is going to save you money especially when you're if God forbid you have to make a trip to the hospital."

## "I'M JUST GOING TO CALL MY INSURANCE"

"You can, but again, you do not have health insurance, only a discount plan. You can let me, a licensed agent, with 7 years of experience and high retention rates assist you, or you can let someone else mislead you and be left with no coverage or discount. I'm just trying to figure out how I can assist you with making sure that you don't lose your benefits or have a lapse of coverage and also that you don't have the tax penalty."



27

## How To Ninja

THE KEY TO ANY GOOD FLIP IS ASKING **A LOT OF QUESTIONS!** IN ORDER TO *GATHER INFORMATION* THAT CAN BE USED TO FLIP THE CLIENT INTO BUYING TODAY!

### 10-95 A form:

Customer: "I'm looking for my 10-95 A form."

Agent: "Absolutely I can get you your 10-95 A form. Underneath the new administration for us to legally release it, you must have ACTIVE coverage for 2022 (current year)."

"So are you currently insured with one of our plans now or are you uninsured?"

If a customer is currently enrolled in a plan, ask them for their personal/plan information and compare their current coverage with the one that you are offering them. Most likely their current coverage has a deductible, explain that they do not technically have coverage until they meet their high deductible.

If they give you a hard time about giving out their information, or if they say that you should already have their info, let them know that in order to speak with them you have to verify their info first and make sure they are who they say they are (HIPPA LAW)

"Absolutely, I can help you get you your 10-95 A form. Under the Biden administration for us to release it, you must have ACTIVE STATE coverage for 2022 (or current year) for 90 days."

28

So are you currently insured with state coverage through CMS now or are you uninsured?"

Customer A : I already have coverage through_____.

Customer B: I do not have coverage..

Customer C: I do not have coverage..and I don't want it or can't afford it...

Agent A: Alright, so unfortunately that coverage does not satisfy the legal state requirements so you can receive your 10-95A form. Again, underneath the current administration for us to release it, you must have ACTIVE STATE coverage for 2022 (or current year) for 90 days and you will receive access to the form today. Go into the script and explain benefits..

Agent B: Alright let's get you active state coverage for 90 days.. The most affordable plan in your state starts at $_____. Go into the script

Agent C: Alright, so unfortunately the only way the system will allow me to send your 10-95A form is if you have active state coverage. You are only required to have it for 90 days, and you will receive access to the form today. The most affordable plan in your state starts at $_____.

Go to healthcare.gov and send them their new log in.

Agent: "Now that you have fulfilled the state requirements you will receive an email from health.care gov and have access to your 10-95A documents."

29

### Medicaid:

Need to hold
Plan for at least 60 days

Customer: "Is this Medicaid?"

"I'd like to enroll in Medicaid?"

"I'd like to check on the status of my Medicaid?"

Agent: "Yes this is Medicaid. How can I help you today?"

"Yes, we can help you enroll today. Let's see what you qualify for!"

"Yes we can help you check your status, when did you first enroll with us?"
(Back to script)

TO PULL UP ELIGIBILITY YOU WILL NEED TO GO TO GOOGLE, TYPE THE CURRENT STATE THE CUSTOMER RESIDES IN AND MEDICAID ELIGIBILITY

ie. Google Search: "*Florida Medicaid Eligibility*"

*Scroll down to the government affiliated site and read the requirements out loud*
(Most likely they do not meet all of the requirements)

*Advise that due to increases in federal poverty level requirements we have to get a new application submitted to maintain eligibility, you do qualify but it takes up to 3 months for the benefits to go into effect. It's crucial to make sure there is no lapse in coverage during that time. If there is a gap of coverage, underneath the new administration their application for income verification will be null and void and the applicant will no longer receive assistance or benefits as well as be faced with a tax penalty up to $4800 and that is per member per household.*

"Now to comply with Federal and your state's guidelines in the State of (members current State) the applicant must pass the Income Means Test, proving you have limited income and assets. The applicant must satisfy the Means Test as it consists of maintaining the lowest costing state qualifying plan proving insurability for a minimum sixty days."

30

[Once the] applicant passes the Income Means Test, the qualified insured begins [eligibility] immediately with the satisfactory period. Once the satisfactory period has [passed the] qualified insured is immediately eligible for state assistance and welfare."

[pause]

[say] so the carrier requires a medical background check and a method of [payment] attached to your application. Once enrolled with the plan your Test of [means] period begins and you will have proof of insurance emailed. So let's get you [approved] today."

[When] you receive your medical ID cards how would you like the first and last [name] to appear?"

[get all] information

➤ If they qualify for medicaid, enroll them into a low cost plan that they can keep and use while their medicaid application is being processed UP TO 90 DAYS

➤ Explain that enrolling into a state issued plan now will expedite their medicaid app because it shows that they are in need of health coverage

➤ If they do not meet the requirements for state medicaid: Pitch a low cost plan (around $200/month) and try to build value in acquiring health insurance, especially during a PANDEMIC. It can be helpful to break the cost down into weekly amounts to make it sound more affordable/attainable, for EX: $50/week.

➤ If they CANNOT afford a month to month plan) -Pitch the lowest wellness & preventive with app fee - Explain that this plan allows for a "reassessment of usage" after 90 days, which means that since they are in good health and are considered low risk, the carrier will automatically assess the usage of the plan once they hit their 90 day mark and if they minimally used the coverage and not for any high risk situations (like a hospital stay) they may quality for a premium reduction of anywhere between 30-50% and they will still be able to keep the zero deductible! This way they may only have to pay the full premium for 3 months. full Price for 3 months after it might get reduced.

31

## "I'm looking for a replacement on my card":

Agent: "No problem! What policy did we get you approved with?"

*(Follow up with... )*

"How much are you responsible for on a monthly basis for that plan?"

"And you're blessed with Good health, no major pre-ex Cancer, Tumor, Stroke etc..."

*(Once they say they have nothing major pre-ex GO FOR THE FLIP!!)*

*Overview...explain they are over paying and pre qualify for a lower rate through the state enrollment. Go right in for the kill. Pitch hard, sell the benefits and unsell their current plan. If it is HMO, or has high deductibles/coinsurance. Tell them they are throwing money away. Because they are healthy, they pre qualify. Let's see if we can get them approved!!*

## "Is my policy still active?"

"You will need to do some digging here, ASK QUESTIONS! There is a reason they are calling to check if their policy is active."

*Question examples:*

- "When did you enroll into the plan?"
- "Did you make your initial payment?"
- "When did you last use the coverage?"
- "When did you make the last payment?"

*More than likely you'll be able to use one of their answers to explain to them that their coverage is not active and that you can find them a new plan that meets their needs so that they don't go uninsured.*

32

# How The Leads Work

**Leads:**
There are thousands of offices just like us that are bidding for a call and it's sort of like going to a casino and gambling money because we are bidding against other offices to target the same exact call just for you!!! How it works is the customer goes online looking for health insurance they are usually on a website where it's an ad and they look to see the different options that they have, they sometimes fill out a few questions depending on their income, medical background, zip code as well as many other factors that determine if the customer is worth $50 or if they are worth $300. There are several marketing campaign platforms that we use, our main one is Media Alpha which is IVR, PRIORITY, AND HIGH INCOME. And then we have a text blast sent out to people regarding health insurance from forms they submit for health insurance inquiries.

**The Buffer:**
The company pays for the call as soon as it rings, a buffer is the cut off time you have to disconnect the call to not be charged for it. This should not be abused and only done if you receive a call that is not health insurance related. Buffers range from about 30 sec to 1 min, the longer the buffer the slower the calls come in. It's very important to work every call you get because they are paid calls. So, love the one you're with because chances are the company paid anywhere from $50-$400 for that call you just answered.

**Ask Questions:**
The leads are different and the calls vary so it's important to probe. Never shop with YOUR pocket, go by what they had before in terms of insurance. Ask how much they were paying for their coverage before because based on that information you are able to pitch a similar price and they are comfortable paying that amount. Deductibles are a selling point, plans with lower deductibles have greater selling points because most insurance carriers have anywhere from $5-12k deductible. When you know what they really need it's easier to get the sale so ask questions and customize a policy based on their needs.

33

# Probing Questions For Sales Calls

- Who is your current provider?
- Is that on your own or through your employer?
- When was the last time you submitted a payment and the amount?
- Do you currently have any medical needs that require immediate care?
- *How often* do you go to the Doctor?
- Do you have any *upcoming scheduled appointments*?
- Any *specific medications* that you are currently taking?
- How soon do you need to refill your prescriptions?

**"Who am I speaking to?"**
State Health Enrollment

**"Why are you contacting me?"**
This is the final attempt to resolve a time sensitive issue, there have been multiple attempts to resolve this matter via mail and email however on our end it's as though it has been ignored. Failure to resolve this today to comply with your state's healthcare regulatory requirements will result in forfeiting your coverage and be faced with a tax penalty.

**"You should have my information, why do I have to tell you?"**
We are HIPPA compliant and cannot disclose any information until you have been verified.

34

# EXPERT EXHIBIT 3

## DECLARATION OF ROBERT TRACY
## PURSUANT TO 28 U.S.C. § 1746

I, Robert Tracy hereby declare as follows:

1.       My name is Robert Tracy. I live in Broomfield, Colorado and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.       I lost my health insurance through my employer when I was laid off in early April 2024. I wanted to buy health insurance from the Colorado state marketplace. I searched online and found what appeared to be a Colorado state marketplace website, and it requested my phone number for a call from a health insurance agent.  After I submitted my phone number on that website, I was bombarded with telemarketing calls day and night.

3.       On April 29, 2024, I picked up a call from 646-362-3938. The caller identified herself as Haley, and she said could enroll me in a health insurance plan from the Colorado state marketplace. Haley first explained that open enrollment had already closed, but I could still enroll in a plan if I had experienced certain qualifying life events. I told her that I had recently lost my job and relatedly health insurance through my employer, and Haley responded that loss of employment was a qualifying life event that would make me eligible to enroll in a plan from the Colorado marketplace.

4.       Next, Haley asked if I was looking for coverage just for myself or a family plan. I told her I needed individual coverage that was similar to the health insurance plan I had through my employer. Haley said she was searching policies to find some options for me that would offer similar coverage but would be cheaper than COBRA. Shortly afterward, Haley said she had found a policy for me through UnitedHealth, and the premium was $421.28 per month. I was excited to hear that Haley had found insurance through UnitedHealth, because that was the

Page 1 of 8

carrier for the employer plan that I had through my job. Haley said that under this plan, all of my medical expenses would be fully covered. Specifically, she stated that I would only have to pay $20 copays for doctor's visits and $10 copays for prescriptions. For accidents and emergency care, Haley said that this plan had "80/20 coverage." She also said there was no limit on the coverage under this plan.

5.      I asked Haley many questions to ensure I knew what I was buying, and our entire call was around 50 minutes long. I asked her to confirm that this was a plan offered through the Colorado state marketplace, and she assured me it was. I also wanted to better understand the "80/20 coverage" Haley promised, so I asked her to talk me through several examples. I don't remember the exact details of the hypotheticals, but Haley confirmed that I would only owe 20% of any medical bill, such as ambulance and hospitalization cost, and the plan would cover the rest.

6.      I also asked Haley to confirm that my prescription medications would be covered under the plan she was offering. I have prescriptions for two drugs: Keppra, an essential medication for epilepsy, and Synthroid, a thyroid medication. Haley stated that my copay for each of these drugs would only be $10 for a 180-day supply. I was thrilled to hear this because this was even better coverage than I had through the insurance from my employer.

7.      I asked Haley if there were plan documents I could review, and she responded that I had to wait until after UnitedHealth had approved me for a plan. Once that occurred, I would receive an email with a link to a web portal on which I could review all of the plan documents.

8.      Because the plan that Haley described provided full coverage from a carrier that I knew—UnitedHealth—I decided to purchase. Haley then collected my payment information and

she said that to complete the purchase I would need to click a link that would be texted to my phone while she stayed on the line. **Tracy Attachment A** is a true and correct image of the text I received. When I clicked the link, it opened a browser page that only featured a number that Haley asked me to read back to her. I don't recall seeing any information other than this number on that page. Once I read the number back to Haley, she confirmed that my enrollment was complete. Before ending the call, Haley gave me her number to call with any questions about the plan: 954-824-5569.

9.      A few minutes later, I received an email from admin_noreply@innovativepartnerslp.com that provided login inforomation to a "Partner Portal" at URL https://member.innovativepartnerslp.com, and it stated that at the portal, I could access my "temporary ID card[], resources, and monthly payment details." **Tracy Attachment B** is a true and correct image of this email. I logged into the portal, and **Tracy Attachment C** is a true and correct image of the site as it appeared once I had logged in. A tab on the left of the screen was labeled "Membership Card," and **Tracy Attachment D** is a true and correct image of the ID card I downloaded from the portal. Given that Haley had said that UnitedHealth was the carrier for this plan, I was surprised to see there was no logo or mention of UnitedHealth on the ID card.

10.      One of the tabs on the left panel of the Member Portal, **Tracy Attachment C**, was labeled "Documents," and when I clicked it, a pop-up box appeared with links to four different documents with titles "Specific Plan Document – Optimum MD 1," "Optimum MD Plan Brochure," "Specific Plan Document Essential," and "Essential Plan Brochure." **Tracy Attachment E** is a true and correct image of the screen as it appeared when I clicked that tab. I opened and saved several of those documents, which are attached. **Tracy Attachment F** is a true and correct pdf of the document I downloaded from the link titled "Specific Plan Document –

Optimum MD 1." **Tracy Attachment G** is a true and correct pdf of the document I downloaded from the link titled "Optimum MD Plan Brochure." **Tracy Attachment H** is a true and correct pdf of the document I downloaded from the link titled "Specific Plan Document Essential."

11.     Another tab on the left panel of the screen in the Member Portal, **Tracy Attachment C** was labeled "Partnership Documents," and when I clicked it, a pop-up box appeared with links to four different documents with titles "Joinder Agreement," "Specific Plan Document – Optimum MD 1," "Specific Plan Document – Essential," and "Health Benefit Plan Wrap Document." **Tracy Attachment I** is a true and correct image of the site as it appeared when I clicked the "Partnership Documents" tab. I opened all of these documents. Two of the documents listed in the pop-up box, "Specific Plan Document – Optimum MD 1" and "Specific Plan Document – Essential" were the same as the documents with the same title that were linked from the pop-up box that appeared in the "Documents" tab. I downloaded and saved the other two documents from the "Partnership Documents" tab, and they are attached. **Tracy Attachment J** is a true and correct pdf of the document I downloaded from the link titled "Joinder Agreement." **Tracy Attachment K** is a true and correct pdf of the document I downloaded from the link titled "Health Benefit Plan Wrap Document."

12.     A tab on the left panel of the Member Portal screen in **Tracy Attachment C** was labeled "My Transactions," and when I clicked it, a page with the heading "My Transactions" appeared. **Tracy Attachment L** is a true and correct image of that page. It listed a "Transaction Date" of April 29, 2024, which is the date I purchased the plan from Haley, and a "Total Amount" of $421.28, which was the amount I had paid.

13.     When I began reading the documents that I had downloaded from the portal, I was shocked. First, I did not see UnitedHealth mentioned in any of the documents, even though

Haley told me that I was purchasing a UnitedHealth plan. Instead, the documents repeatedly referenced "Innovative Partners," a company I had never heard of and that Haley had never mentioned during our call. Second, the plan features as they were described in the documents were a joke—they were completely different from the benefits I had specifically requested and that Haley had confirmed were included in my plan. Although Haley had stated there were no limits on coverage, my understanding of the plan based on these documents is that the payouts were capped. For example, page 4 of the "Summary Plan Description – Optimum 1MD," **Tracy Attachment F**, states that the plan coverage for emergency room visits is only "one (1) visit per year," and the plan would pay just $150 for that visit. On page 3, this document also states that for "[p]hysicians and [u]rgent care visits," coverage is capped at "four (4) visits per year" and $150 for each of those visits. Indeed, page 4 of "Optimum MD Plan Brochure," **Tracy Attachment G,** lists $150 as the "[m]aximum amount per plan year" for emergency room visits and for all "Primary Care Physician, Specialist, [and] Urgent Care Visits." I never would have agreed to purchase a plan with such limited benefits.

14.    Also, even though Haley had told me that under the plan, a 180-day supply of my prescriptions for Keppra and Synthroid would only cost me a $10 copay for each, my understanding of the plan based on the documents was that it only provided a discount on prescription medications. I would not have purchased the plan if Haley had truthfully informed me that this was a prescription discount plan—I did not want such a plan. I wanted an insurance plan that would fully cover my prescriptions, and I had clearly explained that to Haley.

15.    I was especially frustrated and shocked to discover fine print on page 4 of the "Optimum MD Plan Brochure," **Tracy Attachment G**, stating that this plan is "exempt from the Patient Protection and Affordable Care Act and . . . do[es] not come under the definition of

minimum benefits for the purposes of the Act." I understood this to mean that the product I purchased was not a Colorado state marketplace plan, despite Haley's assurances that she was enrolling me in one. If I had known this was not a Colorado marketplace plan, I would not have purchased it.

16.     The "Joinder Agreement," **Tracy Attachment J**, also raised alarms for me. On page 1, it stated that I had agreed to "provide a minimum of five hundred (500) hours of work activity on the internet." My understanding of the Joinder Agreement was that it was supposed to represent my consent to the collection and sale of my information. But I had never agreed to any of this, and Haley had made no mention whatsoever of any work requirement or collection or sale of my personal information. I was shocked to see my name had been signed in the agreement on page 5, dated April 29, 2024—the date I enrolled in the health plan. This is not my signature, and I did not sign any such agreement. I had never seen this document prior to downloading it from the portal.

17.     I was very worried after reviewing the documents and thought perhaps I had been mistakenly enrolled in the wrong plan. A few days after my purchase, I called Haley back at the number she had provided during the sales call, 954-824-5569. She did not pick up and I left a voicemail. Haley did not call me back, so on the morning of May 6, 2024, I texted Haley stating all of my concerns and requesting a call back. **Tracy Attachment M** is a set of true and correct images of the text that I sent to Haley. Haley did not reply to this text. Later that day, May 6, 2024, I texted Haley again repeating my concerns, and there was no response to this text either. Finally, I tried calling the "Partner Services" number, 866-949-3581, which was listed on the membership card, **Tracy Attachment D**. I connected with an answering service, which informed me I would receive a callback. I never received a call back.

Page **6** of **8**

18. I decided to cancel this plan because I believed it was not health insurance and I had been scammed. I was worried about being uninsured, especially if any medical emergency arose, so my first priority was enrolling in health insurance immediately. On May 6, 2024, I made an in-person appointment at the Adams County Health Department, where I enrolled in a health insurance plan from the Colorado state marketplace. Because of my confusing and stressful experience with Innovative Partners, I did not trust any online or phone method of enrolling in health insurance.

19. On May 7, 2024, I sent a letter and an email to Innovative Partners requesting cancellation and a refund of the $421.28 that I had been charged for the plan. **Tracy Attachment N** is a true and correct copy of the cancellation letter that I sent through certified mail to Innovative Partners. That same day, I received an email from partnerservices@innovativepartnerslp.com stating that my cancellation request was being processed. **Tracy Attachment O** is a true and correct copy of this email. On May 9, 2024, I received a full refund from Innovative Partners.

20. On May 8, 2024, I reported my experience to the Federal Trade Commission (FTC), and around that date, I also filed a complaint with the Colorado Attorney General's office.

21. Although I was fortunate enough to receive a refund, this experience was incredibly stressful and frustrating. Even though Haley had stated explicitly that I was purchasing a health insurance plan through UnitedHealth, she enrolled me in a product from a company I'd never heard of. During my initial call with Haley, I had been exceedingly clear that I wanted a full-coverage plan from the Colorado state marketplace, and Haley sold me a plan with such limited benefits that it would have been essentially useless to me. This was especially

stressful because health insurance is a matter of life or death—without coverage, critical healthcare could be withheld or lead to significant, unaffordable medical bills. I also feel violated because this company has acquired my personal information and affixed my signature to an agreement to collect and sell my data. I never consented to the terms in that agreement, and I am worried about sale or dissemination of my information that the company already acquired through the sales process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___Sep 23___, 2024.

Robert Tracy

# Tracy
# Attachment A