

# Tracy
# Attachment B

From: **Innovative partners** <admin_noreply@innovativepartnerslp.com>
Date: Mon, Apr 29, 2024 at 9:36 AM
Subject: Innovative Partners - Partner Portal
To: <█████████@gmail.com>

## Welcome ROBERT TRACY

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: █████████@gmail.com
Temporary Password: █████████

Need help? Contact your recruiter or our partner services team today!

866-949-3581
partnerservices@innovativepartnerslp.com

# Tracy
# Attachment C

Case 0:26-cv-60976-AHS   Document 1-15   Entered on FLSD Docket 04/07/2026   Page 5 of 100

← → C  ⊖ member.innovativepartnerslp.com/dashboard

**INNOVATIVE** PARTNERS

👤 HELLO ROBERT TRACY

- Dashboard
- Documents
- Partnership Documents
- Membership Card
- Program Information
- My Transactions
- Cix Health
- Teladoc
- Find a Provider
- Contact Information
- Sign Out

Welcome back
# ROBERT TRACY !

**Documents**

Specific Plan Document - Optimum MD 1

Optimum MD Plan Brochure

Specific Plan Document - Essential

**Partnership Documents**

Joinder Agreement

Specific Plan Document - Optimum MD 1

Specific Plan Document - Essential

Health Benefit Plan

**Contact Information**

Submit claims to PHCS:
PO Box 21823 Eagan MN 55121 PHC's Payor ID: 28680

Non-PPO claims can be mailed to:
Marpai Health P.O. Box 21112 Eagan,

**ID Wallet**

**Program Information**

**My Transactions**

**Find a Provider**

# Tracy
# Attachment D



## INNOVATIVE
PARTNERS

**Innovative Partners, LP**

Partner Services: 866-949-3581

Name: ROBERT TRACY

Member ID: G938002

Group #: MP200

Optimum-MD 1

**Member Out of Pocket**
PCP: $25
Urgent Care: $25
ER: $25
Wellness: $0

Provider Network



**Teladoc**
HEALTH



**MultiPlan.**
Limited Benefit Plan

$0 co-Pay Telehealth
www.teladoc.com
800-835-2362

---

### Eligibility

**Providers:** To confirm eligibility, verify benefits,
or check the status of a claim:
Electronic Eligibility through Availity - Payer ID: 35245
Marpai Portal: www.myMarpai.com
Innovative Partners Customer Service: 866-949-3581

**Partners:** To confirm eligibility, verify benefits,
or check the status of a claim,
please call Innovative Partners at 866-949-3581
Call 800-467-1403 or visit multiplan.com
to find a MultiPlan provider.

### Claims Submission

Please submit Medical Electronic Claims
Directly to Marpai Payer ID# 35245

Or mail claims to:
Marpai Health
P.O. Box 21112
Eagan, MN 55121

For identification purposes only. Not a guarantee of coverage or payment.

# Tracy
# Attachment E



# Tracy
# Attachment F

# INNOVATIVE PARTNERS, LP HEALTH BENEFIT PLAN
### Summary Plan Description for the Benefits of the Optimum 1MD Policy

Congratulations, you have just enrolled in Innovative Partners, LP's *Optimum 1MD* Health Benefit Plan. This is a limited medical health benefit plan sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA"). This plan is designed to meet the needs of our employees and Active Limited Partners (including their families) who have been either unable to find a suitable major medical policy/plan, or who wish to supplement their existing major medical policy/plan. Please keep in mind that this Plan is not designed to be a major medical policy/plan nor is it designed to replace a major medical policy. This Plan has certain limitations and exclusions contained herein. Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **1-866-949-3581** or email us at: **PartnerServices@InnovativePartnersLP.com**. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1:     GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | April 1, 2023 |
| 1.9. | Plan Year: | January 1 through December 31 |

1.10.   Open Enrollment Period:   Within 30 days of becoming an Employee or an Active Limited Partner

1.11   Program or Policy Name:   Optimum 1MD

1.12.   Waiting Period:   No claim will be paid for medical services that are incurred within the first 30 days of the effective date of coverage

1.13.   Agent for Service of Process: CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201

1.14.   Partner Services:   PartnerServices@InnovativePartnersLP.com

1.15.   Claims:   PHCS, P.O. Box 21823, Eagan, MN  55121
Electronic payor ID: 28680

## SECTION 2:      NETWORK BENEFITS AND DISCOUNT PROGRAMS

### 2.1    MultiPlan Network:

The MultiPlan Network is the largest and most comprehensive independent participating provider (PPO) network in the United States. Your plan includes participation in this network. When you go to a participating provider, MultiPlan will reprice the charges from your doctor and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please go to **MultiPlan.com** and register using the code on your insurance card.

### 2.2    Teladoc Health:

Teladoc Health is one of the largest telemedicine companies in the United States. Your plan allows you to have a consultation with a physician, or other healthcare providers, licensed in your individual state. You will be able to talk to a doctor virtually anytime, anywhere by either telephone or video. You can contact your doctor through your landline telephone, your cellular telephone, the Teladoc app, or through the website. After your consultation, your doctor will diagnose your symptoms and send a prescription if necessary. *All of this is provided for you with a $0 Co-Pay!* Yes, you will not be charged for your medical consultation!

For more information on how to take advantage of this phenomenal opportunity, please use the code on your insurance card to set up an account at Teladoc.com.

### 2.3    Prescription Discount Benefits:

All of the participants in your plan get to enjoy the countless discount pharmaceutical benefits of SingleCare. To download the app simply go to: SingleCare.com and *use the code on your card.*

**SECTION 3:          SCHEDULE OF MEDICAL BENEFITS**

**3.1     General Medical Benefits:**

This Plan provides medical benefits in Section 3.1 that are designed to assist with the expenses that you, or a covered person, may incur as a result of an unforeseen illness, sickness, or injury to the body. Whereas the benefits in Section 3.2 can only be for expenses resulting from an Accident, benefits in Section 3.1 can be used for either Accident or non-Accident expenses.

1. *Physicians and Urgent Care Visits: $150 / four (4) visits per year / $25 co-pay.* We will pay you $150 each time you, or a covered person, visit a physician or urgent care medical professional, and you make a $25 co-pay to the medical facility. This benefit can only be used a maximum of four (4) times per year per covered person.

2. *Wellness Visits: $1,000 / one (1) visit per year / $0 co-pay.* We will reimburse you not to exceed $1,000 when you, or a covered person, has a wellness visit with a medical professional or chiropractor, and we will not ask you to make a co-pay to the healthcare facility. This benefit can only be used a maximum of one (1) time per year per covered person.

3. *Ambulance Trips: $150 / one (1) trip per year / $0 co-pay.* We will reimburse you $150 each time you, or a covered person, is required to be transported to a medical facility by an ambulance, and we will not ask you to make a co-pay to the ambulance provider. This benefit can only be used a maximum of one (1) time per year per covered person.

4. *Laboratory Testing:   $150 / one (1) laboratory test per year / $25 co-pay.* We will reimburse you $150 when you, or a covered person, receive laboratory testing of body tissue or bodily fluid from a state-licensed laboratory, and you make a $25 co-pay to the laboratory. This benefit can only be used a maximum of one time per year per covered person.

5. *Imaging: $150 / one (1) image per year / $25 co-pay.* We will reimburse you $150 when you, or a covered person, receive medical imaging as defined in the Plan Document below, and you make a $25 co-pay to the imaging facility. This benefit can only be used a maximum of one (1) time per year per covered person.

6.   *Emergency Room Visit: $150 / one (1) visit per year/ $25 co-pay.*
     We will pay you $150 each time you, or a covered person, visit a physician or urgent care medical professional, and you make a $25 co-pay to the medical facility. This benefit can only be used a maximum of one (1) time per year per covered person.

## 3.2   Medical Benefits Resulting from an Accident Only:

This Plan also provides additional medical benefits in this Section 3.2 that are designed to assist with the expenses that you, or a covered person, may incur as a result of an Accident as defined herein. *These benefits are not for unforeseen illness or sickness, they are only for an Accident as defined.*

1.   *Hospital Room and General Nursing Care up to the Semiprivate Room Rate: up to $2,500.*
     If you, or a covered person, are confined to a hospital room as a result of an Accident, we will pay up to $2500 for the cost of the room, general boarding costs, and general nursing care up to a maximum of $2500.

2.   *Physician's Fees for Surgery: up to $2500.*
     We will pay a physician's fee for a surgical procedure required by an Accident to you, or a covered person, up to a maximum of $2500. The surgery must be performed in a hospital, or other state-licensed surgical center.

3.   *Anesthesia Services: up to $2500.*
     We will pay for any anesthesia services that are medically necessary as a result of an Accident to you, or a covered person, up to a maximum of $2500.

4.   *Nonsurgical Physician Care, inpatient or outpatient: $75.*
     We will pay you $75 for any nonsurgical physician services that you incur as a result of an Accident to you, or a covered person, regardless if the services are inpatient or outpatient.

5.   *Hospital Emergency Room Care: up to $500.*
     We will pay $500 in the event you, or a covered person, are required to receive emergency room care at a hospital as a result of an Accident.

6.   *X-rays, Ultrasounds, and other Medical Imaging: up to $250.*
     We will pay $250 for x-rays, ultrasounds, and other medical imaging performed, as described herein, that are medically necessary as a result of an Accident to you, or a covered person.

7.   *Ambulance Service: up to $250.*

Page **4** of **11**

We will pay $250 if your injuries, or those of a covered person, as a result of an Accident that requires you, or a covered person, to be transported by an ambulance.

8. ***Prescription Drugs: up to $500.***
We will reimburse up to the amount of $500 for any prescription drug cost that you, or a covered person, incur provided that the prescription drugs are directly related to and medically necessary as a direct result of an Accident.

9. ***Dental Surgery for Injury to Sound Natural Teeth: up to $500.***
We will reimburse you, or a covered person, up to the amount of $500 for any dental surgery medically necessary and entirely required as a direct result of an Accident.

10. ***Physical Therapy: First Visit $60, Subsequent Visits, $30.***
In the event the injuries that you, or a covered person, incur as a direct result of an Accident, require you, or a covered person, to receive physical therapy services, we will reimburse $60 for the first physical therapy visit and reimburse $30 for each subsequent visit up to a maximum number of four (4) visits after the initial first visit.

## 3.3 Waiting Period:

All sickness and indemnity benefits provided for in this Plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an Accident or loss of life.

***PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.***

## Section 4: DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. You should read and understand these definitions.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended **and** unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**Active Limited Partner(s)** means the limited partner made a signatory to either the Limited Partnership Agreement of the Plan Sponsor, or a Joinder Agreement to such Limited Partnership Agreement hereto, as well as other limited partners which may be added from time to time pursuant to the Limited Partnership Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less

than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

**Ambulatory Surgical Center** (ASC) means a distinct entity that operates exclusively for the purpose of furnishing outpatient surgical services. The Ambulatory Surgical Center must be certified by the Center for Medicare and Medicaid Services (CMS). An ASC is either an independent facility or operated by a Hospital. A Hospital-operated facility must be a separately identifiable entity, physically and administratively, and be financially independent and distinct from other operations of the Hospital.

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the participant. This term does not include fostering a child. A child must be below the age of 26.

**Confined or Confinement** means the assignment to a bed as a resident inpatient in a Hospital on the advice of a Physician or Confinement in an Observation Unit within a Hospital for a period of no less than 20 continuous hours on the advice of a Physician.

**Covered Accident** means an Accident that occurs on a day that coverage is in force for a Covered Person, results in a loss or injury covered by the plan, and is not excluded by name or specific description in this Plan.

**Covered Person** means the plan participant. If you purchased insurance coverage that includes your spouse and/or child/children, these individuals are also included.

**Covered Sickness** means a sickness that occurs on a day that coverage is in force, results in a loss covered by this plan, and is not excluded by name or specific description in this plan.

**Diagnosis** means the definitive establishment of the illness condition through the use of clinical and/or laboratory findings. The Diagnosis must be made by a Physician who is a board-certified specialist where required under this coverage.

**Diagnostic Center or Facility** means a licensed and accredited entity that:

- Operates for the primary purpose of conducting medical diagnostic tests on patients,
- Does not assume ongoing responsibility for patient care, and
- Provides its services for use by other medical personnel.
- A Diagnostic Center or Facility may be either independent or operated by another medical entity.

**Dentist, Doctor, or Physician** means a legally qualified practitioner of the healing arts acting within the scope of his or her license and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**Emergency Room** means a portion of a Hospital where emergency diagnosis and treatment of a Sickness or Accident is provided.

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Experimental/Investigational** means a drug, device, medical care, or medical treatment will be considered experimental/investigational if:

- The drug or device cannot be lawfully marketed without the approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;
- The informed consent document utilized with the drug, device, medical care, or treatment states or indicates that the drug, device, medical, or medical treatment is part of a clinical trial, experimental phase, or investigational phase or if such a consent document is required by law;
- The drug, device, medical care, or medical treatment or the patient informed consent document utilized with the drug, device, medical care, or medical treatment was reviewed and approved by the treating facility's Institutional Review Board or other body serving a similar function, or if federal or state law requires such review and approval; or
- Reliable evidence shows that the drug, device, medical care, or medical treatment is the subject of ongoing Phase I or Phase II clinical trials, is the research, experimental study or investigational arm of ongoing Phase III clinical trials, or is otherwise under study to determine the maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis.

**Health Benefit Plan** means this ERISA governed self-funded Plan sponsored by Innovative Partners, LP.

**Hospital** means a short-term, acute general hospital that is:

- Primarily engaged in providing, by or under the continuous supervision of physicians, to inpatients diagnostic and therapeutic services for diagnosis, treatment, and care of injured or sick persons;
- Has organized departments of medicine and major surgery;
- Has a requirement that every patient must be under the care of a physician or dentist;
- Provides 24-hour nursing care by or under the supervision of RNs;
- Has in effect a hospital review plan applicable to all patients which meets at least the standards set forth in Section 1861(k) of the United States Public Law 89-97 (42 USCA 1395x(k));
- Duly licensed by the agency responsible for licensing such hospitals; and

- Not, other than incidentally, a place of rest, a place primarily for the treatment of tuberculosis, a place for the aged, a place for drug addicts or alcoholics, a place primarily for the treatment of mental disorders or chemical dependency, or a place for convalescent, custodial, educational or rehabilitory care.

**Limited Medical Benefit** means a plan, program, or policy that had limited or defined benefits. It is not a comprehensive major medical plan, nor is it intended to replace a major medical plan. The plan is intended to provide you, and your covered dependents, with basic insurance coverage that is capped at specific amounts for specific services. This plan is also exempt from, and thus is not compliant with, ACA.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Medically Necessary** means a service or supply that is necessary and appropriate for the diagnosis or treatment of an injury or Sickness based on generally accepted current medical practice. A service or supply will not be considered Medically Necessary if:

- it is provided only as a convenience to the Covered Person or provider;
- it is not an appropriate treatment for the Covered Person's diagnosis or symptoms;
- it exceeds in scope, duration, or intensity that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment; or
- it is an experimental/investigational treatment.

The fact that a Physician may prescribe, authorize, or direct a service does not, of itself, make it Medically Necessary or covered by the Plan.

**Participant or Plan Participant** means the individual to whom this Plan or any Policy there under is issued.

**Plan** means the Health Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Health Benefit Plan, and such meanings as further defined by the ERISA.

**Pre-existing Condition** means a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received from a physician within a 12-month period preceding the effective date of coverage of the Covered Person.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Reliable Evidence** means only: published reports and articles in an authoritative medical and scientific literature; written protocol or protocols by the treating facility studying substantially the

Page **8** of **11**

same drug, device, or medical care or treatment; or the written informed consent used by the treating facility or other facility studying substantially the same drug, device, medical care or treatment. Benefits will be considered in accordance with the drug or device at the time it is given or when medical care is received.

**Sickness** means an illness, infection, disease, or any other abnormal physical condition not caused by an Accident.

**Spouse** means any individual to whom you are legally married.

**Year or Coverage Year** means the 12-month period beginning on the effective date of this Policy and your participation in this Plan and ending on the anniversary of the effective date of this Policy. Subsequent years will run from anniversary date to anniversary date.

## SECTION 5:      DESCRIPTION OF PLAN BENEFITS

### 5.1     Hospital Confinement Benefit:

We will pay the Hospital Confinement Benefit, shown in the Schedule of Benefits, if a person incurs charges for and is Confined in a Hospital due to injuries received in a Covered Accident or due to a Covered Sickness. The Confinement to a Hospital must begin on a day that the coverage is in force.

### 5.2     Surgery and Anesthesia Benefits:

We will pay the Surgery Benefit, shown in the Schedule of Benefits, for any day a Covered Person undergoes a surgical procedure due to a Covered Accident or Covered Sickness. The procedure must be performed by a board-certified surgeon in a Hospital or Ambulatory Surgical Center.

We will pay the Anesthesia Benefit, shown in the Schedule of Benefits, for any day a Covered Person is administered anesthesia for a covered surgical procedure. Anesthesia must be administered by a licensed anesthesiologist or certified registered nurse anesthetist (CRNA).

### 5.3     Physicians and Urgent Care Visit Benefit:

We will pay the Physicians and Urgent Care Visit Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for a doctor's office visit. This benefit also includes an office visit or diagnostic x-ray and/or laboratory testing for routine or preventative screenings, including a baseline mammogram, screening mammograms, cervical cytologic screenings, colorectal cancer screenings, prostate cancer screenings, and health screenings for children, per the standards and schedules of the American Academy of Pediatrics. Services must be rendered by a licensed Physician acting within the scope of his/her license.

### 5.4     Emergency Room Benefit:

We will pay the Emergency Room Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for and requires medical care from an emergency room due to injuries received in a Covered Accident or due to a Covered Sickness. The visit must occur on a day that the coverage is in force. For a visit due to injuries received in a Covered Accident, the visit must occur within 72 hours after the date of the Covered Accident. Services must be rendered by a Physician.

**5.5      Outpatient Diagnostic X-Ray and Laboratory Test Benefit:**

We will pay the Emergency Room Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for diagnostic x-ray and/or laboratory testing caused by a Covered Accident or Covered Sickness.

A covered test must be performed:
- on a day that the coverage is in force; and
- in a Hospital, Ambulatory Surgical Center, Doctor's office, or Diagnostic Center or Facility.

We will not pay the Diagnostic X-Ray and Laboratory Test Benefit amount for any day a Covered Person is Hospital Confined.

Pathology includes laboratory tests performed for diagnostic purposes.

Radiology includes x-rays, ultrasounds, and other medical imaging performed for diagnostic purposes such as Angiogram, Arteriogram, Computer Tomography Scan (CT), Magnetic Resonance Imaging (MRI), Myelogram, and Positron Emission Tomography Scan (PET).

## SECTION 6:      LIMITATIONS AND EXCLUSIONS

We will not pay benefits for:

- Pre-existing Conditions during the 12 months following the effective date under this Plan.
- Treatment, services or supplies which:
  - Are not Medically Necessary;
  - Are not prescribed by a doctor as necessary to treat the Sickness or Injury;
  - Are experimental/investigational in nature, except as required by law;
  - Are received without charge or legal obligation to pay; or
  - Are provided by an immediate family member.
- Dental care or treatment, except for:
  - Dental care or treatment due to accidental injury to sound natural teeth within 12 months of a Covered Accident and
  - Dental care or treatment necessary due to congenital disease or anomaly.
- Elective procedures and cosmetic surgery.   Cosmetic surgery shall not include:
  - Reconstructive surgery when such service is incidental to, or follows, surgery resulting from trauma, infection or other disease and

- o Reconstructive surgery because of a congenital disease or anomaly of a covered Dependent Child which has resulted in a functional defect.
- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.
- Spinal manipulation or adjustment, including massage therapy.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related Injury or Sickness, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Pregnancy.
- Charges for custodial maintenance or care.
- Treatment of mental illnesses, emotional disorders, and substance abuse.
- Services rendered to a transplant donor of any organ or body element or the acquisition cost of any organ or bodily element.
- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.
- Eyeglasses, contact lenses, hearing aids, eye examinations, and hearing tests.

## SECTION 7:     CLAIMS PROCEDURE

Claims should be submitted to:

**PHCS**
**P.O. Box 21823**
**Eagan, MN  55121**
**Electronic payor ID: 28680**

*Please include the plan number, your plan participant number, as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all medical records regarding your claim.*

# Tracy
# Attachment G



**INNOVATIVE**
PARTNERS

**HEALTH BENEFIT PLAN**

# TABLE OF CONTENTS

Multiplan Overview ...............................................................3

Optimum 1MD ...................................................................4

Optimum 2MD ..................................................................5

Optimum 3MD ...................................................................6

Optimum 4MD.....................................................................7

Optimum 5MD.....................................................................8

Optimum 6MD.....................................................................9

Optimum 7MD.....................................................................10

Program Comparisons ........................................................ 11

Accidental Medical Benefit ...............................................12

Additional Benefits

      Teladoc ........................................................................ 13

      Single Care ................................................................. 15

      Progressive Nutracare ........................................... 16

Ancillary Benefits

      Guardian ..................................................................... 17

      Essential ...................................................................... 18

      Dental ......................................................................... 19

# MULTIPLAN OVERVIEW

As a participant of this plan, you and any beneficiaries you have added to your plan will have access to the following benefits:

## MultiPlan Network:

The MultiPlan Network is the largest and most comprehensive independent participating provider (PPO) network in the United States. Your plan includes participation in this network. When you go to a participating provider, MultiPlan will reprice the charges from your doctor and you will receive the applicable discount. Once any applicable discount is applied, and if your medical service is covered by your plan, the appropriate benefits will be paid toward your claim. Please remember that even after you exhaust your benefits under your plan, you can still receive the participating provider discounts. In order to find out which providers in your area are covered and defined details regarding your specific benefits, please contact  866.949.3581





3

# OPTIMUM 1MD   OVERVIEW

## Wellness Services

$0 Copay. Wellness services are covered 100% up to a maximum of $1,000 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits

$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $150 per plan, per year.

| OPTIMUM 1 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Outpatient Services | Emergency Room | 1 | $150 | $25 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 4 | $150 | $25 |
| Other Care Services | Ambulance | 1 | $150 | $0 |
| | Labs | 1 | $150 | $25 |
| | Imaging | 1 | $150 | $25 |
| | Wellness | 1 | $1000 | $0 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

4

# OPTIMUM 2MD    OVERVIEW

## Wellness Services
$0 Copay. Wellness services are covered 100% up to a maximum of $500 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits
$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $100 per plan, per year.

| OPTIMUM 2 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospital Admission | 1 | $200 | $100 |
| | Hospital Confinement | 10 | $100 | N/A |
| | ICU Admission | 1 | $200 | $100 |
| | ICU Confinement | 5 | $100 | N/A |
| | Inpatient Surgery | 1 | $200 | N/A |
| | General Anesthesia | 1 | $100 | N/A |
| Outpatient Services | Outpatient Surgery | 1 | $200 | $100 |
| | General Anesthesia | 1 | $100 | $25 |
| | Emergency Room | 2 | $100 | $25 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 4 | $100 | $25 |
| Other Care Services | Ambulance | 2 | $200 | N/A |
| | Labs | 1 | $200 | $25 |
| | Imaging | 1 | $200 | $25 |
| | Wellness | 1 | $500 | N/A |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period
All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# OPTIMUM 3MD ➤ OVERVIEW

## Wellness Services
$0 Copay. Wellness services are covered 100% up to a maximum of $500 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits
$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $200 per plan, per year.

| OPTIMUM 3 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospital Admission | 1 | $400 | $100 |
| | Hospital Confinement | 10 | $200 | N/A |
| | ICU Admission | 1 | $400 | $100 |
| | ICU Confinement | 5 | $200 | N/A |
| | Inpatient Surgery | 1 | $400 | N/A |
| | General Anesthesia | 1 | $200 | N/A |
| Outpatient Services | Outpatient Surgery | 1 | $200 | $100 |
| | General Anesthesia | 1 | $100 | $25 |
| | Emergency Room | 2 | $200 | $25 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 6 | $200 | $25 |
| Other Care Services | Ambulance | 2 | $200 | N/A |
| | Labs | 1 | $200 | $25 |
| | Imaging | 1 | $400 | $25 |
| | Wellness | 1 | $500 | N/A |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period
All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

6

# OPTIMUM 4MD

# OVERVIEW

## Wellness Services

$0 Copay. Wellness services are covered 100% up to a maximum of $1,000 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits

$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $300 per plan, per year.

| OPTIMUM 4 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospital Admission | 1 | $800 | $100 |
| | Hospital Confinement | 10 | $400 | N/A |
| | ICU Admission | 1 | $800 | $100 |
| | ICU Confinement | 5 | $400 | N/A |
| | Inpatient Surgery | 1 | $800 | N/A |
| | General Anesthesia | 1 | $400 | N/A |
| Outpatient Services | Outpatient Surgery | 1 | $400 | $100 |
| | General Anesthesia | 1 | $200 | $25 |
| | Emergency Room | 2 | $400 | $25 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 8 | $300 | $25 |
| Other Care Services | Ambulance | 2 | $400 | N/A |
| | Labs | 1 | $400 | $25 |
| | Imaging | 1 | $800 | $25 |
| | Wellness | 1 | $1,000 | N/A |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30 day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

7

# OPTIMUM 5MD   OVERVIEW

## Wellness Services
$0 Copay. Wellness services are covered 100% up to a maximum of $1,000 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits
$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $200 per plan, per year.

| OPTIMUM 5 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospital Admission | 2 | $3,000 | $500 |
| | Hospital Confinement | 30 | $500 | N/A |
| | CU Admission | 1 | $1,000 | $500 |
| | CU Confinement | 5 | $500 | N/A |
| | npatient Rehabilitation | 10 | $500 | $500 |
| | Skilled Nursing Facility | 10 | $500 | $500 |
| | Hospice Facility | 10 | $500 | $500 |
| | npatient Surgery | 3 | $1,000 | N/A |
| | General Anesthesia | 3 | $500 | N/A |
| Outpatient Services | Outpatient Surgery | 3 | $1,000 | $250 |
| | General Anesthesia | 3 | $500 | N/A |
| | Emergency Room | 4 | $500 | $250 |
| | Observation Room | 2 | $500 | $250 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 6 | $200 | $25 |
| | Occupational, Physical Therapy | 5 | $100 | N/A |
| Other Care Services | Ambulance | 3 | $500 | N/A |
| | Chiropractic Care | 5 | $25 | N/A |
| | Home Health Care | 10 | $25 | N/A |
| | Labs | 1 | $250 | $25 |
| | maging | 1 | $500 | $25 |
| | Wellness | 1 | $1,000 | N/A |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

## Waiting Period
All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

8

# OPTIMUM 6MD  OVERVIEW

## Wellness Services
$0 Copay. Wellness services are covered 100% up to a maximum of $1,000 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits
$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $300 per plan, per year.

| OPTIMUM 6 | Services | Days per p an year | Maximum amount per p an year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospita Admission | 2 | $4,000 | $500 |
| | Hospita Confinement | 30 | $1,000 | N/A |
| | ICU Admission | 1 | $2,000 | $500 |
| | ICU Confinement | 5 | $1,000 | N/A |
| | Inpatient Rehabi itation | 10 | $1,000 | $500 |
| | Ski ed Nursing Faci ity | 10 | $1,000 | $500 |
| | Hospice Faci ity | 10 | $1,000 | $500 |
| | Inpatient Surgery | 3 | $2,000 | N/A |
| | Genera Anesthesia | 3 | $1,000 | N/A |
| Outpatient Services | Outpatient Surgery | 3 | $2,000 | $250 |
| | Genera Anesthesia | 3 | $1,000 | N/A |
| | Emergency Room | 4 | $1,000 | $250 |
| | Observation Room | 2 | $1,000 | $250 |
| | Primary Care Physician, Specia ist, Urgent Care Visits | 8 | $300 | $25 |
| | Occupationa , Physica Therapy | 5 | $150 | N/A |
| Other Care Services | Ambu ance | 3 | $1,000 | N/A |
| | Chiropractic Care | 5 | $50 | N/A |
| | Home Hea th Care | 10 | $50 | N/A |
| | Labs | 1 | $500 | $25 |
| | Imaging | 1 | $750 | $25 |
| | We ness | 1 | $1,000 | N/A |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

9

## Waiting Period
All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

# OPTIMUM 7MD → OVERVIEW

## Wellness Services
$0 Copay. Wellness services are covered 100% up to a maximum of $1,000 annually per plan participant, per year.

## Primary Care, Physician, Specialist, or Urgent Care Visits
$25 Copay. Eligible outpatient visits with Primary Care Physician, Specialist, or Urgent Care up to a maximum of $400 per plan, per year.

| OPTIMUM 7 | Services | Days per plan year | Maximum amount per plan year | Copay |
|---|---|---|---|---|
| Inpatient Services | Hospital Admission | 2 | $5,000 | $500 |
| | Hospital Confinement | 30 | $2,000 | N/A |
| | ICU Admission | 1 | $3,000 | $500 |
| | ICU Confinement | 5 | $2,000 | N/A |
| | Inpatient Rehabilitation | 10 | $1,500 | $500 |
| | Skilled Nursing Facility | 10 | $1,500 | $500 |
| | Hospice Facility | 10 | $1,500 | $500 |
| | Inpatient Surgery | 3 | $3,000 | N/A |
| | General Anesthesia | 3 | $1,500 | N/A |
| Outpatient Services | Outpatient Surgery | 3 | $3,000 | $250 |
| | General Anesthesia | 3 | $1,500 | N/A |
| | Emergency Room | 4 | $1,500 | $250 |
| | Observation Room | 2 | $1,500 | $250 |
| | Primary Care Physician, Specialist, Urgent Care Visits | 10 | $400 | $25 |
| | Occupational, Physical Therapy | 5 | $200 | N/A |
| Other Care Services | Ambulance | 3 | $1,500 | N/A |
| | Chiropractic Care | 5 | $75 | N/A |
| | Home Health Care | 10 | $75 | N/A |
| | Labs | 1 | $750 | $25 |
| | Imaging | 1 | $1,000 | $25 |
| | Wellness | 1 | $1,000 | N/A |

10

# PROGRAM COMPARISONS

| PROGRAM COMPARISONS | Optimum 1 | Optimum 2, 3, 4 | Optimum 5, 6, 7 |
|---|---|---|---|
| Primary Care Physician, Specialist, Urgent Care Visits | ✓ | ✓ | ✓ |
| Emergency Room | ✓ | ✓ | ✓ |
| Ambulance | ✓ | ✓ | ✓ |
| Laboratory | ✓ | ✓ | ✓ |
| Imaging | ✓ | ✓ | ✓ |
| Wellness and Preventative | ✓ | ✓ | ✓ |
| Telemedicine | ✓ | ✓ | ✓ |
| Hospitalization | | ✓ | ✓ |
| Inpatient and Outpatient Surgery | | ✓ | ✓ |
| Chiropractic Care | | | ✓ |
| Occupational, Physical, Cardiac Rehab, Speech Therapy | | | ✓ |

# Accidental Medical

## ADDITIONAL BENEFITS

Optimum participants have access to an additional accidental benefit. This benefit is designed to assist with expenses that you, or a covered person may incur as a result of an accident.

| ELIGIBLE ACCIDENTAL MEDICAL | Allowed Amount |
|---|---|
| Nonsurgical Physician Care, inpatient or outpatient | $75 |
| X-rays, Ultrasounds, and other Medical Imaging | $2500 |
| Anesthesia | $2500 |
| Hospital room & General Nursing Care | $2500 |
| Hospital Emergency Room Care | $500 |
| Physician's Fees for Surgery | $2500 |
| Ambulance Service | $250 |
| Prescription Drugs | $500 |
| Dental Surgery for Injury to Sound Natural Teeth | $500 |
| Physical Therapy | First Visit $60, Subsequent Visits, $30 |

PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.

### Waiting Period

All sickness and indemnity benefits provided for in this plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an accident or loss of life.

12

# TELADOC

Teladoc Health is one of the largest telemedicine companies in the United States. Your plan allows you to have a consultation with a physician, or other healthcare providers, licensed in your individual state. You will be able to talk to a doctor virtually anytime, anywhere by either telephone or video. You can contact your doctor through your landline telephone, your cellular telephone, the Teladoc app, or through the website. After your consultation, your doctor will diagnose your symptoms and send a prescription if necessary. All of this is provided for you with a $0 Co-Pay! Yes, you will not be charged for your medical consultation!

## Get Started In Minutes!

To get started, download the app or get started online. You can also call 1-800-Teladoc. Then fill out a brief medical history like you would at a doctor's office

## Teladoc Advantages

Get connected with the right medical care. Don't wait weeks for an appointment. Our doctors, therapists, and specialists can help you with:
- The flu
- Infections
- Anxiety
- Stress
- Skin conditions
- Advice on serious medical conditions.

No matter what you're facing, we're available from wherever you are by phone, video or app.



13

# TELADOC

## Get Peace of Mind

Whether it's a perscription sent to the pharmacy of your choice, the guidance to move forward, or a review of your condition from a medical expert, Teladoc is ready to help.

## Get Started Now

https://member.teladoc.com/registrations/get_started

## Download The App

https://apps.apple.com/US/app/id656872607?mt=8



**Complete care** anytime, anywhere



**Doctors and nurses who** help you stay well



**Therapy and programs** to boost your mental health



**Tips and coaching** for conditions like diabetes





14

# SINGLE CARE

## Save up to 80% on your prescriptions with SingleCare!

Just show one of these cards to the pharmacist next time you fill a prescription.



**SingleCare**

### PHARMACY SAVINGS CARD

AUTHORIZATION NUMBER
001 000 029

BIN 610378
GRP BK0029
PCN SC1

**UP TO 80% OFF YOUR PRESCRIPTIONS**

This card is not insurance.       Customer Support: 1-844-234-3057

## Your Free Card Is Ready To Download

This SingleCare pharmacy savings card entitles you to up 80% off 10,000+ prescription medications.

The card is pre-activated and ready for immediate use at any participating pharmacy nationwide.

SingleCare cards work whether you have health insurance or not, and our prices often beat insurance cost-share. A typical person that regularly fills prescriptions saves an average of $37 a script and hundreds of dollars per year.

Using SingleCare is easy: just show our card to the pharmacist when you fill your next prescription.

Savings are automatically applied at checkout.

Keep one card for yourself and share the QR code with a friend or family member so they can get their digital card!

SingleCare is not insurance. There are no claim forms, deductibles, limitations, or maximums.

SingleCare can be used by anyone. No one is excluded from this program for any reason.



15

# PROGRESSIVE NUTRACARE

Progressive Nutracare specializes in professional grade Nutraceuticals offering a wide arrangement of science backed formulas to support your healthy lifestyle. From Fish Oils and Probiotics, to Thyroid and Adrenal Support, our team of medical experts weigh in on each formula to ensure we exceed industry quality standards.

MEMBERSSAVE15 – this can be included at checkout and you will receive 15% off of your entire Purchase.

## Benefits:

Supplements and Vitamins
- Amino Acids
- Antioxidants
- Fish Oils and Omegas
- Homeopathics
- Probiotics and Enzymes
- Protein

Health Concerns Supported
- Adrenal
- Cardiovascular
- Gut Health
- Joint and Inflammation
- Immune Health
- Weight Loss Support
- Men's Health
- Women's Health
- Yeast and Fungal



16

# GUARDIAN

## ANCILLARY BENEFITS

$5,000 | $10,000 | $15,000 | $20,000 | $25,000 | $35,000 | $50,000

Optimum participants may enroll in our Guardian plan to add coverage for accidental death and dismemberment.
These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| COVERED PERSONS | Percentage of Principal Sum |
| --- | --- |
| Primary Insured | 100% |
| Spouse | 50% |
| Dependent Children | 25% |

| COVERED LOSSES | |
| --- | --- |
| Life | 100% |
| Both Hands, feet, or sight of both eyes | 100% |
| One hand and one foot | 100% |
| One hand or one foot and sight of one eye | 100% |
| Both speech and hearing | 100% |
| One hand or one foot or sight of one eye | 50% |
| Speech or hearing in both ears | 50% |

17

# ESSENTIAL ► ANCILLARY BENEFITS

$5,000 | $10,000 | $15,000 | $20,000 | $25,000

Optimum participants may enroll in our Essential plan to help with their critical illness needs.

These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

| ELIGIBLE ADULT CRITICAL ILLNESS | Percent of Allowed Amount |
|---|---|
| Invasive Cancer | 100%<br>If the Diagnosis is more than 90 days after both the Plan and Policy Effective Date |
| Invasive Cancer | 10%<br>If the Diagnosis is during the first 90 days after the Plan or Policy Effective Date |
| Cancer in Situ | 25% |
| Heart Attack | 100% |
| Stroke | 100% |
| Major Organ Transplant<br>(Only one Major Organ per Lifetime) | 100% |
| Coronary Artery Bypass Surgery | 25% |
| Angioplasty | 25% |
| Aortic Surgery | 25% |
| Heart Valve Replacement/Repair Surgery | 25% |
| Coma<br>(Lasting more than 15 consecutive days) | 100% |
| Paralysis | 100% |
| End-Stage Renal Failure | 100% |

18

# DENTAL

## Copay

Participating members are eligible for dental coverage with copay.

Please contact 866.949.3581 to confirm participating providers and copays.

## Covered Services and Procedures:

- Diagnostic Services
- Preventive Services
- Restorative Services
- Endodontic Services
- Periodontic Services
- Prosthodontic Services
- Prosthodontic Services (removable)
- Implant Services
- Prosthodontic Services
- Oral Surgery Services
- Orthodontic Services
- Adjunctive Services

Procedures and services not included will be discounted 20% of Dentist's normal fee at time of service



19



# Tracy
# Attachment H

# INNOVATIVE PARTNERS, LP HEALTH BENEFIT PLAN

## Summary Plan Description of the Essential Critical Illness Benefit

Congratulations, you have just enrolled in Innovative Partners, LP's Essential Critical Illness Health Benefit Plan. This Essential Critical Illness Policy is intended solely to be a supplement to your other Innovative Partners, LP's Health Benefit Plan coverage. This supplemental policy is sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA").

Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **1-888-677-6074** or email us at: **PartnerServices@InnovativePartnersLP.com**. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1:     GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time. |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | |
| 1.9. | Plan Year: | January 1 through December 31 |
| 1.10. | Open Enrollment Period: | Within 30 days of becoming an Employee or an Active |

Limited Partner

| | | |
|---|---|---|
| 1.11 | Program or Policy Name: | Essential Critical Illness |
| 1.12. | Waiting Period: | No claim will be paid for medical services that are incurred within the first 30 days of the effective date of coverage |
| 1.13. | Agent for Service of Process: | CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201 |
| 1.14. | Partner Services: | PartnerServices@InnovativePartnersLP.com |
| 1.15. | Claims: | Group Resources, Inc. PO Box 100043, Duluth, GA 30096 (Specify: **Innovative Partners Critical Illness Claim**) |

## SECTION 2:   SCHEDULE OF THE HEALTHCARE BENEFIT COVERAGES

When you enrolled, you were given a choice to purchase coverage in various principal sum amounts. Please notice that your actual coverage in the event of a Critical Illness is based upon the Principle Sum amount that you purchased. If the Principal Sum amount listed below is not correct, please contact Partner Services immediately.

**Principal Sum**                    $_____

| Covered Persons | Percentage of Principal Sum |
|---|---|
| Plan Participant | 100% of Principal Sum |
| Spouse | 50% of Principal Sum |
| Dependent Children | 25% of Principal Sum |

Maximum Lifetime Benefit:        Three (3) Times the Initial Benefit Amount

Only One Cancer (of any type) Per Lifetime

| Covered Losses | Benefit Amount |
|---|---|
| • Invasive Cancer *(If the Diagnosis is more than 90 days after both the Plan and Policy Effective Date)* | 100% |
| • Invasive Cancer *(If the Diagnosis is during the first 90 days after the Plan or Policy Effective Date)* | 10% |

- Cancer In Situ                                                                                    25%
  (*If the Diagnosis is more than 90 days after both the Plan and Policy Effective Date*)

- Cancer In Situ                                                                                    5%
  (*If the Diagnosis is during the first 90 days after the Plan or Policy Effective Date*)

- Heart Attack                                                                                     100%
- Stroke                                                                                           100%
- Major Organ Transplant (*Only one Major Organ per Lifetime*)                                    100%
- Coronary Artery Bypass Surgery                                                                   25%
- Angioplasty                                                                                      25%
- Aortic Surgery                                                                                   25%
- Heart Valve Replacement/Repair Surgery                                                           25%
- Coma (lasting more than 15 consecutive days)                                                    100%
- Paralysis                                                                                        100%
- End-Stage Renal Failure                                                                         100%

*All benefits are payable at most once daily per benefit category*

## SECTION 3:     DEFINITIONS

When used in connection with this health benefit plan or policy, the following definitions shall be controlling. You should read and understand these definitions.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**Active Limited Partner(s)** means the limited partner made a signatory to either the Limited Partnership Agreement of the Plan Sponsor, or a Joinder Agreement to such Limited Partnership Agreement hereto, as well as other limited partners which may be added from time to time pursuant to the Limited Partnership Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

**Cancer In Situ** means cancer that is confined to the organ where it first developed and has not spread to other parts of the body. *Please note that this type of cancer has a reduced benefit.*

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the plan participant. This term does not include foster a child. A child must be below the age of 26.

**Covered Accident** means an Accident that occurs on a day that coverage is in force for a Covered Person, results in a loss or injury covered by the Plan and is not excluded by name or specific description in this Plan.

**Covered Person** means the plan participant. If you purchased insurance coverage that includes your spouse and/or child/children, these individuals are also included.

**Covered Sickness** means a sickness that occurs on a day that coverage is in force, results in a loss covered by the Plan, and is specifically described in this Plan.

**Critical Illness** means the Diagnosis, while coverage is in force, of one of the following Covered Conditions:

- Heart Attack
- Invasive Cancer
- Cancer In Situ
- End-Stage Renal Disease
- Major Organ Transplant
- Stroke

**Diagnosis** means the definitive establishment of the Critical Illness Condition through the use of clinical and/or laboratory findings. The Diagnosis must be made by a Physician who is a board-certified specialist where required under this coverage.

**Doctor or Physician** means a legally qualified practitioner of the healing arts acting within the scope of his or her license and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**End-Stage Renal Disease** means the chronic and irreversible failure of both of a Covered Person's kidneys, which requires the Covered Person to undergo periodic and ongoing dialysis. The Diagnosis must be made by a Physician board-certified as a Nephrologist.

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Experimental or Investigational** means a Major Organ Transplant for which one or more of the following is true:

1. The transplant is under study or in a clinical trial to evaluate its toxicity, safety or efficacy for a particular diagnosis or set of indications. Clinical trials include but are not limited to phase I, II and III clinical trials.

2. The prevailing opinion within the appropriate specialty of the United States medical profession is that the transplant needs further evaluation for the particular diagnosis or set of indications before it is used outside clinical trials or other research settings. We will determine if this item 2. is true based on:

   A. Published reports in authoritative medical literature; and
   B. Regulations, reports, publications and evaluations issued by government agencies such as the Agency for Health Care Policy and Research, the National Institutes of Health and the FDA.

3. The provider's institutional review board acknowledges that the use of the transplant is Experimental or Investigational and subject to the board's approval.

4. Research protocols indicate that the transplant is Experimental or Investigational. This item 4 applies for protocols used by the Covered Person's provider as well as for protocols used by other providers studying substantially the same transplant.

**First Ever Diagnosis** means that the diagnosis or procedure is the first time ever in his/her lifetime that the Covered Person has undergone that specific Critical Illness procedure, or been diagnosed with that specific Critical Illness condition.

**First Ever Occurrence** means the date a Covered Person is positively diagnosed by a Physician as having a Critical Illness for the first time ever in his/her lifetime.

**Health Benefit Plan** means this ERISA governed self-funded Plan sponsored by Innovative Partners, LP.

**Heart Attack** means the death of a portion of the heart muscle (myocardium) as a result of inadequate blood supply. The diagnosis must be made by a Physician board-certified as a cardiologist and based on both:

- New clinical presentation and electrocardiographic changes consistent with an evolving heart attack; and
- Serial measurement of cardiac biomarkers showing a pattern and to a level consistent with a Diagnosis of a Heart Attack.

**Invasive Cancer** means a malignant neoplasm (including lymphatic and hematological malignancy) characterized by the uncontrolled growth and spread of malignant cells and the invasion of normal tissue. The Diagnosis of Cancer must be supported by histological evidence of malignancy and must be made by a Pathologist Physician.

**Limited Medical Benefit** means a plan, program, or policy that has limited or defined benefits. It is not a comprehensive major medical plan, nor is it intended to replace a major medical plan. The

plan is intended to provide you, and your covered dependents, with basic insurance coverage that is capped at specific amounts for specific services. This plan is also exempt from, and thus is not compliant with, ACA.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Major Organ Transplant** means the clinical evidence of major organ(s) failure which requires the malfunctioning organ(s) or tissue of the Insured to be replaced with an organ(s) or tissue from a suitable human donor (excluding the Insured) under generally accepted medical procedures. This Benefit is limited to: heart, liver, kidney, lung, pancreas, pancreas-kidney or bone marrow transplants. In order for the Major Organ Transplant to be covered under the Plan, the Covered Person must be registered by the United Network of Organ Sharing (UNOS) or the National Marrow Donor Program (NMDP).

**Medically Necessary** means a service or supply that is necessary and appropriate for the diagnosis or treatment of an injury or Sickness based on generally accepted current medical practice. A service or supply will not be considered Medically Necessary if:

- it is provided only as a convenience to the Covered Person or provider;
- it is not appropriate treatment for the Covered Person's diagnosis or symptoms;
- it exceeds in scope, duration or intensity that level of care which is needed to provide safe, adequate and appropriate diagnosis or treatment; or
- it is experimental/investigational treatment.

The fact that a Physician may prescribe, authorize, or direct a service does not, of itself, make it Medically Necessary or covered by the Plan or Policy.

**Participant or Plan Participant** means the individual to whom this Plan or any Policy there under is issued.

**Plan** means the Health Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Health Benefit Plan, and such meanings as further defined by the ERISA.

**Pre-existing Condition** means a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care or treatment was recommended or received from a physician within a 12-month period preceding the effective date of coverage of the Covered Person.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Spouse** means any individual to whom you are legally married.

**Stroke** means any acute cerebrovascular accident producing neurological impairment and resulting in paralysis or other measurable objective neurological deficit, persisting for at least 96 hours and expected to be permanent. Transient ischemic attack (mini-stroke), head injury, chronic cerebrovascular insufficiency, and reversible ischemic neurological deficits are excluded. The Diagnosis must be made by a Physician who is board-certified as a Neurologist and verified by computed tomography (CT) scan or magnetic resonance imaging (MRI).

**Year, Coverage Year, or Plan Year** means the 12-month period beginning on the effective date of this plan and ending on the anniversary of the effective date of this plan. Subsequent years will run from anniversary date to anniversary date.

## SECTION 4: DESCRIPTION OF BENEFITS

*All benefits provided for in this policy are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter.*

We will pay the Critical Illness Benefit, shown in the Schedule of Benefits, for any Covered Person upon the First Ever Diagnosis by a Physician of one of the following covered conditions or procedure[s] as defined in this Plan:

- Invasive Cancer
- Cancer In Situ
- Heart Attack
- End-Stage Renal Failure
- Major Organ Transplant
- Stroke

The First Ever Occurrence and Diagnosis must occur while the Plan is in force. Any diagnosis or procedure not specifically listed is excluded. In no event will benefits be payable for more than one occurrence of the same Critical Illness. In no event will more than one Maximum Benefit Amount be payable per Covered Person during the entire duration of Coverage, regardless of how many conditions the Covered Person is diagnosed with.

*In-Situ Cancer includes:*

- Stage 1 Hodgkin's disease and
- Early prostate Cancer Diagnosed as T1N0M0 or equivalent staging.

*Cancer does not include:*

- Benign tumors or polyps that are histologically described as non-malignant, pre-malignant or non-invasive.
- All tumors, benign or malignant, in the presence of HIV infection.
- All skin Cancers with the exception of invasive melanoma classified as Clark level II or higher or having a thickness measured in excess of 0.75mm.

Page **7** of **9**

- All tumors of the prostate, unless having progressed to at least TNM classification T2N0M0 or histologically classified as having a Gleason score greater than 6.
- Chronic Lymphocytic Leukemia (CLL) unless Rai Stage 3 or greater.
- Papillary micro-invasive Cancer of the thyroid, bladder, cervix, or breast.

*Major Organ Transplants do not include those that are Experimental or Investigational.*

## SECTION 5:    LIMITATIONS AND EXCLUSIONS

No matter how many illnesses a Plan Participant may have, the maximum lifetime benefit is three (3) times the Principal Sum.

A Plan Participant may only be compensated for one type of cancer during his/her entire lifetime.

We will not pay benefits for:

- Pre-existing Conditions during the 12 months following the effective date under this Plan.
- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related Injury or Sickness, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Services rendered to a transplant donor of any organ or body element or the acquisition cost of any organ or bodily element.
- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.

## SECTION 6:    CLAIMS PROCEDURE

Claims should be submitted to:

**Group Resources, Inc.**
**PO Box 100043**
**Duluth, GA 30096**
**(Specify: Innovative Partners Critical Illness Claim)**

Page **8** of **9**

*Please include the plan number, your plan participant number, as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all medical records regarding your claim.*

# Tracy
# Attachment I



**ROBERT TRACY !**

Documents

Partnership Documents

Membership Card

Program Information

My Transactions

Cix Health

Teladoc

Find a Provider

Contact Information

Sign Out

**Documents**

Specific Plan Document - Optimum MD 1

Optimum MD Plan Brochure

Specific Plan Document - Essential

**Partnership Documents**

Joinder Agreement

Specific Plan Document - Optimum MD 1

Specific Plan Document - Essential

Health Benefit Plan

**Contact Information**

Submit claims to PHCS: PO Box 21823 Eagan MN 55121 PHC's Payor ID: 28680

Non-PPO claims can be

**Partnership Documents** ✕

Joinder Agreement

Specific Plan Document - Optimum MD 1

Specific Plan Document - Essential

Health Benefit Plan Wrap Document

**ID Wallet**

**Program Information**

**My Transactions**

**Find a Provider**

# Tracy
# Attachment J

# INNOVATIVE PARTNERS, LP
# NEW LIMITED PARTNER JOINDER AGREEMENT

**THIS NEW LIMITED PARTNER JOINDER AGREEMENT** ("Agreement") is made and entered into effective for all purposes and in all respects on the date of execution indicated below by Innovative Partners, LP, a Texas limited partnership ("Innovative") and ROBERT TRACY          New Active Limited Partner ("NALP") (collectively, the "parties").

**WHEREAS,** Innovative was formed subject to that certain Limited Partnership Agreement dated December 1, 2022, among Jimmie Sutton, as the General Partner, and the limited partner(s) named therein (the "Partnership Agreement") (capitalized terms used and not otherwise defined herein have the meanings given them in the Partnership Agreement);

**WHEREAS,** Innovative desires to gift an Active Limited Partnership Interest in Innovative to NALP; and

**WHEREAS,** NALP desires to accept a gift of an Active Limited Partnership Interest and become an Active Limited Partner of Innovative subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions contained herein, the parties agree as follows:

## ARTICLE 1
## PURPOSE

The purpose of this Agreement is to establish the terms and conditions upon which Innovative gives and NALP receives an Active Limited Partnership Interest in Innovative, and to confirm that NALP adopts and agrees to all of the terms on the Partnership Agreement which is attached hereto as Exhibit A.

## ARTICLE 2
## ACKNOWLEDGEMENT OF THE NATURE OF ACQUIRING AN ACTIVE LIMITED PARTNERSHIP INTEREST

The parties hereby acknowledge that no money has been exchanged for the issuance of the Active Limited Partnership Interest hereunder by Innovative to NALP; however, NALP has agreed to provide a minimum of five hundred (500) hours of work activity on the internet. This acquisition of the Active Limited Partnership Interest is conditioned upon and subject to the terms of both this Agreement and NALP's compliance with the terms of the Partnership Agreement, as may be amended from time to time.

## ARTICLE 3
## ACTIVE LIMITED PARTNERSHIP INTEREST

Subject to the terms and conditions of this Agreement and the Partnership Agreement, herein incorporated by reference and included as Exhibit A to this Agreement, Innovative hereby gives to NALP an Active Limited Partnership Interest which is represented as a portion of a unit of Innovative as described in Article XV of the Partnership Agreement. This Active Limited Partnership Interest entitles NALP to participate as a Limited Partner in Innovative, with voting rights equal to NALP's Active Limited Partnership Interest in Innovative.

## ARTICLE 4
## ADHERENCE TO PARTNERSHIP AGREEMENT

In accepting this Active Limited Partnership Interest, NALP hereby agrees (i) that NALP is a party to and bound by the Partnership Agreement, (ii) to take notice of, accept, and abide by the terms of the Partnership Agreement, and (iii) to execute and deliver such additional agreements, instruments, certificates, and documents as may be necessary, appropriate or convenient to reflect the foregoing matters and the election of Innovative. NALP hereby acknowledges that they have had an opportunity to review all terms of the Partnership Agreement and to receive advice from their independent legal counsel. NALP accepts this gift of an Active Limited Partnership Interest freely and without reservation and fully supports the mission of Innovative, its interest in adding new partners which may dilute NALP's own newly acquired interest/voting rights in Innovative, and all provisions of the Partnership Agreement.

NALP specifically agrees to and understands the provisions of the Partnership Agreement related to NALP's status as a **Working Partner**, whereas NALP will assist in the collection, aggregation, and selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.

## ARTICLE 5
## NOT SECURITIES

NALP acknowledges that, due to the nature of the acquisition of an Active Limited Partnership Interest and the structure of Innovative, NALP's Active Limited Partnership Interest is not a security and is not subject to federal or state securities laws. Furthermore, based on the terms of the Partnership Agreement, NALP acknowledges that no interest in Innovative is a security interest and that all interests in Innovative are not subject to federal or state securities laws.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE LAWS OF ANY STATE. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE

GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## ARTICLE 6
## EFFECTS

In accordance with the Partnership Agreement, Innovative shall amend the roster of Active Limited Partners to include NALP. To the extent the General Partner of Innovative determines that it is in the best interest of Innovative to certify its Partnership Interests, Innovative may provide NALP with a certificate reflecting NALP's Limited Partnership Interest in Innovative.

## ARTICLE 7
## EMPLOYEE BENEFIT PLANS

NALP understands that Limited Partnership has created an employee health benefit plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") which is only available to employees and working owners such as Active Limited Partners. NALP also understands that Limited Partnership may provide other benefits in the future which will be available to Active Limited Partners as may be decided from time to time by the General Partner. NALP also understands that it is in no way obligated to enroll in any Partnership sponsored benefit plan and that if he/she chooses to enroll in any benefit plan, NALP is free to withdraw from said benefit plan at any time without losing his/her status as an Active Limited Partner.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1:     Duty as an Owner.**
NALP understands that he/she is a co-owner of Innovative and thus owes a duty to his/her fellow Limited Partners, the General Partner, and the Partnership in general. NALP understands that in the process of recruiting new Limited Partners is always possible that a prospective Limited Partner may have been contacted by telephone, text message, email, or some other type of electronic means without having first received the consent of the individual contacted. NALP hereby specifically waives any and all claims that he/she may possibly have regarding a state or national Do Not Call List Registry, the Telephone Consumer Protection Act (47 USC § 227), any similar federal or state laws or regulations, and any other type of cause of action regarding how NALP may have been recruited to become a Limited Partner and/or owner of Innovative.

**8.2     Severability.**
Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable for any reason, the validity of the remaining provisions of this Agreement shall not be affected thereby and the unenforceable provision shall be deemed not to be a part of this Agreement.

**8.3:     Entire Agreement; Waiver; Modification.**
This Agreement and the Partnership Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the

subject matter hereof. No provision of this Agreement may be modified or waived except in writing signed by both parties.

**8.4:    Anti-Waiver.**

The failure of any party to enforce any of its rights arising by reason of any breach of covenant or failure of condition on the part of the other party will not constitute a waiver of such breach. No custom or practice arising between the parties in the course of administering the Agreement will be construed to waive any party's right to: (i) insist upon the performance of the other party of any covenant or condition in the Agreement, or (ii) exercise any rights provided to it on the account of any breach of such covenant or failure of such condition.

**8.5:    Captions.**

Captions in this Agreement are inserted for convenience only and do not define, describe or limit the scope or the intent of this Agreement or form a part thereof.

**8.6:    Interpretation.**

The parties acknowledge that each of them and their respective counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the party responsible for drafting the agreement shall not be applied in the interpretation of this Agreement. In entering into this Agreement each of the parties represents that it has relied upon the advice of counsel of its own choosing and that it has read in full and understood the terms of this Agreement and voluntarily accepted the same.

**8.7:    Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one document. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, .GIF, etc.) signature shall be deemed to be an original.

**8.8:    Arbitration.**

Except as otherwise required by law, all disputes arising under or related to this Agreement (including, but not limited to, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel, or laches) shall be resolved by binding arbitration in Dallas County, Texas before JAMS, or its successor, pursuant to the United States Arbitration Act, 9 U.S.C. § 1, by filing a written demand for arbitration with JAMS, with a copy to the other parties. The arbitration will be conducted in accordance with the provisions of JAMS' Comprehensive Arbitration Rules and Procedures (the "JAMS Rules") in effect at the time of filing of the demand for arbitration; provided, that the parties agree that (i) the arbitration shall be conducted by three (3) arbitrators (unless the parties agree to a smaller number) selected in accordance with the JAMS Rules, and (ii) each party shall bear its or his own costs and expenses in any such arbitration and one-half of the arbitrators' fees and expenses. By agreeing to arbitration, the parties hereto do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration.

**8.9:    Governing Law; Venue.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. Although it is the intention of the parties that the arbitration provisions in Section 8.8 of this Agreement be fully enforced, to the extent any judicial action is required in aid of Section 8.8 of this Agreement or otherwise, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such

courts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date written below.

**Innovative Partners, LP**
Its: Manager
*Jimmie Sutton*
Jimmie Sutton
Date: 29 Apr 2024 15:04:00 GMT

**NALP:**
X : *Robert k tracy*

ROBERT TRACY

Date: 29 Apr 2024 15:04:00 GMT
Effective Date: 01 May 2024
IP Address █████████
Device Identity: Google Chrome

EXHIBIT A

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

THE CONTENTS OF THIS AGREEMENT ARE CONFIDENTIAL. NEITHER PARTY WILL DISCLOSE, PERMIT THE DISCLOSURE OF, RELEASE, DISSEMINATE, OR TRANSFER, ANY INFORMATION OBTAINED HEREUNDER OR OTHERWISE RELATED TO THE AGREEMENT TO ANY OTHER PERSON OR ENTITY EXCEPT A PARTY'S IMMEDIATE STAFF, EMPLOYEES, CONSULTANTS, ACCOUNTANTS, ATTORNEYS, OR OTHER PROFESSIONAL RETAINED FOR THE PARTY'S DUE DILIGENCE REVIEW OF THE AGREEMENT AND EXCEPT, WITH PRIOR NOTICE TO COMPANY, PURSUANT TO LEGAL COMPULSION.

## LIMITED PARTNERSHIP AGREEMENT OF
## INNOVATIVE PARTNERS, LP

This Limited Partnership Agreement of Innovative Partners, LP (the "Agreement") is made and entered into effective for all purposes and in all respects as of December 1, 2022 by Jimmie Sutton, as General Partner ("GP") and the Limited Partner who is a signatory hereto, as well as other Limited Partners which may be added from time to time pursuant to the provisions of the Texas Limited Partnership Act (Title 4, Chapter 153), this Agreement, and by subsequent agreements.

Now, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following terms and conditions.

## ARTICLE I.
## DEFINITIONS

**Section 1.01:          Terms.**
When used in this Agreement, the following terms shall have the following meanings unless the context requires otherwise.

   a. "Agreement" means this Limited Partnership Agreement.

   b. "Certificate" means the Certificate of Limited Partnership described in Section 2.

   c. "Code" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent U.S. revenue laws.

d.  "General Partner" or "GP" means any person or entity from time to time admitted to the Partnership as an additional or substituted General Partner in accordance with this Agreement, and such persons' permitted successors and assigns.

e.  "Joinder Agreement" means an agreement in form and substance satisfactory to the General Partner, entered into between the Partnership and each new Limited Partner and providing for the joining of the Partnership and the possible return or revocation, as the case may be, of Limited Partnership Interests.

f.  "Active Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

g.  "Inactive Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and does not meet the definition of an "Active Limited Partner".

h.  "Limited Partners" means individuals that are either Active Limited Partners or Inactive Limited Partners, as defined herein.

i.  "Partners" means the General Partner(s) and all Limited Partners.

j.  "Partnership" means Innovative Partners, LP.

k.  "Partnership Interest" means each Partner's right to participate in the Partnership, either as a Limited Partner (a "Limited Partnership Interest") or as a General Partner (a "General Partnership Interest"), as the case may be.

l.  "Limited Partnership Act" means the Texas Business Organizations Code, including, but not limited to, Title 4, Chapter 153.

m.  "Successor General Partner" has the meaning specified in Section 10.01.

n.  "Tax Matters Partner" means the Partner so designated pursuant to Section 9.

o.  "Working Owner" means the General Partner or any Active Limited Partner.

**Section 1.02:**      **Usage.**

All references to Article or Section numbers, unless otherwise indicated, refer to articles or sections of this Agreement. Headings are used for convenience only and do not form a part of this Agreement. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, and to the singular or plural, as the identity of the person, persons, entity, or entities to whom or which they refer may require.

## ARTICLE II.
## FORMATION OF LIMITED PARTNERSHIP

**Section 2.01:**      **Formation.**

The Partners hereby form a limited partnership pursuant to the provisions of the Limited

Page **7** of **21**

Partnership Act. The rights and liabilities of the Partners shall be as provided under the Limited Partnership Act, except as otherwise expressly provided in this Agreement. The General Partner shall execute and, as it deems appropriate, cause to be filed, recorded, and published a Certificate of Limited Partnership (the "Certificate") and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the Limited Partnership Act.

**Section 2.02:**          **Name.**

The limited partnership formed hereby shall operate under the name of Innovative Partners, LP ("Partnership").

**Section 2.03:**          **Initial Registered Agent, Registered Address, and Principal Place of Business**

The initial registered agent shall be Patrick Dooley. The initial registered address shall be c/o CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, and the initial principal place of business shall be 130 W. Ovation Drive, Pot St. Joe, FL 32456. The business of the Partnership may also be conducted at such other or additional place or places as may be designated by the General Partner. The registered address and principal place of business may be changed from time to time at the discretion of the General Partner.

**Section 2.04:**          **Term.**

The Partnership shall begin business on the date on which the Certificate of Limited Partnership is filed with the Secretary of State of the State of Texas and shall continue in perpetuity until terminated as provided herein.

## ARTICLE III.
## PURPOSES OF THE PARTNERSHIP

**Section 3.01**

The purposes of the Partnership shall be any legal purposes and shall include, but not be limited to, (i) promoting an understanding and awareness of data usage and security issues; (ii) assisting the Active Limited Partners to secure their personal data and information; (iii) assisting the Active Limited Partners in gathering and collection of data in general; (iv) the capture, segregation, aggregation, and sell to third-party marketing firms of both electronic and health data generated by Active Limited Partners and others; (v) assisting the Partners with marketing and monetizing the data and information collected by Active Limited Partners and others to third parties in a secure manner while removing any individual identifying information; (vi) providing the employees and the Active Limited Partners the opportunity to participate in Partnership-sponsored health insurance programs, the cost of which may be reduced by income generated from revenues from marketing Active Limited Partners' data and information; (vii) encouraging scholarship and research in this field; (viii) promoting publications in this field; and (ix) fostering communications among teachers and scholars to enhance the public's understanding of data usage and security.

**Section 3.02**

In order to promote the interest of the Partnership and to help recruit a significant number of Active Limited Partners which may be necessary to fulfill the needs of the Partnership and promote its ultimate success, the Partnership is authorized to provide and sponsor various health benefit plans to its common law employees and Active Limited Partners as the General Partner determines to be in the best interests of the Partnership. Only common law employees and Active

Limited Partners shall be eligible to participate in said plans. Inactive Limited Partners shall not be allowed to participate.

**Section 3.03**

In order to promote the purposes of the Partnership, each Active Limited Partner agrees and understands that he/she will function as a Working Owner by providing a minimum of 500 hours of work activity per year promoting the purposes of the Partnership.

**Section 3.04**

The Partnership shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Agreement.

**Section 3.05**

In carrying out the Partnership's purposes, the Partnership shall be empowered to (i) exercise all powers necessary to or reasonably connected with the Partnership's business that may be legally exercised by limited partnerships under the laws of the State of Texas and (ii) engage in all activities necessary, customary, convenient, or incidental to any of the foregoing. The Partnership may engage or work with other entities from time to time as co-owners to promote and pursue the Partnership's purpose.

## Article IV.
## ACCOUNTING FOR THE PARTNERSHIP

**Section 4.01:        Annual Statements.**

The General Partner shall cause annual financial statements of the operations of the Partnership to be prepared and made available upon reasonable request to each Limited Partner. Such financial statements need not be audited unless the General Partner determines that audited financial statements are necessary, or unless audited financial statements are required by creditors of the Partnership.

**Section 4.02:        Access to Accounting Records.**

Any Limited Partner shall have reasonable access to the accounting records of the Partnership during regular business hours of the Partnership.

**Section 4.03:        Income Tax Information.**

The General Partner shall make available to each Limited Partner information on the Partnership's taxable status and any business taxable income or loss and each item of income, gain, loss, deduction, or credit that is relevant to reporting Partnership income and how each Limited Partner is impacted by such income. This information shall be available to each Limited Partner within one hundred eighty (180) days after the close of the Partnership's taxable year, and, upon request to the General Partner, a copy of the Partnership's federal return of income for such year shall also be furnished.

**Section 4.04:        Bank Accounts.**

The funds of the Partnership shall be deposited in such separate federally insured bank account or accounts as may be required, and the General Partner shall arrange for the appropriate conduct of such account or accounts.

**Section 4.05:        Books of Account.**

There shall be kept at the principal office of the Partnership true and correct books of account in which shall be entered fully and accurately each and every transaction of the Partnership. The books shall be kept on the cash receipts and disbursements method for the

Partnership's accounting year.

**Section 4.06          Accounting Year.**

The Partnership accounting year shall be the accounting year of the Partnership for both book and (as applicable) tax purposes, beginning January 1st and ending December 31st of each year.

**Article V.**
**ACQUISITION OF PARTNERSHIP INTEREST AND CAPITAL CONTRIBUTIONS**

**Section 5.01:          Acquisition of Partnership Interest; Capital Contributions; Potential Future Revenue Potential.**

Each Inactive Limited Partner shall make a capital contribution in an amount determined by the General Partner in exchange for his/her interest in the Partnership. Active Limited Partners shall not make a capital contribution, other than his/her work effort as described herein, in exchange for his/her interest in the Partnership. The General Partner shall not have any personal liability for the repayment of any Limited Partner's capital contribution.

Notwithstanding the foregoing, it is intended that the Active Limited Partners will be given the opportunity to participate in one or more programs sponsored by the Partnership to market their personal data and information, for which the Partnership will receive compensation. Therefore, is hoped that the Partnership will receive income from such activities, which the Partnership intends to utilize to (i) pay its operational expenses, (ii) pay any outstanding debts, (iii) provide periodic dividends to the Active Limited Partners, (iv) reduce or eliminate the costs to the Partnership's employees of any sponsored health benefit plans, (v) reduce the costs to the Active Limited Partners of any sponsored health benefit plans, and/or (vi) for other purposes that benefit the Limited Partners. *All Limited Partners understand that periodic dividends may be reported to the IRS.*

**Section 5.02:          Loans.**

If the Partnership requires additional capital, the General Partner is authorized to cause the Partnership to borrow money upon such terms as the General Partner, in its sole discretion, shall determine and to mortgage, pledge, or hypothecate the assets of the Partnership in connection with suchborrowing. In that event, the General Partner may, but shall not be required to, lend funds to the Partnership.

**Article VI.**
**PROFITS AND LOSSES**

**Section 6.01:          Determination.**

The net profits or net losses of the Partnership shall be determined in accordance with the method of accounting adopted by the Partnership.

**Section 6.02:          Allocation of Profits and Losses.**

The net profits of the Partnership shall be allocated eighty percent (80%) to the Limited Partners (in accordance with the formula set forth in Section 15.01) and twenty percent (20%) to the General Partner. Upon any dissolution or winding up of the Partnership, after payment of all debts and obligations, the net assets of the Partnership shall be allocated on the same basis

Page **10** of **21**

as netprofits of the Partnership are allocated as provided in this Section 6.02.

## Article VII.
## PARTNERSHIP RECORDS

**Section 7.01**

The General Partner shall cause the Partnership to maintain at its offices (i) a current listof the full name and last known business address of each Partner, (ii) a copy of the Certificate, (iii) copies of tax filings and financial statements for the previous four years, and (iv) copies of any then effective limited partnership agreements related to the Partnership.

## Article VIII.
## PARTICIPATION IN ALLIANCES AND CONTRIBUTION
## OF PARTNER INFORMATION

**Section 8.01:**          **Participation in Strategic Alliances.**

In connection with the purposes and activities described in Article III, and subject to the discretion of the General Partner, the Partnership may enter into one or more agreements, associations, or other arrangements with other organizations involved in the collection, maintenance, marketing, and use of data to help establish guidelines for certain business operations, share costs, and negotiate equitable revenue from said business operations. The General Partner is authorizedto negotiate, execute and deliver a charter and such other documents and instruments as it may deem (in its sole discretion) reasonable or appropriate to enter into and/or consummate such associations.

**Section 8.02:**          **Contribution of Partner Data.**

All Active Limited Partners acknowledge that, for so long as he/she remains an Active Limited Partner, each Active Limited Partner has the duty to contribute, and Partnership may collect, certain personal information and data generated from the use of the internet, mobile apps, "Smart" TVs, and other electronic devices, including without limitation information by which the Active Limited Partner may be personally identified, such as a postal address, e-mail address, telephone number, partnership benefits elections, internet usage information, mobile device app usage information, geo-location information or any other identifier by which such Active Limited Partner may becontacted ("Partner Data").

**Section 8.03:**          **Ownership and Use of Partner Data.**

All such Partner Data, in its aggregated form, shall be the property of the Partnership and may be used at the sole discretion of the General Partner in connection with or in support of the Partnership's business and administrative purposes. Partner Data may also be used by the Partnership to contact Active Limited Partners about goods and services that may be of interest to Active Limited Partners, provided that the Partnership provides a means by which Active Limited Partners may opt out of such use. The Partnership may disclose aggregated Partner Information and information that may, or may not, identify any individual, without restriction. The Partnership may disclose Partner Information that it collects from Active Limited Partners (or that an Active Limited Partner otherwise provides to the Partnership) to the Partnership's subsidiaries and affiliates, to contractors, service providers, and other third parties the Partnership uses to support its business, and to third parties to market their products

or services to Active Limited Partners who have not opted out of such disclosures. The Partnership may also disclose Partner Information to comply with any court order, law, or legal process, including to respond to any government or regulatory request, and to enforce its rights under any applicable agreement or applicable law, including for billing and collection purposes.

**Section 8.04:      Data Security.**

The Partnership shall use commercially reasonable legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the Partner Data and to protect the Partner Data from unauthorized access, disclosure, duplication, use, modification, or loss. The Partnership shall attempt to obtain data protection insurance or similar insurance to the extent such insurance is available and the premiums are commercially reasonable.

**Section 8.05:      Objection to Use by Active Limited Partner.**

All of the foregoing and other uses of Partner Data are at the discretion of the General Partner. In the event an Active Limited Partner objects to any use of such Active Limited Partner's Partner Data, such Active Limited Partner must notify the Partnership of its objection and opt out of such use. In that case, such Active Limited Partner shall be deemed to have exercised its right to return its Active Limited Partnership Interest to the Partnership. Upon return of its Active Limited Partner Interest, the General Partner will provide a withdrawing Active Limited Partner with information and instruction necessary to terminate and/or remove any software provided by the Partnership which captures and transmits Partner Data. All Partner Data provided to the Partnership prior to the withdrawal of an Active Limited Partner as well as all Partner Data transmitted to the Partnership after withdrawal and before termination and/or removal of any data capturing software shall remain the property of the Partnership to be used in accordance with the terms and conditions of this Agreement.

## Article IX.

## ADMINISTRATIVE PROVISIONS

**Section 9.01:      Management by the General Partner.**

All of the business of the Partnership, including, but not limited to, decisions on all tax elections and the voting of any shares of stock owned by the Partnership, shall be under the exclusive management of the General Partner. The Limited Partner(s) shall not participate in the management or operation of the business of the Partnership.

**Section 9.02:      Tax Matters Partner.**

The General Partner shall serve as the "Tax Matters Partner" for the Partnership. The Tax Matters Partner shall perform, and hereby agrees to perform, certain duties and obligations imposed upon a "Tax Matters Partner", as defined in § 6231(a)(7) of the Code, in connection with the audit or review of a Partnership federal return of income, as such duties and obligations are set forth in § 6221 of the Code and following sections. For all years for which the Bipartisan Budget Act of 2015 applies, the Tax Matters Partner shall also be the "Partnership Representative" of the Company under section 6223(a) of the Code (as enacted by the Bipartisan Budget Act of 2015). The Tax Matters Partner shall be reimbursed by the

Partnership for expenses incurred in the performance of such duties, including legal and accounting fees incurred in connection with such duties as Tax Matters Partner.

The General Partner shall have the right at any time to resign as Tax Matters Partner, by giving notice of such resignation in writing to all Partners. In the event it resigns, ceases to be a General Partner of the Partnership, or is unable or unwilling to serve as Tax Matters Partner for any reason, a new Tax Matters Partner will be appointed by a unanimous vote of the Partners.

**Section 9.03:**        **Time Devoted by the General Partner.**

The parties understand that the General Partner has other business activities which over the year take a major part of the respective total time devoted to business matters. Accordingly, the General Partner is required to devote to the business of the Partnership only the time and attention as they, in their sole discretion, shall determine what is required to conduct the business of the Partnership.

**Section 9.04:**        **Limitation on Liability of General Partners, Indemnification.**

To the fullest extent permitted by the Limited Partnership Act, the General Partner shall have no liability, responsibility, or accountability, in damages or otherwise, to any other Partner or the Partnership, and the Partnership agrees to indemnify, pay, protect, and hold harmless the General Partner (on the demand of and to the satisfaction of such General Partner) from and against, any and all liabilities, obligations, losses, damage, penalties, actions, judgments, suits, proceedings, costs, expenses, and disbursements, of any kind or nature whatsoever (including, without limitation, all costs and expenses of defense, appeal, and settlement of any and all suits, actions, or proceedings, instituted against any such General Partner or the Partnership and all costs of investigation in connection therewith) ("Losses ") which may be imposed on, incurred by, or asserted against any such General Partner or the Partnership in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Partnership or on the part of any such General Partner as General Partner of the Partnership; provided that the General Partner shall be liable, responsible, and accountable, and the Partnership shall not be liable to the General Partner, for any portion of such Losses resulting from the General Partner's gross negligence or a willful breach of General Paliner's fiduciary duty to the Partnership or any Partner.

If any action, suit, or proceeding shall be pending or threatened against the Partnership or the General Partner relating to or arising out of, or alleged to relate to or arise out of, any such action or non-action, the General Partner shall have the right to employ, at the expense of the Partnership, separate counsel of the General Partner's choice in such action, suit or proceeding. The satisfaction of the obligations of the Partnership under this Section shall be from and limited to the assets of the Partnership and no Partner shall have any personal liability on account thereof. The General Partner shall have the right to bill the Partnership for, or otherwise request the Partnership to pay, at any time and from time to time after the General Partner has become obligated to make payment therefor, any and all amounts for which the General Partner believes, in good faith, that such General Partner is entitled to indemnification under this Section. The Partnership shall promptly pay any and all such bills and honor any and all such requests for payment when such bill or request is received by such General Partner. In the event that a final determination is made that the Partnership is not so obligated in respect of any amount paid by it to the General Partner, such General Partner shall promptly refund such amount to the Partnership.

The Partnership shall indemnify, to the extent of Partnership assets, the Limited

Partners against any claims of liability asserted against the Limited Partners solely because they are Limited Partners of the Partnership.

**Section 9.05:          Fees of General Partner.**

The Partnership shall pay reasonable fees to the General Partner for services rendered to the Partnership, as determined by the General Partner; provided, that such fees shall not exceed the fair market value of the applicable services, and any agreements providing for such fees shall be negotiated at arm's length.

**Section 9.06:          Limited Liability of Limited Partners.**

A Limited Partner shall not be liable for the debts, liabilities, contracts, or any other obligations of the Partnership. Except as otherwise provided in this Agreement, a Limited Partner shall not take part in, or interfere in any manner with, the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.

**Section 9.07:          Additional Authority of General Partner.**

The General Partner and Limited Partner(s), by signing and executing this Agreement, hereby authorize GP as General Partner, to take, permit, and/or omit any action or actions, and to do or have done any action or actions, which are, or may be, consistent with or authorized by the provisions of this Agreement, and irrevocably make, constitute and appoint GP as General Partner, as true and lawful agent and attorney-in-fact with full power of substitution and with power and authority in each Limited Partner's name, place, and stead to make, sign, execute, acknowledge, swear to, deliver, perform, implement, file, and record any and all agreements, limited partnership agreements, deeds of trust, promissory notes, financing and continuation statements, certificates, options, leases and other conveyances and other documents or instruments, including, but not limited to, the amended certificate and every amended or restated certificate which GP as General Partner, considers to be required, necessary, desirable, or convenient (i) for, to, or in connection with the acquisition and ownership by the Partnership of interests in property, and (ii) for, to, or in the management of conduct of the business of the Partnership.

The power of attorney granted by each Limited Partner is a special power of attorney which (1) is irrevocable, (2) is coupled with an interest, (3) shall survive the death of the Limited Partner, (4) shall not be affected by the subsequent disability or incompetence of the Limited Partner, (5) shall survive the dissolution or termination of a Limited Partner which is a corporation, general or limited partnership, joint venture, trust, estate, or other entity or association. and (6) shall survive the sale, exchange, or other transfer by a Limited Partner of all or any portion of the Limited Partner's interest, where the assignee has been approved by GP as General Partner, for admission to the Partnership as a limited partner, and shall survive such admission and constitute a similar power of attorney from such assignee as a Limited Partner. If there is more than one Limited Partner, the power of attorney may be exercised by GP, as General Partner, for all the Limited Partners by a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all the Limited Partners together, or by listing all of the Limited Partners and executing any instrument with a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all of the Limited Partners together.

Each Limited Partner expressly agrees to be bound by the representations made by GP as General Partner, acting pursuant to this Section 9.07, and hereby waives any and all defenses which shall be available to such Limited Partner to contest, negate, or disaffirm the actions of

GP as General Partner pursuant to this Section 9.07.

Notwithstanding anything contained herein above or below to the contrary, any General Partner may act alone for and on behalf of the Partnership without the necessity of signatures, including but not limited to the exercise of the power of attorney granted to the General Partner under Section 9.07 of this Agreement.

**Section 9.08:      Voting Procedures.**

On all matters requiring a vote of the Partners under this Agreement, the General Partner shall provide written notice to all Partners of (i) the material substance of such vote, (ii) the General Partner's voting recommendation and reasons for such recommendation; (iii) the date by which votes must be received by the Partnership in order to be counted; and (iv) instructions on how each Partner shall cast their votes. Such notice may be delivered by email or other electronic means to all Limited Partners. Votes may be cast by Partners by email or other electronic means as specified in the notice. Where a vote is required of the Partners under this Agreement and does not require a unanimous vote, a simple majority of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Where a unanimous vote is required of the Partners under this Agreement, the unanimous consent of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Any Partner who fails to cast a vote on or before the voting deadline set forth in the notice shall be deemed to have abstained from the vote and such Partner's Partnership Units shall not be included in the determination of a simple majority or unanimous vote.

## Article X.

## DEATH OR WITHDRAWAL OF A PARTNER

**Section 10.01:      Resignation or Withdrawal of a General Partner.**

The Partnership shall not dissolve upon the following events: (a) incapacity of a General Partner, (b) filing, in any court pursuant to any federal or state statute, of a petition in bankruptcy or insolvency by, for a reorganization by, or for the appointment of a receiver of all or a portion of the petitioner's property by a General Partner, and/or (c) making an assignment for the benefit of creditors by a General Partner. Any General Partner may resign upon thirty (30) days' notice to all of the Partners.

In the event of a vacancy in the position of General Partner, a successor General Partner shall be appointed the General Partner. The General Partner will be authorized to appoint its successor any time prior to its departure as General Partner or within thirty (30) days of its vacating the position of General Partner. If the General Partner fails to appoint a successor, a successor General Partner will be appointed by a vote of the Limited Partners.

**Section 10.02:      Death, Bankruptcy, or Incapacity of a Limited Partner.**

The death, bankruptcy, or incapacity of a Limited Partner shall not dissolve the Partnership.

**Section 10.03:      Amended Certificate of Limited Partnership.**

Upon transfer or conversion of any General Partnership Interest, the Partnership shall file for record an amended Certificate and each Partner hereby agrees to execute such instrument, if requested.

**Section 10.04:       Revocation of Limited Partnership Interest.**

Pursuant to a Limited Partner's Joinder Agreement, a Limited Partner's Partnership Interest may be revoked by the Partnership as noted in such Agreements as determined solely by the General Partner. Such action will immediately terminate any Partnership Interest in the Partnership held by such Limited Partner.

<strong>Article XI.</strong>

<strong>TRANSFER OF A PARTNERSHIP INTEREST</strong>

**Section 11.01:       Prohibited Transfer of a Partnership Interest.**

Except as provided in this Article XI, no Partner may transfer or dispose of any Partnership Interest by sale, assignment, gift, or otherwise without the written consent of the General Partner. Any sale, assignment, gift, or transfer, or the purported sale, assignment, gift, or transfer, of any Partnership Interest, except as specifically provided for and allowed in this Article XI, shall be null and void. This Article does not apply to revocations pursuant to Article X.

**Section 11.02:       Transfer of a Partnership Interest by Sale.**

Transfers of a Partnership Interest by sale are not permitted except with the prior written consent of the General Partner.

**Section 11.03:       Transfer of a Partnership Interest by Gift at the Death of a Partner.**

Any gift of a Partnership Interest or any transfer of Partnership Interest after the death of a Partner may be made only on the following conditions:

a. The estate of the deceased Partner or the Partner making a gift of a Partnership Interest (the "Donor") must grant a one (1) year period during which the General Partner may approve or deny the transfer of Partnership Interest; or

b. Any gift or transfer, or purported gift or transfer, of any Partnership Interest after the death of a Partner, except as otherwise provided in this Article XI, shall be null and void unless made strictly in accordance with the provisions of this Article XI.

**Section 11.04:       Substituted Limited Partner.**

No transferee of the whole or any portion of a Limited Partner's interest in the Partnership who is not already a Partner in the Partnership shall have the right to become a substituted Limited Partner in place of the assignor unless:

a. the assignor shall designate such intention in the instrument of assignment;

b.  the written consent of the General Partner to such substitution shall be obtained;

c.  the instrument of assignment shall be in a form and substance satisfactory to the General Partner;

d.  the assignor and assignee named therein shall execute and acknowledge such other instrument or instruments as the General Partner may deem necessary or desirable to effectuate such admission;

e.  the assignee shall accept, adopt, and approve in writing all of the terms and conditions of this Agreement as the same may have been amended; and

f.  such assignee shall pay or, at the election of the General Partner, obligate him or herself to pay all reasonable expenses connected with such admission, including but not limited to the cost of preparing, filing, and publishing any amendment of the Certificate to effectuate such admission.

**Section 11.05:       Further Restrictions on Transfers**

In the case of the transfer of any Partnership Interest in any voluntary or involuntary manner whatsoever (other than as provided in Section 11.01, Section 11.02, and Section 11.03) under judicial order, legal process, execution, attachment, enforcement of a pledge, trust, or encumbrance or sale under any of them, the person to whom the Partnership Interest passes shall offer to give such Partnership Interest in the same manner as provided in Section 11.03 and shall be treated as a "deceased Partner." This section does not apply to revocations as noted in Article X.

No Partner shall make any transfer or assignment of all or any part of his or her interest in this Partnership if said transfer or assignment would, when considered with all other transfers during the same applicable twelve (12) month period, cause a termination of this Partnership for federal or state income tax purposes, create noncompliance of the Partnership with the Limited Partnership Act.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**Section 11.07:       Security Interest.**

No Partnership Interest herein shall be subjected to a security interest by any Partner without the written consent of the General Partner.

**Section 11.08:       Transfer of a General Partner's Interest.**

In the event that a General Partnership Interest is to be transferred pursuant to the provisions of this Article XI, then said General Partnership Interest shall be converted into a

Limited Partnership Interest immediately prior to the closing of said transaction or the making of said transfer and the transferee or recipient shall receive only a Limited Partnership Interest. The Partnership shall file for record an amended Certificate as required by law, which shall specify the portion of the General Partnership Interest converted into a Limited Partnership Interest and the date the conversion occurred. Like other Partnership Interests, a General Partnership Interest may not be sold.

**Section 11.09:**   **Transfer/Granting of Limited Partnership Interest by General Partner to New Limited Partners.**

Notwithstanding anything contained herein above or below to the contrary, General Partner shall not be restricted in the granting of any Limited Partnership Interests to third parties desiring to join the Partnership so long as such new Limited Partners agree to the terms and conditions of this Agreement and a Joinder Agreement, and execute such other documents as deemed appropriate by the General Partner. The Partners anticipate a large volume of Limited Partners joining this Partnership and encourage the General Partner to give Limited Partnership Interests to any prospective Limited Partner in the best judgment of the General Partner subject to the terms of this section. Partners understand and agree that their interest's authority in Partnership may be diluted by the addition of new Limited Partners, but that they welcome new Limited Partners and desire for this Partnership to add as many Limited Partners as possible subject to the terms of this section.

## Article XII.

## DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

**Section 12.01:**   **Right to Dissolve the Partnership.**

No single Partner shall have the right to cause dissolution of the Partnership. However, one hundred percent (100%) of the Partnership Interests shall have the right to cause a dissolution. Notwithstanding anything to the contrary in this Section 12.01, the General Partner has the right to cause a dissolution of the Partnership if (i) the Partnership purposes are deemed illegal or (ii) if the General Partner determines that the Partnership has failed to become economically feasible or has become economically infeasible to operate as intended.

**Section 12.02:**   **Winding Up the Partnership.**

In the event of a dissolution, or the death, incapacity, withdrawal, or bankruptcy of the General Partner without determining a successor General Partner, or the mutual consent of all of the Partners, the Partnership shall immediately commence to wind up its affairs. The proceeds from liquidation of Partnership assets shall be applied in the following order.

    a.  Payment to creditors of the Partnership, other than Partners, in the order of priority provided by law;

    b.  Payment to Partners for loans, if any, made by them to the Partnership;

    c.  The balance, if any, shall be distributed among all the Partners as provided in Section 6.02 herein above.

**Section 12.03:**          **Waiver of Right to Decree of Dissolution.**

The parties hereby agree that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership. Accordingly, each party hereby waives and renounces any rights to a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership.

## Article XIII.

## TITLE TO PARTNERSHIP PROPERTY

**Section 13.01**

Legal title to Partnership property shall be held in the name of the Partnership.  Subject to the provisions of Article IX, and the other provisions hereof, as well as their fiduciary obligations to the Limited Partners, the General Partner shall have the right, power, and authority (without regard to the term of the Partnership), acting for and on behalf of the Partnership, to enter into and execute any lease, contract, agreement, deed, mortgage, or other instrument or document required or otherwise appropriate to lease, sell, mortgage, convey, or refinance Partnership property (or any part thereof), to borrow money and execute promissory notes, to secure the same by mortgage (which term "mortgage" is hereby defined for all purposes of this Agreement to include deeds of trust, financing statements, chattel mortgages, pledges, conditional sales contracts, and similar security agreements) upon Partnership property, to renew or extend any and all such loans or notes, and to convey Partnership property in fee simple by deed, mortgage, or otherwise. In no event shall any party dealing with such General Partner with respect to any Partnership property, or to whom Partnership property (or any part thereof) shall be conveyed, contracted to be sold, leased, mortgaged, or refinanced (which term "refinanced" is hereby defined for all purposes of this Agreement to include recast, modified, extended, or increased) by such General Partner, be obligated to see to the application of any purchase money, rent, or money borrowed or advanced thereon, or be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such General Partner, and every contract, agreement, deed, mortgage, lease, promissory note, or other instrument or document executed by such General Partner, with respect to any Partnership property, shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (a) at the time or times of the execution and/or delivery thereof, the Partnership was in full force and effect, (b) such instrument or document was duly executed and authorized and is binding upon the Partnership and all of the Partners thereof, and (c) such General Partner executing and delivering the same were duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership. It is expressly understood and agreed that the manner of holding title to Partnership property (or any part thereof) and any Partnership assets are solely for the convenience of the Partnership. Accordingly, the spouse, heirs, executors or administrators, beneficiaries, successors, or assigns, of any Partner shall have no right, title or interest in or to any Partnership property or Partnership assets regardless of the manner in which title is held; rather, Partnership property and any Partnership assets shall be subject to the terms of this Agreement.

Page **19** of 21

## Article XIV.

## AMENDMENTS

**Section 14.01**

The General Partner shall have the right to amend the Certificate of Limited Partnership or this Agreement without the consent of any Limited Partners for the following purposes: (i) to change the name or address of a Limited Partner; or (ii) to change the name of the registered office or registered agent of the Partnership; or (iii) in the opinion of the General Partner, there is an inconsistent, ambiguous, false or erroneous provision in this Agreement provided the amendment does not adversely affect the rights of the Partners under this Agreement; (iv) in the opinion of counsel for the Partnership, it is necessary or appropriate to satisfy a requirement of the Code with respect to partnerships, a requirement of Limited Partnership Act, or of any federal or state laws or regulations, provided such amendments do not adversely affect the interests of the Partners. Any amendment to the Certificate of Limited Partnership or this Agreement not otherwise expressly addressed in this Section 14.01 shall require the approval of the Partners pursuant to a vote conducted in accordance with Section 9.08.

## Article XV.

## OWNERSHIP UNITS

**Section 15.01**

Each Partnership Interest may be designated in units or fractional part thereof ("Partnership Units") with each unit representing a percentage interest in the voting rights of the Partnership. The General Partner is hereby granted twenty percent (20.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all General Partnership Interests. The Limited Partners, in the aggregate, are hereby granted eighty percent (80.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all Limited Partnership Interests. With respect to each Limited Partner, the Partnership Units shall equal a percentage equal that Limited Partner's pro rata share in relation to the total aggregate number of Limited Partners. But in no case, shall the total number of Limited Partner units exceed eighty percent (80.00%) of the total number of Partnership Units. Each Partnership Interest represents a Partner's entire interest in the Partnership, including such Partner's right to vote on, consent to, or otherwise participate in any decision or action of or by the Partnership granted pursuant to this Agreement or, subject to applicable provisions of this Agreement, the Limited Partnership Act. Each Partnership Interest shall carry with it the right to vote (as specifically limited herein) as provided in this Agreement.

## Article XVI

## JURISDICTION AND VENUE

**Section 16.01.**

This Agreement is governed by and is to be construed in accordance with the laws

of the State of Texas, irrespective of its choice-of-law rules. To the extent any judicial action is required in, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the undersigned Partners Innovative Partners, LP have sworn hereto and hereunto affixed their signatures as of the date and year first above written.

**GENERAL PARTNER**

*Jimmie Sutton*
Jimmie Sutton

**Innovative Partners, LP**
Its: Manager
*Jimmie Sutton*
Jimmie Sutton

**LIMITED PARTNER:**
*Tiffany Bredeson*
Tiffany Bredeson, Limited Partner

# Tracy
# Attachment K

# Innovative Partners, LP Health Benefit Plan Wrap Document

In order to better serve its employees and Active Limited Partners (collectively "Plan Participants"), Innovative Partners, LP has chosen to offer various different levels of participation in the Health Benefit Plan ("Plan") to our plan participants. These different levels of participation may often be referred to as a "Program" or a "Policy". In order to best address the individual needs of our Plan Participants, our Plan offers eight (1) different levels of limited medical benefit participation. Our most basic and affordable participation levels are the *Elite* Programs/Policies, which are offered at three (3) different levels.  We also offer seven (7) different *Optimum* Programs/Policies which are available at benefit levels one (1) through seven (7).

Any of our Elite or Optimum Programs/Policies can be supplemented by our *Guardian* Accidental Death and Dismemberment ("AD&D") Program/Policy, our *Essential* Critical Illness ("CI") Program/Policy, and/or our *Dental* Program/Policy. The AD&D and the CI Programs/Policies can only be purchased in conjunction with either an Elite or Optimum Program/Policy. Realizing that some of our employees and or Active Limited Partners may have other forms of health insurance that meet their needs and may not want to participate in one of the limited medical benefit Programs/Policies, our employees and active Limited partners may enroll in the Dental Program as a standalone Program/Policy without participating in any of the limited medical benefit Programs/Policies.

Regardless of your level of participation, all of these Programs/Policies collectively constitute the self-funded Innovative Partners, LP Health Benefit Plan. You have been given a Summary Plan Description ("SPD") for each particular Program/Policy that you enrolled in. This WRAP Plan Document merely supplements the SPD(s) that you were given. It in no way reduces or limits any rights that are contained in any SPD.

The rights discussed in this Document apply equally to all of the health benefit plan Programs/Policies that are sponsored by Innovative Partners, LP.

## I.    DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. All of the definitions in the SPD that you received are hereby incorporated by reference into this Document. You should read and understand these definitions as well as the definitions in the SPD.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended or unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**COBRA** means the Consolidated Omnibus Budget Reconciliation Act, as amended.

**Company** means the Plan Sponsor.

**Co-pay** means the charge stated as a set dollar amount, that the Plan Participant is required to pay for certain covered health services. If the Plan has co-pay benefits, please note that the Plan Participant is responsible for paying the lesser of the applicable Co-pay or the covered amount.

**FMLA** means the Family and Medical Leave Act of 1993, as amended.

**GINA** means the Genetic Information Nondiscrimination Act, as amended.

**HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as amended.

**PHI** means Protected Health Information.

**Plan Termination** means the date the Plan Participant is terminated from the Plan.

**Plan Year** means the 12-month period beginning January 1 and ending December 31.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

## II.    GENETIC INFORMATION NONDISCRIMINATION ACT "GINA"

GINA prohibits group health plans, issuers of individual health care policies, and Employers from discriminating based on genetic information. The term "Genetic Information" means, with respect to any individual, information about:

1.    Such individual's genetic tests;
2.    The genetic tests of family members of such individual; and
3.    The manifestation of a Disease or disorder in family members of such individual.

The term "Genetic Information" includes participating in clinical research involving genetic services. Genetic tests would include analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detect genotypes, mutations, or chromosomal changes. Genetic information is a form of Protected Health Information (PHI) as defined by and in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and is subject to applicable Privacy and Security Standards.

Family members as it relates to GINA include Dependents, plus all relatives to the fourth degree, without regard to whether they are related by blood, marriage, or adoption. Underwriting as it relates to GINA includes any rules for determining eligibility, computing premiums, or contributions. Offering reduced premiums or other rewards for providing genetic information would be impermissible underwriting.

GINA will not prohibit a healthcare provider who is treating an individual from requesting that the patient undergo genetic testing. The rules permit the Plan to obtain genetic test results and use them to make claims payment determinations when it is necessary to do so to determine

whether the treatment provided to the patient was medically advisable and/or necessary.

The Plan may request, but not require, genetic testing in certain very limited circumstances involving research, so long as the results are not used for underwriting, and then only with written notice to the individual that participation is voluntary and will not affect eligibility for benefits, premiums, or contributions. In addition, the Plan will notify and describe its activity to the Health and Human Services secretary of its activities falling within this exception.

While the Plan may collect genetic information after initial enrollment, it may not do so in connection with any annual renewal process where the collection of information affects subsequent enrollment. The Plan will not adjust premiums or increase group contributions based on genetic information, request or require genetic testing or collect genetic information either prior to or in connection with enrollment or for underwriting purposes.

## III.   CLAIMS PAYMENT

The procedures outlined below must be followed by Participants to obtain payment of health benefits under this Plan.

All claims and questions regarding health claims should be directed to the Third-Party Administrator. The Plan Administrator shall be ultimately and finally responsible for adjudicating such claims and for providing a full and fair review of the decision on such claims in accordance with the following provisions and with ERISA. Benefits under the Plan will be paid only if the Plan Administrator decides at its discretion that the Participant is entitled to them. The responsibility to process claims in accordance with the Plan Document may be delegated to the Third-Party Administrator; provided, however, that the Third-Party Administrator is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion.

Each Participant claiming benefits under the Plan shall be responsible for supplying, at such times and in such manner as the Plan Administrator in its sole discretion may require, written proof that the expenses were incurred or that the benefit is covered under the Plan. If the Plan Administrator in its sole discretion shall determine that the Participant has not Incurred a Covered Expense or that the benefit is not covered under the Plan, or if the Participant shall fail to furnish such proof as is requested, no benefits shall be payable under the Plan.

A call from a Provider who wants to know if an individual is covered under the Plan, or if a certain procedure is covered by the Plan, prior to providing treatment is not a "claim," since an actual claim for benefits is not being filed with the Plan. These are simply requests for information, and any response is not a guarantee of benefits, since payment of benefits is subject to all Plan provisions, limitations, and exclusions. Once treatment is rendered, a Clean Claim must be filed with the Plan (which will be a "Post service Claim"). At that time, a determination will be made as to what benefits are payable under the Plan.

A Participant has the right to request a review of an Adverse Benefit Determination. If the claim is denied at the end of the appeal process, as described below, the Plan's final decision is

Page **3** of **38**

known as a Final Adverse Benefit Determination. If the Participant receives notice of a Final Adverse Benefit Determination, or if the Plan does not follow the claims procedures properly, the Participant then has the right to request an independent external review. The external review procedures are described below.

The claims procedures are intended to provide a full and fair review. This means, among other things, that claims and appeals will be decided in a manner designed to ensure the independence and impartiality of the persons involved in making these decisions.

Benefits will be payable to the Participant, or to a Provider that has accepted an Assignment of Benefits as consideration in full for services rendered.

According to Federal regulations that apply to the Plan, there are four types of claims: Pre-service (Urgent and Non-urgent), Concurrent Care, and Post service. However, as noted below, because of this Plan's design, there are no Pre-service Urgent Care Claims which may be filed with the Plan.

**A.      When Claims Must Be Filed:**

Claims must be filed with the Third-Party Administrator within 180 days of the date charges for the service were Incurred. Benefits are based upon the Plan's provisions at the time the charges were incurred. Claims filed later than that date shall be denied.

Upon receipt of the required information, the claim will be deemed to be filed with the Plan. The Third-Party Administrator will determine if enough information has been submitted to enable proper consideration of the claim. If not, more information may be requested as provided herein. This additional information must be received by the Third-Party Administrator within 45 days from receipt by the Participant of the request for additional information. Failure to do so may result in claims being declined or reduced.

**B.      Timing of Claim Decisions:**

The Plan Administrator shall notify the Participant, in accordance with the provisions set forth below, of any Adverse Benefit Determination (and, in the case of pre-service claims and concurrent claims, of decisions that a claim is payable in full) within the following timeframes:

1.      If the Participant has provided all of the information needed to process the claim, in a reasonable period of time, but not later than thirty (30) days after receipt of the claim, unless an extension has been requested, then prior to the end of the 15-day extension period.

2.      If the Participant has not provided all of the information needed to process the claim and additional information is requested during the initial processing period, then the Participant will be notified of a determination of benefits prior to the end of the extension period unless additional information is requested during the extension period, then the Participant will be notified of the determination by a date agreed to

Page **4** of **38**

by the Plan Administrator and the Participant. This period may be extended by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Participant, prior to the expiration of the initial 30-day processing period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

3.      The period of time within which a benefit determination is required to be made shall begin at the time a claim is deemed to be filed in accordance with the procedures of the Plan.

**C.      Notification of an Adverse Benefit Determination:**

The Plan Administrator shall provide a Participant with a notice, either in writing or electronically (or, in the case of pre-service urgent care claims, by telephone, facsimile, or similar method, with written or electronic notice following within 3 days), containing the following information:

1.      Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2.      A reference to the specific portion(s) of the Plan Document upon which a denial is based;

3.      Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim;

4.      A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5.      A description of the Plan's review procedures and the time limits applicable to the procedures, including a statement of the Participant's right to bring a civil action under Section 502(a) of ERISA following an Adverse Benefit Determination on final review;

6.      A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

7.      The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

Page **5** of **38**

8.  Any rule, guideline, protocol, or similar criterion that was relied upon in making the determination (or a statement that it was relied upon and that a copy will be provided to the Participant, free of charge, upon request);

9.  In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances or a statement that such explanation will be provided to the Participant, free of charge, upon request; and

10.  In a claim involving urgent care, a description of the Plan's expedited review process.

## IV.  APPEALS PROCEDURE

### A.  Full and Fair Review of All Claims:

In cases where a claim for benefits is denied, in whole or in part, and the Participant believes the claim has been denied wrongly, the Participant may appeal the denial and review pertinent documents. The claims procedures of this Plan provide a Participant with a reasonable opportunity for a full and fair review of a claim and Adverse Benefit Determination. More specifically, the Plan provides:

1.  Participants at least 180 days following receipt of notification of an initial Adverse Benefit Determination within which to appeal the determination;

2.  Participants have the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

3.  Participants have the opportunity to review the Claim file and to present evidence and testimony as part of the internal claims and appeals process;

4.  For a review that does not afford deference to the previous Adverse Benefit Determination and that is conducted by an appropriately named fiduciary of the Plan, who shall be neither the individual who made the Adverse Benefit Determination that is the subject of the appeal nor the subordinate of such individual;

5.  For a review that takes into account all comments, documents, records, and other information submitted by the Participant relating to the claim, without regard to whether such information was submitted or considered in the prior benefit determination;

6.  That, in deciding an appeal of any Adverse Benefit Determination that is based in

Page **6** of **38**

whole or in part upon a medical judgment, the Plan fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual;

7.  For the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with a claim, even if the Plan did not rely upon their advice;

8.  That a Participant will be provided, free of charge: (a) reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim in possession of the Plan Administrator or Third Party Administrator; (b) information regarding any voluntary appeals procedures offered by the Plan; (c) information regarding the Participant's right to an external review process; (d) any internal rule, guideline, protocol or other similar criterion relied upon, considered or generated in making the adverse determination; and (e) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances; and

9.  That a Participant will be provided, free of charge, and sufficiently in advance of the date that the notice of Final Internal Adverse Benefit Determination is required, with new or additional evidence considered, relied upon, or generated by the Plan in connection with the Claim, as well as any new or additional rationale for denial at the internal appeals stage, and a reasonable opportunity for the Participant to respond to such new evidence or rationale.

## B.    Requirements for Appeal:

The Participant must file the appeal in writing (although oral appeals are permitted for pre-service urgent care claims) within 180 days following receipt of the notice of an Adverse Benefit Determination. For pre-service urgent care claims, if the Participant chooses to orally appeal, the Participant may telephone the number shown below. To file an appeal in writing, the Participant's appeal must be addressed as follows and mailed or emailed as follows:

Innovative Partners, LP
2234 North Federal Hwy., #2862
Boca Raton, FL 33431
PartnerServices@InnovativePartnersLP.com

It shall be the responsibility of the Participant to submit proof that the claim for benefits is covered and payable under the provisions of the Plan.  Any appeal must include:

1.  The name of the Participant;

2.  The Participant's social security number;

Page **7** of **38**

3. The group name or identification number;

4. All facts and theories supporting the claim for benefits. Failure to include any theories or facts in the appeal will result in their being deemed waived. In other words, the Participant will lose the right to raise factual arguments and theories which support this claim if the Participant fails to include them in the appeal;

5. A statement in clear and concise terms of the reason or reasons for disagreement with the handling of the claim; *and*

6. Any material or information that the Participant has which indicates that the Participant is entitled to benefits under the Plan.

If the Participant provides all of the required information, it may be that the expenses will be eligible for payment under the Plan.

**C.    Timing of Notification of Benefit Determination on Review:**

The Plan Administrator shall notify the Participant of the Plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the appeal.

**D.    Calculating Time Periods:**

The period of time within which the Plan's determination is required to be made shall begin at the time an appeal is filed in accordance with the procedures of this Plan, without regard to whether all information necessary to make the determination accompanies the filing.

**E.    Manner and Content of Notification of Adverse Benefit Determination on Review:**

The Plan Administrator shall provide a Participant with notification, with respect to pre-service urgent care claims, by telephone, facsimile, or similar method, and with respect to all other types of claims, in writing or electronically, of a Plan's Adverse Benefit Determination on review, setting forth:

1. Information sufficient to allow the Participant to identify the claim involved (including date of service, the healthcare Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning);

2. A reference to the specific portion(s) of the plan provisions upon which a denial is based;

3. Specific reason(s) for denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim, and a discussion of the decision;

4.     A description of any additional information necessary for the Participant to perfect the claim and an explanation of why such information is necessary;

5.     A description of available internal appeals and external review processes, including information regarding how to initiate an appeal;

6.     A description of the Plan's review procedures and the time limits applicable to the procedures. This description will include information on how to initiate the appeal and a statement of the Participant's right to bring a civil action under section 502(a) of ERISA following an Adverse Benefit Determination on final review;

7.     A statement that the Participant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Participant's claim for benefits;

8.     The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request);

9.     Any rule, guideline, protocol, or similar criterion that was relied upon, considered, or generated in making the determination will be provided free of charge. If this is not practical, a statement will be included that such a rule, guideline, protocol, or similar criterion was relied upon in making the determination and a copy will be provided to the Participant, free of charge, upon request;

10.    In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Participant's medical circumstances, will be provided. If this is not practical, a statement will be included that such explanation will be provided to the Participant, free of charge, upon request; *and*

11.    The following statement: "You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

**E.    Furnishing Documents in the Event of an Adverse Determination:**

In the case of an Adverse Benefit Determination on review, the Plan Administrator shall provide such access to, and copies of, documents, records, and other information described in the section relating to "Manner and Content of Notification of Adverse Benefit Determination on Review" as appropriate.

**F.    Decision on Review:**

If, for any reason, the Participant does not receive a written response to the appeal within the appropriate time period set forth above, the Participant may assume that the appeal has been denied. The decision by the Plan Administrator or other appropriate named fiduciary of the Plan on review will be final, binding and conclusive and will be afforded the maximum deference permitted by law. All claim review procedures provided for in the Plan must be exhausted before any legal action is brought.

## G.    External Review Process:

The Federal External Review Process does not apply to a denial, reduction, termination, or failure to provide payment for a benefit based on a determination that a participant or beneficiary fails to meet the requirements for eligibility under the terms of a group health plan.

The Federal External Review Process applies only to:

1.    An Adverse Benefit Determination (including a Final Internal Adverse Benefit Determination) by a plan or issuer that involves medical judgment (including, but not limited to, those based on the plan's or issuer's requirements for Medical Necessity, appropriateness, health care setting, level of care, or effectiveness of a covered benefit; or its determination that a treatment is Experimental or Investigational), as determined by the external reviewer; *and*

2.    A rescission of coverage (whether or not the rescission has any effect on any particular benefit at that time).

## H.    Request for External Review:

The Plan will allow a Claimant to file a request for an external review with the Plan if the request is filed within 4 months after the date of receipt of a notice of an Adverse Benefit Determination or Final Internal Adverse Benefit Determination. If there is no corresponding date four months after the date of receipt of such a notice, then the request must be filed by the first day of the fifth month following the receipt of the notice. For example, if the date of receipt of the notice is October 30, because there is no February 30, the request must be filed by March 1. If the last filing date would fall on a Saturday, Sunday, or Federal holiday, the last filing date is extended to the next day that is not a Saturday, Sunday, or Federal holiday.

1.    *Preliminary Review.* Within 5 business days following the date of receipt of the external review request, the Plan will complete a preliminary review of the request to determine whether:

- The Claimant is or was covered under the Plan at the time the health care item or service was requested or, in the case of a retrospective review, was covered under the Plan at the time the health care item or service was provided;

- The Adverse Benefit Determination or the Final Adverse Benefit Determination does not relate to the Claimant's failure to meet the

Page **10** of **38**

requirements for eligibility under the terms of the Plan (e.g., worker classification or similar determination);

- The Claimant has exhausted the Plan's internal appeal process unless the Claimant is not required to exhaust the internal appeals process under the interim final regulations; and

- The Claimant has provided all the information and forms required to process an external review. Within 1 business day after completion of the preliminary review, the Plan will issue a notification in writing to the Claimant. If the request is complete but not eligible for external review, such notification will include the reasons for its ineligibility and contact information for the Employee Benefits Security Administration (toll-free number 866-444-EBSA (3272)). If the request is not complete, such notification will describe the information or materials needed to make the request complete and the Plan will allow a Claimant to perfect the request for external review with the four-month filing period or within the 48-hour period following the receipt of the notification, whichever is later.

2.   *Referral to Independent Review Organization.* The Plan will assign an Independent. Review Organization (IRO) that is accredited by URAC or by a similar nationally-recognized accrediting organization to conduct the external review. Moreover, the Plan will take action against bias and ensure independence. Accordingly, the Plan will contract with (or direct the Claims Processor to contract with, on its behalf) at least 3 IROs for assignments under the Plan and rotate claims assignments among them (or incorporate other independent unbiased methods for selection of IROs, such as random selection). In addition, the IRO may not be eligible for any financial incentives based on the likelihood that the IRO will support the denial of benefits

3.   *Reversal of Plan's Decision.* Upon receipt of a notice of a final external review decision reversing the Adverse Benefit Determination or Final Internal Adverse Benefit Determination, the Plan will provide coverage or payment for the claim without delay, regardless of whether the plan intends to seek judicial review of the external review decision and unless or until there is a judicial decision otherwise.

I.     **Appointment of Authorized Representative:**

A Participant is permitted to appoint an authorized representative to act on his or her behalf with respect to a benefit claim or appeal of a denial. An Assignment of Benefits by a Participant to a Provider will not constitute the appointment of that Provider as an authorized representative. To appoint such a representative, the Participant must complete a form obtained from the Plan Administrator or the Third-Party Administrator. However, in connection with a claim involving Urgent Care, the Plan will permit a healthcare professional with knowledge of the Participant's medical condition to act as the Participant's authorized representative without the completion of this form. In the event a Participant designates an authorized representative, all future

communications from the Plan will be with the representative, rather than the Participant, unless the Participant directs the Plan Administrator, in writing, to the contrary.

**J.      Physical Examinations:**

The Plan reserves the right to have a Physician of its own choosing examine any Participant whose condition, Sickness or Injury is the basis of a claim. All such examinations shall be at the expense of the Plan. This right may be exercised when and as often as the Plan may reasonably require during the pendency of a claim. The Participant must comply with this requirement as a necessary condition to coverage.

**K.      Autopsy:**

The Plan reserves the right to have an autopsy performed upon any deceased Participant whose condition, Sickness, or Injury is the basis of a claim. This right may be exercised only where not prohibited by law.

**L.      Payment of Benefits:**

All benefits under this Plan are payable, in U.S. Dollars, to the covered Employee whose Sickness or Injury is the basis of a claim. In the event of the death or incapacity of a covered Employee and in the absence of written evidence to this Plan of the qualification of a guardian for his or her estate, this Plan may, in its sole discretion, make any and all such payments to the individual or Institution which, in the opinion of this Plan, is or was providing the care and support of such Employee.

**M.      Assignments:**

Benefits for medical expenses covered under this Plan may be assigned by a Participant to the Provider as consideration in full for services rendered; however, if those benefits are paid directly to the Employee, the Plan shall be deemed to have fulfilled its obligations with respect to such benefits. The Plan will not be responsible for determining whether any such assignment is valid. Payment of benefits that have been assigned will be made directly to the assignee unless a written request not to honor the assignment, signed by the covered Employee and the assignee, has been received before the proof of loss is submitted.

No Participant shall at any time, either during the time in which he or she is a Participant in the Plan, or following his or her termination as a Participant, in any manner, have any right to assign his or her right to sue to recover benefits under the Plan, to enforce rights due under the Plan or to any other causes of action which he or she may have against the Plan or its fiduciaries.

A Provider which accepts an Assignment of Benefits, in accordance with this Plan as consideration in full for services rendered, is bound by the rules and provisions set forth within the terms of this document.

Benefits due to any Network Provider will be considered "assigned" to such Provider and

will be paid directly to such Provider, whether or not a written Assignment of Benefits was executed. Notwithstanding any assignment or non-Assignment of Benefits to the contrary, upon payment of the benefits due under the Plan, the Plan is deemed to have fulfilled its obligations with respect to such benefits, whether or not payment is made in accordance with any assignment or request.

**O.     Recovery of Payments:**

Occasionally, benefits are paid more than once, are paid based upon improper billing or a misstatement in a proof of loss or enrollment information, are not paid according to the Plan's terms, conditions, limitations or exclusions, or should otherwise not have been paid by the Plan. As such this Plan may pay benefits that are later found to be greater than the Maximum Allowable Charge. In this case, this Plan may recover the amount of the overpayment from the source to which it was paid, primary payers, or from the party on whose behalf the charge(s) were paid. As such, whenever the Plan pays benefits exceeding the amount of benefits payable under the terms of the Plan, the Plan Administrator has the right to recover any such erroneous payment directly from the person or entity who received such payment and/or from other payers and/or the Participant.

A Participant, Provider, another benefit plan, insurer, or any other person or entity who receives a payment exceeding the amount of benefits payable under the terms of the Plan or on whose behalf such payment was made, shall return or refund the amount of such erroneous payment to the Plan within 30 days of discovery or demand. The Plan Administrator shall have no obligation to secure payment for the expense for which the erroneous payment was made or to which it was applied.

The person or entity receiving an erroneous payment may not apply such payment to another expense. The Plan Administrator shall have the sole discretion to choose who will repay the Plan for an erroneous payment and whether such payment shall be reimbursed in a lump sum. When a Participant or other entity does not comply with the provisions of this section, the Plan Administrator shall have the authority, in its sole discretion, to deny payment of any claims for benefits by the Participant and to deny or reduce future benefits payable (including payment of future benefits for other injuries or Illnesses) under the Plan by the amount due as reimbursement to the Plan. The Plan Administrator may also, in its sole discretion, deny or reduce future benefits (including future benefits for other injuries or Illnesses) under any other group benefits plan maintained by the Plan Sponsor. The reductions will equal the amount of the required reimbursement.

Providers and any other person or entity accepting payment from the Plan or to whom a right to benefits has been assigned, in consideration of services rendered, payments and/or rights, agrees to be bound by the terms of this Plan and agree to submit claims for reimbursement in strict accordance with their State's health care practice acts, ICD-9 or CPT standards, Medicare guidelines, HCPCS standards, or other standards approved by the Plan Administrator or insurer. Any payments made on claims for reimbursement not in accordance with the above provisions shall be repaid to the Plan within thirty (30) days of discovery or demand or incur prejudgment interest of 1.5% per month. If the Plan must bring an action against a Participant, Provider or other

person or entity to enforce the provisions of this section, then that Participant, Provider or other person or entity agrees to pay the Plan's attorneys' fees and costs, regardless of the action's outcome.

Further, Participants, beneficiaries, estate, heirs, guardian, personal representative, or assigns (Participants) shall assign or be deemed to have assigned to the Plan their right to recover said payments made by the Plan, from any other party and/or recovery for which the Participant(s) are entitled, for or in relation to facility-acquired condition(s), Provider error(s), or damages arising from another party's act or omission for which the Plan has not already been refunded.

The Plan reserves the right to deduct from any benefits properly payable under this Plan the amount of any payment which has been made:

1.    In error;

2.    Pursuant to a misstatement contained in a proof of loss or a fraudulent act;

3.    Pursuant to a misstatement made to obtain coverage under this Plan within two years after the date such coverage commences;

4.    With respect to an ineligible person;

5.    In anticipation of obtaining a recovery if a Participant fails to comply with the Plan's Third-Party Recovery, Subrogation and Reimbursement provisions; or

6.    Pursuant to a claim for which benefits are recoverable under any policy or act of law providing for coverage for occupational Injury or Disease to the extent that such benefits are recovered. This provision shall not be deemed to require the Plan to pay benefits under this Plan in any such instance.

The deduction may be made against any claim for benefits under this Plan by a Participant if such payment is made with respect to the Participant.

If the Plan seeks to recoup funds from a Provider, due to a claim being made in error, a claim being fraudulent on the part of the Provider, and/or the claim that is the result of the Provider's misstatement, said Provider shall, as part of its assignment to benefits from the Plan, abstain from billing the Participant for any outstanding amount(s).


## V.    TERMINATION OF COVERAGE

### A.    Termination of Plan Participation:

A Plan Participant's coverage will terminate with the Plan for any one of the reasons outlined in this section. This termination language will apply to each class of eligible Employee. Coverage

ends on the last day of the month following one of the events listed, unless otherwise specified below:

1.  *Termination of the Plan Participant as either an Employee or an Active Limited Partner.* The Plan Participant will be terminated from the Plan on the last day of the month in which the Plan Participant is either no longer either an Employee or an Active Limited Partner.

2.  *Voluntary Termination of Coverage.* Coverage will end the last day of the month for a Plan Participant who voluntarily ends coverage.

3.  *Death.* Coverage will end on the last day of the month in which the death of the Plan Participant occurred.

4.  *Contributions.* If the covered Plan Participant fails to remit required contributions, then coverage will terminate at the end of the period for which a contribution was last made.

5.  *Leave.* At the end of a company-approved Leave of Absence or the end of an approved period of disability.

6.  *COBRA.* The day the COBRA Plan Participant is no longer eligible for COBRA or after electing COBRA, the day the Plan Participant becomes eligible for Medicare or another insurance plan (unless defined otherwise by federal regulations).

7.  *Military Duty.* The date the Plan Participant becomes a full-time Participant of the Armed Forces of any United States on a full-time active-duty basis, or a government unit covered by or Uniformed Services Employment and Re-employment Rights Act of 1993 (USERRA). Reserve duty, drills, and summer camp shall be excluded from the definition of active duty unless such duty lasts over 30 days as defined by the act. Once eligibility in the Plan ends, the Participant if applicable may have continuation rights with the Plan under COBRA as defined by USERRA.

**B.    Rescission of Coverage:**

Coverage under this Plan may be rescinded under certain circumstances. A determination by the Plan that rescission is warranted will be considered an Adverse Benefit Determination for purposes of review and appeal. A Participant whose coverage is being rescinded will be provided a thirty (30) day notice period as described under Health Care Reform and regulatory guidance. Such notice shall be considered an Adverse Benefit Determination. At the conclusion of the thirty (30) day notice period, coverage shall be terminated retroactively to the date identified in the notification. Claims Incurred after the retroactive date of termination shall not be further processed and/or paid under the Plan. Claims Incurred after the retroactive date of termination that were paid under the Plan will be treated as erroneously paid claims under this Plan.

Page **15** of **38**

## VI.  CONTINUATION OF COVERAGE

### A.  Employer Continuation Coverage:

Continued coverage *may* be available for eligible Participants as provided by the Employer. Please contact the Plan Sponsor for further details regarding any continuation of coverage provisions that may apply. *

*Note: For any Employer sponsored continuation of coverage that exists, coverage will be considered to run concurrently with COBRA continuation coverage.*

### B.  Continuation During Family and Medical Leave Act (FMLA) Leave:

Regardless of the established leave policies mentioned above, the Plan shall at all times comply with FMLA. During any leave taken under FMLA, the Employee will maintain coverage under this Plan on the same conditions as coverage would have been provided if the covered Employee had been continuously employed during the entire leave period.

### C.  Family and Medical Leave Act of 1993 (FMLA):

This applies to Employers with fifty (50) or more Employees for at least twenty (20) workweeks in the current or preceding Calendar Year. The following are some definitions identified by the FMLA:

### D.  Covered Service Member:

Shall Mean current service members and covered veterans who are undergoing medical treatment, recuperation, or therapy due to a serious Injury or Illness, rather than just current service members. A covered veteran is an individual who was discharged or released under conditions other than dishonorable at any time during the five (5) year period prior to when the eligible Employee takes FMLA Leave to care for the covered veteran.

### E.  Eligible Employee:

Shall mean an individual who has been employed by the Plan Sponsor for at least twelve (12) months, has performed at least 1,250 hours of service during the previous twelve (12) month period, and has worked at a location where at least 50 Employees are employed by the Employer within seventy-five (75) miles.

### F.  Family Member:

Shall mean the (a) Employee's biological, step, or foster parent or (b) a natural, adopted, foster, or stepchild, or a legal ward under eighteen (18) years of age, or eighteen (18) years and older and incapable of self-care because of a mental or physical disability or (c) Spouse.
**Serious Illness or Injury (of a service member or covered veteran):** This shall mean an Illness

or Injury Incurred in the line of duty that may render the service member medically unfit to perform his or her military duties. A serious Injury or Illness for a current service member includes an Injury or Illness that existed before the beginning of the service member's active duty and was aggravated by service in the line of duty on active duty in the armed forces. A serious Injury or Illness for a covered veteran means an Injury or Illness that was incurred or aggravated by the service member in the line of duty on active duty in the armed forces and manifested itself before or after the service member became a veteran.

These definitions are listed as a guide and the actual wording of the FMLA, as amended, shall supersede these definitions.

## G.      Basic Leave Entitlement:

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible Employees for the following reasons:

1.      For incapacity due to Pregnancy, prenatal medical care, or childbirth;

2.      To care for the Employee's child after birth or placement for adoption or foster care;

3.      To care for the Employee's Spouse, son, daughter, or parent, who has a serious health condition; or

4.      For a serious health condition that makes the employee unable to perform the Employee's job.

## H.      Military Family Leave Entitlements:

Eligible employees whose spouse, son, daughter, or parent is on covered active duty or call to covered active duty status may use their twelve (12) week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to twenty-six (26) weeks of leave to care for a covered service member during a single twelve (12) month period. A covered service member is:

1.      A current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious Injury or Illness (**Note: The FMLA definitions of "serious Injury or Illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition."**); or

2.      A veteran who was discharged or released under conditions other than dishonorable

at any time during the five-year period prior to the first date the eligible Employee takes FMLA Leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious Injury or Illness.

*Note: The FMLA definitions of "serious Injury or Illness" for current service members and veterans are distinct from the FMLA definition of "serious health condition.")*

**I.      Benefits and Protections:**

During FMLA Leave, the Employer must maintain the Employee's health coverage under any "group health plan" on the same terms as if the Employee had continued to work. Upon return from FMLA Leave, most Employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA Leave cannot result in the loss of any employment benefit that accrued prior to the start of an Employee's leave.

**J.      Eligibility Requirements:**

Employees are eligible if they have worked for a covered Employer for at least twelve (12) months, have 1,250 hours of service in the previous twelve (12) months, and if at least fifty (50) Employees are employed by the Employer within seventy-five (75) miles.

**K.      Definition of Serious Health Condition:**

A serious health condition is an Illness, Injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility or continuing treatment by a health care provider for a condition that either prevents the Employee from performing the functions of the Employee's job or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three (3) consecutive calendar days combined with at least two (2) visits to a health care provider or one (1) visit and a regimen of continuing treatment, or incapacity due to Pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**L.      Use of Leave:**

An Employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when Medically Necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the Employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

**M.     Substitution of Paid Leave for Unpaid Leave:**

Employees may choose, or Employers may require the use of accrued paid leave while taking FMLA Leave. In order to use paid leave for FMLA Leave, Employees must comply with the Employer's normal paid leave policies.

**N.     Employee Responsibilities:**

Employees must provide thirty (30) days advance notice of the need to take FMLA Leave when the need is foreseeable. When a thirty (30) day notice is not possible, the Employee must provide notice as soon as practicable and generally must comply with an Employer's normal call-in procedures.

Employees must provide sufficient information for the Employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the Employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care Provider, or circumstances supporting the need for military family leave. Employees also must inform the Employer if the requested leave is for a reason for which FMLA Leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**O.     Employer Responsibilities:**

Covered Employers must inform Employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the Employees' rights and responsibilities. If they are not eligible, the Employer must provide a reason for the ineligibility.

Covered Employers must inform Employees if leave will be designated as FMLA-protected and the amount of leave counted against the Employee's leave entitlement. If the Employer determines that the leave is not FMLA- protected, the Employer must notify the Employee.

**P.     Unlawful Acts by Employers:**

FMLA makes it unlawful for any Employer to:

1.    Interfere with, restrain, or deny the exercise of any right provided under FMLA; or

2.    Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Q.     Enforcement:**

An Employee may file a complaint with the U.S. Department of Labor or may bring a

Page **19** of **38**

private lawsuit against an Employer. FMLA does not affect any Federal or State law prohibiting discrimination or supersede any State or local law that provides greater family or medical leave rights. FMLA section 109 (29 U.S.C. § 2619) requires FMLA-covered Employers to post the text of this notice. Regulation 29 C.F.R. § 825.300(a) may require additional disclosures.

**R.**     **For Additional Information:**

1-866-4US-WAGE (1-866-487-9243) or TTY: 1-877-889-5627; www.WageHour.dol.gov

**S.**     **Continuation During USERRA:**

Participants who are absent from employment because they are in the Uniformed Services may elect to continue their coverage under this Plan for up to twenty-four (24) months. To continue coverage, Participants must comply with the terms of the Plan, including election during the Plan's annual enrollment period, and pay their contributions, if any. In addition, USERRA also requires that, regardless of whether a Participant elected to continue his or her coverage under the Plan, his or her coverage be reinstated immediately upon his or her return to employment, so long as he or she meets certain requirements contained in USERRA. Participants should contact their participating Employer for information concerning their eligibility for USERRA and any requirements of the Plan.

**T.**     **Continuation During COBRA – Introduction:**

The right to this form of continued coverage was created by a federal law, under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"). COBRA Continuation Coverage can become available to Participants when they otherwise would lose their group health coverage. The entire cost (plus a reasonable administration fee) must be paid by the plan member. Coverage will end in certain instances, including if the Participant fails to make timely payment of contributions or premiums. Participants should check with their Employer to see if COBRA applies to them.

**U.**     **COBRA Continuation Coverage:**

Is a continuation of Plan coverage when coverage otherwise would end because of a life event known as a "Qualifying Event." Life insurance, accidental death and dismemberment benefits and weekly income or long-term disability benefits (if a part of the Employer's plan) are not considered for continuation under COBRA.
**Qualifying Events:** Specific Qualifying Events are listed below. After a Qualifying Event, COBRA Continuation Coverage must be offered to a "Qualified Participant." The Employee could become a Qualified Participant if coverage under the Plan is lost because of the Qualifying Event.

A covered Employee (meaning an Employee covered under the Plan) will become a Qualified Participant if he or she loses his or her coverage under the Plan because either one of the following Qualifying Events happens:

1.     The hours of employment are reduced; or

2.      The employment ends for any reason other than gross misconduct.

**V.      Employer Notice of Qualifying Events:**

When the Qualifying Event is the end of employment (for reasons other than gross misconduct), reduction of hours of employment, or the covered Employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), the Employer must notify the COBRA Administrator of the Qualifying Event.

**W.      Employee Notice of Qualifying Events:**

Each covered Employee is responsible for providing the COBRA Administrator / Plan Administrator with the following notices, in writing, either by U.S. First Class Mail or hand delivery:

1.      Notice of the occurrence of a second Qualifying Event after a Qualified Participant has become entitled to COBRA Continuation Coverage with a maximum duration of eighteen (18) or twenty-nine (29) months;

2.      Notice that a Qualified Participant entitled to receive COBRA Continuation Coverage with a maximum duration of eighteen (18) months has been determined by the Social Security Administration ("SSA") to be disabled at any time during the first sixty (60) days of COBRA Continuation Coverage; and

3       Notice that a Qualified Participant, with respect to whom a notice described above has been provided, has subsequently been determined by the SSA to no longer be disabled.

A form of notice is available, free of charge, from the COBRA Administrator / Plan Administrator and must be used when providing the notice.

**X.      Deadline for Providing the Notice for Qualifying Events:**

As described above, the notice must be furnished by the date that is sixty (60) days after the latest of:

1.      The date on which the relevant Qualifying Event occurs;

2.      The date on which the Qualified Participant loses (or would lose) coverage under the Plan as a result of the Qualifying Event; or

3.      The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

Page **21** of **38**

For the disability determination described above, the notice must be furnished by the date that is sixty (60) days after the latest of:

1.    The date of the disability determination by the SSA;

2.    The date on which a Qualifying Event occurs;

3.    The date on which the Qualified Participant loses (or would lose) coverage under the Plan as a result of the Qualifying Event; or

4.    The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

In any event, this notice must be furnished before the end of the first eighteen (18) months of COBRA Continuation Coverage.

For a change in disability status described above, the notice must be furnished by the date that is thirty (30) days after the later of:

1.    The date of the final determination by the SSA that the Qualified Participant is no longer disabled; or

2.    The date on which the Qualified Participant is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

The notice must be postmarked (if mailed) or received by the COBRA Administrator (if hand delivered), by the deadline set forth above. If the notice is late, the opportunity to elect or extend COBRA Continuation Coverage is lost, and if the person is electing COBRA Continuation Coverage, his or her coverage under the Plan will terminate on the last date for which he or she is eligible under the terms of the Plan, or if the person is extending COBRA Continuation Coverage, such Coverage will end on the last day of the initial eighteen (18) month COBRA coverage period.

**Y.    Who Can Provide the Notice:**

Any individual who is the covered Employee (or former Employee), or any representative acting on behalf of the covered Employee (or former Employee), may provide the notice.

**Z.    Required Contents of the Notice:**

The notice must contain the following information:

1.    Name and address of the covered Employee or former Employee;

Page **22** of **38**

2.    Identification of the initial Qualifying Event and its date of occurrence, if the person is already receiving COBRA Continuation Coverage and wishes to extend the maximum coverage period;

3.    A description of the Qualifying Event (for example, divorce, entitlement to Medicare by the covered Employee or former Employee, disability of a Qualified Participant or loss of disability status);

4.    In the case of a Qualifying Event that is Medicare entitlement of the covered Employee or former Employee, date of entitlement;

5.    In the case of a Qualifying Event that is disability of a Qualified Participant, name and address of the disabled Qualified Participant, the date the disability began, the date of the SSA's determination, and a copy of the SSA's determination;

6.    In the case of a Qualifying Event that is loss of disability status, name and address of the Qualified Participant who is no longer disabled, the date the disability ended and the date of the SSA's determination; and

7.    A certification that the information is true and correct, a signature and date.

If a copy of the SSA's determination cannot be provided by the deadline for providing the notice, complete and provide the notice, as instructed, by the deadline and submit the copy of the SSA's determination within thirty (30) days after the deadline. The notice will be timely if done so. However, no COBRA Continuation Coverage, or extension of such Coverage, will be available until the copy of the SSA's determination is provided.

If the notice does not contain all of the required information, the COBRA Administrator may request additional information. If the individual fails to provide such information within the time period specified by the COBRA Administrator in the request, the COBRA Administrator may reject the notice if it does not contain enough information for the COBRA Administrator to identify the plan, the covered Employee (or former Employee), the Qualifying Event or disability, and the date on which the Qualifying Event, if any, occurred.

**AA.   Electing COBRA Continuation Coverage:** Complete instructions on how to elect COBRA Continuation Coverage will be provided by the COBRA Administrator within fourteen (14) days of receiving the notice of the Qualifying Event. The individual then has sixty (60) days in which to elect COBRA Continuation Coverage. The sixty (60) day period is measured from the later of the date coverage terminates and the date of the notice containing the instructions. If COBRA Continuation Coverage is not elected in that sixty (60) day period, then the right to elect it ceases.

Each Qualified Participant will have an independent right to elect COBRA Continuation Coverage. Covered Employees may elect COBRA Continuation Coverage on behalf of their Spouses.