In the event that the COBRA Administrator determines that the individual is not entitled to COBRA Continuation Coverage, the COBRA Administrator will provide the individual with an explanation as to why he or she is not entitled to COBRA Continuation Coverage.

**BB.     Duration of COBRA Continuation Coverage:**

COBRA Continuation Coverage will be available up to the maximum time period shown below. Generally, multiple Qualifying Events which may be combined under COBRA will not continue coverage for more than thirty-six (36) months beyond the date of the original Qualifying Event. When the Qualifying Event is "entitlement to Medicare," the 36-month continuation period is measured from the date of the original Qualifying Event. For all other Qualifying Events, the continuation period is measured from the date of the Qualifying Event, not the date of loss of coverage. When the Qualifying Event is the covered Employee's (or former Employee's) becoming entitled to Medicare benefits (under Part A, Part B, or both), COBRA Continuation Coverage lasts for up to a total of thirty-six (36) months.

When the Qualifying Event is the end of employment or reduction of the covered Employee's hours of employment, and the covered Employee became entitled to Medicare benefits less than eighteen (18) months before the Qualifying Event, COBRA Continuation Coverage for Qualified Participants other than the covered Employee lasts until thirty-six (36) months after the date of Medicare entitlement. For example, if a covered Employee becomes entitled to Medicare eight (8) months before the date on which his or her employment terminates.

Otherwise, when the Qualifying Event is the end of employment (for reasons other than gross misconduct) or reduction of the covered Employee's hours of employment, COBRA Continuation Coverage generally lasts for only up to a total of eighteen (18) months. There are two ways in which this eighteen (18) month period of COBRA Continuation Coverage can be extended.

**CC.     Disability Extension of COBRA Continuation Coverage:**

If an Employee is determined by the SSA to be disabled and the Employee notifies the COBRA Administrator as set forth above, the Employee may be entitled to receive up to an additional eleven (11) months of COBRA Continuation Coverage, for a total maximum of twenty-nine (29) months. The disability would have to have started at some time before the sixtieth (60th) day of COBRA Continuation Coverage and must last at least until the end of the eighteen (18) month period of COBRA Continuation Coverage. An extra fee will be charged for this extended COBRA Continuation Coverage.

**DD.     Second Qualifying Event Extension of COBRA Continuation Coverage:**

If an Employee experiences another Qualifying Event while receiving eighteen (18) months of COBRA Continuation Coverage, the Spouse can get up to eighteen (18) additional months of COBRA Continuation Coverage, for a maximum of thirty-six (36) months, if notice of the second Qualifying Event properly is given to the Plan as set forth above. This extension may be available to the Spouse receiving COBRA Continuation Coverage if the covered Employee or

former Employee dies, becomes entitled to Medicare benefits (under Part A, Part B, or both), or gets divorced or legally separated, but only if the event would have caused the Spouse to lose coverage under the Plan had the first Qualifying Event not occurred.

**EE.     Shorter Duration of COBRA Continuation Coverage:**

COBRA Continuation Coverage also may end before the end of the maximum period on the earliest of the following dates:

1.      The date the Employer ceases to provide a group health plan to any Employee;

2.      The date on which coverage ceases by reason of the Qualified Participant's failure to make timely payment of any required contributions or premium;

3.      The date that the Qualified Participant first becomes, after the date of the election, covered under any other group health plan (as an Employee or otherwise), or entitled to either Medicare Part A or Part B (whichever comes first) (except as stated under COBRA's special bankruptcy rules). However, a Qualified Participant who becomes covered under a group health plan which has a pre-existing condition limit must be allowed to continue COBRA Continuation Coverage for the length of a Pre-Existing condition or to the COBRA maximum time period, if less (note: there are limitations on plans imposing a pre-existing condition exclusion and such exclusions will become prohibited beginning in 2014 under the Affordable Care Act); or

4.      The first day of the month that begins more than thirty (30) days after the date of the SSA's determination that the Qualified Participant is no longer disabled, but in no event before the end of the maximum coverage period that applied without taking into consideration the disability extension.

**FF.     Contribution and/or Premium Requirements:**

Once COBRA Continuation Coverage is elected, the individual must pay for the cost of the initial period of coverage within forty-five (45) days. Payments then are due on the first day of each month to continue coverage for that month. If a payment is not received within thirty (30) days of the due date, COBRA Continuation Coverage will be canceled and will not be reinstated.

**GG.     Current Addresses:**

In order to protect the rights of the Employee, the Employee should keep the Employer informed of any changes in their address.

**HH.     Marketplace:**

HHS regulations provide special enrollment periods for plans in the Marketplace to

individuals eligible for COBRA when: 1) such individuals initially are eligible for COBRA due to a loss of other minimum essential coverage; and 2) when such individuals' COBRA coverage is exhausted. In addition, COBRA beneficiaries can choose plans in the Marketplace during the annual open enrollment period and if they are determined eligible for any other special enrollment periods outside of the open enrollment period.

## VII.   MISCELLANEOUS PROVISIONS

### A.   Applicable Law:

This is a self-funded benefit plan coming within the purview of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is funded with Employee and/or Employer contributions. As such, when applicable, Federal law and jurisdiction preempt State law and jurisdiction.

### B.   Claims Audit:

In addition to the Plan's Medical Record Review process, the Plan Administrator may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim. While every claim may not be subject to a bill review or audit, the Plan Administrator has the sole discretionary authority for the selection of claims subject to review or audit.

The analysis will be employed to identify charges billed in error and/or charges that are not Usual and Customary and/or Medically Necessary and Reasonable, if any, and may include a patient medical billing records review and/or audit of the patient's medical charts and records.

Upon completion of an analysis, a report will be submitted to the Plan Administrator or its agent to identify the charges deemed in excess of the Usual and Customary and Reasonable amounts or other applicable provisions, as outlined in this Plan Document. Despite the existence of any agreement to the contrary, the Plan Administrator has the discretionary authority to reduce any charge to a Usual, Customary, and Reasonable charge, in accordance with the terms of this Plan Document.

### C.   Clerical Error/Delay:

Clerical errors made on the records of the Plan and delays in making entries on such records shall not invalidate coverage nor cause coverage to be in force or to continue in force. Rather, the Effective Dates of coverage shall be determined solely in accordance with the provisions of this Plan regardless of whether any contributions with respect to Participants have been made or have failed to be made because of such errors or delays. Upon discovery of any such error or delay, an equitable adjustment of any such contributions will be made.

### D.   Conformity With Applicable Laws:

This Plan shall be deemed to automatically be amended to conform as required by any

applicable law, regulation or the order or judgment of a court of competent jurisdiction governing provisions of this Plan, including, but not limited to, stated maximums, exclusions or limitations. In the event that any law, regulation or the order or judgment of a court of competent jurisdiction causes the Plan Administrator to pay claims which are otherwise limited or excluded under this Plan, such payments will be considered as being in accordance with the terms of this Plan Document. It is intended that the Plan will conform to the requirements of ERISA, as it applies to Employee welfare plans, as well as any other applicable law.

**E.     Fraud:**

The following actions by any Participant, or a Participant's knowledge of such actions being taken by another, constitute fraud and will result in immediate termination of all coverage under this Plan for the Employee:

1.     Attempting to submit a claim for benefits (which includes attempting to fill a prescription) for a person who is not a Participant of the Plan;

2.     Attempting to file a claim for a Participant for services that were not rendered or Drugs or other items which were not provided;

3.     Providing false or misleading information in connection with enrollment in the Plan; or

4.     Providing any false or misleading information to the Plan.

**F.     Headings:**

The headings used in this Plan Document are used for convenience of reference only. Participants are advised not to rely on any provision because of the heading.

**G.     No Waiver or Estoppel:**

No term, condition or provision of this Plan shall be deemed to have been waived, and there shall be no estoppel against the enforcement of any provision of this Plan, except by written instrument of the party charged with such waiver or estoppel.  No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than the one specifically waived.

**H.     Plan Contributions:**

The Plan Administrator shall, from time to time, evaluate the funding method of the Plan and determine the amount to be contributed by the Participating Employer and the amount to be contributed (if any) by each Participant.

The Plan Sponsor shall fund the Plan in a manner consistent with the provisions of the

Internal Revenue Code, ERISA, and such other laws and regulations as shall be applicable to the end that the Plan shall be funded on a lawful and sound basis; but, to the extent permitted by governing law, the Plan Administrator shall be free to determine the manner and means of funding the Plan.

Notwithstanding any other provision of the Plan, the Plan Administrator's obligation to pay claims otherwise allowable under the terms of the Plan shall be limited to its obligation to make contributions to the Plan as set forth in the preceding paragraph. Payment of said claims in accordance with these procedures shall discharge completely the Company's obligation with respect to such payments.

In the event that the Company terminates the Plan, then as of the effective date of termination, the Employer and eligible Employees shall have no further obligation to make additional contributions to the Plan and the Plan shall have no obligation to pay claims Incurred after the termination date of the Plan.

## I.   Right to Receive and Release Information:

For the purpose of determining the applicability of and implementing the terms of these benefits, the Plan Administrator may, without the consent of or notice to any person, release or obtain any information necessary to determine the acceptability of any applicant or Participant for benefits from this Plan. In so acting, the Plan Administrator shall be free from any liability that may arise with regard to such action. Any Participant claiming benefits under this Plan shall furnish to the Plan Administrator such information as may be necessary to implement this provision.

## J.   Written Notice:

Any written notice required under this Plan which, as of the Effective Date, is in conflict with the law of any governmental body or agency which has jurisdiction over this Plan shall be interpreted to conform to the minimum requirements of such law.

## K.   Right of Recovery:

In accordance with the Recovery of Payments provision, whenever payments have been made by this Plan in a total amount, at any time, in excess of the Maximum Amount of benefits payable under this Plan, the Plan shall have the right to recover such payments, to the extent of such excess, from any one or more of the following as this Plan shall determine: any person to or with respect to whom such payments were made, or such person's legal representative, any insurance companies, or any other individuals or organizations which the Plan determines are responsible for payment of such amount, and any future benefits payable to the Participant. See the Recovery of Payments provision for full details.

## L.   Statements:

All statements made by the Company or by a Participant will, in the absence of fraud, be considered representations and not warranties, and no statements made for the purpose of obtaining

benefits under this document will be used in any contest to avoid or reduce the benefits provided by the document unless contained in a written application for benefits and a copy of the instrument containing such representation is or has been furnished to the Participant.

Any Participant who knowingly and with intent to defraud the Plan, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent act. The Participant may be subject to prosecution by the United States Department of Labor. Fraudulently claiming benefits may be punishable by a substantial fine, imprisonment, or both.

## M.  Protection Against Creditors:

No benefit payment under this Plan shall be subject in any way to alienation, sale, transfer, pledge, attachment, garnishment, execution, or encumbrance of any kind, and any attempt to accomplish the same shall be void. If the Plan Administrator shall find that such an attempt has been made with respect to any payment due or to become due to any Participant, the Plan Administrator in its sole discretion may terminate the interest of such Participant or former Participant in such payment. And in such case, the Plan Administrator shall apply the amount of such payment to or for the benefit of such Participant or former Participant, spouse, parent, adult child, guardian of a minor child, brother or sister, or other relatives of a dependent of such Participant or former Participant, as the Plan Administrator may determine, and any such application shall be a complete discharge of all liability with respect to such benefit payment. However, at the discretion of the Plan Administrator, benefit payments may be assigned to health care Providers.

## N.  Unclaimed Self-Insured Plan Funds:

In the event a benefits check issued by the Third-Party Administrator for this self-insured Plan is not cashed within one year of the date of issue, the check will be voided and the funds will be returned to this Plan and applied to the payment of current benefits and administrative fees under this Plan. In the event a Participant subsequently requests payment with respect to the voided check, the Third-Party Administrator for the self-insured Plan shall make such payment under the terms and provisions of the Plan as in effect when the claim was originally processed. Unclaimed self-insured Plan funds may be applied only to the payment of benefits (including administrative fees) under the Plan pursuant to ERISA.

## VIII.  HIPAA PRIVACY

The Plan provides each member with a separate Notice of Privacy Practices. This Notice describes how the Plan uses and discloses your personal health information. It also describes certain rights you have regarding this information. Additional copies of our Notice of Privacy Practices are available by calling the Plan Sponsor at the phone number included in Article II -Introduction and Purpose; General Plan Information.

## A.  Breach:

Means an unauthorized acquisition, access, use or disclosure of Protected Health Information ("PHI") or Electronic Protected Health Information ("ePHI") that violates the HIPAA Privacy Rule and that compromises the security or privacy of the information.

**B.      Protected Health Information ("PHI"):**

Means individually identifiable health information, as defined by HIPAA, that is created or received by us and that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or for which there is a reasonable basis to believe the information can be used to identify the individual. PHI includes information of persons living or deceased.

**C.      Commitment to Protecting Health Information:** The Plan will comply with the Standards for Privacy of Individually Identifiable Health Information (i.e., the "Privacy Rule") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Such standards control the dissemination of "protected health information" ("PHI") of Participants. Privacy Standards will be implemented and enforced in the offices of the Employer and Plan Sponsor and any other entity that may assist in the operation of the Plan.

The Plan is required by law to take reasonable steps to ensure the privacy of the Participant's PHI, and inform him/her about:

1.      The Plan's disclosures and uses of PHI;

2.      The Participant's privacy rights with respect to his/her PHI;

3.      The Plan's duties with respect to his/her PHI;

4.      The Participant's right to file a complaint with the Plan and with the Secretary of HHS; and

5.      The person or office to contact for further information about the Plan's privacy practices.

Within this provision capitalized terms may be used, but not otherwise defined. These terms shall have the same meaning as those terms set forth in 45 CFR Sections 160.103 and 164.501. Any HIPAA regulation modifications altering a defined HIPAA term or regulatory citation shall be deemed incorporated into this provision.

**D.      How Health Information May be Used and Disclosed:**

In general, the Privacy Rules permit the Plan to use and disclose, the minimum necessary amount, an individual's PHI, without obtaining authorization, only if the use or disclosure is:

1. To carry out Payment of benefits;

2. For Health Care Operations;

3. For Treatment purposes; or

4. If the use or disclosure falls within one of the limited circumstances described in the rules (e.g., the disclosure is required by law or for public health activities).

**E.   Disclosure of PHI to the Plan Sponsor for Plan Administration Purposes:**
In order that the Plan Sponsor may receive and use PHI for plan administration purposes, the Plan Sponsor agrees to:

1. Not use or further disclose PHI other than as permitted or required by the Plan documents or as required by law (as defined in the Privacy Standards);

2. Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan, agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such PHI;

3. Establish safeguards for information, including security systems for data processing and storage;

4. Maintain the confidentiality of all PHI, unless an individual gives specific consent or authorization to disclose such data or unless the data is used for health care payment or Plan operations;

5. Receive PHI, in the absence of an individual's express authorization, only to carry out Plan administration functions;

6. Not use or disclose genetic information for underwriting purposes;

7. Not use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or Employee benefit plan of the Plan Sponsor, except pursuant to an authorization which meets the requirements of the Privacy Standards;

8. Report to the Plan any PHI use or disclosure that is inconsistent with the uses or disclosures provided for of which the Plan Sponsor becomes aware;

9. Make available PHI in accordance with section 164.524 of the Privacy Standards (45 CFR 164.524);

10. Make available PHI for amendment and incorporate any amendments to PHI in accordance with section164.526 of the Privacy Standards (45 CFR 164.526);

11.    Make available the information required to provide an accounting of disclosures in accordance with section164.528 of the Privacy Standards (45 CFR 164.528);

12.    Make its internal practices, books and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of the U.S. Department of Health and Human Services ("HHS"), or any other officer or Employee of HHS to whom the authority involved has been delegated, for purposes of determining compliance by the Plan with part 164, subpart E, of the Privacy Standards (45 CFR 164.500 et seq);

13.    Report to the Plan any inconsistent uses or disclosures of PHI of which the Plan Sponsor becomes aware;

14.    Train Employees in privacy protection requirements and appoint a privacy compliance coordinator responsible for such protections;

15.    If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible; and

16.    Ensure that adequate separation between the Plan and the Plan Sponsor, as required in section 164.504(f)(2)(iii) of the Privacy Standards (45 CFR 164.504(f)(2)(iii)), is established that only the privacy officer, other Employees, or other persons under control of the Plan Sponsor, shall be given access to the PHI to be disclosed

The Plan may disclose PHI to a government authority when required or authorized by law, or with the Participant's agreement, if the Plan reasonably believes he/she to be a victim of abuse, neglect, or domestic violence. In such case, the Plan will promptly inform the Participant that such a disclosure has been or will be made unless the Plan believes that informing him/her would place him/her at risk of serious harm (but only to someone in a position to help prevent the threat). Disclosure generally may be made to a minor's parents or other representatives although there may be circumstances under Federal or State law when the parents or other representatives may not be given access to the minor's PHI. Some examples of disclosure include, but are not limited to, the following:

1.    Health Oversight Activities. The Plan may disclose PHI to a health oversight agency for oversight activities authorized by law. This includes civil, administrative or criminal investigations; inspections; claim audits; licensure or disciplinary actions; and other activities necessary for appropriate oversight of a health care system, government health care program, and compliance with certain laws;

2.    Lawsuits and Disputes. The Plan may disclose PHI when required for judicial or

administrative proceedings. For example, the Participant's PHI may be disclosed in response to a subpoena, discovery requests, or other required legal processes when the Plan is given satisfactory assurances that the requesting party has made a good faith attempt to advise the Participant of the request or to obtain an order protecting such information, and done in accordance with specified procedural safeguards;

3. Law Enforcement. The Plan may disclose PHI to a law enforcement official when required for law enforcement purposes concerning identifying or locating a suspect, fugitive, material witness or missing person. Under certain circumstances, the Plan may disclose the Participant's PHI in response to a law enforcement official's request if he/she is, or are suspected to be, a victim of a crime and if it believes in good faith that the PHI constitutes evidence of criminal conduct that occurred on the Sponsor's or Plan's premises;

4. Decedents. The Plan may disclose PHI to family members or others involved in decedent's care or payment for care, a coroner, funeral director or medical examiner for the purpose of identifying a deceased person, determining a cause of death or as necessary to carry out their duties as authorized by law. The decedent's health information ceases to be protected after the individual is deceased for 50 years;

5. Research. The Plan may use or disclose PHI for research, subject to certain limited conditions;

6. To Avert a Serious Threat to Health or Safety. The Plan may disclose PHI in accordance with applicable law and standards of ethical conduct, if the Plan, in good faith, believes the use or disclosure is necessary to prevent or lessen a threat to health or safety of a person or to the public;

7. Worker's Compensation. The Plan may disclose PHI when authorized by and to the extent necessary to comply with workers' compensation or other similar programs established by law; and

8. Military and National Security. The Plan may disclose PHI to military authorities of armed forces personnel under certain circumstances. As authorized by law, the Plan may disclose PHI required for intelligence, counter-intelligence, and other national security activities to authorized Federal officials.

**F.     Participant's Rights:**

The Participant has the following rights regarding PHI about him/her:

1. Request Restrictions. The Participant has the right to request additional restrictions on the use or disclosure of PHI for treatment, payment, or health care operations. The Participant may request that the Plan restrict disclosures to family members, relatives, friends or other persons identified by him/her who are involved in his/her care or payment for his/her care.   The Plan is not required to agree to these

requested restrictions;

2. <u>Right to Receive Confidential Communication</u>. The Participant has the right to request that he/she receive communications regarding PHI in a certain manner or at a certain location. The request must be made in writing and how the Participant would like to be contacted. The Plan will accommodate all reasonable requests;

3. <u>Right to Receive Notice of Privacy Practices</u>. The Participant is entitled to receive a paper copy of the plan's Notice of Privacy Practices at any time. To obtain a paper copy, contact the Privacy Compliance Coordinator;

4. <u>Accounting of Disclosures</u>. The Participant has the right to request an accounting of disclosures the Plan has made of his/her PHI. The request must be made in writing and does not apply to disclosures for treatment, payment, health care operations, and certain other purposes. The Participant is entitled to such an accounting for the 6 years prior to his/her request. Except as provided below, for each disclosure, the accounting will include: (a) the date of the disclosure, (b) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (c) a description of the PHI disclosed, (d) a statement of the purpose of the disclosure that reasonably informs the Participant of the basis of the disclosure, and certain other information. If the Participant wishes to make a request, please contact the Privacy Compliance Coordinator;

5. <u>Access</u>. The Participant has the right to request the opportunity to look at or get copies of PHI maintained by the Plan about him/her in certain records maintained by the Plan. If the Participant requests copies, he/she may be charged a fee to cover the costs of copying, mailing, and other supplies. To inspect or copy PHI, or to have a copy of your PHI transmitted directly to another designated person, contact the Privacy Compliance Coordinator. A request to transmit PHI directly to another designated person must be in writing, signed by the Participant and the recipient must be clearly identified. The Plan must respond to the Participant's request within 30 days (in some cases, the Plan can request a 30-day extension). In very limited circumstances, the Plan may deny the Participant's request. If the Plan denies the request, the Participant may be entitled to a review of that denial;

6. <u>Amendment</u>. The Participant has the right to request that the Plan change or amend his/her PHI. The Plan reserves the right to require this request be in writing. Submit the request to the Privacy Compliance Coordinator. The Plan may deny the Participant's request in certain cases, including if it is not in writing or if he/she does not provide a reason for the request; and

7. <u>Fundraising Contacts</u>. The Participant has the right to opt out of fundraising contacts.

**G. Questions or Complaints:**

Page **34** of **38**

If the Participant wants more information about the Plan's privacy practices, has questions or concerns, or believes that the Plan may have violated his/her privacy rights, please contact the Plan using the following information. The Participant may submit a written complaint to the U.S. Department of Health and Human Services or with the Plan. The Plan will provide the Participant with the address to file his/her complaint with the U.S. Department of Health and Human Services upon request.

The Plan will not retaliate against the Participant for filing a complaint with the Plan or the U.S. Department of Health and Human Services. For Privacy Compliance Coordinator Contact Information, please contact the Plan Sponsor at the number indicated in Article II Purpose of Plan; General Information.

## IX.   HIPAA SECURITY PROGRAM

The Plan Sponsor has standards for the security of individually identifiable health information (the "Security Rule") that impose rules for maintaining the integrity, confidentiality, and availability of protected health information that it creates, receives, maintains, or maintains electronically that is kept in electronic format (ePHI) as required under the Health Insurance Portability and Accountability Act (HIPAA).

**A.     Electronic Protected Health Information (ePHI):** As defined in Section 160.103 of the Security Standards (45 C.F.R. 160.103), means individually identifiable health information transmitted or maintained in any electronic media.

**B.     Security Incidents:** As defined within Section 164.304 of the Security Standards (45 C.F.R. 164.304), means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operation in an information system.

**C.     Plan Sponsor Obligations:** To enable the Plan Sponsor to receive and use Electronic PHI for Plan Administration Functions (as defined in 45 CFR §164.504(a)), the Plan Sponsor agrees to:

1.      Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of the Plan;

2.      Ensure that adequate separation between the Plan and the Plan Sponsor, as required in 45 CFR § 164.504(f)(2)(iii), is supported by reasonable and appropriate Security Measures;

3.      Ensure that any agent, including a subcontractor, to whom the Plan Sponsor provides Electronic PHI created, received, maintained, or transmitted on behalf of

the Plan, agrees to implement reasonable and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of the Electronic PHI and report to the Plan any security incident of which it becomes aware; and

4. Report to the Plan any security incident of which it becomes aware.

**D.  Notification Requirements in the Event of a Breach of Unsecured PHI:**

The required breach notifications are triggered upon the discovery of a breach of unsecured PHI. A breach is discovered as of the first day the breach is known, or reasonably should have been known.

When a breach of unsecured PHI is discovered, the Plan will:

1. Notify the Participant whose PHI has been, or is reasonably believed to have been, assessed, acquired, used, or disclosed as a result of the breach, in writing, without unreasonable delay, and in no case later than sixty (60) calendar days after discovery of the breach. Breach Notification will be provided to the individual by:

    a. Written notice by first-class mail to Participant at last known address or, if specified by Participant, e-mail;
    b. If Plan has insufficient or out-of-date contact information for the Participant, the Participant must be notified by a "substitute form;
    c. If an urgent notice is required, Plan may contact the Participant by telephone.

2. The Breach Notification will have the following content:

    a. Brief description of what happened, including the date of the breach, and the date discovered;
    b. Types of unsecured PHI involved (e.g., name, Social Security number, date of birth, home address, account number);
    c. Steps the Participant should take to protect from potential harm; and
    d. What the Plan is doing to investigate the breach, mitigate losses and protect against further breaches.

3. Notify the media if the breach affected more than 500 residents of a State or jurisdiction. Notice must be provided to prominent media outlets serving the State or jurisdiction without unreasonable delay and in no case later than 60 calendar days after the date the breach was discovered;

4. Notify the HHS Secretary if the breach involves 500 or more individuals, contemporaneously with the notice to the affected individual and in the manner specified by HHS. If the breach involves less than 500 individuals, an internal log or other documentation of such breaches must be maintained and annually submitted to HHS within 60 days after the end of each calendar year; and

Page **36** of **38**

5.      When a Business Associate, which provides services for the Plan and comes in contact with PHI in connection with those services discovers a breach has occurred, that Business Associate will notify the Plan without unreasonable delay and in no case later than 60 calendar days after discovery of a breach so that the affected Participants may be notified. To the extent possible, the Business Associate should identify each individual whose unsecured PHI has been, or is reasonably believed to have been, breached.

## X.      OVERVIEW OF ERISA PARTICIPANT'S RIGHTS

As a Participant in the Plan, you are entitled to certain rights and protections under ERISA. ERISA provides that all Participants are entitled to:

## A.      Receive Information About Your Plan and Benefits:

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls (if any), all documents governing the Plan, including insurance contracts, collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

## B.      Continue Group Health Plan Coverage:

Continue health care coverage for yourself if there is a loss of coverage under the Plan as a result of a Qualifying Event. You may have to pay for such coverage. Review this Plan Document and the documents governing the Plan on the rules governing your COBRA Continuation Coverage rights.

## C.      Prudent Actions by Plan Fiduciaries:

In addition to creating rights for Participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Participants and beneficiaries. No one, including your Employer, your union (if any), or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**D.      Enforce Your Rights:**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a State or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who would pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**E.      Assistance with Your Questions:**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest Office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C., 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

Dated and authorized to be effective this 1st day of April 2023.

**Innovative Partners, LP** (*Plan Sponsor and Plan Administrator*)

By: *Jimmie Sutton*
Jimmie Sutton, General Partner

# Tracy
# Attachment L

# MY TRANSACTIONS



| Transaction ID | Transaction Date | Payment Method | Total Amount | Status |
|---|---|---|---|---|
| 9465408528 | April 29, 2024 | Credit Card | $421.28 | APPROVED |

| Essential Amount | Guardian Amount | Dental Amount | Program Amount | Enrollment Fee |
|---|---|---|---|---|
| $169.99 | $0 | $0 | $251.29 | $0 |

Rows per page:  10 ▾      1–1 of 1

# Tracy
# Attachment M



# Tracy
# Attachment N

TO:     Jimmie Sutton
        Innovative Partners, LP
        2234 North Federal Hwy. #2862
        Boca Raton, FL 33431

From:   Member ID: G938002
        Group #: MP200
        Robert Tracy

        ████████████

        Broomfield, CO ████

Date:   May 7, 2024

Subject: Notice of cancellation, demand refund and rejection of New Limited Partner Joinder Agreement

Mr. Sutton,

This communication serves as notice of cancellation of the health insurance sold to me on April 29, 2024 under Member ID: G938002 Group #: MP200. I also reject the terms of the NEW LIMITED PARTNER JOINDER AGREEMENT as I was not properly and fully informed the purchase of health insurance required me to join this partnership, provide 500 hours of work activity on the internet and grant the partnership permission to sell my data to 3rd parties.

On April 29, 2024, I received an unsolicited phone call from a person who represented themselves as "Haley" at 646 362-3938 who claimed she could assist me in securing health insurance. Haley claimed she could secure me health insurance with coverage similar to my former policy and at a cheaper rate than COBRA. She presented me a plan on the phone with a premium that I agreed to. Haley claimed I would be sent an email with a sign-in to access the formal documents on the Innovative Partners portal once the policy had been approved by United Healthcare. Haley said she could be reached at 954 824-5569 if I had any follow-up questions.

When the formal documents were finally available on the Innovative Partners portal, I was shocked to learn the terms of this health insurance policy ***materially deviate from the terms your agent had represented in our phone call on April 29, 2024.***

1. Haley told me the insurance policy was through United Healthcare. The policy documents sent to me and on the portal don't show United Healthcare, but a company I never heard of before.
2. Haley told me there was no maximum $ limit on coverage. The policy documents sent me and on the portal show maximum $ limits per event of only a few hundred or a couple thousand dollars.
3. Haley led me to believe the policy complied with the Patient Protection and Affordable Care Act, yet the documents on the portal specifically claim the policy is exempt from the Patient Protection and Affordable Care Act.
4. I was horrified to learn my signature had been affixed to the New Limited Partner Joinder Agreement. I thought I was purchasing health insurance through United Healthcare plan, Haley never said anything about becoming a New Active Limited Partner and agreeing to "*provide a minimum of five hundred (500) hours of work activity on the internet.* I never was made aware my purchase of health insurance would permit "*selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.*

I never was informed of these terms and never agreed to these terms and deny my signature was properly affixed to this contract. This is not what I agreed to in my April 29 phone call with Haley. ***I do not grant you permission to sell my information to 3rd parties and demand you do not sell my data to any 3rd parties.***
Haley has not responded to my repeated calls nor my texts to 954 824-5569.
I demand you cancel the policy, Member ID: G938002 Group #: MP200; refund the full $421.28 charge made on April 29, 2024 and cease any further attempts to charge the credit card provided. Innovative Partners has no permission to sell my data to 3rd parties and it has no permission to charge the credit card number I gave Haley.

I don't know if this is merely an administrative error or an intentional misrepresentation with the intent to defraud people looking for health insurance. The appropriate law enforcement and regulatory authorities will make that determination.

Robert K. Tracy, CPA

# Tracy
# Attachment O

From: **Innovative Partners** <partnerservices@innovativepartnerslp.com>
Date: Tue, May 7, 2024 at 11:20 AM
Subject: Innovative Partners - Cancellation Confirmation
To: ███████████@gmail.com>
Cc: <IPA02433@carynhealth.com>, <membercc@innovativepartnerslp.com>

Dear ROBERT TRACY,

We've received your request to cancel your health plan activated on 05-01-2024. We're currently processing your cancellation. Your health plan will be terminated as of 05-01-2024.

If you have any questions regarding your cancellation or if you received this email by mistake, please contact Partner Services at 866-949-3581.

Best regards,
Innovative Partners

 INNOVATIVE PARTNERS

866-949-3581
partnerservices@innovativepartnerslp.com

# EXPERT EXHIBIT 4

**DECLARATION OF DIANE SMITH**
**PURSUANT TO 28 U.S.C. § 1746**

I, Diane Smith hereby declare as follows:

1.      My name is Diane Smith. I live in Winters, California and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      In late June 2024, I was looking for health insurance as my husband had recently retired. I was previously covered under a health insurance plan with United Healthcare, which he had through his employer until he retired. I needed a new plan for a few months until I turned 65 and would be eligible for Medicare. I had looked into health insurance with COBRA, but it was very expensive, so I searched online for Covered California, my state marketplace. On June 27, 2024, I called the phone number from one of the top listings on the Google search results page, (855) 665-1865, because I wanted to speak to a health insurance agent about my Covered California plan options.

3.      The person who answered my call introduced herself as Maria. She said she was a health insurance broker that represented many insurance carriers, including "state private insurance" plans. I told Maria that I recently lost health insurance that I had through my husband's job. I explained I was looking for a similar full-coverage plan, including dental, until November, when I would turn 65 and be eligible for Medicare. Maria said she could enroll me in "gap" coverage that would end in November and offer benefits similar to those that I had through my husband's employer plan. I understood this to mean that Maria would enroll me in full coverage health insurance plan to cover me between now, when I was losing insurance through my husband's employer because he had retired, and November, when I could enroll in Medicare. This is exactly what I was looking for. Maria then asked me several questions, including if I had

been hospitalized in the last 6 months. She didn't explain why she was collecting this type of information, and I didn't ask.

4. Next, Maria said she found multiple options for me and then described what she had determined was the best one. She said it was a full coverage "PPO" plan with Multiplan. Maria said this plan had a $0 deductible and $25 copays for doctor and specialist visits. She specifically said the plan would cover emergency room and urgent care visits, ambulance and medical flights, mammograms, CT scans, and MRIs. Maria said the plan had "80/20 coverage." I understood this to mean that for medical expenses, the insurance company would cover 80% of the costs and I would be responsible for the remaining 20%. Maria quoted the premium or cost of this plan as $753.85 per month, which was less than the $1230.83 quote for a COBRA plan with similar coverage. Maria also told me I would have a 30-day look period, starting from the day that I enrolled, during which I could cancel and receive a full refund for the first month's premium. Maria confirmed that my doctor and dentist were covered under this plan. This plan sounded exactly like what I needed until I could enroll in Medicare, so I decided to enroll. **Smith Attachment A** is a true and correct copy of my handwritten notes taken down during this call and subsequent calls with Innovative Partners.

5. I provided Maria with my credit card information, and I don't remember if I completed the enrollment over the phone or on my device. In my inbox, however, I did find an email from "admin_noreply@innovativepartnerslp.com" with subject "Innovative Partners - Enrollment Authorization," stating "[w]ith this email, you can complete the Innovative Partners enrollment application process." It also featured a link to "authorize your enrollment application." **Smith Attachment B** is a true and correct copy of this email.

6. On June 27, 2024, my credit card was charged $753.27 for the plan's monthly premium, which was a few cents less than the original $753.85 Maria quoted. That same day, I received an email from "partnerservices@innovativepartnerslp.com" also copying "IPA2901@carynhealth.com" and "membercc@innovativepartnerslp.com." The subject of the email stated "Sales Receipt." The email included a line-by-line breakdown of the $753.27 monthly premium charge for my health insurance plan. The email showed a $50.00 "Enrollment Fee," $323.30 "Monthly Payment for Optimum-MD 3," $169.99 "Monthly Payment for Essential 25000," $119.99 "Monthly Payment for Guardian 50000," and $89.99 "Monthly Payment for Dental 1000." **Smith Attachment C** is a true and correct copy of this email.

7. While still on the phone with Maria, she confirmed that my enrollment was successful. She then provided me with a member ID number and told me I would be receiving emails related to my plan soon. She also said that if I had any questions about my plan, I should call the following customer service number: (908) 838-0185.

8. A few minutes after my call with Maria, I received two emails from "partnerservices@innovativepartnerslp.com." The subject of one email was "Innovative Partners - Partner Access" and the message included a "provider search link" for finding "in-network providers." **Smith Attachment D** is a true and correct copy of this email. The subject of the other email was "Innovative Partners - Partner Portal," and the message included login information to access a web portal, at URL https://member.innovativepartnerslp.com, to access my "temporary ID cards, resources, [and] monthly payment details" **Smith Attachment E** is a true and correct copy of this email. I logged into the portal and downloaded two of the plan-related documents that were posted there. These documents are attached and labeled as follows: **Smith Attachment F** is a true and correct copy of the document titled "Innovative Partners, LP

Health Benefit Plan, Summary Plan Description for the Benefits of the Optimum 3MD Policy"; and **Smith Attachment G** is a true and correct copy of the document titled "Innovative Partners, LP Health Benefit Plan, Summary Plan Description for the Benefits of the Dental IK Plan."

9.      Once I read the plan documents, **Smith Attachments F and G**, I realized this plan was nothing like what Maria had described. For example, even though Maria said this would be full coverage—similar to the coverage I had through my husband's employer—**Smith Attachment F** stated in fine print that it is "not designed to be a major medical policy nor is it designed to replace a major medical policy plan."

10.      Nor did this plan provide the 80/20 coverage that Maria had described on the phone; instead, my understanding, based on the plan documents, was that I would only receive limited benefits that were capped. For example, on my initial phone call with Maria, she told me that the ambulance trips were fully covered, which I understood to mean that the company would cover 80% of the cost. In the health plan documents, **Smith Attachment F**, the "Hospital Benefits" section stated that ambulance trips will be reimbursed *up to* $200 for each trip. I know ambulance trip costs way more than $200. A plan that only offered limited discounts, such as $200 off an ambulance trip that could be thousands of dollars, is not something I wanted. I also noticed that there were similar coverage caps for almost every single type of care or service listed in the plan documents. What I wanted was real health insurance that would pay for a significant portion of medical bills like ambulance costs, and I would not have bought the Innovative Partners plan if Maria had explained the limited benefits to me honestly.

11.      In the week following my call with Maria, I received a letter in the mail with an enclosure that had two insurance cards affixed. **Smith Attachment H** is a true and correct image of the letter. The letter had an Innovative Partners logo in the top right corner and stated

that I had thirty days from the date of enrollment to cancel and receive a refund of my first monthly premium. **Smith Attachment I** is a true and correct image of the document with the two insurance cards attached. The return address at the top identified the sender as a company called Marpai in Minnesota. There was no other written plan information enclosed in the envelope with the letter. Both cards had a large Innovative Partners logo in the top left. One card identified the plan as "Optimum MD 3" and in the lower left corner, under the "Provider Network" heading was a logo for "MultiPlan." It also listed the following amounts under the heading "Member Out of Pocket": PCP: $25; Specialist: $25; Urgent Care: $25; ER: $25; and "Wellness: $0." This description of out-of-pocket costs was consistent with the plan Maria described over the phone. The other card identified the plan as Dental 1000. The bottom right of the card had the words "Aetna Dental Administrators" in large bold text. In fine print above that, it stated "[a]dministered by Marpai Health." The right side of the card listed two numbers: one for "Partner Services," (866) 949-3581 and another to find a participating dentist, 1-800-513-7177. There was also a website listed to find participating dentist for www.aetna.com/Dentaladministrators.

12.     By early July, I had realized, based on the plan documents, that the plan Maria had sold me was nothing like the plan described in the documents. I would not have purchased a plan that only offered very limited discounts on medical expenses. Had I known Maria was selling me a discount plan, I would have enrolled instead through COBRA, which I knew would offer full coverage.

13.     On July 11, 2024, I called (866) 949-3581, the number listed on the letter that contained my health insurance cards, **Smith Attachment H,** to cancel the plan and request a refund. I explained to the representative on the phone that the plan documents indicated that the

plan was not full coverage, and this is not what I was sold over the phone. Despite this, the representative tried to convince me to stay enrolled in the Innovative Partners plan, and I reiterated that I wanted to cancel and receive a full refund. At this point, the agent said they would have to transfer the call to a different department. Next, they placed me on a series of long holds, and I was transferred to at least two other agents until I finally connected to the "cancellation desk." The representative at the "cancellation desk" agreed to cancel my plan and given that I was in the "free look period," he confirmed I would receive a refund of my first month's premium. He said he would send me an email confirmation shortly.

14.     After the call, I received an email from "partnerservices@innovativepartnerslp.com" titled "Innovative Partners - Cancellation Confirmation." This email stated that Innovative Partners had received my request to cancel my health plan and that my "health plan will be terminated as of 07-27-2024." **Smith Attachment J** is a true and correct copy of that email. I waited until my next credit card statement so that I could check to see if the refund was processed.

15.     Around the beginning of August 2024, I checked my credit statement and noticed that I did not receive a refund from Innovative Partners. On August 9, 2024, I called (866) 949-3581, the number listed on the letter that contained my health insurance cards, **Smith Attachment H**, that I had called to submit my cancellation request on July 11. The representative to whom I connected told me that I would receive an email in 24 hours confirming the refund. I asked her what I should do if I don't receive an email, and she asked me to call back in three days. I didn't receive a refund confirmation email from Innovative Partners that evening.

16.     On August 13, 2024, I called Innovative Partners again at (866) 949-3581 to check on the status on my refund. The representative stated that they could not give me a refund

on my premium because they do not refund premiums. They added that refunds—even inside the 30-day look period—are not part of the company's policies. I refuted this statement and cited my July 11 conversation with the "cancellation desk" representative, who had confirmed that I would receive a refund of my first month's payment because I was in the 30-day look period. The representative replied that I must have called a different company or what I said was a lie. I felt insulted that she was calling me a liar and I was frustrated that the company was refusing to refund hundreds of dollars, as it had stated it would during the June 27 sales call, the July 11 cancellation call, and the letter to me, **Smith Attachment H**.

17. On August 15, 2024, I called my credit card company and disputed the $753.27 charge from Innovative Partners over the phone. **Smith Attachment K** is a true and correct copy of the Barclays's August 15, 2024, letter to me acknowledging receipt of the charge dispute related to the $753.27 charge from "INNOVATIVE HEALTH PLAN." Before Barclays could finish their investigation, Innovative Partners, under the name Innovative Health Plan, credited my account on August 16, 2024, for the full amount of $753.27. **Smith Attachment L** is a true and correct copy of the Barclays's August 19, 2024, letter to me notifying me that the charge had been reversed. **Smith Attachment M** is a true and correct copy of my credit card statements with Barclays the initial charge and credit.

18. On August 18, 2024, I submitted a complaint to the BBB about Innovative Partners. **Smith Attachment N** is a true and correct copy of my BBB complaint.

19. On August 29, 2024, Innovative Partners Compliance responded to my complaint to the BBB. **Smith Attachment O** is a true and correct copy of this response. It stated, "Innovative Partners does not represent as Covered California or any state health exchange nor

does Innovative Partners market/sell insurance/health plans." It also confirmed that I submitted a cancellation request "within the 30-day review period" and that they had processed a full refund.

20.     I did receive my refund from Innovative Partners, and I haven't interacted with Innovative Partners since August 2024. Maria tricked me into purchasing the Innovative Partners plan by lying about the plan benefits, such as telling me that this was an "80/20" plan. I never would have purchased the Innovative Partners product if I had known it was not a marketplace plan and did not provide full coverage for my medical expenses—only limited discounts. I lost a lot of sleep due to stress from my experience with Innovative Partners. I was worried about not receiving a refund for the fake health insurance Maria had sold to me, and the money I had paid, $753.27, was not insignificant—it was worth many grocery store visits for me. I am also extremely upset about the time I lost battling with Innovative Partners to get my refund. I worry that if I had not closely reviewed the fine print on the plan documents, I might have been left without health insurance. I have since signed up for COBRA coverage though my husband's insurance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __14 NOVEMBER__ , 2024.

Diane Smith

# Smith
# Attachment A



# Smith
# Attachment B

Case 0:26-cv-60976-AHS Document 1-16 Entered on FLSD Docket 04/07/2026 Page 36 of 100

# Innovative Partners - Enrollment Authorization Inbox

**Innovative partners** <admin_noreply@innovativepartnerslp.com>                    Thu, Jun 27, 4:00 PM

to me

Images in this message are hidden. This message might be suspicious or spam.

| Show images |        Report spam

Hello DIANE SMITH,

With this email, you can complete the Innovative Partners enrollment application process. Your representative has already entered your information in the Innovative Partners Enrollment Portal. The final step is for you to review a summary of your program and authorize your enrollment application. To do so, click the link below and follow the instructions:

**CLICK HERE**

If you have any questions, please contact your representative. And thank you for your interest in our health plan. You're making a great choice!

Sincerely,
Innovative Partners

Innovative Partners

866-949-3581
partnerservices@
innovativepartnerslp.com

# Smith
# Attachment C

**From:** Diane Smith ████████ @gmail.com>
**Date:** September 28, 2024 at 5:32:39 PM PDT
**To:** ████████████ @msn.com>
**Subject: Fwd: Sales Receipt**


Sent from my iPhone.  Please excuse any typos.


Begin forwarded message:

> **From:** Innovative Partners <partnerservices@innovativepartnerslp.com>
> **Date:** June 27, 2024 at 4:03:49 PM PDT
> **To:** ████████ @gmail.com
> **Cc:** IPA2901@carynhealth.com, membercc@innovativepartnerslp.com
> **Subject: Sales Receipt**

96



Innovative Partners

866-949-3581
partnerservices@innovativepartnerslp.com

DIANE SMITH, your enrollment has been successfully completed! You will receive an email notification shortly that details how to access your online portal to review your plan details, temporary identification cards, resources, and more.

**SALES RECEIPT**

| | |
|---|---|
| Date: | **06-27-2024** |
| Transaction No: | **9665848977** |
| Account No: | ▇**xxxxxxxxxx6358** |
| Payment Method: | **Credit Card** |
| Coverage Through: | **07-27-2024** |

| | |
|---|---|
| Customer ID: | ▇▇▇▇▇**@gmail.com** |
| Customer: | **DIANE SMITH** |
| | ▇▇▇▇ WINTERS, CA, US, ▇▇ |
| | +▇▇▇ |

Payment Towards:

| | |
|---|---|
| Enrollment Fee | **$50.00** |
| Monthly Payment for Optimum-MD 3 | **$323.30** |
| Monthly Payment for Essential 25000 | **$169.99** |
| Monthly Payment for Guardian 50000 | **$119.99** |
| Monthly Payment for Dental 1000 | **$89.99** |
| Total Amount | **$753.27** |

Thank you for your order!

Need help? Contact your recruiter or our partner services team today!

# Smith
# Attachment D

## Innovative Partners - Partner Access  Inbox

**Innovative Partners** <partnerservices@innovativepartnerslp.com>            Thu, Jun 27, 4:04 PM
to me, IPA2901

Welcome DIANE SMITH
Limited Partner ID: G769818

Thank you for applying for health benefits coverage & becoming a plan participant through Innovative Partners! This is an automatically generated email. Please see the information below to get in contact with our Partner Services Team and/or your recruiter should you have any questions regarding the plan(s) you have agreed to enroll in today.

**Below is the provider search link for the PHCS Multiplan PPO Network:**
https://www.multiplan.com/webcenter/portal/ProviderSearch

Step 1: Click "Select Network" and select MultiPlan.
Step 2: Next, Select Limited Benefit Plan.
Step 3: Enter your specialty, provider name, or facility and click on the "Search" button.
Step 4: Enter your zip code. Now you can look at in-network providers in your area.

**BE ON THE LOOKOUT**
You should receive your ID Cards in the mail within 10-14 business days.

You will also receive access details to the Partner Portal that is being setup for you. For questions, please call us or send us an email. Our third-party Partner Service team is available from 9:00 am - 6:00 pm Eastern Standard Time, Monday through Friday.

**IMPORTANT NOTICE**
All cancellations and refund request must be directed to the Partner Service team at the phone number/email below to ensure proper handling of your cancellation and/or refund.



866-949-3581
partnerservices@
innovativepartnerslp.com

# Smith
# Attachment E

## Innovative Partners - Partner Portal  Inbox

**Innovative partners** <admin_noreply@innovativepartnerslp.com>     Thu, Jun 27, 4:04 PM
to me

## Welcome DIANE SMITH

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ███████████**@gmail.com**
Temporary Password: ██████████

Need help? Contact your recruiter or our partner services team today!



866-949-3581
partnerservices@
innovativepartnerslp.com

# Smith
# Attachment F

021524

# INNOVATIVE PARTNERS, LP HEALTH BENEFIT PLAN
### Summary Plan Description for the Benefits of the Optimum 3MD Policy

Congratulations, you have just enrolled in Innovative Partners, LP's *Optimum 3MD* Health Benefit Plan. This is a limited medical health benefit plan sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA"). This plan is designed to meet the needs of our employees and Active Limited Partners (including their families) who have been either unable to find a suitable major medical policy/plan, or who wish to supplement their existing major medical policy/plan. Please keep in mind that this Plan is not designed to be a major medical policy/plan nor is it designed to replace a major medical policy. This Plan has certain limitations and exclusions contained herein. Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **866-949-3581** or email us at: PartnerServices@InnovativePartnersLP.com. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1:    GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | April 1, 2023 |
| 1.9. | Plan Year: | January 1 through December 31 |

Page **1** of **12**

021524

| | | |
|---|---|---|
| 1.10. | Open Enrollment Period: | Within 30 days of becoming an Employee or an Active Limited Partner |
| 1.11 | Program or Policy Name: | Optimum 3MD |
| 1.12. | Waiting Period: | No claim will be paid for medical services that are incurred within the first 30 days of the effective date of coverage |
| 1.13. | Agent for Service of Process: | CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201 |
| 1.14. | Partner Services: | PartnerServices@InnovativePartnersLP.com |
| 1.15. | Claims: | Marpai<br>PO Box 21112, Eagan, MN 55121<br>Payor ID #: 35245 |

## SECTION 2:   NETWORK BENEFITS AND DISCOUNT PROGRAMS

### 2.1   MultiPlan Network:

Your plan includes participation in the MultiPlan Network - a flexible provider network offering greater choice and savings for members. We have negotiated discounts with over a million healthcare providers, bringing you significant savings when you choose to see a participating provider. The network includes both practitioners and facilities, such as hospitals and surgical centers, and your provider will file your claim on your behalf and be reimbursed for the plan's portion of covered charges with the applicable discount agreements applied. Any out-of-pocket costs that you are responsible for will also be based on the discounted amount. In order to find out which participating providers in your area are covered, please contact 800-457-1403 or visit MultiPlan.com and select "Find a Provider" to get started. When selecting a network, be sure to select Network >MultiPlan Network > Limited Benefit Plan.

### 2.2   Teladoc Health:

Teladoc Health is one of the largest telemedicine companies in the United States. Your plan allows you to have a consultation with a physician, or other healthcare providers, licensed in your individual state. You will be able to talk to a doctor virtually anytime, anywhere by either telephone or video. You can contact your doctor through your landline telephone, your cellular telephone, the Teladoc app, or through the website. After your consultation, your doctor will diagnose your symptoms and send a prescription if necessary. *All of this is provided for you with a $0 Co-Pay!* Yes, you will not be charged for your medical consultation!

For more information on how to take advantage of this phenomenal opportunity, please use the code on your insurance card to set up an account at Teladoc.com.

021524

**2.3    Prescription Discount Benefits:**

All of the participants in your plan get to enjoy the countless discount pharmaceutical benefits of SingleCare. To download the app simply go to: SingleCare.com and *use the code on your card.*

**SECTION 3:        SCHEDULE OF HOSPITAL AND MEDICAL BENEFITS**

**3.1    Hospital Benefits:**

1.  *Hospital Admission: $400/ one (1) time per year/ $100 co-pay.*
    You will be reimbursed up to $400 one (1) time per year that you, or a covered person, are admitted to a hospital and you make a $100 co-pay to the hospital.

2.  *Hospital Confinement:  $200 / ten (10) confinement days per year / $0 co-pay.*
    You will be reimbursed up to $200 for each day that you, or a covered person, are confined in a hospital for up to a total of ten (10) confinement days per year, and we will not ask you for a co-pay.

3.  *ICU Admission: $400/ one time per year/ $100 co-pay.*
    You will be reimbursed up to $400 one (1) time per year if you, or a covered person, are admitted to the Intensive Care Unit (ICU) of a Hospital and you make a $100 co-pay to the Hospital.

4.  *ICU Confinement:  $200 / five (5) confinement days per year / $0 co-pay.*
    You will be reimbursed up to $200 for each day that you, or a covered person, are confined in the Intensive Care Unit (ICU) of a hospital for up to a total of five (5) confinement days per year, and we will not ask you to make a co-pay.

5.  *Inpatient Surgery:    $400/ one (1) time per year/ $0 co-pay.*
    You will be reimbursed up to $400 for any surgery that you, or a covered person, have in a hospital on an in-patient basis, not to exceed one surgery per year, and we will not ask you to make a co-pay.

6.  *General Anesthesia (In-Patient):    $200/ one (1) time per year/ $0 co-pay.*
    You will be reimbursed up to $200 if you, or a covered person, are required to have general anesthesia in conjunction with in-patient hospital treatment, and we will not ask you to make a co-pay. This benefit can only be used one time per year per covered person.

7.  *Outpatient Surgery: $200/ one (1) time per year/ $100 co-pay.*
    You will be reimbursed up to $200 for any surgery that you, or a covered person, have at a hospital on an out-patient basis, and you make a $100 co-pay to the hospital. This benefit can only be used one time per year per covered person.

021524

8. ***General Anesthesia (Out-Patient):   $100 / one (1) time per year/ $25 co-pay.*** You will be reimbursed up to $100 if you, or a covered person, are required to have general anesthesia in conjunction with out-patient hospital treatment, and you make a $25 co-pay. This benefit can only be used one (1) time per year.

9. ***Emergency Room Visit: $200 / two (2) visits per year/ $25 co-pay.*** We will pay you up to $200 each time you, or a covered person, visit a physician or urgent care medical professional, and you make a $25 co-pay to the medical facility. This benefit can only be used a maximum of two (2) times per year per covered person.

**3.2   General Medical Benefits:**

1. ***Physicians and Urgent Care Visits: $200 / six (6) visits per year / $25 co-pay.*** We will pay you up to $200 each time you, or a covered person, visit a physician or urgent care medical professional, and you make a $25 co-pay to the medical facility. This benefit can only be used a maximum of six (6) times per year per covered person.

2. ***Wellness Visits: $500 / one (1) visit per year / $0 co-pay.*** We will reimburse you not to exceed $500 when you, or a covered person, has a wellness visit with a medical professional or chiropractor, and we will not ask you to make a co-pay to the healthcare facility. This benefit can only be used a maximum of one (1) time per year per covered person.

3. ***Ambulance Trips: $200 / two (2) trips per year / $0 co-pay.*** We will reimburse you up to $200 each time you, or a covered person, is required to be transported to a medical facility by an ambulance, and we will not ask you to make a co-pay to the ambulance provider. This benefit can only be used a maximum of two (2) times per year per covered person.

4. ***Laboratory Testing:   $200 / one (1) laboratory test per year / $25 co-pay.*** We will reimburse you up to $200 when you, or a covered person, receive laboratory testing of body tissue or bodily fluid from a state-licensed laboratory, and you make a $25 co-pay to the laboratory. This benefit can only be used a maximum of one time per year per covered person.

5. ***Imaging: $400 / one (1) image per year / $25 co-pay.*** We will reimburse you up to $400 when you, or a covered person, receive medical imaging as defined in the Plan Document below, and you make a $25 co-pay to the imaging facility. This benefit can only be used a maximum of one (1) time per year per covered person.

021524

### 3.3    Medical Benefits Resulting from an Accident Only:

This Plan also provides additional medical benefits in this Section 3.3 that are designed to assist with the expenses that you, or a covered person, may incur as a result of an Accident as defined herein. *These benefits are not for unforeseen illness or sickness, they are only for an Accident as defined.*

1.   *Hospital Room and General Nursing Care up to the Semiprivate Room Rate: up to $2,500.*
     If you, or a covered person, are confined to a hospital room as a result of an Accident, we will pay up to $2500 for the cost of the room, general boarding costs, and general nursing care up to a maximum of $2500.

2.   *Physician's Fees for Surgery: up to $2500.*
     We will pay a physician's fee for a surgical procedure required by an Accident to you, or a covered person, up to a maximum of $2500. The surgery must be performed in a hospital, or other state-licensed surgical center.

3.   *Anesthesia Services: up to $2500.*
     We will pay for any anesthesia services that are medically necessary as a result of an Accident to you, or a covered person, up to a maximum of $2500.

4.   *Nonsurgical Physician Care, inpatient or outpatient: $75.*
     We will pay you $75 for any nonsurgical physician services that you incur as a result of an Accident to you, or a covered person, regardless if the services are inpatient or outpatient.

5.   *Hospital Emergency Room Care: up to $500.*
     We will pay up to $500 in the event you, or a covered person, are required to receive emergency room care at a hospital as a result of an Accident.

6.   *X-rays, Ultrasounds, and other Medical Imaging: up to $250.*
     We will pay up to $250 for x-rays, ultrasounds, and other medical imaging performed, as described herein, that are medically necessary as a result of an Accident to you, or a covered person.

7.   *Ambulance Service: up to $250.*
     We will pay up to $250 if your injuries, or those of a covered person, as a result of an Accident that requires you, or a covered person, to be transported by an ambulance.

8.   *Prescription Drugs: up to $500.*

021524

We will reimburse up to the amount of $500 for any prescription drug cost that you, or a covered person, incur provided that the prescription drugs are directly related to and medically necessary as a direct result of an Accident.

9.   ***Dental Surgery for Injury to Sound Natural Teeth: up to $500.***
We will reimburse you, or a covered person, up to the amount of $500 for any dental surgery medically necessary and entirely required as a direct result of an Accident.

10.   ***Physical Therapy: First Visit $60, Subsequent Visits, $30.***
In the event the injuries that you, or a covered person, incur as a direct result of an Accident, require you, or a covered person, to receive physical therapy services, we will reimburse $60 for the first physical therapy visit and reimburse $30 for each subsequent visit up to a maximum number of four (4) visits after the initial first visit.

## 3.4   Waiting Period:

All sickness and indemnity benefits provided for in this Plan are subject to a 30-day waiting period. This waiting period shall begin on the first day of coverage and terminate 30 days thereafter. The waiting period limitation does not apply to benefits regarding an Accident or loss of life.

***PLEASE NOTE: (1) All benefits are payable at most once daily per benefit category; (2) This plan and its benefits are exempt from the Patient Protection and Affordable Care Act and they do not come under the definition of minimum benefits for purposes of the Act.***

## Section 4:   DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. You should read and understand these definitions.

**ACA or PPACA** means the Patient Protection and Affordable Care Act of 2010, as amended.

**Accident** means an unintended **and** unforeseen bodily injury sustained by a Covered Person, wholly independent of disease, bodily infirmity, illness, infection, or any other abnormal physical condition.

**Active Limited Partner(s)** means the limited partner made a signatory to either the Limited Partnership Agreement of the Plan Sponsor, or a Joinder Agreement to such Limited Partnership Agreement hereto, as well as other limited partners which may be added from time to time pursuant to the Limited Partnership Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

021524

**Ambulatory Surgical Center** (ASC) means a distinct entity that operates exclusively for the purpose of furnishing outpatient surgical services. The Ambulatory Surgical Center must be certified by the Center for Medicare and Medicaid Services (CMS). An ASC is either an independent facility or operated by a Hospital. A Hospital-operated facility must be a separately identifiable entity, physically and administratively, and be financially independent and distinct from other operations of the Hospital.

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the participant. This term does not include fostering a child. A child must be below the age of 26.

**Confined or Confinement** means the assignment to a bed as a resident inpatient in a Hospital on the advice of a Physician or Confinement in an Observation Unit within a Hospital for a period of no less than 20 continuous hours on the advice of a Physician.

**Covered Accident** means an Accident that occurs on a day that coverage is in force for a Covered Person, results in a loss or injury covered by the plan, and is not excluded by name or specific description in this Plan.

**Covered Person** means the plan participant. If you purchased insurance coverage that includes your spouse and/or child/children, these individuals are also included.

**Covered Sickness** means a sickness that occurs on a day that coverage is in force, results in a loss covered by this plan, and is not excluded by name or specific description in this plan.

**Diagnosis** means the definitive establishment of the illness condition through the use of clinical and/or laboratory findings. The Diagnosis must be made by a Physician who is a board-certified specialist where required under this coverage.

**Diagnostic Center or Facility** means a licensed and accredited entity that:

- Operates for the primary purpose of conducting medical diagnostic tests on patients,
- Does not assume ongoing responsibility for patient care, and
- Provides its services for use by other medical personnel.
- A Diagnostic Center or Facility may be either independent or operated by another medical entity.

**Dentist, Doctor, or Physician** means a legally qualified practitioner of the healing arts acting within the scope of his or her license and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**Emergency Room** means a portion of a Hospital where emergency diagnosis and treatment of a Sickness or Accident is provided.

021524

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Experimental/Investigational** means a drug, device, medical care, or medical treatment will be considered experimental/investigational if:

- The drug or device cannot be lawfully marketed without the approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;
- The informed consent document utilized with the drug, device, medical care, or treatment states or indicates that the drug, device, medical, or medical treatment is part of a clinical trial, experimental phase, or investigational phase or if such a consent document is required by law;
- The drug, device, medical care, or medical treatment or the patient informed consent document utilized with the drug, device, medical care, or medical treatment was reviewed and approved by the treating facility's Institutional Review Board or other body serving a similar function, or if federal or state law requires such review and approval; or
- Reliable evidence shows that the drug, device, medical care, or medical treatment is the subject of ongoing Phase I or Phase II clinical trials, is the research, experimental study or investigational arm of ongoing Phase III clinical trials, or is otherwise under study to determine the maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis.

**Health Benefit Plan** means this ERISA-governed self-funded Plan sponsored by Innovative Partners, LP.

**Hospital** means a short-term, acute general hospital that is:

- Primarily engaged in providing, by or under the continuous supervision of physicians, to inpatients diagnostic and therapeutic services for diagnosis, treatment, and care of injured or sick persons;
- Has organized departments of medicine and major surgery;
- Has a requirement that every patient must be under the care of a physician or dentist;
- Provides 24-hour nursing care by or under the supervision of RNs;
- Has in effect a hospital review plan applicable to all patients which meets at least the standards set forth in Section 1861(k) of the United States Public Law 89-97 (42 USCA 1395x(k));
- Duly licensed by the agency responsible for licensing such hospitals; and
- Not, other than incidentally, a place of rest, a place primarily for the treatment of tuberculosis, a place for the aged, a place for drug addicts or alcoholics, a place primarily for the treatment of mental disorders or chemical dependency, or a place for convalescent, custodial, educational or rehabilitory care.

Page **8** of **12**

021524

**Limited Medical Benefit** means a plan, program, or policy that has limited or defined benefits. It is not a comprehensive major medical plan, nor is it intended to replace a major medical plan. The plan is intended to provide you, and your covered dependents, with basic insurance coverage that is capped at specific amounts for specific services. This plan is also exempt from, and thus is not compliant with, ACA.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Medically Necessary** means a service or supply that is necessary and appropriate for the diagnosis or treatment of an injury or Sickness based on generally accepted current medical practice. A service or supply will not be considered Medically Necessary if:

- it is provided only as a convenience to the Covered Person or provider;
- it is not an appropriate treatment for the Covered Person's diagnosis or symptoms;
- it exceeds in scope, duration, or intensity that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment; or
- it is an experimental/investigational treatment.

The fact that a Physician may prescribe, authorize, or direct a service does not, of itself, make it Medically Necessary or covered by the Plan.

**Participant or Plan Participant** means the individual to whom this Plan or any Policy there under is issued.

**Plan** means the Health Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Health Benefit Plan, and such meanings as further defined by the ERISA.

**Pre-existing Condition** means a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received from a physician within a 12-month period preceding the effective date of coverage of the Covered Person.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in the Health Benefit Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Reliable Evidence** means only: published reports and articles in an authoritative medical and scientific literature; written protocol or protocols by the treating facility studying substantially the same drug, device, or medical care or treatment; or the written informed consent used by the treating facility or other facility studying substantially the same drug, device, medical care or treatment. Benefits will be considered in accordance with the drug or device at the time it is given or when medical care is received.

021524

**Sickness** means an illness, infection, disease, or any other abnormal physical condition not caused by an Accident.

**Spouse** means any individual to whom you are legally married.

**Year or Coverage Year** means the 12-month period beginning on the effective date of this Policy and your participation in this Plan and ending on the anniversary of the effective date of this Policy. Subsequent years will run from anniversary date to anniversary date.

## SECTION 5:    DESCRIPTION OF PLAN BENEFITS

### 5.1    Hospital Confinement Benefit:

We will pay the Hospital Confinement Benefit, shown in the Schedule of Benefits, if a person incurs charges for and is Confined in a Hospital due to injuries received in a Covered Accident or due to a Covered Sickness. The Confinement to a Hospital must begin on a day that the coverage is in force.

### 5.2    Surgery and Anesthesia Benefits:

We will pay the Surgery Benefit, shown in the Schedule of Benefits, for any day a Covered Person undergoes a surgical procedure due to a Covered Accident or Covered Sickness. The procedure must be performed by a board-certified surgeon in a Hospital or Ambulatory Surgical Center.

We will pay the Anesthesia Benefit, shown in the Schedule of Benefits, for any day a Covered Person is administered anesthesia for a covered surgical procedure. Anesthesia must be administered by a licensed anesthesiologist or certified registered nurse anesthetist (CRNA).

### 5.3    Physicians and Urgent Care Visit Benefit:

We will pay the Physicians and Urgent Care Visit Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for a doctor's office visit. This benefit also includes an office visit or diagnostic x-ray and/or laboratory testing for routine or preventative screenings, including a baseline mammogram, screening mammograms, cervical cytologic screenings, colorectal cancer screenings, prostate cancer screenings, and health screenings for children, per the standards and schedules of the American Academy of Pediatrics. Services must be rendered by a licensed Physician acting within the scope of his/her license.

### 5.4    Emergency Room Benefit:

We will pay the Emergency Room Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for and requires medical care from an emergency room due to injuries received in a Covered Accident or due to a Covered Sickness. The visit must occur on a

021524

day that the coverage is in force. For a visit due to injuries received in a Covered Accident, the visit must occur within 72 hours after the date of the Covered Accident. Services must be rendered by a Physician.

**5.5     Outpatient Diagnostic X-Ray and Laboratory Test Benefit:**

We will pay the Emergency Room Benefit, shown in the Schedule of Benefits, for any day a Covered Person incurs charges for diagnostic x-ray and/or laboratory testing caused by a Covered Accident or Covered Sickness.

A covered test must be performed:
- on a day that the coverage is in force; and
- in a Hospital, Ambulatory Surgical Center, Doctor's office, or Diagnostic Center or Facility.

We will not pay the Diagnostic X-Ray and Laboratory Test Benefit amount for any day a Covered Person is Hospital Confined.

Pathology includes laboratory tests performed for diagnostic purposes.

Radiology includes x-rays, ultrasounds, and other medical imaging performed for diagnostic purposes such as Angiogram, Arteriogram, Computer Tomography Scan (CT), Magnetic Resonance Imaging (MRI), Myelogram, and Positron Emission Tomography Scan (PET).

## SECTION 6:     LIMITATIONS AND EXCLUSIONS

We will not pay benefits for:

- Pre-existing Conditions during the 12 months following the effective date under this Plan.
- Treatment, services or supplies which:
  - Are not Medically Necessary;
  - Are not prescribed by a doctor as necessary to treat the Sickness or Injury;
  - Are experimental/investigational in nature, except as required by law;
  - Are received without charge or legal obligation to pay; or
  - Are provided by an immediate family member.
- Dental care or treatment, except for:
  - Dental care or treatment due to accidental injury to sound natural teeth within 12 months of a Covered Accident and
  - Dental care or treatment necessary due to congenital disease or anomaly.
- Elective procedures and cosmetic surgery.   Cosmetic surgery shall not include:
  - Reconstructive surgery when such service is incidental to, or follows, surgery resulting from trauma, infection or other disease and
  - Reconstructive surgery because of a congenital disease or anomaly of a covered Dependent Child which has resulted in a functional defect.
- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.

Page 11 of 12

021524

- Spinal manipulation or adjustment, including massage therapy.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related Injury or Sickness, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Pregnancy.
- Charges for custodial maintenance or care.
- Treatment of mental illnesses, emotional disorders, and substance abuse.
- Services rendered to a transplant donor of any organ or body element or the acquisition cost of any organ or bodily element.
- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.
- Eyeglasses, contact lenses, hearing aids, eye examinations, and hearing tests.

## SECTION 7:      CLAIMS PROCEDURE

Claims should be submitted to:

**Marpai**
**PO Box 21112, Eagan, MN 55121**
**Payor ID #: 35245**


*Please include the plan number, your plan participant number, as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all medical records regarding your claim.*

# 2023 Instructions for Form FTB 3533
## Change of Address for Individuals

## General Information

For purposes of California income tax, references to a spouse, husband, or wife also refer to a California registered domestic partner (RDP), unless otherwise specified. When we use the initials RDP, they refer to both a California registered domestic "partner" and a California registered domestic "partnership," as applicable. For more information on RDPs, get FTB Pub. 737, Tax Information for Registered Domestic Partners.

## Purpose

Use form FTB 3533, Change of Address for Individuals, to change your mailing address. The changes to your mailing address will be used for future correspondence. Generally, complete only one form FTB 3533 to change your mailing address. If this change also affects the mailing address for your children who filed separate tax returns, complete a separate form FTB 3533 for each child. If you are a representative filing for the taxpayer, go to **ftb.ca.gov/poa** for more information.

You may also go to **ftb.ca.gov** and login or register for MyFTB or call 800.852.5711 to change your address. If you change your address online or by phone, you do not need to file this form.

## Who Must File

Complete form FTB 3533 only if you file any of the following individual income tax returns: Forms 540, 540 2EZ, California Resident Income Tax Return, or Form 540NR, California Nonresident or Part-Year Resident Income Tax Return.

## Name, Identification Number, and Address

Enter the first name(s), middle initial(s), last name(s), social security number(s) (SSN) or individual taxpayer identification number(s) (ITIN), and address in the spaces provided.

Use the Suffix field for generational name suffixes such as "SR", "JR", "III", "IV". Do not enter academic, professional, or honorary suffixes.

## Prior Name

If you or your spouse/RDP filed your 2022 tax return under a different last name, write the last name **only** from the 2022 tax return in the "Prior name" field(s).

## Additional Information

Use the Additional Information field for "In-Care-Of" name or other supplemental address information only.

## PO Box

If your post office does not deliver mail to your street address, show your PO box number instead of your street address.

## Foreign Address

If you have a foreign address, follow the country's practice for entering the city, county, province, state, country, and postal code, as applicable, in the appropriate boxes. Do not abbreviate the country name.

## Signature

You must sign in the space provided. If your spouse/RDP is also requesting a change of address, they must sign in the space provided.

## Where to File

Mail this form to:

FRANCHISE TAX BOARD
PO BOX 942840
SACRAMENTO CA 94240-0002

If you moved after you filed your tax return and you are expecting a refund, notify the post office serving your old address to assist in forwarding your check to the new address.

# Smith
# Attachment G

# INNOVATIVE PARTNERS, LP HEALTH BENEFIT PLAN
### Summary Plan Description for the Benefits of the Dental 1K Plan

Congratulations, you have just enrolled in Innovative Partners, LP's *Dental 1K* Supplemental Benefit Plan. This is an optional supplemental dental benefits plan sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA"). This plan is designed to meet the needs of our employees and Active Limited Partners (including their families) who wish to add dental coverage as a supplement to their existing health policy/plan. This Plan has certain limitations and exclusions contained herein. Please carefully read this entire document as well as the Wrap Plan Document carefully so that you will fully understand all of the benefits and coverage details. If you have any questions whatsoever you should immediately contact **partner services** at: **866-949-3581** or email us at: **PartnerServices@InnovativePartnersLP.com**. Please remember that you have 30 calendar days from the day you enrolled into your plan to cancel your purchase and receive a free refund of your first month's premiums minus your enrollment fee.

*Your Partnership Team*

## SECTION 1: GENERAL PLAN INFORMATION

| | | |
|---|---|---|
| 1.1. | Plan Name: | Innovative Partners, LP Health Benefit Plan |
| 1.2. | Plan Number: | 501 |
| 1.3. | Plan Sponsor: | Innovative Partners, LP; 2234 North Federal Hwy., #2862, Boca Raton, FL 33431 |
| 1.4. | Plan Sponsor FIEN: | 92-1623773 |
| 1.5. | Plan Administrator: | Innovative Partners, LP, or any entity so designated by the Plan Sponsor from time to time. |
| 1.6. | Type of Plan: | Employee Health Benefit Plan |
| 1.7. | Funding Method of Plan: | Self-Funded |
| 1.8. | Original Plan Effective Date: | April 1, 2023 |
| 1.9. | Plan Year: | January 1 through December 31 |
| 1.10. | Open Enrollment Period: | Within 30 days of becoming an Employee or an Active |

3062024

Limited Partner

1.11   Program or Policy Name:   Dental 1K

1.12.   Waiting Period:   Claims for **Basic Procedures** (Section 2.2) will not be covered if incurred within the first three (3) months of the effective date of coverage. Claims for **Major Procedures** (Section 2.3) will not be covered if incurred within the first six (6) months of the effective date of coverage.

1.13.   Agent for Service of Process: CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201

1.14.   Partner Services:   PartnerServices@InnovativePartnersLP.com

1.15.   Claims:   Marpai
PO Box 21112
Eagan, MN 55121
Payor ID #: 35245
(Specify: **Innovative Partners Dental Claim**)

## SECTION 2:   SCHEDULE OF BENEFITS

**2.1   Preventative Procedures:**

1.   Routine dental exams and/or cleanings with a maximum of two (2) per plan year per covered person.

2.   Bitewing X-rays, maximum two (2) per plan year per covered person.

3.   Fluoride treatment for covered persons under the age of 18, no more than once per plan year.

**2.2   Basic Procedures:**

1.   Either Composite Resin or Metal Amalgam Fillings.

2.   Non-periodontal Oral Surgery, excluding Inlays, Outlays, or Crowns.

3.   Extractions of teeth when medically necessary.

**2.3   Major Procedures:**

3062024

1. Installation of original Inlays, Outlays, or Crowns

2. Periodontal Services

3. Repair of Crowns

4. Repair of Dentures

5. The initial installation of fixed bridgework

6. The initial installation of dentures

7. Replacement of existing dentures or fixed bridgework if it is necessary because of the loss of one or more natural teeth after the existing denture or bridgework was installed, or if the existing denture or bridgework can no longer be used and was installed more than 10 years prior to the date of service.

8. Replacing an existing denture or bridgework when it is needed to replace one or more natural teeth extracted after the existing denture or bridgework was installed.

9. Replacing an existing temporary denture with a new permanent denture.

10. Denture or bitewing adjustment that is medically necessary and does not exceed once in a plan year.

11. Major restorative dental services other than those listed above.

*All Basic Procedure benefits (Section 2.2) provided for in this plan are subject to a three (3) month waiting period. All Major Procedure benefits (Section 2.3) provided for in this plan are subject to a six (6) month waiting period. These waiting periods shall begin on the first day of coverage.*

## SECTION 3: DEDUCTIBLES, AMOUNTS PAID, AND MAXIMUM ANNUAL BENEFIT AMOUNT

### 3.1 Deductibles
Each covered person will have an annual plan year deductible of $50; however, the total deductible amount for a covered family shall not exceed $150 for a plan year. This Plan will not pay any benefits until the appropriate deductible has been met. The deductible amount will have to be met each Plan Year.

### 3.2 Benefit Amounts Paid by This Plan
This Plan is designed to give you the maximum discount for your dental services and reduce your out-of-pocket expenses. In order to do that, it is imperative that you only use dental providers that are part of the Aetna Dental® Administrators network. By going to an in-network provider we are able to reprice the charges from your provider to a pre-negotiated discounted

3062024

contract rate. If you go to an out-of-network dental provider there are no restrictions on what that provider might charge you and you will most likely have substantially higher out-of-pocket costs. This Plan has two different types of reimbursement percentages. The amount of reimbursement depends on whether or not your services are rendered by an in-network provider or an out-of-network provider. Please see the breakdown below.

**a. In-Network Provider**

This Plan will pay 100% of the in-network Allowed Amount for the Preventative Procedures listed in Section 2.1 after the annual Plan Year deductible is met by the covered person. This plan will pay for 80% of the in-network Allowed Amount for the Basic Procedures listed in Section 2.2 after the annual Plan Year deductible is met by the covered person. This Plan will pay 50% of the in-network Allowed Amount for the Major Procedures listed in Section 2.3 after the annual Plan Year deductible is met by the covered person.

**b. Out-of-Network Provider**

This Plan will pay 75% of the out-of-network Allowed Amount for the Preventative Procedures listed in Section 2.1 after the annual Plan Year deductible is met by the covered person. This plan will pay for 50% of the out-of-network Allowed Amount for the Basic Procedures listed in Section 2.2 after the annual Plan Year deductible is met by the covered person. This Plan will pay 25% of the out-of-network Allowed Amount for the Major Procedures listed in Section 2.3 after the annual Plan Year deductible is met by the covered person.

**3.3 Maximum Annual Benefit Amount**

Benefits under this Dental Plan are subject to the maximum annual benefit of $3,000 per covered person per plan year.

## SECTION 4: UNDERSTANDING HOW YOUR DENTAL BENEFITS WORK

The following example is merely an illustration that is designed to help you better understand how your benefits would work. The numbers provided here are merely for illustration purposes only and should not be relied upon as specific numbers or pricing.

*In-Network Example:* Mary goes to her **in-network dentist** for a regular checkup upon examination, the dentist realizes that Mary needs a filling. Luckily, Mary has a Dental Plan with Innovative Partners. Mary has already met her annual deductible of $50.

| Procedure | Provider Charge | In-Network Cost | Innovative Pays | Mary Pays |
|---|---|---|---|---|
| Dental Exam | $150 | $35 | 100% of Preventive Services - $35 | $0 |

3062024

| Filling | $275 | $99 | 80% of Basic Services - $79 | $20 |
|---|---|---|---|---|

***Out-of-Network Example:*** Mike goes to his **out-of-network dentist** for a regular checkup upon examination, the dentist realizes that Mike needs a filling. Mike has a Dental Plan with Innovative Partners; however, Mike chose to go to an out-of-network dentist instead of an in-network dentist. Mike has already met his annual deductible of $50.

| Procedure | Provider Charge | Out-of-Network Allowable Amount | Innovative Pays | Mike Pays |
|---|---|---|---|---|
| Dental Exam | $150 | $100 | 75% of Preventive Services - $75 | $25 |
| Filling | $275 | $200 | 50% of Basic Services - $100 | $100 |

## SECTION 5:       DEFINITIONS

The following definitions shall be controlling when used in connection with this Plan. You should read and understand these definitions.

**Active Limited Partner(s)** means the limited partner made a signatory to either the Limited Partnership Agreement of the Plan Sponsor, or a Joinder Agreement to such Limited Partnership Agreement hereto, as well as other limited partners which may be added from time to time pursuant to the Limited Partnership Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

**Allowed Amount**: The maximum amount that this Plan will authorize to be charged for a dental service. This includes any amount you will pay. For in-network providers, the Allowed Amount is based on that provider's previous contracted rate with our network. With out-of-network providers, the Allowed Amount is generally based upon the usual, reasonable, and customary amount ("UCR") for your community. In situations with out-of-network providers, you will generally have to pay a higher out-of-pocket amount.

3062024

**Bitewings:** Images of upper and lower, front and back teeth. They are used to check for decay, whether the teeth line up, bone loss from gum disease, and infection. Bitewings are usually provided in sets of two or four X-rays.

**Child** means any living person that is the natural issue, an adopted child, or a stepchild of the participant. This term does not include fostering a child. A child must be below the age of 26.

**Covered Person** means the plan participant. If you purchased insurance coverage that includes your spouse and/or child/children, these individuals are also included.

**Deductible** means the amount you pay for covered dental care services before this Plan begins to pay. You must pay the deductible amount each Plan Year. If this Dental Plan covers several family members, you will have both an individual deductible and a family deductible. The family deductible is the overall limit on what a family will pay before this Plan pays.

**Dentist** means a Doctor of Dental Medicine ("DMD") or a Doctor of Dental Surgery ("DDS"), is licensed by the state in which he/she practices, and is not an Immediate Family Member. For purposes of this definition, Immediate Family Member means a Covered Person's Spouse, son, daughter, mother, father, sister, or brother.

**Denture** means an artificial substitute for some or all of the natural teeth and adjacent tissues. A complete denture is a prosthetic for the edentulous upper or lower arch, that replaces all teeth. This usually includes six front teeth and eight back teeth. A fixed partial denture is a prosthetic replacement of one or more missing teeth that is generally attached to the support teeth or implant replacements. A removable partial denture is a prosthetic replacement of one or more missing teeth that can be removed by you. A temporary denture is an interim prosthesis designed for use over a limited period of time.

**Employee** means a W-2 employee of the Plan Sponsor or an Active Limited Partner of the Plan Sponsor as defined in the Limited Partnership Agreement, as may be amended from time to time.

**Employer** means the Plan Sponsor.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Hospital** means a short-term, acute general hospital that is:

- Primarily engaged in providing, by or under the continuous supervision of physicians or dentists, to inpatients diagnostic and therapeutic services for diagnosis, treatment, and care of injured or sick persons;
- Has organized departments of medicine and major surgery;
- Has a requirement that every patient must be under the care of a physician or dentist;
- Provides 24-hour nursing care by or under the supervision of RNs;
- Has in effect a hospital review plan applicable to all patients which meets at least the standards set forth in Section 1861(k) of the United States Public Law 89-97 (42 USCA 1395x[k]); and

3062024

- Duly licensed by the agency responsible for licensing such hospitals.

**Limited Partnership Agreement** means the Limited Partnership Agreement (as may be amended from time to time) of Innovative Partners, LP, which is its governing document.

**Medically Necessary** means a service or supply that is necessary and appropriate for the diagnosis or treatment of a covered dental service based on generally accepted current medical dental practice. A service or supply will not be considered Medically Necessary if:

- it is provided only as a convenience to the Covered Person or provider;
- it is not an appropriate treatment for the Covered Person's diagnosis or symptoms;
- it exceeds in scope, duration, or intensity that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment; or
- it is an experimental/investigational treatment.

The fact that a Dentist may prescribe, authorize, or direct a service does not, of itself, make it Medically Necessary or covered by the Plan.

**Participant or Plan Participant** means the individual to whom this Plan or any Policy there under is issued.

**Periodontal Services** means the treatment of gum disease such as the inflammation of gums and/or periodontal membrane of the teeth, which can result in an abnormally deep gingival sulcus that may produce periodontal pockets and loss of supporting alveolar bone. These services must be performed by a Periodontist who specializes in performing these services.

**Plan** means this Dental Benefit Plan.

**Plan Sponsor** means Innovative Partners, LP, the sponsor of this Dental Benefit Plan, and such meanings as further defined by the ERISA.

**Pre-existing Condition** means a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received from a dentist or medical professional within a 12-month period preceding the effective date of coverage of the Covered Person.

**Program or Policy** means the individual self-insured Policy or Policies that the Plan Participant enrolled in. Each Policy is a subpart or individual Program in this Plan. The terms Program(s) and Policy(ies) may be used interchangeably.

**Routine Dental Exam** means a limited clinical exam. Used to find possible signs of oral or other diseases. Also looks for malformation or injury. This also includes the cleaning, scaling, and polishing of teeth.

**Spouse** means any individual to whom you are legally married.

3062024

**Surgery** means dental surgery that is medically necessary and provided in a dental office or outpatient medical facility that is not a hospital.

**Year, Coverage Year, or Plan Year** means the 12-month period beginning on the effective date of this Plan and your participation in this Plan, and ending on the anniversary of the effective date of this Plan. Subsequent Plan Years will run from anniversary date to anniversary date. The terms Year, Coverage Year, or Plan Year may be used interchangeably.

## SECTION 6: LIMITATIONS AND EXCLUSIONS

This Plan will *not* pay benefits for:

- Pre-existing Conditions during the 12 months following the effective date under this Plan.
- Treatment, services, or supplies which:
  - Are not Medically Necessary;
  - Are experimental/investigational in nature, except as required by law;
  - Are received without charge or legal obligation to pay; or
  - Are provided by an immediate family member.
- Elective procedures and cosmetic surgery.
- Commission of, or attempt to commit, a felony or to which a contributing cause was the insured's being engaged in an illegal occupation.
- Suicide, attempted suicide, or intentionally self-inflicted injury.
- War or act of war (whether declared or undeclared); participation in a felony, riot, or insurrection; service in the Armed Forces or any unit auxiliary thereto.
- Work-related injuries or conditions, whether or not benefits are payable under any state or federal Workers' Compensation, employer's liability or occupational disease law, or similar law.
- Participation in the following sports, activities, or occupations: scuba diving; bungee jumping; skydiving; parachuting; hang gliding; ultra-light gliding; mountaineering; spelunking; traveling in or on any all-terrain vehicles (including dirt bikes, snowmobiles, go-carts, ATVs); motorized racing, speed test or stunt show; interscholastic tackle football; intercollegiate sports; semi-professional sports; professional sports.

## SECTION 7: CLAIMS PROCEDURE

Claims should be submitted to:

> **Marpai**
> **PO Box 21112**
> **Eagan, MN 55121**
> **Payor ID #: 35245**
> (Specify: **Innovative Partners Dental Claim**)

3062024

*Please include the plan number, your plan participant number, as well as the full name, telephone number, and email address of the Participant by which the claim is being submitted. Include copies (no originals) of all dental records regarding your claim.*

3062024

# Smith
# Attachment H

 

1401 N University Dr,
Coral Springs, FL, 33071

Dear Fellow Partner:

Congratulations, you have just enrolled in Innovative Partners, LP's Optimum 5MD Health Benefit Plan. This is a self-funded limited medical health benefit plan sponsored by Innovative Partners, LP. and is governed by the Employee Retirement Income Act of 1974 ("ERISA") and is regulated by the United States Department of Labor. As is customary with the nature of insurance in general, this Plan has certain limitations. You have been given the Summary Plan Description document as well as the Wrap Plan Document, please carefully read these entire documents so that you will fully understand all of your benefits and coverage details. If you have any questions whatsoever you should immediately contact Partner Services at 1-866-949-3581 or email us at PartnerServices@InnovativePartnersLP.com. Please remember that you have 30 calendar days from the day you enrolled in your plan to cancel your plan and receive a refund of your first month's premium.

Sincerely,

Your Partnership Team

# Smith
# Attachment I

JC28 [3,673] 1 of 3 Bins[00100]

Marpai
PO BOX 21112
EAGAN, MN 55121-0112



[DR-]

**FORWARDING SERVICE REQUESTED**

⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕ALL FOR AADC 956
PB-OMA-37-ENV 3673                    17
DIANE SMITH
WINTERS CA

**NOTICE:**

## Identification Cards Enclosed



Innovative Partners, LP

Partner Services: 866-949-3581

Name: DIANE SMITH
Member ID: G769818
Group #: MP200
Optimum MD 3

Provider Network
MultiPlan.

**Member Out of Pocket**
PCP: $25
Specialist: $25
Urgent Care: $25
ER: $25
Wellness: $0

Teladoc.
$0 co-Pay Telehealth
www.teladoc.com
800-835-2362

20240703803 Sh: 53 F Bin 3
JC28 Env [3,673] CSets 1 of 1

Innovative Partners, LP

Partner Services: 866-949-3581

Name: DIANE SMITH
Member ID: G769818
Group #: MP200
Dental 1000

Administered by Marpai Health
To find a participating dentist,
call or search online:
1-800-513-7177, Option 7
www.aetna.com/Dentaladministrators

Aetna Dental Administrators

20240703803 Sh: 53 F Bin 3
JC28 Env [3,673] CSets 1 of 1

# Smith
# Attachment J

## Innovative Partners - Cancellation Confirmation

 **Innovative Partners** <partnerservices@innovativepartnerslp.com>
to me, membercc

Thu, Jul 11, 2:55 PM

Dear DIANE SMITH,

We've received your request to cancel your health plan activated on 06-28-2024. We're currently processing your cancellation. Your health plan will be terminated as of 07-27-2024.

If you have any questions regarding your cancellation or if you received this email by mistake, please contact Partner Services at 866-949-3581.

Best regards,
Innovative Partners

**INNOVATIVE** PARTNERS

866-949-3581
partnerservices@
innovativepartnerslp.com

# Smith
# Attachment K

Barclays
P.O. Box 8802
Wilmington, DE 19899-8823


**BARCLAYS**

SP 01 015218 70178 H 48 ASNGLP
DIANE E SMITH

WINTERS, CA

Case Number: ███████

15-AUG-2024
Account ending in 6358

Regarding Your Hawaiian Airlines® World Elite Mastercard®

Dear DIANE E SMITH,

Thank you for notifying us of your billing dispute for the $753.27 transaction from INNOVATIVE HEALTH PLAN that was billed to your account on June 27, 2024. We will do our best to represent your interest in this case.

We have referred your transaction to a dispute specialist. Our specialist will begin an investigation, which may take up to 45 days depending on the complexity of the investigation.

Here are some common questions that we often receive from our customers during the dispute process. We hope the answers to these questions will help you understand this process and know what to expect.

**What happens to this transaction while it is in dispute?**
This transaction will not be subject to interest charges and you do not need to pay any portion of the disputed transaction while we look into this for you. However, while this transaction is in dispute, it will continue to remain as part of your account balance.

When you receive your next statement there will be a message in the Customer News section on the left hand side acknowledging that you have items in dispute.

**Do I need to provide additional information?**
Generally the information you have already provided us is enough. However we may need to contact you for additional information to ensure that we have the strongest case.

If you have not already attempted to contact the merchant, we encourage you to do so and advise us of the outcome. Many of our customers have had success in resolving their disputes quickly by contacting the merchant directly.

**How will I know when my dispute is resolved?**
Once we have completed our review of your dispute, we will send you a letter detailing the results of our investigation.

If you have any questions, feel free to call us at 877-390-4200 (ADA/Accessibility Services - Please use relay services 711). We're available to help you Monday through Friday from 8:00 am to 11:00 pm ET - and on Saturday and Sunday from 8:00 am to 8:00 pm ET.

# Smith
# Attachment L

Barclays
P.O. Box 8802
Wilmington, DE 19899-8823

 **BARCLAYS**

AD 01 078312 76609H 165 ASNGLP
DIANE E SMITH

WINTERS, CA

Case Number: ▮▮▮▮▮▮

19-AUG-2024
Account ending in 6358

Regarding Your Hawaiian Airlines® World Elite Mastercard®

Dear DIANE E SMITH,

This letter is in reference to your Hawaiian Airlines® World Elite Mastercard® account.

We are pleased to notify you that while we were investigating your dispute, INNOVATIVE HEALTH PLAN issued a credit to your account for $753.27 on August 16, 2024. Since the merchant has already credited your account for the disputed amount, we consider this dispute resolved in your favor.

If you have any questions, feel free to call us at 877-390-4200 (ADA/Accessibility Services - Please use relay services 711). We're available to help you Monday through Friday from 8:00 am to 11:00 pm ET - and on Saturday and Sunday from 8:00 am to 8:00 pm ET.

When you call, please reference the case number listed above. For general questions about disputes and tips on how to protect yourself when making purchases or returning merchandise, please visit us online at HawaiianCreditCard.com and access our Frequently Asked Questions section under Help.

Sincerely,

Barclays

# Smith
# Attachment M

Airlines® World Elite™ Mastercard® Statement

E E SMITH                                  |Account Ending 6358   |Statement Period 08/06/24 - 09/05/24      Page 3 of 7

## Transactions

| Transaction Date | Posting Date | Description | | HawaiianMiles | Amount |
|---|---|---|---|---|---|
| **Payments** | | | | | |
| | | | | | |
| **Other Credits** | | | | | |
| Aug 14 | Aug 16 | INNOVATIVE HEALTH PLAN 866-9493581 FL | | -753 | -$753.27 |
| | | | | | |

Purchase Activity for DIANE E SMITH card ending 6358

► continued on page 5

## ...aiian Airlines® World Elite™ Mastercard® Statement

DIANE E SMITH

|Account Ending 6358   |Statement Period 06/06/24 - 07/05/24   Page 5 of 7



| Transaction Date | Posting Date | Description | HawaiianMiles | Amount |
|---|---|---|---|---|
| Jun 27 | Jun 28 | INNOVATIVE HEALTH PLAN 866-9495&1 FL | | |

▶ To see activity after this statement period, visit HawaiianCreditCard.com

## Fees and Interest

| Transaction Date | Posting Date | Description | Amount |
|---|---|---|---|
| **Fees Charged** | | | |
| | | No fees charged for this period | |
| Total fees for this period | | | $0.00 |
| **Interest Charged** | | | $0.00 |
| | | No interest charged for this period | |
| Total interest for this period | | | $0.00 |
| | | | $0.00 |

▶ continued on page 6

Visit HawaiianCreditCard.com or use the Barclays US App

# Smith
# Attachment N

# Innovative Partners, LP

**Case #:** 22159230

| | | | |
|---|---|---|---|
| **Consumer Info:** | Smith, Diane<br>▮▮▮▮▮▮▮<br>Winters, CA ▮▮<br>▮▮▮▮▮▮gmail.com | **Business Info:** | Innovative Partners, LP<br>2234 N Federal Hwy PMB 2862<br>Boca Raton, FL 33431<br>2393839145 |

**Date Filed:** 8/18/2024 1:23:02 AM

**Nature of the Complaint:** Refund / Exchange Issues

**Consumer's Original Complaint:**

I was looking for medical insurance to cover 4 months until I turn 65. Googled covered California and this company came up, Innovative Partners, LP. Thinking that it was part of the exchange I called them and they offered a great "gap" policy that would get me through until November 2024. 80%|20%, ER & Urgent Care, Ambulance/Airlift, mammograms, MRI, x-ray, cat scan etc. $753.27 per month versus $1,100 per month for COBRA. I had 30 days to review and would be given my full refund if not satisfied. I received the documents via email and it was nothing like what I was sold. DEC page clearly stated, " Plan is not designed to be a major medical policy/plan nor is it designed to replace a major medical policy." I purchased this on 6/27/2024, I called to decline on 7/11/2024 (well within the 30 days). I was told that the policy would be cancelled and I would receive a refund. No refund came. I called on 8/9/2024, spoke to rep and she assured me that I would be refunded. She actually said, "No more games". No refund so I called again on 8/13/2024, finally got a person who stated that they don't refund premiums and accused me of threatening her before hanging up. Member ID with them is G769818 Administered by Marpai Health Their phone is 866-949-3581

**Consumer's Desired Resolution:**

Billing Adjustment

# Complaint Timeline

| | | |
|---|---|---|
| **08/18/2024** | Submitted: IABBB Complaint Form (API)<br>**Complaint Form** | |
| **08/18/2024** | Processed by blue: Automation<br>**IABBB Complaint Form** | |
| **08/18/2024** | Pending initial Business response: Action Taken<br>**Threshold Application** | |
| **08/29/2024** | Business Responded to Complaint: Action Taken: Extranet<br>**partnerservices@innovativepartnerslp.com** | |
| **08/30/2024** | Pending consumer Response: Action taken<br>**andrewr@bbbsefl.org** | |
| **08/30/2024** | Close the complaint as Resolved: Action Taken: Extranet<br>▮▮▮▮▮▮**@gmail.com** | |

# Smith
# Attachment O

**08/30/2024**          Resolved: Action taken
                        **andrewr@bbbsefl.org**

# Complaint Messages

**08/29/2024 - Innovative Partners Compliance**
Respond to Complaint

Innovative Partners has carefully reviewed the Partner's concerns regarding the recent experience with our services. We understand the importance of clarity when selecting a health benefit plan, especially in a situation where temporary coverage is needed. Innovative Partners does not represent as Covered California or any state health exchange nor does Innovative Partners market/sell insurance/health plans but we regret to hear that the Partner's enrollment experience was not as expected.

The Partner requested to cancel the plan within the 30-day review period, and we can confirm that the policy was cancelled as requested. Additionally, we have processed a full refund, which the Partner should have recewived. We apologize for any delays in communication and for the frustration this may have caused. If the Partner has any further questions or concerns, we encourage them to reach out to us directly. We are committed to ensuring a smooth resolution.

**08/30/2024 - Diane Smith**
I accept the business's response to resolve this complaint

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID 22159230, and find that this resolution is satisfactory to me.

Sincerely,

Diane Smith

# EXPERT EXHIBIT 5

## DECLARATION OF HAILEY GILLAM
## PURSUANT TO 28 U.S.C. § 1746

I, Hailey Gillam hereby declare as follows:

1.      My name is Hailey Gillam. I live in Gulf Breeze, Florida and am over eighteen years of age. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to these same facts.

2.      My husband recently moved to the United States from England and needed health insurance. Around March 2024, my dad searched online for health insurance. He told me he filled out a form on a health insurance website to receive a call from a health insurance agent with Florida Marketplace. He then received a call and spoke with an agent about health insurance coverage for my husband. The agent then gave his phone number to my dad so that my husband and I could call him to enroll in health insurance.

3.      On March 13, 2024, my husband and I called 936-628-8432, the number the agent had given to my dad, from my cell phone. He did not pick up the phone but texted back to say he would call back "from [his] computer in just a moment." Shortly afterward, we received a call from a different number. When we answered, the caller introduced himself as Joseph and stated he was a health insurance agent with the Florida state marketplace. We said we needed health insurance for my husband who had just moved to the United States. Joseph said he could offer my husband an Aetna plan. It would have a monthly premium of $339.86 and an additional one-time enrollment fee of $124.14 would be added to the first month's premium. I knew Aetna was a major insurance company and was glad to proceed with purchasing a plan from a known company. Joseph described the plan benefits. Although I don't remember all of the details, I do remember specifically that Joseph said that plan had a low or no deductible, modest copays, and full coverage for prescription drugs. Although I don't remember the exact amounts of the copays

Page 1 of 11

Joseph quoted, I remember they were lower than copays quoted by other insurance companies from which we had received health insurance quotes for my husband. The Aetna plan that Joseph described offered the comprehensive coverage we were looking for, and we agreed to buy it. I gave my debit card information for payment, and my husband was enrolled in the plan. I do not recall seeing any written plan information prior to providing my debit card information. My husband and I searched our text messages and inboxes and did not find any plan documents or written information sent to us prior to his enrollment. During the sales call, Joseph did not provide any information about how to cancel the plan he was enrolling us in, but he did say this was a month-to-month plan. Our entire conversation with Joseph lasted nearly two hours.

4.      On March 18, 2024, my husband received an email from admin_noreply@innovativepartnerslp.com, with the subject "Innovative Partners – Partner Portal." The message contained login information and a link to a "Partner Portal," which would provide "immediate access" to my "temporary ID cards, resources, [and] monthly payment details." He forwarded the email to me, and **Gillam Attachment A** is a true and correct copy of that email. I logged in to the portal using this information and downloaded the plan documents I found there, which are attached and labeled as follows: **Gillam Attachment B** is a true and correct copy of the document titled "Innovative Partners, LP Health Benefit Plan, Summary Plan Description for the Benefits of the Elite 6MD Policy"; **Gillam Attachment C** is a true and correct copy of the document titled "Innovative Partners, LP Health Benefit Plan, Guardian Accidental Death and Dismemberment Benefit"; and **Gillam Attachment D** is a true and correct image of the health plan ID card I downloaded and then had printed. The ID card had the name "Innovative Partners, LP" at the top left, and listed my husband's "Member ID" number. The card also listed the following dollar amounts: "Primary Physician Co-Pay: $25" and "Specialist

Co-Pay: $50." The card provided a URL for "First Health Network PPO Information" and a Georgia mailing address for "Group Resources," to which to "[m]ail all NON PPO claims." It also had a phone number for "members" to call regarding "benefits & claims": 866-949-3581. I was surprised that the portal site, plan documents, and ID card referenced a company called Innovative Partners, which I had never heard of, and that Joseph had not mentioned on our almost two-hour call.

5.      A week or two after the enrollment call, my husband received a letter in the mail from Innovative Partners, and it had his physical health insurance ID card attached. Other than the card, there were no written plan documents attached to the letter. **Gillam Attachment E** is a true and correct image of the letter. **Gillam Attachment F** is a true and correct image of the front of the ID card**. Gillam Attachment G** is a true and correct image of the back of the ID card. The physical card looked similar to the ID card I had downloaded from the portal, **Gillam Attachment D**, but had some differences. For example, instead of directing claims to "Group Resources" at the Georgia address, like the ID card from the portal, the physical card featured an instruction to "submit Medical Electronic Claims Directly to Marpai . . . ." It was followed by a Minnesota mailing address for "Marpai Health."

6.      After my husband enrolled in this plan, we wanted to establish care with a primary care physician. To find a doctor in-network for his plan, I logged onto the Partner Portal, where there was a link to a site on which I could search for providers. I found that Ascension Sacred Heart medical centers in Pensacola, Florida accepted this plan, so I went to the Ascension Sacred Heart website and made an appointment for my husband. However, when we looked for appointments, the earliest appointment was far into the future and my husband needed refills sooner on his prescriptions for his psoriatic arthritis.

7.     On May 3, 2024, my husband went to urgent care within the Ascension Sacred Heart medical system to receive a refill of his prescription Celecoxib – an anti-inflammatory for his psoriatic arthritis. I believed his new insurance plan would be accepted there because the Ascension Sacred Heart medical system had appeared in my provider search from the Partner Portal. My husband told me he presented his health insurance ID card at his urgent care appointment, and they accepted his health insurance. He paid a $50 co-pay for this visit. He expected this charge because his health insurance ID card, **Gillam Attachment G,** listed "Specialist Co-Pay: $50." He bought his prescription without using the Innovative Partners plan.

8.     A few weeks later, we received a document in the mail with the title "EXPLANATION OF BENEFITS" in large red font at the top right; the return address indicated it was from Marpai Health in Eagan, Minnesota. **Gillam Attachment H** is a true and correct copy of that document, which I later downloaded from the Marpai website. At the top right, the document stated in bold text "Group Name: Innovative Partners, LP," and below that, in bold red text "*** THIS IS NOT A BILL ***." There was information about my husband's urgent care appointment, including the provider, Sacred Heart Health System, date of service, May 3, 2024, and the "[b]illed [c]harges" of $213.23. Under the heading "NETWORK," there was a column listing the "PAID Amount," and the values listed in that column were all "$0.00." I was confused by this, but I was not concerned because the document also stated that "Amount Patient May Owe Provider," was $0.00.

9.     On June 4, 2024, my husband had his first primary care appointment with his new primary care physician. When the primacy care doctor's office requested his insurance information, he said his provider was Aetna, and he provided the member ID and group number from his health insurance ID card. The doctor's office was unable to find his plan in their

systems when searching under Aetna, so they also tried "Innovative Partners," which was the company name at the top of the health insurance ID card. That did not work either. Finally, the office was able to find my husband's plan under the company Marpai, which was listed on the back of his mailed ID card, **Gillam Attachment G**.

10. On the same day, after this appointment, my husband and I went to CVS to pick up multiple prescriptions. Some of these prescriptions were for his psoriatic arthritis, anxiety, heartburn relief and anti-depressants. When we went to pick up the prescriptions, the pharmacist at CVS notified us that our Innovative Partners plan did not cover prescriptions. While in the CVS, I logged into the Innovative Partners portal on my phone and found a generic prescription savings card. **Gilliam Attachment I** is a correct and true copy of the document with the prescription savings card that was in my Innovative Partners portal. The document had the words "Single Care" in large print in the upper left-hand corner. In the top right corner, there was a copy of a "PHARMACY SAVINGS CARD" with an "AUTHORIZATION NUMER." This card also listed that the Single Care card allowed for "UP TO 80% OFF YOUR PERSCRIPTIONS." The body of the document featuring the card stated to use the card we just needed to "show one of these cards to the pharmacist next time you fill a prescription." Months later, reviewing this document again, I discovered fine print stating that "SingleCare is not insurance. There are no claim forms, deductibles, limitations, or maximums." That was followed by another fine print statement: "SingleCare can be used by anyone. No one is excluded from this program for any reason."

11. I showed the CVS pharmacist the card on my phone, it was accepted, and we were able to purchase the prescriptions at a discounted rate. I do not recall the specific amount the discounted rate was. The medications were more expensive than what I assumed he would

pay with the full coverage insurance we had purchased with Innovative Partners, but despite the cost we bought it because my husband needed them for his pre-existing conditions.

12. Sometime in early June 2024, my bank replaced the debit card I had provided to pay for my husband's health plan because the chip on the card had stopped working. The reissued card had a new number.

13. On June 14, 2024, my husband received an email from partnerservices@innovativepartnerslp.com, with the subject "Innovative Partners – PAYMENT DECLINED – Action Required." My husband forwarded that message to me, and **Gillam Attachment J** is a true and correct copy of the forwarded message. It stated that unless we provided another payment method by calling 866-949-3581—the same number that was listed on my husband's ID card—my husband's "[h]ealth services will be suspended." Around this time, we also received a letter in the mail from Innovative Partners with a similar message. We were very concerned that unless the payment information was updated, my husband would be without health insurance, so again, each of us tried calling 866-949-3581, but neither of us were connected to an agent. Instead, we had the same experience: when we called, the call would ring and ring until it would eventually disconnect. Over the course of the following week, we both called this number numerous times, and none of our calls connected to an agent—they would just disconnect after ringing for several minutes.

14. On June 19, 2024, and June 21, 2024, my husband received emails from Innovative Partners that were the same or substantially similar to the message he received on June 14, 2024, **Gillam Attachment J,** requesting we call 866-949-3581 to update our payment information. We were confused and frustrated by these messages, because we had both been

calling the number, as instructed, for days to update the payment information and no one had picked up our calls.

15. Because we weren't having any luck reaching an agent at the Innovative Partners number from the email alerts and ID card, 866-949-3581, on June 21, 2024, I texted 936-628-8432, the number from which Joseph had originally texted me. **Gillam Attachment K** is a true and correct copy of the text message exchange between Joseph and me that day. I told Joseph that my husband had tried calling 866-949-3581 to update his payment information, but he never connected to an agent. Joseph responded that this was the "wrong number." He explained that 866-949-3581 is the number "for the insurance company as a whole" and would just connect to an "automated system." To speak with a "real person," Joseph directed us to call 855-432-1273, which he said was his "own customer service department" for his clients. Joseph added that we could text him if we had any difficulty connecting with an agent at his customer service number.

16. My husband called 855-432-1273, and he did connect with an agent. He or I provided the updated credit card information over the phone. On this call, the agent warned that my bank will flag the payment as potentially fraudulent, and when that happens, I should approve it. On June 21, 2024, my husband received a confirmation email from partnerservices@innovativepartnerslp.com stating that they had received a request to change the payment method for my husband's plan. He forwarded that email to me, and **Gillam Attachment L** is a true and correct copy of the forwarded email. On June 24, 2024, my card was charged $339.86 by Innovative Health Plans, and **Gillam Attachment M** is a true and correct screenshot of my transaction records from my bank, showing the June 24 monthly premium charge from Innovative Health Plans.

17. On July 3, 2024, my husband went to a medical facility for bloodwork that his doctor had ordered. The staff there had difficulty finding his insurance information, and he suggested they search for his plan under the company Marpai, which was how the doctor's office had found the plan when he had come in for his June 4, 2024 appointment. The facility then told him they were able to find his plan information, and my husband proceeded with the bloodwork. No one noted any issues with his insurance coverage at that appointment.

18. On July 15, 2024, my card was charged $339.86 by Innovative Health Plans for my husband's monthly premium, and this charge is reflected in the transaction record in **Gillam Attachment M**.

19. On July 16, 2024, my husband went for a follow-up appointment with his doctor. Staff at his doctor's office informed him that his insurance company had not been paying for his appointments.

20. That month, July 2024, I realized that I would soon have the option to enroll my husband in the group health insurance plan I had through my employer. Before making the switch, however, I wanted to compare his coverage at that time with the coverage on my employer plan. I reviewed all my plan documents and compared them with my husband's plan documents, which I had downloaded from the Innovative Partners portal, **Gillam Attachments B and C**. I was very surprised at the difference between the two sets of plan documents. The documents from my employer plan were highly detailed regarding specific treatments, procedures, and appointments that were covered and those that were not, while there was very little detail in the Innovative Partners documents. The lack of detail in the Innovative Partners gave me some pause. But my husband could not enroll in my employer's plan until the open enrollment period starting September 1, so we decided to keep him enrolled in the Innovative

Partners plan until then to make sure he had at least some insurance coverage, even if it wasn't as good as the coverage under my employer's plan.

21.     On July 17, 2024—the day after my husband learned as his doctor's appointment that his insurance company had not been paying for his care--I texted Joseph at 936-628-8432 to notify him that the insurance company had not been paying for my husband's appointments. Joseph did not respond to this text.

22.     Later in the evening of July 17, 2024, my husband received an email from Innovative Partners, partnerservices@innovativepartnerslp.com, with the subject "Cancellation Confirmation." He forwarded that message to me, and **Gillam Attachment N** is a true and correct copy of the forwarded email. The message stated that Innovative Partners had received my husband's "request to cancel [his] health plan." This confused us because neither my husband nor I had requested to cancel, and I had been charged for his monthly premium two days prior, on July 15, 2024. We worried that this unprompted cancellation could mean that my husband would be without coverage for the next few weeks and that Innovative Partners would not pay anything towards his existing medical bills.

23.     The next morning, July 18, 2024, I texted Joseph again, alerting him that my husband's health plan had been improperly cancelled. I told Joseph I had already paid my husband's July premium and expected coverage to continue until August 31, 2024. He responded he would have his customer service team and manager look into the issue. Joseph subsequently texted me that my husband's plan had been cancelled because I had not paid for the month of July. I disputed this but Joseph insisted that I had not paid and that the plan cancellation had been proper; he said that if I wanted coverage for my husband through August 31, 2024, I would have to re-enroll. I also repeated my message to Joseph that the insurance company still had not paid

for my husband's medical appointments, and the receptionist was not able to find his policy under Aetna. In response, Joseph reassured me that my husband's plan is "Aetna private insurance." I texted Joseph a request to call my husband to straighten things out.

24.     Shortly afterward, Joseph texted me that he had spoken to my husband and the options going forward were "two different private plans we can get him enrolled into" with the same company that "would still cover the past medical expenses." Joseph's text stated that it would be $300 to enroll in one of these plans. He added the private plans would cover my husband "in any of the United Nations," so when "he's in Britain," where my husband is from, "[h]e will have insurance too."

25.     Based on my husband's reports that the plan had not been paying for his appointments and the extremely limited details in the plan documents, I had become convinced that Innovative Partners was a scam, and we did not pursue re-enrollment. I reported our experience to the Federal Trade Commission and called my bank to report the related charges as fraud. The bank refunded the monthly premium payments of $339.86 dating back to April 2024. It did not, however, refund the initial charge of $464.86 from March 2024, because we were beyond the bank's window for disputing charges.

26.     We were worried about the medical bills for my husband's care while he was enrolled with Innovative Partners. To look into the bills, I searched online for the website for Marpai, the company under which the doctor's office had found my husband's policy. When I reached the Marpai website at the URL www.mymarpai.com, I was prompted to set up a user ID to log in to the portal. None of the emails we had received from Innovative Partners had directed my husband to do this previously. Once I logged in, I found several claim documents for the care my husband had received in July 2024. I downloaded all three of these, and **Gillam Attachment**

O is a true and correct copy of the claim documents. I was alarmed to find that each of the claim documents listed the same dollar value for "Total Billed Charges," "Total Not Covered" and estimated "Total Member May Have to Pay." I understood this to mean that the Innovative Partners plan had not paid anything towards my husband's medical bills and that we could be on the hook for the total $2,086.70 of charges. This realization caused us enormous stress.

27. This experience with Innovative Partners was incredibly stressful for both my husband and me. If we had known this was not health insurance and would not cover a substantial portion of my husband's medical bills, we never would have enrolled. We lost $464.86 for the first month's payment to Innovative Partners that was not refunded, and many hours spent on the phone, online, and texting with Joseph trying to resolve issues related to this plan. The stress of this experience was so severe that I broke down in tears at work one day and had to go home early. We are currently living in fear of the roughly $2,000 in medical bills, which are unaffordable for us and that we have not yet received, for my husband's care during the time he was enrolled in the Innovative Partners plan. After discovering that Innovative Partners was not a real insurance company and was not paying anything towards my husband's appointments, he decided to forgo further care until he could enroll in the insurance plan I had through my employer. For example, despite his doctor's recommendations, he decided not to get an MRI at that time. We just could not afford to take on those costs without insurance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 6 , 2024.

Hailey Gillam

Page 11 of 11

# Gillam
# Attachment A

Fwd: Innovative Partners - Partner Portal

From:  Jack Woodley (███████████████)

To:    hailey.gillam@███████

Date:  Monday, March 18, 2024 at 12:30 PM CDT

---------- Forwarded message ---------
From: **Innovative partners** <admin_noreply@innovativepartnerslp.com>
Date: Mon, 18 Mar 2024 at 12:26
Subject: Innovative Partners - Partner Portal
To: <jack.woodley████████████>

# Welcome JACK G WOODLEY

Thank you! Your enrollment has been successfully completed and you gain immediate access to a dedicated area for easy access to your programs, temporary ID cards, resources, monthly payment details, and more.

Bookmark the page below for easy reference and quick access to your portal. Your login credentials will be the email used on enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.innovativepartnerslp.com**

**PORTAL LOGIN CREDENTIALS**
Username: **jack.woodley**████████████
Temporary Password: ████████████

Need help? Contact your recruiter or our partner services team today!



866-949-3581
partnerservices@innovativepartnerslp.com