■Roberts undercover call

Page 4

possible.  I have been laid-off and COBRA is going to be too expensive and so I guess I'm looking to see what's out there and what, what I can get.

HALEY:  Yeah.  Absolutely.  Yes ma'am.  Yes ma'am.  Absolutely.  I am definitely familiar with the COBRA insurance being, you know, a lot more …  I would say the least cost-effective route just because it's a continuation, you know, of your plan, but they are no longer covering, you know, Employer's no longer responsible for paying their portion.  So we can definitely look into your options here.  Can I just have your first and last name to get started?

MS. CARSON:  Sure.  It's T████, T-████████, and my last name is R████, R████████.

HALEY:  Wonderful, and, and you said your first name is ████████████████ correct?

MS. CARSON:  Correct.

HALEY:  Wonderful, and, Ms. ████████, what is your date of birth?

MS. CARSON:  February 17th, 1978, and you can call me ████.  That's fine.

HALEY:  (Cross talk) okay, perfect, thank you

**Carson Attachment V, Page 4 of 65**

Roberts undercover call

Page 5

so much, and, █████, what is your zip code?

MS. CARSON:  It is █████

HALEY:  Perfect, okay, and now will this be just used for individual coverage, correct?

MS. CARSON:  Yes, just for myself --

HALEY:  Okay.

MS. CARSON:  -- medical and maybe dental depending on the cost.

HALEY:  -- on the cost.  Right.  Right.  You want to try to keep it as cost-effective, of course, as possible, but I'll definitely keep that in mind when I look into all of your options here.

Just to briefly tell you a little bit about, you know, who you're calling, I do work with all the carriers that we … We are contracted with the Blue Cross and Blue Shield, Aetna, United Healthcare.  We, we really try to see what, you know, as far as savings that we are able to apply.

There's two ways that we do generate your savings, right, and so the first way will be primarily based on your health and, you know, your age, your health.  Secondly is going to be based on income.

**Carson Attachment V, Page 5 of 65**

████████ undercover call

Page 6

Now, being that you are right now … You just … You said you'd … You mentioned that you got laid off.  How long has it been since … Was it recent or --

MS. CARSON:  Well, I'm back to work now. I've got a job.  So … But I'm wondering about that, too.

HALEY:  Wonderful.  Okay.

MS. CARSON:  I make about $40,000.00, so I'm hopeful that I can get a discount because of how much I make in ██████

HALEY:  Okay.  Yeah, absolutely, and with COBRA I'm just curious what's, what's the carrier? What, what insurance did you previously have?

MS. CARSON:  Blue Cross Blue Shield, so I would really like --

HALEY:  Okay.

MS. CARSON:  -- to get something similar to that if at all possible?

HALEY:  -- possible, mm-hmm.  Absolutely. Yes.  Yeah.  So just give … Like, for example, we'll, we'll get into that, as well.  I'll be able to, like,

**Carson Attachment V, Page 6 of 65**

█████████ undercover call

Page 7

convert factors if you have any that …  So we can see what plans they are, you know, would be the most cost-effective there.  Do you have, like, a primary doctor, ██████ that you would like to keep or --

MS. CARSON:  No, and that's the issue, too, Haley.  I have not been to the doctor in quite some time and I need to go.  There's --

HALEY:  Right.

MS. CARSON:  Diabetes runs in the family, and I'm kind of concerned --

HALEY:  Right.

MS. CARSON:  -- about that --

HALEY:  Absolutely.

MS. CARSON:  -- so I'm wondering if, like, medications would be covered, diabetes medication --

HALEY:  Mm-hmm.

MS. CARSON:  -- that sort of thing.

HALEY:  Absolutely.  Absolutely.  So, yes, that's …  Anything you tell me is just, it's going to help me kind of navigate through those options here --

MS. CARSON:  Okay.

HALEY:  -- so I do appreciate you telling me

**Carson Attachment V, Page 7 of 65**

███████ undercover call

Page 8

that, but as far as, like, medications right now, ███████ are you on any medications?

MS. CARSON:  No, no medications right now.

HALEY:  Okay.  Great.  Great.  Okay. Wonderful.

And then what's going to be the best e-mail address for you?

MS. CARSON:  It is my name.  So it's ███████ - ████████████████ outlook.com.

HALEY:  Mm-hmm.  All right, and then I'm just going to confirm that again just one more time.  So that is fully-spelled, fully-spelled-out.  It's ███████ █████████████████████████, and then your last name fully spelled-out, ███████@outlook.com.

MS. CARSON:  Correct, yes --

HALEY:  Okay, great.

MS. CARSON:  -- and ███████████.

HALEY:  Yes, perfect, and then, ███████ let me ask you, in case you disconnect, I would love to be able to reach you.  I do have your phone number here. I have ███████.

MS. CARSON:  Yes.

**Carson Attachment V, Page 8 of 65**

■■■■■ undercover call

Page 9

HALEY:  Is that the best number?

MS. CARSON:  Yes, that's fine.  Yes, that's correct.

HALEY:  Okay.  Okay, great.  Okay, let's see here …

Now, as far as that …  So it seems like you are in good health.  What I like to say, you're, you know, blessed, right?  You're very fortunate with your health so far --

MS. CARSON:  So far so good, yes.

HALEY:  Yes!  Very good, very good, and, and that will definitely work in your favor.  You know, as I mentioned before, some plans are strictly based on that, and then we would be required to ask some health questions, but as far as, like, any, God forbid any illnesses or any preexisting you have, you haven't doctor-diagnosed for any of those major conditions, correct, in the last five years?

MS. CARSON:  No.  No, just the concern about maybe pre-diabetes.  That's it.

HALEY:  Pre-diabetes.  Right.  Right, right, absolutely.  All right, let's see here --

█████ undercover call

Page 10

MS. CARSON:  But nothing yet.  No diagnosis. I mean, that's why I need to go to the doctor.

HALEY:  To go to the doctor soon.  Yeah, that's definitely important as soon as possible to just, you know, make sure everything is under control.

So we … All of our plans, they do cover those things, so it's very much like, you know, what you're used to having with the Blue Cross and Blue Shield.

With the COBRA, I'm curious, what was the monthly cost with COBRA?  Did they provide you the --

MS. CARSON:  I don't remember the exact amount.  It, it seems like it was, like, $800.00, $900.00, maybe more.  I didn't really --

HALEY:  It triples.

MS. CARSON:  -- (cross talk) yeah.

HALEY:  Yeah, it triples in cost (inaudible) or doubles.  Yeah.

MS. CARSON:  Yes, it was insane, and I'm just like, "I can't afford that," and even now --

HALEY:  Right.

MS. CARSON:  -- now that I'm working, it's

**Carson Attachment V, Page 10 of 65**

███████ undercover call

Page 11

still too much.  I can't pay that.

HALEY:  Absolutely.  Okay.  Perfect.  So pretty much right now I'm, you know, I'm going to pull out and generate the entire system.  It will pull up every single option.  We'll go based on your area, as well.  So just so you know, we do like to make sure that whatever plan we find is highly-accepted in your region, so …  And then when I get back in a few moments, ███████ I'll go over the plan with you in detail.  Do you have any questions before I place you on a brief hold?

MS. CARSON:  No.  Just you said "highly-accepted" in my region.  You mean like doctors take it?  Hospitals?  That sort of thing?  Is that what you mean?

HALEY:  Correct.  Mm-hmm.

MS. CARSON:  Okay.  Oh, yes, yes, yes.  I definitely want that because …  Yes.  And this is …  This, this is, like, the, the alternative to COBRA, like, the Obamacare?

HALEY:  Mm-hmm.

MS. CARSON:  Okay.  Okay.

**Carson Attachment V, Page 11 of 65**

███████ undercover call

Page 12

HALEY: Yeah. Yeah. Exactly. So this is where you would get insurance outside of your employer.

MS. CARSON: Okay. Perfect.

HALEY: Absolutely. Mm-hmm.

MS. CARSON: Perfect.

HALEY: Yep.

Now, I'm going to go ahead and just place you on a brief hold and I'll be right back on the line. Thank you so much for holding.

MS. CARSON: Okay, wonderful. Thank you so much.

(Call placed on hold from 0:10:05 to 0:14:40.)

HALEY: Hello? ███████

MS. CARSON: Yes?

HALEY: Hey. Thank you so much for holding. I do appreciate your patience.

MS. CARSON: Sure.

HALEY: I just have a few things I want to go over with you before we get started.

MS. CARSON: Okay.

**Carson Attachment V, Page 12 of 65**

█████████ undercover call

Page 13

HALEY:  So I was actually going, looking into your, your savings, right?  So when, when the system looks into your savings, it does look at your income eligibility with the Marketplace, and then it looks based on your health.  So your government Marketplace plan, I pulled up the Blue Cross and Blue Shield, I pulled up United Healthcare, and then Humana, as well. Those premiums range, actually, almost $650.00 a month all the way up to, like, $8, $900.00 a month right now.

So what I noticed, there was a plan that came back - actually very well-known, very accepted, as well, in, in your state - and it's, in fact, this one's going to be under …  It's a PPO.  It's under Aetna First Health.  Have you heard of Aetna before?

MS. CARSON:  I have heard of Aetna.  Okay --

HALEY:  Mm-hmm.

MS. CARSON:  -- and because I'm like, 'Oh my gosh.'  So what does that …

Well, first of all, so the ones under the Marketplace, $650.00 to, like, $1,000.00 a month or something?  That's insane.  I …  Oh my gosh.

**Carson Attachment V, Page 13 of 65**

█████████ undercover call

Page 14

HALEY: Yeah. Right.

MS. CARSON: But you said this one's --

HALEY: Your state-issued plans … So I was able to apply a … Basically it's state-issued. So it's a, it's a health-based savings rather than going based on your income. I was, I was noticing that if we go strictly based on your health, your, your most affordable option is going to be around $295.00 a month. I think that's a lot more doable than the, than the $650.00 a month, correct?

MS. CARSON: Oh my goodness, yes. So that's for this Aetna plan?

HALEY: Yeah, it's going to be … It's actually full coverage. I want to go over the benefits really quick --

MS. CARSON: Oh, please, yes.

HALEY: -- and then, of course … Yeah, feel free to ask me any questions here.

So, first and foremost, this is the largest network. It's known as a PPO. Do you know what that means when it comes to, like, health plans or do you want me to go over that?

**Carson Attachment V, Page 14 of 65**

███████ undercover call

Page 15

MS. CARSON:  I've heard it, but …  Would you please?

HALEY:  Mm-hmm.

MS. CARSON:  That would be great.

HALEY:  Yeah, absolutely.  So with …  The fact when you have insurance, you have a, something called an HMO or a PPO, and so PPO stands for "Preferred Provider Organization."  It actually allows you flexibility of choice to your own doctors, your own hospitals, and your own specialists.  So instead of …  When you have a PPO, you don't have, you don't necessarily have a list that you have to follow to go to a specific doctor, make sure they're in the network, and things like that.

So the HMOs are a little bit more restricting, right?  Those are the ones that gives you a list.  The PPO is …  It, it allows you to prefer your own doctors --

MS. CARSON:  Oh.

HALEY:  -- with, with …  Yeah, with no limitations.  So that's what you would have, actually. It's, it's a PPO, and there's --

█████ undercover call

Page 16

MS. CARSON:  So I could see any doctor?

HALEY:  Any doctor, any hospital, any specialist in the United States.

MS. CARSON:  Oh, good.

HALEY:  It's considered a nationwide network, as well.

MS. CARSON:  Okay.  Great.  Great.  Okay.

HALEY:  Mm-hmm.

And then you …  There's no referrals, so, which is better in your case.  So, like, if let's say you went to your primary doctor.  You can go as needed to a specialist.  You don't have to get a referral to see your specialist, which is good.

MS. CARSON:  Oh, okay.  That is good.  Okay.

HALEY:  You're also going to get a prescription card with the plan.  All of your prescriptions are sent to a Prescription Assistance Division, and it's a program where your generic medications are actually covered at a high 96% coverage, so that's really good.  That's pretty much what you had, probably had before.  So with this insurance, it does reduce your medications.  I would

**Carson Attachment V, Page 16 of 65**

█████ undercover call

Page 17

say they're going to be around $4.00 to $15.00.

MS. CARSON:  Oh, wow, and you did say in the event I do need diabetes medication, that would be covered?

HALEY:  That would be covered, yes.

MS. CARSON:  Okay.

HALEY:  Now, for diabetes medication, it's considered most likely a high-level medication.  It's a high-tier medication.  I want to say those …  The brand …  Anything that's brand-name and it's not generic is going to be around a $30.00 copay, but still that's not bad --

MS. CARSON:  Okay.  Okay.

HALEY:  -- because that medication could be …  Yeah.  I mean, that, that …  Those medications are in the high-thousands, $1500.00 easy --

MS. CARSON:  Oh, jeez.  Okay.

HALEY:  -- but, yeah, you will only have to pay the $30.00 copay for that.

MS. CARSON:  Okay.  Okay.  Okay.  That's good news.  Okay.

HALEY:  Yes.

█████████ undercover call

Page 18

Now, at your primary care visits you will see a $25.00 copay --

MS. CARSON:  Oh, wow.  Okay.

HALEY:  -- which is really good.  So they cover 100% of your screenings.  If you need to go get your blood work drawn, if you need to get any sort of labs, get a physical …  So you actually don't pay anything for those visits, so any one of those things if you ever need it, we call it "wellness," like an annual, you know, check-up or blood work and things that are, like, routine, those wellness visits are 100% $0.00 to you.  You don't pay any copay on that, so, which is good.

MS. CARSON:  Oh, wow.  Okay.  That's good.  Okay.

HALEY:  Yeah, and then anything, anything else is only $25.00 at your primary doctor.

MS. CARSON:  And that's …  Can I see them anytime?  Is that only so many visits?  Is that … Because, again (cross talk) --

HALEY:  Mm-hmm.  Anytime.

MS. CARSON:  Anytime.  Okay.

██████████ undercover call

Page 19

HALEY:  Yes.

MS. CARSON:  Great.  Great, great, great.

HALEY:  Mm-hmm.

Now, for a specialist …  So in this case if you need to go to a diabetes specialist, you are covered.  That would only be a $50.00 copay --

MS. CARSON:  Okay.  Okay.

HALEY:  -- and urgent care is also $50.00, as well.

MS. CARSON:  Okay, like, urgent …  Gotcha.  Okay.

What about, like, hospital visits - God forbid - but if I needed to, I don't know --

HALEY:  Yeah.

MS. CARSON:  -- break a leg, break a bone --

HALEY:  Emergency room …  Absolutely.  So emergency room I believe is only $100.00 copay, but you have a zero deductible, so …  Which is amazing.  So what that means is with insurance they have a deductible yearly, and, and basically that's …  It's kind of like …  I'll compare it really quick, ██████ to, like, your car insurance that you pay every month.

**Carson Attachment V, Page 19 of 65**

███████ undercover call

Page 20

So in the event that you get into, like, God forbid any accident, right, even though you pay monthly for your car insurance, you still have what they call an "out-of-pocket" that you have to meet at the hospital. Let's say it's $1,000.00, right?

MS. CARSON:  Oh, yes.  Gotcha.  Okay.

HALEY:  You would reach the $1,000.00, and then they cover everything else pertaining to what you get done.

So with this plan, it's the same way, but the, you qualify for a no-deductible policy, so we call it "first dollar coverage."  So basically you only have your copay that you pay your doctors and the medications that you pay (cross talk) --

MS. CARSON:  Oh, wow.  This sounds like --

HALEY:  Yeah.

MS. CARSON:  -- an amazing plan.  This is better than what I had with Blue Cross Blue Shield.

HALEY:  Yeah, no, I, I'm telling you it's …  They're …  Right now they're, like, the number one right now, in the state just so you know.  They are number one right now.  These are --

undercover call

Page 21

MS. CARSON:  This Aetna plan?  Wow.

HALEY:  Yeah, the Aetna plan is, like, number one.  All the other carriers …  I would say Blue Cross is, like, is a top five, but it's not, it's not, like, the, the top, at the top.  It's, like, at the bottom because their premiums are just unaffordable, you know?

MS. CARSON:  Right.

HALEY:  Things are getting more expensive, and, yeah.  Yeah.  So …

Now, the only thing is it does …  So we would have to ask you some questions to get you initially …  There's an approval process.  Approval takes maybe five minutes --

MS. CARSON:  Oh, okay.

HALEY:  -- to find out if you're approved, and then if you are approved, then I could actually do what's called a "next-day coverage," which means you don't have to wait until the first of the month to get it starting.  I might be able to get it starting next-day.

MS. CARSON:  Oh, wow.  Okay.  Okay.  And then

**Carson Attachment V, Page 21 of 65**

███████ undercover call

Page 22

it … Go ahead. I'm sorry.

HALEY: Now, the dental … So really quick. So this, the $295.00 a month is for everything, it covers everything that we just went over with healthcare. Dental is something that is always going to be an add-on. Just like your job, how they, you know, they ask you do you want dental, do you want vision. It's considered an add-on. So we can add it on and I can tell you what it would be if you like.

MS. CARSON: Sure. Sure. Please. Yeah, and then I can see.

HALEY: Yeah, and then you tell me what would be best. You know, it's, it's up to you.

So if we do dental, I don't have any discount dentals. Basically if you've ever had a dental plan where they don't cover very much, right, and you call it a "discount plan" because it's, like, a … It only gives you, like, 50% savings on your visit. I don't have that. I actually have a better option available, and it's 100% for the, the exam, the cleaning. It's a little bit more a month, it's about $89.00 a month, but then that would bring you at $385.00 a month for

**Carson Attachment V, Page 22 of 65**

██████████ undercover call

Page 23

total, for your healthcare and your dental insurance together.

MS. CARSON:  Oh, wow.

HALEY:  $385.00.  Yeah.

MS. CARSON:  And that would be …  And you said the dental was no deductibles …  I mean, 100%?

HALEY:  Yeah, I have more I need to tell you. So it's a no-deductible for the year.  So, again, you don't have a deductible.  When you go in for your exams, your x-rays and your cleanings are free, so you get that every six months for free.

MS. CARSON:  Oh, wow, because I know that's incredibly expensive --

HALEY:  Yeah.

MS. CARSON:  -- and is that the same thing? Can I go to any dentist or --

HALEY:  Any dentist.  Mm-hmm.

MS. CARSON:  Okay.

HALEY:  Any dentist, yeah.  It's a PPO. It's, it's an open-access plan.

MS. CARSON:  Okay, and then what if I needed, I don't know, a root canal or cavities, things like

**Carson Attachment V, Page 23 of 65**

███████ undercover call

Page 24

that filled?

HALEY: Mm-hmm. Yep. So the ... So cavity fillings, extractions, and basic services, those actually are covered at 80%, which is really good, and then if you needed any root canals ... So root canals, crowns, implants, and believe it or not, implants and dentures are covered, as well, but you are looking at 50% for those, which is still not bad. I mean, that's, that's actually ... Class 3 services are ... A lot of plans don't cover those. So, so, yeah, I mean, that would be included with this plan.

MS. CARSON: Okay, okay, and now is this something ... Can I add it later?

HALEY: Absolutely. Yes. So you don't necessarily have to get it right away. This plan ... I want to go over something really quick. So what I did notice is this plan is actually a, it's a customizable plan. So, basically, it's short, it's considered short-term, but it's month-to-month, so basically if you ever needed to let's say drop this coverage at any time, you have the freedom of doing so because there's no, like, a contract or anything, it's considered

**Carson Attachment V, Page 24 of 65**

██████████ undercover call

Page 25

month-to-month --

MS. CARSON:  Okay.

HALEY:  -- so that means that you can, you can, you can always add things, you can add dental later, and you can remove things, as well, if you need to.

MS. CARSON:  Okay.  Okay, because I'm just … I mean, not …  I know that sounds like a great plan, but my budget is right about $300.00 and I'm just …  I may need to add that later if I …  I'm really more concerned with the health insurance at this point (inaudible).

HALEY:  Absolutely, and, and so, yes, and, and so you can definitely add it later, █████ if, if you would like.  So you want to just do the health for now and, and just do the, the full coverage?

MS. CARSON:  Yes.  Yes.  So …  And …  So the health insurance then for the month is …  Because you said it's $295.00?

HALEY:  Yep (cross talk) …  Yep.  So the, the total monthly - and this would cover you for medications, doctors, everything we, we went over - so

████████ undercover call

Page 26

your monthly total would be $295.00 month-to-month.

MS. CARSON: Okay. Okay. Okay, and, and I know you said this was the best option because the Marketplace, I think you said Marketplace … I'm sorry, I was trying to take some notes --

HALEY: Mm-hmm.

MS. CARSON: -- but I know you gave me a ton of information, and I'm so grateful for that. Is … Can you send it to me in an e-mail, as well, so I can have it --

HALEY: So … Yeah. So, so basically … So remember we do need to get you approved. So, so there's … The carriers, they don't --

MS. CARSON: That's right. That's right.

HALEY: -- they don't … Yeah. We have to make sure that you are approved first before … You know, I, I cannot unfortunately send anything because of the fact that we are also outside of open enrollment, so basically what you would get today, when you sign up today, you get your e-mail with everything, but that, that comes from the insurance company directly. It wouldn't come from an agent just

undercover call

Page 27

because we don't have that ability.

MS. CARSON:  I got you.  So it'll come from the insurance company?  So from Aetna I'll get the documents --

HALEY:  You'll get everything --

MS. CARSON:  -- everything that will explain everything that I need?

HALEY:  -- yeah.  You get your --

MS. CARSON:  Okay.  Okay.

HALEY:  -- digital ID number, your member ID, your digital insurance card, and then you get also a welcome packet in the mail, but it usually takes about a week.

MS. CARSON:  Okay.  Okay.  Okay.  All right, and …  Okay.  Yep.  Let's …  I think …  Yeah, let's do it.

HALEY:  Okay (cross talk) --

MS. CARSON:  Well, and I guess that …  Oh, go ahead.  I'm sorry.  Go ahead.

HALEY:  Oh, no, no, you had a question.  I, I was just going to move on to your medical questions just so we can see …  Again, I don't …  You know, I, I

█████████ undercover call

Page 28

want to make sure you're approved --

MS. CARSON:  Okay.

HALEY:  -- if you want to …  You know, there is an approval here, but go ahead, you had a question for me?

MS. CARSON:  Well, I'm just, like …  So what if I since I can't see …  I mean, the plan sounds amazing.  What if I don't like it?  Can I, can I cancel it?  Can I switch plans?  Can I get a refund?

HALEY:  Yeah.

MS. CARSON:  How does that all work?

HALEY:  Absolutely.  Yeah.  So with …  So …  Exactly.  So typically …  So when you get, and I know this is your first time getting insurance outside of your job.  So --

MS. CARSON:  Right.

HALEY:  -- I completely understand your question.  Now …  Absolutely.  So whenever you get a plan outside of your employer, you have what's called a "forty-five-day free-look period."  It's actually …  They …  The insurance would like you to use the insurance to see if it's to your liking, and if it's

**Carson Attachment V, Page 28 of 65**

█████████ undercover call

Page 29

not for whatever reason, if it's, you want to change it or cancel it, you actually have that revisionary period to do so, and it's a money-back guarantee.

MS. CARSON:  Oh, wow.  Okay.  Okay.  That, that is a piece of mind because I'm …  I mean, I know $300.00 doesn't sound like a lot, but it is a lot, so I just want to make sure --

HALEY:  Oh, it is.  Yeah.  Absolutely.  Absolutely.

MS. CARSON:  -- so that I can if it isn't what I think or …  Okay.

HALEY:  Yep.

MS. CARSON:  Okay.  All right.  Thank you so much for your patience.  I appreciate that.

HALEY:  Absolutely.  So would you like to, ███████ go ahead and see if we can get you approved to the, to, for the policy?

MS. CARSON:  Yes, yes, and, and you said that --

HALEY:  Okay.

MS. CARSON:  -- this approval, that's what's needed because --

**Carson Attachment V, Page 29 of 65**

████████ undercover call

Page 30

HALEY:  Yeah.

MS. CARSON:  -- of my income, or that's why it's so much cheaper than COBRA or, and my Blue Cross plan and even the, the, the government ones?

HALEY:  Yes, because we have to go through a medical approval.

MS. CARSON:  Okay.

HALEY:  That's right.  So, yes, absolutely.

MS. CARSON:  Okay.

HALEY:  So …  Now, these questions, I don't want you to be alarmed, ████████  These questions, they are based on the last five years, so they might, they may seem a little extreme, but they're just requiring you to answer them yes or no at the end of the question --

MS. CARSON:  Okay.

HALEY:  -- okay?  So here we go.

To the very best of your knowledge and belief, within the last five years, ████████ has there been any medical treatments or been medically diagnosed for any of the following conditions or symptoms: cancer, tumor, stroke, had a heart attack,

███████ undercover call

Page 31

had a heart surgery, or COPD diagnosis?

MS. CARSON:  No.

HALEY:  Okay.

To the best of your knowledge and belief, within the last five years has, has there been any medical treatment or diagnosis for Crohn's Disease, liver disease, or kidney disease?

MS. CARSON:  No.

HALEY:  Okay, and, lastly, to the best of your knowledge and belief, within the last five years has there been any medical treatment by any physician or a medical practitioner for AIDS or HIV?

MS. CARSON:  No.

HALEY:  Okay.  Okay.

Now, we're going to go ahead and attach those medical questions to the application, and then while we're waiting on that, we will just complete the primary information here.

And, ███████ just really quick, for your insurance application, do you have a middle initial or just your first and last name?

MS. CARSON:  My --

**Carson Attachment V, Page 31 of 65**

███████ undercover call

Page 32

HALEY:  You did say you do, right?  J?  Is it J?

MS. CARSON:  Mm-hmm.  J.  Yes.  Yes.  Good job.  Good memory.

HALEY:  Yep.  I remember that ...  Yes, yes, I remember that from your e-mail, and then for mailing, of course, so mailing, primary mailing address, and this is just for us to mail you your physical welcome packet.

MS. CARSON:  Okay, because I have a mailbox separate from my home address.  So my mail goes to ███ ████████████████████████ and it's ██████████████████████ in-████████85, and that's in ███████████ █████████, ████████

HALEY:  (Cross talk) ...  Okay, ████████ and then just for verification I'm going to read that back to you if that's okay, so here we go.

So your mailing ...  Mailing is different.  So for mailing is going to be ████████████████████████, and that's █████████████████████████████ --

MS. CARSON:  Correct.

HALEY:  -- and the zip code on that is ████████

MS. CARSON:  That is correct, yes.

**Carson Attachment V, Page 32 of 65**

█████ undercover call

Page 33

HALEY:  Okay.  Perfect.  Thank you so much.

MS. CARSON:  So are these plans, is it just because of my, the health-based because of the questions that you asked, is that why this plan is so cheap and so much cheaper than --

HALEY:  So this plan … Well, no.  So remember this plan (inaudible) because I can tell you directly how much an individual would pay without savings, so I can tell you how much this plan is. Give me one second here.

MS. CARSON:  I guess I'm just wanting to make sure I'm not going to see, like, a huge increase in a, you know, in a month, six months, a year, that sort of thing.

HALEY:  Yeah.  No.  Absolutely.  So … Well, remember, anything that's state-issued … This is state-issued --

MS. CARSON:  Okay.

HALEY:  -- so it, it … Yeah.  State-issued plans, they are guaranteeing your monthly cost.  As long as you pay monthly, it's guaranteed, not only your benefits, but your premiums, as well, is

**Carson Attachment V, Page 33 of 65**

███████ undercover call

Page 34

guaranteed to you.  The only time it'll change is if you call us to say, "Hey, I want to add dental on the plan," but you would have to authorize that, and then your insurance would increase back to, remember, I think it was, like, three, three-something a month.

MS. CARSON:  Three … Yeah, three … Like, like, eighty-something more.  Okay, got it --

HALEY:  Uh-huh.  Yeah.

MS. CARSON:  -- and you said I can add that any time, so I could call --

HALEY:  Yes.

MS. CARSON:  -- in a month or so and --

HALEY:  Mm-hmm.

MS. CARSON:  Okay.  So I can just kind of see --

HALEY:  Yes.

MS. CARSON:  Okay.  Perfect.  Perfect.

HALEY:  Yeah.  Yeah.

So, like, this plan I'm looking here is typically around $625.00 a month.

MS. CARSON:  Oh, wow.

HALEY:  With your savings … So, actually …

**Carson Attachment V, Page 34 of 65**

████████ undercover call

Page 35

Yeah.  So if we are to get the approval today, that, that would be $295.97, as savings.

MS. CARSON:  Okay.  Oh, wow.

HALEY:  That's your monthly cost.  Yeah.

MS. CARSON:  Wow.

HALEY:  Mm-hmm.

MS. CARSON:  Okay.  That's great.  Thank you.  Okay.

HALEY:  You're welcome.

All right, and then for …  What is your approximate height and weight?

MS. CARSON:  About 5'7 and 145.

HALEY:  Okay.  All right.

All right, and then if you can just please confirm, ████ just the last four of your social?

MS. CARSON:  I am …  I'm not really comfortable giving that out.  Can, can I sign up without giving my Social?

HALEY:  Oh, no, you don't have to give the whole Social, but it does require the, just the last four with health insurance.

MS. CARSON:  Okay.  Okay.  8767.

**Carson Attachment V, Page 35 of 65**

███████ undercover call

Page 36

HALEY: Okay. Thank you. All right.

Now, for … Perfect, and then for the e-mail address, I just want … If you can, just go ahead and confirm that for me one more time. You're going to receive welcome e-mails, as well.

MS. CARSON: Okay. Right now? Should I … Do I need to log in or no? Just that something --

HALEY: Oh, no, no. Just, just confirm it for me so I can confirm that I have it correct. Yes. Mm-hmm (cross talk) --

MS. CARSON: Oh, gotcha. Gotcha. So it's my first name, ███████ ████████████████████, ████████████████@outlook.com.

HALEY: Perfect. All right, I have that here.

Well, also being that this is a, this is a plan that's considered … You're paying monthly, so it's a month-to-month. With this plan, yes, it guarantees your benefits and your monthly cost. So if let's say you decided on keeping this, you know, for a few years or a few months, remember that your price is guaranteed. So unlike income, income-based plans,

**Carson Attachment V, Page 36 of 65**

█████████ undercover call

Page 37

they can change based on your income or based on …

You know, every year insurance does go up, right?  But with going based on the state …  Anything that's state, it's going to be a fixed premium.  So even let's say if your job --

MS. CARSON:  Oh, wow.

HALEY:  Yeah.  If your job says, "Hey, your …  You know, your income now is X amount."  Let's just say it went up to $45 or $50,000.00.  That will never affect your monthly cost for your insurance, which is good.

MS. CARSON:  Oh, you're kidding.

HALEY:  Yeah.

MS. CARSON:  So this will always stay the $295.00?  Is --

HALEY:  It will stay the $295.00, but, remember, once you turn sixty-five I believe you go on your Red White and Blue, you obviously have a lot of time, but, yes, once you get onto Medicare, then, then it would, then you would have to go to Medicare, but until then, yes.  I've actually had members that have had this policy for, like, five, six years-plus --

████████ undercover call

Page 38

MS. CARSON:  Oh, wow.  Okay.

HALEY:  -- and it stays the same … Yeah, it stays the same cost.

MS. CARSON:  Okay.

HALEY:  Mm-hmm.

MS. CARSON:  Okay.

HALEY:  And then also keep in mind, ██████ like, if your, if your employer …  I know you mentioned that you do have a new job right now.  If they offer you benefits and you want to go with that, remember that you can cancel this insurance.  There's no, like, you know, penalty if you do decide to cancel.

MS. CARSON:  Okay, great, and, and no issues to cancel and get a refund?  Because you mentioned there's that "free-look" period, too --

HALEY:  A forty-five day … Right.

MS. CARSON:  Okay.

HALEY:  Right.  Yeah.  You always have that legally with the state … Any policy, any health insurance that gives you a provisionary period, and that pre-look period is the forty, the first

**Carson Attachment V, Page 38 of 65**

■■■■■ undercover call

Page 39

forty-five days.

MS. CARSON:  Okay.  So I don't have to pay for forty-five days or --

HALEY:  Nope.  No, no.  So, remember, so you …  Today when your, when we do your payment, your first month does come out today.

MS. CARSON:  Okay.  Okay.

HALEY:  However, what I'm saying is you do have the forty-five days.  They, they actually want you to use your benefits, see if it's something that's to your liking, of course, and, and if for whatever reason if you wanted, you know, had a change of mind or anything like that, remember you do have that, that forty-five-day period.

MS. CARSON:  Okay.  Okay.  Got it.  Got it.

HALEY:  Mm-hmm.

MS. CARSON:  Got it.

HALEY:  Now, now, the, the first month you will see your breakdown.  So once they set up your payment here shortly, you're going to, I'm going to send you an, an enrollment link.  We'll just have you do a signature.  So it's actually going to show you a

**Carson Attachment V, Page 39 of 65**

██████ undercover call

Page 40

quick breakdown of your … It's your payment monthly, and then it will show you that the state does have a one-time enrollment. So in, in the state of Illinois they do have a one-time enrollment. It's … Normally enrollment … For 2026 it looks like it's $100.00. I'm going to work on getting that reduced for you. I do want to help you out today as your agent. Let me see if I can get it reduced here.

MS. CARSON: Oh, that would be great. Thank you.

HALEY: Of course.

MS. CARSON: And you said it's an enrollment fee and --

HALEY: Enrollment. Yeah. So let me see here … Every state has their own enrollment, which is a one-time enrollment - typically it's added on the first month - and actually I got it reduced here to … It looks like the statement above is $50.00, so I was able to get that reduced to $50.00.

MS. CARSON: Oh, great. Okay.

HALEY: Now … Yes. Any policy that has this, like, month-to-month like this, it typically has

**Carson Attachment V, Page 40 of 65**

███████ undercover call

Page 41

an enrollment.

MS. CARSON:  And so my …  This plan is month-to-month, too?  I'm sorry, I thought just the dental was.  So this is month-to-month, too, so I can cancel …  What?  I …  Yes, I know you said I can cancel.

HALEY:  The whole policy is month-to-month. Yeah.

MS. CARSON:  Okay.

HALEY:  The whole policy.

MS. CARSON:  Okay, and so you said it's a, a fee …  You got it down to $50.00, so thank you so much for that.  Does that go to the state then to, like, fund these policies or what, what's the fee?

HALEY:  (Cross talk) …  Yes.  Correct.  Yeah. So it goes, it goes to the, to the state enrollment. So because right now you're, you're outside of enrollment period, ███████ it's outside of open enrollment, so they have an enrollment fee.

MS. CARSON:  Okay.  Okay.  When did enrollment end then?  This is so new to me.

HALEY:  So January 15th actually.  So they

**Carson Attachment V, Page 41 of 65**

██████████ undercover call

Page 42

extended it from December … It started back in November of 2025, November 1st. It's always the same, so November 1st, and then it went all the way to December 15th, and then we had an extension until January 15th. So, yeah, the deadline was on the 15th of this month.

MS. CARSON: Okay. Okay, but I can still enroll? That's not an issue? No problem with --

HALEY: Exactly.

MS. CARSON: Okay.

HALEY: Exactly. That's why, that's why they have that enrollment, enrollment fee on the first month. Mm-hmm.

MS. CARSON: Gotcha. Okay. So that … And I only have to pay that one time then and it goes to the state?

HALEY: Only one time.

MS. CARSON: Okay.

HALEY: Yeah.

MS. CARSON: Got it. Got it. Got it.

HALEY: Yeah. Yeah, it's not like an annual fee or anything like that. You'll never see that

**Carson Attachment V, Page 42 of 65**

██████████ undercover call

Page 43

again, okay?

MS. CARSON:  Okay.  Okay.  Got it.

HALEY:  Yeah.

MS. CARSON:  Sorry for all the questions. This is just so …  But you've been fabulous.

HALEY:  No, no (cross talk) mm-hmm.  Yeah. Absolutely.  Absolutely.

And so …  And then what I'm going to do is I am ready to set up …  I'm going to attach a card on-file, and then …  And you're not being charged. This is just to add onto the application, right?

MS. CARSON:  Okay.

HALEY:  So we need to attach a card on-file, and then after that I will have you do your enrollment application link, I'll, I'll walk you through that link, and then for the first month, do you want to go ahead and put a Visa, Mastercard, Discover, or American Express on the first month?

MS. CARSON:  I have to go get my card.  It's a Visa.  Let me get that.  Give me one sec.  Let me get that out real quick.

HALEY:  Sure.  Take your time.

**Carson Attachment V, Page 43 of 65**

Page 44

MS. CARSON:  And then while I'm getting that, so I know you said this is with Aetna, but you said it was Aetna something else?

HALEY:  Yeah.  So with insurance you have the carrier and then you have the network, so this is … Aetna pays the claims.  This is a First Health Network, First Health PPO.

MS. CARSON:  Okay.  So Aetna pays the claims? They're the insurance company?

HALEY:  Correct.  Mm-hmm.

MS. CARSON:  Okay.  Okay.  Got it.  Okay, I have my card.  I'm sorry.

HALEY:  All right, perfect, and then whenever you're ready, ████  At this time you are on a secured line.  You can start with the sixteen-digit card number, please.

MS. CARSON:  Okay.  It's ██████████

HALEY:  Perfect, and then the expiration date?

MS. CARSON:  It is ██████.

HALEY:  All right, and then just the three digits on the back, please.

**Carson Attachment V, Page 44 of 65**

███████████ undercover call

Page 45

MS. CARSON:  ███.

HALEY:  And then just for verification I'm going to read the card back to you, ██████ and just let me know if this all correct, please.

MS. CARSON:  Okay.

HALEY:  So your card, it will be, we'll be using on the first payment, it will be a Visa card, and that's going to be ██████████████.

MS. CARSON:  That's correct.

HALEY:  Wonderful, and then on the card, ██████ does your middle initial appear or will it just be ████████.

MS. CARSON:  Just ██████████.

HALEY:  Okay, and I know you mentioned that …  Billing.  So for the billing address on the card, will that be the same billing address that you gave me earlier or is it different?

MS. CARSON:  Yes.  Yes.

HALEY:  Perfect.  It's the same.  Okay.

MS. CARSON:  Same address.  Yes.  I'm sorry.

HALEY:  (Cross talk) --

MS. CARSON:  And then the charge …  So just

██████████ undercover call

Page 46

so I know, what's, how much is the charge going to be for then today?

HALEY:  Yeah, absolutely.  So the total today, and this is, including your whole month of coverage with the enrollment fee, is $345.97 --

MS. CARSON:  $345.97.  Okay.

HALEY:  -- and then every month following it will reflect the $295.97, and you'll see, actually see that here in just a moment.  I'm going to send you a breakdown here.

MS. CARSON:  Oh, okay.  Okay.

HALEY:  Mm-hmm.

MS. CARSON:  You're going to e-mail it to me or how are you going to send it to me?

HALEY:  Yeah, I'm going to have …  I'm actually going to walk you through the self-by-step.

MS. CARSON:  Okay.

HALEY:  So it's a quick verification, and you're going to receive a SMS text message --

MS. CARSON:  Oh, gotcha.

HALEY:  -- with the enrollment link, and then I'll walk you through that here.  Give me one moment.

**Carson Attachment V, Page 46 of 65**

█████████ undercover call

Page 47

Okay, Box …  I'm just putting in the, the address here.  121 …  We want to make sure you receive your insurance card and your welcome packet.

MS. CARSON:  Yes, and, and I know, I think at one point you said this could be next-day coverage or will it be next month or what with the fee?  When will this start?

HALEY:  Yeah.  Yeah.  So the …  So they did approve you for next-day coverage --

MS. CARSON:  Oh, fabulous.

HALEY:  -- is, is that okay?

MS. CARSON:  Yeah, that's wonderful.  So that'll start tomorrow then?

HALEY:  Yes.  Now, typically with any insurance they always suggest that you wait for any, like, new appointments.  They, they like to have you wait about fifteen to twenty-five days to make a new appointment.

However, if you already have an existing appointment, you can still make a new appointment, right?  This is just a suggestion, but with any insurance, emergency room starts right away, so I did

**Carson Attachment V, Page 47 of 65**

█████████ undercover call

Page 48

want to let you know emergency room starts midnight tonight, and then prescription, doctor's visits, everything starts within twenty-four hours.

MS. CARSON:  Okay.

HALEY:  We always say if you, if you have, like, an existing appointment, you can go to that right away, but if, if let's say you absolutely have to make a new appointment, you can also do that, as well.

MS. CARSON:  Okay, but if ...  So are, are you going to send me then my card and stuff like --

HALEY:  (Cross talk) --

MS. CARSON:  I know you're going to mail it, but will it come another way, too?

HALEY:  -- mm-hmm.  Yes.  Yep.  You're also going to get a member portal, so very much like what you're used to having.  You, you have a member portal in your e-mail, and once you create your own password and things like that, you'll actually have access to your digital card, as well --

MS. CARSON:  Oh.  Okay, great.  So, mail is so slow.

**Carson Attachment V, Page 48 of 65**

██████ undercover call

Page 49

HALEY:  -- so you will get that one in twenty-four hours.

MS. CARSON:  Okay.

HALEY:  Mm-hmm.

MS. CARSON:  Great.  Okay.

HALEY:  Yeah.

MS. CARSON:  Okay.

HALEY:  Yeah, they make everything kind of, you know … Technology has taken over.

MS. CARSON:  Yes, yes, and we're, we're always like, "Gimme, gimme, gimme," so --

HALEY:  But it's good, you know, because, I mean, you know, in the event, like, you, you know, you need to use your insurance, you need to just … Sometimes … Like, I'll give you … Today I'm going to give you your insurance number --

MS. CARSON:  Oh, okay.

HALEY:  -- in just a moment, and so … But sometimes, like, like, the hospital or, you know, doctors, they need to see a card, so that's why I always tell my members, like, "You're literally going to receive a digital card within the next twenty-four

**Carson Attachment V, Page 49 of 65**

██████████ undercover call

Page 50

hours," which is amazing.

MS. CARSON: Okay. Okay. Okay.

HALEY: Yeah.

Now, you should be receiving a text message verification. For this part, ████, I do encourage you to please go ahead and place me on speakerphone just so I can walk you through that process here. So here we go.

MS. CARSON: Okay.

HALEY: There we go. So it should be coming through right now. It will come in and it'll say, "To complete your health enrollment application" --

MS. CARSON: Oh, yep.

HALEY: -- "you must click on the link." So perfect. Let me know once you, it successfully loads for you.

MS. CARSON: Okay. So … Okay. So it says, "To enroll American Collective" --

HALEY: You're going to click the enrollment link. Yes. Mm-hmm.

MS. CARSON: Okay. Okay, and American Collective, that's not the insurance company, right?

**Carson Attachment V, Page 50 of 65**

████ undercover call

Page 51

HALEY: No, no, no. That is … So that's actually … You go through underwriting, so they're responsible to, for the approval here today.

MS. CARSON: Oh, okay. Okay. So they're going to approve me. Oh, gotcha. Okay. Okay.

HALEY: And then as soon as it comes up on the next page, it's going to have you … It's going to say … There we go. I think it just loaded for you. It'll say, "Please verify the primary applicant's date of birth."

MS. CARSON: Okay.

HALEY: Now, this part is important. You'll just … You'll enter your date of birth normally, just make sure to put a zero before the two, and then the full year after that.

MS. CARSON: Okay.

HALEY: Let me know if you need my help, and then once you are able to type that in, it'll have you click "submit."

MS. CARSON: "Done?"

HALEY: Or "done." Mm-hmm. Yes.

MS. CARSON: Okay. Okay.

**Carson Attachment V, Page 51 of 65**

undercover call

Page 52

HALEY:  And then on the next page after, you should see it says, "Program Summary Breakdown."  So it just breaks it down.  The safeguard is just part of your hospital, so that should total out …  It likes to break it down like a little itemization receipt, but that's, the total at the bottom is just your monthly cost and then plus the one-time enrollment fee, so --

MS. CARSON:  And, and I'm sorry, I missed it, Haley, as I was looking through there, what did you say the safeguard was?  I'm so sorry.

HALEY:  That's okay.  So you know how when you sign up through your employer they like to break down, like, your benefits, like, almost like a, a breakdown receipt?  So the safeguard is your hospitalization.  It just likes to …  And the top, the unity is, like, your doctors' visits and prescriptions, and the safeguard is your hospital and your critical illness.

MS. CARSON:  Oh, okay.  I see at the top then …  Okay.  So unity, that's my, my normal care, and then safeguard, that's my emergent care?

HALEY:  Emergent care, exactly.  So it just

**Carson Attachment V, Page 52 of 65**

██████ undercover call

Page 53

breaks it down for you.

MS. CARSON:  Okay.  Got it, got it, and then I see the enrollment fee for the state.  Got it, okay, and thank you again for discounting that for me, and then --

HALEY:  Absolutely.

MS. CARSON:  -- and then --

HALEY:  And then you'll click "I accept."

MS. CARSON:  Okay.  Got it.  Okay.

HALEY:  And then on this screen is just a quick …  It's going to be a three little tiny "I agree and acknowledge boxes."  So you'll see that each …  And you're going to receive it all today, as well.  You get everything that you're signing in, in your e-mail, but the acknowledgments are acknowledging …

The first box is acknowledging the, the payment setup.  So we did successfully set up your payment as autopay, and then you can always unenroll in that, as well.

The second payment, I mean, the second acknowledge is going to be your joinder agreement I

**Carson Attachment V, Page 53 of 65**

Page 54

believe.  That's just acknowledging that you have your forty-five-day period and that you have, it's month-to-month.

MS. CARSON:  That's the joinder agreement? Okay. Got it.  Okay.

HALEY:  Yeah.  Yeah.  You're going to check each individual box.

MS. CARSON:  Okay.

HALEY:  The third box is just acknowledging that we went over all of the benefits today.

MS. CARSON:  Okay, and, and then it …  Okay, and it's got my documents.  Got it, okay, and then --

HALEY:  And then you'll click "next."

MS. CARSON:  "Next?"  Okay.

HALEY:  Mm-hmm.

Now, on this part it's a little tricky because we've, we've had an issue with the "Let Me Draw."  There should be another option for "use stylized scripts," and that should be highlighted or checked off for you already, ████.  So --

MS. CARSON:  Yep.  It is.

HALEY:  -- as, as long as that's checked …

**Carson Attachment V, Page 54 of 65**

███ █████undercover call

Page 55

Perfect.  You're going to go ahead and type your name using your keyboard.  So it should …  Let me know if it gives you some issues.  We've been working on the, troubleshooting the system here.

MS. CARSON:  Okay.  In this box I'm just typing my name then?

HALEY:  Perfect.  Yeah.  You're going to type your first and last name.  You can put your middle initial.  It, it's not required.

MS. CARSON:  Okay.  Okay.  Got it.

HALEY:  And then you'll actually see it beautifully typed out there at the bottom.

MS. CARSON:  Okay.

HALEY:  It, it, like, kind of stylizes it for you.  Did you …  Do you see that at the bottom?

MS. CARSON:  I do.  Okay.  That's neat.  Okay.

HALEY:  (Cross talk) okay.  Okay, and then you'll be able to click "submit."

MS. CARSON:  Okay.

HALEY:  You're going to click "submit application."

**Carson Attachment V, Page 55 of 65**

██████████ undercover call

Page 56

MS. CARSON:  Not "view."  Just hit "submit," right?

HALEY:  Yes.

MS. CARSON:  Okay.

HALEY:  That's right, and then it'll take you …  The last page is just confirming that I entered your mailing address --

MS. CARSON:  Oh, okay.

HALEY:  -- and as long as that looks good …  Actually, you don't have to check the box for the "billing is different."  Billing is the same --

MS. CARSON:  Yep.

HALEY:  -- so you just …  You, you click "submit application" once again, and then it's going to come up with a message.  Just wait one moment while we receive everything here.  And I believe now you should see it change.  It's going to come up with a "success" message.  Do you see it?

MS. CARSON:  Oh, I do.  Yes.  Okay.  Okay.

HALEY:  Okay.  Awesome.  So you can log out, ██████, and, congratulations, everything has been successfully approved, so congratulations on your

**Carson Attachment V, Page 56 of 65**

████████ undercover call

Page 57

policy.  It will begin tomorrow, January 22nd, and then I actually want to give you a few things.

MS. CARSON:  Okay.

HALEY:  If you want to, you can log out at this time, and I'm going to have you write down just a few things here for me.  Let me know when you're ready.

MS. CARSON:  Okay.  Okay, I am ready.  Go ahead.

HALEY:  All right.

So, ████  first and foremost, I do want to thank you so much for letting me kind of talk your ear off today.

MS. CARSON:  Oh my God, thank you so much for all of my questions, too.  I appreciate it.

HALEY:  Awww.  No, actually, it's my job.  I, I enjoy helping people and, and I'm, I'm glad I can simplify this process for you.

MS. CARSON:  Well, you did, because it's been a nightmare, and so thank you so much.

HALEY:  Awww.  No, you're welcome.  We always dread …  You know, we always dread doing things like

**Carson Attachment V, Page 57 of 65**

███████ undercover call

Page 58

this, but I'm glad I was able to make it somewhat

enjoyable here.

        MS. CARSON:  Yes.

        HALEY:  Now, let me give you a few things

just to write down before you leave me today.  So my

name is Haley.

        MS. CARSON:  Okay.

        HALEY:  I am your agent on-record.  That's

spelled H-A-L-E-Y.

        MS. CARSON:  Okay, great.

        HALEY:  And, █████, my …  Your …  I'm going

to give you a customer service number.

        MS. CARSON:  Okay.

        HALEY:  So for …  Because I'm in the

Enrollment Department, but you do have a Member

Services, and this is the number you call, this is

directly to your member account, and they can answer

all your member-related questions, as well.  So the

number is 888 --

        MS. CARSON:  Okay.

        HALEY:  -- 563, and then 2313.

        MS. CARSON:  Okay.  Are there specific hours

**Carson Attachment V, Page 58 of 65**

███████ undercover call

Page 59

for that or is that --

HALEY:  All right, and then I'll confirm that for … Yes.  Yes.  So the, the hours of operation are Monday through Friday.  Their best time is 10:00 A.M. to 5:00 P.M.

MS. CARSON:  Okay, great.

HALEY:  Mm-hmm.  Eastern Standard Time --

MS. CARSON:  Eastern.  Okay.

HALEY:  -- so it's Monday through Friday.

MS. CARSON:  Got it.  Okay.

HALEY:  And then I'm going to give you your member ID.  So …  And remember this is just for your records.  Everything is going to be mailed, electronically e-mailed, as well.  So your --

MS. CARSON:  Okay.

HALEY:  -- member ID is going to start with a capital-U --

MS. CARSON:  Okay.

HALEY:  -- and then ███████, and I'll just repeat it here.  So that's capital-U ███████.

MS. CARSON:  Okay, and can I repeat the customer service number just to make sure I got that

**Carson Attachment V, Page 59 of 65**

█████████ undercover call

Page 60

right, too?

HALEY:  Of course.

MS. CARSON:  888-563-2313?

HALEY:  That's right, yes.

MS. CARSON:  Okay, and then my insurance number: U-as-in-umbrella 485483?

HALEY:  That's right (cross talk) --

MS. CARSON:  Okay.  Great.

HALEY:  And then let me also just confirm here.  So your mail, your ███████████████ (cross talk) --

MS. CARSON:  Correct, and it doesn't need "box."

HALEY:  Okay.

MS. CARSON:  I mean, it could just have the number, but it is a box, so --

HALEY:  Okay, beautiful, and then the, and then the address is ████████████████, and that zip code is █████.

MS. CARSON:  Correct.  Yep.

HALEY:  Got it.  Okay.  Awesome.

Well, typically for business days, right,

■ ■ undercover call

Page 61

because they typically mail it, like, the following business day, but it could take anywhere from seven-to-ten business days.  Sometimes fourteen business days.  I've had members get it, like, within ten days usually, but for your physical card you're going to get, like, a hard copy in the mail --

MS. CARSON:  Okay.

HALEY:  -- but you're going to get a prescription card and a medical card --

MS. CARSON:  Okay.

HALEY:  -- so just, just look out for that, and then let me just make sure you have …  Let's see …  You have your member ID …  Yeah, and then one more thing, as well.  So remember today we did the first initial payment for your first month.  It did come out today.

MS. CARSON:  Okay.

HALEY:  So you're taken care of up until …  Let's see here …  So you're covered until …  It'll be coming out on the 21st of each month.

MS. CARSON:   Okay.  So February 21st will be my next payment.  Okay.  Okay, and then --

**Carson Attachment V, Page 61 of 65**

Page 62

HALEY:  If you want to just make a note for that.

MS. CARSON:  Yep, I sure will.  I'll put that in my (inaudible) for auto payments, and then since the documents will come, like, seven-to-ten days, business days or whatever --

HALEY:  Mm-hmm.

MS. CARSON:  -- but my …  You're going to send me a link to the portal --

HALEY:  Yes.

MS. CARSON:  -- and my insurance card will be in there --

HALEY:  Exactly.

MS. CARSON:  -- and my insurance plan?  Okay, great, and my prescription card and all that.  It …  I mean, I don't need it right now, but, okay, got it.

HALEY:  Yes, everything is sent to you … Yeah, everything is sent to you from Customer Service. So the American Collective is the company that is going to be responsible to send that out to you.  Just take a look in your e-mail.  I want to say it usually takes up to twenty-four hours, so just give it that

**Carson Attachment V, Page 62 of 65**

Page 63

twenty-four hours to get, and then your policy will start on tomorrow. Like, midnight tonight, but really you'll get all your digital cards. Just make sure to set up your own portal, and it will actually tell you how to do it in that, in that e-mail itself.

MS. CARSON: Okay. So I'll get e-mails from American Collective, and you said they --

HALEY: That's right.

MS. CARSON: -- they're the … What were they again? Because that's not the --

HALEY: So they're the underwriters --

MS. CARSON: The underwriters. Okay.

HALEY: -- so they are responsible for approving … Yes, for approving you. Mm-hmm.

MS. CARSON: Okay. Okay. Perfect. Perfect. Okay. Great.

HALEY: Okay. Awesome. Well, yeah, other than that, I mean, everything else is basically all set up and approved, so you're all set on my end, and, ████ is there any other questions? Anything else I can help you with today?

MS. CARSON: I don't think so at all, no.

**Carson Attachment V, Page 63 of 65**

████████ undercover call

Page 64

You have been so incredibly helpful, Haley.  I appreciate all of your time.

HALEY:  Awww, you're so welcome, and it has really been a pleasure again assisting you, ████  Best of luck with everything, and I hope you have a great rest of your day.

MS. CARSON:  Thank you so much.  You, as well.  Take care.

HALEY:  All right.  Thank you.  Bye-bye.

MS. CARSON:  Bye-bye.

The time is now 2:13 P.M. Central time, and that concludes my call to American Collective.

(End of recording.)

**Carson Attachment V, Page 64 of 65**

undercover call

Page 65

CERTIFICATE OF TRANSCRIBER

I, TIMOTHY ROBERT DUVAL, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Timothy Robert DuVal*

TIMOTHY ROBERT DUVAL

**Carson Attachment V, Page 65 of 65**

# Carson Attachment W

**From:** ███████████

**To:** Carson, Christine

**Subject:** Fw: American Collective - Enrollment Authorization

**Date:** Wednesday, January 21, 2026 2:36:15 PM

---

You don't often get email from ███████████████. Learn why this is important

---

**From:** American collective <partnerservices@americancollectivelp.com>

**Sent:** Wednesday, January 21, 2026 8:02 PM

**To:** ████████████████████████████████████████

**Subject:** American Collective - Enrollment Authorization

Hello ████████████,

With this email, you can complete the American Collective enrollment application process. Your representative has already entered your information in the American Collective Enrollment Portal. The final step is for you to review a summary of your program and authorize your enrollment application. To do so, click the link below and follow the instructions:

**CLICK HERE**

If you have any questions, please contact your representative. And thank you for your interest in our health plan. You're making a great choice!

Sincerely,
American Collective

---

**Carson Attachment W, Page 1 of 9**

American Collective LP



(866) 270-1554
partnerservices@americancollectivelp.com

**Carson Attachment W, Page 2 of 9**

**From:** ████████
**To:** Carson, Christine
**Subject:** Fw: American Collective - Partner Access
**Date:** Wednesday, January 21, 2026 2:34:33 PM

You don't often get email from ████████@outlook.com. Learn why this is important

**From:** American Collective <partnerservices@americancollectivelp.com>
**Sent:** Wednesday, January 21, 2026 8:07 PM
**To:** ████████████████████████████
**Cc:** membercc@americancollectivelp.com <membercc@americancollectivelp.com>
**Subject:** American Collective - Partner Access

Welcome ████████
Limited Partner ID: ████

Thank you for applying for health benefits coverage & becoming a plan participant through American Collective! Your personalized care journey begins here.

Please see the information below to get in contact with our Partner Services Team and/or your recruiter should you have any questions regarding the plan(s) you have agreed to enroll in today.

**Below is the provider search link for the First Health Network:**
https://providerlocator.firsthealth.com/home/index

Step 1: Click "Locate Provider".
Step 2: Next, "Select First Health network" and click "Start now".
Step 3: Select the provider type, ZIP or state and click on the "Search now" button.

**BE ON THE LOOKOUT**
You should receive your ID Cards in the mail within 10-14 business days.

You will also receive access details to the Partner Portal that is being setup for you. For questions, please call us or send us an email. Our third-party Partner Service team is available from 9:00 am - 6:00 pm Eastern Standard Time, Monday through Friday.

**IMPORTANT NOTICE**
All cancellations and refund request must be directed to the Partner Service team at the phone number/email below to ensure proper handling of your cancellation and/or refund.

**Carson Attachment W, Page 3 of 9**

American Collective LP



(866) 270-1554
partnerservices@americancollectivelp.com

| | |
|---|---|
| **From:** | ████████ |
| **To:** | Carson, Christine |
| **Subject:** | Fw: American Collective - Payment Receipt |
| **Date:** | Wednesday, January 21, 2026 2:34:21 PM |

You don't often get email from ████████ @outlook.com. Learn why this is important

**From:** American Collective <partnerservices@americancollectivelp.com>
**Sent:** Wednesday, January 21, 2026 8:07 PM
**To:** ████████████████████████
**Cc:** membercc@americancollectivelp.com <membercc@americancollectivelp.com>
**Subject:** American Collective - Payment Receipt

American Collective LP



Billing Department
650 Poydras Street, Suite 1400, PMB #6807,
New Orleans, LA 70130

Partner's Name: ████████████
████████████████

## Payment Receipt

| | |
|---|---|
| Date: | 01/21/2026 |
| Total Amount: | $345.97 |
| Transaction ID: | ████████ |

**Carson Attachment W, Page 5 of 9**

| Payment Method: | Visa 4xxxxxxxxxxxx0819 |
|---|---|

**Partner ID:** ████
**Coverage Period: 01/22/2026 - 02/21/2026**

| Plan Information & Breakdown | Total Billed Amount |
|---|---|
| Enrollment Fee | $50.00 |
| Unity 4 | $226.02 |
| Safeguard+ 3 | $69.95 |
| | $345.97 |

If you have inquiries regarding your coverage or benefits, we encourage you to reach out to our dedicated Partner Services Team. They are readily available to provide guidance and support, ensuring that you have a clear understanding of your benefits and coverage options. Our team is committed to assisting you every step of the way, addressing any questions or concerns you may have to ensure you make informed decisions about your health plan needs. Please don't hesitate to contact us at (866) 270-1554, we are here to help!



American Collective LP

**Next Premium Payment**

**Carson Attachment W, Page 6 of 9**

| Due Date: | 02/22/2026 |
|---|---|
| Amount Due: | $295.97 |
| Coverage Period: | 02/22/2026 - 03/21/2026 |
| Payment Method: | ███████████████ |

**Payment Reminders and Options**

Ensuring your timely payment is crucial to maintaining uninterrupted coverage with American Collective. It is essential to pay the full amount on or before the due date indicated at the top of your bill. Failure to do so, including late payments or partial payments, may result in the loss of your coverage. If the full amount is not received by the end of your grace period, your coverage may be cancelled due to nonpayment.

**New Payment Option: ACH Payments**

We are pleased to announce that we now accept ACH (Automated Clearing House) payments, which are widely recognized as the safest method for paying bills. ACH payments offer security and convenience, ensuring your payments are processed efficiently and securely.

**Important Information Regarding Past Due Amounts:**

If you apply for a new policy with us, any past due amounts owed within the last 12 months may need to be settled before your new coverage can commence.

**Payment Options:**

- **Autopay:** We are pleased to inform you that we accept ACH, as well as Visa, Mastercard, and American Express for premium payments. Should you choose to use any of these methods, you can rest assured that your transaction will be processed securely and efficiently.
- **Phone:** Contact our dedicated team at (866) 270-1554 for assistance with payments or to set up other payment arrangements.

Your prompt attention to these payment guidelines helps us continue to provide you with comprehensive coverage and support. Should you have any questions or require further assistance, please do not hesitate to reach out. We are committed to ensuring a seamless payment experience for you.

**Carson Attachment W, Page 7 of 9**

**From:**
**To:** Carson, Christine
**Subject:** Fw: American Collective Partner Portal
**Date:** Wednesday, January 21, 2026 2:35:02 PM

You don't often get email from ██████@outlook.com. **Learn why this is important**

**From:** American collective <partnerservices@americancollectivelp.com>
**Sent:** Wednesday, January 21, 2026 8:07 PM
**To:** ██████
**Subject:** American Collective Partner Portal

Welcome to American Collective! Your enrollment has been successfully completed. Now let's get started using your plan.

Get started by registering your partner portal – your personalized care journey begins here. Your partner portal is your central access point to manage your health plan —view digital ID cards, review your benefits, check co-pays and out-of-pocket maximums, search for providers, view claims, and more.

Your login credentials will be the email used upon enrollment and the temporary password listed below. Upon successful login, you will be prompted to update your password for continued access.

Partner Portal URL: **https://member.adv.americancollectivelp.com**

**PORTAL LOGIN CREDENTIALS**
Username: ██████@outlook.com
Temporary Password: **E10wUdRqGt***

We recommend you bookmark the page below for easy reference and quick access to your portal. However, should you have any questions contact our Partner Services Team at partnerservices@americancollectivelp.com.

**Carson Attachment W, Page 8 of 9**

American Collective LP



(866) 270-1554
partnerservices@americancollectivelp.com

# Carson Attachment
# X



**AMERICAN** Collective LP

Partner Services: 866-270-1554

**Name:** ▮▮▮▮▮▮▮▮
**Member ID:** ▮▮▮▮▮
**Group #: N/A**
**Unity 4**
**Dependent(s):**

Partner Out of Pocket
PCP: $25
Specialist: $50
Urgent Care: $100
Preventive Care: $0

Provider Network

First Health Network

PRINT    VIEW BACK OF CARD

**Carson Attachment X, Page 1 of 202**

>

# Eligibility

**Providers:** To confirm eligibility, verify benefits, or check the status of a claim:
American Collective Customer Service: 866-270-1554
**Partners:** To confirm eligibility, verify benefits, or check the status of a claim,
please call American Collective at 866-270-1554
Call 800-226-5116 or visit firsthealthlbp.com to find a First Health provider

## Claims Submission
**Please submit Medical Electronic Claims Using Payer ID# 29084**
**Or**

**Mail Claims To:**
**American Collective**
**P.O. Box 211475**
**Eagan, MN 55121-3075**

**American Collective Rx Discount**



the virtual care clinic
**Authorization #: 001 000 029**
**Bin: 610378**
**GRP: 218347**
**PCN: SC1**
**Customer Support: (888) 220-6650**
**member.myrevive.health**

For identification purposes only. Not a guarantee of coverage or payment.

PRINT    VIEW FRONT OF CARD

**Carson Attachment X, Page 2 of 202**

# MY TRANSACTIONS

| | Transaction ID | Transaction Date | Payment Method | Total Amount | Status |
|---|---|---|---|---|---|
| ⌄ | 11615094783 | January 21, 2026 | Credit Card | $345.97 | APPROVED |

| Protector Amount | Safeguard Amount | Dental Amount | Allstate Amount | Program Amount | Enrollment Fee |
|---|---|---|---|---|---|
| $0 | $69.95 | $0 | $0 | $226.02 | $50 |

**Carson Attachment X, Page 3 of 202**

# PROGRAM INFORMATION

| Summary | Eligible Services | Add-Ons | Enrolled Members |
|---|---|---|---|

## Safeguard

**Active**

Members Enrolled ████████████

Effective Date
**Jan, 22 2026**

Our Safeguard plans help members with their critical illness needs. These plans are optional add-on benefits at an additional monthly cost for you and are available for additional family members.

**MANAGE ADD-ONS**

**Carson Attachment X, Page 4 of 202**

# PROGRAM INFORMATION

| Summary | Eligible Services | Add-Ons | Enrolled Members |
|---|---|---|---|

| Benefit | Value |
|---|---|
| Benefit | Unity 4 |
| SICKNESS AND ACCIDENT - Max Visits Per Year | 4 |
| Primary Care Physician | $25 |
| Specialist | $50 |
| Urgent Care Center | $100 |
| Wellness | 100% |

**Carson Attachment X, Page 5 of 202**

# PROGRAM INFORMATION

| Summary | Eligible Services | Add-Ons | Enrolled Members |
|---------|-------------------|---------|------------------|



| Member Name | Member ID | Relationship | Birth Date | Birth Gender | Effective Date |
|-------------|-----------|--------------|------------|--------------|----------------|
| Adult 1 ███ | ███ | Self | Feb 17, 1978 | Female | Jan 22, 2026 |

**UPDATE HOUSEHOLD**

**Carson Attachment X, Page 6 of 202**

# AMERICAN COLLECTIVE, LP
# NEW LIMITED PARTNER JOINDER AGREEMENT

**THIS NEW LIMITED PARTNER JOINDER AGREEMENT** ("Agreement") is made and entered into effective for all purposes and in all respects on the date of execution indicated below by American Collective, LP, a Texas limited partnership ("American") and ▮▮▮▮▮▮▮▮ as New Active Limited Partner ("NALP") (collectively , the "parties").

**WHEREAS,** American was formed subject to that certain Limited Partnership Agreement dated July 16, 2025, among Shermar Moore, as the General Partner, and the limited partner(s) named therein (the "Partnership Agreement") (capitalized terms used and not otherwise defined herein have the meanings given them in the Partnership Agreement); and

**WHEREAS,** American desires to gift an Active Limited Partnership Interest in American to NALP; and

**WHEREAS,** NALP desires to accept a gift of an Active Limited Partnership Interest and become an Active Limited Partner of American subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions contained herein, the parties agree as follows:

## ARTICLE 1
## PURPOSE

The purpose of this Agreement is to establish the terms and conditions upon which American gives and NALP receives an Active Limited Partnership Interest in American, and to confirm that NALP adopts and agrees to all of the terms on the Partnership Agreement which is attached hereto as Exhibit A.

## ARTICLE 2
## ACKNOWLEDGEMENT OF THE NATURE OF ACQUIRING AN ACTIVE LIMITED PARTNERSHIP INTEREST

The parties hereby acknowledge that no money has been exchanged for the issuance of the Active Limited Partnership Interest hereunder by American to NALP; however, NALP has agreed to provide a minimum of five hundred (500) hours of work activity on the internet. This acquisition of the Active Limited Partnership Interest is conditioned upon and subject to the terms of both this Agreement and NALP's compliance with the terms of the Partnership Agreement, as may be amended from time to time.

## ARTICLE 3
## ACTIVE LIMITED PARTNERSHIP INTEREST

Page **1** of **21**

**Carson Attachment X, Page 7 of 202**

Subject to the terms and conditions of this Agreement and the Partnership Agreement, herein incorporated by reference and included as Exhibit A to this Agreement, American hereby gives to NALP an Active Limited Partnership Interest which is represented as a portion of a unit of American as described in Article XV of the Partnership Agreement. This Active Limited Partnership Interest entitles NALP to participate as a Limited Partner in American, with voting rights equal to NALP's Active Limited Partnership Interest in American.

## ARTICLE 4
## ADHERENCE TO PARTNERSHIP AGREEMENT

In accepting this Active Limited Partnership Interest, NALP hereby agrees (i) that NALP is a party to and bound by the Partnership Agreement, (ii) to take notice of, accept, and abide by the terms of the Partnership Agreement, and (iii) to execute and deliver such additional agreements, instruments, certificates, and documents as may be necessary, appropriate or convenient to reflect the foregoing matters and the election of American. NALP hereby acknowledges that they have had an opportunity to review all terms of the Partnership Agreement and to receive advice from their independent legal counsel. NALP accepts this gift of an Active Limited Partnership Interest freely and without reservation and fully supports the mission of American, its interest in adding new partners which may dilute NALP's own newly acquired interest/voting rights in American, and all provisions of the Partnership Agreement.

NALP specifically agrees to and understands the provisions of the Partnership Agreement related to NALP's status as a **Working Partner**, whereas NALP will assist in the collection, aggregation, and selling of its data to third parties for the financial benefit of the limited partnership. NALP also specifically agrees to and understands the data sold may not always be de-identified and that NALP's identity may be contained in the sold data.

## ARTICLE 5
## NOT SECURITIES

NALP acknowledges that, due to the nature of the acquisition of an Active Limited Partnership Interest and the structure of American, NALP's Active Limited Partnership Interest is not a security and is not subject to federal or state securities laws. Furthermore, based on the terms of the Partnership Agreement, NALP acknowledges that no interest in American is a security interest and that all interests in American are not subject to federal or state securities laws.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE LAWS OF ANY STATE. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE

**Carson Attachment X, Page 8 of 202**

GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## ARTICLE 6
## EFFECTS

In accordance with the Partnership Agreement, American shall amend the roster of Active Limited Partners to include NALP. To the extent the General Partner of American determines that it is in the best interest of American to certify its Partnership Interests, American may provide NALP with a certificate reflecting NALP's Limited Partnership Interest in American.

## ARTICLE 7
## PLANS AND TERMINATION/WITHDRAWAL

NALP understands that Limited Partnership has created an employee health benefit plan (the "Plan") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") which is only available to employees and working owners such as Active Limited Partners. NALP also understands that Limited Partnership may provide other benefits in the future which will be available to Active Limited Partners as may be decided from time to time by the General Partner.

NALP understands that it is in no way obligated to enroll in any Partnership sponsored benefit plan and that if he/she chooses to enroll in any benefit plan, NALP is free to withdraw from said benefit plan in accordance with the terms of the Plan without losing his/her status as an Active Limited Partner. NALP also understands that that if he/she ceases acting as a Working Partner, NALP's benefit plan, if any, may automatically continue coverage pursuant to the Consolidated Omnibus Budget Reconciliation Plan of 1986, as amended ("COBRA") without an active election, as may be decided from time to time by, and in the discretion of, the General Partner. NALP is free to withdraw from said benefit plan at any time.

To the extent NALP enrolls in any the Plan, NALP agrees that a portion of the monthly payment made for benefits under the Plan shall include an administrative fee to cover administrative expenses of the Plan. The amount of the administrative fees shall be determined by the General Partner, in his discretion, and may change from time to time.

## ARTICLE 8
## MISCELLANEOUS PROVISIONS

**8.1   Duty as an Owner.**
NALP understands that he/she is a co-owner of American and thus owes a duty to his/her fellow Limited Partners, the General Partner, and the Partnership in general. NALP understands that in the process of recruiting new Limited Partners is always possible that a prospective Limited Partner may have been contacted by telephone, text message, email, or some other type of electronic means without having first received the consent of the individual contacted. NALP hereby specifically waives any and all claims that he/she may possibly have regarding a state or national Do Not Call List Registry, the Telephone Consumer Protection Act (47 USC § 227), any similar federal or state laws or regulations, and any other type of cause of action regarding how

20890817.1                                   Page 3 of 21

**Carson Attachment X, Page 9 of 202**

NALP may have been recruited to become a Limited Partner and/or owner of American.

**8.2     Severability.**

Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable for any reason, the validity of the remaining provisions of this Agreement shall not be affected thereby and the unenforceable provision shall be deemed not to be a part of this Agreement.

**8.3     Entire Agreement; Waiver; Modification.**

This Agreement and the Partnership Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. No provision of this Agreement may be modified or waived except in writing signed by both parties.

**8.4     Anti-Waiver.**

The failure of any party to enforce any of its rights arising by reason of any breach of covenant or failure of condition on the part of the other party will not constitute a waiver of such breach. No custom or practice arising between the parties in the course of administering the Agreement will be construed to waive any party's right to: (i) insist upon the performance of the other party of any covenant or condition in the Agreement, or (ii) exercise any rights provided to it on the account of any breach of such covenant or failure of such condition.

**8.5     Captions.**

Captions in this Agreement are inserted for convenience only and do not define, describe or limit the scope or the intent of this Agreement or form a part thereof.

**8.6     Interpretation.**

The parties acknowledge that each of them and their respective counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the party responsible for drafting the agreement shall not be applied in the interpretation of this Agreement. In entering into this Agreement each of the parties represents that it has relied upon the advice of counsel of its own choosing and that it has read in full and understood the terms of this Agreement and voluntarily accepted the same.

**8.7     Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one document. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement. A facsimile or scanned (e.g., .PDF, .GIF, etc.) signature shall be deemed to be an original.

**8.8     Arbitration.**

Except as otherwise required by law, all disputes arising under or related to this Agreement (including, but not limited to, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel, or laches) shall be resolved by binding arbitration in Dallas County, Texas before JAMS, or its successor, pursuant to the FAA, by filing a written demand for arbitration with JAMS, with a copy to the other parties. The arbitration will be conducted in accordance with the provisions of JAMS' Comprehensive Arbitration Rules and Procedures (the "JAMS Rules") in effect at the time of filing of the demand for arbitration; provided, that the parties agree that (i) the arbitration shall be conducted by three (3) arbitrators (unless the parties agree to a smaller number) selected in accordance with the JAMS Rules, and (ii) each party shall bear its or his own costs and expenses in any such arbitration and one-half of the arbitrators' fees and expenses. By agreeing to arbitration, the parties hereto do not intend to deprive any court

20890817.1

**Carson Attachment X, Page 10 of 202**

of its jurisdiction to issue a pre- arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration.

**8.9 Governing Law; Venue.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. Although it is the intention of the parties that the arbitration provisions in Section 8.8 of this Agreement be fully enforced, to the extent any judicial action is required in aid of Section 8.8 of this Agreement or otherwise, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date written below.

**American Collective, LP**

*Shermar Moore*

Its: Manager
Shermar Moore

**NALP:**

X : ███████

████████████

Date: 21 Jan 2026 20:01:00 GMT
Effective Date: 22 Jan 2026
IP Address: 208.185.240.0
Device Identity: Google Chrome

—

20890817.1

**Carson Attachment X, Page 11 of 202**

**EXHIBIT A**

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

THE CONTENTS OF THIS AGREEMENT ARE CONFIDENTIAL. NEITHER PARTY WILL DISCLOSE, PERMIT THE DISCLOSURE OF, RELEASE, DISSEMINATE, OR TRANSFER, ANY INFORMATION OBTAINED HEREUNDER OR OTHERWISE RELATED TO THE AGREEMENT TO ANY OTHER PERSON OR ENTITY EXCEPT A PARTY'S IMMEDIATE STAFF, EMPLOYEES, CONSULTANTS, ACCOUNTANTS, ATTORNEYS, OR OTHER PROFESSIONAL RETAINED FOR THE PARTY'S DUE DILIGENCE REVIEW OF THE AGREEMENT AND EXCEPT, WITH PRIOR NOTICE TO COMPANY, PURSUANT TO LEGAL COMPULSION.

# LIMITED PARTNERSHIP AGREEMENT
# OF AMERICAN COLLECTIVE, LP

This Limited Partnership Agreement of American Collective, LP (the "Agreement") is made and entered into effective for all purposes and in all respects as of July 16, 2025 by Shemar Moore, as General Partner ("GP") and the Limited Partner who is a signatory hereto, as well as other Limited Partners which may be added from time to time pursuant to the provisions of the Texas Limited Partnership Act (Title 4, Chapter 153), this Agreement, and by subsequent agreements.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following terms and conditions.

## ARTICLE I.
## DEFINITIONS

**Section 1.01: Terms.**

When used in this Agreement, the following terms shall have the following meanings unless the context requires otherwise.

a.   "Agreement" means this Limited Partnership Agreement.

b.   "Certificate" means the Certificate of Limited Partnership described in Section 2.

c.   "Code" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent U.S. revenue laws.

20890817.1

Page **6** of **21**

**Carson Attachment X, Page 12 of 202**

d.      "General Partner" or "GP" means any person or entity from time to time admitted to the Partnership as an additional or substituted General Partner in accordance with this Agreement, and such persons' permitted successors and assigns.

e.      "Joinder Agreement" means an agreement in form and substance satisfactory to the General Partner, entered into between the Partnership and each new Limited Partner and providing for the joining of the Partnership and the possible return or revocation, as the case may be, of Limited Partnership Interests.

f.      "Active Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and has decided to actively work for the financial success of the Partnership by downloading the Partnership's software and/or application on no less than one digital device which will allow the Partnership to collect, aggregate, and market the Limited Partner's Internet and/or electronic data for the purpose of producing revenue for the Partnership. Additionally, Active Limited Partners must spend a minimum of 500 hours per year searching on the Internet.

g.      "Inactive Limited Partner(s)" means the limited partner made signatory hereto, as well as other limited partners which may be added from time to time pursuant to this Agreement, and does not meet the definition of an "Active Limited Partner".

h.      "Limited Partners" means individuals that are either Active Limited Partners or Inactive Limited Partners, as defined herein.

i.      "Partners" means the General Partner(s) and all Limited Partners

j.      "Partnership" means American Collective, LP.

k.      "Partnership Interest" means each Partner's right to participate in the Partnership, either as a Limited Partner (a "Limited Partnership Interest") or as a General Partner (a "General Partnership Interest"), as the case may be.

l.      "Limited Partnership Act" means the Texas Business Organizations Code, including, but not limited to, Title 4, Chapter 153.

m.      "Successor General Partner" has the meaning specified in Section 10.01.

n.      "Tax Matters Partner" means the Partner so designated pursuant to Section 9.

o.      "Working Owner" means the General Partner or any Active Limited Partner.

**Section 1.02:  Usage.**

All references to Article or Section numbers, unless otherwise indicated, refer to articles or sections of this Agreement. Headings are used for convenience only and do not form a part of this Agreement. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, and to the singular or plural, as the identity of the person, persons, entity, or entities to whom or which they refer may require.

20890817.1

**Carson Attachment X, Page 13 of 202**

## ARTICLE II.
## FORMATION OF LIMITED PARTNERSHIP

**Section 2.01: Formation.**

The Partners hereby form a limited partnership pursuant to the provisions of the Limited Partnership Act. The rights and liabilities of the Partners shall be as provided under the Limited Partnership Act, except as otherwise expressly provided in this Agreement. The General Partner shall execute and, as it deems appropriate, cause to be filed, recorded, and published a Certificate of Limited Partnership (the "Certificate") and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the Limited Partnership Act.

**Section 2.02: Name.**

The limited partnership formed hereby shall operate under the name of American Collective, LP ("Partnership").

**Section 2.03: Initial Registered Agent, Registered Address, and Principal Place of Business**

The initial registered agent shall be CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, and the initial principal place of business shall be 650 Poydras St., Suite 1400 PMB #6807, New Orleans, LA 70130. The business of the Partnership may also be conducted at such other or additional place or places as may be designated by the General Partner. The registered address and principal place of business may be changed from time to time at the discretion of the General Partner.

**Section 2.04: Term.**

The Partnership shall begin business on the date on which the Certificate of Limited Partnership is filed with the Secretary of State of the State of Texas and shall continue in perpetuity until terminated as provided herein.

## ARTICLE III.
## PURPOSES OF THE PARTNERSHIP

**Section 3.01**

The purposes of the Partnership shall be any legal purposes and shall include, but not be limited to, (i) promoting an understanding and awareness of data usage and security issues; (ii) assisting the Active Limited Partners to secure their personal data and information; (iii) assisting the Active Limited Partners in gathering and collection of data in general; (iv) the capture, segregation, aggregation, and sell to third-party marketing firms of both electronic and health data generated by Active Limited Partners and others; (v) assisting the Partners with marketing and monetizing the data and information collected by Active Limited Partners and others to third parties in a secure manner while removing any individual identifying information; (vi) providing the employees and the Active Limited Partners the opportunity to participate in Partnership- sponsored health insurance programs, the cost of which may be reduced by income generated from revenues from marketing Active Limited Partners' data and information; (vii) encouraging

**Carson Attachment X, Page 14 of 202**

scholarship and research in this field; (viii) promoting publications in this field; and (ix) fostering communications among teachers and scholars to enhance the public's understanding of data usage and security.

**Section 3.02**

In order to promote the interest of the Partnership and to help recruit a significant number of Active Limited Partners which may be necessary to fulfill the needs of the Partnership and promote its ultimate success, the Partnership is authorized to provide and sponsor various health benefit plans to its common law employees and Active Limited Partners as the General Partner determines to be in the best interests of the Partnership. Only common law employees and Active Limited Partners shall be eligible to participate in said plans. Inactive Limited Partners shall not be allowed to participate.

**Section 3.03**

In order to promote the purposes of the Partnership, each Active Limited Partner agrees and understands that he/she will function as a Working Owner by providing a minimum of 500 hours of work activity per year promoting the purposes of the Partnership.

**Section 3.04**

The Partnership shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Agreement.

**Section 3.05**

In carrying out the Partnership's purposes, the Partnership shall be empowered to (i) exercise all powers necessary to or reasonably connected with the Partnership's business that may be legally exercised by limited partnerships under the laws of the State of Texas and (ii) engage in all activities necessary, customary, convenient, or incidental to any of the foregoing.
The Partnership may engage or work with other entities from time to time as co-owners to promote and pursue the Partnership's purpose.

**Article IV.**
**ACCOUNTING FOR THE PARTNERSHIP**

**Section 4.01: Annual Statements.**

The General Partner shall cause annual financial statements of the operations of the Partnership to be prepared and made available upon reasonable request to each Limited Partner. Such financial statements need not be audited unless the General Partner determines that audited financial statements are necessary, or unless audited financial statements are required by creditors of the Partnership.

**Section 4.02: Access to Accounting Records.**

Any Limited Partner shall have reasonable access to the accounting records of the Partnership during regular business hours of the Partnership.

**Carson Attachment X, Page 15 of 202**

**Section 4.03: Income Tax Information.**

The General Partner shall make available to each Limited Partner information on the Partnership's taxable status and any business taxable income or loss and each item of income, gain, loss, deduction, or credit that is relevant to reporting Partnership income and how each Limited Partner is impacted by such income. This information shall be available to each Limited Partner within one hundred eighty (180) days after the close of the Partnership's taxable year, and, upon request to the General Partner, a copy of the Partnership's federal return of income for such year shall also be furnished.

**Section 4.04: Bank Accounts.**

The funds of the Partnership shall be deposited in such separate federally insured bank account or accounts as may be required, and the General Partner shall arrange for the appropriate conduct of such account or accounts.

**Section 4.05: Books of Account.**

There shall be kept at the principal office of the Partnership true and correct books of account in which shall be entered fully and accurately each and every transaction of the Partnership. The books shall be kept on the cash receipts and disbursements method for the Partnership's accounting year.

**Section 4.06 Accounting Year.**

The Partnership accounting year shall be the accounting year of the Partnership for both book and (as applicable) tax purposes, beginning January 1st and ending December 31st of each year.

**Article V.**
**ACQUISITION OF PARTNERSHIP INTEREST AND CAPITAL CONTRIBUTIONS**

**Section 5.01: Acquisition of Partnership Interest; Capital Contributions; Potential Future Revenue Potential.**

Each Inactive Limited Partner shall make a capital contribution in an amount determined by the General Partner in exchange for his/her interest in the Partnership. Active Limited Partners shall not make a capital contribution, other than his/her work effort as described herein, in exchange for his/her interest in the Partnership. The General Partner shall not have any personal liability for the repayment of any Limited Partner's capital contribution.

Notwithstanding the foregoing, it is intended that the Active Limited Partners will be given the opportunity to participate in one or more programs sponsored by the Partnership to market their personal data and information, for which the Partnership will receive compensation. Therefore, is hoped that the Partnership will receive income from such activities, which the Partnership intends to utilize to (i) pay its operational expenses, (ii) pay any outstanding debts, provide periodic dividends to the Active Limited Partners, (iv) reduce or eliminate the costs to the Partnership's employees of any sponsored health benefit plans, (v) reduce the costs to the Active Limited Partners of any sponsored health benefit plans, and/or (vi) for other purposes that benefit the Limited Partners. ***All Limited Partners understand***

20890817.1        Page **10** of **21**

**Carson Attachment X, Page 16 of 202**

*that periodic dividends may be reported to the IRS.*

**Section 5.02: Loans.**

If the Partnership requires additional capital, the General Partner is authorized to cause the Partnership to borrow money upon such terms as the General Partner, in its sole discretion, shall determine and to mortgage, pledge, or hypothecate the assets of the Partnership in connection with such borrowing. In that event, the General Partner may, but shall not be required to, lend funds to the Partnership.

**Article VI.**
**PROFITS AND LOSSES**

**Section 6.01:  Determination.**

The net profits or net losses of the Partnership shall be determined in accordance with the method of accounting adopted by the Partnership.

**Section 6.02:  Allocation of Profits and Losses.**

The net profits of the Partnership shall be allocated eighty percent (80%) to the Limited Partners (in accordance with the formula set forth in Section 15.01) and twenty percent (20%) to the General Partner.  Upon any dissolution or winding up of the Partnership, after payment of all debts and obligations, the net assets of the Partnership shall be allocated on the same basis as net profits of the Partnership are allocated as provided in this Section 6.02.

**Article VII.**
**PARTNERSHIP RECORDS**

**Section 7.01**

The General Partner shall cause the Partnership to maintain at its offices (i) a current list of the full name and last known business address of each Partner, (ii) a copy of the Certificate, (iii) copies of tax filings and financial statements for the previous four years, and copies of any then effective limited partnership agreements related to the Partnership.

**Article VIII.**
**PARTICIPATION IN ALLIANCES AND CONTRIBUTION OF PARTNER INFORMATION**

**Section 8.01:  Participation in Strategic Alliances.**

In connection with the purposes and activities described in Article III, and subject to the discretion of the General Partner, the Partnership may enter into one or more agreements, associations, or other arrangements with other organizations involved in the collection, maintenance, marketing, and use of data to help establish guidelines for certain business operations, share costs, and negotiate equitable revenue from said business operations. The  General Partner is authorized to negotiate, execute and deliver a charter and such other documents and instruments as it may deem (in its sole discretion) reasonable or appropriate to enter into and/or consummate such associations.

20890817.1

**Carson Attachment X, Page 17 of 202**

**Section 8.02:  Contribution of Partner Data.**

All Active Limited Partners acknowledge that, for so long as he/she remains an Active Limited Partner, each Active Limited Partner has the duty to contribute, and Partnership may collect, certain personal information and data generated from the use of the internet, mobile apps, "Smart" TVs, and other electronic devices, including without limitation information by which the Active Limited Partner may be personally identified, such as a postal address, e-mail address, telephone number, partnership benefits elections, internet usage information, mobile device app usage information, geo-location information or any other identifier by which such Active Limited Partner may be contacted ("Partner Data").

**Section 8.03:  Ownership and Use of Partner Data.**

All such Partner Data, in its aggregated form, shall be the property of the Partnership and may be used at the sole discretion of the General Partner in connection with or in support of the Partnership's business and administrative purposes. Partner Data may also be used by the Partnership to contact Active Limited Partners about goods and services that may be of interest to Active Limited Partners, provided that the Partnership provides a means by which Active Limited Partners may opt out of such use. The Partnership may disclose aggregated Partner Information and information that may, or may not, identify any individual, without restriction. The Partnership may disclose Partner Information that it collects from Active Limited Partners (or that an Active Limited Partner otherwise provides to the Partnership) to the Partnership's subsidiaries and affiliates, to contractors, service providers, and other third parties the Partnership uses to support its business, and to third parties to market their products or services to Active Limited Partners who have not opted out of such disclosures. The Partnership may also disclose Partner Information to comply with any court order, law, or legal process, including to respond to any government or regulatory request, and to enforce its rights under any applicable agreement or applicable law, including for billing and collection purposes.

**Section 8.04:  Data Security.**

The Partnership shall use commercially reasonable legal, organizational, physical, administrative, and technical measures and security procedures to safeguard and ensure the security of the Partner Data and to protect the Partner Data from unauthorized access, disclosure, duplication, use, modification, or loss. The Partnership shall attempt to obtain data protection insurance or similar insurance to the extent such insurance is available, and the premiums are commercially reasonable.

**Section 8.05:  Objection to Use by Active Limited Partner.**

All of the foregoing and other uses of Partner Data are at the discretion of the General Partner. In the event an Active Limited Partner objects to any use of such Active Limited Partner's Partner Data, such Active Limited Partner must notify the Partnership of its objection and opt out of such use. In that case, such Active Limited Partner shall be deemed to have exercised its right to return its Active Limited Partnership Interest to the Partnership. Upon return of its Active Limited Partner Interest, the General Partner will provide a withdrawing Active Limited Partner within formation and instruction necessary to terminate and/or remove any software provided by the Partnership which captures and transmits Partner Data. All Partner Data provided to the Partnership

20890817.1

**Carson Attachment X, Page 18 of 202**

prior to the withdrawal of an Active Limited Partner as well as all Partner Data transmitted to the Partnership after withdrawal and before termination and/or removal of any data capturing software shall remain the property of the Partnership to be used in accordance with the terms and conditions of this Agreement.

## Article IX.
## ADMINISTRATIVE PROVISIONS

**Section 9.01:  Management by the General Partner.**

All of the business of the Partnership, including, but not limited to, decisions on all tax elections and the voting of any shares of stock owned by the Partnership, shall be under the exclusive management of the General Partner. The Limited Partner(s) shall not participate in the management or operation of the business of the Partnership.

**Section 9.02:  Tax Matters Partner.**

The General Partner shall serve as the "Tax Matters Partner" for the Partnership. The Tax Matters Partner shall perform, and hereby agrees to perform, certain duties and obligations imposed upon a "Tax Matters Partner", as defined in § 6231(a)(7) of the Code, in connection with the audit or review of a Partnership federal return of income, as such duties and obligations are set forth in § 6221 of the Code and following sections. For all years for which the Bipartisan Budget Act of 2015 applies, the Tax Matters Partner shall also be the "Partnership Representative" of the Company under section 6223(a) of the Code (as enacted by the Bipartisan Budget Act of 2015). The Tax Matters Partner shall be reimbursed by the   Partnership for expenses incurred in the performance of such duties, including legal and accounting fees incurred in connection with such duties as Tax Matters Partner.

The General Partner shall have the right at any time to resign as Tax Matters Partner, by giving notice of such resignation in writing to all Partners. In the event it resigns, ceases to be a General Partner of the Partnership, or is unable or unwilling to serve as Tax Matters Partner for any reason, a new Tax Matters Partner will be appointed by a unanimous vote of the Partners.

**Section 9.03:  Time Devoted by the General Partner.**

The parties understand that the General Partner has other business activities which over the year take a major part of the respective total time devoted to business matters. Accordingly, the General Partner is required to devote to the business of the Partnership only the time and attention as they, in their sole discretion, shall determine what is required to conduct the business of the Partnership.

**Section 9.04:  Limitation on Liability of General Partners, Indemnification.**

To the fullest extent permitted by the Limited Partnership Act, the General Partner shall have no liability, responsibility, or accountability, in damages or otherwise, to any other Partner or the Partnership, and the Partnership agrees to indemnify, pay, protect, and hold harmless the General Partner (on the demand of and to the satisfaction of such General Partner) from and against, any and all liabilities, obligations, losses, damage, penalties, actions, judgments, suits, proceedings, costs, expenses, and disbursements, of any kind or nature whatsoever (including, without limitation, all costs and expenses of defense, appeal, and settlement of any and all suits,

20890817.1

Page **13** of **21**

**Carson Attachment X, Page 19 of 202**

actions, or proceedings, instituted against any such General Partner or the Partnership and all costs of investigation in connection therewith) ("Losses ") which may be imposed on, incurred by, or asserted against any such General Partner or the Partnership in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Partnership or on the part of any such General Partner as General Partner of the Partnership; provided that the General Partner shall be liable, responsible, and accountable, and the Partnership shall not be liable to the General Partner, for any portion of such Losses resulting from the General Partner's gross negligence or a willful breach of General Pal iner's fiduciary duty to the Partnership or any Partner.

If any action, suit, or proceeding shall be pending or threatened against the Partnership or the General Partner relating to or arising out of, or alleged to relate to or arise out of, any such action or non-action, the General Partner shall have the right to employ, at the expense of the Partnership, separate counsel of the General Partner's choice in such action, suit or proceeding. The satisfaction of the obligations of the Partnership under this Section shall be from and limited to the assets of the Partnership and no Partner shall have any personal liability on account thereof. The General Partner shall have the right to bill the Partnership for, or otherwise request the Partnership to pay, at any time and from time to time after the General Partner has become obligated to make payment therefor, any and all amounts for which the General Partner believes, in good faith, that such General Partner is entitled to indemnification under this Section. The Partnership shall promptly pay any and all such bills and honor any and all such requests for payment when such bill or request is received by such General Partner. In the event that a final determination is made that the Partnership is not so obligated in respect of any amount paid by it to the General Partner, such General Partner shall promptly refund such amount to the Partnership.

The Partnership shall indemnify, to the extent of Partnership assets, the Limited Partners against any claims of liability asserted against the Limited Partners solely because they are Limited Partners of the Partnership.

## Section 9.05:  Fees of General Partner.

The Partnership shall pay reasonable fees to the General Partner for services rendered to the Partnership, as determined by the General Partner; provided, that such fees shall not exceed the fair market value of the applicable services, and any agreements providing for such fees shall be negotiated at arm's length.

## Section 9.06:  Limited Liability of Limited Partners.

A Limited Partner shall not be liable for the debts, liabilities, contracts, or any other obligations of the Partnership. Except as otherwise provided in this Agreement, a Limited Partner shall not take part in, or interfere in any manner with, the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.

## Section 9.07:  Additional Authority of General Partner.

The General Partner and Limited Partner(s), by signing and executing this Agreement, hereby authorize GP as General Partner, to take, permit, and/or omit any action or actions, and to do or have done any action or actions, which are, or may be, consistent with or authorized by the provisions of this Agreement, and irrevocably make, constitute and appoint GP as General Partner, as true and lawful

**Carson Attachment X, Page 20 of 202**

agent and attorney-in-fact with full power of substitution and with power and authority in each Limited Partner's name, place, and stead to make, sign, execute, acknowledge, swear to, deliver, perform, implement, file, and record any and all agreements, limited partnership agreements, deeds of trust, promissory notes, financing and continuation statements, certificates, options, leases and other conveyances and other documents or instruments, including, but not limited to, the amended certificate and every amended or restated certificate which GP as General Partner, considers to be required, necessary, desirable, or convenient (i) for, to, or in connection with the acquisition and ownership by the Partnership of interests in property, and (ii) for, to, or in the management of conduct of the business of the Partnership.

The power of attorney granted by each Limited Partner is a special power of attorney which (1) is irrevocable, (2) is coupled with an interest, (3) shall survive the death of the Limited Partner, (4) shall not be affected by the subsequent disability or incompetence of the Limited Partner, (5) shall survive the dissolution or termination of a Limited Partner which is a corporation, general or limited partnership, joint venture, trust, estate, or other entity or association, and (6) shall survive the sale, exchange, or other transfer by a Limited Partner of all or any portion of the Limited Partner's interest, where the assignee has been approved by GP as General Partner, for admission to the Partnership as a limited partner, and shall survive such admission and constitute a similar power of attorney from such assignee as a Limited Partner. If there is more than one Limited Partner, the power of attorney may be exercised by GP, as General Partner, for all the Limited Partners by a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in-fact for all the Limited Partners together, or by listing all of the Limited Partners and executing any instrument with a single signature and acknowledgment or verification of GP as General Partner, acting as attorney-in- fact for all of the Limited Partners together.

Each Limited Partner expressly agrees to be bound by the representations made by GP as General Partner, acting pursuant to this Section 9.07, and hereby waives any and all defenses which shall be available to such Limited Partner to contest, negate, or disaffirm the actions of GP as General Partner pursuant to this Section 9.07.

Notwithstanding anything contained herein above or below to the contrary, any General Partner may act alone for and on behalf of the Partnership without the necessity of signatures, including but not limited to the exercise of the power of attorney granted to the General Partner under Section 9.07 of this Agreement.

**Section 9.08:  Voting Procedures.**

On all matters requiring a vote of the Partners under this Agreement, the General Partner shall provide written notice to all Partners of (i) the material substance of such vote, (ii) the General Partner's voting recommendation and reasons for such recommendation; (iii) the date by which votes must be received by the Partnership in order to be counted; and (iv) instructions on how each Partner shall cast their votes. Such notice may be delivered by email or other electronic means to all Limited Partners. Votes may be cast by Partners by email or other electronic means as specified in the notice. Where a vote is required of the Partners under this Agreement and does not require a unanimous vote, a simple majority of all Partnership Units casting votes on or before the voting deadline set forth in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Where a unanimous vote is required of the Partners under this Agreement, the unanimous consent of all Partnership Units casting votes on or before the voting deadline set forth

in the notice provided by the General Partner shall be sufficient to approve the matter in issue. Any Partner who fails to cast a vote on or before the voting deadline set forth in the notice shall be deemed to have abstained from the vote and such Partner's Partnership Units shall not be included in the determination of a simple majority or unanimous vote.

## Article X.
## DEATH OR WITHDRAWAL OF A PARTNER

**Section 10.01:  Resignation or Withdrawal of a General Partner.**

The Partnership shall not dissolve upon the following events: (a) incapacity of a General Partner, (b) filing, in any court pursuant to any federal or state statute, of a petition in bankruptcy or insolvency by, for a reorganization by, or for the appointment of a receiver of all or a portion of the petitioner's property by a General Partner, and/or (c) making an assignment for the benefit of creditors by a General Partner. Any General Partner may resign upon thirty (30) days' notice to all of the Partners.

In the event of a vacancy in the position of General Partner, a successor General Partner shall be appointed the General Partner. The General Partner will be authorized to appoint its successor any time prior to its departure as General Partner or within thirty (30) days of its vacating the position of General Partner. If the General Partner fails to appoint a successor, a successor General Partner will be appointed by a vote of the Limited Partners.

**Section 10.02:  Death, Bankruptcy, or Incapacity of a Limited  Partner.**

The death, bankruptcy, or incapacity of a Limited Partner shall not dissolve the Partnership.

**Section 10.03:  Amended Certificate of Limited Partnership.**

Upon transfer or conversion of any General Partnership Interest, the Partnership shall file for record an amended Certificate and each Partner hereby agrees to execute such instrument, if requested.

**Section 10.04:  Revocation of Limited Partnership Interest.**

Pursuant to a Limited Partner's Joinder Agreement, a Limited Partner's Partnership Interest may be revoked by the Partnership as noted in such Agreements as determined solely by the General Partner. Such action will immediately terminate any Partnership Interest in the Partnership held by such Limited Partner.

## Article XI.
## TRANSFER OF A PARTNERSHIP INTEREST

**Section 11.01: Prohibited Transfer of a Partnership Interest.**

Except as provided in this Article XI, no Partner may transfer or dispose of any Partnership Interest by sale, assignment, gift, or otherwise without the written consent of the General Partner. Any sale, assignment, gift, or transfer, or the purported sale, assignment, gift, or transfer, of any

**Carson Attachment X, Page 22 of 202**

Partnership Interest, except as specifically provided for and allowed in this Article XI, shall be null and void. This Article does not apply to revocations pursuant to Article X.

**Section 11.02:  Transfer of a Partnership Interest by Sale.**

Transfers of a Partnership Interest by sale are not permitted except with the prior written consent of the General Partner.

**Section 11.03:  Transfer of a Partnership Interest by Gift at the Death of a Partner.**

Any gift of a Partnership Interest or any transfer of Partnership Interest after the death of a Partner may be made only on the following conditions:

a. The estate of the deceased Partner or the Partner making a gift of a Partnership Interest (the "Donor") must grant a one (1) year period during which the General Partner may approve or deny the transfer of Partnership Interest; or
b. Any gift or transfer, or purported gift or transfer, of any Partnership Interest after the death of a Partner, except as otherwise provided in this Article XI, shall be null and void unless made strictly in accordance with the provisions of this Article XI.

**Section 11.04:  Substituted Limited Partner.**

No transferee of the whole or any portion of a Limited Partner's interest in the Partnership who is not already a Partner in the Partnership shall have the right to become a substituted Limited Partner in place of the assignor unless:

a. the assignor shall designate such intention in the instrument of assignment;
b. the written consent of the General Partner to such substitution shall be obtained;
c. the instrument of assignment shall be in a form and substance satisfactory to the General Partner;
d. the assignor and assignee named therein shall execute and acknowledge such other instrument or instruments as the General Partner may deem necessary or desirable to effectuate such admission;
e. the assignee shall accept, adopt, and approve in writing all of the terms and conditions of this Agreement as the same may have been amended; and
f. such assignee shall pay or, at the election of the General Partner, obligate him or herself to pay all reasonable expenses connected with such admission, including but not limited to the cost of preparing, filing, and publishing any amendment of the Certificate to effectuate such admission.

**Section 11.05:  Further Restrictions on Transfers**

In the case of the transfer of any Partnership Interest in any voluntary or involuntary manner whatsoever (other than as provided in Section 11.01, Section 11.02, and Section 11.03) under judicial order, legal process, execution, attachment, enforcement of a pledge, trust, or encumbrance or sale under any of them, the person to whom the Partnership Interest passes shall offer to give such Partnership Interest in the same manner as provided in Section 11.03 and shall be treated as a "deceased Partner." This section does not apply to revocations as noted in Article X.

No Partner shall make any transfer or assignment of all or any part of his or her interest in

**Carson Attachment X, Page 23 of 202**

this Partnership if said transfer or assignment would, when considered with all other transfers during the same applicable twelve (12) month period, cause a termination of this Partnership for federal or state income tax purposes, create noncompliance of the Partnership with the Limited Partnership Act.

THE LIMITED PARTNERSHIP INTEREST REPRESENTED BY THIS AGREEMENT HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH INTEREST MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED TO ANY PERSON IN THE ABSENCE OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

### Section 11.07:  Security Interest.

No Partnership Interest herein shall be subjected to a security interest by any Partner without the written consent of the General Partner.

### Section 11.08:  Transfer of a General Partner's Interest.

In the event that a General Partnership Interest is to be transferred pursuant to the provisions of this Article XI, then said General Partnership Interest shall be converted into a Limited Partnership Interest immediately prior to the closing of said transaction or the making of said transfer and the transferee or recipient shall receive only a Limited Partnership Interest. The Partnership shall file for record an amended Certificate as required by law, which shall specify the portion of the General Partnership Interest converted into a Limited Partnership Interest and the date the conversion occurred. Like other Partnership Interests, a General Partnership Interest may not be sold.

### Section 11.09:  Transfer/Granting of Limited Partnership Interest by General Partner to New Limited Partners.

Notwithstanding anything contained herein above or below to the contrary, General Partner shall not be restricted in the granting of any Limited Partnership Interests to third parties desiring to join the Partnership so long as such new Limited Partners agree to the terms and conditions of this Agreement and a Joinder Agreement, and execute such other documents as deemed appropriate by the General Partner. The Partners anticipate a large volume of Limited Partners joining this Partnership and encourage the General Partner to give Limited Partnership Interests to any prospective Limited Partner in the best judgment of the General Partner subject to the terms of this section. Partners understand and agree that their interest's authority in Partnership may be diluted by the addition of new Limited Partners, but that they welcome new Limited Partners and desire for this Partnership to add as many Limited Partners as possible subject to the terms of this section.

### Article XII.
### DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

20890817.1

**Carson Attachment X, Page 24 of 202**

**Section 12.01:  Right to Dissolve the Partnership.**

No single Partner shall have the right to cause dissolution of the Partnership. However, one hundred percent (100%) of the Partnership Interests shall have the right to cause a dissolution. Notwithstanding anything to the contrary in this Section 12.01, the General Partner has the right to cause a dissolution of the Partnership if (i) the Partnership purposes are deemed illegal or (ii) if the General Partner determines that the Partnership has failed to become economically feasible or has become economically infeasible to operate as intended.

**Section 12.02:  Winding Up the Partnership.**

In the event of a dissolution, or the death, incapacity, withdrawal, or bankruptcy of the General Partner without determining a successor General Partner, or the mutual consent of all of the Partners, the Partnership shall immediately commence to wind up its affairs. The proceeds from liquidation of Partnership assets shall be applied in the following order.

    a.  Payment to creditors of the Partnership, other than Partners, in the order of priority provided by law;
    b.  Payment to Partners for loans, if any, made by them to the Partnership;
    c.  The balance, if any, shall be distributed among all the Partners as provided in Section 6.02 herein above.

**Section 12.03:  Waiver of Right to Decree of Dissolution.**

The parties hereby agree that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership. Accordingly, each party hereby waives and renounces any rights to a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership.

**Article XIII.**
**TITLE TO PARTNERSHIP PROPERTY**

**Section 13.01**

Legal title to Partnership property shall be held in the name of the Partnership.  Subject to the provisions of Article IX, and the other provisions hereof, as well as their fiduciary obligations to the Limited Partners, the General Partner shall have the right, power, and authority (without regard to the term of the Partnership), acting for and on behalf of the Partnership, to enter into and execute any lease, contract, agreement, deed, mortgage, or other instrument or document required or otherwise appropriate to lease, sell, mortgage, convey, or refinance Partnership property (or any part thereof), to borrow money and execute promissory notes, to secure the same by mortgage (which term "mortgage" is hereby  defined for all purposes of this Agreement to include deeds of trust, financing statements, chattel mortgages, pledges, conditional sales contracts, and similar security agreements) upon Partnership property, to renew or extend any and all such loans or notes, and to convey Partnership property in fee simple by deed, mortgage, or otherwise. In no event shall any party dealing with such General Partner with respect to any Partnership property, or to whom Partnership property (or any part thereof) shall be conveyed, contracted to be sold, leased, mortgaged, or refinanced (which term "refinanced" is hereby defined for all purposes of this Agreement to include recast, modified, extended, or increased) by such General Partner, be obligated to see to the application of any purchase money, rent, or money borrowed or advanced

**Carson Attachment X, Page 25 of 202**

thereon, or be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such General Partner, and every contract, agreement, deed, mortgage, lease, promissory note, or other instrument or document executed by such General Partner, with respect to any Partnership property, shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (a) at the time or times of the execution and/or delivery thereof, the Partnership was in full force and effect, (b) such instrument or document was duly executed and authorized and is binding upon the Partnership and all of the Partners thereof, and (c) such General Partner executing and delivering the same were duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership. It is expressly understood and agreed that the manner of holding title to Partnership property (or any part thereof) and any Partnership assets are solely for the convenience of the Partnership. Accordingly, the spouse, heirs, executors or administrators, beneficiaries, successors, or assigns, of any Partner shall have no right, title or interest in or to any Partnership property or Partnership assets regardless of the manner in which title is held; rather, Partnership property and any Partnership assets shall be subject to the terms of this Agreement.

**Article XIV.**
**AMENDMENTS**

**Section 14.01**

The General Partner shall have the right to amend the Certificate of Limited Partnership or this Agreement without the consent of any Limited Partners for the following purposes: (i) to change the name or address of a Limited Partner; or (ii) to change the name of the registered office or registered agent of the Partnership; or (iii) in the opinion of the General Partner, there is an inconsistent, ambiguous, false or erroneous provision in this Agreement provided the amendment does not adversely affect the rights of the Partners under this Agreement; (iv) in the opinion of counsel for the Partnership, it is necessary or appropriate to satisfy a requirement of the Code with respect to partnerships, a requirement of Limited Partnership Act, or of any federal or state laws or regulations, provided such amendments do not adversely affect the interests of the Partners. Any amendment to the Certificate of Limited Partnership or this Agreement not otherwise expressly addressed in this Section 14.01 shall require the approval of the Partners pursuant to a vote conducted in accordance with Section 9.08.

**Article XV.**
**OWNERSHIP UNITS**

**Section 15.01**

Each Partnership Interest may be designated in units or fractional part thereof ("Partnership Units") with each unit representing a percentage interest in the voting rights of the Partnership. The General Partner is hereby granted twenty percent (20.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all General Partnership Interests. The Limited Partners, in the aggregate, are hereby granted eighty percent (80.00%) of all Partnership Units, which shall constitute one hundred percent (100%) of all Limited Partnership Interests. With respect to each Limited Partner, the Partnership Units shall equal a percentage equal that Limited Partner's pro rata share in relation to the total aggregate number of Limited Partners. But in no case, shall the total number of Limited Partner units exceed eighty percent (80.00%) of the total number of Partnership Units. Each Partnership Interest represents a Partner's entire interest in the Partnership, including such

**Carson Attachment X, Page 26 of 202**

Partner's right to vote on, consent to, or otherwise participate in any decision or action of or by the Partnership granted pursuant to this Agreement or, subject to applicable provisions of this Agreement, the Limited Partnership Act. Each Partnership Interest shall carry with it the right to vote (as specifically limited herein) as provided in this Agreement.

### Article XVI
### JURISDICTION AND VENUE

**Section 16.01.**

This Agreement is governed by and is to be construed in accordance with the laws of the State of Texas, irrespective of its choice-of-law rules. To the extent any judicial action is required in, the parties agree that any such action shall be filed exclusively in the state or federal courts with jurisdiction over Dallas County, Texas, and each of the parties hereby consents to the jurisdiction and venue of such courts.

IN WITNESS WHEREOF, the undersigned Partners of American Collective, LP have sworn hereto and hereunto affixed their signatures as of the date and year first above written.

**GENERAL PARTNER**                                    **American Collective, LP**


*Shermar Moore*                                        *Shermar Moore*

Shermar Moore                                          Its:      Manager
                                                       Shermar Moore


**LIMITED PARTNER**

*Alejandra Borucki*

Alejandra Borucki, Limited Partner

**Carson Attachment X, Page 27 of 202**