# UNITY 4
## PLAN COVERAGES AND BENEFITS



**AMERICAN**
Collective LP



# UNITY 4 — PLAN COVERED BENEFITS

This plan is offered to provide coverage of certain basic services, as outlined below.  Review the plan details carefully to understand the specific coverage offered.  You should assess whether the plan's coverage is right for you given your current and potential future health needs.

### Benefits for Treatment of Sickness and Accidents During Office Visits and Urgent Care Visits

| COVERED BENEFIT | UNITY 4 PLAN |
|---|---|
| Deductible | There are no deductibles |
| Coinsurance/Out-Of-Pocket Limit | There is No Coinsurance or Out-of-Pocket |

The American Collective Plans provide coverage for the preventive health services required under Section 2713(a) of the Public Health Services Act without any cost-sharing requirements.  Amendments to this section through legislation, regulations or other published guidance are incorporated by reference.

| OFFICE VISITS FOR SICKNESS AND ACCIDENT | |
|---|---|
| Maximum Visits Per Year | 4 |
| Visit Limit Applies | Combined Total of PCP, Specialist, and Urgent Care |
| Primary Care Physician (PCP) | $25 Copayment, then 100% of Allowed |
| Providers Considered PCP | Internal Medicine, Pediatrician, Family Practice, General Practice, and Geriatrician (All Other Provider Types are considered Specialists) |
| Specialist | $50 Copayment, then 100% of Allowed |
| Urgent Care Center | $100 Copayment, then 100% of Allowed |
| PHARMACY | |
| Preventative (If included on Revive's Preferred Drug List) | 100% Covered, $0 Copayment |
| Non-Preventative | Over 1,100 Drugs Covered, $0 Copayment |

**Note:** Office visit charges, Diagnostic Labs and Radiology Completed in the Office; Specialist testing such as Cardiac Testing, Pulmonary Testing (Including Sleep Studies), Neurologic Testing, and Gastroenterology Testing are not covered.

**Carson Attachment CC, Page 66 of 80**

# PREVENTION AND WELLNESS CARE FOR ADULTS

| COVERED BENEFIT | UNITY 4 PLAN |
| --- | --- |
| **This does not apply to your annual sickness or accident office visit limit.** | |
| Adult Benefit Apply For | Applicable to Members between the ages of 18 and 64 |
| Benefit for Prevention/Wellness | 100% of Maximum Allowable Benefits (No Deductible, Coinsurance or Copayments) |
| Preventive Exam/Physical | Up to One Exam Every 12 Months |
| Abdominal Aortic Aneurysm Screening | Up to One Exam Per Lifetime for Members who have smoked |
| Alcohol Misuse: Unhealthy Alcohol Use Screening and Counseling | Up to One Alcohol and Drug Screening Per Year |
| Anxiety Disorders in Adults | Up to One Anxiety Screening Per Year |
| Aspirin: Preventive Medication | Low Dose Aspirin is covered for adults ages 50-59 with a high cardiovascular risk |
| Blood Pressure Screening | For Members up to Age 40, a least one Blood Pressure Screening every 2 Years; For Members Age 40 and above, one Blood Pressure Screening Per Year |
| Cholesterol Screening | For Members with Heart Disease, Diabetes or a Family History of High Cholesterol, one Cholesterol Screening Per Year |
| Colorectal Cancer Screening | For Members Ages 45-64, Up to One Colorectal Cancer Screening Every 10 Years; Up to One Fecal Screening Test (Cologuard Every 2 Years) |
| Depression Screening | Up to One Depression Screening Per Year |
| Diabetes Screening | Up to One Diabetes Screening Per Year for those Ages 40-65 overweight or obese, or have other risk factors |
| Healthy Diet and Physical Activity Counseling | Up to One Diet and Physical Activity Counseling Per Year for those at higher risk for chronic diseases |
| Hepatitis B Virus Infection Screening | Up to One Hepatitis B Screening Per Year for Members at high risk (Not vaccinated as an infant or from a Country with a high prevalence of Hepatitis B) |
| Hepatitis C Virus (HCV) Infection Screening | Up to One Hepatitis C Screening Per Year |
| HIV Preexposure Prophylaxis for the Prevention of HIV Infection | These are Covered; Please see the subsection "Preventive Medications" for more information. |
| HIV Screening and Counseling | Up to One HIV Screening Per Year for Members Over Age 15 or with Higher Risk |
| Latent Tuberculosis Infection Screening in Adults | Up to One Tuberculosis Screening Per Year for Members at High Risk |
| Lung Cancer Screening | Up to One Lung Cancer Screening Per Year for Members Over Age 50 or those who have quit smoking in last 15 Years |
| Sexually Transmitted Infections Counseling | Up to One Counseling Session Per Year for Adults at Higher Risk |
| Syphilis Screening | Up to One Syphilis Screening Per Year for Members at High Risk |
| Tobacco Use Counseling and Interventions | Up to One Tobacco Counseling Per Year for Tobacco Users |



**Carson Attachment CC, Page 67 of 80**



# PREVENTION AND WELLNESS CARE FOR WOMEN

| COVERED BENEFIT | UNITY 4 PLAN |
|---|---|
| This does not apply to your annual sickness or accident office visit limit. | |
| Well Women Exams | Up to one Well Women exam Per Year |
| Bone Density Screening | Up to One Bone Density Screening Per Year for Women 64 and Under who have gone through menopause |
| Breast Cancer Genetic Test (BRCA) | One-time Test for Women at Higher Risk (Risk must be established via Screening) |
| Breast Cancer Screening Via Mammogram | Mammogram Screening every Year for Women ages 40 and Older |
| Breast Cancer Chemoprevention Counseling | Up to One Counseling Session Per Year for Women at High Risk |
| Cervical Cancer Screening | One Test Per Year for Women Ages 21 to 65 |
| Chlamydia Infection Screening | One Test Per Year for Women at Higher Risk |
| Diabetes Screening | For Women with a history of gestational diabetes who aren't currently Pregnant or haven't been diagnosed with Type 2 diabetes previously |
| Domestic and Interpersonal Violence Screening and Counseling | Up to One Screening and Counseling Session Per Year |
| Gonorrhea Screening | One Test Per Year for Women at Higher Risk |
| Urinary Incontinence Screening | One Screening Per Year |

# PREVENTION AND WELLNESS CARE FOR PREGNANT WOMEN (OR THOSE WHO MAY BECOME PREGNANT)

| COVERED BENEFIT | UNITY 4 PLAN |
|---|---|
| This does not apply to your annual sickness or accident office visit limit. | |
| Breastfeeding Support and Counseling | Programs provided by Trained Professionals for Pregnant and Nursing Women |
| Breastfeeding Supplies | Rental or Purchase of a Breast Pump |
| Birth Control | Up to One Patient Education and Counseling Session for Birth Control |
| Gestational Diabetes Screening | Up to One Screening for Women 24 weeks' Pregnant or those at risk of developing gestational diabetes |
| Maternal Depression Screening | Available at Each Well Baby Visit |
| Preeclampsia Prevention and Screening | Available for Women with High Blood Pressure or other risk factors |
| Rh Incompatibility Screening | Up to One Screening for Pregnant Women, with follow-up testing for Women at High Risk |

**Carson Attachment CC, Page 68 of 80**

# PREVENTION/WELLNESS CARE FOR CHILDREN
(APPLIES TO MEMBERS UNDER AGE 18)

| COVERED BENEFIT | UNITY 4 PLAN | |
| --- | --- | --- |
| | **This does not apply to your annual sickness or accident office visit limit.** | |
| Well Child Visits | Up to One Exam within each of the following timeframes/ages (Please refer to Immunization Schedule Below) | |
| | Birth to 3-5 days | |
| | 1 Month | Up to 1 Visit |
| | 2 Months | Up to 1 Visit |
| | 4 Months | Up to 1 Visit |
| | 6 Months | Up to 1 Visit |
| | 9 Months | Up to 1 Visit |
| | 12 Months | Up to 1 Visit |
| | 15 Months | Up to 1 Visit |
| | 18 Months | Up to 1 Visit |
| | 2 Years | Up to 1 Visit |
| | 30 Months | Up to 1 Visit |
| | 3 Years | Up to 1 Visit |
| | 4 Years | Up to 1 Visit |
| | 5+ Years | Up to 1 Visit |
| Alcohol, Tobacco and Drug Use Assessment for Adolescents | Up to One Assessment Per Year for Children between 10 and 19 Years old | |
| Autism Screening | One Screening at 18 Months and Another at 24 Months | |
| Behavioral Assessment | Up to One Assessment Per Year for Children between 10 and 19 Years old | |
| Bilirubin Concentration Screening | As needed for Newborns | |
| Blood Screening for Newborns | As needed for Newborns | |
| Depression Screening for Adolescents | Up to One Screening Per Year for Children Age 12 and Over | |
| Developmental Screening | Up to One Screening for Children Age 3 and Under | |
| Dyslipidemia Screening | Up to One Screening for Children between 9 and 11 Years and between 17 and 21 Years who are at risk for Lipid Disorders | |
| Gonorrhea Preventive Medication | Up to one administration of the medication for the eyes of all Newborns | |
| Hearing Screenings | Up to One Screening for a Newborn and regular Screenings is recommended by a medical Provider | |
| Hematocrit or Hemoglobin Screening | Up to One Screening Per Child | |
| Hemoglobinopathies and/or Sickle Cell Screening for Newborns | Up to One Screening Per Newborn | |
| Hypothyroidism Screening | Up to One Screening Per Newborn | |
| Lead Screening | Screening based on Exposure to Lead | |
| Obesity Screening and Counseling | Up to One Screening and Counseling Session Per Year | |
| Oral Health Risk Assessment | Up to One Screening and Counseling Session Per Year for Children Ages 6 Months to 6 Years | |
| Phenylketonuria (PKU) Screening | Up to One Screening for Newborns | |
| STI Prevention Counseling | Up to One Counseling Session for Adolescents at Higher Risk | |
| Vision Screening | Up to One Screening Per Year | |

**Carson Attachment CC, Page 69 of 80**



# IMMUNIZATIONS

| COVERED BENEFIT | UNITY 4 PLAN |
| --- | --- |
| Frequency of Immunization | Varies based on Age with Standards detailed in https://www.cdc.gov/vaccines/hcp/imz-schedules |
| Chickenpox (Varicella) | Covered based on CDC Recommended Schedule |
| Diphtheria, Tetanus and Pertussis (DTaP) | Covered based on CDC Recommended Schedule |
| Haemophilus Influenzae Type B | Covered based on CDC Recommended Schedule |
| Hepatitis A | Covered based on CDC Recommended Schedule |
| Hepatitis B Virus Infection Screening | Covered based on CDC Recommended Schedule |
| Human Papillomavirus (HPV) | Covered based on CDC Recommended Schedule |
| Inactive Poliovirus | Covered based on CDC Recommended Schedule |
| Influenza (Flu Shot) | Covered based on CDC Recommended Schedule |
| Measles | Covered based on CDC Recommended Schedule |
| Meningococcal | Covered based on CDC Recommended Schedule |
| Mumps | Covered based on CDC Recommended Schedule |
| Pneumococcal | Covered based on CDC Recommended Schedule |
| Rotavirus | Covered based on CDC Recommended Schedule |
| Rubella | Covered based on CDC Recommended Schedule |

\* Office visits are covered only for in-network providers.
\*\*Office visits for preventive care do not count toward the office visit limits.
\*\*\*See the SPD for a complete list of covered and excluded services.

**Carson Attachment CC, Page 70 of 80**

# PREVENTIVE MEDICATIONS

In accordance with the Patient Protection and Affordable Care Act (PPACA) certain preventive medicines are covered at 100 percent with no member out of pocket cost. All medicines, including over-the-counter items, require a prescription from the doctor and must be provided by a participating retail, or through the home delivery pharmacy.

**BELOW IS INFORMATION ABOUT THE MEDICINES AVAILABLE.  A SUMMARY OF THE CATEGORIES INCLUDES:**

- Low-dose aspirin to prevent cardiovascular disease for men age 45-79 and to prevent cardiovascular disease and preeclampsia for women age 13-79.
- Generic bowel prep medicines required for the preparation of a preventive colonoscopy screening.
- Generic breast cancer prevention medicines for women age 35 and older.
- Fluoride supplements for children ages 6 months through 5 years old.
- Folic acid supplements for women.
- Statins for primary prevention of cardiovascular diseases in adults: low to moderate intensity statins are recommended for adults who are between the ages of 40-75, have no history of cardiovascular disease (CVD), have one or more risk factors for CVD and have a calculated 10-year CVD event risk of 10% or greater. Lovastatin and pravastatin are covered.
- Smoking cessation: Generic, brand-name with no generic equivalent (single source) and over the counter smoking cessation medicines. The day supply limit applied to these FDA-approved tobacco cessation medicines is 180 days per member per 365 days. Brand smoking cessation medicines that do have a generic equivalent (multi-source) are covered with copayment/cost sharing, or according to your benefit design.
- Routine immunizations for children, adolescents and adults as recommended from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (covered under medical benefit).
- Iron supplementation for children ages 6 months to 1 year old who are at increased risk for iron deficiency anemia.
- Contraceptives: Generic contraceptives are covered with no cost share. Brand contraceptive products that do have a generic equivalent (multi-source) and brand name contraceptives with no generic equivalent (single source) are covered with copayment/cost sharing
- Pre-Exposure Prophylaxis (PrEP) for the prevention of HIV infection.



**Carson Attachment CC, Page 71 of 80**



Carson Attachment CC, Page 72 of 80

# UNITY 6
## PLAN COVERAGES AND BENEFITS



AMERICAN
Collective LP

**Carson Attachment CC, Page 73 of 80**



# UNITY 6 — PLAN COVERED BENEFITS

This plan is offered to provide coverage of certain basic services, as outlined below.  Review the plan details carefully to understand the specific coverage offered.  You should assess whether the plan's coverage is right for you given your current and potential future health needs.

### Benefits for Treatment of Sickness and Accidents During Office Visits and Urgent Care Visits

| COVERED BENEFIT | UNITY 6 PLAN |
| --- | --- |
| Deductible | There are no deductibles |
| Coinsurance/Out-Of-Pocket Limit | There is No Coinsurance or Out-of-Pocket |

The American Collective Plans provide coverage for the preventive health services required under Section 2713(a) of the Public Health Services Act without any cost-sharing requirements.  Amendments to this section through legislation, regulations or other published guidance are incorporated by reference.

| OFFICE VISITS FOR SICKNESS AND ACCIDENT | |
| --- | --- |
| Maximum Visits Per Year | 6 |
| Visit Limit Applies | Combined Total of PCP, Specialist, and Urgent Care |
| Primary Care Physician (PCP) | $25 Copayment, then 100% of Allowed |
| Providers Considered PCP | Internal Medicine, Pediatrician, Family Practice, General Practice, and Geriatrician (All Other Provider Types are considered Specialists) |
| Specialist | $50 Copayment, then 100% of Allowed |
| Urgent Care Center | $100 Copayment, then 100% of Allowed |

| PHARMACY | |
| --- | --- |
| Preventative (If included on Revive's Preferred Drug List) | 100% Covered, $0 Copayment |
| Non-Preventative | Over 1,100 Drugs Covered, $0 Copayment |

**Note:** Office visit charges, Diagnostic Labs and Radiology Completed in the Office; Specialist testing such as Cardiac Testing, Pulmonary Testing (Including Sleep Studies), Neurologic Testing, and Gastroenterology Testing are not covered.

**Carson Attachment CC, Page 74 of 80**

# PREVENTION AND WELLNESS CARE FOR ADULTS

| COVERED BENEFIT | UNITY 6 PLAN |
|---|---|
| **This does not apply to your annual sickness or accident office visit limit.** | |
| Adult Benefit Apply For | Applicable to Members between the ages of 18 and 64 |
| Benefit for Prevention/Wellness | 100% of Maximum Allowable Benefits (No Deductible, Coinsurance or Copayments) |
| Preventive Exam/Physical | Up to One Exam Every 12 Months |
| Abdominal Aortic Aneurysm Screening | Up to One Exam Per Lifetime for Members who have smoked |
| Alcohol Misuse: Unhealthy Alcohol Use Screening and Counseling | Up to One Alcohol and Drug Screening Per Year |
| Anxiety Disorders in Adults | Up to One Anxiety Screening Per Year |
| Aspirin: Preventive Medication | Low Dose Aspirin is covered for adults ages 50-59 with a high cardiovascular risk |
| Blood Pressure Screening | For Members up to Age 40, a least one Blood Pressure Screening every 2 Years; For Members Age 40 and above, one Blood Pressure Screening Per Year |
| Cholesterol Screening | For Members with Heart Disease, Diabetes or a Family History of High Cholesterol, one Cholesterol Screening Per Year |
| Colorectal Cancer Screening | For Members Ages 45-64, Up to One Colorectal Cancer Screening Every 10 Years; Up to One Fecal Screening Test (Cologuard Every 2 Years) |
| Depression Screening | Up to One Depression Screening Per Year |
| Diabetes Screening | Up to One Diabetes Screening Per Year for those Ages 40-65 overweight or obese, or have other risk factors |
| Healthy Diet and Physical Activity Counseling | Up to One Diet and Physical Activity Counseling Per Year for those at higher risk for chronic diseases |
| Hepatitis B Virus Infection Screening | Up to One Hepatitis B Screening Per Year for Members at high risk (Not vaccinated as an infant or from a Country with a high prevalence of Hepatitis B) |
| Hepatitis C Virus (HCV) Infection Screening | Up to One Hepatitis C Screening Per Year |
| HIV Preexposure Prophylaxis for the Prevention of HIV Infection | These are Covered; Please see the subsection "Preventive Medications" for more information. |
| HIV Screening and Counseling | Up to One HIV Screening Per Year for Members Over Age 15 or with Higher Risk |
| Latent Tuberculosis Infection Screening in Adults | Up to One Tuberculosis Screening Per Year for Members at High Risk |
| Lung Cancer Screening | Up to One Lung Cancer Screening Per Year for Members Over Age 50 or those who have quit smoking in last 15 Years |
| Sexually Transmitted Infections Counseling | Up to One Counseling Session Per Year for Adults at Higher Risk |
| Syphilis Screening | Up to One Syphilis Screening Per Year for Members at High Risk |
| Tobacco Use Counseling and Interventions | Up to One Tobacco Counseling Per Year for Tobacco Users |



**Carson Attachment CC, Page 75 of 80**



# PREVENTION AND WELLNESS CARE FOR WOMEN

| COVERED BENEFIT | UNITY 6 PLAN |
|---|---|
| **This does not apply to your annual sickness or accident office visit limit.** | |
| Well Women Exams | Up to one Well Women exam Per Year |
| Bone Density Screening | Up to One Bone Density Screening Per Year for Women 64 and Under who have gone through menopause |
| Breast Cancer Genetic Test (BRCA) | One-time Test for Women at Higher Risk (Risk must be established via Screening) |
| Breast Cancer Screening Via Mammogram | Mammogram Screening every Year for Women ages 40 and Older |
| Breast Cancer Chemoprevention Counseling | Up to One Counseling Session Per Year for Women at High Risk |
| Cervical Cancer Screening | One Test Per Year for Women Ages 21 to 65 |
| Chlamydia Infection Screening | One Test Per Year for Women at Higher Risk |
| Diabetes Screening | For Women with a history of gestational diabetes who aren't currently Pregnant or haven't been diagnosed with Type 2 diabetes previously |
| Domestic and Interpersonal Violence Screening and Counseling | Up to One Screening and Counseling Session Per Year |
| Gonorrhea Screening | One Test Per Year for Women at Higher Risk |
| Urinary Incontinence Screening | One Screening Per Year |

# PREVENTION AND WELLNESS CARE FOR PREGNANT WOMEN (OR THOSE WHO MAY BECOME PREGNANT)

| COVERED BENEFIT | UNITY 6 PLAN |
|---|---|
| **This does not apply to your annual sickness or accident office visit limit.** | |
| Breastfeeding Support and Counseling | Programs provided by Trained Professionals for Pregnant and Nursing Women |
| Breastfeeding Supplies | Rental or Purchase of a Breast Pump |
| Birth Control | Up to One Patient Education and Counseling Session for Birth Control |
| Gestational Diabetes Screening | Up to One Screening for Women 24 weeks' Pregnant or those at risk of developing gestational diabetes |
| Maternal Depression Screening | Available at Each Well Baby Visit |
| Preeclampsia Prevention and Screening | Available for Women with High Blood Pressure or other risk factors |
| Rh Incompatibility Screening | Up to One Screening for Pregnant Women, with follow-up testing for Women at High Risk |

**Carson Attachment CC, Page 76 of 80**

# PREVENTION/WELLNESS CARE FOR CHILDREN
## (APPLIES TO MEMBERS UNDER AGE 18)

| COVERED BENEFIT | UNITY 6 PLAN |
|---|---|
| | This does not apply to your annual sickness or accident office visit limit. |
| Well Child Visits | Up to One Exam within each of the following timeframes/ages (Please refer to Immunization Schedule Below) |

| | | |
|---|---|---|
| | Birth to 3-5 days | |
| | 1 Month | Up to 1 Visit |
| | 2 Months | Up to 1 Visit |
| | 4 Months | Up to 1 Visit |
| | 6 Months | Up to 1 Visit |
| | 9 Months | Up to 1 Visit |
| | 12 Months | Up to 1 Visit |
| | 15 Months | Up to 1 Visit |
| | 18 Months | Up to 1 Visit |
| | 2 Years | Up to 1 Visit |
| | 30 Months | Up to 1 Visit |
| | 3 Years | Up to 1 Visit |
| | 4 Years | Up to 1 Visit |
| | 5+ Years | Up to 1 Visit |

| COVERED BENEFIT | UNITY 6 PLAN |
|---|---|
| Alcohol, Tobacco and Drug Use Assessment for Adolescents | Up to One Assessment Per Year for Children between 10 and 19 Years old |
| Autism Screening | One Screening at 18 Months and Another at 24 Months |
| Behavioral Assessment | Up to One Assessment Per Year for Children between 10 and 19 Years old |
| Bilirubin Concentration Screening | As needed for Newborns |
| Blood Screening for Newborns | As needed for Newborns |
| Depression Screening for Adolescents | Up to One Screening Per Year for Children Age 12 and Over |
| Developmental Screening | Up to One Screening for Children Age 3 and Under |
| Dyslipidemia Screening | Up to One Screening for Children between 9 and 11 Years and between 17 and 21 Years who are at risk for Lipid Disorders |
| Gonorrhea Preventive Medication | Up to one administration of the medication for the eyes of all Newborns |
| Hearing Screenings | Up to One Screening for a Newborn and regular Screenings is recommended by a medical Provider |
| Hematocrit or Hemoglobin Screening | Up to One Screening Per Child |
| Hemoglobinopathies and/or Sickle Cell Screening for Newborns | Up to One Screening Per Newborn |
| Hypothyroidism Screening | Up to One Screening Per Newborn |
| Lead Screening | Screening based on Exposure to Lead |
| Obesity Screening and Counseling | Up to One Screening and Counseling Session Per Year |
| Oral Health Risk Assessment | Up to One Screening and Counseling Session Per Year for Children Ages 6 Months to 6 Years |
| Phenylketonuria (PKU) Screening | Up to One Screening for Newborns |
| STI Prevention Counseling | Up to One Counseling Session for Adolescents at Higher Risk |
| Vision Screening | Up to One Screening Per Year |

**Carson Attachment CC, Page 77 of 80**



# IMMUNIZATIONS

| COVERED BENEFIT | UNITY 6 PLAN |
| --- | --- |
| Frequency of Immunization | Varies based on Age with Standards detailed in https://www.cdc.gov/vac-cines/hcp/imz-schedules |
| Chickenpox (Varicella) | Covered based on CDC Recommended Schedule |
| Diphtheria, Tetanus and Pertussis (DTaP) | Covered based on CDC Recommended Schedule |
| Haemophilus Influenzae Type B | Covered based on CDC Recommended Schedule |
| Hepatitis A | Covered based on CDC Recommended Schedule |
| Hepatitis B Virus Infection Screening | Covered based on CDC Recommended Schedule |
| Human Papillomavirus (HPV) | Covered based on CDC Recommended Schedule |
| Inactive Poliovirus | Covered based on CDC Recommended Schedule |
| Influenza (Flu Shot) | Covered based on CDC Recommended Schedule |
| Measles | Covered based on CDC Recommended Schedule |
| Meningococcal | Covered based on CDC Recommended Schedule |
| Mumps | Covered based on CDC Recommended Schedule |
| Pneumococcal | Covered based on CDC Recommended Schedule |
| Rotavirus | Covered based on CDC Recommended Schedule |
| Rubella | Covered based on CDC Recommended Schedule |

\* Office visits are covered only for in-network providers.
\*\*Office visits for preventive care do not count toward the office visit limits.
\*\*\*See the SPD for a complete list of covered and excluded services.

**Carson Attachment CC, Page 78 of 80**

# PREVENTIVE MEDICATIONS

In accordance with the Patient Protection and Affordable Care Act (PPACA) certain preventive medicines are covered at 100 percent with no member out of pocket cost. All medicines, including over-the-counter items, require a prescription from the doctor and must be provided by a participating retail, or through the home delivery pharmacy.

**BELOW IS INFORMATION ABOUT THE MEDICINES AVAILABLE.  A SUMMARY OF THE CATEGORIES INCLUDES:**

- Low-dose aspirin to prevent cardiovascular disease for men age 45-79 and to prevent cardiovascular disease and preeclampsia for women age 13-79.
- Generic bowel prep medicines required for the preparation of a preventive colonoscopy screening.
- Generic breast cancer prevention medicines for women age 35 and older.
- Fluoride supplements for children ages 6 months through 5 years old.
- Folic acid supplements for women.
- Statins for primary prevention of cardiovascular diseases in adults: low to moderate intensity statins are recommended for adults who are between the ages of 40-75, have no history of cardiovascular disease (CVD), have one or more risk factors for CVD and have a calculated 10-year CVD event risk of 10% or greater. Lovastatin and pravastatin are covered.
- Smoking cessation: Generic, brand-name with no generic equivalent (single source) and over the counter smoking cessation medicines. The day supply limit applied to these FDA-approved tobacco cessation medicines is 180 days per member per 365 days. Brand smoking cessation medicines that do have a generic equivalent (multi-source) are covered with copayment/cost sharing, or according to your benefit design.
- Routine immunizations for children, adolescents and adults as recommended from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (covered under medical benefit).
- Iron supplementation for children ages 6 months to 1 year old who are at increased risk for iron deficiency anemia.
- Contraceptives: Generic contraceptives are covered with no cost share. Brand contraceptive products that do have a generic equivalent (multi-source) and brand name contraceptives with no generic equivalent (single source) are covered with copayment/cost sharing
- Pre-Exposure Prophylaxis (PrEP) for the prevention of HIV infection.



**Carson Attachment CC, Page 79 of 80**



# Carson Attachment
# DD

**STATE OF MICHIGAN**
**DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES**

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Innovative Partners, LP**                                        **Enforcement Case No. 24-17818 & 25-18221**
(Unauthorized)

**Marpai Administrators, LLC**
(Unauthorized)

Respondents.
_____/

**Issued and entered**
**on November 4, 2025**
**by Joseph A. Garcia**
**Senior Deputy Director**

**ORDER TO CEASE AND DESIST WITH STATEMENT OF FINDINGS**
**AND NOTICE OF OPPORTUNITY FOR HEARING**

Pursuant to Section 251 of the Michigan Insurance Code (Code), MCL 500.251 and Section , and after reviewing evidence of the conduct described in the attached Statement of Findings, and

**WHEREAS**, the Director of the Department of Insurance and Financial Services finds that immediate action is necessary and appropriate in the public interest for the protection of the public health, safety, and welfare, and consistent with the purposes fairly intended by public policy and provisions of the Code,

**IT IS ORDERED THAT:**

1.      Respondent(s) shall immediately **CEASE AND DESIST** from all activities in violation of the Code as described in the Statement of Findings.

2.      A copy of this Order shall be immediately served upon Respondent(s). This Order shall be effective as to each Respondent upon the date of service effective to each Respondent.

3.      Respondent(s) will have 30 calendar days after the service of this Order to contest the Order or any findings in the attached Statement of Findings, by requesting a hearing. Within 10 calendar days after receiving the request, the hearing process shall commence. If a hearing is requested, an administrative law judge from the Michigan Office of Administrative Hearings and Rules shall preside over any such hearing.

4.      Any such hearing held shall address the following issues:

        a.      The facts set forth in the Statement of Findings.

**Carson Attachment DD, Page 1 of 6**

Order to Cease and Desist
Innovative Partners, LP and Marpai Administrators, LLC
Enforcement Case No. 24-17818 & 25-18221
Page 2 of 2

    b.      The continuation of the Order to Cease and Desist.

    c.      Restitution to be paid by the Respondent(s).

5.    The Director shall have five (5) business days after the hearing (if requested) to affirm, modify, or set aside in whole or in part this Order.

6.    Any request for a hearing should be addressed to the Department of Insurance and Financial Services, Attention: Randie Swinson, Hearings Coordinator, P.O. Box 30220, Lansing, MI 48909-7720 or faxed to 517-284-8851.

7.    **Failure to request a hearing within the period and through the procedures set forth in paragraph 3 through 6 above will result in this Order becoming FINAL. Failure to comply with this Order, including, without limitation, any failure to immediately cease and desist from the unauthorized activity and/or other unlawful conduct described in the Statement of Findings, may result in a separate administrative proceeding seeking fines and other penalties set forth in paragraph 10 below.**

8.    Moreover, DIFS reserves the right to pursue additional administrative proceedings authorized by law for Respondent(s)' alleged conduct described in the Statement of Findings. In the event that DIFS decides to proceed with further administrative action, Respondent(s) will receive notice and the opportunity to be heard in connection with these subsequent proceedings in accordance with the Code and the Michigan Administrative Procedures Act, MCL 24.201 *et seq.*

9.    The Director retains jurisdiction of the matters contained herein and the authority to issue such further Orders as shall be deemed just, necessary, and appropriate.

10.    Pursuant to Section 251(6) of the Code, MCL 500.251(6), a person who violates or otherwise fails to comply with an Order to Cease and Desist is subject to one or more of the following:

    a.      Payment of a civil fine of not more than $1,000 for each violation not to exceed an aggregate civil fine of $30,000. However, if the person knew or reasonably should have known the conduct was in violation of the cease-and-desist order, the person shall be subject to a civil fine of not more than $25,000 for each violation not to exceed an aggregate civil fine of $250,000.

    b.      Suspension or revocation of the person's license or certificate of authority.

    c.      Complete restitution, in the form, amount, and within the period determined by the Director, to all persons in Michigan damaged by the violation or failure to comply.

Joseph A. Garcia
Senior Deputy Director

**Carson Attachment DD, Page 2 of 6**

**STATE OF MICHIGAN**
**DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES**

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Innovative Partners, LP**                               **Enforcement Case No. 24-17818 & 25-18221**
(Unauthorized)

**Marpai Administrators, LLC**
(Unauthorized)

                    Respondent.
_____/

**STATEMENT OF FINDINGS**

1.      Pursuant to Section 251(1) of the Michigan Insurance Code (Code), MCL 500.251(1), the Director is empowered to issue a cease and desist order if the Director finds any of the following:

        (a)      A person is conducting transactions of insurance for which a certificate of authority is required by this act without having obtained a certificate of authority.

        (b)      A person is acting as an insurance agent, solicitor, adjuster, or counselor without a license as required by this act.

        (c)      A person is engaged in an act or practice in the business of insurance for which authority from or notification to the commissioner is required by this act and the person has not received authority or given notification.

        (d)      A person authorized to engage in the business of insurance under this act is engaged in conduct that presents an immediate danger to public health, safety, or welfare. MCL 500.251(1).

2.      Pursuant to Section 402 of the Code, MCL 500.402, a "person shall not act as an insurer and an insurer shall not issue a policy or otherwise transact insurance in this state except as authorized by a subsisting certificate of authority granted to it by the director under this act."

3.      Pursuant to Section 402a of the Code, in Michigan, the following transactions of insurance, whether effected by mail or otherwise, require a certificate of authority:

        (a)      The issuance or delivery of insurance contracts to residents of this state.

        (b)      The solicitation of applications for insurance contracts from residents of this state.

**Carson Attachment DD, Page 3 of 6**

Statement of Findings
Innovative Partners, LP and Marpai Administrators, LLC
Enforcement Case No. 24-17818 & 25-18221
Page 2 of 4

(c)     The collection of premiums, membership fees, assessments, or other consideration for insurance contracts from residents of this state.

(d)     The doing or proposing to do any act in substance equivalent to subdivisions (a) to (c).

4.     Pursuant to Section 20 of the Third Party Administrator Act (TPA Act), MCL 550.920, the Director has the same authority with respect to a third party administrator or manager as she does with respect to an insurance agency or agent under the Code.

5.     Pursuant to Section 2(t) of the TPA Act, MCL 550.902(t), a third party administrator is defined as, "a person that directly or indirectly processes claims under a service contract and that may also provide 1 or more other administrative services under a service contract."

6.     Pursuant to Section 10(1) of the TPA Act, MCL 550.910(1), "[a] person shall not operate as a third party administrator without first obtaining and maintaining a certificate of authority pursuant to this act."

7.     Pursuant to Section 52(3)(a) of the TPA Act, MCL 550.952(3)(a), "[t]he director … may issue a cease and desist order if the TPA is not licensed, if the director finds … [t]hat the TPA has violated any … provision of the insurance laws of this state."

8.     On or about November 20, 2023, DIFS Staff received information about possible unauthorized activity by Respondent Innovative Partners, LP (Respondent Innovative Partners). On or about March 20, 2024, DIFS Staff received additional information about possible unauthorized activity by Respondent Innovative Partners. DIFS Staff reviewed DIFS' records and confirmed that Respondent Innovative Partners is not authorized to act as an insurer in the state of Michigan.

9.     On or about July 23, 2024, DIFS Staff received information about possible unauthorized activity by Respondent Marpai Administrators, LLC (Respondent Marpai), acting as a third party administrator on behalf of Respondent Innovative Partners. DIFS Staff reviewed DIFS' records and confirmed that Respondent Marpai is not authorized to act as a third party administrator in the state of Michigan.

10.     An investigation was opened by DIFS relative to both Respondent Innovative Partners and Respondent Marpai. During the investigation, DIFS Staff discovered that Respondent Innovative Partners acted as an insurer in the state of Michigan by soliciting applications for insurance contracts from residents in the state of Michigan, issuing and/or delivering insurance contracts to residents of the state of Michigan, and collecting premiums, membership fees, assessments, or other consideration for insurance contracts from residents of the state of Michigan. Additionally, DIFS Staff discovered that Respondent Marpai acted as a third party administrator in the state of Michigan by directly or indirectly processing claims under a service contract with Respondent Innovative Partners. In particular, DIFS Staff found that:

(a)     Respondent Innovative Partners, LP (Respondent Innovative Partners) is a foreign limited partnership formed under the laws of Texas, with a principal place of business in Florida. Respondent Innovative Partners is not registered or authorized as an insurer in any jurisdiction in the United States.

**Carson Attachment DD, Page 4 of 6**

Statement of Findings
Innovative Partners, LP and Marpai Administrators, LLC
Enforcement Case No. 24-17818 & 25-18221
Page 3 of 4

(b)     Respondent Marpai Administrators, LLC (Respondent Marpai) is a foreign limited liability company organized under the laws of Florida, with a principal place of business in Florida.

(c)     Respondent Innovative Partners contracted with Michigan residents to provide health plans that were described in a document called, "Health Benefit Plan – Summary Plan Description for the Benefits of the Optimum 2 Policy (Plan Description)." Among the information contained in the Plan Description was the following:

(i)     Description of the plan being "Self-Funded."

(ii)     Descriptions of the amounts of coverage available for the following:

    a.   Hospital admission - $200.00/one time per year – with a $100.00 co-pay.

    b.   Hospital confinement - $100.00 for ten confinement days per year – with a $0.00 co-pay.

    c.   ICU admission - $200.00/one time per year – with a $100.00 co-pay.

    d.   ICU confinement - $100.00 for five confinement days per year – with a $0.00 co-pay.

    e.   Inpatient surgery - $200.00/one time per year – with a $0.00 co-pay.

    f.   General anesthesia (in-patient) - $100.00/one time per year – with a $0.00 co-pay.

    g.   Outpatient surgery - $200.00/one time per year - $100.00 co-pay.

    h.   General anesthesia (out-patient) - $100.00/one time per year - $25.00 co-pay.

    i.   Emergency room visit - $100.00/two (2) visits per year - $25.00 co-pay.

(iii)     Language in the Plan Description that states as follows, "This is a limited medical health benefit plan sponsored by Innovative Partners, LP, and is governed by the Employee Retirement Income Act of 1974 ("ERISA"). This plan is designed to meet the needs of our employees and Active Limited Partners (including their families) who have been either unable to find a suitable major medical policy/plan, or who wish to supplement their existing major medical policy/plan. Please keep in mind this Plan is not designed to be a major medical policy/plan nor is it designed to replace a major medical policy."

(iv)     Respondent Innovative Partners has sold at least 3 limited benefit plans to Michigan residents since 2023. The most recent complaint from a Michigan resident entails the payment of over $5,000.00 in premium, with all three consumers having complaints that claims being submitted for payment under Respondent Innovative

**Carson Attachment DD, Page 5 of 6**

Statement of Findings
Innovative Partners, LP and Marpai Administrators, LLC
Enforcement Case No. 24-17818 & 25-18221
Page 4 of 4

             Partners plans were not being processed or paid accordingly by Respondent Innovative Partners or its third-party administrator.

(d)      Respondent Marpai was identified on a membership card provided by Respondent Innovative Partners to one of its Michigan customers as the entity to which claims should be submitted, with the following address identified on the membership card, "Marpai Health, P.O. Box 21112, Eagan, MN 55121."

(e)      Respondent Marpai maintained a website portal through http://www.mymarpai.com that provided a Dashboard through which Michigan consumers could track the submission of their claims. Respondent Marpai's Dashboard portal included information relative to a customer's termination notices, claims summary, billed amounts, plan allowances, amounts covered, and member liability.

11.    The conduct of Respondent Innovative Partners as described above constitutes acting as an insurer, soliciting applications for insurance contracts to residents of Michigan, issuing and/or delivering insurance contracts to residents of Michigan, and collecting premiums, membership fees, assessments, or other consideration for insurance contracts from residents in Michigan, all without the requisite certificate of authority, in violation of Sections 402 and 402a of the Code, MCL 500.402 and MCL 500.402a.

12.    Respondent Marpai's conduct as described above constitutes operating as a third party administrator by directly or indirectly processing claims under a service contract with Respondent Innovative Partners and providing one or more administrative services under a service contract with Respondent Innovative Partners, all without the requisite certificate of authority, in violation of Section 10(1) of the TPA Act, MCL 550.910(1).

13.    The above-described violations of Chapter 4 of the Code authorize the Director to issue a Cease and Desist Order pursuant to Section 251(1)(a) of the Code, MCL 500.251(1)(a) against Respondent Innovative Partners.

14.    The above-described violations of the TPA Act authorize the Director to issue a Cease and Desist Order pursuant to Section 52(3)(a) of the TPA Act, MCL 550.952(3)(a), against Respondent Marpai.

# Carson Attachment
# EE



# Commissioner Lara issues Cease and Desist to Innovative Partners and multiple other entities for scheme involving sale of misleading health insurance

News: 2025 Press Release

For Release: July 15, 2025
Media Calls Only: 916-492-3566
Email Inquiries: cdipress@insurance.ca.gov

**Commissioner Lara issues Cease and Desist to Innovative Partners and multiple other entities for scheme involving sale of misleading health insurance**

Consumers who have purchased policies from Innovative Partners encouraged to call Department of Insurance for assistance

**SACRAMENTO, Calif.** – Insurance Commissioner Ricardo Lara issued a [Cease and Desist Order](#) against Innovative Partners, LP for illegally acting as an insurance company in California and providing health coverage without proper certification. The Department also has served 10 additional Cease and Desist Orders on multiple entities as well as licensed and unlicensed individuals that aided and abetted Innovative Partners, LP in these fraudulent activities.

"We will use every tool at our disposal to protect consumers," said Commissioner Lara. "When Californians purchase health coverage they deserve the full confidence the coverage they are promised will be there when they need it. Selling insurance without the proper licensing or certification is against the law and puts consumers health and financial well-being at risk."

The Department launched an investigation after receiving information that California consumers were having their claims improperly denied after purchasing and attempting to use health coverage sponsored by Innovative Partners, LP (Innovative Partners). The investigation found that beginning in 2023, Innovative Partners defrauded victims by selling them limited or non-existent health coverage and convincing them they were purchasing comprehensive insurance plans. Many of these victims believed they were speaking with representatives from Covered California and purchasing comprehensive Blue Shield or Aetna policies. However, when the victims attempted to use their coverage, they found the coverage was limited or non-existent and would not cover the medical expenses they were told were covered with their policy.

Innovative Partners is not partnered with Covered California. Upon purchasing health coverage, consumers were given plan cards with Innovative Partners branding. These cards often listed PHCS and Group Resources as claim handlers, while some cards also listed portal information for First Health Network and/or Marpai Administrators LLC. Other plan cards also included Teladoc Health Inc. contact information.

Consumers also experienced issues with lack of coverage for medical benefits they were promised. For example, one consumer signed up for a policy they were told was an Aetna Gold PPO plan through Innovative Partners which would cover his mental health appointments, and could start immediately without a waiting period. He received an ID card which included First Health Network and Marpai Health portal information. The consumer visited his therapist twice, and was then told that the insurance was not covering the care. After contacting both of the numbers on the back of the card he was given, a representative assured him he did have coverage for mental

**Carson Attachment EE, Page 1 of 22**

health. Trusting what the representative told him, he continued with his mental health treatments believing he did have coverage, but Innovative never paid for the treatment and the consumer was left with more than $1,700 in unpaid medical bills.

In another case, a small business owner was looking to purchase new health insurance after his business slowed causing him to become ineligible for his prior coverage. The consumer stated that the issue began after he tried to purchase a policy through Covered California and gave up due to cost. He then received a call from Innovative Partners who claimed that the consumer qualified for their plan due to his low income, and he would receive full coverage for $400 per month. Upon signing up, the consumer specifically asked about E.R. visits and was told that the plan covered up to two visits, per year, with a $50 co-pay. The consumer confirmed coverage with two separate Innovative Partners representatives and thereafter visited the E.R. using his Innovative policy. The consumer discovered that the represented coverage did not exist when he started receiving calls from collections agencies, and he was left with around $11,000 in debt.

Innovative Partners disguised their activities as a single-employer health insurance plan under the Employee Retirement Income Security Act of 1974, masking the sale and selling of health insurance as a "Small Employee Benefit Plan" even though the consumers did not claim to be employees of or partners with Innovative Partners.

Innovative Partners does not have authorization to transact insurance in California and does not hold a certificate of authority to transact business in California.

Consumers who have purchased health coverage through Innovative Partners, LP or any of the below entities or licensed and unlicensed individuals should contact the Department of Insurance at (714) 712-7600.

Cease and Desist Orders were served against the following:

- Innovative Partners, LP
- Arman Motiwalla – License #4134341
- Amani Shokry
- Jimmie Sutton
- Omar Kasani
- Group Resources
- First Health Network
- MultiPlan Inc.
- PHCS
- Marpai Administrators LLC

### ###

**Media Note:**

- Cease and Desist Order

Led by Insurance Commissioner Ricardo Lara, the California Department of Insurance is the consumer protection agency for the nation's largest insurance marketplace and safeguards all of the state's consumers by fairly regulating the insurance industry. Under the Commissioner's direction, the Department uses its authority to protect Californians from insurance rates that are excessive, inadequate, or unfairly discriminatory, oversee insurer solvency to pay claims, set standards for agents and broker licensing, perform market conduct reviews of insurance companies, resolve consumer complaints, and investigate and prosecute insurance fraud. Consumers are urged to call 1-800-927-4357 with any questions or contact us at www.insurance.ca.gov via webform or online chat. Non-media inquiries should be directed to the Consumer Hotline at 800-927-4357. Teletypewriter (TTY), please dial 800-482-4833.

**Carson Attachment EE, Page 2 of 22**

Translate this page with **Google**Translate

Privacy Policy        ADA Compliance        Site Map        Career Opportunities        Internships

Free Document Readers        Scheduled Site Maintenance

Copyright © California Department of Insurance

**Carson Attachment EE, Page 3 of 22**

BEFORE THE INSURANCE COMMISSIONER

OF THE STATE OF CALIFORNIA

In the Matter of:

**INNOVATIVE PARTNERS LP,**
**ARMAN MOTIWALLA,**
**AMANI SHOKRY,**
**JIMMIE SUTTON,**
**OMAR KASANI,**
**GROUP RESOURCES,**
**FIRST HEALTH NETWORK,**
**MULTIPLAN INC.,**
**PHCS,**
**MARPAI ADMINISTRATORS LLC,**
**TELADOC HEALTH INC.;**

Respondents.

File No. OC202400194

**ORDER TO CEASE AND DESIST**

**ORDER TO SHOW CAUSE WHY AN**
**ORDER IMPOSING A MONETARY**
**PENALTY SHOULD NOT ISSUE**

**NOTICE OF RIGHT TO HEARING**

(Cal. Ins. Code §§ 12921.8)

TO:  **INNOVATIVE PARTNERS LP**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **ARMAN MOTIWALLA**; and, **AMANI SHOKRY**; and, **JIMMIE SUTTON**; and, **OMAR KASANI**; and, **GROUP RESOURCES**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **FIRST HEALTH NETWORK**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **MULTIPLAN, INC.**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **PHCS**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **MARPAI ADMINISTRATORS LLC.**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, service representatives; and, **TELADOC HEALTH, INC.**, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, and service representatives.

1

**Carson Attachment EE, Page 4 of 22**

## JURISDICTION

1. The California Department of Insurance (hereafter "Department") brings this matter before the Insurance Commissioner of the State of California (hereafter "Insurance Commissioner"), pursuant to the provisions of California Insurance Code section 12921.8.

## FINDINGS & AUTHORITY

2. California Insurance Code Section 12921.8(a)(1) authorizes the Commissioner to issue a cease and desist order to a person who has acted in a capacity for which a license, registration, or certificate of authority from the Commissioner was required but not possessed.

3. California Insurance Code Section 12921.8(a)(2) authorizes the Commissioner to issue a cease and desist order to a person who has aided or abetted a person described in Section 12921.8(a)(1).

4. California Insurance Code Section 12921.8(a)(3) authorizes the Commissioner to issue an order to show cause for imposition of a monetary penalty against a person described in 12921.8(a)(1) or 12921.8(a)(2).

5. California Insurance Code Section 12921.8(c) authorizes the Commissioner to issue an order to show cause without holding a hearing prior to issuance.

6. California Insurance Code section 12921.8(a)(3) authorizes the Commissioner to impose a fine on those whom have aided or abetted a person who has acted in a capacity for which a license, registration, or certificate of authority from the commissioner was required but not possessed in an amount the greater of the following:

> "(A) Five times the amount of money received by the person for acting in the capacity for which the license, registration, or certificate of authority was required but not possessed.
>
> (B) Five thousand dollars ($5,000) for each day the person acted in the capacity for which the license, registration, or certificate of authority was required but not possessed. In the absence of contrary evidence, it shall be presumed that a person continuously acted in a capacity for which a license, registration, or certificate of authority was required on each day from the date of the earliest such act until the date those acts were discontinued, as proven by the person at a hearing."

7. California Insurance Code section 35 provides that:

> "'Transact' as applied to insurance includes any of the following: (a) Solicitation. (b) Negotiations preliminary to execution. (c) Execution of a

2

**Carson Attachment EE, Page 5 of 22**

contract of insurance. (d) Transaction of matters subsequent to execution of the contract and arising out of it."

8. California Insurance Code section 700(a) provides that:

"A person shall not transact any class of insurance business in this state without first being admitted for that class."

9. California Insurance Code section 703 provides that:

"Except when performed by a surplus line broker, the following acts are misdemeanors when done in this state:

(a) Acting as agent for a nonadmitted insurer in the transaction of insurance business in this state for a home state insured as defined in subdivision (f) of Section 1760.1.

(b) In any manner advertising a nonadmitted insurer in this state.

(c) In any other manner aiding a nonadmitted insurer to transact insurance business in this state for a home state insured as defined in subdivision (f) of Section 1760.1.

In addition to any penalty provided for commission of misdemeanors, a person violating any provision of this section shall forfeit to this state the sum of five hundred dollars ($500), together with one hundred dollars ($100) for each month or fraction thereof during which he or she continues the violation. This section shall not apply to advertising authorized by Section 703.1, subdivision (h) of Section 1760.5, or Section 1773."

10. California Insurance Code section 781(a) provides that:

"A person shall not make any statement that is known, or should have been known, to be a misrepresentation (1) to any other person for the purpose of inducing, or tending to induce, such other person either to take out a policy of insurance, or to refuse to accept a policy issued upon an application therefor and instead take out any policy in another insurer, or (2) to a policyholder in any insurer for the purpose of inducing or tending to induce him or her to lapse, forfeit or surrender his or her insurance therein."

11. California Insurance Code section 1631 provides that:

"[u]nless exempt by the provisions of this article, a person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner authorizing the person to act in that capacity."

12. California Insurance Code section 1633 provides that:

"Any person who transacts insurance without a valid license so to act is guilty of a misdemeanor punishable by a fine not exceeding fifty thousand dollars ($50,000) or by imprisonment in a county jail for a period not exceeding one year, or by both that fine and imprisonment."

**Carson Attachment EE, Page 6 of 22**

13. Commencing on or before June 30, 2023, Respondent INNOVATIVE PARTNERS LP (hereinafter "INNOVATIVE"), has unlawfully acted as an insurance company in California, and has in that capacity unlawfully transacted the business of insurance in this State without the requisite certificate of authority.

14. Part of INNOVATIVE'S scheme was to defraud victims into purchasing limited or non-existent health coverage by convincing them they were purchasing comprehensive insurance plans.

15. Further, INNOVATIVE, without disclosing their involvement, represented itself as Covered California in order to convince victims that they were purchasing comprehensive Aetna or Blue Shield health insurance policies through Covered California.[1] Once the victims paid for INNOVATIVE'S coverage they were given plan cards with INNOVATIVE'S branding and often listing PHCS and Group Resources as claim handlers. Some plan cards also listed First Health Network and/or, Marpai Administrators LLC portal information. Some of the cards also included Teladoc Health INC. contact information offering "$0 co-pay".

16. INNOVATIVE is a non-admitted insurer not authorized to transact insurance in California.[2] INNOVATIVE was formed in Texas on November 28, 2021, and also operates out of a 1401 N. University Drive, Suite 207, Coral Springs, Florida, 33071, address. INNOVATIVE has never been licensed to transact in insurance in California. Based on information and belief, INNOVATIVE is not otherwise licensed by another California governmental agency that permits or qualifies it to provide insurance coverage within California as contemplated in Insurance Code section 740. INNOVATIVE does not currently hold a certificate of authority to transact business in the State of California, and has not held a certificate of authority during any time period relevant to the matters at issue.

17. INNOVATIVE acted in a capacity for which a certificate of authority is required but not possessed, insuring at least forty-five Californians in violation of Insurance Code section 700.

---

[1] INNOVATIVE is not partnered with Covered California.
[2] California Insurance Code section 25.

18.     INNOVATIVE has also transacted insurance in California by soliciting California residents and executing contracts for insurance without being licensed as an agent or broker in violation of sections 1631 and 1633 of the California Insurance Code.

19.     Part of INNOVATIVE'S scheme was to disguise their activities as a single-employer health insurance plan under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974. This was in aid of masking the sale and selling INNOVATIVE health insurance as a "Small Employee Benefit Plan", excluded from State of California oversight. None of the individual victims who filed complaints with the Department of Insurance were aware of this scheme at the time they contracted with INNOVATIVE. None of the victims claimed to be employees of or partnered with INNOVATIVE.

20.     INNOVATIVE also misrepresented insurance benefits to California residents in violation of sections 780(a), 781(a), and 790.03(b) of the California Insurance Code.

21.     Additional violations include, but are not limited to:

a.   Misrepresentation of insurance benefits in violation of sections 780(a), 781, and 790.03(b) of the California Insurance Code.

b.   Soliciting, negotiating, and/or effecting contracts of insurance without a valid license in violation of Insurance Code section 1631 of the California Insurance Code.

**Individuals Aiding and Abetting INNOVATIVE**

Omar Kasani

22.     Omar Kasani (hereinafter "Respondent Kasai") aided and abetted INNOVATIVE, acting as "plan administrator," for the fake INNOVATIVE single-employer health insurance plan, and signing as such on the 2023 Short Form Annual Return/Report of the Small Employee Benefit Plan filed with the United States Department of the Treasury. Respondent Kasani holds a Public Accountancy license with the Texas State Board of Public Accountancy.

23.     The phony INNOVATIVE single-employer health insurance plan lists zero participants at the beginning of 2023, and over fourteen thousand participants by year's end.

///

5

**Carson Attachment EE, Page 8 of 22**

Amani Shokry

24. INNOVATIVE'S Chief Technical Officer was, at all relevant times, Amani Shokry (hereinafter "Respondent Shokry").

Arman Motiwalla

25. Arman Motiwalla (hereinafter "Respondent Motiwalla") served, at all relevant times, as INNOVATIVE'S Chief Operating Officer.

26. Respondent Motiwalla was also named as the primary contact at INNOVATIVE by GROUP RESOURCES and MARPAI ADMINISTRATORS LLC representatives.

27. Respondent Motiwalla was first licensed in California as an out of state Insurance Producer on August 23, 2021. Their license is set to expire on August 31, 2025.

Jimmie Sutton

28. Jimmie Sutton (hereinafter "Respondent Sutton") was the signatory for INNOVATIVE in their contract to access the MULTIPLAN primary and complementary networks for limited benefit plans on a per enrollee, per month basis. Respondent is listed as a debtor for the organization of INNOVATIVE. Jimmie Sutton is also listed as INNOVATIVE'S General Partner on their Certificate of Formation of Limited Partnership filed with the Texas Secretary of State.

Group Resources

29. Group Resources acted as a third-party administrator for Innovative Partners from at least May 1, 2023, through April 30, 2024.

30. Group Resources contact information was displayed on INNOVATIVE plan cards issued to California consumers, adding legitimacy to INNOVATIVE'S scheme.

31. Group Resources facilitated INNOVATIVE'S scheme by providing administrative services and providing Explanation of Benefits on behalf of INNOVATIVE'S California consumers.

First Health Network

32. First Health Network acted as a third-party administrator for INNOVATIVE.

33. On November 22, 2024, an investigator from the Department contacted First

6

**Carson Attachment EE, Page 9 of 22**

Health Network representatives.

34. During the phone call the investigator was told that First Health Network was contracted with INNOVATIVE to act as a provider directory for INNOVATIVE customers, provide pricing based on whether the provider is in-network, and that INNOVATIVE was a legitimate health care provider.

35. First Health Network contact information was displayed on INNOVATIVE plan cards issued to California consumers, adding legitimacy to INNOVATIVE'S scheme.

36. First Health Network facilitated INNOVATIVE'S scheme by providing administrative services on behalf of INNOVATIVE'S California consumers.

37. In a more recent communication with the Department, First Health Network claimed to have ceased working with INNOVATIVE as of April 30, 2024.

38. First Health Network was previously ordered by the Department to CEASE AND DESIST similar activities on February 22, 2022, in Department case number LA202100084.

Marpai Administrators LLC

39. Marpai Administrators LLC acted as a third-party administrator for INNOVATIVE beginning on March 1, 2024, through at least December 12, 2024.

40. Marpai Administrators LLC's role was to process claims for INNOVATIVE'S customers including issuing claim payments.

41. Marpai Administrators LLC facilitated INNOVATIVE'S scheme by providing administrative services to INNOVATIVE'S California consumers on behalf of INNOVATIVE.

Multiplan Inc. & PHCS

42. Multiplan Inc. creates and maintains a national network of providers through agreements with practitioners and facilities.

43. Multiplan Inc. contracted with INNOVATIVE to provide INNOVATIVE access to those services for INNOVATIVE'S California consumers, adding legitimacy to INNOVATIVE'S activities.

44. Multiplan Inc. branding was displayed on INNOVATIVE plan cards issued to California consumers, adding further legitimacy to INNOVATIVE'S scheme.

7

**Carson Attachment EE, Page 10 of 22**

45. PHCS is a wholly owned subsidiary of Multiplan Inc.

46. PHCS provides a primary preferred provider organization ("PPO") network to clients on a national or regional basis.

47. PHCS contracted with INNOVATIVE to provide INNOVATIVE access to those services for INNOVATIVE'S California consumers, adding legitimacy to INNOVATIVE'S activities.

48. First Health Network contact information was displayed on INNOVATIVE plan cards issued to California consumers, adding further legitimacy to INNOVATIVE'S scheme.

Teledoc Health Inc.

49. Teladoc Health Inc. claims to offer comprehensive care including talk therapy, diagnosis and medication support.

50. Teledoc Health Inc. confirmed to Department investigators that they contracted with INNOVATIVE, allowing INNOVATIVE'S customers access to Teladoc Health Inc.'s services since at least March 1, 2023.

51. Teledoc Health Inc.'s contact information was displayed on INNOVATIVE plan cards issued to California consumers, adding legitimacy to INNOVATIVE'S scheme.

52. Teledoc Health Inc. facilitated INNOVATIVE'S scheme by providing health services to INNOVATIVE'S California consumers on behalf of INNOVATIVE.

## ACCOUNTS FROM VICTIMS

**Summary of Complaints**

53. On February 9, 2024, the Department received the first complaint.

54. The majority of the complaints allege that INNOVATIVE is defrauding victims into purchasing either limited or non-existent health coverage by convincing them they are purchasing comprehensive insurance plans.

55. Many of the complaints allege that INNOVATIVE, without disclosing their involvement, is representing itself as Covered California in order to convince victims that they are purchasing comprehensive Aetna or Blue Shield health insurance policies.

56. INNOVATIVE is not partnered with Covered California.

8

**Carson Attachment EE, Page 11 of 22**

57. Once the victims pay for, and then try and use the coverage, they find it is either much more limited or non-existent.

58. This has led many victims to experience delays in necessary medical treatment and/or unexpected bills.

59. None of the victims ever represented that they were the employees of INNOVATIVE. Instead, oftentimes they were seeking insurance because of recent unemployment.

**Individual Accounts**

Victim K.K.

60. On February 9, 2024, the Department received the first complaint against INNOVATIVE from K.K., who claimed that she purchased insurance from INNOVATIVE for her son. When she attempted to use the insurance, her claims were improperly denied.

61. INNOVATIVE also improperly charged her credit card multiple times.

62. According to K.K. she also tried for days, unsuccessfully, to cancel the policy.

63. As part of the Department's investigation, K.K. provided photos of the card she received from INNOVATIVE. The cards list PHCS and Group Resources as the claims handlers and included MultiPlan and Teledoc logos and information:



Victim M.S.

64. On September 24, 2024, Department Investigator Lauren Wyckoff interviewed M.S.

65. M.S. contacted an INNOVATIVE representative, on or around July 10, 2024, to

9

replace Anthem Blue Shield Coverage, using a phone number his father gave him.

66.     M.S. told the representative that he needed a new health care policy that included mental health coverage to cover his bi-weekly therapist appointments.

67.     During the phone-call, it was represented to M.S. that he was purchasing an Aetna Gold PPO plan through INNOVATIVE which would cover his appointments, and could start immediately without a waiting period.

68.     Based on these representations, M.S. purchased the plan, paying an initial premium of $462 which included a $50 activation fee, and $412 monthly thereafter.

69.     It was represented to M.S. that while he was purchasing the insurance through INNOVATIVE, the plan would be an Aetna Gold PPO plan.

70.     Subsequent to the purchase of the policy, M.S. received an ID card which included First Health Network and Marpal Health portal information:



71.     Thereafter, M.S. visited his therapist twice.

72.     Subsequently, he was told that the insurance was not covering the care.

73.     Upset, M.S. contacted both of the numbers on the back of the card[3] he was given and, upon reaching a representative, was told that he did have coverage for mental health.

74.     M.S. continued to go to therapist appointments, believing that he did have mental health coverage.

75.     INNOVATIVE never paid for the mental health care and M.S. was left with

---

[3] INNOVATIVES' Member Services at 844-689-4584 and Partner Services at 866-949-3581

10

$1,709.24 in unpaid medical bills.

Victim A.S.

76. On November 21, 2024, Department Investigator Wyckoff interviewed A.S.

77. A.S. told investigator Wyckoff that he purchased health insurance in, or around, June of 2023, through INNOVATIVE who promised coverage which was not provided.

78. A.S. was a small business owner who was looking to purchase new health insurance after his business slowed causing him to become ineligible for his prior coverage.

79. A.S. stated that the issue began after he tried to purchase a policy through Covered California and gave up due to cost.

80. Thereafter, he received a call from INNOVATIVE who claimed that A.S. qualified for an INNOVATIVE plan due to his low income.

81. INNOVATIVE told A.S. that the plan included full coverage and so A.S. signed up for $400 per month.

82. A.S. specifically asked about E.R. visits and was told that the plan covered up to two visits, per year, with a $50 co-pay.

83. Shortly thereafter, A.S. received a card which included First Health Network PPO and Group Resources information.

84. A.S. was also told that there would be a $25 co-pay for primary care physician visits and that the policy would cover lab work and prescriptions.

85. In early 2024, A.S. confirmed coverage with two separate INNOVATIVE representatives and thereafter visited the E.R. using his INNOVATIVE policy.

86. A.S. also had several regular primary care doctor visits in early 2024.

87. A.S. discovered that the represented coverage did not exist when he started receiving calls from collections agencies.

88. All told, A.S. paid between $500 and $600 out-of-pocket for services which were represented to him as being covered by INNOVATIVE and was left with around $11,000 in debt.

Victims D.C. and Family

89. In late June or July of 2024, D. C. called an 800 number which he believed was

11

**Carson Attachment EE, Page 14 of 22**

associated with Covered California in order to purchase insurance for himself, his wife, and son.

90.     An agent for INNOVATIVE told D.C. that INNOVATIVE was a division of Aetna and sold D.C. an INNOVATIVE First Health PPO policy for $1,142 which was supposed to cover him, his wife, and son.

91.     Thereafter, in fall of 2024, D.C. became concerned when his wife tried to use the policy multiple times and was unsuccessful, despite the claim that it provided full coverage.

92.     D.C.'s concerns increased when he tried to contact the INNOVATIVE representative whom he had worked with and his number was disconnected.

93.     D.C. tried to cancel the INNOVATIVE policy, through the phone number they provided, but was left on indefinite hold.

94.     Ultimately, D.C. canceled his credit card in order to cease payments to INNOVATIVE.

Victim D.P.

95.     On January 13, 2025, Investigator Wyckoff interviewed D.P.

96.     During the interview, D.P. stated that in March of 2024, she called whom she thought was a representative of Covered California to enroll in a Blue Shield policy.

97.     During the phone call, she was sold what she believed to be a Blue Shield Gold 80 PPO policy.

98.     Instead, she was actually sold an INNOVATIVE policy.

99.     D.P. was also told to download a "MedTrust" application which would help her select providers.

100.     D.P. paid $638.59 for the first month of the INNOVATIVE plan which started on March 29, 2024.

101.     Thereafter, D.P. started getting emails from INNOVATIVE.

102.     She was concerned by the emails from INNOVATIVE because she was unaware of their involvement up unto that point.

103.     D.P. emailed INNOVATIVE to cancel the policy on April 19, 2024, believing she was defrauded.

**Carson Attachment EE, Page 15 of 22**

104. INNOVATIVE did not respond until June 24, 2024.

105. Prior to INNOVATIVE'S response, D.P. contacted her bank to reverse the charges and filed a police report with the San Dimas Police Department.

Victim E.B.

106. On August 19, 2024, E.B. called whom she thought was Covered California in order to obtain a policy of PPO health insurance.

107. During the call she was sold a policy by INNOVATIVE representatives who claimed to be with Covered California.

108. Shortly thereafter, E.B. realized she was being scammed and tried to cancel the policy.

109. When E.B. attempted to cancel her policy through INNOVATIVE she was provided various excuses for why her cancelation could not immediately occur.

110. Thereafter, E.B. contacted the Department to report INNOVATIVE conduct.

Victim J.B.

111. On or around July 9, 2024, J.B. called a number he believed to be Covered California, after searching for the Covered California website.

112. During the phone call, J.B. was led to believe he was speaking with Covered California and being sold an Aetna PPO policy.

113. J.B. gave the representative his personal information and the name of his doctor, whom he was told was covered under the policy.

114. J.B. purchased the policy for $622.87 based on the representations made by INNOVATIVE.

115. In reality, J.B. was sold an INNOVATIVE limited policy of insurance.

116. Shortly after the phone call, J.B. became aware of INNOVATIVE'S involvement and attempted to cancel the policy over the phone.

117. J.B. was told by an INNOVATIVE "supervisor" that they would cancel his policy.

118. J.B. became concerned when the cancelation was not reflected on his statement within a reasonable period of time leading him to cancel his credit card, dispute the charges, and

13

**Carson Attachment EE, Page 16 of 22**

report INNOVATIVE to the Department.

Victims J.F. and K.B.

119. On or around December 3, 2024, J.F. called a number he believed to be Covered California, after searching for the Covered California website, to purchase health insurance for himself and his wife.

120. While on the phone, J.B. spoke to a representative and explained that he wished to purchase basic health insurance for himself and his wife K.B.

121. At no time during the phone call did the representative identify themselves as working for INNOVATIVE, instead presenting themselves as a representative of Covered California.

122. During the call, J.B. was quoted $670, per month, for an Aetna PPO health insurance plan which the representative stated would cover him and his wife.

123. He was told that the plan did not have deductibles and that a regular appointment with his doctor would be $25.

124. J.B. gave the representative his credit card information based on the above representations.

125. J.B. stated that he did not sign any documents and was not given any policy documents prior to enrolling in the policy.

126. J.B. received an email from admin_noreply@Innovativepartnerslp.com immediately after getting off the phone.

127. The email did not mention Aetna, or the policy he thought he had purchased.

128. Instead, the email was the first time J.B. learned about INNOVATIVE'S involvement.

129. J.B. became increasingly concerned over the next couple of days and attempted to cancel his policy on December 9, 2024.

130. INNOVATIVE gave J.B. the runaround and so J.B. contacted his bank directly and made a fraud dispute.

///

14

**Carson Attachment EE, Page 17 of 22**

Victim C.A.

131.    On February 13, 2024, victim C.A. submitted the following summary of their problem in their Request for Assistance to the Department:

"[I] was sold health insurance through an agent at a covered [C]alifornia location to Innovative partners on 12/26. since then, [I] have yet to receive ID cards, find doctors in network, use insurance for prescriptions. for the entire month of [J]anuary multiple calls made to "customer service" phone number [I] was provided. however, never an answer. called covered [C]alifornia as [I] was unable to reach the insurance they brokered me and was told covered [C]alifornia had no history of this nor do they associate with this company. it was suggested [I] file through the fraud department. the fraud department referred me to this."

Victim N.S. and C.M.

132.    On May 30, 2024, victim C.M. submitted the following Request for Assistance to the Department:

"My mother purchased Me health insurance on her credit card. We went through the covered California site. Immediately we begin receiving fraudulent charges. My mother is elderly and did not check her account over the last five months of reoccurring charges. Covered California has contacted us and said they're having a problem with this fraudulent company illegally claiming to be covered California."

Victim R.P.

133.    On June 6, 2024, R.P. contacted the Department to request assistance after his wife was turned away from multiple urgent care facilities.

134.    R.P. stated that he purchased a policy of insurance from Innovative on January 26, 2024, for himself and his wife.

135.    He was given the following card as part of their enrollment:

136.    R.P. was also directed to a site which purported to list in-network providers, including Concentra Urgent Care located at 16420 Perris Blvd. Suite Q, Moreno Valley, CA, 92551.

137.    When his wife had an emergency medical situation R.P. attempted to take her to the Concentra Urgent care.

138.    When they arrived, R.P. was told INNOVATIVE was not in their network.

139.    Subsequently, R.P. learned that other providers listed as in-network were not.

///

15

**Carson Attachment EE, Page 18 of 22**

<u>Victim W.J.</u>

140.    On July 15, 2024, victim W.J. submitted the following problem description as part of her Request for Assistance to the Department:

> "Innovative Partners has been unreliable in telling both myself and my physicians office what is covered as part of my policy. Every time we have called we have received different answers and when I ask politely to speak with a supervisor my request has been ignored. The scheduler at my surgeon's office said she has never experienced anything like this and agreed that I should file a complaint with the Department of Insurance. My surgery schedule for 6/27/24 had to be cancelled because I had no coverage for the surgery although told previously it would be partially covered. I then increased my coverage paying $1,118.76 a month. They told both myself and the surgery scheduler I would be covered up to 70%, but ultimately they said the max coverage for a partial thyroid lobectomy would be $3,000.00 for a $43K procedure. As another example of Innovative Partners poor business practices, I have uploaded a Quest Diagnosis invoice I recently received in which it states that PHCS Innovative has not responded to their insurance billing requests…"

## LEGAL CAUSE FOR DISCIPLINE

141.    WHEREAS, INNOVATIVE PARTNERS LP acted in a capacity for which a certificate of authority is required but not possessed and misrepresented the terms of an insurance policy, in violation of California Insurance Code sections 700, 780(a), 781, and 790.03(b).

142.    WHEREAS, ARMAN MOTIVALLA has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

143.    WHEREAS, AMANI SHOKRY has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

144.    WHEREAS, JIMMIE SUTTON has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

145.    WHEREAS, OMAR KASANI has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

16

**Carson Attachment EE, Page 19 of 22**

146.    WHEREAS, GROUP RESOURCES has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

147.    WHEREAS, FIRST HEALTH NETWORK has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

148.    WHEREAS, MULTIPLAN INC. has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

149.    WHEREAS, PHCS has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

150.    WHEREAS, MARPAI ADMINISTRATORS LLC. has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

151.    WHEREAS, TELADOC HEALTH INC. has aided and abetted INNOVATIVE, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

152.    WHEREAS, California Insurance Code section 12921.8(c) authorizes the Insurance Commissioner to issue a Cease and Desist Order without holding a hearing prior to issuance of said Order.

<strong><u>ORDER TO CEASE AND DESIST</u></strong>

NOW THEREFORE, ALL Respondents are HEREBY ORDERED to immediately CEASE AND DESIST the unlawful activities set forth herein.

<strong><u>ORDER TO SHOW CAUSE</u></strong>

NOW THEREFORE, INOVATIVE PARTNERS LP is HEREBY ORDERED to SHOW CAUSE why the facts recited above do not establish grounds for the Commissioner to impose a

**Carson Attachment EE, Page 20 of 22**

monetary penalty pursuant to Insurance Code section 12921.8 of five times the amount of money received by INNOVATIVE PARTNERS LP while acting in the capacity for which a license, registration or certificate of authority was required but not possessed, or five thousand dollars ($5,000) for each day INNOVATIVE PARTNERS LP acted in the capacity for which a license, registration or certificate of authority was required but not possessed, whichever is greater. Absent contrary evidence, it shall be presumed that a person continuously acted in a capacity for which a license, registration, or certificate of authority was required on each day from the date of the earliest such act until the date those acts were discontinued, as proven by the person at a hearing; and,

NOW THEREFORE, ARMAN MOTIVALLA, AMANI SHOKRY, OMAR KASANI, GROUP RESOURCES, FIRST HEALTH NETWORK, MULTIPLAN INC., JIMMIE SUTTON, PHCS, MARPAI ADMINISTRATORS LLC and TELADOC HEALTH INC. are HEREBY ORDERED to SHOW CAUSE why the facts recited above do not establish grounds for the Commissioner to impose a monetary penalty pursuant to Insurance Code section 12921.8 of five times the amount of money received by any of said Respondents while aiding and abetting INNOVATIVE PARTNERS LP to act in a capacity for which a license, registration or certificate of authority was required but not possessed, or five thousand dollars ($5,000) for each day any of said Respondents have aided or abetted INNOVATIVE PARTNERS LP to act in a capacity for which a license, registration or certificate of authority was required but not possessed, whichever is greater.

## NOTICE OF RIGHT TO HEARING

California Insurance Code section 12921.8(c) provides in part, as follows:

> "A person to whom a cease and desist order is issued, may, within seven days after service of the order, request a hearing by filing a request for a hearing with the commissioner."

If you desire a hearing in this matter, your written request for a hearing must be received within seven days after you are personally served with this Order. The seven days begins to run on the day after the day you are served, and if the seventh day falls on a weekend, the period in which

18

**Carson Attachment EE, Page 21 of 22**

your request must be filed is extended to Monday or the next business day, if Monday is a holiday.

Your written request for a hearing must be directed to:

Jason S. Y. Gatchalian
Assistant Chief Counsel
California Department of Insurance
Legal Division
300 Capitol Mall, 17th Floor
Sacramento, California 95814

A copy of the request for a hearing shall be sent to:

Brennain J. Garber
Senior Attorney
Enforcement Bureau I
Legal Division
California Department of Insurance
1901 Harrison Street, 4th Floor
Oakland, California 94612

IN WITNESS WHEREOF, I have hereunto set my hand and affixed by official seal, this 30th day of June, 2025.

RICARDO LARA
Insurance Commissioner


By _____
JASON S. Y. GATCHALIAN
Assistant Chief Counsel

19

**Carson Attachment EE, Page 22 of 22**

# Carson Attachment
# FF



® Report an accessibility issue.

**CT.GOV** | State of Connecticut                    🔍 Search   🌐 Language

## CT Insurance Department

☰ Main Menu

*CONSUMER NOTICE – November 22, 2024*

### BE CAREFUL BEFORE BUYING 'SELF-FUNDED, LIMITED PARTNER' HEALTH PLANS

Connecticut Insurance Commissioner Andrew N. Mais cautions Connecticut residents to be aware of salespeople offering "self-funded" health plans to individual consumers. The latest pitch involves so-called self-funded health coverage that makes people "limited partners" or "part owners" of an employer group that is offering these plans.

**Consumers lack state protection, can have high, unpaid medical bills**

These plans do not provide comprehensive medical coverage and can leave consumers with large, unpaid medical bills. These plans are not ACA compliant and are not approved by the Department. They claim ERISA exemption and therefore, fall outside of the Connecticut Department's authority. That means if something happens, the Department cannot protect you as we would consumers buying fully insured plans.

Be careful. Proceed with caution before signing up and paying a monthly premium.



Some of the groups marketing self-funded coverage in Connecticut include:

- Affiliated Workers Alliance
- Consumer Data Partners, LP
- Employers Business Alliance, LLC
- Innovative Partners, LPSocios Buenos, LP
- Strategic Limited Partners
- The Vitamin Patch, LLC

**Plans have limited coverage and benefits**

These groups do not offer major medical plans. Major medical plans cover a full range of medical services, including preventive care, office visits, inpatient and outpatient services, prescription drugs, and emergency care.

Unlike major medical plans, some of these self-funded plans only cover preventive services such as a yearly check-up or annual health screening. Other plans place limits on the number of services, like doctor visits, that will be covered. There are even some self-funded plans that restrict this already limited coverage by not covering preventive services if they are provided in a hospital facility.

**How to know if you have one these plans:**

To determine if you have purchased coverage through one of these groups, look at the documents that were emailed after you enrolled in the pl... ... the insurance card they may have sent you. The group may not even send a physical card, so consumers should check their email for an ID ca...



## Connecticut Insurance Department                    f 𝕏 in ⊙ ▶

153 Market Street, 7th Floor                                        **Contact CID**
Hartford, CT 06103                                      Phone: (860) 297-3800
                                                     Toll Free: (800) 203-3447

                                                   **Employment opportunities**
                                                   Equal Employment Opportunity
                                                                      Polices
                                                                      Careers

**CT.GOV**  About CT   Policies   Accessibility   Directories   Social Media        🇺🇸 United States
                                                                              Mast: (Half)      Mast: (Half)

**Carson Attachment FF, Page 1 of 2**

For State Employees
© 2025 CT.gov – Connecticut's Official State Website



https://portal.ct.gov/cid/consumer-resource-library/consumer-alerts/2024-consumer-alerts/notice-2024-11-22?language=en_US
132.0.2957.127
Windows 10 Pro 22H2 (64-bit Build 19045)
1/27/2025 8:54:45 AM

**Carson Attachment FF, Page 2 of 2**

# Carson Attachment
# GG