**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Civ. Case No. 26-60976-CIV-SINGHAL

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| INNOVATIVE PARTNERS, LP, also doing business as INNOVATIVE HEALTH PLAN or HEALTHCARE PLAN, a Texas limited partnership, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

**PLAINTIFF FEDERAL TRADE COMMISSION'S**
**RESPONSE IN OPPOSITION TO AHMED SHOKRY AND**
**CORPORATE DEFENDANTS' EXPEDITED MOTION TO MODIFY**
**PRELIMINARY INJUNCTION TO RELEASE FUNDS FOR ATTORNEY FEES**

Defendants Ahmed Shokry; Innovative Partners, LP; American Collective, LP; Health Plan Administrators, LLC; and Papyrus Green Investments LLC ("Moving Defendants") seek the release of over $146,000 from frozen assets to allow for payment of attorneys' fees and costs for work performed over just 11 days. (Dkt. 66.) In so doing, Moving Defendants ask this Court to saddle defrauded consumers—some of whom paid Defendants thousands of dollars on the false promise of comprehensive health insurance coverage and, in exchange, were plunged into catastrophic medical debt—with the additional obligation of underwriting their legal defense. This request should be denied, especially given Moving Defendants' failure to explain why Ahmed Shokry, the scheme's chief architect and beneficiary, cannot pay for legal expenses from other, non-frozen sources, such as by seeking loans from family members or financial institutions, incurring a debt to his counsel, or obtaining gainful employment. It is Shokry, not

1

the consumers he defrauded, who should presumptively foot the bill for legal problems he created.

The law is clear that defendants have no entitlement to use frozen assets for attorneys' fees. The ability to preserve assets for consumer redress should be the paramount consideration in assessing any proposed release, especially where, as here, total consumer injury of at least $91 million far exceeds the less than approximately $10 million in frozen assets. And as the consumer declarations submitted in this case poignantly demonstrate, the injury suffered by consumers is by no means limited to those consumers' payments to Defendants for their illegally marketed patchwork of healthcare-related products. These consumers already stand to recover only a miniscule fraction of what they lost. The Court should not permit Moving Defendants to further burden the consumers they injured with the cost of their legal defense.

I.      BACKGROUND

A.      The Court Found Good Cause to Believe That the FTC Is Likely to Prevail

In entering an *ex parte* temporary restraining order in this case, the Court found good cause to believe that Defendants illegally marketed and sold a patchwork of healthcare-related products as if they were comprehensive health insurance, and that the FTC "is therefore likely to prevail on the merits of this action."[1] The Court similarly found that Defendants have taken at least $91 million from consumers in connection with their unlawful practices, and that an asset freeze and appointment of a temporary receiver were in the public interest.[2] These findings were supported by volumes of exhibits submitted by the FTC, including over twenty sworn

---

[1] *See* Sealed *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO") (Dkt. 13) at 2–4.
[2] *See id.* at 3–4.

declarations from consumers, law enforcement personnel, and a health insurance expert; an undercover sales call transcript; and numerous consistent consumer complaints.[3]

Based on the FTC's compelling evidentiary showing at the TRO stage, the Court directed Defendants to "show cause, if there is any," why a preliminary injunction should not be entered.[4] They did not do so.  In fact, the evidence the FTC obtained since the entry of the TRO bolsters the FTC's allegations.

### B. Evidence Uncovered Since Entry of the TRO Confirms Defendants' Unlawful Conduct

Inspection of Defendants' business premises—inside and outside the building—pursuant to the TRO revealed numerous facially deceptive scripts consistent with those described and depicted in the FTC's Complaint[5] and the voluminous evidence submitted in support of the TRO, confirming that Defendants' operation is permeated with fraud.  These new scripts are replete with the false statements and high-pressure sales tactics at the core of the FTC's allegations, including misrepresenting Defendants' healthcare-related products as comprehensive health insurance and impersonating the government and well-known businesses.

For example, in one newly discovered script, agents following up on declined payments are instructed to tell confused consumers who ask "Why am I being charged?" that the consumer "enrolled in our comprehensive health coverage," and that they must make an immediate payment to "avoid any lapse in coverage, and prevent the account from being sent to

---

[3] *See id.* at 3; *see also* Plaintiff's Exhibit ("PX") 1 through PX 24, in Exhibits Supporting Plaintiff's *Ex Parte* Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (Dkts. 7-2 through 7-33).
[4] *See* TRO, Dkt. 13 at 35.
[5] *See, e.g.,* Dkt. 1 at ¶¶ 30, 33, 39–40, 42, 50–51, 53.

collections."[6]  Another egregious script found on the business premises instructs sales agents to say they "have access to all of the Top A rated insurance companies" and are shopping "ALL of the available insurance plans" on the consumer's behalf.[7]  The script then instructs agents to quote various prices for other hypothetical plans, which the script expressly notes are "made up."[8]  And although Defendants' products are riddled with significant exclusions,[9] the sales script goes on to falsely state that, "the only thing the plan doesn't cover is Maternity for newborn babies and Substance abuse for Drugs and alcohol[.]"[10]

Yet another sales script found onsite instructs agents to falsely tell low-income consumers who might qualify for free or low-cost insurance that due to a "new law," "pregnant women and critically ill people are the ONLY citizens that will get free coverage."[11]  In other words, telemarketers lead the consumers least able to afford Defendants' expensive products to believe they must pay for it, and then proceed to enroll them in a Frankensteinian patchwork of healthcare-related products that bears no resemblance to comprehensive health insurance.

Still other scripts located at Defendants' business location show Defendants' blatantly false government affiliation claims.  For example, one sales script falsely describes Defendants'

---

[6] *See* Second Supplemental Declaration of Christine Carson ("Carson Second Supp. Dec."), PX 26, filed concurrently herewith, at ¶ 8 & Attachment ("Att.") B, p. 3.

[7] *See id.*, PX 26 at ¶ 10 & Att. C, p. 2; *see also id.*, PX 26 at ¶ 12 & Att. E, p. 7 ("Well it's important Over 117 plans were compared between the ACA Marketplace and the Private Insurance Network to find you this program at this rate. . . . Now if there was a better plan out there for you/you guys then that is the plan that we would be going over together because, again, I am an agent, so I don't work for 1 specific insurance company.  I work for you!").

[8] *See id.*, PX 26 at ¶ 10 & Att. C, p. 2.

[9] *See generally* Plaintiff's *Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, and Incorporated Memorandum of Law in Support (Dkt. 7) at 9–12.

[10] *See id.*, PX 26 at ¶ 10 & Att. C, p. 3.

[11] *See id.*, PX 26 at ¶ 11 & Att. D, p. 1.

plans as "State Issued."[12] As for the $100 enrollment fee Defendants charge consumers who sign up for the plan, the script instructs telemarketers to say that each consumer's "state regulates an additional $100 for the first month[,]"[13] but that charge has nothing to do with any state regulation.

These scripts also show how Defendants' telemarketers routinely misrepresent affiliations with well-known insurance carriers. In one, a hypothetical consumer calls Defendants "trying to get in contact with (insurance company)."[14] "Not a problem," Defendants' agents are told to answer, "[w]e are contracted with them."[15] The sales script then instructs a pivot to the sales pitch, even though Defendants are not contracted with and do not offer plans from major insurance carriers. (Relatedly, a collections-focused script found at Defendants' business location contains a specific, canned rebuttal to use with consumers who call in saying, "I was told this is Blue Cross Blue Shield."[16])

## II.  ARGUMENT

Against this backdrop, Ahmed Shokry and the Corporate Defendants now ask the Court to release $146,707 from the frozen assets for attorneys' fees. In doing so, they make no attempt to rebut the FTC's allegations or minimize their involvement in the scheme. Instead, they focus entirely on the volume and intensity of defense counsel's work in the 11 days leading up to entry of the stipulated preliminary injunction—work that counsel undertook without a retainer or

---

[12] *See id.*, PX 26 at ¶ 10 & Att. C, p. 3; *see also id.*, PX 26 at ¶ 10 & Att. C, p. 11 (describing "state issued private plans through [the consumer's] state of _____.").

[13] *See id.*, PX 26 at ¶ 10 & Att. C, p. 4.

[14] *See id.*, PX 26 at ¶ 12 & Att. E, p. 3.

[15] *See id.*

[16] *See id.*, PX 26 at ¶ 9 & Att. B, p. 4 ("I completely understand the confusion[.] It's possible the enrolling agency may have mentioned Blue Cross Blue Shield in comparison. Although there may have been some misunderstanding, your coverage remained active through [Paid Through Date], which is why there's still a balance due. At this point, it's important to get the payment processed to avoid any potential issues with your account, including collection activity.").

guarantee of payment, apparently assuming that the Court would agree to compensate them with frozen funds held for the benefit of defrauded consumers.  The Court should deny their request.

> A.      **Defendants Have No Legal Right to Frozen Assets Presumptively Earmarked for Consumer Redress**

Because civil defendants have no right to counsel, *FTC v. Assail, Inc.*, 410 F.3d 256, 266–67 (5th Cir. 2005), they have no right to access frozen funds to pay attorneys' fees.  *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013).  Courts have discretion to authorize payment of attorneys' fees out of frozen funds when equity requires, but that discretion is necessarily guided by a key underlying purpose of the asset freeze—ensuring that funds are available to provide consumers redress.  *Id.*  "When frozen assets are less than the amount needed to compensate consumers for their losses, a district court can properly refuse to unfreeze assets."  *Id.*; *FTC v. Lanier L., LLC*, No. 3:14-CV-786, 2015 WL 9302786, at *3 (M.D. Fla. Dec. 22, 2015) (declining to unfreeze funds for attorneys' fees because frozen funds fell far short of potential liability).  And where, as here, the total consumer harm eclipses the total amount frozen, "equity favors preserving the meager frozen assets to protect consumers."  *FTC v. IAB Mktg. Assocs., LP*, No. 12-61830-CIV, 2013 WL 2433214, at *2 (S.D. Fla. June 4, 2013); *see also FTC v. Vision Online, Inc.*, No. 6:23-CV-1041, 2024 WL 1050518, at *2 (M.D. Fla. Mar. 11, 2024) (while parties "generally may spend their resources as they see fit to retain counsel, they may not use their victims' assets to hire counsel to help them retain the fruits of their violations").

In assessing requests to pay legal fees out of frozen funds, courts in this circuit also consider such factors as the ability to "maintain[] fairness in the legal proceedings," a "defendant's unclean hands after entry of the asset freeze," whether the funds at issue were "derived . . . from the alleged illegal activities," and whether there exist other available sources

of funds to pay defendants' legal fees. *FTC v. Roca Labs, Inc.*, 8:15-CV-2231-T-35TBM, 2017 WL 11002307, at *1 (M.D. Fla. Apr. 7, 2017). Mere assertions by defense counsel that frozen funds are necessary to their continued representation are not a sufficient basis to release assets. *See FTC v. Williams, Scott & Assocs. LLC*, No. 1:14-CV-1599, 2015 WL 7351993, at *3 (N.D. Ga. Sept. 22, 2015) (in denying fee request, noting that "counsel should have been well aware" that defendant "might lack sufficient funds to pay counsel's attorneys' fees when they began to represent [him]" and that counsel accordingly "assumed the risk of nonpayment"); *FTC v. Revmountain, LLC*, No. 2:17-CV-02000-APG-GWF, 2017 WL 4532196, at *2 (D. Nev. Oct. 6, 2017) ("counsel knew when they took the case that the defendants were subject to an asset freeze," so they "took a known risk of nonpayment").

Applying these factors in similar FTC cases, courts in this circuit have routinely denied defendants' requests to release frozen assets to pay attorneys' fees. *See, e.g.*, *Vision Online, Inc.*, 2024 WL 1050518, at *3 (denying attorneys' fees for work performed in lead-up to entry of stipulated preliminary injunction based on "serious concerns" about allowing defense counsel to "cut in line" in front of "consumer victims . . . and potential creditors"); *Roca Labs, Inc.*, 2017 WL 11002307, at *1 (denying request to unfreeze $100,000 in attorneys' fees in case where the value of frozen assets "f[ell] far short of Defendants' estimated monetary liability," Defendants made "no showing that the funds at issue were derived by means separate and apart from the alleged illegal activities," and Defendants failed to show "that the frozen funds are the only funds available to pay for their defense"); *Lanier L., LLC*, 2015 WL 9302786, at *3 (declining to unfreeze funds for legal counsel because, "[h]aving found that the FTC is substantially likely to prevail . . . on the merits, the Court has a duty to ensure that [defendant's] assets are available to make restitution to the injured consumers"); *Williams, Scott & Assocs. LLC*, 2015 WL 7351993,

at *2 (denying request to unfreeze funds where frozen assets appeared to fall short of amount needed to compensate consumers); *FTC v. Clean Credit Rep. Servs., Inc.*, No. 08-22922-CIV, 2010 WL 11505557, at *4–5 (S.D. Fla. July 23, 2010) (denying request for attorneys' fees where consumer loss was greater than available assets, there had been violations of the asset freeze, and defendants failed to show that funds were derived from non-fraudulent sources); *FTC v. RCA Credit Servs., LLC*, 2008 WL 5428039, at *4 (M.D. Fla. Dec. 31, 2008) (denying request for attorneys' fees where frozen assets were derived unlawfully and were insufficient to redress consumers); *FTC v. USA Fin. LLC*, No. 8:08-CV-899-T-17MAP, 2008 WL 3165930, at *3 (M.D. Fla. Aug. 6, 2008) (denying request for $50,000 in attorneys' fees where value of "frozen assets f[e]ll far below the amount needed to compensate the consumers"). The Court should follow suit here.

**B.      The Equities Weigh Strongly Against Depleting Consumer Funds**

In this case, the relevant equitable factors militate in favor of preserving all available assets to redress injured consumers. Moving Defendants show no entitlement to such funds.

**1.      The Total Consumer Harm Dramatically Exceeds the Amount Frozen**

The foremost concern when evaluating requests to release frozen assets is whether those assets are sufficient to compensate consumers for their losses. *IAB Mktg. Assocs., LP*, 972 F. Supp. 2d at 1313. Here, the total funds frozen to date total less than $10 million[17]—a figure that pales in comparison to the more than $91 million in estimated consumer loss, putting aside the

---

[17] *See* Carson Second Supp. Dec., PX 26 at ¶ 14 (as of May 12, 2026, funds totaling approximately $9,825,222.47 frozen). In his separately filed response in opposition to Moving Defendants' motion, the court-appointed Receiver notes that "approximately $7.6 million dollars [have been] thus far seized by the receivership." Dkt. 69 at 3. Upon information and belief, this $7.6 million figure reflects the total funds transferred into the receivership bank account thus far. The FTC's $9.8 million figure is higher because it includes the frozen personal assets of the Defendants as well as frozen receivership assets that have been identified but that have yet to be transferred from their respective financial institutions to the Receiver.

substantial and, for some, catastrophic additional monetary and non-monetary harms Defendants inflicted on consumers.[18]  At best, such consumers stand to recover a tiny fraction of the monthly premiums they paid Defendants; they will recoup nothing of any additional reliance damages they incurred.  That makes this case different in kind from *FTC v. Click Profit, LLC*, which Moving Defendants cite extensively and inaccurately describe as presenting "a nearly identical situation."  Dkt. 66 at 5.  In *Click Profit*, the frozen assets totaled just under a quarter of the estimated consumer harm, and the losses the FTC sought to recover were limited to the amount consumers paid into the defendants' business opportunity scheme.[19]  Here, by contrast, the assets frozen thus far amount to just over 10% of the more than $91 million that consumers paid in premiums alone.

### 2.    The Frozen Funds Are Derived from Defendants' Unlawful Conduct

There appears to be no dispute that the approximately $10 million in frozen funds were "derived . . . from the alleged illegal activities" detailed in the FTC's complaint.  *Roca Labs, Inc.*,

---

[18] *See, e.g.*, Declaration of Karl P. Clark, PX 2, at ¶¶ 5–6, 34, 38–39, 41 (consumer paid more than $2,800 for what was described as an Aetna PPO plan and ultimately accrued more than $60,000 in uncovered medical bills before discovering that he did not, in fact, have comprehensive health insurance); Declaration of Griffin Malnar, PX 11, at ¶¶ 4, 24 (consumer paid Defendants over $2,200 for what was described as comprehensive health insurance and wound up accruing more than $15,000 in medical bills for care that he needed but could not afford without health insurance); Declaration of Kimberly Hood, PX 7, at ¶¶ 45–46, 64 (consumer paid nearly $2,500 in premiums to Defendants, incurred nearly $2,000 in uncovered medical bills, and, upon learning she was uninsured, went without necessary medical care, including a CT scan and mammogram); *see also* Declaration of Christine Carson, PX 24 at ¶ 40 (detailing additional consumer complaints submitted to the FTC, including one consumer who was billed $35,000 for childbirth-related care and another who was billed $26,402.38 for surgery, despite express representations from Innovative Partners that such care would be covered); Carson Second Supp. Dec., PX 26 at ¶ 13 & Att. F (mail correspondence discovered at Defendants' business location shows that Defendants denied a consumer's $155,000 claim for a spinal surgery, even though consumer's medical provider had been reassured on two prior occasions that the surgery would be covered).

[19] *See FTC v. Click Profit, LLC, et al.*, No. 1:25-CV-20973-DSL (S.D. Fla. Apr. 18, 2025), Dkt. 77 at pp. 3–4 (about $3.4 million frozen compared to approximately $14.4 million in consumer harm).

2017 WL 11002307, at *1.  To be clear, a defendant's assets need not be traceable to the alleged fraudulent activity to be properly frozen.  *See Lanier L., LLC*, 2015 WL 9302786, at *2 (collecting cases).  But the as-yet-unrebutted fact that the frozen funds appear to consist entirely of capital derived from or directly related to Defendants' unlawful scheme is certainly relevant to the equities; it underscores the perverse reality that Moving Defendants' motion seeks to force defrauded consumers to bankroll the legal defense of the Defendants who defrauded them.

### 3. There Is No Suggestion that Moving Defendants Have Explored Other Sources of Funding

Moving Defendants fail to explain why they cannot draw on other sources of funding to pay their legal fees.  There has been no suggestion, for instance, that Ahmed Shokry is incapable of seeking a line of credit, borrowing money from friends or family, or incurring a debt to his attorneys and working to pay it off through gainful employment.  *See, e.g.*, *FTC v. Elite IT Partners, Inc.*, No. 2:19-CV-125, 2019 WL 1568400, at *2 (D. Utah Apr. 5, 2019) (defendant "supplies no testimony or evidence describing any efforts to finance his legal expenses through new employment, available lines of credit, loans, or any other potential sources of funds"); *IAB Mktg. Assocs.*, 972 F. Supp. 2d at 1314 (denying request to unfreeze funds where defendants failed to offer "persuasive evidence" that they were incapable of working).

### 4. Evidence Destruction Raises Concerns of Unclean Hands

Finally, there is the specter of unclean hands.  "[A] party cannot seek equitable relief from the court when he has failed to abide by court orders." *CFTC v. Traders Domain FX Ltd.*, No. 240CV023745, 2025 WL 2829717, at *2 (S.D. Fla. Aug. 5, 2025).  At present, there remain serious, unresolved questions about who is responsible for the spree of evidence destruction that immediately followed service of the TRO.[20]  At the very least, Defendants failed to take care to

---

[20] *See generally* Dkt. 45.

preserve evidence in accordance with the TRO's requirements.  *See* TRO (Dkt. 13) at § XII.  To date, Defendants have not told the FTC whether they distributed the TRO to any of their employees, as the TRO required.  *See* TRO (Dkt. 13) at § XXIV.  Once the FTC has been able to fully develop the facts related to the evidence destruction, the FTC may move the Court for appropriate sanctions or other relief.  Regardless, Defendants' failure to secure evidence culminated most visibly in the wanton exposure of highly sensitive consumer information, which as-yet-unidentified individuals stuffed in dumpsters and left strewn around the parking lot outside Innovative Partners' headquarters.[21]  Under these circumstances, the equities weigh strongly against unfreezing any funds.

In sum, Moving Defendants have failed to make the threshold entitlement showing necessary to justify tapping frozen consumer funds to pay their legal bills.

### C.      Defendants' Requested Fee Amounts Are Unreasonable

Only after defendants "establish entitlement to the payment from the frozen funds and the receivership"—including by overcoming the "serious concerns" engendered by allowing attorneys to "cut in line" ahead of consumers—do courts consider the reasonableness of the fee request itself.  *Vision Online, Inc.*, 2024 WL 1050518, at *2–3.  The reasonableness inquiry involves assessment of both the requested hourly rate(s) and the total hours expended.  *Id.* at 2. Here, the FTC and this Court cannot do any meaningful analysis of the reasonableness of Moving Defendants' fee request because they did not attach itemized billing records to their motion.  Instead, Moving Defendants provide only high-level, bullet-point summaries of collective litigation tasks from which it is impossible to determine who did what work over what period of time.  "[A] party seeking fees bears the burden to submit a request for fees that will

---

[21] *See* Supplemental Declaration of Christine Carson, PX 25 at ¶ 14 & Att. F, pp. 6, 7, 9 (Dkt. 45-1).

enable the court to determine what time was reasonably expended, and a failure to submit counsel's billing records can constitute a failure to meet this burden." *4539 Pinetree LLC v. Certain Underwriters at Lloyd's London*, No. 1:22-22901-CIV, 2025 WL 2098804, at *3 (S.D. Fla. July 8, 2025) (cleaned up), *report and recommendation adopted,* No. 22-22901-CIV, 2025 WL 2096964 (S.D. Fla. July 25, 2025). *Cf.* S.D. Fla. L.R. 7.3(b) (requiring that motions for attorneys' fees arising from entry of a final judgment or order provide, *inter alia*, "the number of hours reasonably expended by each [] timekeeper" and "the tasks done during those hours"). This is reason enough to deny Moving Defendants' motion.[22]

Even without the benefit of Moving Defendants' billing records, however, Moving Defendants' request is excessive on its face. Moving Defendants seek fees for the work of eight attorneys who billed a combined total of 164.9 hours, at rates that ranged from $495 to $1,064 per hour,[23] over the course of 11 days. *See* Dkt. 66-1 at 3, 4; Dkt. 66-2 at 4. This shakes out to an average of $13,337 per day. Moving Defendants assert, without any substantiating billing records, that they "involved associates to the extent possible and asked the lowest rate counsel appropriate for the work to undertake tasks insofar as the pace allowed," Dkt. 66 at 7, but the $146,707 overall figure could only have been achieved through substantial involvement from

---

[22] Defendants offer to allow the Court to review their billing records in camera, and to provide redacted versions of those records to the FTC upon request. Dkt. 66 at 7, 8 n.4. If the Court is inclined to entertain Moving Defendants' fee request, the FTC respectfully requests an opportunity to review Moving Defendants' redacted billing records and to file a supplemental response. In addition, the FTC requests that the Court review and approve Moving Defendants' proposed redactions to those records in advance to ensure that they are not excessive. *See, e.g.*, *Click Profit*, 2025 WL 2256563, at *2 (court reviewed and approved proposed redactions to billing records, ordered that those records be produced to the FTC, and allowed the FTC to submit supplemental response).

[23] The highest billing attorney, Steven Wernikoff of Honigman, LLC, has yet to file an appearance in this matter.

high-billing partners.[24]   Moving Defendants cite two cases in which courts have unfrozen amounts higher than the $146,707 they request.  *See Click Profit*, 2025 WL 2256563; *FTC v. Legion Media, LLC*, No. 8:24-CV-1459-JLB-AAS, 2024 WL 5456293 (M.D. Fla. July 1, 2024). As noted above, the more common approach in this district is to deny requests to pay attorneys' fees out of frozen funds outright.  *See supra* at 7–8.  But in cases where courts *have* awarded fees out of frozen funds, they often authorize far more modest amounts than the $146,707 Moving Defendants seek here.  *See, e.g.*, *FTC v. U.S. Mortg. Funding, Inc.*, No. 11-CV-80155, 2011 WL 2293377, at *1 n.4, 2 (S.D. Fla. June 9, 2011) ($26,077.45 released in case where defendants made affirmative showing of inability to pay attorneys' fees through other sources); *IAB Mktg. Assocs.*, 2013 WL 2433214, at *2–3 (denying fee request after previously releasing $75,000 to compensate attorneys for representing defendants in contested preliminary injunction hearing ).

What's more, Moving Defendants' requested rates for partners average out to $933.50 per hour, *see* Dkts. 66-1; 66-2, which trends higher than rates recently approved by South Florida courts in other contexts for partners with decades of experience.  As one court recently explained, "South Florida attorney hourly rates seem to be a solid group with a large percentage in the $200–$300 range, a second tier of $450- to $500-an-hour attorneys and a handful in the $600 range.  *Hayden v. Urvan*, No. 21-CV-82051, 2025 WL 826697, at *3 (S.D. Fla. Mar. 14, 2026) (approving blended rate of $600 per hour for a partner with 31 years of experience). Indeed, "some of our earlier cases awarded only up to $500 per hour for experienced partners, even in complicated cases."  *Soc. Life Network, Inc. v. Peak One Opportunity Fund, L.P.*, 21-21373-CV, 2023 WL 5053985, at *5, 7 (S.D. Fla. July 20, 2023) (allowing $700 per hour for a

---

[24] The average rate billed is approximately $890 per hour (derived from counsel's total request of $146,707 divided by their total time billed of 164.9 hours).  *See* Dkts. 66-1, 66-2.  This suggests that significant work was performed by partners.

"high-level partner"); *see, e.g.*, *Hepburn v. Luxurban Hotels, Inc.*, No. 1:23-CV-24380, 2025 WL 1094198, at *3 (S.D. Fla. Apr. 4, 2025) ($625 per hour); *Family First Life, LLC v. Rutstein*, 22-CV-80243-AMC, 2023 WL 5939620, at *3 (S.D. Fla. Aug. 23, 2023) ($775 per hour).

In addition to being under-supported, Moving Defendants' request for $146,707 is unreasonably high and should thus be denied wholesale or in substantial part.

## III.   CONCLUSION

For the above reasons, the FTC respectfully requests that the Court deny Moving Defendants' motion to release frozen assets for attorneys' fees.

Dated: May 14, 2026

Respectfully submitted,

/s/ William J. Hodor
D'Laney Gielow (admission forthcoming)
William J. Hodor (Special Bar No. A5501501)
Federal Trade Commission, Midwest Region
230 South Dearborn Street, Room 3030
Chicago, Illinois 60604
(312) 960-5595[telephone, Gielow]
(312) 960-5592 [telephone, Hodor]
dgielow@ftc.gov [e-mail, Gielow]
whodor@ftc.gov [e-mail, Hodor]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

I HEREBY CERTIFY that on May 14, 2026, I electronically filed the foregoing document via this Court's CM/ECF system, which provided a true copy to all those registered to receive such notice.

/s/ William J. Hodor
William J. Hodor
Special Bar No. A5501501

14