UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.

CASE NO. 26-60976-CIV-SINGHAL

INNOVATIVE PARTNERS, LP, d/b/a
INNOVATIVE HEALTH PLAN, et al.,

        Defendants.

_____/

**RECEIVER'S REPLY IN SUPPORT OF FIRST INTERIM APPLICATION FOR
PAYMENT OF PROFESSIONAL FEES AND EXPENSES THROUGH MAY 31, 2026**

Paul Lopez, in his capacity as Receiver ("Receiver") for Innovative Partners, LP d/b/a
Innovative Health Plan or Healthcare Plan; American Collective, LP, d/b/a ACLP Health Plan;
Health Plan Administrators, LLC; Papyrus Green Investments, LLC; and Prosperity Health, LLC
(collectively, the "Receivership Entities"), files this Reply in support of his First Interim
Application for Payment of Professional Fees and Expenses through May 31, 2026 (D.E. 97).

Defendants Ahmed Shokry; Innovative Partners, LP; American Collective, LP; Health Plan
Administrators, LLC; and Papyrus Green Investments, LLC object to certain of the Receiver's
claimed professional fees and expenses on various grounds, arguing that these fees and expenses
should be denied or reduced. *See* (D.E. 104 at 1). As demonstrated below, however, the Receiver's
and his professionals' fees and expenses are reasonable for the work performed in the fast-moving
environment of a receivership. The Court should grant the Receiver's First Fee Application in its
entirety.

**A. Billing on April 20, 2026, for Immediate Access to Business Premises**

First, Defendants argue that five timekeepers on the Receiver's legal team unreasonably
billed for securing Innovative Partners' and American Collective's leased office space on the day

of the FTC's raid on April 20, 2026. *See* (D.E. 104, at 3–4). According to Defendants, the Receiver has not demonstrated why five timekeepers, billing a total of 45.3 hours, were needed to secure the premises. In support, Defendants rely on *F.T.C. v. Worldwide Info Services, Inc.*, 2015 WL 144389, at *7 (M.D. Fla. Jan. 12, 2015), where they say the Middle District denied fees and expenses relating to three of the receiver's professionals billing for travel time at the commencement of the receivership.

But *Worldwide Info* is distinguishable. There, to execute the temporary restraining order and secure the premises, the receiver sent eleven of its own professionals plus two additional accounting professionals from California to Orlando, Florida, where the receivership business was located. *Id.* at *1. After the first full day, three of the receiver's professionals plus the two accounting professionals left Orlando. *Id.* at *2. At the end of the second day, all the receiver's professionals, except for the IT specialists, left Orlando. *Id.*; *see also id.* at *6. The district court found that the receiver's actions of "sending several professionals home immediately after commencing the Receivership[] indicate that the Receivership was initially overstaffed." *Id.* at *7. Although the receiver voluntarily reduced his professionals' hours billed for "excessive travel time," the receiver still claimed a "significant portion" of fees for travel time in his fee application. *Id.* at *6. In determining the reasonable amount of fees and in light of the evidence presented, the district court determined that it was unreasonable for *three* of the receiver's *thirteen* professionals to travel from California to Florida at the commencement of the receivership to secure the premises, so the court denied fees associated with those three timekeepers. *Id.* at *7.

That's not the situation here. Defendants here take issue with five timekeepers (consisting of four attorneys and one paralegal) billing for the local travel to the Coral Springs premises and performing other seizure/inspection-related tasks for the entire day of the raid on April 20. This

work was directly related to the Receiver carrying out his fiduciary duties under the Temporary Restraining Order (D.E. 13) of securing the business premises and the Receivership Entities' assets, as well as gathering any information possible at the outset. This work is also reasonable given that all but one of these timekeepers[1] have been regularly performing work on this case and have secured real value for the receivership as reflected in the Receiver's First Status Report. *See* (D.E. 89). It also goes without saying that a paralegal's functions are different than an attorney's, so the paralegal, Nicole Santoro's, time should be fully compensated for the reasonable work performed.

Regarding Defendants' argument that the Receiver should be required to separate the block-billed time, this request should be denied. As demonstrated in the Receiver's exhibits to his Motion, the Receiver, his counsel, and his accounting professionals have all kept meticulous time with detailed and separated time entries on all days after the raid. *See* (D.E. 97-1, 97-2). It is only on the day of the raid—where events were unfolding quickly; the Receiver's professionals were gathering information; and several different, but related, tasks were being performed at the same time by the same individual timekeeper—that the timekeepers block-billed. In light of the Receiver's and his professionals' other time entries, the Court should not require separation of time entries on April 20, 2026. In sum, 45.3 hours billed by four attorneys and one paralegal for the day of the raid on April 20 is reasonable. The Court should allow all this time.

**B.  Billing Related to Response to Defendants' Request to Unfreeze Assets**

Next, Defendants claim that the Receiver's and his counsel's 9.2 hours of time spent opposing Defendants' request to unfreeze assets was "unnecessary and duplicative of the FTC's role." (D.E. 104, at 4). Not so.

---

[1] Lexy Semino, who only billed 4.0 hours on April 20, was asked to attend the raid and coordinate with federal and local law enforcement because of his expertise associated with his former career as a law enforcement officer.

#5019945v2-221495.0001

Defendants' argument overlooks that the Receiver manages and controls the Receivership Entities' bank accounts. Defendants—in support of their argument now—point to a single line in their Reply in Support of Their Motion to Release Funds for Attorneys' Fees where they assert that "Mr. Shokry's individual accounts," as opposed to receivership assets, "appear to contain sufficient funds to satisfy the requested release of attorneys' fees." *See* (D.E. 75, at 5). Notably, however, Defendants' original motion to release funds—which simply sought a release of funds from the "asset freeze"—did not make this distinction clear, and this assertion was mentioned for the first time in Defendants' reply. *See generally* (D.E. 66).

In fact, the motion to unfreeze assets was filed on behalf of the *corporate Defendants* in addition to Mr. Shokry, *see* (D.E. 66, at 1), so Defendants' position that they were not seeking release of receivership assets is simply untrue. Defendants also repeatedly stated in their original motion that both they and the Receiver presumably intended to get paid out of the frozen funds, which implies that Defendants also sought release of receivership assets. Further, Defendants cited a case in their original motion standing for the proposition that the movant must establish entitlement to payment "from the frozen funds *and the receivership estate*," *id.* at 5 (emphasis added) (quoting *FTC v. Click Profit, LLC*, 2025 WL 2256563, at *3 (S.D. Fla. June 16, 2025)), which further supports the Receiver's and his counsel's work spent drafting and preparing a response opposing the release of frozen funds. Lastly, the Court specifically ordered the *Receiver* and the FTC to respond to Mr. Shokry and the corporate Defendants' expedited motion seeking the release of frozen funds (D.E. 67), so the Receiver was required to comply with this Court's Order.

Finally, contrary to Defendants' position that this work was not "reasonably necessary to preserve or administer the Receivership estate," the Receiver's opposition to the release of frozen

4

assets necessarily means that the Receiver intended to preserve the receivership assets. The Court agreed with the Receiver that the funds should not be released, *see* (D.E. 90), meaning that the Receiver's work prevented further depletion of receivership assets to fund Mr. Shokry's and the corporate Defendants' defense. Thus, the work spent on researching, drafting, and revising the Receiver's response to the motion to unfreeze assets was reasonable, was not duplicative of the FTC's role, and should be allowed in its entirety.

C. **Billing Related to the Addition of Prosperity Health and Safe Guard Management to Receivership**

Defendants challenge the 16.4 hours spent by the Receiver and his counsel to investigate Prosperity Health, LLC ("Prosperity") and Safe Guard Management, LLC ("Safe Guard") and the associated work drafting the filings seeking to bring these entities into this receivership. *See* (D.E. 104, at 5). As Defendants acknowledge, the Court granted the Receiver's motion to add Prosperity Health as a Receivership Entity. *See* (D.E. 91). As of the filing of this Reply, the briefing on the Safe Guard motion has not yet closed.

The Receiver has added value to the estate by seeking to bring these entities into the receivership. As to Safe Guard, in response to the discovery served by the Receiver on Safe Guard, the Receiver demanded from Mr. Shokry a vehicle he purchased with Safe Guard assets for $125,000 that was titled in Safe Guard's name. Safe Guard also has two bank accounts totaling approximately $20,000.00. If the Court grants the Receiver's motion as to Safe Guard, these additional assets will benefit the receivership estate. Although Mr. Shokry's counsel previously agreed to "treat" Safe Guard's assets as frozen, the Receiver's work spent in actually seeking to name Safe Guard a receivership entity, if the motion is granted by the Court, will allow the Receiver to have *control* over Safe Guard's assets to be managed or disposed of in accordance with the Receiver's fiduciary duties.

5

#5019945v2-221495.0001

Both Prosperity and Safe Guard were entities deeply entangled in the corporate Defendants' business and financial affairs. The Receiver's and Kaufman Rossin's investigations have revealed that these entities were used at various times as conduits for the flow of cash monies or assets into or out of the Receivership Entities, or to third parties, many of which are owned or controlled by apparent insiders.

Based on these facts, the Receiver was acting in accordance with his fiduciary duties under the Stipulated Preliminary Injunction (D.E. 64) in seeking to name Prosperity Health and Safe Guard as Receivership Entities. Accordingly, the Receiver's and his counsel's work performed is reasonable and should be allowed in its entirety without deferral.

### D. Billing Related to HIPAA Research

Next, Defendants challenge the 14.1 hours spent by the Receiver's counsel researching and drafting a memorandum on the Health Insurance Portability and Accountability Act ("HIPAA"). *See* (D.E. 104, at 6). As Defendants are fully aware, the corporate Defendants, as entities that obtained and dealt with patients' protected health information under the allegedly fraudulent health plans, were subject to HIPAA law and regulations. At the outset of the receivership, the Receiver took possession of thousands of documents from Defendants' offices—and from the dumpsters outside the offices—that appeared to contain protected health information subject to HIPAA. Despite repeated communications from the Receiver's counsel to Defendants about the nature of those patient documents, Defendants failed to provide the Receiver with any requested information about these documents containing protected information located at the premises.

The Receiver—who steps into the shoes of the corporate Defendants—must ensure that the companies he takes over continue to comply with any obligations under HIPAA. Thus, in carrying out his fiduciary duties, the Receiver's counsel researched and drafted an extensive 44-page

6

#5019945v2-221495.0001

memorandum analyzing the Receiver's duties and obligations under HIPAA. This research and analysis provided a material benefit to the estate because it ensured that the Receiver took the proper steps and protective measures to comply with his obligations under HIPAA, especially where Defendants failed to provide the requested information. This work was reasonable and necessary to ensure that the Receiver properly carried out his fiduciary duties and complied with all relevant laws.

### E. Billing Related to the FTC

Defendants appear to take the position that neither the Receiver nor his counsel may bill or recover fees for time spent conferring with the FTC on various issues related to the litigation. *See* (D.E. 104, at 6–7).

The Receiver recognizes that he is an agent of the Court. *See* Stipulated Preliminary Injunction § XIV (D.E. 64). Although Defendants correctly point out that the Receiver is a neutral party, *see Sterling v. Stewart*, 158 F.3d 1199, 1201 n.2 (11th Cir. 1998), the Receiver also owes a fiduciary duty to consumers who have allegedly been defrauded by the Defendants' actions to the extent that the receivership estate's assets are ultimately found to belong to the consumers. *See Fed. Trade Comm'n v. On Point Glob. LLC*, 2020 WL 5819809, at *2 (S.D. Fla. Sept. 30, 2020) ("While a receiver must be impartial between parties, that impartiality does not extend to [his] relationship with the receivership estate[,] as receivers owe a fiduciary duty to the owners of the property under [his] care and thus must protect and preserve the receivership's assets for the benefit of the persons ultimately entitled to it." (cleaned up) (quoting *SEC v. Schooler*, 2015 WL 1510949, at *3 (S.D. Cal. March 4, 2015))).[2]

---

[2] The Receiver also represents the corporate Defendants' interests to the extent that the receivership property is ultimately found to rightfully belong to Defendants. *See On Point Glob. LLC*, 2020 WL 5819809, at *6 (alterations and omission in original) ("Indeed, the Receiver represents *both* the interests of the Defendants she represents and consumers. The FTC acknowledges this in its own briefing. (*See* ECF No. 272, at 4 ("under receivership law ... the

#5019945v2-221495.0001

Until the veracity of the FTC's allegations in the Complaint is determined one way or another, the Receiver must consider how best to preserve and administer the receivership assets for the benefit of the consumers—which oftentimes requires consulting and strategizing with the FTC. The Receiver and his counsel therefore spent reasonable time meeting with the FTC and discussing several matters pertaining to the litigation or preserving the receivership estate. Contrary to the Defendants' arguments, none of the Receiver's or his counsel's time entries involve supporting the FTC's "prosecution, investigation, or public-enforcement strategy." *See* (D.E. 104, at 7). Instead, they simply involve the Receiver and his counsel meeting with the FTC on various open matters to discuss how the Receiver should best administer the receivership estate—with ultimate decision-making authority vested in the Receiver, not the FTC.

All time entries by the Receiver and his counsel relating to meetings or communications with the FTC are reasonable and necessary for the Receiver's performance of his obligations to the Court and his fiduciary duties to the receivership estate.

**F.  Kaufman Rossin's Billing**

For Kaufman Rossin's billing, Defendants challenge the $1,797.18 sought by the outsourced accounting team for "prior invoices" and the $487.13 for the Technology and Administrative Fee. *See* (D.E. 104, at 8); (D.E. 97-2). This referenced "prior invoice" is actually the first invoice for Kaufman Rossin's tax team performing work on this receivership, which was inadvertently omitted from the Receiver's Motion. A copy of the tax team's "prior invoice" that breaks down the $1,797.18 is attached as **Exhibit A**. In accordance with the Court's clarification order on Kaufman Rossin's fees, *see* (D.E. 83), the tax team provided a 20% discount on its

---

Receiver owes a fiduciary duty to both: (1) the defendants, who retake their property if the agency does not prove it case; and (2) ... consumers[ ] who are entitled to the assets if the agency does prove its case.")."). Notably, Defendants do not challenge any time spent by the Receiver's counsel in meeting with defense counsel.

#5019945v2-221495.0001

invoice. *See* Ex. A. Additionally, the 5% Technology and Administrative Fee in the accounting team's invoice was disclosed in the engagement letter attached to the Receiver's original motion to employ Kaufman Rossin, *see* (D.E. 65-1, at § 3), which the Court reviewed and approved when appointing Kaufman Rossin. *See* (D.E. 68, 83).

Defendants also take issue with certain work performed by Kaufman Rossin, arguing that some Kaufman Rossin entries "do not clearly fall within the Receiver's description of Kaufman Rossin's work" as described by the Receiver. (D.E. 104, at 9). But this does not mean that Kaufman Rossin's fees are not reasonable or necessary for the Receiver to carry out his fiduciary duties. Defendants appear to simply take issue with how Kaufman Rossin phrased its time entries. If the Court needs additional detail in the time entries, they may be provided upon further Court order. In the absence of such an order, however, the Receiver maintains that the work Kaufman Rossin performed consisted of reviewing the Receivership Entities' financial records, flagging entities of interest based on suspicious transactions, tracking the Receivership Entities' receipts and disbursements based on QuickBooks entries, and reconstructing accounts. Attached to this Reply as **Exhibit B** is a revised invoice for Kaufman Rossin's accounting team that separates the "administrative and onboarding" work from "substantive accounting and reconciliation" work.

In sum, all Kaufman Rossn's time in Exhibits A and B for the accounting team and the tax team are reasonable and necessary for the Receiver's performance of his fiduciary duties and should be granted in their entirety.

### G. Support for Receiver's Claimed Expenses

Lastly, Defendants argue that the Receiver is not entitled to his claimed expenses because he does not provide the support for each expense. *See* (D.E. 104, at 9); (D.E. 97-1, at 33). Each claimed expense, with the exception of attorneys' lunch costs in the amount of $52.94, was

9

reasonable and necessary to the Receiver's carrying out his fiduciary duties. An itemized list of the claimed expenses is attached as **Exhibit C**.

For example, attorney Corey Cohen was reimbursed for out-of-pocket expenses he personally paid for moving receivership property at the Defendants' business premises, as well as for parking associated with attending hearings, which are both recoverable costs. Although the Receiver's Motion claims $783.65 in moving costs incurred on April 23, *see* (D.E. 97-1, at 33), a portion of this sum includes reimbursement for multiple attorneys' lunch costs ($52.94) on the day of the raid, which is not recoverable in this case. *See* Ex. C, at 2. Thus, the revised amount sought on this day is $730.71, which brings the total amount of claimed expenses to **$1,240.19**. The other claimed expenses relate to photocopying court documents and FedEx costs for mailing the Temporary Restraining Order to multiple entities who were required to be given notice of said Order. *See* Ex. C. Thus, the Receiver's expenses in the amount of $1,240.19 is reasonable and should be awarded. For the reasons discussed above, the Court should grant the Receiver's First Interim Application for Payment of Professional Fees and Expenses through May 31, 2026 (D.E. 97).

**DATED: July 15, 2026.**

Respectfully submitted,

By: */s/ Charles M. Tatelbaum*
Charles M. Tatelbaum, Esquire
Florida Bar No. 177540
**TRIPP SCOTT, P.A.**
110 S.E. 6th Street, 15th Floor
Ft. Lauderdale, FL 33301
Phone: (954) 525-7500
E-mail: cmt@trippscott.com

10

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 15th day of July, 2026, I electronically filed the foregoing

document with the Clerk of Court via CM/ECF.

By: */s/ Charles M. Tatelbaum*
Charles M. Tatelbaum, Esquire

11

#5019945v2-221495.0001